# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION** and **PACIFIC MARITIME ASSOCIATION**, | Case No.: 3:12-cv-01058-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **ICTSI OREGON, INC**, | |
| Defendant, | |
| and | |
| **PORT OF PORTLAND** and **IBEW LOCAL 48**, | |
| Intervenor-Defendants. | |

| |
|---|
| **ICTSI OREGON, INC**, |
| Counterclaim-Plaintiff, |
| v. |
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; PACIFIC MARITIME ASSOCIATION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 8**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 40**, |
| Counterclaim-Defendants. |

**PORT OF PORTLAND**,

       Counterclaim-Plaintiff and
       Crossclaim-Plaintiff,

    v.

**PACIFIC MARITIME ASSOCIATION**;
**INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION**; and
**INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION LOCAL 8**,

       Counterclaim-Defendants,

   and

**ICTSI OREGON, INC**,

       Crossclaim-Defendant.

Jeffrey P. Chicoine, Miller Nash LLP, 3400 U.S. Bancorp Tower, 111 S.W. Fifth Avenue, Portland, Oregon 97204; Clifford D. Sethness, Morgan, Lewis & Bockius LLP, 300 South Grand Avenue, 2nd Floor, Los Angeles, California 90071. Attorneys for Pacific Maritime Association.

Robert Remar, Eleanor Morton, and Emily Maglio, Leonard Carder, LLP, 1188 Franklin Street, #201, San Francisco, California 94109; Robert Lavitt, Schwerin, Campbell, Barnard, Iglitzin and Lavitt, LLP, 18 West Mercer Street, Suite 400, Seattle, Washington 98119. Attorneys for International Longshore and Warehouse Union and International Longshore and Warehouse Union Local 8.

Michael T. Garone, Thomas M. Triplett, Román D. Hernández, and Amanda T. Gamblin, Schwabe, Williamson & Wyatt, PC, 1900 Pacwest Center, 1211 S.W. 5th Avenue, Portland, Oregon 97204. Attorneys for ICTSI Oregon, Inc.

Randolph C. Foster, Jeremy D. Sacks, and Nathan C. Brunette, Stoel Rives LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, Oregon 97204; Kathy A. Peck, Williams Zografos & Peck PC, 334 3rd Street, Lake Oswego, Oregon 97034. Attorneys for the Port of Portland.

**SIMON, District Judge.**

## INTRODUCTION

This matter is one of six separate but related actions arising from a labor dispute at Terminal 6 at the Port of Portland.[1] Briefly stated, the dispute concerns who is entitled to perform the work of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer work") at Terminal 6. Plaintiffs International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") contend that their collective bargaining agreement—the Pacific Coast Longshore Contract Document ("PCLCD")—requires Defendant ICTSI Oregon, Inc. ("ICTSI"), the operator of Terminal 6 and a PMA member, to assign the reefer work to ILWU members.[2] ICTSI, and Intervenor-Defendants the Port of Portland (the "Port") and the International Brotherhood of Electrical Workers ("IBEW") Local 48, contend that other contracts—including the Terminal 6 Lease Agreement between the Port and ICTSI and the District Council of Trade Unions ("DCTU") Agreement between the Port and IBEW—require that the reefer work be assigned to IBEW members.

In this action, ILWU and PMA have filed a single claim for relief under § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, requesting the Court confirm certain arbitration awards. On December 21, 2012, the Court stayed this claim pending final

---

[1]  The other five cases are *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-01100-SI (D. Or.); *Int'l Longshore & Warehouse Union v. Port of Portland*, Case No. 3:12-cv-01494-SI (D. Or.); *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1088-SI (D. Or.); *Hooks v. Int'l Longshore &Warehouse Union*, Case No. 3:12-cv-01691-SI (D. Or.); and *Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO (D. Or.).

[2]  The PCLCD covers work performed by ILWU Local 8 longshore workers. PMA and ILWU are also parties to a collective bargaining agreement called the Pacific Coast Clerks Contract Document ("PCCCD"), which covers work performed by ILWU Local 40 clerks. Together, the two collective bargaining agreements are known as the "Pacific Coast Longshore and Clerks Agreement." Compl. at ¶ 7.

adjudication of related proceedings before the National Labor Relations Board ("NLRB"). Dkt. 110. ICTSI and the Port have filed several counterclaims. Dkts. 32, 60. Presently before the Court are ILWU and PMA's motions to dismiss several of those counterclaims. Dkts. 65, 68, 75, 93. In addition, the Court required the parties to provide supplemental briefing addressing whether the Court should stay any or all of the counterclaims by ICTSI or the Port pending the related NLRB proceedings. Dkt. 110. ILWU and PMA filed briefing asking the Court to stay the counterclaims. Dkts. 116, 117. ICTSI and the Port filed briefing urging the Court not to stay the counterclaims. Dkts. 113, 118.

As more fully described below, the Court grants in part and denies in part ILWU and PMA's joint motion to dismiss ICTSI's counterclaims and grants in part and denies in part PMA and ILWU's motions to dismiss the Port's counterclaims. Finally, the Court stays final resolution of the Port's first, second, and third counterclaims and ICTSI's first, second, and third counterclaims pending resolution of the related NLRB actions. The parties may, however, conduct discovery.

## BACKGROUND

IBEW-represented employees have performed the reefer work on Terminal 6 since 1974. Beginning in March 2012, ILWU began filing grievances under the PCLCD's grievance and arbitration procedures alleging that ICTSI is "refusing and failing to assign to ILWU longshore mechanics the" reefer work in violation of the PCLCD. Compl. ¶ 29 (Dkt. 1). In May and June 2012, ILWU and PMA arbitrated ILWU's grievances. An arbitrator issued two decisions (the "PCLCD awards") directing ICTSI to assign the reefer work to ILWU members. In response to ILWU's attempts to obtain the reefer work for ILWU-represented employees, ICTSI and the Port filed several charges with the NLRB.

A.     **The NLRB Proceedings**

1.     **NLRB Case No. 19-CD-080738**

When IBEW learned of ILWU's grievances, IBEW threatened to picket if ICTSI re-

assigned the reefer work from IBEW-represented employees to ILWU-represented employees.

On May 10, 2012, ICTSI filed an unfair labor practice charge with the NLRB against IBEW

alleging that IBEW violated § 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D), by engaging

in proscribed activity with an object of forcing ICTSI to assign the reefer work to IBEW-

represented employees rather than to ILWU-represented employees. *Int'l Bhd. of Elec. Workers*,

358 NLRB No. 102, 2012 WL 3306478, at *1 (Aug. 13, 2012). ICTSI's § 8(b)(4)(D) charge

triggered § 10(k) of the NLRA, 29 U.S.C. § 160(k), which empowers the NLRB to resolve

jurisdictional disputes between unions. In *Foley-Wismer & Becker v. National Labor Relations*

*Board*, the Ninth Circuit described the § 10(k) process:

> Unfair labor practice charges brought under § 8(b)(4)(D) of the Act are handled in
> a way quite different from all other charges that may be brought under the Act. . . . When
> a charge is brought under § 8(b)(4)(D), the Regional Director conducts an investigation
> and, if appropriate, issues a notice of [a § 10(k)] hearing. 29 C.F.R. § 101.33 (1981). The
> hearing is to be within 10 days of the initial filing of charges. If the parties fail to reach a
> voluntary resolution of the dispute, a non-adversary hearing is held. The purpose of this
> hearing is simply to assemble a full record of the relevant facts. The hearing officer
> makes no recommendation as to resolution of the dispute. *Id.* § 101.35. The record thus
> assembled is transmitted to the Board, which either "determines the dispute" by issuing a
> § 10(k) award—an assignment of the disputed work to one of the contending unions—or
> ends the proceedings by determining that no jurisdictional dispute exists within the
> meaning of § 8(b)(4)(D).

682 F.2d 770, 772 (9th Cir. 1982) (*en banc*) (internal citations omitted).

The NLRB issued a § 10(k) hearing notice in response to ICTSI's charge. ILWU

intervened in the action. On May 24, 25, 29, and 30, 2012, the NLRB held a § 10(k) hearing in

which ICTSI, IBEW, and ILWU presented evidence. *Int'l Bhd. of Elec. Workers*, 2012 WL

3306478, at *1. Those parties, as well as the Port as *amicus*, also presented post-hearing briefing to the NLRB. *Id.* On August 13, 2012, the NLRB issued a § 10(k) decision awarding the reefer work to IBEW-represented employees. *Id.* at *7.

The NLRB relied on three factors to reach its conclusion: the terms of the collective-bargaining agreements, the employer's preference, and past practice. *Id.* at *7. With respect to the collective bargaining agreements, the NLRB determined that the Port, which is not a party to the PCLCD, controlled the assignment of the reefer work. Thus, the NLRB found that it was irrelevant that the PCLCD purportedly requires ICTSI to assign reefer work to ILWU-represented employees because under the DCTU Agreement and the Terminal 6 Lease Agreement, the Port, not ICTSI, controls that assignment. The NLRB explained:

> Both IBEW and ILWU are party to collective-bargaining agreements that cover the disputed work. The DCTU Agreement, to which IBEW and the Port are bound, states in pertinent part that it covers "all construction, demolition, installation and maintenance assignments which have been historically and consistently performed by employees covered under this Agreement at all marine cargo handling facilities owned and operated by the Port, including any marine cargo handling facilities leased and operated by the Port." The "scope of [the DCTU Agreement] shall include any marine cargo handling facilities leased by the Port to an independent contractor to the extent the Port retains the responsibility for the maintenance or repair of any such leased facility or facilities." As the Port retained maintenance and repair responsibilities for terminal 6 under its lease with ICTSI and as the disputed work has historically been performed by DCTU employees, the DCTU Agreement covers the disputed work.

> [. . .]

> As set forth above, ICTSI is bound to the PCLCD. Sections 1.7 and 1.71 of the PCLCD describe the scope of work and ILWU's jurisdiction as the "maintenance and repair of containers of any kind" and "maintenance and repair of all stevedore cargo handling equipment" used by PMA-member companies. However, in jurisdictional disputes, the relevant collective-bargaining agreement is the one negotiated with the employer who has ultimate control over the assignment of the disputed work. *Elevator Constructors Local 91 (Ot is Elevator Co.)*, 340 NLRB 94, 96 (2003). Here, the record evidence shows that the work in dispute is performed by IBEW-represented Port

Page 6 – OPINION AND ORDER

employees pursuant to the terms of the DCTU. The Port's lease makes clear that ICSTI cannot perform "at the Terminal any DCTU Work . . . or . . . undertake any action that would cause the Port to be in violation of the terms of the DCTU Agreement." Because ICTSI has no authority to control the disputed work, the PCLCD is not relevant: it applies only to maintenance and repair work directed or controlled by a PMA-member employer. We therefore find that the factor of collective-bargaining agreements favors awarding the disputed work to employees represented by IBEW.

*Id.* at *5.

Section 10(k) decisions are not final orders and are not directly reviewable by any court. *N. L. R. B. v. Int'l Longshoremen's & Warehousemen's Union, Local No. 50*, 504 F.2d 1209, 1213 n.1 (9th Cir. 1974). To obtain review of a § 10(k) decision, "a party must fail to comply, thereby precipitating an 'unfair labor practice' proceeding in which the § 10(k) award becomes important evidence. When that proceeding culminates, as it must, in a final order, the disappointed party can bring the order into court and challenge the underlying § 10(k) determination." *J.F. White Contracting Co. v. Local 103 Int'l Bhd. of Elec. Workers*, 890 F.2d 528, 531 (1st Cir.1989).

The § 10(k) decision now forms the basis of the Regional Director's complaint in NLRB Case Nos. 19-CC-87504 and 19-CD-87505, discussed next. A final order in that case will permit the "disappointed party" to challenge the § 10(k) decision in an appeal to a federal circuit court of appeals.

## 2.    NLRB Case Nos. 19-CC-87504 and 19-CD-87505

In late August 2012, ICTSI filed two new charges with the NLRB alleging that ILWU was failing to comply with the § 10(k) decision. The Regional Director consolidated the charges and issued an administrative complaint alleging that ILWU and its Locals, Local 8 and Local 40, violated §§ 8(b)(4)(ii)(B) and 8(b)(4)(D) of the NLRA, 29 U.S.C. §§ 160(b)(4)(ii)(B) and 160(b)(4)(D), by continuing to maintain this lawsuit and by filing lost work opportunity

grievances under the PCLCD against both ICTSI and certain shipping companies that call on Terminal 6 (the "Carriers").[3] (Hereinafter, this NLRB administrative action shall be referred to as the "87504 Proceeding.")

The Regional Director also petitioned this Court for a preliminary injunction pursuant to § 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), to enjoin ILWU and its Locals from continuing to engage in the conduct alleged in the 87504 Proceeding. On November 21, 2012, this Court issued a preliminary injunction. *Hooks ex rel. N. L. R. B. v. Int'l Longshore & Warehouse Union, Local 8*, No. 3:12-CV-01691-SI, 2012 WL 5877536 (D. Or. Nov. 21, 2012). In issuing this injunction, the Court found that the Regional Director was likely to prevail on his claims that ILWU and its Locals had violated both §§ 8(b)(4)(ii)(B) and 8(b)(4)(D).

ILWU conceded one allegation in the Regional Director's administrative complaint. ILWU agreed that it violated § 8(b)(4)(D) by continuing to maintain its claim in this action despite the § 10(k) decision awarding the reefer work to IBEW-represented employees. ILWU explained that it maintained the lawsuit in order to obtain a final order so that it could appeal the § 10(k) determination: "Since issuance of the NLRB's § 10(k) ruling, Respondent ILWU has not withdrawn its pending lawsuit against ICTSI in [the present case] . . . . This is because the statutory scheme of § 10(k) and 8(b)(4)(D) require such refusal in order to perfect an appeal challenging the merits of the NLRB's § 10(k) award, which appeal ILWU is seeking." *Hooks*, 2012 WL 5877536, at *5 n.5 (quoting ILWU's briefing).

_____

[3] The NLRB has separate adjudicatory and prosecutorial sections. The adjudicatory section is led by five board members, each appointed by the president to five-year terms. The NLRB's General Counsel, who is appointed by the president to a four-year term, leads the prosecutorial section. The result is "a single enforcement agency with authority divided between two independent units." J. Higgins, THE DEVELOPING LABOR LAW 2656–57 (5th ed. 2006); 29 U.S.C. § 153. Regional Director Hooks' administrative complaint is brought under the authority of the General Counsel. 29 U.S.C. § 153(d).

The Regional Director's administrative complaint is currently pending before the NLRB. An administrative law judge ("ALJ") will hold a hearing and issue a decision. 29 C.F.R. §§ 101.10 and 101.11. The Regional Director, ICTSI, and ILWU will have an opportunity to appeal the ALJ's decision to the members of the NLRB. *Id.* at § 101.12. If any party disagrees with the NLRB's decision, that party may appeal the NLRB's decision to the United States Court of Appeals for the Ninth Circuit or, at the party's election, to the United States Court of Appeals for the District of Columbia Circuit. *Id.* at § 101.14; 29 U.S.C. § 160(f).

### 3.    NLRB Case Nos. 19-CC-82533 and 19-CC-82744

In June 2012, shortly before Plaintiffs filed this action, ICTSI and the Port filed charges with the NLRB alleging that ILWU has engaged in unfair labor practices. In particular, ICTSI and the Port alleged that ILWU and its Locals, Local 8 and Local 40, threatened ICTSI management, and engaged in work slowdowns and stoppages at Terminal 6. On June 15, 2012, Regional Director Hooks consolidated the charges and issued an administrative complaint alleging that ILWU and its Locals violated §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. §§ 158(b)(4)(i)(B) and (b)(4)(ii)(B), by threatening ICTSI management and engaging in work slowdowns and stoppages at Terminal 6. (Hereinafter, this administrative action shall be referred to as the "82533 Proceeding.") The conduct complained of in the Regional Director's complaint allegedly took place between May 24, 2012, and June 10, 2012. Declaration of Michael T. Garone at ¶ 5 (Dkt. 114).

Pursuant to §10(*l*) of the NLRA, Regional Director Hooks petitioned this Court for a preliminary injunction to enjoin ILWU and its Locals from engaging in the conduct alleged in the 82533 Proceeding. On July 19, 2012, this Court entered a preliminary injunction proscribing ILWU and its Locals from engaging in work slowdowns or stoppages at Terminal 6 and from

otherwise violating §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B). The Regional Director's administrative complaint is currently pending before the NLRB. ILWU, ICTSI and the Port participated in a hearing before an ALJ in August 2012, and filed post-hearing briefing in October 2012. The ALJ has not yet issued a decision.

Among other issues, the NLRB is expected to decide which party controls assignment of the reefer work. As noted above, the Port contends that under the DCTU Agreement and the Terminal 6 Lease Agreement, it controls assignment of the reefer work. During the August hearing, ILWU argued to the ALJ that the Carriers control the reefer work. Dkt. 114, Ex. A. The NLRB will likely need to resolve this issue in order to determine whether ILWU's alleged work slowdowns and stoppages at Terminal 6 were lawful primary activity, protected by the NLRA, or unlawful secondary activity prohibited by §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B).

As with the Regional Director's Complaint in the 87504 Proceeding, described above, after the ALJ issues a decision, the parties may appeal that decision to the NLRB. They may also appeal the NLRB's decision to the Ninth Circuit or to the D.C. Circuit.

**B.    ICTSI and the Port's Counterclaims**

ICTSI, the Port, and IBEW filed answers to Plaintiffs' complaint. Dkts. 32, 60, 62. ICTSI and the Port's answers each raise several counterclaims.[4] ICTSI's answer originally raised only three counterclaims:[5] First, ICTSI seeks a court order, under § 301 of the LMRA, vacating the arbitration awards. Second, ICTSI brings a claim against ILWU pursuant to § 303 of the LMRA,

_____

[4]  IBEW also raised a counterclaim in its initial answer. Dkt. 62. On its own motion, however, IBEW requested that the Court dismiss that counterclaim. Dkt. 83. The Court granted IBEW's motion, Dkt. 95, and IBEW filed an amended answer that did not raise a counterclaim. Dkt. 96.

[5]  ICTSI filed an amended answer on December 17, 2012, after Plaintiffs filed their motions to dismiss and after the Court held oral argument on those motions. Dkt. 109. The amended answer repleads the antitrust counterclaim and adds a fourth counterclaim for breach of fiduciary duty against PMA.

29 U.S.C. § 187, for damages resulting from ILWU's allegedly unfair labor practices. Third, ICTSI claims that Plaintiffs have violated the Sherman Act, 15 U.S.C. §§ 1 and 2.

The Port raises four counterclaims: First, the Port requests a court order, under § 301, vacating the arbitration awards. Second, the Port requests a declaration and an injunction establishing that the Port controls the assignment of the reefer work and prohibiting ICTSI from assigning the reefer work to ILWU members. Third, the Port brings a claim against ILWU and Counterclaim-Defendant ILWU Local 8 pursuant to § 303 of the LMRA for damages resulting from ILWU and ILWU Local 8's allegedly unfair labor practices. Fourth, the Port claims that PMA, ILWU, and ILWU Local 8 tortiously interfered with the Port's contracts with ICTSI and IBEW.

## STANDARDS

### A.    Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir 2011). All reasonable inferences from

the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

**B.    Stay**

The power to stay proceedings is inherent to the court. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979). When determining whether a stay is warranted, the court must balance the hardships to the parties. *See Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (balancing interests between parties).

## DISCUSSION

Presently before the Court are several motions. First, ILWU moves to dismiss all of ICTSI's counterclaims. Dkt. 65. PMA joins in ILWU's motion with respect to ICTSI's third counterclaim. Dkt. 68. Second, ILWU moves to dismiss the Port's first, second, and fourth counterclaims. Dkt. 75. Finally, PMA moves to dismiss the Port's first, second, and fourth counterclaims. Dkt. 93. In addition, on December 21, 2012, the Court requested that the parties submit additional briefing addressing whether the Court should stay any or all of the counterclaims. Dkt. 110. ILWU and PMA submitted briefing urging the Court to stay all the counterclaims. Dkts. 116, 117. The Port and ICTSI submitted briefing urging the Court not to stay the counterclaims. Dkts. 113, 118. The Port also submitted a memorandum of additional authority alerting the Court to the United States Circuit Court of Appeals for the District of Columbia's decision in *Noel Canning v. National Labor Relations Board*, 705 F.3d 490 (D.C. Cir. 2013). Dkt. 120. ILWU also submitted a brief addressing *Canning*. Dkt. 121.

For the reasons discussed below, the Court grants in part and denies in part ILWU and PMA's joint motion to dismiss ICTSI's counterclaims. Dkts. 65 and 68. The Court grants in part and denies in part ILWU and PMA's motions to dismiss the Port's counterclaims. Dkts. 75 and 93. Finally, the Court stays final resolution of ICTSI and the Port's § 301 and § 303 counterclaims, ICTSI's amended antitrust counterclaim, and the Port's declaratory and injunctive relief counterclaim pending finals orders in the related NLRB actions. The parties may conduct discovery.

**A.    Motions to Dismiss**

    **1.    ICTSI and the Port's Counterclaims to Vacate the Arbitration Awards**

ILWU moves to dismiss ICTSI's first counterclaim to vacate the PCLCD awards. ILWU and PMA also move to dismiss the Port's first counterclaim to vacate the PCLCD awards. As discussed below, the Court stays these § 301 counterclaims. Accordingly, the Court denies ILWU and PMA's motions to dismiss these counterclaims, with leave to refile when the stay is lifted.

    **2.    ICTSI's § 303 Counterclaim**

ILWU moves to dismiss ICTSI's § 303 counterclaim. ILWU advances two arguments for dismissing the § 303 counterclaim. First, ILWU argues that ICTSI's § 303 counterclaim is subject to mandatory arbitration under the PCLCD. Second, ILWU argues that it is not liable to ICTSI under § 303. As discussed below, the Court stays the resolution of ICTSI's § 303 counterclaim during the pendency of the related NLRB actions, but permits the parties to conduct discovery during the stay. ILWU's second argument turns in part on issues that will be addressed by the NLRB in the related actions. Thus, the Court denies ILWU's motion to the extent it is based on the second argument. ILWU may refile its motion on this argument when the stay is lifted. ILWU's first argument, however, may be resolved without benefit of the NLRB's final orders in the related actions. Accordingly, the Court considers ILWU's first argument.

Section 303 "authorizes a private damages action for an employer who has been injured by a union's unfair labor practice." *Summit Valley Indus. Inc. v. Local 112, United Broth. of Carpenters & Joiners of Am.*, 456 U.S. 717, 722 (1982). Under § 303, "an employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available." *San*

*Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997). ILWU argues that ICTSI's § 303 counterclaim is subject to arbitration because, whether ICTSI can obtain money damages in an action against ILWU "depends on the language of the PCLCD, including its arbitral history[.]" ILWU's Mem. in Support of Mot. to Dismiss at 12 (Dkt. 66). ILWU further argues that the PCLCD does not necessarily require arbitration of all statutory claims, but it does require the parties to arbitrate whether "ICTSI waived the right to recover damages." Transcript at 96:16 (Dkt. 108).

Where a collective bargaining agreement ("CBA") "contains an arbitration clause, there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-583 (1960)). The presumption in favor of arbitration, however, "does not extend beyond the reach of the principal rationale that justifies it, which is that arbitrators are in a better position than courts to interpret the terms of a CBA." *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 78 (1998). Accordingly, there is no presumption in favor of arbitration for statutory claims. *Id.* at 79. The Court, therefore, will not order the parties to arbitrate a statutory claim unless the CBA is "particularly clear" that statutory claims are subject to arbitration. *Id.* at 79.

The PCLCD contains an arbitration clause, which provides, in relevant part:

> The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

Dkt. 14-1 ("PCLCD") at § 17.15. This provision does not provide that the parties must arbitrate statutory claims. Nor does it state that the parties must arbitrate whether damages are available in statutory claims. Section 17.15's terms only require that the parties arbitrate "dispute[s] involving this Agreement [.]" ILWU has not identified any provision of the PCLCD that requires the parties to arbitrate statutory claims or damages flowing from statutory claims. In fact, § 17.52 expressly limits the power of arbitrators "*strictly* to the application and interpretation of the Agreement as written." PCLCD at § 17.52 (emphasis added).

At least one court has found that a collective bargaining agreement's arbitration clause required the parties to arbitrate a § 303 claim. *Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines, Local Union No. 550*, 167 F.3d 764 (2d Cir. 1999). The arbitration clause at issue in that case, however, required the parties to arbitrate "*any act or conduct* or relation between the parties hereto, directly or indirectly." *Id.* at 765 (emphasis added). The Second Circuit described that arbitration clause as "unusually broad." *Id*. The arbitration clause in the PCLCD is not similarly broad. It does not apply to "any act or conduct." Instead, it is expressly limited to disputes "involving this Agreement," and arbitrators are limited to applying and interpreting the agreement's terms. Thus, the Court finds that the PCLCD does not require ICTSI and ILWU to arbitrate ICTSI's § 303 counterclaim or the availability of damages arising from that counterclaim.

Notwithstanding the PCLCD's express terms, ILWU maintains that an arbitration decision rendered some years ago provides that "PMA-member companies are precluded from recovering damages[.]" Transcript at 72:3-4. ILWU also maintains that, under § 24.3 of the PCLCD, arbitration "decisions from the Coast arbitrators are a part of the contract document." *Id.* at 71:25-72:1; *see also id.* at 82:4-19. Thus, ILWU argues that even if the PCLCD does not

expressly require arbitration of § 303 claims or the availability of damages arising from statutory claims, an arbitration decision incorporated into the PCLCD requires arbitration.

The Court does not agree with this interpretation. Section 24.3 provides that "arbitration decisions and rulings of the Labor Relations Committees with respect to provisions of the Contract that are not changed or modified in this Agreement, remain in effect[.]" Section 24.3 merely provides that an arbitration decision resolving a particular dispute between two parties remains effective even as new versions of the PCLCD supersede older versions. It does not provide that arbitration decisions are incorporated into the terms of the PCLCD.

Moreover, even if ILWU were correct, the Court would still have no basis on which to compel arbitration. ILWU has not submitted a copy of the arbitration decision that purportedly requires arbitration of damages flowing from statutory claims. Without a copy of that decision, the Court cannot compare the facts, issues, and interpretations in that decision to the circumstances in this case.

ILWU also contends that a brief, unpublished Ninth Circuit memorandum opinion, issued more than a decade ago, suggests that "the PCLCD precludes ICTSI from recovering damages in this case." ILWU's Reply in Support of Mot. to Dismiss ICTSI's Counterclaims at 4-5 (Dkt. 91). In *Pacific Maritime Association v. International Longshoremen's and Warehousemen's Union*, the Ninth Circuit found that "PMA continues to be bound by the permanent Coast Arbitrator's 1990 ruling, which interpreted the CBA as not allowing recovery of monetary damages for breaches of the contract's no-strike clause." 232 F.3d 895 (9th Cir. 2000) (unpublished). That case is clearly distinguishable from the present dispute. In the earlier case, PMA brought its claim under § 301 of the LMRA, which provides a cause of action for "violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). The PCLCD unambiguously

requires PMA and ILWU to arbitrate disputes under the PCLCD. PCLCD at § 17.15. ICTSI's counterclaim in the present case, however, is brought under § 303 of the LMRA, and it is not based on any alleged breach of the PCLCD.

ILWU also argues that an unpublished district court decision suggests that arbitration is required. In *Pacific Maritime Association v. International Longshoremen's and Warehousemen's Union, Local 63*, the court required the parties to arbitrate whether the PCLCD waived PMA's "right to bring a Section 303 lawsuit against the Locals." No. CV-97-6757 (C.D. Cal. Feb. 6, 1998); Dkt. 87 at 5. That case was decided before the Supreme Court's decision in *Wright*, which requires collective bargaining agreements to be "particularly clear" that statutory claims are subject to arbitration. As discussed above, the PCLCD does not clearly require the parties to arbitrate statutory claims. The Court, therefore, finds that *Local 63* does not survive *Wright*. The PCLCD does not require ICTSI and ILWU to arbitrate whether damages are available for ICTSI's § 303 counterclaim. ILWU's motion to dismiss ICTSI's § 303 counterclaim on those grounds is, therefore, denied.

### 3.  ICTSI's antitrust counterclaim

In its third counterclaim, ICTSI alleged that PMA and ILWU violated the Sherman Act, 15 U.S.C. § 1, *et seq.* At oral argument, the parties stipulated that the Court would dismiss this counterclaim with leave to replead. Transcript at 93:3-16. On December 17, 2012, ICTSI filed an amended complaint, which repleaded its antitrust counterclaim. ICTSI's Amended Answer at ¶¶ 58-73 (Dkt. 109). As such, ILWU and PMA's motions to dismiss the original antitrust counterclaim are denied as moot. As set forth below, however, the Court stays the resolution of ICTSI's amended antitrust counterclaim.

**4.      The Port's Declaratory and Injunctive Relief Counterclaim**

ILWU and PMA move to dismiss the Port's second counterclaim, which requests

declaratory and injunctive relief. As discussed below, the Court stays the resolution of this

counterclaim. Accordingly, ILWU and PMA's motions are denied with leave to refile when the

stay is lifted.

**5.      The Port's Counterclaim for Tortious Interference with Contract**

In its fourth counterclaim, the Port asserts that PMA, ILWU, and Local 8 "intentionally

interfered with the Port's contractual relationship with ICTSI and IBEW Local 48 through

improper means and for an improper purpose." Port's Answer at ¶ 69. The Port asserts this

counterclaim in the alternative to its third counterclaim. *Id.* at ¶ 70. To state a claim for tortious

interference with contract under Oregon law:

> there must be pleaded a wrongful interference with a contractual . . . relationship. An
> interference is "wrongful" if it is carried out in pursuit of an improper motive or by
> improper means. . . . "Improper means" must be independently wrongful by reason of
> statutory or common law, beyond the mere fact of the injury complained of.

*Thompson v. Tel. & Data Sys., Inc.*, 130 Or. App. 302, 313, *opinion adhered to as modified on*

*reconsideration*, 132 Or. App. 103 (1994).

ILWU and PMA separately argue that the Port's counterclaim must be dismissed because

it is preempted by the LMRA. Dkt. 76 at 8-9; Dkt. 94 at 10-13. When "resolution of a state-law

claim is substantially dependent upon analysis of the terms of an agreement made between the

parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as

pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220

(1985) (internal citation omitted). The "claim is the touchstone for [the preemption] analysis; the

need to interpret the CBA must inhere in the nature of the . . . claim. If the claim is plainly based

on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001).

The Court declines to reach the preemption argument, however, because the Port has failed to allege sufficient facts to state a claim for tortious interference with contract. The Port's counterclaim merely states that PMA, ILWU, and Local 8 had an "improper motive" and used "improper means." *See* PMA's Mem. at 11 (Dkt. 94). Those conclusory allegations do not state a plausible claim for relief. *Shroyer*, 622 F.3d at 1044 ("the court cannot determine from Shroyer's barebone allegations that he has stated a plausible claim"). Those allegations also are insufficient to determine whether the Port's counterclaim turns on interpretation of a collective bargaining agreement. If it does, the counterclaim will be precluded by § 301 of the LMRA. If it does not, and if it is not preempted by another provision of federal labor law, *see, e.g., Point Ruston, LLC v. Pac. Nw. Reg'l Council of the United Broth. of Carpenters & Joiners of Am.*, 658 F. Supp. 2d 1266, 1276 (W.D. Wash. 2009), a well-pleaded claim may go forward. Accordingly, the Port's counterclaim alleging tortious interference with contract is dismissed with leave to replead.

In the event that the Port repleads the counterclaim, and, as repleaded, the counterclaim is not preempted, the Court will likely stay its final resolution. At least in its current form, the counterclaim appears to be premised on the contention that the Port—rather than ICTSI or the Carriers—controls the assignment of the reefer work. As set forth below, the Court is staying counterclaims that are dependent on that issue until the NLRB issues final orders in the related NLRB actions.

**B.      Stay**

**1.      ICTSI and the Port's Counterclaims to Vacate the Arbitration Awards**

ICTSI and the Port request that the Court vacate the PCLCD awards requiring ICTSI to re-assign the reefer work to ILWU-represented employees. ICTSI's Answer at ¶¶ 50-52 (Dkt. 32); ICTSI's Amended Answer at ¶¶ 50-52 (Dkt. 109); Port's Answer at ¶¶ 50-52 (Dkt. 60). On December 21, 2012, the Court stayed Plaintiffs' claim to confirm the PCLCD awards pending the resolution of the NLRB and court actions addressing the NLRB's § 10(k) award.[6] At oral argument, the Court asked counsel for both ICTSI and the Port if they objected to the Court also staying the counterclaims to vacate the arbitration awards. Dkt. 108 ("Transcript") at 63:6-7, 98:19-25. Neither counsel objected. *Id.* at 63:8-14, 99:1-3. The Court, therefore, stays ICTSI and the Port's counterclaim to vacate the arbitration awards. If the § 10(k) award is confirmed in a final NLRB order, this Court will lack the authority to confirm the arbitration awards.[7] *Sheet Metal Workers Int'l Ass'n v. Murphy Const. Co.*, 191 F.3d 909, 911 (8th Cir. 1999) ("Given that the district court will be unable to enforce the arbitration award to Local 36 in the face of a contrary NLRB [§ 10(k)] decision, we conclude in this instance that appropriate deference to the jurisdiction and expertise of the NLRB required a stay of judicial proceedings." (internal quotation marks, citation, and alterations omitted)). If the NLRB does not adopt a final order confirming the § 10(k) award, or if the collateral challenge to the NLRB's jurisdiction is successful, the Court will lift the stay on Plaintiffs' claim and on ICTSI and the Port's counterclaims and consider the merits.

---

[6] PMA has brought a collateral challenge to the NLRB's jurisdiction to issue the § 10(k) decision in a related case pending in this District. *Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO (D. Or.).

[7] As discussed above, the § 10(k) award is at issue in the 87504 Proceeding.

### 2.    ICTSI and the Port's Counterclaims for Damages under § 303 of the LMRA

When an employer believes that a labor organization has committed an unfair labor practice, as defined in § 8(b)(4) of the NLRA, it may pursue two courses of actions. First, the employer may file a charge with the NLRB, as provided in § 10 of the NLRA, 29 U.S.C. § 160. After a charge has been filed, the NLRB "is provided with statutory authority under section 10(a), 29 U.S.C. § 160(a), to adjudicate and remedy unfair labor practices." *Ad Art, Inc. v. N. L. R. B.*, 645 F.2d 669, 674 (9th Cir. 1980). To remedy an unfair labor practice, the NLRB may issue "an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . , as will effectuate the policies of" the NLRA. 29 U.S.C. § 160(c); *see Sure-Tan, Inc. v. N. L. R. B.*, 467 U.S. 883, 900 (1984) ("Under § 10(c), the Board's authority to remedy unfair labor practices is expressly limited by the requirement that its orders effectuate the policies of the Act." (internal quotation marks omitted)). Second, the employer may also file an action for damages in a United States district court under § 303 of the LMRA, 29 U.S.C. § 187. As noted above, § 303 "authorizes a private damages action for an employer who has been injured by a union's unfair labor practice." *Summit Valley Indus. Inc.*, 456 U.S. at 722.

Thus, "Congress intended to provide two remedies—one directed to ending unfair labor practices [a § 8(b)(4) proceeding before the NLRB], the other to providing for recovery of damages [a § 303 suit in federal court]." *Butchers' Union, Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 631 F. Supp. 1001, 1006 (E.D. Cal. 1986) (internal citation and quotation marks omitted; brackets in original); *Int'l Longshoremen's & Warehousemens's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 243-44 (1952) ("Section 8(b)(4)(D) gives rise to an administrative finding; [§ 303] to a judgment for damages. The fact

that the two sections have an identity of language and yet specify two different remedies is strong confirmation of our conclusion that the remedies provided were to be independent of each other." (internal footnote omitted)). Neither the NLRB nor the courts are vested with exclusive jurisdiction to determine whether a labor organization has committed an unfair labor practice: The "determination of whether a union's conduct violates section 8(b)(4) may be made either by the [NLRB] . . . or by the court in a suit under section 303." *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1381 (9th Cir. 1975).

Notwithstanding the concurrent jurisdiction between the courts and the NLRB, when confronted with a § 303 claim that is based on the same or similar facts alleged in a parallel proceeding before the NLRB, some courts have recommended staying the § 303 claim pending resolution of the NLRB action. *Consol. Exp., Inc. v. New York Shipping Ass'n, Inc.*, 641 F.2d 90, 94 (3d Cir. 1981) ("*Connex*") (staying § 303 and antitrust claims during pendency of parallel NLRB unfair labor practice proceeding); *Penn. Truck Lines, Inc. v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, No. CIV.A. 88-6968, 1990 WL 59305 (E.D. Pa. May 4, 1990) (staying § 303 claim during pendency of parallel NLRB unfair labor practice proceedings). In *Connex*, the Third Circuit identified three reasons to stay the employer's § 303 and antitrust claims during the pendency of a parallel NLRB unfair labor practice action. First, the Third Circuit found that where both actions "will involve, to a large extent, the same evidence," pursuing each at the same time would result in an "obvious duplication of effort." *Id.* at 94; *see also Wickham Contracting Co., Inc. v. Bd. of Educ. of City of New York*, 715 F.2d 21, 26 (2d Cir. 1983) ("the judicial and other resources consumed in relitigating [a § 303 claim after resolution of an NLRB unfair labor practice action] is pure waste"). Second, the Third Circuit noted that "initial deference" to the NLRB was appropriate because the NLRB has primary

responsibility for resolving issues arising under the NLRA. *Id.*; *see also N. Cal. Dist. Council of Hod Carriers, Bldg. & Const. Laborers, AFL-CIO v. Opinski*, 673 F.2d 1074, 1075 (9th Cir. 1982) ("Appropriate deference to the jurisdiction and expertise of the agency often will require a stay of judicial proceedings."). Last, the Third Circuit recognized that "there is the distinct possibility that if both cases go forward simultaneously they may wind up before this court, or before two separate courts of appeals, with conflicting factual determinations, subject to differing standards of appellate review." *Id.* at 94-95.

In the present case, ICTSI and the Port's § 303 counterclaims mirror the Regional Director's unfair labor practice complaint pending in the 82533 Proceeding. In fact, as discussed above, the Regional Director's administrative complaint in the 82533 Proceeding is based on unfair labor practice charges brought by ICTSI and the Port. Given that substantially similar factual and legal questions will be decided by the NLRB in that proceeding, the three factors identified by the Third Circuit in *Connex* favor staying ICTSI and the Port's § 303 counterclaims in this proceeding. First, because the § 303 counterclaims and the NLRB action both allege that ILWU's conduct at Terminal 6 violated § 8(b)(4)(B) of the NLRA, litigating ILWU's liability in both this forum and the NLRB will result in an "obvious duplication of effort." The NLRB's findings with respect to liability will likely preclude relitigating the ILWU's liability for the same conduct here. *Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 93 v. Stevens Pontiac-GMC-Honda, Inc.*, 945 F.2d 409 (9th Cir. 1991) (unpublished) ("The law is clear that a party is foreclosed from relitigating in federal court those issues that were material to a proceeding before the NLRB and resulted in a final order of the NLRB."). Second, this Court will benefit from availing itself of "the NLRB's expertise in dealing with unfair labor practice disputes." *Penn. Truck Lines*, 1990 WL 59305, at *8. Finally, by allowing the NLRB to decide

the question of ILWU's liability first, the court obviates the possibility of conflicting decisions between this Court and the NLRB, and separate appeals addressing the same question before different courts of appeals.

Nevertheless, both ICTSI and the Port argue that a stay is not warranted because the conduct alleged in their § 303 counterclaims covers a longer period of time than the conduct alleged in the NLRB action. Dkt. 118 at 14; Dkt. 113 at 7, 12. In support of this argument, the Port contends that the NLRB action "is limited to the ILWU's conduct over a span of about 10 days." Dkt. 118 at 14. In contrast, ICTSI and the Port's § 303 counterclaims cover conduct ranging from May 2012 "to the present." Dkt. 113 at 7. As such, ICTSI and the Port argue that "there is no compelling reason to stay the Section 303 claims." Dkt. 118 at 14.

For two reasons, the Court disagrees. First, even if the Regional Director's complaint only alleges violations occurring during a 10-day period, the NLRB's findings and order may cover conduct broader than that alleged in the complaint. *Hartman Bros. Heating & Air Conditioning, Inc. v. N. L. R. B.*, 280 F.3d 1110, 1114 (7th Cir. 2002) (There is no "reason to hold the Board to the letter of the complaint unless there is prejudice to the employer or to whoever else is the respondent in the proceeding."); *N. L. R. B. v. Duncan Foundry & Mach. Works, Inc.*, 435 F.2d 612, 615 (7th Cir. 1970) ("Even where a complaint is devoid of notice of the unfair labor practice found, due process is satisfied by full litigation of the issues."). Thus the NLRB could issue findings covering conduct up until the hearing that occurred in August. Second, even if the NLRB's decision only addresses the 10-day period described in the Regional Director's complaint, the NLRB will nevertheless decide a crucial legal issue that is uniquely within its expertise. ILWU contends that its work slowdowns and stoppages at Terminal 6 were primary activity protected by the NLRA. The Regional Director, on the other hand, contends that

ILWU's work slowdowns and stoppages were illegal secondary activity. ILWU's liability in both the NLRB proceeding and this action depends on the answer to this dispute. The Court will benefit from the NLRB's analysis. Moreover, because neither ICTSI nor the Port contends that ILWU's conduct after the 10-day period was substantially different than ILWU's conduct during the 10-day period, the NLRB's decision will streamline this Court's resolution of the § 303 counterclaims even if they address a longer period of time than the NLRB's decision.

ICTSI and the Port also argue that "many years will likely elapse before a final decision by the NLRB." Dkt. 113 at 8. ICTSI cites evidence showing that the median time between an ALJ decision and an NLRB decision on review is 362 days. *Id.* (citing 51 Wayne L. Rev. 107, 123 (2005)). The Court is cognizant that resolution of the NLRB proceedings could take some time and that courts should generally avoid staying litigation for long periods. *See Landis v. N. Am. Co.*, 299 U.S. 248, 256-57 (1936). Nonetheless, in this case, ICTSI and the Port are protected in two respects from the potentially deleterious effects of this stay. First, ILWU is currently subject to two preliminary injunctions. *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1088-SI (D. Or.); *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, No. 3:12-CV-01691-SI, 2012 WL 5877536 (D. Or. Nov. 21, 2012). These injunctions prohibit ILWU from filing grievances under the PCLCD against ICTSI and the Carriers and enjoin ILWU from engaging in work slowdowns and stoppages at Terminal 6.[8] Second, as described below, the

---

[8]  ICTSI asserts that ILWU has continued to engage in "slowdowns, threats of slowdowns, safety gimmicks, hard-timing and other similar conduct" despite this Court's preliminary injunction. Dkt. 113 at 12. The Port contends that "[p]reliminary injunctive relief has not proven an effective remedy in this case." Dkt. 118 at 6. The Court reminds the parties that it "takes its orders very seriously," *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, No. 3:12-CV-1088-SI, 2012 WL 2994056 (D. Or. July 20, 2012), and it has the power to find any party that violates its § 10(*l*) injunctions in civil or criminal contempt. *See Muniz v. Hoffman*, 422 U.S. 454 (1975).

Court will allow discovery to proceed on ICTSI and the Port's §303 counterclaims. As such, there is little danger that those claims will grow stale during the pendency of the NLRB action.

On balance, the benefits of staying final resolution of the § 303 counterclaims outweigh the harms of declining to issue a stay. The Court and the parties will avoid the waste of duplicating their efforts in more than one forum and avoid the possibility of conflicting decisions in separate courts of appeal. Further, the Court will be able to rely on the NLRB's expertise in interpreting the NLRA when deciding this case.

3.      **The Port's Declaratory and Injunctive Relief Counterclaim**

In its second counterclaim, the Port asks the Court to resolve which party—the Port or ICTSI—controls the assignment of reefer work at Terminal 6. The Port alleges that the reefer work "was expressly reserved to the Port and its employees under the terms of the Terminal 6 Lease, and ICTSI is contractually obliged to use the Port to perform such work." Port's Answer at ¶ 56. Based on this allegation, the Port requests that the Court declare "that ICTSI is obliged to honor the Terminal 6 Lease's requirement that ICTSI use the Port's services in connection with the plugging, unplugging, and monitoring of reefers at Terminal 6 and that ICTSI may not assign that work to ICTSI's ILWU Loca18 employees without the Port's express approval." *Id.* at ¶ 60. The Port also requests that the Court enjoin Plaintiffs from taking "any action" to enforce the arbitration awards. *Id.* at ¶ 61.

To resolve which party controls the reefer work, an adjudicator must interpret the DCTU Agreement, the PCLCD, and the Terminal 6 Lease Agreement. Ordinarily, courts are "the principal sources of contract interpretation[.]" *N. L. R. B. v. Strong*, 393 U.S. 357, 360-61 (1969). The NLRB, however, may, "if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract." *Id.* at 361. Where, as here, a question of

contract interpretation "is closely related to an unfair labor practice charge the employer has already presented to the NLRB, the district court must exercise its discretion to determine whether proceedings should be stayed until final disposition of the NLRB proceeding." *Opinski*, 673 F.2d at 1075; *Cent. Valley Typographical Union No. 46 v. McClatchy Newspapers*, 762 F.2d 741, 746 (9th Cir. 1985) ("*McClatchy*"), *abrogated on other grounds by Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193 (2000) (same).

In *McClatchy*, the Ninth Circuit identified several factors that a court should consider when deciding whether to stay a question of contract interpretation pending a related unfair labor practice proceeding. First, the Court must "consider whether and to what extent the contractual interpretation issue presented to the ALJ was bound up with the determination of" the unfair labor practice issue. 762 F.2d at 748. Second, the Court "must consider whether the ALJ's decision, if adopted [by the NLRB], presents a likelihood of preclusion." *Id.* Third, the Court must weigh the equities. *Id.*

These factors favor staying the question of which party controls assignment of the reefer work. First, the question of which party controls the reefer work is inextricably tied to all of the NLRB proceedings. In NLRB Case No. 19-CD-080738, a hearings officer held a four-day evidentiary hearing and the NLRB issued a § 10(k) decision that addressed in detail the DCTU Agreement, the PCLCD, and the Terminal 6 Lease Agreement. A portion of the NLRB's written decision, quoted in part above, explained each of those agreements and concluded that the Port controls assignment of the reefer work. In the 87504 Proceeding, the NLRB will decide whether ILWU violated §§ 8(b)(4)(ii)(B) and (D) when it maintained this lawsuit and continued to file lost work grievances against the Carriers, despite the NLRB's § 10(k) decision. In doing so, the NLRB will either confirm or abrogate the § 10(k) decision. Finally, in the 82533 Proceeding the

question of which party controls the reefer work is crucial to determining whether ILWU

engaged in lawful primary activity protected by the NLRA or unlawful secondary activity

constituting an unfair labor practice.

Under the second *McClatchy* factor the Court must consider whether the NLRB's final

orders will present a likelihood of preclusion. Issue preclusion "bars relitigation of issues

adjudicated in an earlier proceeding if three requirements are met: (1) the issue necessarily

decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the

first proceeding ended with a final judgment on the merits; and (3) the party against whom

collateral estoppel is asserted was a party or in privity with a party at the first proceeding."[9]

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006) (internal quotation

marks and citation omitted); *see also Int'l Ass'n of Machinists & Aerospace Workers, Dist.

Lodge No. 93 v. Stevens Pontiac-GMC-Honda, Inc.*, 945 F.2d 409 (9th Cir. 1991) (unpublished)

("The law is clear that a party is foreclosed from relitigating in federal court those issues that

were material to a proceeding before the NLRB and resulted in a final order of the NLRB.").

Each of these requirements will likely be satisfied here. First, the issue that will be

decided in the NLRB proceedings is identical to the issue here. As explained above, that issue of

which party—ICTSI, the Carriers, or the Port—controls the reefer work was before the NLRB in

NLRB Case No. 19-CD-080738, and formed part of the basis of the § 10(k) decision. The

§ 10(k) decision, in turn, is an essential component of the Regional Director's complaint in the

87504 Proceeding. Moreover, whether ILWU is liable for unfair labor practices in the 82533

---

[9] "Issue preclusion" is the preferred term for this doctrine, replacing "collateral estoppel." *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008) ("issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'").

Proceeding will depend in part on establishing which party controlled the reefer work. Second, the 87504 and 82533 Proceedings will likely result in final judgments on the merits.

Finally, the party against whom issue preclusion will be asserted will be a party to the NLRB actions or in privity with a party to the NLRB actions. ILWU and ICTSI are both party to all of the NLRB actions. Although PMA is not party to any of the NLRB actions, ILWU and PMA's interests in this litigation are bound together by the PCLCD. This contractual relationship is likely sufficient to establish privity between ILWU and PMA: "Privity has traditionally been understood as referring to the existence of a substantive legal relationship, such as by contract, from which it was deemed appropriate to bind one of the contracting parties to the results of the other party's participation in litigation." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310-11 (3d Cir. 2009) (citing *Taylor v. Sturgell*, 553 U.S. 880, 894 n.8 (2008)). Thus, it is likely that the results of the NLRB actions will preclude relitigation of the issue of which party controls the reefer work in this court.[10]

The last *McClatchy* factor requires this Court to consider the equities. The equities, on balance, weigh in favor of a stay. ICTSI and the Port initially faced a choice of whether to file charges with the NLRB or to file suit in a district court. They chose to invoke the NLRB's jurisdiction by filing charges. The NLRB has already held several hearings and ICTSI, the Port, and ILWU have already produced documents and witnesses and filed briefing in the various actions. In addition, the *Connex* factors also suggest that a stay is wise. The issue of which party

---

[10] In its briefing, the Port cited several cases in which courts declined to find that an NLRB decision precluded consideration of certain questions. Dkt. 118 at 11-12; *Pantex Towing Corp. v. Glidewell*, 763 F.2d 1241 (11th Cir. 1985); *O'Hare v. Gen. Marine Transp. Corp.*, 740 F.2d 160 (2d Cir. 1984); *Glaziers & Glassworkers Local Union No. 767 v. Custom Auto Glass Distributors*, 689 F.2d 1339 (9th Cir. 1982). In each of these cases, however, the court found that the issue before the court differed in some material respect from the issue before the NLRB. The same is not true here. The issue of whether the Port, the Carriers, or ICTSI controls the reefer work is squarely before both the NLRB and this Court.

Page 30 – OPINION AND ORDER

controls the reefer work has already been the subject of § 10(k) hearing and briefing to the

NLRB. Relitigation of that issue in this Court would result in a duplication of effort. It would

also create the potential for conflicting decisions, both between this Court and the NLRB and

between several courts of appeal.[11] On balance, the "judicial process will benefit significantly

from the result of avoiding retrial of issues already decided." *Connex*, 641 F.2d at 95.

### 4.       ICTSI's Antitrust Counterclaim

In its third counterclaim, as repleaded in its Amended Answer, ICTSI alleges that PMA

and ILWU have violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. 1 and 2. ICTSI's Amended

Answer at ¶¶ 58-73. This counterclaim is partially dependent on resolution of several issues

pending before the NLRB. For example, ICTSI alleges that after the NLRB issued its § 10(k)

decision, ILWU "engaged in slowdowns, work stoppages, safety gimmicks and . . . prosecuted

numerous grievances against both ICTSI and ocean carriers calling on Portland in an effort to

force ICTSI to assign the disputed work to the ILWU." ICTSI's Amended Answer at ¶ 69(G).

ICTSI also alleges that "PMA and the ILWU have refused to dismiss their claim in this case to

confirm the Committee determinations and resulting arbitrations, notwithstanding the clear and

unambiguous mandate of the law that the Section 10(k) award supersedes any prior grievance

and arbitration awards." *Id.* at ¶ 69(I). The extent to which ILWU engaged in conduct that

illegally contravened the § 10(k) decision is before the NLRB in the 87504 Proceeding. In

addition, ICTSI alleges that PMA and ILWU have attempted "to compel ICTSI . . . to breach

---

[11]     The Port argues that there is "no likely conflict because the court's preliminary
conclusions regarding the Port's rights to the [reefer work] are consistent with the NLRB's
§ 10(k) determination." Dkt. 118 at 8. The Port's argument begs the question. It is, of course,
possible that the Court would find that the Port controls the reefer work. The Court cannot,
however, assume that it would reach that conclusion in order to justify addressing the question in
the first place. *See Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1225 (3d Cir. 1976)
("The 'proof' assumes the answer rather than proving it.").

ICTSI's contractual obligations to the Port." *Id.* at ¶ 69(J). This allegation is predicated on the assumption that under the Terminal 6 Lease Agreement and the DCTU Agreement the Port controls assignment of the reefer work.

The NLRB will not decide whether Plaintiffs have violated the Sherman Act. The NLRB will, however, resolve these predicate issues. As such, it is appropriate to stay final resolution of ICTSI's antitrust counterclaim while the NLRB actions are pending. *See Connex*, 641 F.2d at 94 ("While the court owes no particular deference to the Board's antitrust views, its own views on the reach of the antitrust laws cannot but be enlightened by the Board's opinion" on the scope of labor law); *Wickham Contracting Co., Inc. v. Bd. of Educ. of City of New York*, 715 F.2d 21, 27 (2d Cir. 1983) ("the relitigation of issues adjudicated by the NLRB is precluded in the antitrust action by the doctrine of collateral estoppel to the extent that the issues are identical and their resolution was essential to the NLRB's decision").

### 5. ICTSI's Fiduciary Duty Counterclaim

ICTSI's fourth counterclaim, raised for the first time in its Amended Answer, alleges that PMA breached its fiduciary duty to ICTSI. No party has moved against this counterclaim. It is, therefore, not stayed.

### 6. Discovery

ILWU argues that the Court should also stay discovery: "Staying discovery of the counterclaims at issue here would protect against unnecessary costs and burden and promote the Court's and parties' goal of efficiency by potentially avoiding the expenditure of associated costs, hassle, time, and burden until and unless necessary." Dkt. 117 at 9. The Court agrees in part and disagrees in part. Some of ICTSI and the Port's counterclaims are broader than the charges before the NLRB. Staying discovery during the pendency of the NLRB actions "would

increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." *Clinton v. Jones*, 520 U.S. 681, 707-08 (1997). Discovery may, therefore, proceed. *See Connex*, 641 F.2d at 95 (staying § 303 and antitrust claims, but permitting district court to determine whether "discovery should go forward"); *Hill v. PeopleSoft USA, Inc.*, 341 F. Supp. 2d 559, 561 (D. Md. 2004) (staying trial and summary judgment motions, but permitting parties to continue discovery and amend pleadings during interlocutory appeal).

## CONCLUSION

ILWU and PMA's joint motion to dismiss ICTSI's counterclaims, Dkts. 65 and 68, is **GRANTED** in part and **DENIED** in part. ICTSI's third counterclaim in its original answer is **DISMISSED**. ILWU may refile its motion against ICTSI's first and second counterclaims when the stay is lifted. Within 30 days of the date of this Order, ILWU and PMA may refile their joint motion against ICTSI's amended antitrust counterclaim, so long as that motion is not premised on issues before the NLRB in the related actions. Otherwise, ILWU and PMA may refile their joint motion against ICTSI's antitrust counterclaim when the stay is lifted. ILWU's motion to dismiss the Port's counterclaims, Dkt. 75, is **GRANTED** in part and **DENIED** in part. PMA's motion to dismiss the Port's counterclaims, Dkt. 93, is **GRANTED** in part and **DENIED** in part. The Port's fourth counterclaim for tortious interference with contract is **DISMISSED** with leave to replead within 14 days of the date of this Order.

The final resolution, whether by motion or by trial, of the Port's first, second, and third counterclaims and ICTSI's first and second counterclaims, and ICTSI's repleaded antitrust counterclaim is **STAYED** pending resolution of NLRB Case Nos. 19-CC-87504 and 19-CD-87505 and Case Nos. 19-CC-82533 and 19-CC-82744. The parties shall submit joint status

reports describing the progress of the NLRB actions every four months during the pendency of this stay, commencing four months from the date of this Order. The parties may conduct discovery during the stay.

IT IS SO ORDERED.

Dated this 15th day of March, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge