## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION** and **PACIFIC MARITIME ASSOCIATION**, | Case No. 3:12-cv-01058-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **ICTSI OREGON, INC.**, | |
| Defendant, | |
| and | |
| **PORT OF PORTLAND** and **IBEW LOCAL 48**, | |
| Intervenor-Defendants. | |

**ICTSI OREGON, INC.**,

        Counterclaim-Plaintiff,

    v.

**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; PACIFIC MARITIME ASSOCIATION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 8**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 40**,

        Counterclaim-Defendants.

PAGE 1 – OPINION AND ORDER

**PORT OF PORTLAND**,

        Counterclaim-Plaintiff and
        Crossclaim-Plaintiff,

    v.

**PACIFIC MARITIME ASSOCIATION**;
**INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION**; and
**INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION LOCAL 8**,

        Counterclaim-Defendants,

    and

**ICTSI OREGON, INC.**,

        Crossclaim-Defendant.

Jeffrey P. Chicoine, Miller Nash LLP, 3400 U.S. Bancorp Tower, 111 S.W. Fifth Avenue, Portland, Oregon 97204; Clifford D. Sethness and Jason M. Steele, Morgan, Lewis & Bockius LLP, 300 South Grand Avenue, 2nd Floor, Los Angeles, California 90071. Of Attorneys for Pacific Maritime Association.

Robert S. Remar, Eleanor I. Morton, Emily Maglio, Amy Endo, and Philip C. Monrad, Leonard Carder, LLP, 1188 Franklin Street, Suite 201, San Francisco, California 94109; Robert H. Lavitt, Schwerin, Campbell, Barnard, Iglitzin & Lavitt LLP, 18 West Mercer Street, Suite 400, Seattle, Washington 98119. Of Attorneys for International Longshore and Warehouse Union and International Longshore and Warehouse Union Locals 8 and 40.

Michael T. Garone, Thomas M. Triplett, Román D. Hernández, and Amanda T. Gamblin, Schwabe, Williamson & Wyatt, PC, 1900 Pacwest Center, 1211 S.W. Fifth Avenue, Portland, Oregon 97204. Of Attorneys for ICTSI Oregon, Inc.

Randolph C. Foster, Jeremy D. Sacks, Nathan C. Brunette, and Kathy Ann Peck, Stoel Rives LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, Oregon 97204; Kathy Ann Peck, Williams, Zografos & Peck PC, 334 3rd Street, Lake Oswego, Oregon 97034. Of Attorneys for the Port of Portland.

Norman D. Malbin, 15937 N.E. Airport Way, Portland, OR 97230. Of Attorneys for IBEW Local 48.

PAGE 2 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

This matter is one of six separate but related lawsuits arising from a labor dispute at Terminal 6 at the Port of Portland.[1] The dispute arose over who is entitled to perform the work of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer work") at Terminal 6. Plaintiffs International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") contend that Defendant ICTSI Oregon, Inc. ("ICTSI"), the operator of Terminal 6 and a member of PMA, must assign the reefer work to ILWU members. ICTSI, and Intervenor-Defendants the Port of Portland (the "Port") and the International Brotherhood of Electrical Workers ("IBEW") Local 48, contend that the reefer work must be assigned to IBEW members.

As part of this lawsuit, Defendant ICTSI asserts several counterclaims, including a counterclaim against both PMA and ILWU under the federal antitrust laws and a counterclaim against PMA for breach of fiduciary duty (ECF 109). PMA has moved to dismiss ICTSI's antitrust counterclaim (ECF 131), and ILWU has joined that motion (ECF 133). PMA has also moved to dismiss ICTSI's counterclaim against PMA for breach of fiduciary duty (ECF 131). In addition, Defendant-Intervenor, the Port, asserts several counterclaims, including a counterclaim against both PMA and ILWU for tortious interference (ECF 136). Both PMA and ILWU have moved to dismiss the Port's tortious interference counterclaim (ECF 138 and 146, respectively). For the reasons that follow, PMA and ILWU's motions are granted in part and denied in part.

---

[1] The other five cases are *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-01100-SI (D. Or.); *Int'l Longshore & Warehouse Union v. Port of Portland*, Case No. 3:12-cv-01494-SI (D. Or.); *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1088-SI (D. Or.); *Hooks v. Int'l Longshore &Warehouse Union*, Case No. 3:12-cv-01691-SI (D. Or.); and *Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO (D. Or.).

**STANDARDS**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Baca*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

PAGE 4 – OPINION AND ORDER

## BACKGROUND

The labor dispute giving rise to this case and its related cases both before this Court and the National Labor Relations Board ("NLRB") is factually intensive and "highly complex and very technical." *Int'l Longshore & Warehouse Union, AFL-CIO*, 2013 WL 4587186 (NLRB Aug. 28, 2013). For purposes of the pending motions, the Court briefly summarizes the facts admitted to or alleged by ICTSI or the Port that are relevant to the specific counterclaims PMA and ILWU have moved to dismiss.

ILWU is a labor union that "represents longshore workers, longshore mechanics, gearmen, and marine clerks, employed by waterfront companies who are members of PMA, at all West Coast ports including Portland, Oregon." Compl. (ECF 1) ¶ 3; ICTSI Am. Answer and Counterclaims (ECF 109) ("ICTSI CC") ¶ 61. PMA is "a multiemployer collective bargaining association whose members include stevedoring companies, terminal operators, and maintenance and repair contractors that employ dockworkers, such as longshoremen" throughout the West Coast. Compl. ¶ 4; ICTSI CC ¶ 61. PMA has approximately 70 members companies, each of whom delegate bargaining authority to PMA. ILWU and PMA are parties to the Pacific Coast Longshore Contract Document ("PCLCD"), a collective bargaining agreement covering commercial ports along the West Coast, which governs the terms and conditions of employment of all longshore workers. The PCLCD is administered by the joint Coast Labor Relations Committee ("CLRC"), which is composed of representatives of ILWU and PMA.

PMA pays more than 50 percent of the cost to operate a joint dispatch facility with ILWU. The dispatch facility determines which longshoreman to dispatch, pays the salary and benefits of those who are dispatched, and is paid by member and non-member employers based on hours worked by longshoremen.

For decades, PMA and ILWU negotiated successive bargaining agreements. In 2008, the PCLCD included for the first time a provision that maintenance and repair work, including the reefer work at issue in this case, be performed by ILWU-represented employees. Before this time, the reefer work had been performed at some ports, including Terminal 6, by employees who were not ILWU members. When the 2008 PCLCD was negotiated, PMA members that had direct contracts with other unions for the reefer work were exempted from the new requirement that such work be assigned to ILWU members.

The Port operated Terminal 6 until February 2011, when ICTSI commenced operating Terminal 6 pursuant to a long-term lease agreement between the Port and ICTSI ("Terminal 6 Lease"). IBEW-represented employees of the Port had performed the reefer work on Terminal 6 for decades. Because the Port was not a PMA member, it was not bound by the PCLCD and did not receive the benefit of the bargained exemption in the 2008 PCLCD for current PMA members exempting them from assigning reefer work to ILWU members. Even after ICTSI took over operations at Terminal 6, the Port continued, under the terms of the Terminal 6 Lease, to manage the reefer work and assign that work to IBEW-represented Port employees. ICTSI joined PMA in June 2011, several months after it had entered into the Terminal 6 Lease.

In 2011 and 2012, ILWU filed numerous grievances against ICTSI and other PMA members complaining about the non-ILWU workers performing the reefer work. IBEW threatened to picket if the reefer work were assigned to ILWU-represented employees. ICTSI then filed a complaint before the NLRB against IBEW, in which ILWU intervened. The night before the NLRB hearing on May 24, 2012, the CLRC held a meeting to which ICTSI and the Port were not invited and agreed that the reefer work at Terminal 6 should be performed by ILWU-represented workers. Shortly thereafter, in June 2012, an arbitrator reached the same

conclusion and ordered ICTSI to have ILWU-represented workers perform the reefer work. In August 2012 the NLRB awarded the reefer work to ILWU-represented workers.[2]

PMA, with the encouragement and direction of ILWU, threatened to fine ICTSI $50,000 per day and to expel ICTSI from the PMA if ICTSI did not have ILWU members perform the reefer work. PMA member companies also threatened to bypass the Port unless the reefer work was performed by ILWU members. Beginning in June 2012, ILWU "engaged in slowdowns, work stoppages, safety gimmicks and the like and have prosecuted numerous grievances against both ICTSI and ocean carriers calling on Portland in an effort to force ICTSI to assign the disputed work to the ILWU; and to ignore the NLRB's jurisdictional ruling." ICTSI CC ¶ 69G. PMA and ILWU also dispatched "inefficient" workers and workers who are not "Registered Longshoremen" to ICTSI. ICTSI CC ¶¶ 69O, P. PMA and ILWU filed this action in federal court to enforce the arbitration award and force ICTSI to assign the reefer work to ILWU members, and PMA filed another federal lawsuit seeking to invalidate the NLRB decision awarding the work to IBEW-represented workers.[3] ICTSI and the Port responded to these actions by filing several complaints before the NLRB, alleging that these actions by ILWU were unfair labor practices in violation of labor law.[4]

ICTSI also alleges that ILWU "caused" the Port of San Diego to replace a non-PMA member with a PMA member, caused EGT, LLC ("EGT") in the Port of Longview to terminate the services of a company that did not use ILWU-represented labor and execute a collective

---

[2] This decision was subsequently vacated. *See Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO, Judgment, Docket 54 (D. Or. June 17, 2013).

[3] PMA ultimately prevailed in that lawsuit and the NLRB award was vacated. *Supra* n.2.

[4] After the briefing and oral argument on the pending motions, the NLRB issued a decision concluding that ILWU had engaged in unfair labor practices. *Int'l Longshore & Warehouse Union, AFL-CIO*, 2013 WL 4587186 (NLRB Aug. 28, 2013).

PAGE 7 – OPINION AND ORDER

bargaining agreement in which EGT agreed to use ILWU-represented workers, and threatened third parties in other ports, insisting that a PMA member be retained to perform longshore services. ICTSI CC ¶¶ 69K-M.

## DISCUSSION

### A.  ICTSI's Antitrust Counterclaim

In a single counterclaim against both PMA and ILWU that ICTSI labels "Antitrust," ICTSI alleges that PMA and ILWU "have violated the provisions of 15 U.S.C. §§ 1 and 2 of the Sherman Act." ICTSI CC ¶ 58. PMA moves to dismiss ICTSI's antitrust counterclaim on the grounds that the alleged actions on which the antitrust counterclaim is based are exempted from the federal antitrust laws pursuant to the nonstatutory labor exemption. ILWU joins this motion and further moves to dismiss ICTSI's antitrust counterclaim to the extent it is based on allegations of ILWU's unilateral, traditional union activity on the grounds that this conduct is subject to the statutory labor exemption from federal antitrust laws. As discussed below, both of these arguments are well taken, and ICTSI's antitrust counterclaim is dismissed.

### 1.  The *Noerr-Pennington* doctrine immunizes PMA and ILWU's federal lawsuits from antitrust scrutiny

Before considering the statutory and nonstatutory labor exemptions from the federal antitrust laws argued by PMA and ILWU, the Court notes that ICTSI bases its antitrust counterclaim, in part, on the fact that PMA and ILWU have not dismissed their claims in this lawsuit and have filed a second lawsuit challenging the NLRB's jurisdiction. The *Noerr-Pennington* doctrine "provides broad antitrust protection for those who 'petition the government for a redress of grievances.'" *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810 (9th Cir. 1994) (quoting *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 378 (1991). This protection extends to petitioning administrative

agencies and courts. *Id.* This protection may be lost when parties institute "sham" proceedings "with or without probable cause, and regardless of the merits of the cases." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511-12 (1972). ICTSI alleges, in conclusory fashion, that the two federal lawsuits brought by PMA and ILWU are a "sham."

ICTSI fails, however, sufficiently to allege facts from which the Court can reasonably infer that the two federal lawsuits are a sham. The act of filing these two lawsuits does not support a contention that ILWU and PMA are inappropriately using the courts to achieve an anticompetitive goal without consideration of the merits of their cases. In considering each case, they are not "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 60 (1993). In fact, PMA prevailed at summary judgment in one of the cases. *See Pac. Mar. Ass'n v. N.L.R.B.*, Case No. 3:12-cv-02179-MO, Judgment, Docket 54 (D. Or. June 17, 2013). This prohibits the application of the "sham exception."

To the extent ICTSI is attempting to allege a sham exception based on a "whole series of legal proceedings," it is doubtful that two cases are sufficient, but even if they were, the sham exception still would not apply. *USS-POSCO*, 31 F.3d at 811. In considering the application of the sham exception to an alleged series of legal proceedings, the question is not whether any one case has merit, but whether the cases are brought pursuant to a policy of commencing proceedings without regard to their merits. *Id.* Because PMA has already prevailed at summary judgment in one of the two lawsuits, it cannot reasonably be alleged that these lawsuits were brought without regard to their merits. *Id.* (finding that a "batting average" of approximately .500 "cannot be reconciled with the charge that the unions were filing lawsuits and other actions

willy-nilly without regard to success"). Thus, the allegations that ILWU and PMA have engaged in federal litigation cannot support ICTSI's antitrust counterclaim.

### 2. The statutory labor exemption applies to the alleged conduct solely performed by ILWU

Based on the "'interlacing'" Sherman, Clayton, and Norris-LaGuardia Acts, certain conduct by organized labor is given a "statutory" exemption from federal antitrust laws. *USS-POSCO*, 31 F.3d at 805 (quoting *United States v. Hutcheson*, 312 U.S. 219, 232 (1941); *see also Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621 (1975). As long as a union acts in its own legitimate self-interest and does not combine with nonlabor groups, these statutes exempt from antitrust scrutiny traditional union activities, including secondary picketing, boycotts, hand-billing, and encouraging work stoppages. *See Connell*, 421 U.S. at 622; *USS-POSCO*, 31 F.3d at 805, 808-809.

In applying the statutory labor exemption, courts do not distinguish the "licit and the illicit" or look to "the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *Hutcheson*, 312 U.S. at 232. "[W]here a union engages in activities normally associated with labor disputes, these will be presumed to be in pursuit of the union's legitimate interest absent a very strong showing to the contrary." *USS-POSCO*, 31 F.3d at 808. Union activity done to "eliminate non-union shops altogether by making an example" of a particular employer is a legitimate labor goal subject to the strong presumption, as is activity done to preserve jobs for union members. *See, e.g., id.* at 809 (noting that traditional union activities done to eliminate non-union shops are in the union's legitimate self-interest); *Intercontinental Container Transp. Corp. v. New York Shipping Ass'n*, 426 F.2d 884, 887 (2d Cir. 1970) ("Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws."). The statutory

labor exemption is not an affirmative defense but is an element (or, to be precise, its inapplicability is an element) of any claim that a union has violated the antitrust laws. *USS-POSCO*, 31 F.3d at 805 n.3. Accordingly, the party bringing the antitrust claim bears the burden of proving that the exemption does not apply. *Id.*

Here, ICTSI's antitrust counterclaim is based, in part, on allegations that ILWU engaged in the traditional activities of work stoppages, slowdowns, and filing grievances in an attempt to force ICTSI to assign the reefer work to ILWU workers. ICTSI CC ¶ 69G. ICTSI has not alleged that PMA and ILWU conspired together and agreed that ILWU would engage in such conduct, nor could such an allegation plausibly be made. PMA members suffer as a result of the alleged work stoppage and slow downs, and PMA filed its own lawsuit against ILWU to restrain this alleged conduct.

The alleged work stoppages, slowdowns, and filing of grievances by ILWU are traditional union activity, done for the purpose of trying to preserve jobs for ILWU workers. Although ILWU workers did not historically perform reefer services at Terminal 6, the negotiated compromise in the 2008 PCLCD requiring that reefer work be assigned to ILWU members was an attempt to preserve jobs for ILWU members because other jobs historically performed by ILWU members were being lost to technology. Because these actions were done in furtherance of ILWU's legitimate self-interest and were not done in concert with a nonlabor group, the Court cannot look to the wisdom or wrongness of the alleged activities. They are exempt from federal antitrust law.

ICTSI also alleges that ILWU threatened and otherwise "caused" third parties to use PMA members to provide longshore services in other ports and use ILWU labor. ICTSI CC ¶¶ 69K, L, M. First, such allegations are insufficient to state a claim for antitrust liability or

injury. ICTSI does not allege how or why ILWU "caused" the other ports to use PMA members. ICTSI also does not allege that ILWU engaged in this conduct at the behest of PMA to reduce competition or drive out competitors of PMA or its members. Additionally, as discussed further below, PMA has more than 70 members who are competitors with one another, and thus does not fall within the classical definition of a "monopoly" under federal antitrust law. Second, even if these allegations by ICTSI gave rise to potential antitrust liability, the union's activities as alleged are exempt under the statutory labor exemption. The alleged conduct was engaged in by the union in its own legitimate self-interest. As admitted by ICTSI in its Answer and Counterclaims, ILWU represents longshore workers who are employed by members of PMA. Thus, having ports use vendors that are PMA members necessarily results in the use of ILWU labor. This is a legitimate union goal. Thus, the alleged conduct is exempt from federal antitrust law.

### 3. The nonstatutory labor exemption applies to the alleged joint action by ILWU and PMA

ICTSI also bases its antitrust counterclaim on alleged conduct pursuant to alleged agreements between PMA and ILWU. The statutory labor exemption does not exempt concerted action or agreements between unions and nonlabor parties. *Connell*, 421 U.S. at 622. Thus, the alleged conduct is not subject to the statutory exemption. It is, however, subject to the nonstatutory labor exemption.

#### a. The contours of the nonstatutory labor exemption

The Supreme Court has recognized that a proper accommodation between the congressional policy favoring collective bargaining and the congressional policy favoring free competition "requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." *Id.* This exemption "interprets the labor statutes . . . as

limiting an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice" and "substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236-37 (1996). "'[S]ome restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions' to give effect to federal labor policy and to allow meaningful collective bargaining to occur." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1125 (9th Cir. 2011) (*en banc*) ("*Safeway*") (alteration in original) (quoting *Brown*, 518 U.S. at 237). "[I]t would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work." *Brown*, 518 U.S. at 237 (emphasis in original). The precise boundaries of the nonstatutory labor exemption have never been delineated by the Supreme Court, and what guidance it has given "'has come mostly in cases in which agreements between an employer and a labor union were alleged to have injured or eliminated a competitor in the employer's business or product market.'" *Safeway*, 651 F.3d at 1125 (quoting *Clarett v. Nat'l Football League*, 369 F.3d 124, 131 (2d Cir. 2004)).

Historically, the application of the nonstatutory labor exemption was only considered in cases involving union-employer agreements. *See Connell*, 421 U.S. at 622 (noting that the nonstatutory exemption is necessary for "some *union-employer* agreements") (emphasis added). In considering whether the nonstatutory exemption applies to an agreement between a union and an employer, the Court of Appeals for the Ninth Circuit has adopted the three-part test articulated in *Mackey v. Nat'l Football League*, 543 F.2d 606 (8th Cir. 1976). *See Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 861 (9th Cir. 1996). Under this test,

> the parties to an agreement restraining trade are exempt from
> antitrust liability only if (1) the restraint primarily affects the
> parties to the agreement and no one else, (2) the agreement
> concerns wages, hours, or conditions of employment that are
> mandatory subjects of collective bargaining, and (3) the agreement
> is produced from bona fide, arm's-length collective bargaining.

*Id.* This test was derived primarily from the Supreme Court's decisions in *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*, 381 U.S. 676 (1965), *Connell*, and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). *Mackey*, 543 F.2d at 614.

ICTSI argues that the *Mackey* test does not survive the Supreme Court's decision in *Brown* and that *Brown* added the requirement that in order to obtain the benefit of the nonstatutory exemption, the conduct at issue must not violate labor law. The Court does not read *Brown* so broadly.

In *Brown*, the Supreme Court extended the nonstatutory labor exemption, under very limited circumstances, to concerted conduct by employers after impasse had been reached (which the Supreme Court described as occurring during the collective bargaining "process"). *Brown*, 518 U.S. at 250. Because *Brown* involved an agreement only among employers that was not produced from bona fide, arm's-length collective bargaining, the third prong of the *Mackey* test was not met, yet the nonstatutory exemption was still applied. This arguably calls into question the continued validity of the *Mackey* test.

*Brown*, however, did not expressly abrogate the *Mackey* test and did not even address whether the *Mackey* test survives for cases involving union-employer agreements. The Supreme Court in *Brown* specifically noted that its opinion addressed only the narrow issue of whether the scope of the nonstatutory labor exemption included "an agreement among several employers bargaining together to implement after impasse the terms of their last best good-faith wage

offer." *Brown*, 518 U.S. at 238. The Supreme Court in *Brown* was not analyzing the scope or application of the nonstatutory exemption to union-employer agreements. Additionally, the Supreme Court in *Brown* cited with favor the cases from which *Mackey* garnered the principles for its test—*Jewel Tea*, *Pennington*, and *Connell*. Thus, *Brown* expanded the nonstatutory exemption and did not limit the application of the exemption in the union-employer context.

The Court of Appeals for the Ninth Circuit also has not proclaimed that the *Mackey* test has been fully abrogated. In a case involving an employer-only agreement, a panel noted that *Brown* appeared to abrogate *Mackey* because it applied the nonstatutory exemption to an employer-only agreement (thus violating *Mackey's* third prong). *Cal. ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1200 n.15 (9th Cir. 2010), *reheard en banc by Safeway*, 651 F.3d 1118. That case was reheard *en banc*, however, and the *en banc* opinion eliminated the discussion of the status of the *Mackey* test after *Brown*. *Safeway*, 651 F.3d 1118. Further, that case involved employer-only agreements, which are expressly governed by *Brown*.

The Court has an additional concern with reading *Brown* and *Safeway* as abrogating the *Mackey* test and setting a new standard for analyzing the application of the nonstatutory exemption in cases involving employer-union agreements. *Brown* and *Safeway* involve employer-only agreements and the unilateral imposition of terms by employers. These types of actions are of particular concern in both labor and antitrust law, and thus the courts were careful to circumscribe narrow circumstances in which employer-only action can obtain the benefit of the nonstatutory labor exemption from antitrust liability. *Brown* and *Safeway* considered several factors in deciding whether employer-only agreements should benefit from the nonstatutory

labor exemption.[5] These include factors similar to the first two prongs of the *Mackey* test, but also include factors arising from the concern regarding employer-only actions. Specifically, the courts analyzed whether the conduct at issue was directly and extensively regulated by labor law and was clearly acceptable under labor law. *Brown*, 518 U.S. at 238; *Safeway*, 651 F.3d at 1129. There is no indication in *Brown* and *Safeway* that these requirements extend to cases involving union-employer agreements.

Notably, the nonstatutory labor exemption historically could apply to union-employer agreements, even if the conduct violated labor law. *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 906 (9th Cir. 1987); *accord Connell*, 421 U.S. at 622-25 (analyzing whether the nonstatutory labor exemption applied separately from whether the conduct violated labor law, thereby suggesting that the presence of a labor law violation may not itself decide the exemption issue). Further, the policy behind the creation and enforcement of the nonstatutory exemption is to "prevent 'judicial use of antitrust law to resolve labor disputes' and [to limit] antitrust courts' authority to determine what qualifies as a reasonable practice in industrial conflict." *Safeway*, 651 F.3d at 1127 (quoting *Brown*, 518 U.S. at 236-37). Without a clear indication from the Supreme Court or the Ninth Circuit, this Court does not interpret *Brown* and *Safeway* as creating potential antitrust liability for union-employer agreements solely because the conduct also might create liability under labor law. Such an interpretation is antithetical to the purpose behind the nonstatutory labor exemption.

---

[5] The cases considered whether: (1) the labor market, as opposed to the "business" or "product" market was involved; (2) the conduct took place during or immediately after a collective-bargaining negotiation; (3) the conduct grew out of, and was directly related to, the lawful operation of the collective bargaining process; (4) the conduct was an accepted practice of labor negotiations that has been extensively regulated and carefully circumscribed; (5) the conduct involved a matter that the parties were required to negotiate collectively; and (6) the conduct concerned only the parties to the collective-bargaining relationship. *Brown*, 518 U.S. at 250; *Safeway*, 651 F.3d at 1129, 1130, 1130 n. 7.

### b.  Applying the nonstatutory labor exemption

The nonstatutory labor exemption is applicable to multiemployer groups. *Brown*, 518 U.S. at 240 ("Multiemployer bargaining itself is a well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor."). As discussed above, in evaluating whether the nonstatutory exemption applies in this case, the Court applies the *Mackey* test.

ICTSI alleges various conduct by ILWU and PMA in support of ICTSI's antitrust counterclaim, but all of the alleged conduct arises out of ILWU and PMA's interpretation of the PCLCD. The alleged conduct by ILWU and PMA, individually and together, was engaged-in by PMA and ILWU to enforce their interpretation of the PCLCD.[6] The Court has already determined that some of the alleged conduct is exempt from antitrust scrutiny under the statutory labor exemption and the *Noerr-Pennington* doctrine, so the Court considers only the remaining alleged conduct: (1) that PMA, in concert with ILWU, threatened to fine or expel ICTSI; (2) that PMA agreed to a CLRC meeting without notifying ICTSI; (3) that ILWU and PMA agreed to discriminate against ICTSI and against non-PMA employers by exempting PMA members that had direct contracts with other unions for the performance of the reefer work in the 2008 PCLCD; (4) that PMA members threatened to bypass Terminal 6; (6) that ILWU violated labor law; and (7) that ILWU and PMA have dispatched inefficient and underqualified workers to ICTSI. ICTSI CC ¶¶ 69A, B, C, D, E, F, N, O, P.

---

[6] In its brief in response to the motion to dismiss, ICTSI argues that its antitrust counterclaim is also based on a May 23, 2012 CLRC "agreement" between ILWU and PMA. ICTSI Resp. Br. at 17-18. No such "agreement" was alleged in ICTSI's counterclaims, and if it were, it would not be a proper characterization of the May 23, 2012 meeting. As ICTSI properly alleges, on May 23, 2012, the CLRC held a meeting and interpreted the PCLCD as requiring the reefer work be assigned to ILWU-represented workers. This is an interpretation of the PCLCD, not a separate agreement entered into between PMA and ILWU. Further, as alleged by ICTSI, it is the role of the CLRC to interpret the PCLCD.

###### i. The first prong of *Mackey*—whether the conduct primarily affects the parties to the agreement

The remaining alleged conduct on which ICTSI bases its antitrust counterclaim, enumerated above, primarily affects only members who are parties to the PCLCD,[7] with the exception of number three, ICTSI's allegation that PMA and ILWU discriminate against non-PMA members by granting an exemption in the 2008 PCLCD to certain existing PMA members so they could assign the reefer work to non-ILWU workers. The requirement that ILWU workers be assigned the work, however, is only binding on PMA members, who are parties to the collective bargaining agreement. Non-PMA members can compete for stevedoring work and its ancillary services and can assign anyone they choose to perform reefer work. Non-PMA members have no need for the exemption because they are not bound by the PCLCD's requirement to assign reefer work to ILWU members. Thus, the alleged restraint primarily affects only the parties to the PCLCD.[8] *See Phoenix Elec.*, 81 F.3d at 862 (finding that an alleged agreement that does not "impose its terms on any nonsignatory party" primarily affects only the parties to the agreement).

---

[7] ICTSI also alleges that PMA and ILWU work in concert to create a monopoly for PMA members in the market of loading and unloading of freight, and related ancillary services, in West Coast ports. Such conduct would affect nonparties to the PCLCD (*e.g.*, non-PMA members who wish to perform such work and cannot). As discussed in Section A.4 below, however, the Court finds that ICTSI fails to state a claim for monopolization, attempted monopolization, or conspiracy to monopolize, so this conduct is not relevant to the Court's analysis on the application of the nonstatutory labor exemption.

[8] Although the dispute at Terminal 6 affects persons who are not parties to the agreement, including the public, businesses who ship through Terminal 6, and the Port, this is not the type of effect encompassed in the first prong of the *Mackey* test. All alleged anticompetitive conduct has some effect on consumers and competitors, but courts look to the primary effect of the alleged agreement and whether the alleged agreement "imposes its terms on any nonsignatory party." *Phoenix Elec.*, 81 F.3d at 862. Here, the alleged agreement is the PCLCD, and it does not impose the requirement that ILWU-represented workers be assigned reefer work on any nonsignatory party.

ICTSI also alleges that members who join PMA after the 2008 PCLCD was negotiated, such as ICTSI, are discriminated against because they cannot benefit from the exemption. First, these members are parties to the PCLCD, so this allegation does not run afoul of the first prong of *Mackey*. Second, this allegation does not give rise to antitrust liability. Representatives who negotiate collective bargaining agreements can favor some constituents over others. *See Clarett*, 369 F.3d at 139 (finding that representatives may advantage certain categories over others, subject to the duty of fair representation, including favoring current employees over new employees and excluding outsiders (citing *Vaca v. Sipes*, 386 U.S. 171, 177 (1967); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338-39 (1953), *Fibreboard Paper Prods. Corp v. N.L.R.B.*, 379 U.S. 203, 210-15, (1964))). Although those cases involve negotiation by labor representatives as opposed to representatives of multiemployer groups, the Court does not see this as a material difference in terms of the obligations of the negotiating representative. *See, e.g.*, *N.L.R.B. v. Siebler Heating & Air Conditioning, Inc.*, 563 F.2d 366, 371 (8th Cir. 1977) (finding that members of an employer group have, similar to labor, a right to expect that their interests will be fairly represented and that their interests will not be "totally sacrificed"). At the time the 2008 PCLCD was negotiated, PMA representatives chose to favor existing PMA members over future PMA members with regard to the exemption—such conduct does not support an antitrust counterclaim by ICTSI.

The first prong of the *Mackey* test is met.

> ### ii.   The second prong of *Mackey*—whether the agreement concerns a mandatory subject of collective bargaining

The second prong of the *Mackey* test is whether the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining. Work assignments are mandatory subjects of collective bargaining, even if the employer is assigning

work outside of the collective bargaining unit. *See Antelope Valley Press*, 311 NLRB 459, 460 (1993). Terms and conditions that relate to job preservation and minimizing the curtailment of jobs are also subjects of mandatory bargaining. *See Fibreboard Paper*, 379 U.S. at 213; *see also Intercontinental*, 426 F.2d at 887 ("The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern."). Changing the scope of a bargaining unit, however, is not. *Antelope Valley*, 311 NLRB at 460.

ICTSI concedes that work preservation is a mandatory subject of collective bargaining, but argues that because the 2008 PCLCD added reefer jobs that ILWU labor did not previously perform in Portland, this aspect of the PCLCD was changing the scope of the bargaining unit and was not, therefore, a mandatory subject of collective bargaining. ICTSI's argument is not persuasive.

To whom the reefer jobs must be assigned within the bargaining unit relates to work assignments. It is, therefore, a subject of mandatory bargaining. Even if the provision did not relate to the assignment of work, however, it relates to work preservation and minimizing the curtailment of ILWU jobs. The provision in the 2008 PCLCD relating to the reefer work was added to preserve ILWU jobs, as technology was eroding union jobs. Additionally, the reefer work had been performed by ILWU-represented employees in some ports governed by the PCLCD. Thus, this is a subject relating to work preservation and is a proper subject of mandatory bargaining. *See Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 640-41 (1967); *Antelope Valley*, 311 NLRB at 460.

The fact that ILWU-represented employees did not previously perform the reefer work at Terminal 6 and elsewhere is not dispositive of the question of whether this was work preservation as opposed to a change in the scope of the bargaining unit. ICTSI alleges that ILWU

and PMA represent labor and employers, respectively, for all of the West Coast ports, and that only in "some" West Coast ports was the reefer work performed by non-ILWU-represented employees. ICTSI CC ¶ 68. ICTSI argues that because ILWU labor did not perform the work at Terminal 6 and "some" other ports, the 2008 PCLCD was a "land grab" in those ports. The critical issue on this point is whether the universe for the work preservation analysis is Terminal 6 and the other ports in which the reefer work was performed differently, or all of the West Coast ports. That question was answered by the Ninth Circuit in *Maui Trucking, Inc. v. Operating Engineers Local Union No. 3 Int'l Union of Operating Engineers AFL-CIO*, 37 F.3d 436 (9th Cir. 1994). In that case, the Ninth Circuit held that the relevant work universe is coextensive with the bargaining unit. *Id.* at 439.

Here, the bargaining unit includes all of the West Coast ports and thus, that is the universe for the job preservation analysis. A single collective bargaining agreement governs all of the West Coast ports, many PMA members dock at multiple ports, and union members can move to find work. "It would be senseless to break the [West Coast ports] into parts for this analysis, possibly creating different rules for each [port]." *Id.* In most of the West Coast ports, ILWU workers performed the reefer work. Thus, requiring in 2008 that the reefer work be assigned to ILWU members was a job preservation issue and not a change in the scope of the bargaining unit.

The second prong of the *Mackey* test is met.

### iii. The third prong of *Mackey*—whether the agreement is the result of bona fide, arm's-length collective bargaining

ICTSI does not allege that the PCLCD was derived from anything other than bona fide, arm's-length collective bargaining. Indeed, ICTSI alleges that "[f]or many years, the ILWU and

PMA have *negotiated* successful collective bargaining agreements. . . ." ICTSI CC ¶ 68 (emphasis added). Thus, the third prong of the *Mackey* test is met.

Accordingly, the challenged agreement between PMA and ILWU is exempt from antitrust scrutiny based on the nonstatutory labor exemption.

### 4. Monopolization, Attempted Monopolization, and Conspiracy to Monopolize

ICTSI also alleges that ILWU and PMA have violated Section 2 of the Sherman Act through a conspiracy to monopolize. One of the elements required to state a claim for violation of Section 2 based on a theory of conspiracy to monopolize is the existence of a combination or conspiracy to monopolize a relevant market. *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003); *see generally Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) ("To pose a threat of monopolization, one firm *alone* must have power to control market output and exclude competition.") (emphasis in original).

ICTSI alleges that the relevant market is "the loading and unloading of freight, and related ancillary services, to and from dockside port of rest, for marine oceangoing cargo on West Coast ports and/or the submarket of the metropolitan Portland area." ICTSI CC ¶ 62. ICTSI further alleges that PMA and ILWU jointly possess the means to exclude competition within the relevant market. ICTSI, however, does not allege that ILWU and PMA are conspiring to create a monopoly for any single PMA member or firm or even for a small group of PMA members. Instead, ICTSI argues that ILWU and PMA are conspiring to create a monopoly on the West Coast ports for the 70-member PMA. ICTSI's allegations of such a conspiracy to create a "shared monopoly" fail to state a claim under Section 2.

"[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2." S*tandfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405

F. Supp. 2d 1141, 1152 (C.D. Cal. 2005). As further explained by the U.S. District Court for the

District of Columbia:

> A monopoly arises when a single firm "controls all or the bulk of a
> product's output, and no other firm can enter the market, or expand
> output, at comparable costs." The very phrase "shared monopoly"
> is paradoxical; when a small number of large sellers dominates a
> market, this typically is described as an oligopoly. In enacting the
> prohibitions on monopolies, Congress was concerned about "the
> complete domination of a market by a *single* economic entity," and
> therefore did not include "shared monopolies" or oligopolies
> within the purview of Section 2. As a result, "[o]ligopoly can, in
> some cases, violate Sections 1 and/or 3 of the Sherman Act, but
> *competitors*, by conspiring to maintain or create an oligopoly, do
> not run afoul of the Section 2 prohibitions against monopoly." To
> the extent that plaintiffs have alleged a market structure in which
> [Defendants] each possess and seek to protect market power within
> the same markets, their monopoly claims based on an alleged
> agreement to monopolize must fail.

*Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013)

(emphasis in original) (citations omitted).[9]

PMA is a multiemployer bargaining unit that negotiates collective bargaining agreements

and provides management and administrative services. It is not a competitor itself in the relevant

market—its 70 members are competitors with one another. The fact that, pursuant to federal law,

PMA shares the cost to run the joint dispatch center does not serve to make PMA a competitor

performing, for example, stevedoring services.

There are numerous competitors in the relevant market, including the more than 70 PMA

members and many non-PMA members. Thus, the alleged conduct by PMA and ILWU fails to

---

[9] ICTSI also cites to *United States v. Am. Airlines*, 743 F.2d 1114 (5th Cir. 1984), which
is distinguishable. In that case, the Fifth Circuit held that an offer to fix prices among two
competitors who collectively controlled the market for a relevant period of time due to regulatory
constraints was an attempt to monopolize in violation Section 2. Such a price-fixing agreement
would have resulted in the equivalent of a single-firm price-setting, which is the essence of
monopolization. That is not what oligopolies do.

state a claim for a violation of Section 2. *See Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*, 2013 WL 2154793, at *3-4 (S.D. Cal. May 17, 2013) ("Because PMA members compete against each other, the alleged conspiracy would create a 'shared monopoly' or oligopoly. Such conduct is not a violation of section 2."); *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 867 F. Supp. 925, 941-42 (D. Or. 1994) (rejecting a Section 2 claim because "[a]s a multi-employer bargaining agent, it negotiates collective bargaining agreements with the electrical union, and provides management and administrative services related to those agreements. . . . There is likewise no suggestion that any one or small group of the contractors who belong to [the multiemployer bargaining group] have or could obtain monopoly power. As mentioned previously, nothing in the record suggests that the members of [the multi-employer bargaining group] do not compete vigorously among themselves."); *accord Harking Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 490 (9th Cir. 1988) (declining to decide whether a shared monopoly could be viable under any circumstance, but holding that in a "small market with numerous sellers, no claim is stated under section 2").

### 5.  Standing

ILWU and PMA also argue that ICTSI cannot maintain an antitrust lawsuit because it lacks antitrust standing. Because the Court finds that the alleged behavior is exempt from antitrust scrutiny under a combination of the *Noerr-Pennington* doctrine, the statutory labor exemption, and the nonstatutory labor exemption, the Court declines to reach the question of antitrust standing.

## B.  ICTSI's Breach of Fiduciary Duty Counterclaim

ICTSI alleges that, pursuant to its membership in PMA, PMA is "authorized to represent and act on behalf of" ICTSI and that PMA is authorized "to exercise independent judgment on ICTSI's behalf and/or to protect ICTSI's economic and other interests with regards to labor

relations issues." ICTSI CC ¶ 75. ICTSI further alleges that it and PMA were in a fiduciary relationship under which PMA owed ICTSI duties of care, loyalty, good faith and fair dealing, and full, fair, and frank disclosure and that ICTSI breached those duties. *Id.* ¶¶ 76, 77.

PMA moves to dismiss ICTSI's breach of fiduciary duty counterclaim, arguing that: (1) the only potential fiduciary relationship and concomitant fiduciary duties alleged arise out of California corporation law and, under that body of law, PMA does not owe fiduciary duties to ICTSI; (2) the Court should abstain from considering the issue because it interferes with the autonomy of a voluntary association's internal management; and (3) the breach of fiduciary duty counterclaim is preempted by the Labor Management Relations Act ("LMRA"),[10] specifically Section 301,[11] and the *Garmon* preemption doctrine, which arises out of the National Labor Relations Act ("NLRA").[12] PMA's arguments are unavailing. Accordingly, PMA's motion to dismiss ICTSI's breach of fiduciary duty claim is denied.

## 1.  ICTSI has adequately pled a fiduciary relationship giving rise to fiduciary duties

### a.  PMA is the agent of ICTSI with respect to the negotiation, administration, and management of the PCLCD

ICTSI alleges that PMA acts on behalf of ICTSI and exercises independent judgment on ICTSI's behalf in labor negotiations and labor relations issues. Although ICTSI does not use the word "agent" to describe PMA's relationship to ICTSI, these allegations serve to allege a principal-agent relationship. *See Eads v. Borman*, 277 P.3d 503, 508 (Or. 2012) ("Classically, an agency relationship 'results from the manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act.'" (quoting

---

[10] 29 U.S.C. § 141, *et seq.*

[11] 29 U.S.C. § 185.

[12] 29 U.S.C. § 151, *et seq.*

*Vaughn v. First Transit, Inc.*, 206 P.3d 181, 186 (Or. 2009))).[13] PMA does not dispute that it acts as the agent for ICTSI and PMA's other members with respect to the negotiation, administration, and management of the PCLCD. Instead, PMA argues that it owes fiduciary duties to the multiemployer group as a whole and not to any individual employer member.[14]

Agents owe independent fiduciary duties to their principals. *See Boyer v. Salomon Smith Barney*, 188 P.3d 233, 237 (Or. 2008) ("The law of agency imposes duties on the agent; those duties 'exist[ ] independent of the contract and without reference to the specific terms of the contract.'" (citing *Georgetown Realty v. Home Ins. Co.*, 831 P.2d 7, 14 (Or. 1992))). Here, PMA represents multiple principals. Oregon law recognizes that an agent can serve more than one principal. *Wallulis v. Dymowski*, 918 P.2d 755, 764 (Or. 1996); *Blair v. United Fin. Co.*, 365 P.2d 1077, 1078 (Or. 1961). Oregon courts have not, however, defined the contours of the fiduciary duties owed by an agent to a principal in the multiple representation context, so the Court looks to the Restatement of Agency[15] for guidance. Comment b to Section 3.16, Agent for

---

[13] PMA argues that California law should apply because the allegations involve PMA's "internal affairs" and any duty would arise out of California state law governing non-profit mutual benefit organizations. PMA Br. at 18, 21. Dkt. 132. The Court finds that the fiduciary relationship stems from the agency relationship between a principal and its agent, however, and not PMA's corporate status. Additionally, the specific allegations from which the Court determines that ICTSI states a counterclaim for breach of fiduciary duty do not involve PMA's "internal affairs." The Court applies Oregon law, however, the choice of law is immaterial to the outcome because, as PMA and ICTSI both concede, Oregon and California law on claims for breach of fiduciary do not conflict.

[14] PMA also argues that because it is a California non-profit mutual benefit corporation, it does not owe any fiduciary duties to ICTSI. Whether PMA's status as a non-profit mutual benefit corporation gives rise to fiduciary obligations is irrelevant, however, because the Court finds that it is PMA's status as an agent of ICTSI that gives rise to fiduciary obligations. Non-profit mutual benefit corporations do not necessarily act as agents to their members, and PMA cites to no authority that, when non-profit mutual benefit corporations do act as an agent, their status as a non-profit mutual corporation negates agency principles.

[15] In considering the contours of agency law, Oregon courts look to the Restatement of Agency. *See Vaughn*, 206 P.3d at 185-89.

Coprincipals, states that "[a]n agent who acts on behalf of more than one principal in the same matter or transaction owes duties to all principals." Restatement (Third) of Agency § 3.16 cmt. b (2006). The Restatement goes on to describe the duties owed to multiple principals:

> (2) An agent who acts for more than one principal in a transaction between or among them has a duty
>
> > (a) to deal in good faith with each principal,
> >
> > (b) to disclose to each principal
> >
> > > (i) the fact that the agent acts for the other principal or principals, and
> > >
> > > (ii) all other facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and
> >
> > (c) otherwise to deal fairly with each principal.

*Id.* § 8.06(2). In sum, "the agent owes duties of good faith, disclosure, and fair dealing to all of the principals." *Id.* cmt. d(2).

Additionally, as noted above, the Court concludes that the multiemployer bargaining representative is analogous to the labor representative and has the right to favor one constituent over another. The Court similarly concludes that the multiemployer group representative, like the labor representative, has a duty of fair representation to its constituents. *See Siebler*, 563 F.2d at 371 (finding that members of an employer group have the right to expect that their interests will be fairly represented and that their interests will not be "totally sacrificed"). Although an individual employer's interests may be subsumed to the interest of the group as a whole, that does not mean that PMA does not owe *any* duty to its individual employer members.

PAGE 27 – OPINION AND ORDER

PMA is contracting on behalf of its members with a third party and negotiating a binding, legal agreement between its members and ILWU. Further, depending on the circumstances and the stage of the collective bargaining process, employers may not be able to withdraw from a multiemployer bargaining group if the bargaining representative is not fairly representing the employer. *See Charles D. Bonanno Linen Serv., Inc. v. N.L.R.B.*, 454 U.S. 404, 412 (1982) (noting that labor law "has sought to further the utility of multiemployer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw during negotiations" and finding that impasse does not constitute extraordinary circumstances warranting withdrawal from a multiemployer group); *Siebler*, 563 F.2d at 371 ("We recognize that dissatisfaction with the results of group bargaining does not justify an untimely withdrawal."). Given these circumstances, if the multiemployer group representative owes no duty to any individual employer member and acts in bad faith, an employer may not have any recourse. Multiemployer bargaining groups are "important" and offer "advantages to both management and labor." *Brown*, 518 U.S. at 240. A finding that a multiemployer group representative owes no duty to any individual employer may weaken this bargaining institution.

Although PMA has a great deal of freedom to consider the interests of the multiemployer group as a whole, the Court finds that PMA is the agent of ICTSI and owes ICTSI a duty of fair representation and to deal in good faith with respect to the negotiation, administration, and management of the PCLCD.[16] Other courts have similarly spoken of the relationship between multiemployer groups and the individual employers in agency terms. *See, e.g.*, *Fed. Maritime Comm'n v. Pac. Maritime Ass'n*, 435 U.S. 40, 45 (1978) (referencing PMA as "a collective-bargaining agent for a multiemployer bargaining unit made up of various employers of Pacific

---

[16] There is no allegation that PMA did not fully disclose to ICTSI the fact that it represents other principals or other facts that ICTSI should know before joining the PMA.

coast dockworkers"); *Resort Nursing Home v. N.L.R.B.*, 389 F.3d 1262, 1270 (D.C. Cir. 2004)

("If an employer is dissatisfied with the representation of its multi-employer association, it

retains its remedies against the association under contract and agency law."); *N.L.R.B. v. Marcus*

*Trucking Co.*, 286 F.2d 583, 588 (2d Cir. 1961) (discussing the multiemployer group relationship

as governed by agency law when analyzing an individual employer's withdrawal from the unit,

citing the Restatement of Agency, and noting that the NLRB has passed on "the question

whether the Board has power to alter the rules of agency applicable in multi-employer

bargaining").

> ### b. ICTSI has pled sufficient facts to state a claim against PMA for breach of fiduciary duty

ICTSI alleges that PMA breached its duties of good faith and fair representation by:

(a) failing to provide notice to ICTSI of the CLRC meeting and failing to fairly consider or

present ICTSI's position; (b) refusing to present ICTSI's position to joint committees and

arbitrators; (c) threatening to fine or expel ICTSI if ICTSI did not assign the reefer work to

ILWU members; (d) joining ILWU in legal efforts to compel ICTSI to assign the reefer work to

ILWU members; (e) failing to vigorously seek the confirmation of the arbitration awards finding

ILWU guilty of work stoppages and slowdowns; (f) causing inefficient or unqualified workers to

be dispatched to ICTSI through the jointly administered hiring hall and failing to act on ICTSI's

complaints regarding the quality of dispatched personnel and suggestions of a hiring hall

monitor; and (g) failing to bring issues before the CLRC in order to stop the ongoing slowdowns,

work stoppages, and safety gimmicks by ILWU. ICTSI CC ¶¶ 77A-G. The Court analyzes

whether ICTSI alleges sufficient facts from which the Court could find that any of the alleged

conduct was done in bad faith or constituted unfair representation.

The Court concludes that ICTSI fails to allege sufficient facts from which the Court could reasonably infer that the legal efforts to compel ICTSI to assign the reefer work were not done in good faith (¶ 77D). As discussed above in the Court's *Noerr-Pennington* analysis, ICTSI does not sufficiently allege facts from which it could be inferred that the legal proceedings were a sham or were otherwise filed in bad faith.

The Court also finds that ICTSI fails to plead sufficient facts from which the Court could reasonably infer that PMA has acted in bad faith with respect to the alleged work stoppages and slowdowns by ILWU (¶¶ 77E, G). PMA may not have brought the issue to the CLRC, but PMA filed a lawsuit in federal court seeking to confirm the arbitration award. *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-01100-SI (D. Or.). Additionally, in that lawsuit PMA sought a temporary restraining order to stop the alleged work stoppages and slowdowns. ICTSI alleges no facts showing why filing a federal lawsuit does not constitute "vigorously seek[ing]" confirmation of the arbitration award or why it is bad faith to seek a restraining order in federal court as opposed to bringing the issue before the CLRC.

With respect to ICTSI's allegation that it is a breach of fiduciary duty for PMA to threaten to fine or expel ICTSI (¶ 77C), ICTSI does not allege sufficient facts to show a breach of fiduciary duty. PMA has the right to interpret the PCLCD. ICTSI does not allege facts showing that PMA's interpretation of the PCLCD as requiring the reefer work be assigned to ILWU members was done in bad faith. PMA also has the right, under its Bylaws, to fine or expel members. The mere fact that PMA threatened to exercise such rights is not sufficient to show bad faith or unfair representation.

The Court, however, finds that ICTSI has alleged sufficient facts from which it can reasonably be inferred that PMA acted in bad faith or unfairly represented ICTSI with respect to

the May 2012 CLRC meeting and other arbitration and committee meetings (¶¶ 77A, B). ICTSI

alleges that PMA did not notify ICTSI of the CLRC meeting, did not consider ICTSI's position

for that meeting and other meetings, and did not present ICTSI's position. PMA also did not

offer ICTSI the opportunity to present its own position. ICTSI appears to be entitled to have its

position considered in CLRC and other committee meetings and arbitrations. It may well be that

PMA may elect not to agree with or present ICTSI's position and may present PMA's own,

conflicting, position. But PMA is ICTSI's agent with respect to the administration and

management of the PCLCD and if PMA is not going to present ICTSI's position, basic notions

of fairness and due process require that PMA notify ICTSI of that fact and that ICTSI be given

the opportunity to present its own position.

     The Court also finds that ICTSI has alleged sufficient facts from which it can reasonably

be inferred that PMA acted in bad faith with respect to the dispatch of workers from the hiring

hall to ICTSI (¶ 77F). PMA administers the hiring hall jointly with ILWU. ICTSI specifically

alleges that inefficient or unqualified workers were dispatched, that ICTSI complained to PMA

about the quality of the workers, that PMA ignored those complaints, and that PMA refused

ICTSI's request that a hiring hall monitor be appointed to prevent hiring hall abuses. Assuming

those allegations to be true, as the Court must at this stage in the proceedings, these allegations

are sufficient to state a counterclaim for breach of fiduciary duty.

### 2.  The California abstention doctrine relating to certain interpretation of rules and laws of private organizations does not apply

     PMA argues that the Court should apply the abstention doctrine as enunciated by the

California Supreme Court in *California Dental Ass'n v. Am. Dental Ass'n*, 590 P.2d 401

(Cal. 1979), and decline to consider ICTSI's counterclaim for breach of fiduciary duty. In

*California Dental*, the state dental society expelled a member dentist after determining that the

dentist had violated the ethics rules of both the state and the national society. *Id.* at 403. The

national society reversed the expulsion on appeal and refused to consider holding a rehearing. *Id.*

at 404. The state organization argued that the national organization's refusal to consider the state

organization's more stringent ethics code plainly contravenes the national organization's bylaws.

*Id.* at 406. The California Supreme Court agreed, and held that:

> We conclude that when a private voluntary organization plainly
> contravenes the terms of its bylaws, the issues of whether and to
> what extent judicial relief will be available depend on balancing
> (1) the interest in protecting the aggrieved party's rights against
> (2) the infringement on the organization's autonomy and the
> burdens on the courts that will result from judicial attempts to
> settle such internal disputes.

*Id.* at 403. The heart of the *California Dental* case was a dispute between a national society and

one of its local chapters as to whether the national organization's conduct violated its own

bylaws. Rather than abstaining, the court in *California Dental* found that it did and ordered the

national society to reconsider the issue in light of the state organization's higher ethical

principles. *Id.* at 408. In doing so, the court noted:

> In many disputes in which such rights and duties [affecting internal
> government and the management of a society's affairs] and are at
> issue, however, the courts may decline to exercise jurisdiction.
> Their determination not to intervene reflects their judgment that
> the resulting burdens on the judiciary outweigh the interests of the
> parties at stake. One concern in such cases is that judicial attempts
> to construe ritual or obscure rules and laws of private organizations
> may lead the courts into what Professor Chafee called the "dismal
> swamp." Another is with preserving the autonomy of such
> organizations. We [previously] stated . . . that "in adjudicating a
> challenge to the society's rule as arbitrary a court properly
> exercises only a limited role of review. As the Arizona Supreme
> Court observed . . . 'In making such an inquiry, the court must
> guard against unduly interfering with the Society's autonomy by
> substituting judicial judgment for that of the Society in an area
> where the competence of the court does not equal that of the
> Society . . . .'"

*Id.* at 405.

The facts as alleged by ICTSI do not support application of the abstention doctrine articulated in *California Dental*. First, PMA is an agent of ICTSI and negotiates binding, legal agreements on behalf of ICTSI. *California Dental* and the other cases cited by PMA do not involve situations where the voluntary association is acting as an agent of the member and binding the member to legal contracts with third parties. Second, the resolution of ICTSI's breach of fiduciary duty counterclaim does not involve interpreting "ritual or obscure rules and laws of private organizations." *Id.* Third, ICTSI is not challenging an internal rule of PMA, and the Court would not be unduly interfering with PMA's autonomy by reaching the issue of whether PMA breached its duties of good faith and fair representation. This is not a claim relating to PMA's internal government. Finally, the heart of ICTSI's fiduciary duty counterclaim is whether PMA acted fairly and in good faith in representing ICTSI at the May 2012 CLRC meeting and other meetings and in dispatching workers to ICTSI and responding to ICTSI's complaints about dispatched workers. These are not areas where the Court's competence does not equal PMA's competence. The Court does not find that any potential infringement of PMA's interest in autonomy outweighs ICTSI's interest in having its rights and claims adjudicated. The Court declines to abstain from considering ICTSI's counterclaim for breach of fiduciary duty.

### 3. Section 301 and *Garmon* preemption do not apply

PMA also argues that the fiduciary duty counterclaim should be dismissed because it is preempted by Section 301 of the LMRA and *Garmon* preemption.

### a. Section 301 preemption

Section 301 of the LMRA preempts state law claims that are "substantially dependent on analysis of a collective-bargaining agreement." *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007) (quoting *Caterpillar Inc. v. Williams*, 483 U.S. 386, 394 (1987)). To determine whether a right conferred by state law is substantially dependent on the terms of a

PAGE 33 – OPINION AND ORDER

collective-bargaining agreement, a court should "decide whether the claim can be resolved by looking to versus interpreting the [collective-bargaining agreement]." *Id.* at 1060 (citation and quotation marks omitted). "If the latter, the claim is preempted; if the former, it is not." *Id.*

As explained above, ICTSI's adequately stated counterclaim for breach of fiduciary duty rests on narrow allegations that PMA violated its fiduciary duties with respect to representing ICTSI at the CLRC meeting, at other meetings and arbitrations, and in dispatching inefficient or unqualified workers to ICTSI and failing properly to address ICTSI's complaints about the dispatched workers. PMA's fiduciary duties to deal in good faith and fairly represent ICTSI, as discussed above, arise under agency law and exist independent of PMA's contractual obligations under the PCLCD. Thus, the Court may consult the terms of the PCLCD to inform its analysis of whether PMA dealt in good faith and fairly represented ICTSI, but the resolution of ICTSI's fiduciary duty counterclaim does not appear to depend on the Court's interpretation of the PCLCD.

With regard to ICTSI's allegations that PMA failed to provide timely notice and fairly represent ICTSI's interests, that issue will likely primarily involve consideration of PMA's obligations under its Bylaws and general agency law, and only tangentially involve what the PCLCD instructs regarding dispute resolution procedures. To the extent the Court looks to the PCLCD, it would be just one consideration in determining whether PMA acted in good faith and fairly represented ICTSI. Similarly, what the PCLCD instructs with respect to dispatching workers from the hiring hall appears, at most, to be a minor consideration in evaluating whether PMA acted in good faith in dispatching workers, addressing ICTSI's complaints regarding those workers, and refusing to appoint a hiring hall monitor. For example, the PCLCD may give PMA broad discretion in dispatching workers, but if PMA exercised that discretion in bad faith, even if

it is not a violation of the PCLCD, it could still be a violation of PMA's fiduciary duty to represent ICTSI in good faith.

The terms of the PCLCD are not dispositive of whether PMA dealt in good faith with ICTSI in the alleged matters. Because the Court can resolve ICTSI's fiduciary duty counterclaim by looking to, but not interpreting, the terms of the PCLCD, the Court finds that ICTSI's fiduciary duty counterclaim is not substantially dependent on an analysis of the PCLCD. Thus, PMA's argument that ICTSI's fiduciary duty counterclaim is preempted by Section 301 is without merit.

### b. *Garmon* preemption

*Garmon* preemption was first articulated in *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 238 (1959). *Garmon* preemption "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Wis. Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986). A primary justification for the *Garmon* doctrine is "the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose." *Vaca*, 386 U.S. at 180-81. The *Garmon* preemption doctrine is not applicable in cases involving alleged breaches of the union's duty of fair representation. *Id.* at 181.

As discussed above, the Court finds that ICTSI has adequately stated a counterclaim for breach of fiduciary duty based on allegations that PMA violated its duties by: (1) failing to notify ICTSI of the CLRC meeting and failing to fairly consider or present ICTSI's position, or provide ICTSI timely notice to present its own position; (2) failing to fairly consider or present ICTSI's position, or provide ICTSI timely notice to present its own position, to joint committees and

arbitrators considering ILWU grievances regarding assignment of the reefer work; and (3) causing the dispatch of inefficient or unregistered workers to ICTSI, failing to act on ICTSI's complaints regarding those workers, and failing to appoint a hiring hall monitor to prevent hiring hall abuses. This alleged conduct, however, is not governed by the NLRA and is not prohibited by that statute. The NLRA says little about multiemployer bargaining units, except to establish that it is an unfair labor practice for a union to interfere with the employer's selection of its bargaining representative. 29 U.S.C. §158(b)(1)(B).

PMA argues that the conduct alleged in ICTSI's fiduciary duty counterclaim is prohibited the NLRA and that *Garmon* preemption therefore applies to the fiduciary duty counterclaim. PMA argues that the alleged conduct is prohibited by section 8(a)(5) (which establishes that it is an unfair labor practice for an employer to refuse to bargain collectively with a representative of his employees), section 8(b)(3) (which establishes that it is an unfair labor practice for a labor organization to refuse to bargain collectively with an employer), or section 8(e) (which establishes that it is an unfair labor practice for a labor organization and employer to agree that the employer will stop doing business with any other employer). The Court finds that the three surviving allegations supporting ICTSI's fiduciary duty counterclaim are not prohibited by these section of the NLRA. The allegations do not involve a refusal by PMA or ILWU to bargain with one another, nor an alleged agreement between PMA and ILWU to cease doing business with another employer. Thus, *Garmon* preemption is not applicable.

Courts have also deferred to the NLRB in determining what constitutes impasse and when an employer can permissibly withdraw from a multiemployer bargaining unit, but such deferral is rooted in the NLRB's expertise in impasse, appropriate conduct upon impasse, and balancing pursuit of the national policy of promoting labor peace and collective bargaining.

PAGE 36 – OPINION AND ORDER

*Bonanno*, 454 U.S. at 414. There is, however, no such allegation in ICTSI's fiduciary duty counterclaim. Here, the breach of fiduciary duty allegations involve conduct between PMA and ICTSI and duties owed by PMA to ICTSI.

As an additional consideration, the requirement of fair representation by unions is set forth in the NLRA, and yet the Supreme Court has held that claims of unfair representation by a union are not preempted by *Garmon*.[17] *Vaca*, 386 U.S. at 181-86; *see also Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 74-76 (1989) (refusing to create an exception to the *Vaca* rule that *Garmon* preemption does not apply to claims of unfair representation). There is even less reason to extend *Garmon* preemption to claims of unfair representation by a multiemployer group representative because the NLRA does not address multiemployer representation in a similar manner as it does union representation, and the Court will not so extend the doctrine. The alleged conduct is not governed by the NLRA and, therefore, ICTSI's claim against PMA for breach of fiduciary duty is not preempted by *Garmon* preemption.

### 4. Stay of ICTSI's Counterclaim Against PMA for Breach of Fiduciary Duty

Although ICTSI's claim against PMA for breach of fiduciary duty is not dependent on an interpretation of the PCLCD, it is related to the conduct by ILWU, alleged to be performed jointly with PMA, that ICTSI and the Port allege are unfair labor practices. Whether the conduct is an unfair labor practice may be evidence of and relevant to the question of PMA's good or bad faith. The issue of whether ILWU and PMA's conduct constitutes an unfair labor practice is before the NLRB, and there also are outstanding issues as to whether the NLRB has jurisdiction

---

[17] Such claims may, however, be preempted by Section 301. *See, e.g.*, *Scott v. Machinists Automotive Trades Dist. Lodge No. 190 of N. Cal.*, 827 F.2d 589, 591 (9th Cir. 1987). As discussed above, Section 301 preemption does not apply to ICTSI's breach of fiduciary duty counterclaim.

to consider the allegations to the extent they involve the Port. That issue is before the Ninth Circuit. Accordingly, the Court stays ICTSI's breach of fiduciary duty counterclaim against PMA until after the jurisdictional issues of the NLRB are resolved and, if applicable, after the NLRB decides whether the alleged conduct constitutes an unfair labor practice. Such a stay will avoid the waste of duplicating efforts in more than one forum and avoid the possibility of conflicting decisions in separate courts of appeal. Further, the Court may be able to rely on the NLRB's expertise in interpreting the NLRA when deciding whether certain conduct is or is not an unfair labor practice, which may be relevant to ICTSI's breach of fiduciary duty claim against PMA.

## C. The Port's Tortious Interference Counterclaim Against Both PMA and ILWU

The Port asserts a counterclaim for tortious interference against both PMA and ILWU. To state a claim for tortious interference with contract[18] under Oregon law, a party

> must allege each of the following elements: (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus*, 901 P.2d 841, 844 (Or. 1995) (citations omitted).

PMA moves to dismiss the Port's counterclaim for tortious interference with contract on the grounds that it is preempted by Section 301 of the LMRA and, alternatively, that the Port did not sufficiently plead the "improper means or improper purpose" element of tortious interference

---

[18] Under Oregon law, tortious interference with contract is the tort of "intentional interference with economic relations." *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 348 F.3d 1116, 1122 (9th Cir. 2003).

with contract. ILWU joins in this motion and additionally moves to dismiss the tortious

interference counterclaim against it as preempted by Section 303 of the LMRA.

**1.   The Port's tortious interference counterclaim against ILWU is preempted by
      Section 303 of the LMRA**

Section 303(a) of the LMRA prohibits certain secondary boycott activities. 29 U.S.C.

§ 158(b)(4)(B); 29 U.S.C. § 187 ("[i]t shall be unlawful . . . in an industry or activity affecting

commerce, for any labor organization to engage in any activity or conduct defined as an unfair

labor practice in section 158(b)(4) of this title"). As relevant to this case, under

section 158(b)(4),[19] it is an unfair labor practice for a labor organization or its agents:

> (i) to engage in, or to induce or encourage any individual . . . to
> engage in, a strike or a refusal in the course of his employment to
> use, manufacture, process, transport, or otherwise handle or work
> on any goods, articles, materials, or commodities or to perform any
> services; or (ii) to threaten, coerce, or restrain any person engaged
> in commerce or in an industry affecting commerce, where in either
> case an object thereof is
>
> * * *
>
> (B) forcing or requiring any person to cease using, selling,
> handling, transporting, or otherwise dealing in the products of any
> other producer, processor, or manufacturer, or to cease doing
> business with any other person . . . .
>
> * * *  [or]
>
> (D) forcing or requiring any employer to assign particular work to
> employees in a particular labor organization or in a particular
> trade, craft, or class rather than to employees in another labor
> organization or in another trade, craft, or class . . . .

29 U.S.C. § 158(b)(4).

In support of its tortious interference counterclaim, the Port alleges that PMA and ILWU:

(a) pressured, coerced, and threatened the Port to assign the reefer work to ILWU-represented

---

[19] 29 U.S.C. § 158 is commonly referred to as "Section 8" of the NLRA.

employees; (b) pressured, coerced, and threatened ICTSI to assign the reefer work to ILWU-represented employees; (c) coerced or induced carriers to bypass or threaten to bypass Terminal 6 to pressure the Port to give up the reefer work; (d) coerced or induced carriers into pressuring the Port to give up the reefer work; (e) threatened ICTSI with large fines or expulsion from the PMA; (f) instituted and maintained litigation against ICTSI seeking to force ICTSI to assign the reefer work to ILWU-represented employees; and (g) "encouraged" and "acquiesced in" ILWU's improper and illegal coercion of the Port to assign the reefer work to ILWU-represented employees and failed to properly represent ICTSI in connection with ILWU-filed grievances and work issues or permit ICTSI to protect its own interests. Port's Am. Ans. and Counterclaims (ECF 136) ("Port CC") ¶¶ 69a-g. Although the Port does not distinguish which conduct was allegedly engaged-in by ILWU and which by PMA, it is clear that allegations (e) and (g) are not allegations by the Port of conduct committed by ILWU. With respect to allegation (f), although ILWU is a plaintiff in this pending lawsuit, the Port does not allege sufficient facts to show that the filing of this lawsuit was wrongful or otherwise improper.

The remaining alleged conduct on which the Port bases its tortious interference counterclaim, allegations (a)-(d), allege that the ILWU pressured, coerced, and threatened the Port and other businesses in an attempt to force the Port to give up the reefer work and ICTSI to assign the reefer work to ILWU-represented workers. These are secondary boycott activities. The Port appears to argue that this conduct is not preempted by Section 303 because it does not all fall within the prohibition of Section 303. The Port points to some specific conduct that is not considered an unfair labor practice, such as the CLRC decision in May 2012. The Port's argument fails for two reasons.

First, the Court finds that the alleged conduct is governed by Section 303. Coercion and threats to force the Port or ICTSI to assign the reefer work to ILWU members is covered by the statute. Second, even if some sliver of specific conduct did not fall within the parameters of Section 303's covered labor practices, this would not prevent Section 303 preemption.

The type of conduct identified as an unfair labor practice and "made the subject of a private damage action was considered by Congress, and [Section] 303(a) comprehensively and with great particularity 'describes and condemns specific union conduct directed to specific objectives.'" *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 258 (1964) (quoting *Local 1976, United Bhd. of Carpenters and Joiners of Am. v. N.L.R.B.*, 357 U.S. 93, 98 (1958)). Congress selected "which forms of economic pressure should be prohibited by [Section] 303," striking a balance between the "uncontrolled power of management and labor" by preserving labor's right "to bring pressure to bear on offending employers" while "shielding unoffending employers and others from pressures in controversies not their own." *Id.* at 258-59 (quotation marks and citation omitted). Allowing labor to bring certain types of economic pressure while prohibiting other types of economic pressure is a "weapon of self-help" that "is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community." *Id.* at 259.

State law cannot "be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted [Section] 303" because this would "frustrate the congressional determination to leave this weapon of self-help available" and "upset the balance of power between labor and management expressed in our national labor policy." *Id.* at 259-60. Although some alleged secondary activity may be "neither protected nor prohibited," it is still preempted by Section 303 because "[f]or a state to impinge on the area of labor combat

PAGE 41 – OPINION AND ORDER

designed to be free is quite as much an obstruction of federal policy" as a state allowing

prohibited conduct. *Id.* at 258, 260. "In short, this is an area of judicial decision within which the

policy of the law is so dominated by the sweep of federal statutes that legal relations which they

affect must be deemed governed by federal law having its source in those statutes, rather than by

local law." *Id.* at 261 (quotation marks and citation omitted); *see also San Antonio Cmty. Hosp.*

*v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997) ("The interference

with prospective economic advantage and contractual rights claims are preempted by section 303

of the LMRA.").

The Supreme Court has, however, carved out an exception to Section 303 preemption for

allegations "'of conduct marked by violence and imminent threats to the public order.'" *Local*

*20*, 377 U.S. at 257 (citation omitted). State jurisdiction prevails in such situations because of the

"compelling state interest" of maintaining "domestic peace." *Garmon*, 359 U.S. at 247. This

exception does not apply to the facts alleged by the Port. The Port does not allege ILWU

engaged in violence or imminent threats to the public order or other conduct that is the subject of

a compelling state interest outside of coercion and threats in a labor dispute. Accordingly, the

Port's tortious interference counterclaim against ILWU is preempted by Section 303 and is

dismissed.

### 2.  The Port fails to state a claim for tortious interference against PMA

The Port's allegations of conduct allegedly giving rise to a tortious interference

counterclaim against PMA combines alleged conduct by PMA individually, PMA acting in

concert with ILWU, and PMA "encouraging" or "acquiescing in" ILWU's wrongful conduct.

Port CC ¶ 69. The Port's failure to specify which of the acts of allegedly wrongful conduct were

performed by PMA itself is grounds for dismissing the tortious interference counterclaim against

PMA. Even assuming, however, that all of the alleged wrongful conduct was engaged-in by

PAGE 42 – OPINION AND ORDER

PMA, the Port still fails to state a claim for tortious interference because it fails to sufficiently allege improper purpose or improper means.

### a.  Improper purpose

Under a claim for tortious interference with contract, a defendant acts with improper purpose if the defendant's purpose was "to inflict injury on the plaintiff 'as such.'" *Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124 (Or. 1999) (quoting *Top Serv. Body Shop v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978). "Generally, a defendant's subjective judgment as to its own business purposes will control." *Id.* It is not improper for a defendant to interfere with a contract in a manner "wholly consistent with [its] pursuit of its own business purposes as it [sees] them." *Top Serv.*, 582 P.2d at 1372.

The Port does not allege that PMA's purpose was to inflict injury on the Port. The Port's allegation of improper purpose is that PMA, with "full knowledge of the Port's right to control and assign the" reefer work, sought to require ICTSI to breach its obligations to the Port under the Terminal 6 lease and "to misappropriate the [reefer work] so that ICTSI would perform the services using ILWU labor." Port CC at ¶ 67. Thus, as alleged, PMA's purpose is to ensure that ILWU-represented employees perform the reefer work, not to harm the Port. Additionally, PMA's purpose of ensuring that ILWU members perform the reefer work is wholly consistent with PMA's business purpose of enforcing its interpretations of its contracts. Thus, the Port has not sufficiently alleged that PMA acted with improper purpose.

### b.  Improper means

Under Oregon law, to constitute improper means conduct "must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Nw. Nat'l*, 982 P.3d at 1124. Improper means include "violence, threats or other intimidation, deceit or misrepresentation,

PAGE 43 – OPINION AND ORDER

bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Serv.*, 582 P.2d at 1371 n.11. In applying this standard to the Port's allegations, the Port fails to allege sufficient facts that PMA used "improper means."

The Port's allegations (a) through (d) are that PMA pressured, coerced, or threatened various businesses in order to force ICTSI to assign the reefer work to ILWU members. The Port uses the conclusory term "threatened," but does not allege any facts relating to the alleged "threat." If PMA threatened violence or property destruction, that would fall within Oregon's definition of improper means, but the Port makes no such allegation. It appears that the Port is alleging threats and coercion by economic pressure. This is similar to allegation (e), which alleges that PMA threatened ICTSI with fines or expulsion. Oregon, however, has not accepted economic pressure as a type of "improper means."

The Port cites to *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211 (2d Cir. 2003), to support the Port's argument that economic pressure may constitute improper means. *Scutti*, however, applied New York law, which defines improper means as "representing 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.'" *Id.* at 216 (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*, 664 N.E.2d 492, 497 (N.Y. 1996)). Oregon, unlike New York, however, has not defined improper means to include some degrees of economic pressure. In Oregon's seminal case defining improper means, *Top Service*, the Oregon Supreme Court, after explaining that improper means requires a violation of a statute, regulation, recognized rule of common law, and perhaps an established standard of a trade or profession, noted that "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood" are examples of improper means. *Top Serv.*, 582 P.2d at 1371 n.11. This

PAGE 44 – OPINION AND ORDER

list of wrongful conduct was gleaned from the Restatement (Second) of Torts, Tent. Draft No. 23 §§ 766 and 767. Notably absent from *Top Services's* list of improper means, however, is economic pressure, even though economic pressure was specifically included as another type of improper means in the draft Restatement that was relied upon by the Oregon Supreme Court. Indeed, the only improper means listed in the draft Restatement that the Oregon Supreme Court did not include was economic pressure.

Further, analyzing whether economic pressure is an improper means requires a balancing test, considering the circumstances in which the pressure is exerted, the objective of the pressure, the degree of coercion, the extent of harm that it threatens, the effect upon neutral parties and competition, and the general reasonableness of the pressure. Restatement (Second) of Torts § 767 cmt. c.[20] This analysis is antithetical to the "objective" standard under Oregon law. Indeed, *Top Service* specifically noted that there are "difficulties inherent in 'balancing' as an approach to individual cases" in the context of tortious interference. *Top Serv.*, 582 P.2d at 1371 n.12. Accordingly, the Court will not expand Oregon's definition of improper means to include economic pressure. Allegations (a) through (e), which allege that PMA threatened, pressured, or coerced the Port and other businesses with economic pressure, are thus insufficient to state a claim of tortious interference.

The Port's allegation that PMA engaged in litigation to force ICTSI to assign the reefer work to ILWU members (allegation (f)) is also insufficient to state a claim for tortious interference. Wrongfully instituting litigation may support a claim for tortious interference, but the Port does not allege sufficient facts from which the Court can reasonably infer that the two lawsuits initiated by PMA were sham lawsuits, were filed without regard to merit, or were

---

[20] The balancing test approach of the Restatement (Second) of Torts remains unchanged from Draft No. 23 relied upon by the Oregon Supreme Court in *Top Service*.

otherwise unfounded. As discussed above, PMA succeeded at summary judgment in one lawsuit, which negates an argument that it was a wrongfully instituted, sham, or unfounded.

The Port's final allegation (allegation (g)) is that PMA "encouraged" or "acquiesced" to ILWU's wrongful conduct and that PMA failed properly to represent ICTSI. These are not violations of an "objective, identifiable standard[]" that can support a claim for tortious interference. *Northwest Nat'l*, 982 P.3d at 1124.

"Acquiesce" means to "accept tacitly or passively; to give implied consent." Black's Law Dictionary 26 (9th ed. 2009). The Port does not allege that PMA had a duty to speak out against ILWU's alleged conduct and that by remaining silent PMA violated a statute, regulation, or rule of common law. Thus, the Port fails to allege facts from which it can reasonably be inferred that PMA's "acquiescence" constituted improper means.

To the extent the Port is attempting to plead that PMA was jointly liable for ILWU's tortious conduct by "encouraging" ILWU, thus rendering PMA's conduct wrongful, the Port must plead sufficient facts from which an underlying tort by ILWU and joint liability by PMA can be inferred. Under Oregon law, joint liability requires pleading sufficient facts from which it can reasonably be inferred that PMA (1) performed a tortious act in concert with or pursuant to a common design with ILWU; (2) knew that ILWU's conduct constituted a breach of duty and gave ILWU substantial assistance or encouragement; or (3) gave substantial assistance to ILWU in accomplishing a tortious result and PMA's own conduct, separately, constitutes a breach of duty to the Port. *Granewich v. Harding*, 985 P.2d 788, 792 (Or. 1999). The conclusory allegation that PMA "encouraged" ILWU's "improper and illegal conduct" is insufficient. Port CC ¶ 69g.

Finally, the allegation that PMA did not properly represent ICTSI in response to ILWU grievances and work actions does not sufficiently state a claim for tortious interference with the

Port's economic relationship with ICTSI. The Court interprets the Port's allegation and argument to be that PMA breached its fiduciary duty to ICTSI, thereby rendering PMA's conduct wrongful and supporting a claim for tortious interference by the Port. Whether PMA may have violated its fiduciary duty to ICTSI, however, is a claim for ICTSI to bring against PMA, which ICTSI has done. The Court is unaware of, and the Port does not identify, any Oregon appellate case that holds that a breach of fiduciary duty constitutes improper means for purposes of stating a claim for tortious interference by a third party.

There are other jurisdictions that accept a breach of fiduciary duty as "improper means," but they are jurisdictions that also recognize that economic pressure may constitute improper means. *See, e.g.*, *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (noting that breach of fiduciary duty constitutes wrongful means; applying New York law, which recognizes that applying economic pressure may constitute wrongful means); *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1200 (Col. App. 2009) (same, applying Colorado law). Given the fact that Oregon has not accepted economic pressure as improper means and focuses on an objective standard, the Court will not expand the concept of improper means under Oregon tort law.

Additionally, in those jurisdictions that have accepted a breach of fiduciary duty as "improper means," the fiduciary duty breached is a duty owed to the plaintiff. *Id.* That is not the situation alleged by the Port. The Port alleges that PMA breached its fiduciary duty owed to ICTSI, not that PMA breached any such duty owed to the Port or caused ICTSI to breach any fiduciary duty owed to the Port. For all of these reasons, the Port fails adequately to state a claim against PMA for tortious interference.

### 3. Section 301 preemption

Because the Court finds that the Port fails to state a claim against PMA or ILWU for tortious interference, the Court does not reach the issue of Section 301 preemption.

PAGE 47 – OPINION AND ORDER

**CONCLUSION**

PMA's motion to dismiss ICTSI's antitrust and breach of fiduciary duty counterclaims (ECF 131), joined in part by ILWU (ECF 133), is granted in part and denied in part. ICTSI's antitrust counterclaim against both PMA and ILWU is dismissed. ICTSI's counterclaim against PMA for breach of fiduciary duty is not dismissed, but that counterclaim is stayed. PMA and ILWU's motions to dismiss the Port's counterclaim for tortious interference (ECF 138 and 146) are granted, and the Port's tortious interference counterclaim is dismissed.

**IT IS SO ORDERED**.

DATED this 24th day of March 2014.


/s/ Michael H. Simon
Michael H. Simon
United States District Judge