**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**, | Case No. 3:12-cv-1058-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **ICTSI OREGON, INC.,** | |
| Defendant. | |

**ICTSI OREGON, INC.,**

Counterclaim-Plaintiff,

v.

**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**; **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 8**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 40**,

Counterclaim-Defendant.

**Michael H. Simon, District Judge.**

Before the Court is ICTSI Oregon, Inc.'s ("ICTSI") Motion to Compel and International Longshore and Warehouse Union ("ILWU"), International Longshore and Warehouse Union Local 8 ("Local 8"), and International Longshore and Warehouse Union Local 40's ("Local 40") (collectively, "ILWU Entities") Motion for Protective Order. For the reasons discussed below, both motions are granted in part and denied in part, and the Court reserves ruling on a few issues.

## A. Case Background

This case is the last remaining active case out of five separate actions that were filed in 2012 arising from a labor dispute at fever ("T6") at the Port of Portland ("Port").[1] Briefly stated, the dispute concerns who is entitled to perform two jobs of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer" jobs) at T6. This case was originally filed by the ILWU and Pacific Maritime Association ("PMA"). They argued that their collective bargaining agreement—the Pacific Coast Longshore and Clerks Agreement ("PCL&CA")—required ICTSI, the then-operator of T6 and a PMA member, to assign the reefer jobs to ILWU members. ICTSI, the Port of Portland (the "Port"), and the International Brotherhood of Electrical Workers ("IBEW") Local 48 contended that other contracts—including the T6 Lease Agreement between the Port and ICTSI and the District Council of Trade Unions Agreement between the Port and IBEW—required that the reefer jobs be assigned to IBEW members.

---

[1] The other four cases are *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-1100-SI (closed May 7, 2018); *Int'l Longshore & Warehouse Union v. Port of Portland*, Case No. 3:12-cv-1494-SI (closed April 3, 2014); *Hooks v. Int'l Longshore &Warehouse Union*, Case No. 3:12-cv-1088-SI (closed April 25, 2018); and *Hooks v. Int'l Longshore &Warehouse Union*, Case No. 3:12-cv-1691-SI (closed April 23, 2018).

The ILWU and PMA brought this action under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, to enforce two arbitration awards, issued by arbitrators pursuant to the PCL&CA, assigning the reefer jobs to ILWU members. After the ILWU and PMA filed their complaint, the Port and the IBEW intervened as defendants.

The Port and ICTSI filed counterclaims against the ILWU Entities. The Port also filed crossclaims against ICTSI. The Court dismissed some of the counterclaims and stayed one of the counterclaims pending resolution of the appeal of the National Labor Relations Board ("NLRB") decision awarding the reefer jobs to IBEW members. The NLRB later issued a decision that certain conduct by the ILWU Entities was illegal secondary boycott conduct and not legal primary conduct, and that decision was also appealed. Those appeals were heard before the U.S. Court of Appeals for the D.C. Circuit, which upheld the decisions of the NLRB. Because NLRB decisions take precedence over inconsistent arbitration decisions, those cases mooted the ILWU and PMA's claim to enforce the arbitration award in this case and the Port and ICTSI's counterclaims requesting that the Court void the arbitration award. At the parties' requests, the Court dismissed ILWU and PMA's claims and the Port and ICTSI's counterclaims relating to the arbitration award. ECF 280. The Court then dismissed the Port and the PMA from this case. ECF 229, 231, 285. IBEW also withdrew. ECF 241.

After the various legal rulings and voluntary dismissals in this case and the legal rulings in other related cases, the only remaining parties in this case are the ILWU Entities and ICTSI. What remains at issue is: (1) ICTSI's Second Counterclaim for money damages under 29 U.S.C.

§ 187 based on the ILWU Entities' illegal secondary boycott activities; and (2) ILWU's First through Seventh Affirmative Defenses.[2]

## B. ICTSI's Motion to Compel

### 1. Settlement-Related Documents—DENIED

ICTSI moves to compel the ILWU Entities to produce documents for which they have withheld production based on the confidentiality of settlement negotiations. The ILWU Entities have asserted this "settlement privilege" in response to numerous Requests for Production ("RFP") issued by ICTSI. The underlying documents appear to relate to the settlement between the ILWU Entities and the Port, including early settlement discussions that occurred through the office of the Governor of Oregon. Although ICTSI has a copy of the final settlement agreement between the ILWU Entities and the Port, ICTSI requests draft agreements and other documents relating to discussions between the parties. ICTSI also requests the documents relating to the settlement efforts by the Governor's office. ICTSI asserts that the ILWU Entities are going to rely on these discussions in their defense in this lawsuit. The ILWU Entities respond that they are not going to rely on any of these discussions in their defense in this case.

ICTSI cites to patent cases for the proposition that settlement discussions and related documents may lead to admissible evidence. In the unique context of patent cases, however, settlement agreements may be relevant in calculating a reasonable royalty as damages for infringement. Other than arguing that the ILWU Entities will rely on the settlement discussions as a defense in this case, which the ILWU Entities deny, ICTSI has not explained how the settlement discussions between the Port and the ILWU Entities could lead to admissible evidence

---

[2] ICTSI has moved for partial summary judgment against most of the ILWU Entities' affirmative defenses. Oral argument on this motion is scheduled for January 10, 2019.

in this case.[3] Settlement discussions are generally confidential, protected, and not admissible.

*See, e.g.*, *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th

Cir. 2003) (explaining that "there exists a strong public interest in favor of secrecy of matters

discussed by parties during settlement negotiations"); *Four in One Co. v. S.K. Foods, L.P.*, 2014

WL 4078232, at *2 n.1 (E.D. Cal. Aug. 14, 2014) (noting that "settlement negotiations and

communications exchanged therein are inherently confidential"). The ILWU Entities assert that

they will not use any of the settlement discussions or documents in their defense. The Court will

hold them to this assertion. Accordingly, ICTSI's motion is denied with respect to settlement

documents.

---

[3] ICTSI discusses the relevance of the 2017 Settlement Agreement to show the ILWU Entities' motives in continuing to fight for the two reefer jobs through 2017 and with respect to the ILWU Entities' Fourth Affirmative Defense. The Court notes that in their most recent answer, after the Court ruled on ICTSI's motion to strike, this affirmative defense was renumbered and is now the ILWU Entities' Third Affirmative Defense. That is how the Court will refer to it in this Opinion and Order. ICTSI has a copy of the final settlement agreement and thus has the evidence it needs with respect to the ILWU Entities' Third Affirmative Defense.

Regarding the ILWU Entities' continuing efforts to fight for the reefer jobs, ICTSI had other avenues of discovery to obtain that information, including depositions and interrogatories that would not invade the confidentiality of settlement negotiations. Further, ICTSI does not explain how drafts of the settlement agreement or how other settlement communications are relevant. For example, how would the fact that the Port or the ILWU Entities may have initially, for strategic reasons, demanded something in settlement that that they were willing to "give up" to achieve a final agreement be relevant to this case? *See, e.g.*, *Goodyear*, 332 F.3d at 981 ("'Settlement negotiations are typically punctuated with numerous instances of puffing and posturing since they are "motivated by a desire for peace rather than from a concession of the merits of the claim." *United States v. Contra Costa County Water Dist.*, 678 F.2d [90, 92 (9th Cir. 1982)]. What is stated as fact on the record could very well not be the sort of evidence which the parties would otherwise actually contend to be wholly true. That is, the parties may assume disputed facts to be true for the unique purpose of settlement negotiations. The discovery of these sort of "facts" would be highly misleading if allowed to be used for purposes other than settlement.'" (alteration in original) (quoting *Cook v. Yellow Freight System, Inc.*, 132 F.R.D. 548, 554 (E.D. Cal. 1990)).

## 2. Personal Email Accounts—DENIED

ICTSI moves to compel the ILWU Entities to search the personal email accounts of their officers, agents, and members for responsive documents. ICTSI notes that only one personal email account was searched as a source for document production—the email account of Leal Sundet.

ICTSI fails to show that the ILWU Entities have possession, custody, or control over the personal email accounts of their officers, agents, and members. Personal email accounts are separate from work email accounts. As U.S. Magistrate Judge Paul S. Grewel explained in considering a similar motion:

> What does it mean for a party to have control over data like the data disputed here? "Control is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). Like the majority of circuits, the Ninth Circuit has explicitly rejected an invitation "to define 'control' in a manner that focuses on the party's practical ability to obtain the requested documents." *Id.* at 1107-08. Documents are not discoverable under Rule 34 if the entity that holds them "could legally—and without breaching any contract—continue to refuse to turn over such documents." [*Id.*] "The party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." [*United States v.*] *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d [1450,]1452 [(9th Cir. 1989)].

*Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2015 WL 8482256, at *3 (N.D. Cal. Dec. 10, 2015) (citations omitted) (denying motion to compel production of employees' personal email accounts and noting that the moving party had not identified any legal authority under which the employer could force its employees to turn over email from personal accounts).

The Court acknowledges, however, that a company's officer or agent should not be able to avoid the rules of discovery by using personal email, which is in the custody and control of that officer or agent, for work purposes. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2972806, at *2 (N.D. Cal. July 12, 2017) ("Otto Trucking must produce responsive documents in

the custody, control or possession of its officers . . . . It cannot hide responsive documents simply because these officers' work for Otto Trucking was done using their personal email accounts, especially since they are all current Otto Trucking officers. . . . The cases Otto Trucking does cite are all inapposite; none involve a corporation refusing to produce documents involving corporation business in the possession, custody or control of the corporation's officers. To accept Otto Trucking's argument would mean that it could not compel its current officers to produce Otto Trucking's own trade secrets to Otto Trucking merely because the officers conducted Otto Trucking business with their personal email accounts. Nonsense. Otto Trucking must produce responsive documents in the custody, control or possession of its officers and agents."). Other than producing a single work-related email from Bruce Holte's personal account, however, ICTSI fails to show that the officers, agents, or members of the ILWU Entities use personal email for work correspondence more than a *de minimus* amount. To the contrary, the deposition testimony is that they do not. ICTSI's motion is denied.

### 3. RFP 3: Redacted Meeting Minutes—GRANTED IN PART

The ILWU Entities produced union meeting minutes that are heavily redacted. ICTSI moves to compel production of those minutes without redaction. ICTSI contends that the ILWU Entities stated that the redactions involve complaints against other employers and thus are irrelevant. ICTSI argues, however, that the ILWU Entities assert in this case that ICTSI was a "particularly terrible" employer that did not follow West Coast labor standards, and thus complaints against (or complimentary discussions about) other employers are relevant. The ILWU Entities now argue that producing unredacted versions of these minutes would violate the union members' First Amendment associational privilege.

The Ninth Circuit has addressed First Amendment associational rights and discovery requests (in the context of a government defendant), describing how a court should analyze the claim as follows:

> a claim of First Amendment privilege is subject to a two-part framework. The party asserting the privilege must demonstrate a *prima facie* showing of arguable first amendment infringement. This *prima facie* showing requires appellants to demonstrate that enforcement of the [discovery requests] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights. If appellants can make the necessary *prima facie* showing, the evidentiary burden will then shift to the government [to] demonstrate that the information sought through the [discovery] is rationally related to a compelling governmental interest [and] the 'least restrictive means' of obtaining the desired information. More specifically, the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it. The question is therefore whether the party seeking the discovery has demonstrated an interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the free exercise of [the] constitutionally protected right of association.
>
> To implement this standard, we balance the burdens imposed on individuals and associations against the significance of the interest in disclosure, to determine whether the interest in disclosure outweighs the harm. This balancing may take into account, for example, the importance of the litigation; the centrality of the information sought to the issues in the case; the existence of less intrusive means of obtaining the information; and the substantiality of the First Amendment interests at stake. Importantly, the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1). The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable.

*Perry v. Schwarzenegger*, 591 F.3d 1126, 1140-41 (9th Cir. 2009) (alterations in original) (alterations, quotation marks, and citations omitted).

The ILWU Entities offer declarations of members and officers regarding the sensitive nature of information discussed at the meetings, including political activity, collective bargaining strategy, contract interpretation, complaints against members, and charitable contributions. The declarants also testify that disclosure of this information would have a chilling effect on the free flow of information at these meetings. The Court agrees, and also notes that ICTSI has not made a request for that type of information or explained the relevance of that information. ICTSI has requested complaints against or complimentary discussions about other employers as relevant to the ILWU Entities' assertions that ICTSI is a particularly poor employer. Thus, the Court considers only whether disclosure of that specific type of information gives rise to First Amendment associational concerns.

ICTSI disputes that the ILWU Entities meet their burden of establishing a *prima facie* case regarding that specific information. ICTSI argues that the Protective Order in this case provides sufficient protection from disclosure to third parties, thereby mitigating any potential chilling effect of disclosure in this case. ICTSI furthers argues that it is no longer leasing any facilities at the Port and thus there is no risk of it retaliating against union members. The requested redacted information, however, does not relate to complaints about ICTSI, but complaints about other employers. The risk of retaliation and harassment from disclosure of that information thus would not be from ICTSI—the ILWU entities produced the complaints about ICTSI without redaction. The risk the Court must consider is whether disclosure to ICTSI of complaints about other employers would chill the associational conduct of the members of the ILWU Entities.

The evidence offered by the ILWU Entities does not specifically discuss disclosure under a protective order to ICTSI of complaints or compliments about nonparty employers. Nor does

common sense dictate that disclosure in this lawsuit of discussions regarding complaints or compliments about nonparty employers, which would be subject to a protective order, would chill associational rights. Disclosure in a manner that might risk exposure to those nonparty employers, who could subject the speakers of complaints to retaliation and harassment, may well chill associational rights. But disclosure in this lawsuit is not disclosure to those nonparty employers, and the risk of such disclosure is minimal because of the protective order. The declarations submitted by the ILWU Entities describe numerous topics discussed at meetings and ICTSI requests disclosure of only a small part—complains or compliments about nonparty employers. The disclosure of only a small part of the discussions at the meetings does not give rise to "other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights," such as discouraging the free flow of information at meetings. *Perry*, 591 F.3d at 1140.

Moreover, although ICTSI disputes that the ILWU Entities meet their burden of making a *prima facie* showing that disclosure would have a chilling effect on associational rights, ICTSI proposes having the names of the speakers at the meetings designated as "attorney's eyes only" under the protective order, arguing that the name of the speaker is the most sensitive information. The Court finds that the entire discussion regarding other employers is sensitive, not just the name of the speaker. Accordingly, the entire discussion may be designated as "attorney's eyes only" under the protective order. ICTSI's motion on this topic thus is granted in part. Discussions regarding complaints or compliments about other employers must be produced unredacted. They may be designated as "attorney's eyes only" under the protective order. Any other redacted information may remain redacted.

### 4. RFP 11: Jurisdictional Disputes at Other Ports—GRANTED

ICTSI alleges that the slowdowns and stoppages at the Port's T6 was part of a larger strategy along the West Coast to monopolize work. Accordingly, in RFP No. 11, ICTSI requested documents from the ILWU Entities regarding claims for maintenance and repair work at other ports that led to jurisdictional disputes with other unions. ICTSI limited the request to documents dated from July 1, 2008, to the present. The ILWU Entities argue that these documents are irrelevant because what happened at other ports has nothing to do with T6 and any coastwide theory is "far-fetched" and without evidentiary support. The ILWU Entities also argue that production would be disproportionate and unduly burdensome because the Port only involves two percent of ILWU members. These arguments are without merit.

Regarding relevance, at the discovery stage, documents need not be admissible to be discoverable. Fed. R. Civ. P. 26(b)(1). They need only be relevant to claims or defenses. *Id.* ICTSI cites to the deposition testimony of ILWU's President, who stated with respect to the two reefer jobs at the Port that if the union "let those jobs go" that "it would bleed up and down the whole entire West Coast," that "it would undermine the contract that I had bargained," and that the two Portland jobs "are symbolic, not just for two jobs, but for jobs up and down the coast." ICTSI also argues that a West Coast strategy explains why the ILWU Entities were willing to let T6 shut down permanently over a dispute about two jobs, which otherwise makes no financial sense when one looks at T6 in a vacuum. ICTSI has met its burden to show relevancy.

Regarding proportionality and the burden of production, the discovery request is narrowly-tailored and has nothing to do with the number of union members who worked at the Port as compared to the number of union members working at other ports along the West Coast. The discovery request relates only to a narrow category of information—the ILWU or its local unions' claims for maintenance and repair work that led to jurisdictional disputes with other

unions. The request also is limited in scope to only documents after July 1, 2008. ICTSI's motion to compel production of documents in response to RFP 11 is granted.

### 5. RFP 44-45: Slowdowns and Stoppages at Other Ports—GRANTED

ICTSI also issued RFP Nos. 44 and 45, which request documents related to work stoppages or slowdowns by ILWU members or affiliated local unions at any West Coast container terminal between July 1, 2014, and the execution of the contract between the ILWU and the PMA on or about March 2, 2015. ICTSI argues these documents are relevant because the ILWU Entities have argued that their members' conduct at issue in this case was motivated solely by primary labor concerns and not efforts to obtain the disputed reefer jobs. ICTSI asserts that it is entitled to examine ILWU members' conduct and productivity coastwide during its negotiations with the PMA for the new bargaining agreement and compare that to the conduct and productivity in Portland to test the veracity of the ILWU Entities' assertions in this case. The ILWU Entities object that this request is disproportionate and unduly burdensome because work stoppages and slowdowns are some of the most common issues addressed by the union and the amount of union labor at the other ports is far greater than at the Port.

The ILWU Entities provide no details regarding the purported undue burden, other than the general statistic regarding the size of the Port compared to all other West Coast terminals (two percent). That statistic provides no guidance, however, regarding the production burden relating to work stoppages and slowdowns at those terminals during the requested period. For example, were there work stoppages and slowdowns at every port on the West Coast or only one or two? Were there work stoppages and slowdowns all throughout the requested period or only for a few weeks? This type of information would have been more helpful in evaluating burden than the general fact that the Port represents only two percent of the labor force of the West Coast terminals. If there were only a few work stoppages and slowdowns at other West Coast

terminals and there were many at T6, then that two percent of the labor force might represent 90 percent of West Coast work stoppages and slowdowns, and producing documents relating to the other ports would require only a minimal burden. Moreover, the document request has a narrow time frame—eight months. The Court finds that the ILWU Entities have not shown that this request is unduly burdensome or disproportionate. ICTSI's motion is granted with respect to this request.

### 6. RFP 25-26: Communications with Carriers—GRANTED

ICTSI moves to compel documents in response to RFP Nos. 25 and 26, which request communications by or among the ILWU Entities and T6 carriers from January 1, 2012, to the present. ICTSI states that it "knows" that the ILWU has failed to produce responsive documents in its possession because responsive emails have been produced by Hanjin, a T6 carrier. The ILWU Entities did not respond to this portion of ICTSI's motion.

The fact that responsive email was in the possession of Hanjin at the time of production does not necessarily mean that it remains in the possession of any of the ILWU Entities, depending on their document retention policies and procedures. The Court notes, however, that the lawsuit in this case was filed on June 13, 2012 (six months after the earliest date requested in these RFPs), and thus a litigation hold should have been in place, at a minimum, by that date. Regardless, the Court orders that the ILWU Entities conduct a diligent and reasonable search and produce any responsive documents that are in their possession, custody, or control, or confirm in writing if no responsive documents exist.

### 7. RFP 37: Leal Sundet's Journals—DENIED WITHOUT PREJUDICE

ICTSI originally moved to compel production of Leal Sundet's journals, requested in RFP No. 37. The ILWU Entities responded that no such journals existed. ICTSI replied that one of its employees took a photo of Mr. Sundet with such a journal and that after seeing the

photograph the ILWU Entities then claimed that Mr. Sundet destroyed his journals. ICTSI withdrew its motion to compel, but requested sanctions. The ILWU Entities denied that Mr. Sundet destroyed any journals, instead contending that if he took any notes he destroyed those notes.

Because ICTSI has not filed a proper motion for sanctions, the Court denies ICTSI's informal request for sanctions raised in ICTSI's response to the ILWU Entities' motion for a protective order. This denial is without prejudice to ICTSI's ability to bring a motion for sanctions under Rule 37 of the Federal Rules of Civil Procedure, if ICTSI believes that the relevant standard is met under the circumstances of Mr. Sundet's purported destruction of evidence.

8.  **RFP 38-42: Alleged Violations of the CBA, Past Practice, or Working Conditions—DENIED**

ICTSI issued RFP Nos. 38-42, which request documents relating to any action or failure to act by ICTSI that the ILWU Entities contend violated past practices, violated the parties' collective bargaining agreement, relate to working conditions, or interfered with productivity or efficiency at T6. The ILWU Entities produced only union complaints in response. ICTSI requested that the ILWU Entities either confirm that all alleged actions or failures by ICTSI are contained in the union complaints, or identify by Bates number other responsive documents. The ILWU Entities did not respond to this request.

It is unclear what ICTSI is asking the Court to compel. The ILWU Entities assert that they have provided all nonprivileged, responsive documents. The Court understands this to mean that there are no emails, meeting minutes, internal memoranda, or other documents discussing alleged misconduct or failure to act by ICTSI that have not been produced. To the extent any

such documents exist, they must be produced. If the ILWU Entities attempt to use in the future any responsive documents that were not produced, they will be prohibited from doing so.

Regarding ICTSI's apparent request that the ILWU Entities be estopped from arguing any conduct or failure to act by ICTSI not contained in the union complaints, the Court declines to issue such an order. An ILWU member may have believed that ICTSI acted or failed to act in a relevant manner without documenting it in a way that is now subject to document production. That is a topic to be explored through other means of discovery, such as interrogatories or at deposition, including depositions of the ILWU Entities under Rule 30(b)(6) of the Federal Rules of Civil Procedure, if the question is submitted with appropriate specificity. ICTSI's motion is denied.

### 9.  RFP 4, 13: Telephone Records and Calendars—DENIED

ICTSI moves to compel production of cellular telephone records, billing records, and calendars and other documents showing the schedules of certain agents and representatives of ILWU. The ILWU Entities object that ICTSI is requesting the personal cell records and calendar information, which are not within the control of the ILWU Entities. They also object on confidentiality grounds. The parties have resolved this dispute relating to text messages, but not the other aspects of this request.

This request suffers from the same deficiency as ICTSI's request that the personal email accounts of ILWU members be searched for responsive documents. ICTSI has failed to show either that the ILWU Entities have possession, custody, or control of the requested cell records or calendars, or that the members use their personal cell phones or calendars for more than *de minimis* work purposes. ICTSI's motion is denied.

**10. RFP 6, 8: ILWU Member Discipline, Expulsion, Resignation, Retirement—DENIED**

ICTSI moves to compel production of records of all fines, discipline, expulsion, and threats of the same, plus retirements and resignations, for ILWU members assigned to work at T6 during the relevant period. ICTSI argues that the disciplinary information is relevant because the ILWU Entities' failure to discipline or expel ILWU members who intentionally engaged in illegal slowdowns is relevant to show the ILWU Entities' failure to take steps to stop the slowdown after the Court issued its injunction. ICTSI requests information on retirements and resignations because former employees may be more "candid" in discussing the issues of this case.

Although the ILWU Entities objected to RFP 8 (requesting disciplinary information for ILWU members working in the "Columbia River region"), they state in their response to the motion to compel that they have produced "member discipline records concerning employment at ICTSI and Terminal 6" because such information would be subject to production despite First Amendment associational protection. And although RFP 8 requested disciplinary information for more than just ILWU members working at T6, in the motion to compel ICTSI requests this information only for members "assigned to T6." Thus, it appears that the ILWU Entities have produced the disciplinary information that ICTSI is requesting in this motion and there is no dispute between the parties on this particular request. The Court therefore denies this portion of ICTSI's motion as moot.[4]

---

[4] The Court notes that in the parties' correspondence before filing this motion, they discussed the dispute relating to this issue to be disciplinary records of ILWU members *not assigned to T6. See* ECF 319 at 36. ICTSI, however, did not move to compel such records and thus it is unclear why this issue was included in the motion to compel.

Regarding the information relating to resignations and retirements, the ILWU Entities argue that this information is protected under the First Amendment associational protection and that ICTSI has the information available to it through PMA records. The ILWU Entities explain that the ILWU and PMA jointly maintain registration lists, which are separate from the union's membership lists. The registration lists identify who is employed as a longshoreman. The ILWU Entities argue that as a member of the PMA, ICTSI has access to the registration lists and can use that information to ascertain who has resigned or retired. Because union lists implicate associational interests and registration lists do not, the ILWU Entities argue that ICTSI should obtain the information it requests through the registration lists to which it already has access. ICTSI did not respond to this argument. The Court denies this portion of ICTSI's motion, without prejudice to renew if the registration lists prove to be insufficient to meet ICTSI's needs.

### 11. RFP 34: Press Releases and Media Statements—GRANTED

ICTSI moves to compel production of documents related to press releases and media statements from January 1, 2012, to the present. ICTSI contends that the ILWU Entities produced nothing other than the final press releases. ICTSI argues that drafts and internal discussions relating to what to say to the media are relevant to refute the ILWU Entities' claims that the work stoppages and slowdowns were for primary labor reasons. The ILWU Entities respond generally that they have produced responsive documents.[5]

The ILWU Entities did not provide the Court with any specifics regarding the purported document production on this topic. This motion is granted. The ILWU Entities must conduct a reasonable and diligent search and produce documents in addition to the final press releases and media statements, if any are found. These include, without limitation, drafts and communications

---

[5] The ILWU Entities simply state that they have produced responsive documents to several portions of ICTSI's motion to compel, without providing any further detail.

relating to press releases and media statements both before and after the statement. The ILWU Entities also must confirm in writing if no additional responsive documents are found and also must identify any documents withheld and the basis for that withholding.

### 12. RFP 35: Communications with Port Commission—GRANTED

ICTSI moves to compel documents relating to communications with the Port of Portland Commission, including documents relating to a statement read by Local 8 President Mike Stanton to the Commission on July 9, 2014. ICTSI argues that these documents are relevant to demonstrate the ILWU Entities' continued desire to get the Port to relinquish control over the two reefer jobs and may show the ILWU's control over the actions of Local 40 and Local 8. The ILWU Entities respond generally that they have produced responsive documents.

The ILWU Entities did not provide the Court with any specifics regarding the purported document production on this topic. This motion is granted. The Court is concerned if there is an absence of responsive documents during the period this litigation is pending, when a litigation hold should be in place. The ILWU Entities must conduct a reasonable and diligent search and produce responsive documents, if any are found. The ILWU Entities also must confirm in writing if no additional responsive documents are found, and also must identify any documents withheld and the basis for that withholding.

### 13. RFP 36: Documents Related to a Picket at T6 by Visiting Hondurans--GRANTED

ICTSI requests documents relating to a visit to San Francisco and then Portland in March 2014 by individuals purporting to be from Honduras, who then picketed at T6 and caused a work stoppage. ICTSI contends that this visit and picket was orchestrated by the ILWU and was motivated by the ILWU's animosity toward ICTSI. ICTSI agrees to redact the names of the

foreign nationals who were involved in the picket, but otherwise contends that the protective order in this case is sufficient to negate any confidentiality concerns of the ILWU Entities.

The ILWU Entities assert that they have produced all responsive, non-privileged documents under their control "with the exception of a few documents from which ICTSI could identify union leaders, supporters, and their families" and that the ILWU Entities redacted faces from photos and withheld an email chain between ILWU officers and staff with Honduran union leaders, to protect the privacy and the safety of the union leaders and their families.

The ILWU Entities may not unilaterally withhold relevant documents out of "privacy" concerns. Only privileged information may be unilaterally withheld. All relevant and responsive documents must be produced, although any documents for which the ILWU Entities have good faith privacy concerns may be designated "attorney's eyes only" pursuant to the Protective Order in this case. ICTSI's motion is granted.

**14. RFP 47: ILWU's Decision to Withdraw from the AFL-CIO—DENIED**

ICTSI requests documents related to the ILWU's decision to withdraw from the AFL-CIO. The ILWU Entities object that this information is irrelevant. ICTSI surmises that if the ILWU's decision was related to the reefer dispute at T6, then it is relevant. At this time, ICTSI has nothing other than sheer speculation to tie the ILWU's decision to withdraw from the AFL-CIO to anything related to T6. ICTSI fails to show that this request is relevant to any claim or defense. This motion is denied.

**15. RFP 48: Documents from ILWU to Local 8 or Local 40 Regarding the Port Commission—GRANTED**

ICTSI requests documents from ILWU to Local 8 or Local 40 for reading at the Port of Portland Commission meetings. ICTSI argues that these documents are relevant to demonstrate the ILWU Entities' continued desire to get the Port to relinquish control over the two reefer jobs

and may show the ILWU's control over the actions of Local 40 and Local 8. The ILWU Entities respond generally that they have produced responsive documents.

The ILWU Entities did not provide the Court with any specifics regarding the purported document production on this topic. This motion is granted. The ILWU Entities must conduct a reasonable and diligent search and produce responsive documents, if any are found. The ILWU Entities also must confirm in writing if no additional responsive documents are found, and also must identify any documents withheld and the basis for that withholding.

### 16. Documents the ILWU Entities have Agreed to Produce—GRANTED IN PART

ICTSI asserts that the ILWU Entities have agreed to produce documents responsive to several document requests, but that no responsive documents have yet been produced. ICTSI asked the ILWU Entities to confirm in writing that no responsive documents exist, or provide Bates numbers for the responsive documents, but the ILWU Entities have failed to do so. ICTSI notes that due to technical issues, approximately 90 percent of the ILWU Entities' production is spam and other nonresponsive documents, making reviewing for responsive material difficult and time consuming.

The ILWU Entities admit that their early document production had technical problems and this resulted in nonresponsive documents being produced. The ILWU Entities contend that these production problems have now been fixed. Given the admitted early problems and volume of nonresponsive documents produced, the Court orders the ILWU Entities to provide ICTSI with the information it requests, if it can be provided without undue burden. Accordingly, if the ILWU Entities can confirm that no responsive documents exist or provide Bates numbers for the responsive documents in less than 20 hours of paralegal or attorney time, they shall do so. If the ILWU Entities believe in good faith that accomplishing this task will take longer than 20 hours of work, the Court will require more specific information from the ILWU Entities as to the

anticipated burden. If the Court determines that it is too burdensome for the ILWU Entities to provide the information ICTSI seeks, then the burden shall remain with ICTSI to search the production for responsive documents. If ICTSI believes that the documents have been produced in an unreasonable format (*e.g.*, not text searchable or without appropriate metadata), then ICTSI may file a motion and the Court will consider ordering the ILWU Entities to re-produce the documents in a different format. The Court also may hold an evidentiary hearing regarding this dispute.

### 17. Interrogatory Nos. 6 and 7—GRANTED IN PART

In Interrogatory No. 6, ICTSI requested that the ILWU Entities identify each action of lawful primary activity by the ILWU between June 1, 2012, and March 15, 2017. ICTSI moved to compel more specific responses, arguing that the responses provided by the ILWU Entities were too broad and vague because they reference every time ILWU members did something, such as file a complaint with an agency, file a grievance, engage in a strike, or "stand down" from work. ICTSI argues that it is entitled to details regarding the purported grievances and complaints, the communications associated with the complaints, the dates and details of when employees "stood down" from work, and similar information.

The ILWU Entities served supplemental responses to Interrogatory Nos. 6 and 7 after ICTSI's motion to compel was filed. The ILWU Entities objected that Interrogatory No. 6 was overbroad, unduly burdensome, and requested information protected by the attorney-client privilege and work product doctrine. The ILWU Entities then responded to Interrogatory No. 6 by identifying the following actions:

- Every grievance filed by the ILWU alleging violations of the collective bargaining agreements between the ILWU and the PMA, except for the grievances specifically alleging that ICTSI and other PMA member companies were required to assign dockside reefer work to longshoremen at T6.

- Every response to any Employer Complaint filed by ICTSI against employees represented by the ILWU.

- Every response to any claim by ICTSI that any of the ILWU or their members violated Section 11 of the PCL&CA.

- Every Joint Port Labor Relations Committee ("JPLRC") and Joint Coast Labor Relations Committee ("JCLRC") meeting where an issue on the meeting's agenda or minutes concerned ICTSI, except for the items concerning grievances specifically alleging that ICTSI and other PMA member companies were required to assign dockside reefer work to longshoremen at T6.

- Every arbitration concerning the employment of longshoremen, marine clerks, and foremen/walking bosses at T6, except for arbitrations over grievances specifically alleging that ICTSI and other PMA member companies were required to assign dockside reefer work to longshoremen at T6.

- Every time that an employee represented by the ILWU aided the ILWU in preparing for an arbitration or refrained from aiding the ILWU in preparing for an arbitration.

- Every time that an employee represented by the ILWU communicated with a shop steward, business representative, elected officer of the ILWU, or staff of the ILWU concerning the terms and conditions of his or her employment with ICTSI.

- Every time that a shop steward, business representative, elected officer of the ILWU, or its staff observed operations at T6 or otherwise investigated whether ICTSI was complying with its collective bargaining agreements with the Counter-Defendants.

- Every time that a shop steward, business representative, elected officer, or staff of the ILWU communicated with a representative of ICTSI or of the PMA concerning a dispute over compliance with the collective bargaining agreements, including, but not limited to, communications described in Section 11.43 and subsections and Section 17.2 and subsections of the PCL&CA.

- Every communication between a shop steward, business representative, elected officer, or staff of the ILWU and a representative of ICTSI or of the PMA concerning the terms and conditions of employment at T6, except for communications concerning grievances specifically alleging that ICTSI and other PMA member companies were required to assign dockside reefer work to longshoremen at T6.

- Every complaint lodged with any federal or state agency responsible for workplace safety at T6, including every communication with said agencies.

- Every strike by employees represented by the ILWU over a grievance filed against ICTSI from July 1, 2014 to March 3, 2015, when the PCL&CA had expired and its no-strike/no lockout provisions were not in effect.

- Every action by employees represented by the ILWU supporting, opposing, or refraining from supporting or opposing the ILWU's position in bargaining the July 1, 2014 PCL&CA with the PMA.

- Every time that employees represented by the ILWU "stood down" from working due to "a good faith" concern over an immediate health and safety issue or over an onerous workload under Section 11 of the PCL&CA.

- Every time that an employee represented by the ILWU complained about working conditions at ICTSI, excluding the condition of ICTSI's refusal to comply with arbitration awards or JCLRC rulings ordering it to assign dockside reefer work to longshoremen.

- Every time that two or more ILWU-represented employees were disgruntled with the working conditions at ICTSI, excluding the condition of ICTSI's refusal to comply with arbitration awards or JCLRC rulings ordering it to assign dockside reefer work to longshoremen.

- Every time that ILWU-represented employees responded to working conditions at ICTSI, excluding the condition of ICTSI's refusal to comply with arbitration awards and JCLRC rulings ordering it to assign dockside reefer work to longshoremen.

- Every time that ILWU-represented employees supported other ILWU employees concerning those employees' working conditions at ICTSI, excluding the condition of ICTSI's refusal to comply with arbitration awards or JCLRC rulings ordering it to assign dockside reefer work to longshoremen.

- Every time that ILWU-represented employees refrained from supporting other employees concerning those employees' working conditions at ICTSI.

- Every time that ILWU-represented employees expressed an opinion regarding their elected officials' relationships with or positions regarding ICTSI.

- Every time that ILWU members supported, opposed, or otherwise refrained from supporting or opposing a candidate for any ILWU office based in whole or in part on that candidate's relationship with or position regarding ICTSI.

- Every time that ILWU-represented employees wore or refrained from wearing clothing, buttons, pins, or stickers or displayed a tattoo expressing support for the ILWU.

- Every time that ILWU-represented employees invoked or asserted rights, practices or provisions under the PCL&CA and its related agreements as to employment at T6, excluding the condition of ICTSI's refusal to comply with arbitration awards or JCLRC rulings ordering it to assign dockside reefer work to longshoremen.

The Court agrees with the ILWU Entities that going through five years of interactions and identifying every specific action of purported primary conduct by date and time would be unduly burdensome. The supplemental response provided by the ILWU Entities is sufficient for ICTSI to understand what the ILWU Entities contend was primary activity. ICTSI's motion is denied with respect to Interrogatory No. 6.

In Interrogatory No. 7, ICTSI requested that the ILWU state the cause or motive for the primary activity identified in Interrogatory No. 6. In their supplemental response, the ILWU Entities list the same objections as made against Interrogatory No. 6, and then respond: "See response to Interrogatory No. 6." Nearly all of the responses to Interrogatory No. 6, however, do not include information relating to cause or motive. With the exception of a few responses, such as ILWU members wearing or refraining from wearing clothing expressing support for the ILWU or ILWU members standing down from work over a good faith concern for health and safety issues, the responses to Interrogatory No. 6 list actions, not motives. Accordingly, the ILWU must supplement its response to Interrogatory No. 7 to include the motives for its purported primary conduct. This supplemental response need not include specific motives for specific actions by date and time, but may generally ascribe motives to general categories of actions. ICTSI's motion is granted in part with respect to Interrogatory No. 7.

### 18. Interrogatory Nos. 8 and 9—DENIED

ICTSI moves to compel the ILWU Entities to identify certain oral communications that are the subject of Interrogatory Nos. 8 and 9. The ILWU Entities provided supplemental responses after the motion to compel was filed, in which they identify oral communications. The Court asked the parties to clarify what issues remained disputed and the parties identified this as an issue that remains disputed despite the supplemental responses provided by the ILWU Entities. The Court finds the supplemental responses to be sufficient. If ICTSI is concerned that the supplemental response is incomplete, ICTSI can make an appropriate motion (such as a motion *in limine* or motion to strike specific evidence or testimony) if and when there is a factual basis to indicate that the response is incomplete, such as the ILWU Entities attempting to introduce exhibits or evidence of additional oral communications. At this time, however, there is no evidence that the supplemental response is incomplete. ICTSI's motion is denied.

### 19. Interrogatory No. 11—GRANTED IN PART

ICTSI requested in this interrogatory that the ILWU Entities identify the factors from June 1, 2012, to March 15, 2017, that the ILWU Entities claim caused productivity at T6 to decline. The ILWU Entities provided a supplemental response after the motion to compel was filed, as follows:

> ICTSI's cost-cutting and autocratic management; ICTSI's economic takeaways from employees; ICTSI's micromanaging of employees; ICTSI's increased monitoring and surveillance of employees; ICTSI's abuse and overuse of Employer Complaints and other forms of employee discipline; ICTSI's practice of imposing group or collection discipline on employees without regard to individual guilt; ICTSI's ineffective management staff; ICTSI's efforts to change the culture at Terminal 6; ICTSI's counter-productive changes to established policies and practices; ICTSI's chronic equipment shortages; ICTSI's failure to maintain safe working conditions; ICTSI's creation of a hostile workplace; lawful, primary disputes between ICTSI, the ILWU and their members unrelated to the 2012 claim to the dockside reefer work at Terminal 6; the effects of bargaining the 2014 PCL&CA; the geographic location of Terminal 6 and Portland; profitability of Terminal 6 and Portland; Hanjin's bankruptcy; ICTSI's rate negotiations and relationships with its customers; and economic factors affecting the shipping industry at large.

Some of this response is sufficiently specific, such as "ICTSI's chronic equipment shortage," "the geographic location of Terminal 6," and "Hanjin's bankruptcy." But many of the responses are too general and vague, particularly those relating to ICTSI's purported actions and failure to act. These include, without limitation, "ICTSI's cost-cutting and autocratic management," "ICTSI's economic takeaways from employees," "ICTSI's micromanaging of employees," "ICTSI's ineffective management staff," ICTSI's creation of a hostile workplace," "ICTSI's efforts to change the culture at Terminal 6," "ICTSI's counter-productive changes to established policies and practices," "ICTSI's failure to maintain safe working conditions," and

"economic factors affecting the shipping industry at large." The ILWU Entities must provide more detail and specificity on those alleged problems. ICTSI's motion is granted in part.

### 20. Interrogatory No. 13—DENIED

ICTSI requests in this interrogatory that the ILWU Entities identify all purported violations by ICTSI of the labor agreements, safety codes, or past practices. ICTSI argued that the original response, which merely referenced the responses to Interrogatory Nos. 6 and 11, was insufficient because those responses were insufficient. The ILWU Entities provided a supplemental response after the motion to compel was filed, listing the following actions as violations of the PCL&CA and related documents, including the Safety Code:

- Terminating and disciplining ILWU members, as reflected in specifically-enumerated Employer Complaint numbers and Arbitration Award numbers.

- Terminating and otherwise disciplining longshoremen, marine clerks, business agents, and other union officials for exercising their right to stand by for health and safety under section 11.41 of the PCLCD, including those terminations and disciplinary actions described in the October 8, 2014 declaration of Stuart Strader.

- Allowing non-bargaining unit personnel to perform bargaining unit work, failing to pay wages owed, failing to hire required gangs, and other violations reflected in pay shortage claims, specifically-enumerated Union Complaint numbers, and specifically-enumerated Arbitration Award numbers.

- Making material changes to the working conditions at T6, including introducing electronic surveillance cameras and changing stop signs to yield signs in the container yard, without consulting the ILWU.

- Requiring ILWU members to work in unsafe and onerous conditions, including by requiring Local 8 members to operate the T6 gantry cranes in bypass mode and without anti-collision wiring.

- Refusing to assign Local 8 mechanics to plug, unplug, and monitor the dockside reefers as required by the terms of the PCL&CA and related documents.

- Refusing to comply with the ruling of the Joint Coast Labor Relations Committee that the dockside reefer work was properly within Local 8's jurisdiction.

The ILWU Entities also listed the following actions as breaches of ICTSI's agreements with the ILWU and changes to agreed-upon past practices:

- Filing hundreds of complaints against workers, at a rate of about four times the prior norm for employer complaints, and adopting a practice of pressuring superintendents to file complaints;

- Instituting a practice of firing entire gangs based on the conduct of one gang member;

- Ending the established joint practice of allowing Local 8 crane operators to work "four on, four off" shifts;

- Changing the established practice of when ILWU members would take breaks during their shifts;

- Changing the practice with respect to paying members for agreeing to work on weekends;

- Reducing the workforce, including reducing the number of steadies, the number of marine clerks and vessel planners, and the number of workers in the areas of maintenance and repair and at the gate;

- Changing the process for ordering parts and delaying the approval of parts purchases;

- Changing the instructions given to supercargoes for when and how to record detention time;

- Terminating vessel planners' access to ship files;

- Revoking privileges previously granted to ILWU members, such as ending the joint practice of allowing ILWU members to park inside the T6 fence on the weekends and removing vending machines and the television from the members' breakroom;

- Changing stop signs to yield signs in the container yard; and

- Increasing the monitoring of the ILWU workforce, including through the use of electronic surveillance and ICTSI superintendents

The ILWU Entities further noted that ICTSI violated local, state, and federal law by committing documented occupational safety and health violations.

The parties indicate that this issue remains in dispute despite the supplemental response by the ILWU Entities. The Court finds that the supplemental response is sufficient. ICTSI's motion is denied.

## C.  The ILWU Entities' Motion for Protective Order

The ILWU Entities move for a protective order relating to certain requested topics for depositions under Rule 30(b)(6) of the Federal Rules of Civil Procedure. ICTSI states that because the ILWU Entities' document production and responses to interrogatories were so

deficient, and because of case deadlines, ICTSI propounded deposition notices under Rule 30(b)(6) in part as an attempt to get the information that ICTSI did not receive from the ILWU Entities' document production and interrogatory responses. ICTSI states that if the Court grants ICTSI's motion to compel, some of the requested testimony under Rule 30(b)(6) will not be needed.

As an initial matter, the Court notes that "[b]ecause Rule 30(b)(6) places substantial responsibilities and burdens on the responding corporate party, the rule itself expressly requires that the party requesting the deposition 'must describe with reasonable particularity the matters for examination.'" *Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 661 (D. Or. 2015). Thus, "[a]s one court has explained, 'to allow the Rule to effectively function, the requesting party must take care to designate, *with painstaking specificity*, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute.'" *Id.* (emphasis in original) (quoting *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006).

### 1. Topic 1—GRANTED IN PART

The first topic focuses on the ILWU Entities' efforts to search for documents responsive to ICTSI's document requests. The ILWU Entities argue that this was done by their attorneys and the only information a corporate representative would have relating to this topic would be obtained through conversations with counsel and thus subject to the attorney-client privilege or protection under the work-product doctrine. ICTSI responds that inquiries into how a company stores its electronic data are routine for witnesses designated under Rule 30(b)(6). That may be true, but that is not what ICTSI requested in Topic 1. Topic 1 requests: the process used for searching for responsive documents in this case; descriptions of all responsive documents in this case; an explanation of why the document production in this case included so many irrelevant

documents; a description of the primary communication methods among union members; an explanation of why text messages were not produced; and an explanation of why personal email messages were not produced. Other than the description of the primary methods of communication among union members, the remainder of the request focuses on the document production in this case and not general information regarding the ILWU Entities' electronically-stored information.

First, ICTSI has leave to amend its notice to request general information regarding the ILWU Entities' electronic systems, including the information discussed in ICTSI's response, ECF 318 at 5. Second, regarding attorney-client privileged information used to prepare a witness designated under Rule 30(b)(6), the Court directs the parties to the Court's opinion in *Adidas Am., Inc. v. TRB Acquisitions LLC*, 324 F.R.D. 389 (D. Or. 2017). In that opinion the Court discusses the circumstances under which privileged documents and information must be disclosed when used to prepare a witness designated under Rule 30(b)(6).

Finally, the Court notes that there is much that a witness designated under Rule 30(b)(6) may testify about relating to the entity's preparation to respond to document discovery that does not necessarily implicate the attorney-client privilege or work-product doctrine. Often the entity gathers its own documents or email or provides images of its servers or hard drives using its technical personnel. Although an attorney may be involved in identifying relevant custodians and servers, that assistance does not involve communications between client and attorney seeking legal advice such that it is subject to the attorney-client privilege. Nor is it work product. Although gathering the email of relevant custodians or imaging hard drives is done for purposes of litigation, it does not reflect litigation strategy, the opinion of counsel, or other things the work-product doctrine is designed to protect. It is more akin to an administrative function.

After the custodial documents are provided to counsel, however, the specific searches or other methods used by counsel to retrieve and produce responsive documents are not appropriate topics for a deposition under Rule 30(b)(6), absent a showing of need. At this time, ICTSI's concerns regarding the lack of responsive documents, the number of irrelevant documents produced, and the lack of metadata are more appropriate for a motion to compel or a conference with the Court and opposing counsel (and perhaps the parties' technical consultants, if applicable). The ILWU Entities' motion on this topic is granted in part.

### 2. Topics 2, 8, 10, 13, and 20—RESERVED

ICTSI states that if the Court orders the ILWU Entities to identify responsive documents or confirm that none exist, then the ICTSI would not need a Rule 30(b)(6) deposition on these topics. The Court has ordered the ILWU Entities to provide the requested information if they can do so with no more than 20 hours of work, and to provide the Court with more detailed information if they believe it will take more than 20 hours. Accordingly, the Court reserves ruling on the ILWU Entities' motion on these topics until it is known whether the ILWU Entities will provide the information requested by ICTSI regarding responsive documents.

### 3. Topic 7—DENIED

Topic 7 requests testimony on claims for maintenance and repair work by the ILWU that resulted in any jurisdictional disputes with other labor organizations on the West Coast from July 1, 2008, to the present. The ILWU Entities argue that this topic is unduly burdensome and duplicative of document requests. For the same reason the Court found document production on this topic not to be unduly burdensome, it finds that preparing a witness for testimony would not be unduly burdensome. Additionally, simply because the Court ordered that any responsive documents related to this topic be produced does not mean that no deposition testimony can be elicited. Deposition testimony can involve more information than is shown in documents,

including information regarding motive and intent. The mere fact that there may be responsive documents related to a topic does not mean that the topic is improperly duplicative. Moreover, at this point, before responsive documents have even been searched for and produced, it is too early to assert that documents alone are sufficient to cover this topic. The ILWU Entities' motion on this topic is denied.

### 4. Topics 16, 17, 23-27, and 30—Granted in Part

The ILWU Entities object to these topics as unduly burdensome and duplicative of other discovery requests. Topic 16 requests testimony related to actions or failures to act by ICTSI regarding working conditions from August 13, 2013, through the closure of T6. This is related to Interrogatory No. 11, although much more narrow than that interrogatory. The Court has ordered the ILWU Entities to provide more detail in its interrogatory response, particularly relating to ICTSI's purported actions and inactions. The deposition topic itself is not improperly duplicative, however, because the deposition testimony likely will provide more information and detail than the amended interrogatory response. The Court agrees, however, that requiring the ILWU Entities to prepare a witness to testify to every alleged act or failure to act by ICTSI relating to working conditions over a period of approximately three years[6] would be unduly burdensome. The Rule 30(b)(6) witness can, however, testify as to any specific acts and failure to act for which the ILWU Entities intend to provide evidence at trial (because the ILWU Entities have that evidence and thus it is not unduly burdensome), and can testify generally as to the type of acts and failures to act during the relevant period that the ILWU members found unacceptable, distressing, not in compliance with the parties' agreements or past practices, or

---

[6] T6 lost approximately 95 percent of its container business in approximately April 2015 and lost the last of its container business in approximately May 2016.

otherwise cause for action or concern on the part of the ILWU members. The ILWU Entities'
motion on this topic is granted in part.

Topic 17 requests testimony related to any action by ICTSI that the ILWU contends
interfered with productivity or efficiency at T6 from August 13, 2013, to the closure of T6. This
request is also related to Interrogatory No. 11. The Court's ruling is the same as with Topic 16.

Topic 23 requests specific information regarding every complaint lodged by the ILWU
with any federal or state agency responsible for workplace safety, including every
communication with said agency. This is related to the ILWU Entities' response to Interrogatory
No. 6, which referenced complaints lodged with agencies as primary activities. The Court has
accepted that general response over ICTSI's objection. The request for a deposition for more
information regarding the complaints thus is not duplicative. Regarding burden, the ILWU
Entities have not provided any information regarding the number of complaints filed to show that
preparing a witness to testify about such complaints would be unduly burdensome. Preparing a
witness to testify about five complaints would not be an undue burden, whereas preparing a
witness to testify about 200 complaints might be. The burden is on the ILWU Entities to show
that this request is unduly burdensome, and they have not done so. Accordingly, the ILWU
Entities' motion on this topic is denied.

Topic 24 requests testimony on strikes and work stoppages or slowdowns by the ILWU
against ICTSI from July 1, 2014 to March 3, 2015. This topic is not set forth with the requisite
painstaking specificity required by Rule 30(b)(6). ICTSI does not specify what type of
information it intends to elicit regarding the strikes, work stoppages, or work slowdowns. For
example, does ICTSI intend to ask about the motive for the actions, the duration of the actions,
the employees involved, the resulting discipline, if any, or any other number of pieces of

information that could be considered "specific information regarding" the strikes, work stoppages, and work slowdowns? Accordingly, the ILWU Entities' motion on this topic is granted.

Topic 25 requests dates, times, and circumstances surrounding each time the ILWU members "stood down" working due to any claim of health and safety issue or due to any claim of an onerous workload under the terms of any collective bargaining agreement between the ILWU and the PMA applicable to ICTSI's operations at T6 between June 1, 2012 and March 31, 2016. This is related to the ILWU Entities' response to Interrogatory No. 6, which generally stated that this conduct was a primary activity. Deposition testimony would not be impermissibly duplicative. The Court agrees, however, that it would be unduly burdensome for the ILWU Entities' to prepare a witness to testify regarding every instance, by date and time, and providing specific detail, that an ILWU member "stood down" from work. The Rule 30(b)(6) witness can, however, testify as to any specific instances where an ILWU member "stood down" for which the ILWU Entities intend to provide evidence at trial, and can generally testify as to the type of circumstances during the relevant period that the ILWU members found deserving of "standing down" from work. The ILWU Entities' motion on this topic is granted in part.

Topic 26 requests testimony on every instance that the ILWU contend reduced productivity was related solely to primary activity. This is an exact duplicate of Interrogatory No. 6. The ILWU Entities' motion on this topic is granted.

Topic 27 requests specific information related to the date, time, location, cause, and motivation for the alleged primary activity identified in Topic 26. This is related to Interrogatory No. 7. In ruling on ICTSI's motion to compel a response to Interrogatory No. 7, the Court ordered the ILWU Entities to provide more information relating to motive and cause. The Court,

however, allowed for a somewhat general response. Deposition testimony, therefore, will not be impermissibly duplicative. The information requested, however, will be unduly burdensome. The Rule 30(b)(6) witness can testify regarding cause and motivation for the primary activities identified in the ILWU Entities' response to Interrogatory No. 6, but not the date, time, or location of each specific activity. The ILWU Entities' motion on this topic is granted in part.

Topic 30 requests specific information on every factor that impacted productivity between June 1, 2012 and March 15, 2017, including certain identified general categories of factors that the ILWU Entities submitted in their response to Interrogatory No. 11. This topic is not set forth with the requisite painstaking specificity required by Rule 30(b)(6). Accordingly, the ILWU Entities' motion on this topic is granted.

### 5. Topic 19

Topic 19 requests testimony on any agreement between ILWU and the Port in 2017. ICTSI argues that this testimony is relevant to showing the ILWU Entities' motives in continuing to fight for the two reefer jobs through 2017, and to the ILWU Entities' Fourth[7] Affirmative Defense. This request implicates the confidentiality of settlement negotiations. As discussed above, ICTSI has a copy of the final agreement, which is sufficient for purposes of ICTSI's argument relating to its Fourth Affirmative Defense. Regarding the ILWU Entities purported continued fight for the reefer jobs, that information could have been obtained through means other than violating the confidentiality of settlement negotiations, including percipient or Rule 30(b)(6) deposition questioning or an interrogatory asking whether the ILWU continued to pursue those two jobs. The ILWU Entities' motion on this topic is granted.

---

[7] This affirmative defense has been renumbered and is now the ILWU Entities Third Affirmative Defense.

**6. Rule 30(b)(6) Witnesses**

The ILWU Entities move to preclude ICTSI from taking the Rule 30(b)(6) depositions of Mr. Leal Sundet and Mr. Dane Jones. The ILWU Entities notified ICTSI several days before Mr. Sundet's percipient deposition and two days before Mr. Jones' percipient deposition that they would each be designated as Rule 30(b)(6) witnesses on the topics to which the ILWU Entities agreed that 30(b)(6) depositions could be taken. ICTSI informed the ILWU Entities that it would wait to take Rule 30(b)(6) depositions until after the Court ruled on the pending motions so that all allowable topics could be covered at once.

The ILWU Entities argue that because ICTSI did not take the Rule 30(b)(6) depositions of those two witnesses on the agreed-upon topics when they had them for their fact depositions, they should now be precluded from taking any Rule 30(b)(6) deposition of these witnesses. This motion is denied.

**CONCLUSION**

ICTSI's Motion to Compel (ECF 295) and the ILWU Entities' Motion for Protective Order (ECF 311) are GRANTED IN PART AND DENIED IN PART, as set forth in this Opinion and Order.

**IT IS SO ORDERED.**

DATED this 3rd day of December, 2018.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge