# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION,

       Plaintiff,

    v.

ICTSI OREGON, INC.,

       Defendant.

_____

ICTSI OREGON, INC.,

       Counterclaim-Plaintiff,

    v.

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION;
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION Local 8; and
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION Local 40,

       Counterclaim-Defendant.

Case No. 3:12-cv-1058-SI

**OPINION AND ORDER**

**Michael H. Simon, District Judge.**

Before the Court is a motion for partial summary judgment filed by ICTSI Oregon, Inc. ("ICTSI") against several affirmative defenses alleged by International Longshore and Warehouse Union ("ILWU"), International Longshore and Warehouse Union Local 8 ("Local 8"), and International Longshore and Warehouse Union Local 40 ("Local 40") (collectively, the "ILWU Entities"). ICTSI also seeks partial summary judgment based on issue preclusion, arising out of the earlier opinions of this Court and the decisions of the National Labor Relations Board ("NLRB"), affirmed by the United States Court of Appeals for the D.C. Circuit. For the reasons discussed below, ICTSI's motion is granted in part and denied in part.

## LEGAL STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## B.  Issue Preclusion

Issue preclusion, also known as collateral estoppel, "is designed to 'bar [ ] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination.'" *Paulo v. Holder*, 669 F.3d 911, 918 (9th Cir. 2011) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)); *see also Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) ("The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding. . . . The issue must have been actually decided after a full and fair opportunity for litigation." (quotation marks and citations omitted)). Thus, the party asserting issue preclusion must demonstrate: (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessarily decided, also described as necessary or essential to the judgment.[1] *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017).

"[I]ssue preclusion, 'is not limited to those situations in which the same issue is before two courts. Rather, where a single issue is before a court and an administrative agency,

---

[1] The Ninth Circuit sometimes discusses issue preclusion as requiring either the issue be "necessarily decided" or "essential to the judgment," interchangeably. *See United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995) (setting out the elements as including "necessarily decided" and then discussing the "necessary to the judgment" element as being the same element). The Court uses "necessarily decided" because that is an issue disputed by the parties and because the weight of Ninth Circuit authority describes the "essential" or "necessary" to the judgment element in this manner for issue preclusion. Additionally, the Ninth Circuit sometimes lists the elements for issue preclusion as: (1) the issue was necessarily decided; (2) the first proceeding ended with a judgment on the merits; and (3) the party against whom preclusion is sought was a party or in privity with a party in the first litigation. *See Paulo*, 669 F.3d at 917. The Court considers the latter two elements to be more appropriate elements for claim preclusion, *see Howard*, 871 F.3d at 1039, although part of having a full and fair opportunity to litigate encompasses being a party or being in privity with a party. *See Taylor*, 553 U.S. at 892-93 (noting that "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit" and then discussing several exceptions to that rule).

preclusion also often applies.'" *Pauma v. Nat'l Labor Relations Bd.*, 888 F.3d 1066, 1072 (9th Cir. 2018) (quoting *B & B Hardware v. Hargis Indus.*, --- U.S. ---, 135 S. Ct. 1293, 1303 (2015)). The Ninth Circuit "has held that preclusion 'doctrines apply to administrative determinations . . . of the [National Labor Relations] Board.'" *Id.* (alterations in original) (quoting *Bldg. Materials & Constr. Teamsters v. Granite Rock Co.*, 851 F.2d 1190, 1195 (9th Cir. 1988)). "Generally speaking, so long as an administrative agency is acting in a judicial capacity and resolv[ing] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the federal common law rules of preclusion . . . extend to . . . administrative adjudications of legal as well as factual issues, even if unreviewed." *Id.* (alterations in original) (quotation marks and citations omitted); *see also Airline Prof'ls Ass'n of the IBT, Local No. 1224 v. Allegiant Air, LLC*, 788 F.3d 1080, 1089 (9th Cir. 2015) (holding that administrative agency findings are entitled to preclusive effect "when made in proceedings that satisfy due process and when the findings were supported by substantial evidence").

## BACKGROUND

This lawsuit is the last remaining active case out of six separate actions that were filed in 2012 arising from a labor dispute at Terminal 6 ("T6") at the Port of Portland ("Port").[2] Briefly stated, the dispute concerns who is entitled to perform two jobs of plugging, unplugging, and monitoring refrigerated shipping containers (the "reefer" jobs) at T6. This case was originally filed by the ILWU and Pacific Maritime Association ("PMA"). They alleged that their

---

[2] The other five cases are *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-1100-SI (closed May 7, 2018); *Int'l Longshore & Warehouse Union v. Port of Portland*, Case No. 3:12-cv-1494-SI (closed April 3, 2014); *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1088-SI (closed April 25, 2018); *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1691-SI (closed April 23, 2018); and *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*, Case No. 3:12-cv-2179-MO (closed June 17, 2013).

collective bargaining agreement—the Pacific Coast Longshore and Clerks Agreement[3] ("PCL&CA")—required ICTSI, the then-operator of T6 and a PMA member, to assign the reefer jobs to ILWU members. ICTSI, the Port of Portland (the "Port"), and the International Brotherhood of Electrical Workers ("IBEW") Local 48 contended that other contracts— including the T6 Lease Agreement between the Port and ICTSI and the District Council of Trade Unions Agreement ("DCTU Agreement") between the Port and IBEW—required that the reefer jobs be assigned to IBEW members.

Beginning in March 2012, ILWU began filing grievances under the PCL&CA grievance and arbitration procedures, alleging that ICTSI was refusing to assign the reefer jobs to ILWU members in violation of the PCL&CA. In May and June 2012, ILWU and PMA arbitrated ILWU's grievances. An arbitrator issued two decisions directing ICTSI to assign the reefer work to ILWU members. In response to ILWU's attempts to obtain the reefer work for ILWU-represented employees, ICTSI and the Port filed several charges with the NLRB.

When IBEW learned of ILWU's grievances, IBEW threatened to picket if ICTSI re-assigned the reefer work from IBEW-represented employees to ILWU-represented employees. On May 10, 2012, ICTSI filed an unfair labor practice charge with the NLRB against IBEW, alleging that IBEW violated the National Labor Relations Act ("NLRA") by engaging in proscribed activity with an object of forcing ICTSI to assign the reefer work to IBEW-represented employees rather than to ILWU-represented employees. *Int'l Bhd. of Elec. Workers*, 358 NLRB No. 102, 2012 WL 3306478 (Aug. 13, 2012). The NLRB considered ICTSI's charge to trigger § 10(k) of the NLRA, 29 U.S.C. § 160(k), which empowers the NLRB to resolve jurisdictional disputes between unions.

---

[3] This agreement is set forth in two documents—the Pacific Coast Clerks Contract Document and the Pacific Coast Longshore Contract Document ("PCLCD").

The NLRB held a § 10(k) hearing in which ICTSI, IBEW, and ILWU presented evidence. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *1. Those parties, as well as the Port as *amicus*, also presented post-hearing briefing to the NLRB. *Id.* While that proceeding was pending before the NLRB, the ILWU and PMA brought this action on June 13, 2012, under § 301 of the LMRA, 29 U.S.C. § 185, to enforce the two arbitration awards issued by arbitrators pursuant to the PCL&CA assigning the reefer jobs to ILWU members. After the ILWU and PMA filed their complaint, the Port and the IBEW intervened as defendants. The Port and ICTSI filed counterclaims against the ILWU Entities. The Port also filed crossclaims against ICTSI.

The NLRB also filed an action in this Court, on June 18, 2012, requesting a temporary restraining order and preliminary injunctive relief to enjoin the ILWU Entities from engaging in alleged improper secondary boycott activity under the NLRA. *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-1088-SI. The NLRB alleged that the ILWU Entities had engaged and were continuing to engage in work slowdowns, stoppages, withholding of services, threats, coercion and restraint of persons engaged in commerce or in an industry affecting commerce, in violation of 29 U.S.C. § 8(b)(4)(i) and (ii)(B). The Court held a hearing on June 22 and 29 and July 3, 2012, and issued a temporary restraining order on July 3, 2012. The Court held another hearing on July 19, 2012, which included witness testimony, and issued its preliminary injunction that same day. The Court held that the ILWU Entities "have engaged in, and are engaging in, acts and conduct in violation of 29 U.S.C. §§ 158 (b)(4)(i) and (ii)(B) and affecting commerce within the meaning of 29 U.S.C. §§ 152(6) and (7), and that such acts and conduct will likely be repeated or continued unless enjoined." *Hooks*, Case No. 3:12-cv-1088-SI, ECF 50 at 2. Neither the temporary restraining order or the preliminary injunction were based on the § 10(k) charges or proceeding.

On August 13, 2012, the NLRB issued its § 10(k) decision and awarded the reefer work to IBEW-represented employees. *Int'l Bhd. of Elec. Workers*, 2012 WL 3306478, at *7. The NLRB relied on three factors to reach its conclusion: the terms of the collective-bargaining agreements, the employer's preference, and past practices. *Id.* at *7. With respect to the collective bargaining agreements, the NLRB determined that the Port, which is not a party to the PCL&CA, controlled the assignment of the reefer work. Thus, the NLRB found that it was irrelevant that the PCL&CA purportedly requires ICTSI to assign reefer work to ILWU-represented employees because under the DCTU Agreement and the T6 Lease Agreement, the Port, not ICTSI, controls that assignment.[4]

In late August 2012, ICTSI filed two new unfair labor practice charges with the NLRB against the ILWU entities. The NLRB Regional Director consolidated the charges and issued an administrative complaint alleging that ILWU and its Locals, Local 8 and Local 40, violated § 8(b)(4)(B) and (D) of the NLRA, 29 U.S.C. § 158(b)(4)(i),(ii)(B) and (D), by continuing to maintain this lawsuit and by filing lost work opportunity grievances under the PCLCD against both ICTSI and certain shipping companies that call on T6 (the "Carriers").

The Regional Director also petitioned this Court for a preliminary injunction pursuant to § 10(l) of the NLRA, 29 U.S.C. § 160(l), to enjoin ILWU and its Locals from continuing to

---

[4] The NLRB's decision was later vacated in an oral decision by U.S. District Judge Michael W. Mosman, on the ground that the Port's electricians were public-sector employees and thus not "employees" within the meaning of the NLRA. *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*, Case No. 3:12-cv-2179-MO (D. Or.). The Ninth Circuit reversed, holding that the PMA had adequate alternate means to challenge the NLRB's accepting jurisdiction in the § 10(k) proceedings, although the Ninth Circuit expressed skepticism over whether the NLRB properly had jurisdiction over the Port's electricians. *Pac. Mar. Ass'n v. Nat'l Labor Relations Bd.*, 827 F.3d 1203 (9th Cir. 2016). In later proceedings before the NLRB, the Board severed the portion of the proceedings relying on this § 10(k) opinion. ICTSI does not rely on the severed portion or alleged violations of § 8(b)(4)(ii)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(D), in the pending motion for partial summary judgment.

engage in the conduct alleged in the NLRB administrative proceeding. On November 21, 2012, this Court issued the requested preliminary injunction. *Hooks v. Int'l Longshore & Warehouse Union*, 2012 WL 5877536 (D. Or. Nov. 21, 2012). In issuing this injunction, the Court found that the Regional Director was likely to prevail on his claims that ILWU and its Locals had and were continuing to violate 29 U.S.C. § 158(b)(4)(i),(ii)(B) and (D).

ILWU conceded one allegation in the Regional Director's administrative complaint. ILWU agreed that it violated § 8(b)(4)(D) by continuing to maintain its claim in this action despite the § 10(k) decision awarding the reefer work to IBEW-represented employees. ILWU explained that it maintained the lawsuit in order to obtain a final order so that it could appeal the § 10(k) determination: "Since issuance of the NLRB's § 10(k) ruling, Respondent ILWU has not withdrawn its pending lawsuit against ICTSI in [the present case] . . . . This is because the statutory scheme of § 10(k) and 8(b)(4)(D) require such refusal in order to perfect an appeal challenging the merits of the NLRB's § 10(k) award, which appeal ILWU is seeking." *Hooks*, 2012 WL 5877536, at *5 n.5 (quoting ILWU's briefing). Because ICTSI is not relying in the pending motion on any violations of § 8(b)(4)(D) or the NLRB's § 10(k) award, the NLRB's decisions and the ILWU's concessions relating to these purported violations are noted for background purposes only.

Between July 31, 2012 and August 29, 2012, ALJ William L. Schmidt conducted a 12-day hearing on the consolidated cases brought before the NLRB relating to the ILWU Entities' alleged conduct from May 21, 2012 through August 2012. On August 28, 2013, ALJ Schmidt issued a Decision and Recommended Order, finding that from May 21, 2012 through June 10,

2012,[5] the ILWU Entities violated 29 U.S.C. § 158(b)(4)(i),(ii)(B).[6] ECF 310-1; *also available at Int'l Longshore and Warehouse Union, AFL-CIO, et al.*, 2013 WL 4587186 (Aug. 28, 2013).

ALJ Schmidt found that the ILWU Entities did not have a valid work-preservation claim because IBEW workers had historically performed the reefer jobs. ALJ Schmidt also found that the Port was the entity in control of assigning the reefer jobs. ALJ Schmidt further found that the ILWU Entities engaged in a series of job actions against ICTSI and the Carriers with an unlawful "cease doing business" object—namely seeking the Port's relinquishment of control over the dockside reefer work at T6 for the benefit of the workers represented by Local 8. In making his findings, ALJ Schmidt held:

> To satisfy the cease doing business object required under Section 8(b)(4)(B), it need only to be shown that the union's secondary activities sought to alter the way in which the primary employer traditionally operates. *NLRB v. Operating Engineers Local 825*, 400 U.S. 297, 304-305 (1971). Accordingly, it is enough to establish violation here if the Respondents engaged in secondary activities in order to cause the Port to abandon its historical practice of using its own electricians to perform the dockside reefer work.
>
> Respondents conduct here had an unlawful cease doing business object within the meaning of Section 8(b)(4)(B). Their activities between May 21 and June 10 pressured ICTSI and the carriers—all

---

[5] ALJ Schmidt found that the ILWU Entities conduct from June through August 2012 in filing "lost work" grievances violated § 8(b)(4)(ii)(D), but that finding is irrelevant to the pending motion based on the NLRB's later severance of that portion of the opinion and ICTSI's representation that it is not relying on § 8(b)(4)(ii)(D) in this motion. Further, although ALJ Schmidt only noted in his conclusion relating to § 8(b)(4)(B) violations that conduct from May 21 to June 10, 2012 had an unlawful cease doing business object to pressure the Port and the carriers to have the reefer work assigned to Local 8 members, he did make factual findings that on August 15, 2012, ILWU sent threatening letters to the Carriers and on August 16, 2012, Hanjin responded to that threat by demanding that ICTSI use ILWU labor for the reefer jobs. He further noted that Hanjin threatened ICTSI that if ILWU sought fines from Hanjin related to the reefer job assignments, Hanjin would seek reimbursement from ICTSI.

[6] ALJ Schmidt also found that the ILWU Entities violated § 8(b)(4)(ii)(D), but that finding is irrelevant to the pending motion.

> neutral employers—to seek the relinquishment of the Port's control
> over the dockside reefer work for the benefit of the ILWU-
> represented workers at T6. . . . By engaging in conduct disruptive
> of the operations of ICTSI and the carriers at T6 in order to cause
> the Port to relinquish its control over the dockside reefer work,
> Respondents violated Section 8(b)(4)(i) and (ii)(B) as alleged.

ECF 310-1 at 44.

ALJ Schmidt's decision was affirmed by a three-member panel of the NLRB, except for his references to the NLRB's § 10(k) decision and his finding that the ILWU Entities also violated § 8(b)(4)(ii)(D). ECF 310-1, at 3; *also available at Int'l Longshore & Warehouse Union, AFL-CIO, et. al*, 363 NLRB No. 12, 2015 WL 5638153 (Sept. 24, 2015). The NLRB's decision was affirmed by the D.C. Circuit. *ILWU Local 8 v. NLRB*, 705 F. App'x 1 (D.C. Cir. 2017).

In November and December 2013, ALJ Jeffrey D. Wedekind held a 12-day hearing and allowed post-hearing briefs on a case before the NLRB alleging that the ILWU Entities engaged in continued unlawful secondary boycott activity from September 2012 through June 2013. On May 30, 2014, ALJ Wedekind issued a decision, finding that the ILWU and Local 8 violated §8(b)(4)(i)(B) of the NLRA by engaging in unlawful secondary boycott activity, including inciting or encouraging unlawful slowdowns. ECF 310-1 at 54-69; *also available at Int'l Longshore and Warehouse Union, AFL-CIO, et al.*, 2014 WL 2453202 (May 30, 2014). ALJ Wedekind dismissed the claims against Local 40. ALJ's Wedekind's decision was affirmed by an NLRB panel. ECF 310-1, at 51-53; *also available at Int'l Longshore and Warehouse Union, AFL-CIO, et al.*, 363 NLRB No. 47, 2015 WL 7750748 (Nov. 30, 2015). The NLRB's decision was affirmed by the D.C. Circuit. *ILWU Local 8 v. NLRB*, 705 F. App'x 3 (D.C. Cir. 2017).

On September 15, 2014, the NLRB filed a petition for an order of civil contempt with the Court in the related case of *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-

1088-SI. The NLRB alleged that ILWU and Local 8 had consistently engaged in unlawful

secondary boycott activities, including work stoppages and slowdowns, after the Court issued its

preliminary injunction in July 2012. The NLRB alleged that ILWU and Local 8 engaged in the

alleged conduct with an unlawful purpose of causing neutral employers, including ICTSI, to

pressure the Port to assign its reefer work to Local 8's members. On October 21, 2014, the Court

held a hearing on the petition. No party presented any witnesses. The Court permitted

supplemental briefing, which was filed by both parties on October 31, 2014 and November 7,

2014. On December 16, 2014, the Court issued is Findings of Fact and Conclusions of Law

regarding the NLRB's petition for civil contempt ("Contempt Order"). The Court found that

"there is clear and convincing evidence that the ILWU and Local 8 violated the Court's

preliminary injunction by engaging in unlawful secondary boycott activities from July 20, 2012

through August 13, 2013." *Hooks v. Int'l Longshore & Warehouse Union*, 72 F. Supp. 3d 1168,

1171 (D. Or. 2014). The Court held that the NLRB did not provide clear and convincing

evidence of unlawful secondary boycott activity after August 13, 2013, primarily because the

NLRB did not provide economic expert evidence, a regression analysis, or similar evidence to

what was provided relating to the earlier time period. *Id.* at 1187-88.

While the appeals were ongoing relating to the NLRB's decisions, and the related cases

in this Court were largely stayed, the Court in this case dismissed some of the counterclaims and

stayed one of the counterclaims pending resolution of the appeals of the NLRB decisions. As

noted above, the D.C. Circuit ultimately upheld the decisions of the NLRB. Because NLRB

decisions take precedence over inconsistent arbitration decisions, those cases mooted the ILWU

and PMA's claim to enforce the arbitration award in this case and the Port and ICTSI's

counterclaims requesting that the Court void the arbitration award. At the parties' request, the

Court dismissed ILWU and PMA's claims and the Port and ICTSI's counterclaims relating to the arbitration award. ECF 280. The Court then dismissed the Port and the PMA from this case. ECF 229, 231, 285. IBEW also withdrew. ECF 241.

After the various legal rulings and voluntary dismissals in this case and the legal rulings in other related cases, the only remaining parties in this case are the ILWU Entities and ICTSI. All that remains at issue are: (1) ICTSI's Second Counterclaim for money damages under § 303 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 187, based on the ILWU Entities' illegal secondary boycott activities; and (2) ILWU's First through Seventh Affirmative Defenses.

## DISCUSSION

ICTSI has filed eight motions for partial summary judgment. These motions assert: (1) the ILWU Entities are liable under 29 U.S.C. § 187 as a matter of law for the time period from May 21, 2012 through August 13, 2013, because this issue has already been adjudicated by the NLRB and this Court; (2) any labor activities the ILWU Entities applied to ICTSI at any time that had an object of obtaining the reefer work violated the secondary boycott provisions of 29 U.S.C. § 158(b)(4)(i),(ii)(B), because the underlying predicates to reach such a conclusion have already been adjudicated by the NLRB and this Court; (3) numerous particular facts and conclusions from the NLRB and this Court's earlier adjudications are preclusive and beyond dispute by the ILWU Entities; (4) the ILWU Entities' Fourth and Fifth Affirmative Defenses have already been determined by the Court to fail as a matter of law; (5) the ILWU Entities' Sixth Affirmative Defense fails as a matter of law because it is not an affirmative defense but instead attack ICTSI's ability to present its *prima facie* case; (6) the ILWU Entities' Third Affirmative Defense fails under the collateral source rule; (7) the ILWU Entities' First Affirmative Defense fails as a matter of law because it is not an affirmative defense but instead

attack ICTSI's ability to present its *prima facie* case; and (8) ICTSI is entitled to some damages as a matter of law. Each motion is discussed in turn.

## A. Preclusion—Liability for the Time Period May 21, 2012 through August 13, 2013

ICTSI asserts that the issue of liability for the ILWU Entities' unlawful secondary boycott activities from May 21, 2012 through August 13, 2013, in violation of 29 U.S.C. § 158(b)(4)(i),(ii)(B) has already been adjudicated by the NLRB and this Court.[7] ICTSI moves for partial summary judgment that the ILWU Entities are liable as a matter of law for violating LMRA § 303, 29 U.S.C. § 187, for this time period under the doctrine of issue preclusion. The Court addresses ICTSI's motion in stages.

### 1. Preclusion—Violation of § 303(a), 29 U.S.C. § 187(a)

The first stage is the preclusive effect of the NLRB decisions and the Court's Contempt Order[8] finding that the ILWU Entities violated § 8(b)(4). The Court agrees that the elements for issue preclusion are met with respect to this determination. The first and second elements are met because the material issue of whether the ILWU Entities violated § 303(a) (which is defined as a violation of § 8(b)(4)) is identical in both this case and all three earlier proceedings, and actually

---

[7] ALJ Schmidt and the case history affirming his adjudication relating to § 158(b)(4)(i),(ii)(B) involves the time period from May 21, 2012 through June 10, 2012, although he made a factual finding relating to relevant conduct on August 15 and 16, 2012. ALJ Wedekind and the case history affirming his adjudication involves the time period from September 2012 through June 2013. This Court's Contempt Order involves the time period from July 20, 2012 through August 13, 2013, although the Court made a separate factual finding relating to the ILWU Entities' ongoing conduct from June 1, 2012 through July 19, 2012.

[8] The Court's Contempt Order also may be given preclusive effect. *See, e.g.*, *In re Reiff*, 17 F. App'x 695, 696 (9th Cir. 2001) ("The bankruptcy court did not err in holding that the contempt order was entitled to collateral estoppel effect in the bankruptcy discharge proceeding."); *Cf. Theofel v. Farey-Jones*, 359 F.3d 1066, 1074 n.1 (9th Cir. 2004) (giving preclusive effect to a sanctions proceeding and quoting with approval "18 James Wm. Moore *et al.*, *Moore's Federal Practice* § 132.03[4][k][vii], at 132-126 (3d ed. 1997) (judgment of contempt is issue preclusive)" (alterations in original)).

was litigated in the earlier proceedings. The third element is met because the ILWU Entities had a full and fair opportunity to litigate the issue, including multi-day hearings before the NLRB along with two-levels of appeals, and hearings before this Court with the opportunity to present witnesses and provide supplementary briefing. The final element of issue preclusion is met because the issue of whether the ILWU Entities violated § 8(b)(4) was necessarily decided. Indeed, it was the focus of the earlier cases. And the requirement for an administrative agency decision to have preclusive effect—that the proceedings comport with due process and the findings be supported by substantial evidence—are satisfied here with the extensive proceedings before and detailed findings by the NLRB.

The ILWU Entities argue that issue preclusion is not appropriate because a different standard of proof applies in this case than applied before the NLRB or this Court in the contempt proceeding. The ILWU Entities contend that the NLRB and the Court in considering contempt only considered whether secondary boycott activities were "an object" of the conduct, but to *prove damages* under § 303 ICTSI must prove that secondary boycott activities "materially contributed" or were a "substantial factor" in bringing about ICTSI's loss. *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1379 (9th Cir. 1975). The ILWU Entities are conflating proving the violation of § 303(a), 29 U.S.C. § 187(a) (liability) with proving the violation of § 303(b), § 187(b) (causation and damages).

The statutory text of the two subsections of § 187 helps elucidate this issue. The first provision states: "It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title." 29 U.S.C. § 187(a). Thus, conduct that violates § 158 (b)(4), violates § 303(a).

The second provision states: "Whoever shall be injured in his business or property by reason [of][9] any violation of subsection (a) may sue therefor in any district court of the United States . . . ." 29 U.S.C. § 187(b). This subsection thus requires the violation of § 303(a) to have a causal connection to the injury of the aggrieved party. It is this latter requirement that *Mead* addresses.

Courts have routinely held that the NLRB's finding of a § 158(b)(4) violation is preclusive of *liability* under § 303, when the proceedings provide due process and the findings are based on substantial evidence. *See, e.g.*, *Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21, 26 (2d Cir. 1983) ("The legal and factual issues in the administrative and judicial proceedings are, but for damages, absolutely identical since section 303 authorizes damage actions for violations of section 8(b)(4)[.]"); *Consol. Express, Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 503 (3d Cir. 1979), *vacated on other grounds*, 448 U.S. 902 (1980) (noting that "courts in several circuits have held that prior NLRB unfair labor practice determinations were controlling on the issue of liability, as to both facts and law, in a subsequent § 303(b) damage action," which holdings are "undoubtedly sound"); *Consol. Exp., Inc. v. N.Y. Shipping Ass'n*, 641 F.2d 90, 92 (3d Cir. 1981) (discussing the history of the case and noting that the district court originally had held that the NLRB's finding of a § 8(b)(4) violation "collaterally estopped [the union] from litigating its liability for damages on the section 303 count" and that the Third Circuit had affirmed that finding, before the case was remanded on other grounds by the U.S. Supreme Court. Upon remand, the Third Circuit stayed the case pending a final decision by the NLRB, which had re-opened the case, and the court acknowledged that with the stay the union would be "deprived of trial by jury on some issues by virtue of collateral estoppel" but stated that

---

[9] The statute notes that this probably should read "of" but reads "or" in the original text. 29 U.S.C. § 187(b) n.1.

the union could not complain because the "judicial process will benefit significantly from the result of avoiding retrial of issues already decided"); *Sillman v. Teamsters Union Local 386, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 535 F.2d 1172, 1173, 1173 n.1 (9th Cir. 1976) (involving judgment only on damages because "[t]he liability issue had been previously decided by the [NLRB]. . . . The District Court found this decision was *res judicata* on the issue of liability"); *Paramount Transp. Sys. v. Teamsters Local 150*, 436 F.2d 1064, 1065-66 (9th Cir. 1971) (affirming grant of summary judgment on liability based on issue preclusion from NLRB § 8(b)(4) decision, noting that the union was bound by "those material issues of fact decided adversely to it in the proceedings culminating in a final order by the [NLRB]"); *Painters Dist. Council No. 38 v. Edgewood Contracting Co.*, 416 F.2d 1081, 1083 (5th Cir. 1969) (affirming district court's decision that a final decision of the NLRB "was *res judicata* as to liability and that the issue to be tried was that of damages" in a subsequent § 303 case).

The ILWU Entities rely on *Mead* to argue that issue preclusion should not apply with respect to liability because *Mead* created a more stringent standard of proof. *Mead* involved a unique set of circumstances, where the underlying court expressly found that the union sought multiple lawful objectives and one unlawful objective with its labor activities, but that the damages were not separable. *Mead*, 523 F.2d at 1373-74. In circumstances where a union only engages in unlawful secondary conduct or the damages are separable, *Mead* does not apply and an NLRB decision will likely be determinative of everything but the amount of damages.

Even in *Mead*, however, the Ninth Circuit applied issue preclusion with respect to liability. The court in *Mead* stated:

> The Board and the Court of Appeals for the District of Columbia Circuit have determined that the proposed demonstrator clause was illegal under section 8(e) and that the Union's insistence on the clause violated section 8(b)(4)(A). This determination is binding

> upon us. The literal conditions for suit under section 303(b) are
> therefore satisfied. Moreover, we have affirmed a finding of
> liability under section 303 under circumstances quite similar to
> those presented here, though without discussion.

*Mead*, 523 F.2d at 1374. The court continued, discussing whether § 303(b), 29 U.S.C. § 187(b),

provided a *remedy* for violations when the union was found to have engaged in both lawful

(primary) and unlawful (secondary) activity.

In *Mead*, the Ninth Circuit held that § 303(b) did provide a remedy under such

circumstances, but that in order to recover damages, an aggrieved party must prove that it was

injured in its business or property by reason of the violation.[10] *Id.* at 1376. This holding was

derived directly from the text of 29 U.S.C. § 187(b). The Ninth Circuit found that "injury

occurred 'by reason of' particular unlawful conduct if such conduct 'materially contributed' to

the injury or was a 'substantial factor' in bringing it about, 'notwithstanding other factors

contributed also.'" *Id.* (citations omitted).

The court also held that damages did not need to be proven with certainty. *Id.* at 1377.

"Regarding the quantum of proof required to establish the fact of damage, the rule is that the

plaintiff is required to establish with reasonable probability the existence of some causal

connection between the defendant's wrongful act and some loss of anticipated revenue." *Id.*

(quoting *E. V. Prentice Mach. Co. v. Associated Plywood Mills, Inc.*, 252 F.2d 473, 477 (9th Cir.

1958)). Evidence is sufficient if it supports a just and reasonable inference that the union's

conduct harmed the aggrieved party. *Id.*

Accordingly, applying issue preclusion to the NLRB's decisions and this Court's

Contempt Order with respect to finding a violation of § 187(a) does not run afoul of the

standards set forth in *Mead* relating to causation and damages under § 187(b), assuming *Mead*

---

[10] It is only the violation that in the *Mead* case was proven through issue preclusion.

applies to this case. The Court finds that issue preclusion is appropriate under § 187(a) because the ILWU Entities were found by the NLRB and this Court to have violated § 8(b)(4)(B) and those findings are binding in this case.

### 2. Preclusion—Motivation for the Stoppages and Slowdowns

The next stage of ICTSI's first motion relates to the motivation of the ILWU Entities in engaging in the stoppages and slowdowns. ICTSI framed this as "causation" in its moving papers, but at oral argument clarified that ICTSI is seeking preclusion on the issue that the reefer dispute was a substantial factor or materially contributed to the ILWU's work stoppages and slowdowns, not that the reefer dispute was a substantial factor or materially contributed to ICTSI's claimed amount of damages. The ILWU Entities responded at oral argument to this assertion by arguing that the NLRB and this Court found that the reefer dispute was "a factor" in the work stoppages and slowdowns but not a "substantial factor."

As an initial matter, the *Mead* standard ("substantial factor" or "materially contribute") is for causation of injuries. Finding issue preclusion on the issue of whether the ILWU Entities were motivated by the reefer dispute in engaging in the work stoppages and slowdowns is not a finding on causation of ICTSI's damages. Even if the Court finds this issue through preclusion, ICTSI will still have to prove that the work stoppages and slowdowns were a substantial factor or materially contributed to ICTSI's injury. The ILWU Entities can present their evidence and argument that other factors are what contributed to ICTSI's injury, such as the recession, increased capacity at other ports, and limitations in reaching T6 caused by the Columbia River. ICTSI can thus argue that the work stoppages and slowdowns were not a substantial factor or what materially contributed to ICTSI's injury.

What the ILWU Entities would not be able to argue if issue preclusion is applied is that the work stoppages or slowdowns were motivated by something other than the reefer dispute,

such as ICTSI's poor management, equipment failure, or safety issues. This would be because the issue of what motivated the work stoppages and slowdowns was directly at issue in the previous adjudications, the ILWU Entities made arguments regarding what motivated them or had the opportunity to make those arguments, and those arguments were rejected. This is unlike the facts in *Mead*, where both lawful and unlawful activity was found by the court and the issue was how to calculate damages and figure out causation when faced with those circumstances. Here, ICTSI is arguing that preclusive effect should be given to the previous adjudications made under §158(b)(4)(i),(ii)(B) (and thus § 187(a)) as part of the liability determination, that the ILWU Entities were motivated in their conduct by the illegal secondary activity. The *Mead* standard, therefore, does not apply to this specific issue and the Court applies general issue preclusion principles.

ICTSI contends that for the first NLRB proceeding and its subsequent appeals the ILWU Entities asserted that all labor activities were done solely to obtain the reefer jobs, which the ILWU Entities contended was lawful primary activity. The ILWU Entities lost that argument when the NLRB determined that the conduct was unlawful secondary activity. ICTSI argues that the ILWU Entities cannot now attempt to raise new theories and arguments relating to the motivation of its conduct by claiming that its conduct was done both to obtain the reefer jobs (unlawful activity) and for other lawful, primary reasons.

With respect to the second NLRB determination, ALJ Wedekind directly addressed the ILWU Entities' arguments that other factors motivated or caused the decline in productivity, including some of the factors argued in this case, such as ICTSI's management inexperience, stricter enforcement of rules, and changes made to the yard like changing stop signs to yield signs. ALJ Wedekind rejected those arguments, noted that many of the factors were included in

the economist's regression analysis, and found "substantial other evidence that the slowdowns were deliberate" and that if ILWU members were upset with changes made by ICTSI, "to the extent the longshoremen reduced their production in response to those changes, they did so indirectly because of the reefer dispute." ECF 310-1 at 61-65 (quoting an expert report noting that "the union's perception of changes in climate or a change in management attitude may be the byproduct of the labor dispute and not the source of the decline in labor productivity"). ALJ Wedekind went on to note: "To disregard such a connection or relationship in evaluating the object of union action would ignore industrial realities and potentially discourage employers from engaging in self-help efforts to prevent or document continued unlawful conduct." *Id.* at 65. The ALJ then made an alternative finding that "even considering" ICTSI's changes as separate events from the reefer dispute, for unlawful secondary conduct the ALJ need only find "an object" be secondary conduct, not the only object. *Id.* He concluded under such an assumption "that forcing ICTSI to support Local 8 in that dispute did, in fact, continue to be a direct object of the slowdowns during the relevant period." *Id.* ICTSI argues that the ILWU Entities cannot reargue that "other" factors caused the decline in productivity, nor raise new theories of other reasons why productivity declined.

With respect to the proceedings relating to the Court's Contempt Order, the ILWU Entities argued in opposing the contempt petition that the decline in productivity was motivated or caused by other factors, some of which they argue in this case, including poor management by ICTSI, equipment shortage and failures, a hostile work environment, and an unsustainable reduction in labor. In its Findings of Fact, the Court rejected each of the ILWU Entities proffered alternative explanations for the work stoppages and slowdowns. *See Hooks*, 72 F. Supp. 3d at 1176-77; *see also id.* at 1185 ("The other explanations provided by Respondents for the

stoppages and slowdowns do not fully explain the conduct, as discussed in Dr. Ward's expert report. Additionally, Respondents' argument that many of the work stoppages and slowdowns were done in response to an action by ICTSI, such as firing an ILWU member or docking pay for late arrival, is not persuasive. The Court finds such actions by ICTSI to be the byproduct of the labor dispute over the reefer jobs and not the source of the decline in productivity."). ICTSI argues that the ILWU Entities cannot reargue these factors motivated or caused the work stoppages and slowdowns, nor raise new theories of other reasons why productivity declined.

In making its argument, ICTSI relies on *Paulo v. Holder*, which explains:

> The government is correct that the question of whether the statutory counterpart rule made Paulo ineligible for § 212(c) relief was not raised in the district court. The government could have made an argument addressed to this question, but it did not. The fact that a particular argument against Paulo's eligibility was not made by the government and not addressed by the district court does not mean that the issue of Paulo's eligibility for § 212(c) relief was not decided. Issue preclusion is designed to "bar[ ] 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination.'" *Taylor*, 553 U.S. at 892 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). If a party could avoid issue preclusion by finding some argument it failed to raise in the previous litigation, the bar on successive litigation would be seriously undermined. *See* 18 James Wm. Moore et al., *Moore's Federal Practice* § 132.02[2][c] (3d ed. 2010) ("If a new legal theory or factual assertion raised in the second action is relevant to the issues that were litigated and adjudicated previously, the prior determination of the issue is conclusive on the issue despite the fact that new evidence or argument relevant to the issue was not in fact expressly pleaded, introduced into evidence, or otherwise urged."). The issue sought to be relitigated in this case is Paulo's eligibility for § 212(c) relief, which was decided in the previous proceeding by the district court.

669 F.3d 911, 917-18 (9th Cir. 2011) (citation omitted) (alterations in original). Thus, the fact that a particular argument or theory was not adjudicated does not prevent issue preclusion—it is only the underlying *issue* that must actually have been litigated, not the argument relevant to the issue.

The issue of whether other factors versus the reefer dispute motivated the ILWU Entities to engage in the work stoppages and slowdowns (*i.e.*, "caused" the work stoppages and slowdowns—but not "caused" ICTSI's damages) was already adjudicated by the NLRB and this Court for the previously-adjudicated time periods. For the first NLRB adjudication, the ILWU Entities did not argue that they had any other motivation for the work stoppages and slowdowns. For the second NLRB adjudication and the Court's contempt proceedings, the ILWU Entities argued that other factors motivated ILWU members to engage in works stoppages and slowdowns and the NLRB and the Court rejected those arguments. The ILWU Entities had the full opportunity to litigate the issue of their motivation for the work stoppages and slowdowns, and could have raised additional arguments about their motivation in those adjudications, some of which they now seek to raise. Under *Paulo*, failure to raise arguments does not prevent issue preclusion from being applied. The issue of what motivated the ILWU members to engage in work stoppages and slowdowns is identical, was actually litigated, and was necessarily decided (as discussed above, the NLRB and the Court made specific factual findings and without finding an illegal motive there would not have been any findings of § 158(b)(4)(i),(ii)(B) violations or contempt). Thus, it is given preclusive effect.[11]

---

[11] The Court notes that even if the *Mead* standard did apply to the issue of the ILWU Entities' motivation in engaging in work stoppages and slowdowns, the Court would still find issue preclusion on this issue. It is apparent from a review of the relevant opinions that all the adjudications found the dispute over the reefer jobs to be the substantial cause or motivation of the work stoppages and slowdowns. It was the only cause found by ALJ Schmidt. ALJ Wedekind concluded that the ILWU Entities' proffered alternate reasons all related to the reefer dispute, and ALJ Wedekind only made the finding that the changes by ICSTI were separate as an alternative finding. This Court rejected every reason offered by the ILWU Entities in its Findings of Fact, although in its Conclusions of the Law the Court focused on the § 158 legal standard of "an object." But by necessity, after the Court rejected all the proffered lawful primary reasons, that left the unlawful secondary reason as the substantial cause.

### 3. Preclusion—Local 40

The final stage of ICTSI's first motion is how to apply issue preclusion to Local 40. ALJ Schmidt found Local 40 violated § 8(b)(4)(B) from May 21 through June 10, 2012. ALJ Wedekind, however, found that Local 40 did not violate § 8(b)(4)(B) during the period of his consideration. The NLRB did not seek an order of civil contempt against Local 40 with this Court, and the Court did not make a finding of contempt against Local 40 during the period of the Court's consideration. ICTSI, however, argues that ILWU, Local 8, and Local 40 are joint tortfeasors and thus the preclusive effect against ILWU and Local 8 from June 11, 2012 through August 13, 2013, should also apply to Local 40.

ICTSI contends that ALJ Schmidt found that Local 40 was a joint tortfeasor with Local 8 and ILWU in their illegal conduct performed to achieve an illegal object. ICTSI asserts that there is no evidence that Local 40 ever expressly or voluntarily renounced that illegal conduct or illegal object. Even if it had, argues ICTSI, the Ninth Circuit has held that "[a] union may not escape liability for pursuing an illegal object by renouncing it if the effects of an illegal demand nevertheless continue." *Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 623 F.2d 1354, 1363 (9th Cir. 1980). Because Local 8 and ILWU continued with their illegal conduct and the "effects" of the illegal demand Local 40 had been engaged in during the May and June, 2012 period also continued, ICTSI argues that Local 40 remains liable through August 13, 2013. ICTSI also argues that Local 40 is liable as a joint tortfeasor because Local 40 was an active participant in the secondary boycott in May and June 2012, and the ongoing misconduct by Local 8 and ILWU was foreseeable and flowed from the unlawful scheme of all three parties to force ICTSI to assign the reefer jobs to ILWU members. ICTSI cites *ILWU v. Juneau Spruce Corp.*, 189 F.2d 177, 190 (9th Cir. 1951) ("[W]here two persons act in concert to commit a wrong each is liable for the entire injury

resulting therefrom and . . . one who abets a wrongful act is equally liable with the perpetrator."), and *Allied Int'l v. Int'l Longshoremen's Ass'n*, 814 F.2d 32, 40 (1st Cir. 1987) (noting that "an active participant in an illegal secondary boycott" is "jointly and severally liable" with "the prime sponsor of the boycott . . . for *all* damages flowing from the unlawful scheme, wheresoever originating" (emphasis in original)).

Local 40 was not adjudicated to have violated § 8(b)(4) other than from May 21 through June 10, 2012. Accordingly, issue preclusion against Local 40 for the other time periods is not appropriate. The issue was not actually litigated or necessarily decided against Local 40, which is a requirement to apply issue preclusion as ICTSI proposes. ICTSI's arguments regarding the liability of joint tortfeasors can be made to the factfinder, but it is not an argument of issue preclusion.

### 4. Conclusion

ICTSI's motion for partial summary judgment on this issue is granted in part. Partial summary judgment is granted that ILWU, Local 40, and Local 8 violated 29 U.S.C. § 187(a) from May 21 to June 10, 2012. Partial summary judgment also is granted that ILWU and Local 8 violated 29 U.S.C. § 187(a) from June 11, 2012 through August 13, 2013.[12] Partial summary judgment also is granted during these time periods with respect to the ILWU Entities' motivation—that the violations of § 187(a), the work stoppages and slowdowns, were motivated by the reefer dispute.

---

[12] In the Court's Contempt Order, the Court made a factual finding that "[f]rom June 1, 2012 through July 19, 2012, . . . work stoppages and slowdowns occurred as a result of the labor dispute over the reefer jobs." *Hooks*, 72 F. Supp. 3d at 1175. The Court also found that ILWU and Local 8 violated the Court's July 19, 2012 preliminary injunction by engaging in unlawful secondary boycott activities from July 20, 2012 through August 13, 2013. *Id.* at 1171.

**B. Preclusion—Labor Activities with an Object of Obtaining the Reefer Work**

ICTSI moves for partial summary judgment that any labor activities the ILWU Entities applied to ICTSI at any time with an object to obtain the reefer work violated the secondary boycott proscriptions of 29 U.S.C. § 158(b)(4)(i),(ii)(B). ICTSI argues that because the NLRB and this Court previously found that labor activities with an object to obtain the reefer work was such a violation, that issue has been adjudicated and carries forward to any time period not subject to the preclusion in Motion A.

ILWU responds that Motion B implicates the settlement privilege. This response appears to be based on a belief that ICTSI intends to prove the ILWU Entities' intent to obtain the reefer work during later time periods by presenting evidence of settlement discussions. Issues of proof of intent, however, are not the point of this motion. This motion is limited to the preclusive effect of the previous findings that labor activities with an object to obtain the reefer work violated § 8(b)(4).

The Court agrees that the issue of whether labor activities with an object to obtain the reefer work violate the secondary boycott proscriptions of 29 U.S.C. § 158(b)(4)(i),(ii)(B) has already been adjudicated. ALJ Schmidt determined which entity had the right to control the reefer jobs (the Port), and why the ILWU Entities did not have a work preservation claim (because for decades IBEW members had performed the work). ALJ Schmidt also explained why the labor activities had an improper "cease doing business object." ALJ Wedekind and this Court reached similar conclusions. The ILWU Entities had a full and fair opportunity to litigate the issue, the issue is identical, and the issue was necessarily decided. Accordingly, it is entitled to preclusive effect.

In Motion A, the Court gave this determination preclusive effect for the time periods in which it was also adjudicated that the ILWU Entities engaged in such conduct. For this motion,

the practical effect of issue preclusion is that if ICTSI proves that one or more of the ILWU Entities engaged in such activities during a time period other than the time periods already adjudicated in Motion A, then that conduct will conclusively be found to violate § 8(b)(4). In other words, ICTSI will not have to relitigate whether the ILWU Entities had a work preservation claim or who had control over the reefer jobs to prove the violation of § 8(b)(4), in addition to proving the underlying conduct. ICTSI, however, will still have to prove the underlying conduct for the periods not covered in Motion A. And if ICTSI proves that the ILWU Entities engaged in labor activity with an object of obtaining the reefer work, to recover on its claims, ICTSI will also have to prove the elements of 29 U.S.C. § 187(b)—that the unlawful conduct was a substantial factor or materially contributed to damages incurred by ICTSI.

Regarding the ILWU Entities' concerns of settlement privilege, this motion is not the appropriate forum. The ILWU Entities may file a motion *in limine* if they have concerns regarding the type of evidence ICTSI may offer at trial. ICTSI's motion for partial summary judgment on this issue is granted.

## C. Preclusion—Facts and Conclusions from Earlier Adjudications

ICTSI moves for partial summary judgment for the Court to give preclusive effect to a litany of facts and conclusions "adjudicated" in the previous proceedings. ICTSI also requests that the manner of presenting these previously-adjudicated facts will to the jury should be left open at this time. ICTSI contends that it has the right later to choose how to present the facts— whether by stipulation, documentary evidence, such as offering the NLRB opinions, an instruction from the Court, or witness testimony. ICTSI attaches an appendix listing 205 enumerated "findings." Many of these "findings," however, are simply headings of sections of the opinions, such as "The June Complaint Allegations" and "Complaint paragraphs 6(b) and (aa): the May 24 threats." These are not "findings" that were made by the NLRB. ICTSI is

simply taking sentences and section headings from the NLRB opinions and the Court's

Contempt Order and labelling them as "findings" this Court should now give preclusive effect.

Although some are factual findings, the 205 enumerated items are not useful to the Court.

The ILWU Entities respond that preclusion is appropriate only for findings that were

made on material issues, necessary to the decision in the prior proceedings, and based on

substantial evidence. The ILWU Entities argue that ICTSI fails to show that many of the 205

enumerated items were necessary to the NLRB's decisions, that the ILWU Entities violated

§ 8(b)(4) or the Court's decision, that ILWU and Local 8 violated the Court's injunction, or that

the purported factual findings were based on substantial evidence. By way of example, the

ILWU Entities argue that any finding by the Court relating to actions before the date of the

injunction cannot be necessary to the Court's decision that ILWU and Local 8 were in contempt

of the injunction. The ILWU Entities propose only five "streamlined" adjudicated facts for which

the Court should give preclusive effect:

1.   ILWU's claim to the reefer work was secondary.

2.   Local 8 engaged in job actions and slowdowns in June 2012 and from

September 2012 to June 2013 with an object of obtaining the reefer work.

3.   Local 40 engaged in job actions and slowdowns in June 2012 with an object of

obtaining the reefer work.

4.   ILWU directed, condoned, or ratified Local 8's and Local 40's job actions during

the times described above.

5.   Local 40 did not engage in any job actions or slowdowns from September 2012 to

June 2013 with an object of obtaining the reefer work.

The Court disagrees with the ILWU Entities that their five proposed adjudicated facts are the only appropriate facts for which the Court should give preclusive effect. The Court also disagrees that all facts found by the Court in the Contempt Order relating to a period before the preliminary injunction was issued are not "necessarily decided." The Ninth Circuit has explained what "necessarily decided" means in the context of issue preclusion as follows:

> We follow, rather, the approach we have taken in deciding whether an issue is "necessarily decided" for purposes of collateral estoppel. As Chief Judge Schroeder explained in *United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995), "in order to justify invoking collateral estoppel, a factual determination must have been 'necessarily' (and not 'presumably') decided in the first proceeding." But "necessarily," she noted, means only that the court undeniably decided the issue, not that it was unavoidable for it do so. Over the disagreement of one our colleagues, *see id.* at 534 (Norris, J., concurring), *Weems* held that where the court heard evidence and argument from both parties, and specifically ruled on the issue, a party may not escape the ruling's binding effect on the ground that it was not logically essential to the court's ultimate determination. *See id.* at 532.
>
> Of course, not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case. However, any such reconsideration should be done cautiously and rarely—only where the later panel is convinced that the earlier panel did not make a deliberate decision to adopt the rule of law it announced.

*United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001).

The Court will follow the Ninth Circuit's guidance that when the NLRB and the Court heard evidence and argument and specifically ruled on a factual determination, it will have a preclusive effect in this proceeding. ICTSI, however, has not demonstrated that the 205 enumerated items should be given preclusive effect. Nor has ICTSI's motion requested specific relief from the Court, but instead has essentially asked for pre-approval of ICTSI's ability to

present at trial some large amount of unidentified evidence (*e.g.*, unknown witness testimony, unidentified documentary evidence, etc.). This request is rejected.

Pretrial motions and evidentiary submissions appear to be the better avenue for this particular request. For example, ICTSI argues that NLRB opinions have been admitted as trial exhibits. ICTSI can put the opinions on its exhibit list and if there is an objection by the ILWU Entities then the Court will resolve it before or at trial. Similarly, ICTSI can identify a witness and provide a summary of that witness's testimony (as required by the Court's Civil Trial Management Order). If the ILWU Entities object, the Court can resolve the dispute at the pretrial conference or at trial. And if ICTSI wants to move *in limine* to preclude the ILWU Entities from presenting certain specific evidence because of issue preclusion, the Court will consider such a motion. ICTSI's motion for partial summary judgment as presented, however, is denied without prejudice to renew in a different format and at a different time.

**D. Fourth and Fifth Affirmative Defenses**

The ILWU Entities' Fourth Affirmative Defense alleges that ICTSI's claim are barred because ICTSI failed to exhaust its remedies under the mandatory grievance procedure of the Pacific Coast Longshore Contract Document ("PCLCD"), one of the documents comprising the PCL&CA. The ILWU Entities' Fifth Affirmative Defense alleges that ICTSI's claim for monetary damages is barred because ICTSI waived any right to such relief in the PCL&CA.

ICTSI argues that in denying the ILWU Entities' motion to dismiss, the Court already rejected the contentions of these affirmative defenses. The Court found, with respect to the PCLCD's mandatory arbitration provision:

> This provision does not provide that the parties must arbitrate
> statutory claims. Nor does it state that the parties must arbitrate
> whether damages are available in statutory claims. Section 17.15's
> terms only require that the parties arbitrate "dispute[s] involving
> this Agreement[.]" ILWU has not identified any provision of the

> PCLCD that requires the parties to arbitrate statutory claims or
> damages flowing from statutory claims. In fact, § 17.52 expressly
> limits the power of arbitrators "*strictly* to the application and
> interpretation of the Agreement as written." PCLCD at § 17.52
> (emphasis added).

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 932 F. Supp. 2d 1181, 1193 (D.

Or. 2013) (emphasis in original). The Court noted that it would "not order the parties to arbitrate

a statutory claim unless the CBA is 'particularly clear' that statutory claims are subject to

arbitration." *Id.* (quoting *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 79 (1998)). The

Court thus held that "the PCLCD does not require ICTSI and ILWU to arbitrate ICTSI's § 303

counterclaim or the availability of damages arising from that counterclaim." *Id.* at 1193.

The ILWU Entities respond to this motion by asserting that they object only to preserve

their appellate rights. Under the law of the case doctrine, these issues have been resolved in favor

of ICTSI. *See, e.g.*, *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (noting that

the law of the case doctrine "generally preludes a court from reconsidering an issue decided

previously by the same court"). Accordingly, ICTSI's motion for partial summary judgment

against the ILWU Entities' Fourth and Fifth Affirmative Defenses is granted.

## E. Sixth Affirmative Defense

In their Sixth Affirmative Defense, the ILWU Entities allege that the actions of the

unions, other than to obtain the disputed reefer jobs, constitute lawful primary action under the

NLRA. ICTSI moves for summary judgment against this affirmative defense, arguing that it is

not an affirmative defense, but is an attack on ICTSI's ability to make out its *prima facie* case.

ICTSI must prove that the ILWU Entities engaged in unlawful secondary activity that materially

contributed or was a substantial factor in causing ICTSI's injury.

The ILWU Entities respond that they are entitled to present evidence to show that union

members engaged in lawful primary disputes and that those primary disputes were the cause of

ICTSI's injury and not the secondary dispute relating to the reefer jobs. The ILWU Entities state: "The point of the ILWU's sixth affirmative defense is to explain to the jury specifically why the reefer dispute was not a substantial factor causing ICTSI's losses, by identifying numerous other primary disputes and their significance." The ILWU Entities are confusing a negative defense with an affirmative defense.

"A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (citing *Flav-O-Rich v. Rawson Food Serv. Inc.* (*In re Rawson Food Service, Inc.*), 846 F.2d 1343, 1349 (11th Cir. 1988)). The Eleventh Circuit explained, in *Rawson Food Service, Inc.*, that a defense pointing out a defect in the plaintiff's *prima facie* case is not an affirmative defense. 846 F.2d at 1349. "'An affirmative defense raises matters extraneous to the plaintiff's *prima facie* case; as such, they are derived from the common law plea of 'confession and avoidance.' On the other hand, some defenses negate an element of the plaintiff's *prima facie* case; these defenses are excluded from the definition of affirmative defense in Fed. R. Civ. P. 8(c)." *Id.* (citation omitted) (quoting *Ford Motor Co. v. Transp. Indemnity Co.*, 795 F.2d 538, 546 (6th Cir. 1986)); *see also Auld-Susott v. Galindo*, 2018 WL 3148095, at *4 (D. Haw. June 27, 2018) ("Defenses that negate an element of the plaintiffs' prima facie case are excluded from the definition of affirmative defense in Federal Rule of Civil Procedure 8(c)." (quotation marks omitted)). An affirmative defense thus negates liability even if ICTSI proves its *prima facie* case. *See, e.g.*, *In re Rawson Food Service, Inc.*, 846 F.2d at 1349; *Fed. Deposit Ins. Corp. v. Main Hurdman*, 655 F. Supp. 259, 262 (E.D. Cal. 1987) (noting that affirmative defenses "plead matters extraneous to the plaintiff's *prima facie* case, which deny plaintiff's right to recover, even if the allegations are true"); BLACK'S LAW DICTIONARY, 482 (9th Ed. 2009) (defining "affirmative defense" as: "A

defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.").

The ILWU Entities' ability to present evidence that ICTSI's alleged harm was caused by lawful primary activity and not unlawful secondary activity is a negative defense and not an affirmative defense. ICTSI's motion for partial summary judgment against the ILWU Entities' Sixth Affirmative Defense is therefore granted.

## F. Third Affirmative Defense

The ILWU Entities' Third Affirmative Defense alleges that ICTSI's damages, if any, must be offset by the Port's payments to ICTSI through the "rent rebate" and "cost sharing" programs between ICTSI and the Port. ICTSI moves for summary judgment against this defense, arguing that it is precluded by the collateral source rule.

In the cost sharing agreement, the Port agreed to pay ICTSI 50 percent of certain "shared costs" caused by the work stoppages and slowdowns at T6, up to a capped amount of approximately $4.6 million. In the rent rebate agreement, the Port agreed to pay ICTSI up to $3.7 million of ICTSI's annual rent. The cost sharing agreement requires ICTSI reimburse the Port under a specified formula up to the total amount paid by the Port through any recovery that ICTSI obtains in litigation. The rent rebate agreement also requires ICTSI to reimburse the Port through amounts that ICTSI recovers in litigation, after deducting legal fees and costs, and to the extent these payments were unrecovered by the Port on the claims the Port independently asserted against the ILWU Entities.[13] Later, the ILWU Entities and the Port entered into their own settlement agreement, which provides, in relevant part, that any reimbursement paid to the

---

[13] At the time of the agreements, the Port was independently pursuing its own claims against ILWU. The Port has since settled its claims against ILWU and dismissed those claims.

Port by ICTSI under the rent rebate or cost sharing programs must then be paid by the Port to the ILWU Entities.

ICTSI argues that the primary purpose of the collateral source rule is to prevent wrongful actors from reaping a benefit by not having to pay damages they caused. ICTSI asserts that the collateral source rule applies in cases brought under § 303 and that the purpose is served under the facts of this case. ICTSI also argues that the effect of the Port-ILWU agreement would be to allow a "double reduction" of ICTSI's claimed damages and confer a windfall on the ILWU Entities. ICTSI asserts that a portion of the litigation damages paid from ILWU to ICTSI that ICTSI then pays to the Port would be paid back to ILWU. Because the Court or the jury would deduct an amount from ICTSI's award, ICTSI would still have to reimburse the Port, and the Port would then still pay the monies back to ILWU, ILWU receives the benefit of having damages reduced by the Court or jury and then a second benefit of receiving the Port's reimbursement amount, while ICTSI suffers a net loss.

The ILWU Entities respond by arguing that the collateral source rule may apply under certain circumstances in § 303 cases, but a court should consider all the purposes of the rule in determining whether it should apply. The ILWU Entities argue that the collateral source rule should not apply in this case because the offset in damages is necessary to avoid ICTSI obtaining a "double recovery" by receiving a rent rebate from the Port for amounts purportedly caused by ILWU's conduct and then obtaining money damages from ILWU. The ILWU Entities also provide a declaration from a Port manager stating that the Port will not seek reimbursement from ICTSI under the rent rebate and cost sharing agreements if the Court allows the damages deduction requested by the ILWU Entities.

The collateral source rule is recognized as part of the federal common law. *See Gill v. Maciejewski*, 546 F.3d 557, 565 (8th Cir. 2008). Under the collateral source rule, "benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." *McLean v. Runyon*, 222 F.3d 1150, 1155-56 (9th Cir. 2000) (quoting 1 Dan B. Dobbs, LAW OF REMEDIES, § 3.8(1) (2d Ed. 1993)); *see also Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1134 (9th Cir. 2003) ("Under the collateral source rule, the tortfeasor is not entitled to be relieved of the consequences of its tort by some third party's compensation to the victim."). "The rule 'does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him.'" *Solis-Diaz v. Las Vegas Metro. Police Dep't*, 2017 WL 374908, at *2 (D. Nev. Jan. 25, 2017) (quoting Restatement (Second) of Torts, § 920A cmt. b)). "The primary justifications for the collateral source rule are that the defendant should not get a windfall for collateral benefits received by the plaintiff and that the defendant should not profit from benefits that the plaintiff has paid for himself." *McLean*, 222 F.3d at 1156; *see also Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534-35 (9th Cir. 1962) ("The question in not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall which already exists. As between the injured person and the tortfeasor, the former's claim is the better. This may permit a double recovery, but it does not impose a double burden. The tortfeasor bears only the single burden for his wrong. That burden is imposed by society, not only to make the plaintiff whole, but also to deter negligence and encourage due care. . . . Collateral source funds are usually created through the prudence and foresight of persons other than the tortfeasor, frequently including the injured person himself. They are intended for the benefit of the injured person, and not for that of the person who injures him."); Restatement (Second) of Torts § 920A cmt. b ("[T]o the extent that

the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. . . . One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.").

The ILWU Entities argue that the collateral source rule should not apply in this § 303 case. They argue that because § 303 of the LMRA permits only compensatory damages and does not allow for punitive damages, the collateral source rule cannot apply. The Ninth Circuit, however, has rejected the argument that the collateral source rule cannot apply when punitive damages are precluded. *Siverson v. United States*, 710 F.2d 557, 560 (9th Cir. 1983) (rejecting the government's argument that the collateral source rule does not apply to the Federal Tort Claims Act because it does not permit punitive damages and noting that "[t]he government's rationale would essentially always find recovery from a collateral source to be 'punitive' and ignores the collateral source doctrine's purpose of preventing a windfall to the defendant").

The ILWU Entities also argue that because § 303 provides only compensatory damages, it is similar to a breach of contract action and the Court should follow the Ninth Circuit's reasoning in *United States v. City of Twin Falls*, 806 F.2d 862, 874 (9th Cir. 1986), *overruled on other grounds as recognized by Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 551-52 (9th Cir. 1986), in declining to apply the doctrine. In *Twin Falls*, the Ninth

Circuit explained that the collateral source rule did not apply to contract damages because "the purpose of awarding damages for breach of contract is to fully recompense the non-breaching party for its losses . . . , not to punish the breaching party." *Id.* at 874. Violations of § 8(b)(4) of the NLRA, however, are equated with tortious conduct, not breach of contract. *See Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 814 F.2d 32, 40 (1st Cir. 1987) ("A violation of § 303 is a tort, in the nature of interference with advantageous economic relations."); *C & K Coal Co. v. United Mine Workers of Am.*, 704 F.2d 690, 697 (3d Cir. 1983) (noting that "[v]iolations of section 8(b)(4) are torts"); *Mason-Rust v. Laborers' Local 42*, 435 F.2d 939, 945 (8th Cir. 1970) ("Since violations of § 8(b)(4) of the National Labor Relations Act are equated with tortious conduct in considering the nature of the Act and the right to compensatory damages, we think the collateral source rule is equally applicable to the reimbursement payments made by the Army to Mason-Rust." (citations omitted)).

The ILWU Entities also rely on *The Austin Company v. International Brotherhood of Electrical Workers, Local Union No. 701* to support their contention that the collateral source ruled should not apply in this case. 665 F. Supp. 614 (N.D. Ill. 1987). The Court in *Austin* acknowledged that one purpose of the collateral source rule is to prevent windfalls to the defendant. *Id.* at 620. The court declined to apply the collateral source rule because the court concluded that subrogation was appropriate in that case. *Id.* The plaintiff had been fully compensated by a third party, and the court concluded that the third party thus "owns" any claim the plaintiff had for damages caused by the union, which the court described as "the essence of subrogation." *Id.* at 621. The court then concluded that "any double recovery, in the face of the feasibility of subrogation, would be antithetical to the goals of federal labor law. Accordingly, the court will utilize the device of subrogation so that the employer does not receive a double

recovery, but the Union will nevertheless remain liable [to the third party] for the damages it caused." *Id.*

The court in *Austin* explains that its analysis is specific to the facts of that case. *See id.* at 618. Instead of applying the collateral source rule, the court in *Austin* used the "approach the law has developed in certain appropriate cases for accomplishing the goal of preventing a windfall to the defendant (that is, still holding the defendant liable for damages) while simultaneously avoiding double recovery to the plaintiff[;] the device of subrogation." *Id.* at 620. The court relied on subrogation and the fact that the third party essentially owned the plaintiff's claims. By contrast, the contracts relating to the rent rebate and cost sharing programs do not show that the Port "owns" ICTSI's claims against the ILWU Entities or that subrogation is appropriate here. The Port only provided ICTSI with a partial benefit, and ICTSI is contractually obligated to reimburse the Port for at least a portion of the amounts received.[14]

Moreover, the court in *Austin* looked to the two purposes of the collateral source rule: (1) considering "that one who gratuitously donates a benefit to an injured party should not instead be forced, in effect, to transfer that benefit to the wrongdoer," *id.* at 619; and (2) "to prevent undeserved (and unpaid for) windfalls to the defendant." *Id.* at 620. Both purposes support applying the collateral source rule in this case. The Port gratuitously donated the benefit to ICTSI, only expecting repayment if ICTSI recovered in litigation. This benefit to ICTSI was to compensate for the wrongdoing of the ILWU Entities. The fact that the Port later (after ICTSI terminated its lease with the Port) entered into a separate settlement agreement with the ILWU

---

[14] The Court also is not persuaded by the declaration from a Port employee that reimbursement from ICTSI will not be sought if the deduction is allowed. The Court instead looks to the contractual relationship between all the relevant entities. Further, when considering the purpose of the collateral source rule in this case, the Court looks at the intent of the Port and ICTSI at the time they entered into their agreements, because that is the time the collateral benefit was conferred to ICTSI.

Entities to resolve their disputes does not detract from the benefit the Port conferred on ICTSI or change the purpose behind the rent rebate and cost sharing programs.

With respect to the second purpose of the collateral source rule as discussed in *Austin*, failing to apply the collateral source rule here, unlike in *Austin*, would not result in the ILWU Entities "nevertheless remain[ing] liable . . . for the damages [they] caused." *Austin*, 665 F. Supp. at 621. Instead, failing to apply the collateral source rule would result in a windfall to the ILWU Entities by not being held liable for a portion of the damages they caused. This is antithetical to the collateral source rule and contrary to the holding in *Austin*. Further, this windfall is unrelated to whether ICTSI is required to reimburse any amount to the Port or whether the Port, in turn, pays any amount to the ILWU Entities.

The Court also is not persuaded by the ILWU Entities' argument that without the requested offset, ICTSI will get a double recovery. First, it is not clear that will be the case, because the contracts require ICTSI to reimburse the Port, after certain legal expenses are deducted. Second, although application of the collateral source rule may result in some "windfall" to ICTSI, "the law has long been comfortable with this result." *Solis-Diaz*, 2017 WL 374908, at *3. As the Ninth Circuit has repeatedly stated, including more than fifty-five years ago in *Gypsum Carrier*, as between a windfall going to the party who engaged in the wrongful conduct or a windfall going to the plaintiff, the better option is the windfall going to the plaintiff, as long as the defendant only pays a single payment.[15] 307 F.2d at 534; *see also In re*

---

[15] During the past few decades many states have made legislative changes to the collateral source rule, including for cases involving insurance payments, personal injury and death, and subrogation, generally done to alleviate problems with rising insurance premiums. *See generally* Cong. Budget Office, U.S. Cong., The Effects of Tort Reform: Evidence from the States (2004), *available at* http://www.cbo.gov/ftpdocs/55xx/doc5549/Report. pdf. That does not, however, affect ICTSI's claims or the underlying rationale for the application of the doctrine

*Air Crash Disaster Near Cerritos, Cal., On Aug. 31, 1986*, 982 F.2d 1271, 1277 (9th Cir. 1992)

(noting that "[t]o order the government to pay the plaintiffs, thereby allowing them a double

recovery, is not problematic" but that to impose "double payment from the government" is

problematic); *Siverson*, 710 F.2d at 560 (noting that the collateral source doctrine prevents the

defendant from receiving a windfall, irrespective of whether application of the doctrine results in

a double recovery for the plaintiff).

Moreover, the remaining rationale for applying the collateral source rule discussed in

*Gypsum Carrier* and its progeny, although generally involving tort cases, is equally applicable in

this case. The rent rebate and cost sharing programs were instituted between the Port and ICTSI

for the stated purpose of sharing the costs caused by and mitigating the consequences of the

ILWU Entities' work stoppages and slowdowns that resulted in decreased productivity at T6 and

increased costs to ICTSI. *See* ECF 310-1 at 121, 133-34. The Port and ICTSI desired to enter

into a temporary program under which the Port would share some of these increased costs. *Id.* As

discussed above, NLRB, this Court, and the D.C. Circuit have all determined that the ILWU

Entities' conduct for at least some portion of time was illegal secondary activity. Therefore,

under the collateral source rule, any windfall, if one arises, out of the Port's willingness to

provide a benefit is better conferred on ICTSI than to the ILWU Entities, as the parties who

engaged in the wrongful conduct. *See Gypsum Carrier*, 307 F.2d at 534-35 (noting that the

collateral benefits are intended for the benefit of the injured person and not the tortfeasor and

"that intention should be effectuated"). Further, this benefit was created through the Port and

ICTSI's prudence, not the ILWU Entities' prudence, and was intended to benefit ICTSI, not the

ILWU Entities. *See id.* at 534 (noting that collateral benefits are generally created through the

---

in this case. This case does not involve insurance payments, personal injury, subrogation, or state
law.

prudence of persons other than the tortfeasor, often including the injured party). ICTSI made "advantageous . . . arrangements" with the Port and under the collateral source rule is entitled to keep the benefits as opposed to having them conferred to the tortfeasor, the ILWU Entities. Restatement (Second) of Torts, § 920A, cmt. b.

Additionally, the Court is not persuaded by the ILWU Entities' argument that the rent rebate and cost sharing programs are the equivalent of "mitigation" as that term is used in the context of a plaintiff mitigating its damages, regardless of the term "mitigate" used in the rent rebate agreement. The ILWU Entities argue that a plaintiff is obligated to mitigate its damages and that once it does, the defendant gets the benefit of that mitigation. ICTSI, however, was not obligated to enter into a special contract with the Port to share in some of the costs that resulted from the ILWU Entities' wrongdoing. The Port gratuitously entered into these contracts. This is analogous to the example provided in the Restatement (Second) of Torts in discussing examples of collateral source rule benefits, when a plaintiff is injured and unable to work and her employer gratuitously still agrees to pay her salary. § 920A, cmt. c(2). Although the tortfeasor who injured the plaintiff may argue that her arrangement to continue to receive salary is "mitigation" of damages, the law accepts that as collateral benefits and not damages mitigation. Other examples include gratuitous cash gifts and gratuitous services rendered. The Port's decision to enter into the rent rebate and cost sharing contracts and agree to pay ICTSI monies to offset some of ICTSI's losses is analogous to these gratuitous gifts that are deemed collateral benefits.

The ILWU Entities rely on *Gruber v. San Diego Cty. Bldg. & Const. Trades Council* in support of its mitigation argument. 1973 WL 1121 (S.D. Cal. Apr. 2, 1973). The Court does not find this case persuasive on the issue of the collateral source doctrine and mitigation, and it is distinguishable. In *Gruber*, a contractor and Gruber, a subcontractor, were illegally picketed by

AFL-CIO union members because Gruber employed NAIU members instead of AFL-CIO members. *Id.* at *5-6. The contractor was also found by the AFL-CIO union board to be in violation of the master agreement with the union. *Id.* at *7. As a result of the picketing and board determination, the contractor cancelled the contract with Gruber and turned off water to the job site so Gruber could not complete performance. *Id.* The Court found that the unions' conduct resulted in approximately $75,000 in damages to Gruber. *Id.* at *8. The court then stated: "Subsequent to the cancellation of the subcontract, Young [the contractor] and Gruber entered into an equipment lease, on which Gruber received from Young the sum of $50,975.11. This payment was in mitigation of damages and not from a collateral source of remuneration to Gruber. It is credited against the total damages sustained by Gruber and his damages are found to be $25,022.26." *Id.*

The court in *Gruber* provided no analysis or explanation for why the equipment lease with the contractor was considered mitigation of damages and not collateral source. The entire analysis of the court is the one sentence conclusion that the payment was mitigation and not collateral benefits. Nonetheless, it appears that after the contractor cancelled its original contract with Gruber, likely wrongfully, the two parties entered into a new contract, the "equipment lease." Under this new contract the contractor paid Gruber to mitigate some of the harm caused by the contractor's cancellation of its first contract with Gruber. Although the court ultimately determined that the contractor's cancellation of its first contract was triggered by the unions' illegal conduct, this is a different circumstance from the rent rebate and cost sharing agreements. The Port did not cancel any contract with ICTSI, the breach for which ICTSI arguably could sue the Port, and then the parties' entered into the cost sharing and rent rebate agreements as

mitigation of damages for that contract cancellation. As previously noted, the Port and ICTSI both gratuitously entered into these contracts.

The Court is persuaded by the Eighth Circuit's reasoning in *Mason-Rust* that the collateral source rule is appropriate in the context of a § 303 case. 435 F.2d at 945; *see also Virginia Elec. & Power Co. v. Int'l Bhd. of Boilermakers*, 1980 WL 2062, at *28 (N.D. W. Va. Mar. 3, 1980) (applying collateral source rule in § 303 case). The Eighth Circuit in *Mason-Rust* noted that the collateral source rule has been applied in other labor law contexts and added that violations of § 8(b)(4) of the NLRA are equated with tortious conduct, and thus the collateral source rule is applicable in this context. *Mason-Rust*, 435 F.2d at 945. The Court also is persuaded by using the methodology encouraged by the ILWU Entities—looking at the purposes of the rule. As discussed above, the purposes of the rule are more appropriately served by applying the collateral source rule in this case. Accordingly, the ILWU Entities may not obtain an offset against their liability for the benefit ICTSI received from the Port under the rent rebate or cost sharing programs.[16] ICTSI's motion for partial summary judgment against the ILWU Entities' Third Affirmative Defense is granted.

## G. First Affirmative Defense

The ILWU Entities' First Affirmative Defense alleges that ICTSI suffered no damages attributable to any act of the ILWU Entities. As discussed in addressing ICSTI's motion against the ILWU Entities' Sixth Affirmative Defenses, this defense challenges ICTSI *prima facie* case and therefore is a negative defense and not an affirmative defense. ICSTI's motion for partial summary judgment on this issue is granted.

---

[16] The Court does not reach the issue, not presently before it, of whether evidence of the rent rebate or cost sharing program may be received in evidence for any other purpose.

## H. Damages

ICTSI moves for partial summary judgment that the Court hold as a matter of law that ICTSI is entitled to *some* compensatory damages beyond mere nominal damages for the ILWU Entities' violation of 29 U.S.C. § 187. The Court has found, based on issue preclusion, that for certain time periods ICTSI has established a violation of § 187(a) and that the ILWU Entities' motivation for the work stoppages and slowdowns was the reefer dispute. ICTSI must still, however, prove causation and damages under § 187(b). Regarding causation, ICTSI must show that the violation of § 187(a) was a substantial factor or materially contributed to ICTSI's damages. *Mead*, 523 F.2d at 1379. Regarding damages, although the Ninth Circuit has held that damages do not need to be proven with certainty and that evidence suffices if it supports a "just and reasonable inference" that the union's conduct harmed the aggrieved party, *id.* at 1377, that does not absolve ICTSI from proving damages. Whether any damages beyond nominal damages are appropriate, however, is an issue for the factfinder. ICTSI's motion for partial summary judgment on this issue is denied.

## CONCLUSION

ICTSI's Motion for Partial Summary Judgment (ECF 309) GRANTED IN PART AND DENIED IN PART as stated in this Opinion and Order.

**IT IS SO ORDERED.**

DATED this 17th day of January, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge