**Robert Lavitt** (OSB No. 40083)
SCHWERIN, CAMPBELL, BARNARD,
IGLITZIN AND LAVITT, LLP
18 West Mercer Street, Suite 400
Seattle, WA 98119-3871
206-257-6004 / Fax: 206-257-6039
lavitt@workerlaw.com

**Eleanor Morton** (CA No. 220407)
**Emily Maglio** (CA No. 267190)
LEONARD CARDER, LLP
1188 Franklin Street, Suite 201
San Francisco, CA 94109
415-771-6400 / Fax: 415-771-7010
emorton@leonardcarder.com
emaglio@leonardcarder.com

(Admitted Pro Hac Vice)

**Susan J. Harriman** (CA No. 111703)
**Daniel Purcell** (CA No. 191424)
**Brook Dooley** (CA No. 230423)
**Philip J. Tassin** (CA No. 287787)
**Maya Karwande** (CA No. 295554)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
415-391-5400 / Fax: 415 397 7188
sharriman@keker.com
bdooley@keker.com

(Admitted Pro Hac Vice)

**Robert Remar** (CA No. 100124)
LAW OFFICES OF ROBERT REMAR
1188 Franklin Street, 4th Floor
San Francisco, CA 94109
510-499-1570 / Fax: 415-775-1302
rremar@remarlaw.com

(Admitted Pro Hac Vice)

*Attorneys for Plaintiff and Counter-Defendants*
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,
ILWU LOCAL 8 *and* ILWU LOCAL 40

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON, PORTLAND DIVISION

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,<br><br>Plaintiff,<br><br>v.<br><br>ICTSI OREGON, INC., *an Oregon corporation,*<br><br>Defendant.<br><br>―――――――――――――――――<br><br>AND RELATED ACTIONS. | Case No.  3:12-CV-01058-SI<br><br>**THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE**<br><br><br>Judge: Hon. Michael H. Simon<br><br>Trial date: March 19, 2019 |

## TABLE OF CONTENTS

**Page**

Opposition to MIL 1 ............................................................................................... 1

Opposition to MIL 2 ............................................................................................... 3

Opposition to MIL 3: ............................................................................................. 4

Opposition to MIL 4 ............................................................................................... 5

Opposition to MIL 5 ............................................................................................... 7

Opposition to MIL 6 ............................................................................................... 9

Opposition to MIL 7 ............................................................................................. 11

Opposition to MIL 8 ............................................................................................. 12

Opposition to MIL 9 ............................................................................................. 13

Opposition to MIL 10 ........................................................................................... 14

Opposition to MIL 11 ........................................................................................... 15

Opposition to MIL 12 ........................................................................................... 17

Opposition to MIL 13 ........................................................................................... 19

Opposition to MIL 14 ........................................................................................... 19

Opposition to MIL 15 ........................................................................................... 21

Opposition to MIL 16 ........................................................................................... 22

Opposition to MIL 17 ........................................................................................... 23

Opposition to MIL 18 ........................................................................................... 25

Opposition to MIL 19 ........................................................................................... 26

Opposition to MIL 20 ........................................................................................... 27

Opposition to MIL 21 ........................................................................................... 28

Opposition to MIL 22 ........................................................................................... 29

Opposition to MIL 23 ........................................................................................... 30

Opposition to MIL 24 ........................................................................................... 30

Opposition to MIL 25 ........................................................................................... 31

Opposition to MIL 26 ........................................................................................... 32

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

1317890

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acton v. Target Corp.*,
  2010 WL 11523624 (W.D. Wash. May 11, 2010)................................................................20

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
  475 F.3d 1080 (9th Cir. 2007) ...........................................................................................9

*Austin Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 701*,
  665 F. Supp. 614 (N.D. Ill. 1987) ....................................................................................17

*Branch v. Umphenour*,
  2014 WL 3891813 (E.D. Cal. Aug. 7, 2014).....................................................................32

*Chipman Freight Services v. NLRB*,
  843 F.2d 1224 (9th 1988)..................................................................................................31

*DeMedeiros v. Koehring Co.*,
  709 F.2d 734 (1st Cir. 1983)............................................................................................21

*Eichel v. New York Central R.R. Co.*,
  375 U.S. 253 (1963)...........................................................................................................21

*Feather v. United Mine Workers of Am.*,
  711 F.2d 530 (3d Cir. 1983)................................................................................16, 17, 18

*Fl. Sugar Mktg. & Terminal Ass'n Inc. v. Local No. 3, Int'l Longshoreman's
  Ass'n, AFL-CIO*,
  668 F. Supp. 173 (S.D.N.Y. 1987).....................................................................................18

*Hoffman v. Constr. Protective Servs., Inc.*,
  541 F.3d 1175 (9th Cir. 2008) ..........................................................................................32

*Hooks v. Int'l Longshore & Warehouse Union, Local 8*,
  72 F. Supp. 3d 1168 (D. Or. 2014) ................................................................................6, 8

*Hyatt Chalet Motels, Inc. v. Salem Bldg. & Const. Trades Council*,
  298 F. Supp. 699 (D. Or. 1968) ........................................................................................18

*Jinro Am. Inc. v. Secure Inv., Inc.*,
  266 F.3d 993 (9th Cir.), *opinion amended on denial of reh'g,* 272 F.3d 1289
  (9th Cir. 2001)...................................................................................................................23

*John B. Cruz Const. Co. v. United Bhd. of Carpenters & Joiners of Am., Local 33*,
  907 F.2d 1228 (1st Cir. 1990)............................................................................................16

*Limbach Co. v. Sheet Metal Workers Int'l Assoc., AFL-CIO*,
   949 F.2d 1211 (3d Cir. 1991), *vacated in part on other grounds*, 942 F.2d
   1240 (3d Cir. 1991)......................................................................................................18

*Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*,
   366 U.S. 667 (1961)......................................................................................................31

*Mead v. Retail Clerks Int'l Ass'n*,
   523 F.2d 1371 (9th Cir. 1975) ...........................................................................2, 16, 17

*Moser v. Health Ins. Innovations, Inc.*,
   2018 WL 6735710 (S.D. Cal. Dec. 21, 2018)...........................................................27

*N.L.R.B. v. Markle Mfg. Co.*,
   623 F.2d 1122 (5th Cir. 1980) ....................................................................................9

*Old Chief v. United States*,
   519 U.S. 172 (1997)......................................................................................................5

*Oshodi v. Holder*,
   729 F.3d 883 (9th Cir. 2013) ......................................................................................8

*Outley v. City of New York*,
   837 F.2d 587 (2d Cir. 1988).................................................................................26, 27

*Phillips v. W. Co. of N. Am.*,
   953 F.2d 923 (5th Cir. 1992) .....................................................................................21

*Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters*,
   704 F.2d 1443 (9th Cir. 1983) ...................................................................................10

*Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union #7*,
   643 F.3d 473 (6th Cir. 2011) ...............................................................................17, 18

*Sheehy v. S. Pac. Transp. Co.*,
   631 F.2d 649 (9th Cir. 1980) .....................................................................................21

*Stoba v. Saveology.com, LLC*,
   2015 WL 10857528 (S.D. Cal. July 7, 2015) ...........................................................32

*Thornhill v. State of Alabama*,
   310 U.S. 88 (1940).....................................................................................................30

*United States v. Abel*,
   469 U.S. 45 (1984).........................................................................................19, 20, 26

*Vesta Corp. v. Amdocs Mgmt., Ltd*,
   No. 3:14-CV-01142-HZ, 2018 WL 4354301 (D. Or. Sept. 12, 2018).....................23

iv

**Federal Statutes**

29 U.S.C. § 158(b)(4)(B) ...................................................................................11, 31

**Rules**

Fed. R. Evid. 401 ...................................................................................................24

Fed. R. Evid. 403 ...........................................................................................10, 27

Fed. R. Evid. 408 .............................................................................................7, 8

Fed. R. Evid. 608 ...................................................................................................29

Fed. R. Evid. 701 ...................................................................................................23

**Constitutional Provisions**

First Amendment ...................................................................................................30

**Other Authorities**

Restatement of Torts § 920 .............................................................................16, 17, 19

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

**Opposition to MIL 1**

The ILWU will abide by the Court's summary judgment rulings when presenting evidence at trial. But ICTSI's Motion 1 is too broad, seeking relief that the Court's summary judgment rulings do not support.

ICTSI asks the Court to preclude the ILWU from presenting any evidence of "alternative motives for work stoppages and slowdowns" prior to August 14, 2013. ICTSI MIL No. 1 at 3. The Court will instruct the jury that prior to August 14, 2013 the ILWU's and Local 8's job actions were substantially motivated by a desire to obtain the reefer work. But that does not mean that other motivations, even if less substantial, did not exist, are irrelevant to trial, or would be unfairly prejudicial to ICTSI. In fact, the reverse is true.

During much (if not all) of the period after August 13, 2013, the ILWU's conduct was not motivated by obtaining the reefer work. On February 22, 2014, the ILWU was *awarded* the reefer work and retained that work for seven months, until September 22, 2014. Plainly the ILWU cannot be accused of taking job actions to obtain work it was already doing. Yet production at Terminal 6 did not improve, because of the many other problems with ICTSI's management—including its habit of self-sabotaging by firing entire gangs of ILWU workers for any perceived slowdown, bringing all work on the docks to a grinding halt. Further, on July 1, 2014, and when the reefer work was reassigned to the IBEW in September 2014, the ILWU's coastwise contract with the PMA (and thus ICTSI) had expired, opening up all conceivable labor issues with PMA members to negotiation and causing carriers to divert cargo from West Coast ports generally. Not surprisingly, during the open contract period, relations between the ILWU and ICTSI grew more adversarial, causing a further drop in production, for reasons having nothing to do with reefer work.

For these time periods, the ILWU is entitled to show ICTSI's mismanagement of the ILWU workers and Terminal 6, and the ILWU's objections to numerous issues

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

unrelated to reefers.  The ILWU is also entitled to explain that ICTSI's abusive management practices and cavalier disregard for the safety and well-being of ILWU workers did not start overnight on August 14, 2013.  To the contrary, ICTSI showed its colors as soon as it began operating Terminal 6 in February 2011.  Its practices grew worse over time.  But precluding the ILWU entirely from presenting evidence of ICTSI's bad acts during the earlier period will leave the impression that there were none, and allow ICTSI to argue that it is an innocent party who was forced to take aggressive, punitive measures after August 14, 2013 because of ILWU intransigence.  That distorts reality.  It would prejudice the ILWU to deny it the ability to put ICTSI's actions after August 14, 2013 in their proper context, as part of a deliberate, hard-line business strategy, as opposed to a reasonable reaction to labor unrest.

Further, ICTSI's Motion No. 1 does not address, and the Court should not preclude the ILWU from offering, evidence and argument regarding the other ***causes*** of ICTSI's failed operations (and thus monetary losses) at Terminal 6, whether before or after August 14, 2013.  The Court's summary judgment ruling (and the preclusive NLRB decision) addressed only the ILWU's ***motives*** for taking certain job actions; to prove damages, ICTSI must show that the job actions proximately caused its damages.  *See Mead v. Retail Clerks Int'l Ass'n,* 523 F.2d 1371, 1376-77 (9th Cir. 1975).  But ILWU job actions were far from ICTSI's only problems at Terminal 6.  Terminal 6 has inherently limited potential as a container shipping port because of its remote location, the shallow depth of the Columbia River, the relatively small local population, and more attractive competing regional ports.  Terminal 6 had been underwater since being deserted by several of its carrier customers in the mid-2000s.  Moreover, ICTSI barely tried and utterly failed to attract new carrier customers to Terminal 6 and alienated other customers that could have provided supplementary sources of revenue.  None of this evidence has anything to do with ILWU job actions or the motives therefor, and there is no basis to preclude it at trial.

**Opposition to MIL 2**

ICTSI's Motion No. 2 sweeps more broadly than the law or the Court's prior rulings allow.  The ILWU concedes that it is bound by the NLRB's ruling that the Port controlled the reefer work and that job actions against ICTSI with the object of obtaining that work were secondary.  But this does not mean, as ICTSI argues, that the ILWU should be barred from offering any evidence or argument about the origins of the reefer dispute or the fact that the PCL&CA explicitly assigned the reefer work to the ILWU.  In fact, explaining the origin of the dispute and the parties' respective positions fully and accurately is essential to fundamental fairness to avoid misleading the jury.

ICTSI willingly joined the PMA, and in doing so accepted both the burdens and benefits of the PCL&CA, including its assignment of the reefer work.  Cutting off the ILWU from explaining the conflict between the PCL&CA and ICTSI's lease would create substantial and unfair prejudice to the ILWU.  If ICTSI is allowed to discuss the result of the NLRB proceedings without allowing both sides to fairly explain how the dispute arose, it will give the jury the false impression that the ILWU pursued the reefer work for no good reason.  If the jury begins its deliberations with this false impression, it will not be able to treat the ILWU fairly in reaching a verdict.

The ILWU will not argue that the PCL&CA should trump ICTSI's lease with the Port.  It accepts that its litigation position in 2012 was determined to be legally incorrect, and that its good-faith belief to the contrary is not a defense to liability.  Nonetheless, it would be misleading and an invitation to error to conceal the origin of the dispute from the jury.

Further, the jury is entitled to evaluate the reefer dispute in the broader context of ICTSI's business practices.  The ILWU will not argue, as ICTSI suggests, that ICTSI "deliberately hatched" a plot with the Port to deprive the ILWU of the reefer work.  But the ILWU is entitled to ask why ICTSI did not abide by its commitments under the PCL&CA and to inquire about the effect ICTSI expected its disregard of the PCL&CA to

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

have on its workforce.  It is undisputed that, when ICTSI came to Portland, it negotiated and signed a lease with the Port that has been determined to give the Port control over the reefer work, directly contrary to the PCL&CA.  At the same time, ICTSI falsely represented to the PMA that it had no third-party contractual obligations that conflicted with the PCL&CA.  This was a ticking time bomb that the ILWU had nothing to do with setting.

The fact that ICTSI chose to sign a lease that violated the PCL&CA and undermined relations with its workforce right out of the gate is highly relevant to the issues at trial.  It is probative of ICTSI's management philosophy and style, which was top-down and dictatorial, without regard for past commitments or any desire to work cooperatively with anyone else.  Evidence at trial will show that ICTSI was like the proverbial carpenter whose only tool was a hammer and saw everyone else as a nail. Whether the counterparty was the ILWU, the ocean carriers, the Port, other customers (like Oregon Steel, a lessee that ICTSI ran off from Terminal 6, squandering additional revenue), or contractors, ICTSI management took the most aggressive possible tack and rarely, if ever, showed a willingness to compromise.  The ILWU is entitled to ask the jury to consider how ICTSI's behavior affected worker morale and thus production at Terminal 6.  ICTSI's approach and tactics are the root of the ILWU's complaints— constant on-the-job harassment and suspicion, collective punishment of innocent workers through mass firings that in turn sabotaged production, a cavalier attitude toward safety in an extremely dangerous industry, and failure to maintain equipment in good working conditions, among other serious problems.

For these reasons, the Court should deny ICTSI's Motion 2.

**Opposition to MIL 3:   UNOPPOSED**

The ILWU and its locals reserve all rights of appeal on this issue.

4

**Opposition to MIL 4**

The ILWU accepts the Court's order giving preclusive effect to the NLRB's rulings and the Court's contempt order with respect to the period from May 21, 2012 to August 13, 2013.  ICTSI, however, seeks to stretch the Court's order far beyond its boundaries in order to muzzle the ILWU from presenting its defenses.  The Court should reject ICTSI's overreach.

The Court's preclusion order does not render evidence concerning the ILWU's safety complaints—including those in the May 21, 2012–August 13, 2013 period— irrelevant or prejudicial to ICTSI.  To the contrary, preventing the ILWU from presenting the jury with the full context of Local 8's safety complaints, including for the period covered by the Court's order, would prejudice the ILWU by leaving the jury with a skewed and incomplete view of Terminal 6's history.  In particular, the preclusive effect of the Court's order should not prevent Local 8 from showing that its early concerns for safety grew over time and lasted into the post-August 13, 2013 period.  Nor should the Court's order prevent the ILWU from showing that, from the beginning of its operation of Terminal 6, ICTSI's business strategy was to push for productivity at the expense of its workers' safety.  As in any case, the ILWU should be allowed to provide the jury with the full series of events as the ILWU sees them.  *See Old Chief v. United States*, 519 U.S. 172, 187 (1997) (holding it "unquestionably true" that a party should be permitted to "present to the jury a picture of the events relied upon") (quotation marks omitted).

In addition to seeking to exclude any reference to safety issues in the May 21, 2012–August 13, 2013 period, ICTSI also attempts to preclude the ILWU from referencing safety issues for periods ***beyond*** August 13, 2013.  In doing so, ICTSI ignores the Court's preclusion order, which limited the preclusive effect of the prior judgments to the period from May 21, 2012 to August 13, 2013.  Dkt. No. 362 (Jan. 17, 2019 Op. &

Order) ("SJ Order") at 24.  For the period after August 13, 2013, the ILWU is entitled to contest every element of ICTSI's Section 303 claim, including whether any labor actions were motivated by safety concerns rather than pursuit of the reefer work.[1]

Indeed, in its contempt order, the Court refused to find that the ILWU's complaints about safety issues in the post-August 13, 2013 period were pretextual or disingenuous—or, as ICTSI calls them, "gimmicks"—and further refused to find the ILWU in contempt for raising them.  *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, 72 F. Supp. 3d 1168, 1187 (D. Or. 2014).  It would be incongruous to now preclude the ILWU from referencing those same safety complaints.  Moreover, even if safety complaints in the post-August 13, 2013 period are shown to be pretextual, the ILWU is entitled to argue that they were lawful primary activity.  *See id.* at 1188 (acknowledging that the expiration of the PCLCD in July 2014 could be "an intervening and superseding cause for primary boycott activity").  Thus, for the period after August 13, 2013, ICTSI may not prevent the locals from presenting evidence of safety concerns.

Finally, there is no basis for requiring the ILWU to make a preliminary showing of a "material change in circumstances" before referencing safety concerns after August 13, 2013.  It is ICTSI's burden to prove by a preponderance of the evidence that any safety complaints in the post-August 13, 2013 period were disingenuous and substantially motivated by pursuit of the reefer work.  The Court's finding on preclusion for an earlier period does not allow ICTSI to flip its burden of proof onto the ILWU.  Indeed, in its contempt order, the Court rejected the same fallacy ICTSI asserts here—that a finding of unlawful secondary activity in the earlier period leads to a similar finding for the subsequent period.  *Id.* at 1187.  ICTSI must prove each element of its claim with respect to the post-August 13, 2013 period, without shortcuts.

---

[1] The Court's preclusion order with respect to Local 40 was limited to the May 21, 2012 to June 10, 2012 period, so Local 40 may present evidence that safety concerns and other factors motivated its actions for any period after June 10, 2012.  SJ Order at 24.

1317890

The Court should deny ICTSI's Motion 4.

**Opposition to MIL 5**

Consistent with Rule 408 of the Federal Rules of Evidence, the ILWU will not seek to introduce statements made during settlement discussions, including the 2013 mediation with Governor Kitzhaber. ICTSI should abide by the same rule. With its Motion 5, however, ICTSI reveals its intention to contravene Rule 408 by relying on the Court's previous finding that, at the 2013 mediation, Leal Sundet promised to increase productivity at Terminal 6 if the reefer jobs were assigned to the ILWU. Even if Mr. Sundet had made that promise, it would be inadmissible under Rule 408.

As explained in the ILWU's Motion in Limine 4, parties may not use "conduct or a statement made during compromise negotiations" to "prove . . . the validity or amount of a disputed claim." Fed. R. Evid. 408(a)(2). Nor may parties introduce evidence of anyone "furnishing, promising, or offering . . . valuable consideration" during settlement discussions. Fed. R. Evid. 408(a)(1). Yet that is what ICTSI intends to do. ICTSI seeks to preclude the ILWU from "disput[ing] the consideration"—namely, increasing productivity in exchange for the reefer work—that ICTSI claims Mr. Sundet offered during the 2013 mediation, presumably so ICTSI may use the purported promise as evidence. For the reasons stated in the ILWU's Motion in Limine 4, the Court should forbid ICTSI from using any settlement communications to support its Section 303 claim.[2]

If, despite Rule 408, ICTSI is allowed to introduce the Court's finding that Mr. Sundet promised to increase productivity in exchange for the reefer work, the ILWU must be allowed to dispute that he made such a promise. The Court based its finding on its determination that Bill Wyatt's account of the mediation discussions was more

---

[2] In addition, for the reasons stated in the ILWU's opposition to ICTSI's Motion 6, ICTSI fails to meet its burden to establish as a preclusive fact that Mr. Sundet made the promise about the reefer work.

credible than Mr. Sundet's. *Hooks*, 72 F. Supp. 3d at 1179. Mr. Wyatt had submitted a declaration stating that Mr. Sundet made the promise, while Mr. Sundet had submitted a declaration denying that he did. *See id.* The Court determined that Mr. Wyatt was more credible, even though it acknowledged that it was unable to personally evaluate the credibility of the witnesses because they did not testify live. *Id.* at 1179, 1185.

Since the Court's contempt order, discovery has revealed evidence calling Mr. Wyatt's declaration into doubt. In a November 25, 2013 email from Mike Radak to other Hanjin employees, Mr. Radak recounted a phone call he had just completed with the Port's Sam Ruda. Mr. Ruda said that "if the jurisdiction issue is resolved AND if ICTSI drops its lawsuit against the ILWU, productivity would be back to normal or maybe improved in a heartbeat." Dep. Ex. 60; Ex. E (Radak Dep. 70:22–71:4).[3] Mr. Radak's call with Mr. Ruda, which took place contemporaneously with the settlement talks, confirms that the ILWU's goal at the time was for ICTSI to drop its lawsuit, not to gain jurisdiction over the reefer work, undermining Mr. Wyatt's account upon which the Court based its finding that Mr. Sundet promised to increase productivity in exchange for the reefer work. If ICTSI puts the parties' settlement discussions into issue, fairness dictates that the ILWU be allowed to present to the jury the evidence relevant to evaluating whether Mr. Sundet made the purported promise, especially since the Court based its earlier credibility determination on a paper record, not live testimony. *See Oshodi v. Holder*, 729 F.3d 883, 885 (9th Cir. 2013) ("It is well established that live testimony is critical to credibility determinations.").

Under Rule 408, the Court should bar ICTSI from introducing or relying upon any settlement communications or offers to prove its claim, including the Court's earlier finding that Mr. Sundet promised during settlement discussions to increase productivity

---

[3] Unless otherwise noted, all exhibits are attached to the concurrently filed Declaration of Philip Tassin.

in exchange for the reefer work.  But if the Court allows ICTSI to introduce that finding, it should allow the ILWU to prove that Mr. Sundet never made such a promise.

### Opposition to MIL 6

ICTSI seeks a ruling of staggering breadth—that "*all* factual findings and legal conclusions in the two NLRB decisions and [] this Court's contempt order be given preclusive effect"—and does so without attempting to analyze a single one of those findings under the relevant legal standard for issue preclusion.  ICTSI Motions in Limine at 9–10.  Worse, ICTSI wants the ILWU to bear the burden of notifying the Court and ICTSI if it "intend[s] to dispute" any of the myriad findings for which ICTSI seeks the Court's blanket assent, and only then would ICTSI attempt to establish the preclusive effect of the particular fact.  *Id.* at 10.  While the ILWU accepts that certain findings are covered by issue preclusion, ICTSI's proposal is flawed, for several reasons.

*First*, it is not appropriate to afford preclusive effect to legal conclusions.  *See, e.g.*, *N.L.R.B. v. Markle Mfg. Co.*, 623 F.2d 1122, 1126 (5th Cir. 1980) ("[C]ollateral estoppel . . . [is] not normally applied to conclusions of law[.]").  While ICTSI is free to propose jury instructions based on prior legal determinations, it is this Court's province to instruct the jury, and the Court bears no obligation to grant preclusive effect to conclusions of law.  *See Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007).

*Second*, the Court's summary judgment order made clear that "ICTSI"—not the ILWU—bears the burden of "demonstrat[ing] that [each of its] enumerated items should be given preclusive effect."  SJ Order at 28.  ICTSI cannot shirk that duty by asking for pre-approval of a large number of findings based on nothing more than its own *ipse dixit*.  Instead, ICTSI must show that "the NLRB and the Court heard evidence and argument and specifically ruled on [each] factual determination" that ICTSI seeks to afford

preclusive effect.  *Id.*  ICTSI has made no such effort.  Its sweeping request for pre-approval therefore must be rejected.

*Third*, the law does not permit "all factual findings and legal conclusions in the two NLRB decisions and [] this Court's contempt order" (ICTSI MIL No. 6 at 9-10, Dkt. No. 385) to be given preclusive effect because "[c]ollateral estoppel is applicable only to those findings ***necessary*** to the decision[s] in the prior proceeding[s]."[4]  *Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters*, 704 F.2d 1443, 1446 (9th Cir. 1983) (emphasis in original).  Indeed, to have preclusive effect here, ICTSI must show that each finding was necessary either to (a) the NLRB's decisions that the ILWU and its locals violated section 8(b)(4) at particular times in 2012 and 2013; or (b) the Court's decision that the ILWU violated its July 19, 2012 injunction.  ICTSI has made no effort to meet this demand.

*Fourth*, ICTSI's blanket request for pre-approval of Exhibit A should be rejected because the findings in Exhibit A are compound constructions containing numerous sub-findings.  Without unpacking these compound constructions, the ILWU (and the Court) cannot adequately assess whether each embedded fact satisfies the legal standard for issue preclusion.

*Fifth*, to the extent that ICTSI is seeking to admit the factual findings and legal conclusions contained in Exhibit A, the evidence is cumulative, prejudicial, likely to waste the Court's time, and will result in undue delay.  *See* Fed. R. Evid. 403.  Moreover, ICTSI has not disclosed how it would present previously-adjudicated facts to the jury, and is thus improperly "ask[ing] for pre-approval of [its] ability to present at trial some large amount of unidentified evidence (*e.g.*, unknown witness testimony, unidentified documentary evidence, etc.)."  SJ Order at 28–29.

---

[4] The ILWU respectfully disagrees with the Court's contrary ruling on this point.  *See* SJ Order at 3 n.1, 26–29.

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

In addition to these general objections, the ILWU has appended specific objections to each of the findings listed in Exhibit I to the Declaration of Philip Tassin, filed concurrently hereto.

### Opposition to MIL 7

The ILWU will not seek to change the findings of the NLRB, but a fair trial requires that the jurors understand the motivations of the ILWU and its locals for their earlier and later actions.  In that regard, the ILWU will provide evidence that the Port told Sundet and others at the ILWU that, if they followed the grievance procedures with respect to the reefer work, the Port would respect the outcome of that process.  Ex. F (Ruda Dep., 104:13-105:5).  That promise shaped the background and origins of the dispute and explains many of the ILWU's early actions with respect to its efforts to obtain the reefer work.  As part of the grievance process, the PMA advised ICTSI that its contractual argument had "no chance of winning."  Dep. Ex. 134 (9/24/15 NLRB opinion, p. 11).  And on May 23, 2012 and on June 4 and 10, 2012, the Coast Labor Relations Committee (CLRC) and Jan Holmes, the Area Arbitrator, ordered ICTSI to assign the dockside reefer work to the ILWU—an order that ICTSI defied.  *See* Dep. Exs. 7, 8, 369 (CLRC Order and Interim Orders).  Those orders and the ICTSI's defiance of them and of the PCL&CA (before contrary orders by the NLRB or by this Court) caused actions on the part of the members of Locals 8 and 40.

Although the ILWU and Local 8 cannot contest that they engaged in secondary activity from May 21, 2012 to August 13, 2013, ICTSI must prove that the ILWU committed an unlawful labor action for the period after August 2013.  ICTSI argues that the ILWU's contemporaneous understandings and beliefs are irrelevant, but the secondary-action statute—which ICTSI must satisfy here to obtain damages—requires ICTSI to prove that the ILWU had an improper motive.  29 U.S.C. § 158(b)(4)(B) ("It shall be an unlawful labor practice . . . to threaten, coerce, or restrain any person engaged

in commerce . . . ***where*** . . . ***an object thereof is*** . . . forcing or requiring any person to . . . cease doing business with any other person.") (emphasis added).  Thus, the ILWU's good-faith belief as to how the PCL&CA operated speaks to its motive and is relevant.

Moreover, ICTSI has argued for making the ILWU's motives a trial centerpiece. In its Trial Memorandum, ICTSI contends that the "purposes, motives, and intent" of ILWU's "officers and agents" are highly relevant (Dkt. No. 376 at 7), that the "jury will be entitled to consider whether [the ILWU Entities] intended to harm ICTSI" (*id.* at 9), that it can prove that ILWU Entities had a "clear intention" to drive away carriers (*id.* at 10), and that "intent is important because, in effect, that intent makes the ILWU Entities responsible for a broad range of harms" (*id.*).  The ILWU must be allowed to rebut these arguments with its own evidence as to what it believed and what it intended.  This is particularly true as to the post-August 2013 period, but even as to earlier time periods, the ILWU is entitled to explain the history of these conflicts and how they developed over time.

Finally, there can be no danger of unfair prejudice, as ICTSI claims, because the Court will instruct the jury that certain findings of the NLRB are binding.  Nonetheless, without an understanding of the background of the reefer dispute, the jurors will not understand the dispute itself or be able to make factual determinations about the future actions of ICTSI or the ILWU and its locals.

For these reasons, the Court should deny Motion 7.

**Opposition to MIL 8**

The Court will instruct the jury that the Port controlled the reefer work and that the Union's and its locals' actions *vis a vis* ICTSI were secondary.  But the ILWU is entitled to explain the origin of the dispute and the parties' respective positions fully and accurately in order to ensure fundamental fairness and to avoid misleading the jury.

These background facts will show that ICTSI could have avoided this dispute, and some of the damages it now claims, by simply asking the Port to amend the lease.  Had it done so, ICTSI would have controlled the disputed work and could have assigned it to Local 8.  Other than ICTSI, the Port "[d]idn't have a good plan B."  Ex. C (Leavitt Dep., 12:15-24).  By failing to seek control when the Port was almost guaranteed to comply, ICTSI displayed its intransigence and lack of concern for the terms of the PCL&CA and the views of its customers and employees—all traits that explain its mismanagement and contributed to the eventual failure of Terminal 6.

Despite that mismanagement, ICTSI seeks to pin the blame for the reefer dispute solely on the ILWU, while avoiding any responsibility whatsoever for its own actions.  ICTSI wants the Court to exclude this evidence because it conflicts with the story that the company wants to tell at trial—that ICTSI was a helpless victim in a situation over which it had no control.  Not true.  ICTSI could have ended any dispute by asking the Port to amend its lease.

The jury is entitled to learn that the problems at Terminal 6 began at the start of ICTSI's tenure as operator and only worsened over time.  This evidence is relevant to the jury's understanding of the dispute, so the Court should deny Motion 8.

## Opposition to MIL 9

After the CLRC ruled on May 23, 2012 that ICTSI should assign the reefer work to the ILWU, Hanjin, as a member of the PMA, wrote several emails to ICTSI, demanding that it assign the reefer work to the ILWU.  *See, e.g.*, Dep. Exs. 75 and 76.  Mike Radak, a former Senior Vice President of Hanjin, was also a member of the Board of Directors of PMA.  Radak's emails shriek of his frustrations with both the Port and ICTSI for violating the collective bargaining agreement.  *Id.*  Though ICTSI contends that the ILWU entities brought pressure against Hanjin, tellingly, they cite no evidence to

support that position.[5]  No evidence of any communication between the ILWU and

Hanjin exists before or at the time that Radak sent his emails.[6]  Therefore, the premise of

this motion—that Hanjin asked ICTSI to relent only because it was facing "illegal

pressure"—is unsupported by any evidence.

Hanjin was responsible for 80 percent of the business at Terminal 6.  ICTSI argues

repeatedly that, but for the labor actions, it would have been able to increase business at

Terminal 6.  The evidence, however, shows that ICTSI did nothing to satisfy its largest

customer.  ICTSI's cavalier attitude toward its customers—as demonstrated from its

refusal to comply with Hanjin's demand—contributed to its inability to solicit new

business, which in turn proves that its damages were self-inflicted.

The evidence and testimony are relevant, and the Court should deny Motion 9.


**Opposition to MIL 10**

During the course of ICTSI's operation of Terminal 6, ICTSI did nothing to keep

its customers happy or to make any substantial effort to increase business at Terminal 6.

The Port received nearly a million dollars a year in revenue from Oregon Steel, a

subtenant at Terminal 6.  Ex. H (Wyatt Dep., 184:1-6).  Oregon Steel left Terminal 6 and

moved to the Port of Vancouver because "they were very unhappy because of the

operational changes that ICTSI made that made it very difficult for them to operate."  *Id.*

at 181:11-13; 183:14-21.

Nolan Gimpel, ICTSI's expert, concluded that the only way for Terminal 6 to be

profitable is as a mixed-use terminal, i.e., having non-container customers like Oregon

---

[5] ICTSI cites Eden Ex. D, which contradicts its position.  There, Radak explains: "You
both knew fully well that [Hanjin] is a signator to the collective bargaining agreement . . .
yet you chose to throw us under the bus in your zeal to construct a deal with each other.
As a PMA member we cannot and will not violate the terms and conditions of the
collective bargaining agreement that we are bound to contractually."

[6] The ILWU letters to Hanjin and other carriers are dated August 15, 2012—after
Radak's emails.

1317890

Steel. Dep. Ex. 443 at 11. By allowing Oregon Steel to leave Terminal 6, ICTSI lost one million dollars a year in revenue, another factor that contributed to Terminal 6's failure. Limited testimony about Oregon Steel will help the jury decide whether ICTSI's damages were caused by actions unrelated to obtaining the reefer work. The Court therefore should deny Motion 10.

### Opposition to MIL 11

Hanjin, one of the largest container carriers in the world, was ICTSI's biggest customer. In August 2016, for reasons unrelated to Terminal 6 or the dispute over obtaining the reefer work, Hanjin filed for bankruptcy protection in South Korea and shortly thereafter ceased operations worldwide. Thus, regardless of the ILWU's conduct—and even if there had never been a dispute over the reefer work—ICTSI would have lost 80 percent of its volume in August 2016. ICTSI seeks to keep this fact from the jury by excluding evidence of Hanjin's bankruptcy.

The Court should deny Motion 11 for four reasons. *First*, Hanjin's bankruptcy is relevant to ICTSI's damages claim. ICTSI's damages expert Sickler assumes that, but for the ILWU's conduct, ICTSI would have increased container traffic at Terminal 6 from mid-2012 to March 2017 (and, at the same time, continually raised prices). In one of his damages scenarios, he estimates that ICTSI would have increased monthly container volume by 55 percent during that time. *See* Ex. B to ICTSI's Expert Witness List (Sickler Report) at Ex. F1 (p. 64), Dkt. No. 372. The fact that Hanjin—ICTSI's largest customer and the source of 80 percent of its container volume—ceased operating in August 2016 shows that these assumptions are unfounded.

*Second*, Hanjin's bankruptcy illustrates the competitive and challenging nature of the containerized shipping industry at that time and undermines Mr. Sickler's assumption that ICTSI could have achieved unprecedented growth in volume while raising prices.

*Third*, Hanjin's bankruptcy is relevant to show that the ILWU did not cause ICTSI's economic losses after August 2016, including several amounts ICTSI includes as its purported "special damages." "[S]ection 303(b) requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff . . . .  If the plaintiff would have been harmed regardless of the section 8(b)(4) violation, then of course there can be no recovery." *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 537 (3d Cir. 1983).

Here, the evidence will show that, regardless of any action by the ILWU, ICTSI would have lost 80 percent of its business in August 2016.  Furthermore, there will be testimony that ICTSI would not have been able to replace the lost Hanjin business and would have had to close Terminal 6 because of Hanjin's bankruptcy.  The ILWU is entitled to present this evidence to the jury.

*Finally*, ICTSI's convoluted arguments based on abstract tort law principles are not grounds for excluding evidence of Hanjin's bankruptcy.  Section 920 of the Restatement of Torts is beside the point, because the ILWU is not arguing it conferred a "special benefit" on ICTSI "by driving Hanjin away, thereby circumventing later similar harms" such that ICTSI's damages should be offset.[7]  Rather, Hanjin's bankruptcy is relevant because it undercuts ICTSI's damages analysis and establishes that the ILWU cannot be held liable for ICTSI's economic losses after August 2016.

ICTSI's argument based on Section 425A of the Restatement fares no better.  For starters, ICTSI misstates the law governing causation.  The ILWU is not, as ICTSI argues, liable for harm that it "intended" or "increased the risk of."  The ILWU is only liable to the extent that its actions, motivated by obtaining the reefer work, were a substantial factor in bringing about ICTSI's harm.  *Mead*, 523 F.2d at 1379; *see also John*

---

[7] The ILWU does not intend to argue at trial that ICTSI "avoided having unpaid accounts receivable when Hanjin … filed for bankruptcy protection."  Thus, the Court should deny Motion 11 as moot as to that argument.

*B. Cruz Const. Co. v. United Bhd. of Carpenters & Joiners of Am., Local 33*, 907 F.2d 1228, 1232 (1st Cir. 1990) (plaintiff must show that injury was "the direct and proximate result of unlawful secondary activity.").  Moreover, none of the authority cited by ICTSI supports excluding evidence of Hanjin's bankruptcy.

Therefore, the Court should deny Motion 11.

**Opposition to MIL 12**

ICTSI misconstrues the ILWU's position on damages.  The ILWU will not argue for an offset for ICTSI's 21 years of avoided lease payments to the Port.  Nor will the ILWU contend that its actions conferred a "special benefit" on ICTSI under Section 920 of the Restatement (Second) of Torts on grounds that its conduct enabled ICTSI to terminate its lease with the Port at a lower price. Instead, the ILWU will offer evidence to show that ICTSI may not recover its supposed "special" damages because those out-of-pocket costs—the March 2017 lease termination payment, and the value of equipment abandoned by ICTSI when it closed Terminal 6—were not directly or proximately caused by any ILWU conduct.

The law of damages pursuant to Section 303(b) "requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff." *Feather*, 711 F.2d at 537.  Section 303 damages "must be nonspeculative and the direct and proximate result of the proscribed conduct." *Austin Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 701*, 665 F. Supp. 614, 617 (N.D. Ill. 1987). As the Ninth Circuit has explained, the plaintiff must demonstrate that the defendant's illegal conduct "materially contributed to" plaintiff's injury or was a "substantial factor" in causing it. *Mead*, 523 F.2d at 1376; *Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union #7*, 643 F.3d 473, 478-479 (6th Cir. 2011) (noting that virtually all circuits have adopted a proximate causation requirement).  However, "***if the plaintiff would have been harmed regardless*** of the [labor practices] violation, then of course there can be no

1317890

recovery." *Feather*, 711 F.2d at 537 (emphasis added); *see also Hyatt Chalet Motels, Inc. v. Salem Bldg. & Const. Trades Council*, 298 F. Supp. 699, 705-06 (D. Or. 1968) ("The damage, if any, was caused by the initial picketing by the other unions.  The later picketing by defendant had nothing to do with the bank's decision to bar Reimann from bidding on this job.").  A causal link based on "mere speculation, conjecture, or fantasy" may never suffice.  *Shafer*, 643 F.3d at 477-80 (affirming summary judgment in favor of defendant union where evidence was based on "conjecture" and did not demonstrate that union's activity was a "substantial factor" in customer's decision to switch suppliers).

The causation requirement of Section 303 applies with equal, if not greater, force to "out-of-pocket" losses, or so-called "special damages."  Courts allow for recovery of non-economic-loss damages where the defendant's conduct forced the plaintiff to incur costs that it would not otherwise have incurred.  *See, e.g.*, *Fl. Sugar Mktg. & Terminal Ass'n Inc. v. Local No. 3, Int'l Longshoreman's Ass'n, AFL-CIO*, 668 F. Supp. 173, 182-83 (S.D.N.Y. 1987).  But, if the court or jury finds that the union's conduct was not the proximate cause of such out-of-pocket expenses, such costs may not be recovered.  *See Limbach Co. v. Sheet Metal Workers Int'l Assoc., AFL-CIO*, 949 F.2d 1211, 1234 (3d Cir. 1991), *vacated in part on other grounds*, 942 F.2d 1240 (3d Cir. 1991).

With respect to ICTSI's "special damages," ICTSI will be unable to establish the requisite causal nexus.  The evidence will show that, independent of the ILWU's conduct, Hanjin's bankruptcy would have caused T6 to fail by the middle of 2016 and ICTSI would have been forced to shut down Terminal 6 by 2017.  As the ILWU's expert Kidder concluded, "ICTSI was going to incur the same out-of-pocket costs that it incurred in 2017 – very likely in the same amounts."  Ex. B to ILWU's Expert Witness List (Kidder Rep. at 53).  ICTSI's supposed out-of-pocket costs are not directly connected to the ILWU's alleged conduct.

And, the premise of Motion 12—that the ILWU is seeking a $94 million offset for avoided lease payments—is false.  The question of what damages, including special

damages, can be attributed to the ILWU's conduct is reserved to the jury.  Accordingly, the Court should deny Motion 12.

**Opposition to MIL 13**

ICTSI improperly seeks to exclude evidence of whether or not its Terminal 6 operations would have been profitable after May 2017.  ICTSI's long-term profitability is a relevant issue for examination at trial—but not for the reasons ICTSI attacks.  The ILWU does not intend to argue that it conferred a "special benefit" on ICTSI, or that the ILWU is entitled to an offset based on ICTSI's future profitability.  Instead, ICTSI's future profitability is relevant to the recoverability of its supposed "special damages." Because of the Hanjin bankruptcy in 2016, Terminal 6 was destined for failure, regardless of the ILWU's conduct.  If, as the ILWU contends, the costs of closing Terminal 6 were going to be borne by ICTSI either way, those out-of-pockets were not directly and proximately caused by the ILWU and cannot be recovered.  For that reason, the ILWU must be able to present evidence that Hanjin's bankruptcy (or any other issue or event) would have devastated Terminal 6's profitability after 2016.  To preclude the ILWU from presenting such evidence and testimony would be to improperly remove the question of causation from the jury's hands.  The Court therefore should deny Motion 13.

**Opposition to MIL 14**

The ILWU does not seek to introduce evidence of bonuses to ICTSI employees or payments by ICTSI to its corporate parent, ICTSI, Inc., to "offset" ICTSI's damages. ICTSI's arguments about the application of Section 920 of the Restatement of Torts are inapposite.  What is more, evidence of ICTSI's bonus payments and its repatriation of money to ICTSI, Inc. is relevant and admissible for the reasons set forth below.

*First*, evidence that ICTSI paid bonuses to its witnesses who will testify at trial is relevant to the jury's assessment of those witnesses' bias, motive, and credibility.  *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias may be induced by a witness' like,

dislike, or fear of a party, or by the witness' self-interest."); *Acton v. Target Corp.*, 2010 WL 11523624, at *3 (W.D. Wash. May 11, 2010) (inquiry about employee's compensation permitted to establish bias).  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *Abel*, 469 U.S. at 52.

ICTSI paid bonuses to the executives and managers whom it intends to call at trial, including bonuses to CEO Ganda of $83,333 in 2012, and $100,000 in 2013 and 2014. Dep. Ex. 404.  The ILWU is entitled to put this evidence before the jury so that it can assess the credibility of ICTSI's witnesses.

*Second*, the fact that ICTSI paid discretionary bonuses to its executives and managers while the company was performing poorly is relevant to show that ICTSI did not make meaningful efforts to improve business at Terminal 6.  In 2014, ICTSI paid Mr. Ganda a $100,000 bonus and paid Trzyzewski, its COO, a $40,000 bonus even though volume and revenue had declined, and even though they had failed to recruit any new carriers to Terminal 6.  *Id.*

*Third*, evidence that ICTSI repatriated cash to its corporate parent in the Philippines in the form of dividends and payments on inter-company debt is relevant to assess the claims of ICTSI's damages expert Sickler.  ICTSI repatriated $3.5 million to ICTSI, Inc. in 2013 and another $2.374 million in 2014.  Ex. B to ILWU's Expert Witness List (Kidder Rep. at 44).  These payments represented a significant annual cash expense for ICTSI.  Mr. Sickler, however, failed to consider this expense in estimating what ICTSI's results would have been "but for" the ILWU's allegedly illegal conduct. *See id*.

Therefore, the Court should deny ICTSI's Motion 14.

1317890

**Opposition to MIL 15**

In light of the Court's ruling on summary judgment, the ILWU cannot offer evidence, or argue, that payments received by ICTSI under its rent rebate and cost sharing agreements with the Port offset ICTSI's damages. However, evidence regarding those agreements and the payments received by ICTSI is relevant for other purposes and should not be excluded.

No *per se* rule excludes evidence of collateral benefits if it is relevant to an issue before the jury. *See, e.g.*, *DeMedeiros v. Koehring Co.*, 709 F.2d 734, 739-40 (1st Cir. 1983) (rejecting "a rule of per se inadmissibility" and admitting evidence of plaintiff's disability benefits as relevant to "the extent of [plaintiff']s disability and the consequent expected loss of future earnings capacity."). Indeed, the case cited by ICTSI concludes, "We do not mean to imply that evidence of [defendant's] payment of disability benefits to [plaintiff] could under no circumstances be introduced at trial." *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 934 (5th Cir. 1992). Accordingly, it is within the Court's discretion to admit evidence related to the rent rebate and cost sharing agreements.[8]

The Court should admit evidence regarding the rent rebate agreement and the Port's payments to ICTSI because it is relevant to ICTSI's damages claim. For example, ICTSI's damages expert Sickler assumes that ICTSI's massive rate increase in 2013 was sustainable and that the carriers would have accepted annual rate increases through 2017. Yet Mr. Ganda testified that ICTSI's profits in 2013 were materially affected by the $3.4 million in rent rebate payments. Ex. B (Ganda Dep. 195:16-24), undercutting Mr. Sickler's key assumption that ICTSI would have been able to sustain its 2013 price increases.

---

[8] Cases such as *Eichel v. New York Central R.R. Co.*, 375 U.S. 253 (1963), and *Sheehy v. S. Pac. Transp. Co.*, 631 F.2d 649 (9th Cir. 1980), which limit the Court's discretion to admit evidence related to collateral benefits, are distinguishable because they arise out of claims under the Federal Employers Liability Act.

The rent rebate agreement is also relevant because ICTSI was entitled to a certain amount of money each month based on Terminal 6's rates of production.  ICTSI was thus incentivized to demonstrate lower rates of production to the Port.  *See* Ex. B (Ganda Dep., 89:21-90:12); Dep. Ex. 309 (requesting analysis to justify a higher rent-rebate). Given ICTSI's emphasis on Terminal 6's purportedly low rates of production, the jury is entitled to hear any evidence related to ICTSI's motive, credibility, and bias in creating its production statistics.

The terms of the cost sharing agreement and the Port's payments to ICTSI are also relevant to show that ICTSI has overstated the harm allegedly caused by the ILWU's actions.  Under the cost sharing agreement, ICTSI was entitled to be reimbursed for 50 percent of its 2012 costs attributable to the labor dispute, up to a maximum of $4,664,356.  Dep. Ex. 27.  ICTSI has admitted, however, that it received less than $2,700,000 under the Agreement.  ICTSI Resp. to ILWU's 3d Set of Interrogatories.  The fact that ICTSI received less than 60 percent of the reimbursements to which it was entitled is relevant to show ICTSI's exaggeration of its alleged economic losses.

Finally, it is relevant that ICTSI never told the carriers about either the rent rebate or the cost sharing agreement or the millions of dollars it received under these agreements.  Ex. E (Radak Dep., 152:20-153:9). This is further evidence of how poorly ICTSI treated its customers and how ICTSI has only itself to blame for its lost business.

For these reasons, ICTSI's Motion 15 should be denied.

### Opposition to MIL 16

ICTSI seeks to exclude Local 8 and 40 members' lay testimony on what they "would have done" absent ICTSI's management practices.  The locals do not intend to elicit this type of testimony—i.e., hypothetical questions on what would have happened at Terminal 6 "but for" ICTSI's management.  The locals, however, may present testimony of their experiences working under ICTSI management, ICTSI's management

practices, the differences between ICTSI management and the Port's management, and the impact of ICTSI's management practices on morale, production, and efficiency. *See* Fed. R. Evid. 701 Advisory Committee notes (permitting lay testimony based on witness's particularized knowledge by virtue of participation in the business); *Vesta Corp. v. Amdocs Mgmt., Ltd*, No. 3:14-CV-01142-HZ, 2018 WL 4354301, at *6 (D. Or. Sept. 12, 2018) (permitting testimony of lay witness based on his personal knowledge as sales engineering manager). Local 8 and 40 witnesses have first-hand knowledge of these topics based on their experience working at Terminal 6 before, during, and after ICTSI's tenure operating Terminal 6. To the extent ICTSI's Motion 16 seeks to exclude such testimony, it should be denied.

### Opposition to MIL 17

The ILWU entities do not (and never did) intend to present evidence or argument that denigrates or "stereotypes" ICTSI because it is a Philippines-based company. Agreement on this point should resolve this motion. But again, ICTSI goes too far. ICTSI seeks to broadly exclude *any reference* to the "nationality, locations, or affiliate locations of ICTSI Inc. or ICTSI Oregon." No authority ICTSI cites supports such a broad exclusion, and the case law upon which it relies states the opposite. *See Jinro Am. Inc. v. Secure Inv., Inc.*, 266 F.3d 993, 1008 (9th Cir.), *opinion amended on denial of reh'g,* 272 F.3d 1289 (9th Cir. 2001) (testimony about defendant's nationality is not "inherently prejudicial"). ICTSI's exclusion would sweep in the fact that ICTSI Inc. is a global company that operates container terminals around the world through subsidiaries, such as ICTSI Oregon, and that ICTSI Inc., the corporate parent, is based in the Philippines. This evidence is relevant (and not unduly prejudicial) for at least the following reasons.

*First*, as the ILWU's expert Kidder explained, repatriation of ICTSI Oregon's cash (in the form of dividends and payments on inter-company debt) to ICTSI Inc. occurred

1317890

*because* of the company's location in the Philippines. Ex. B to ILWU's Expert Witness List (Kidder Rep. at ¶¶124-125). This transfer represented a significant expense on ICTSI's financial statements. In addition, ICTSI Inc. was directing ICTSI's budgeting decisions. *See* Dep. Ex. 426. ICTSI is claiming it is entitled to exorbitant amounts of allegedly lost profits. The jury must be able to understand ICTSI's accounting methods, financial statements, and financial relationship to its parent, ICTSI Inc., to evaluate these claims and would be unable to do so if the fact that ICTSI Inc. is Philippines-based is excluded.

*Second*, it is relevant that, prior to operating Terminal 6, ICTSI Inc. had never operated a terminal in the United States or anywhere along the West Coast, where the ILWU and PMA have jurisdiction. ICTSI was not familiar with the ILWU, the PMA, U.S. labor laws, or regional labor practices or customs. The Port's Chief Commercial Officer testified that ICTSI's lack of experience was a concern for the Port and a risk it had to accept when making the deal with ICTSI. *See* Ex. C (Leavitt Dep., 20:14-21:2). Gallaway of Hapag-Lloyd testified that he was concerned when he learned that ICTSI was taking over operations at Terminal 6 because of his previous experience with ICTSI's monopolistic operations, unusually high rates, and poor customer support in Brazil and Mexico. Ex. A (Gallaway Dep., 98:1-14). ICTSI's lack of experience, knowledge, and long-term commitment to West Coast ports is relevant to determining whether ICTSI managed the terminal poorly and whether ICTSI's poor management (rather than the reefer dispute) motivated any ILWU labor actions and caused ICTSI's damages. Fed. R. Evid. 401.

*Third*, ICTSI email communications reveal that ICTSI Inc. and ICTSI Limited are intimately involved in this litigation and directing this lawsuit. For example, after ICTSI terminated its lease with the Port, ICTSI Inc.'s CEO Razon stated that "all that's left is to pursue the case all the way. The union has nothing to negotiate and what we pay to the port authority we add to the damages claim." Dep. Ex. 429; *see also* Dep. Ex. 427

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

1317890

(seeking approval from ICTSI Inc. regarding termination of lease with Port and impact on litigation strategy).  The jury is entitled to hear these facts and understand the relationship between ICTSI and its parent.

*Fourth*, the Port expected that ICTSI would use the resources of the ICTSI, Inc.'s global marketing team and experience (based in the Philippines) to bring new business to Terminal 6.  Ex. H (Wyatt Dep., 189:2-15).  ICTSI's admission that it failed to do so is relevant because it explains why it couldn't attract new business.  *See* Ex. G (Trzyzewski Dep. 20:4-21:6).  In explaining why ICTSI Inc.'s global marketing experience and connections would have helped ICTSI, it is necessary to explain that ICTSI Inc. is a global company with locations around the world.

Accordingly, the Court should deny ICTSI's Motion 17.

### Opposition to MIL 18

ICTSI admits that its financial data is relevant, yet seeks to exclude any "further information" related to the financial resources of ICTSI Oregon, ICTSI Inc., and ICTSI employees (who will be testifying at trial) as irrelevant and unduly prejudicial.  This broad, vague motion encompasses relevant evidence and should be denied for at least the following reasons.

*First*, ICTSI *agrees* that its financial resources and data are relevant to its purported damages claim and may be introduced at trial.  Since the jury will receive information regarding ICTSI's financial status, it makes no sense that "further information" related to this financial data could somehow be "unduly prejudicial."

*Second*, ICTSI Inc. was intimately involved in ICTSI's financials.  As explained by the ILWU's expert Kidder, ICTSI sent a yearly "repatriation" amount to ICTSI Inc. that was categorized as an expense on ICTSI's financial statements.  Ex. B to ILWU's Expert Witness List (Kidder Rep. ¶¶ 124-125).  Evidence of the relationship between

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
CASE NO. 3:12-CV-01058-SI

ICTSI Inc.'s and ICTSI's financials is relevant to the jury's understanding of ICTSI's claimed damages and is thus relevant and admissible.

*Third*, evidence of ICTSI employees' compensation is relevant because it demonstrates their bias in favor of ICTSI. *See Abel*, 469 U.S. at 52 ("Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

Both Ganda and Trzyzewski have received their full salary and benefits since ICTSI stopped operating Terminal 6. During this time-period, both of their salaries *increased*, while their duties were limited to assisting with this litigation. Ex. B (Ganda Dep., 10:19-12:3); Ex. G (Trzyzewski Dep., 11:21-12:5). The ILWU is entitled to explore ICTSI employees' compensation and its impact on the credibility of their testimony.

Therefore, the Court should deny ICTSI's Motion 18.

## Opposition to MIL 19

The ILWU and its locals will not use any of the catch-phrases listed in ICTSI's Motion 19, "demean the civil justice system," or suggest that ICTSI is "litigious." It is unclear what, if any, other evidence ICTSI intends to exclude with this motion and it should be denied on that basis alone.

To ensure there is no ambiguity, the ILWU notes that, under Federal Rules of Evidence 401-403, the ILWU may introduce evidence of ICTSI's numerous disputes with the various entities related to Terminal 6 as well as ICTSI's decision to file this lawsuit. The authority that ICTSI relies upon does not support excluding this evidence. *Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988), is a case involving the City of New York's strategy of portraying a civil rights plaintiff as "claims-minded" by introducing

evidence of the number of plaintiff's past civil rights claims against the City, unfairly portraying those suits as a "nuisance," and labelling him a "perpetual litigant" in opening statements. *Id.* at 592-93, 595. *Outley* does not stand for the proposition that evidence related to other litigation or a plaintiff's decision to file a lawsuit is *necessarily* unduly prejudicial or improper character evidence. Such evidence is admissible if, as here, it is relevant to other disputed issues. *See Moser v. Health Ins. Innovations, Inc.*, 2018 WL 6735710, at *15 (S.D. Cal. Dec. 21, 2018).

The evidence that the ILWU will introduce is relevant to the key disputed issue in this case: the motivation behind any Local 8 slowdown or labor action. ICTSI's disputes with the numerous entities involved with Terminal 6—i.e., the Port, the PMA, Hanjin, other carriers, barge companies, and Oregon Steel—are relevant because they demonstrate that ICTSI managed the terminal poorly and that ICTSI's poor management (rather than the reefer dispute) motivated any labor actions and caused ICTSI's damages. The ILWU likewise may explain that ICTSI did not abide by the CLRC decision to award the reefer work to the ILWU, filing this lawsuit instead. This fact is critical to the jury's understanding of the difficult relationship between the parties and the origin of the reefer dispute. Explaining this history does not "disparage" ICTSI's use of legal remedies, and any prejudice is outweighed by the probative value. Fed. R. Evid. 403.

Accordingly, the Court should deny ICTSI's Motion 19.

**Opposition to MIL 20**

ICTSI claims that disputes between the Port and ICTSI are "collateral" and the ILWU should be precluded from even "suggesting" their existence. Not so. Disputes between the Port and ICTSI, including those relating to "reimbursables," are relevant for at least the following reasons.

1317890

*First*, ICTSI's disputes with other entities related to Terminal 6, including the Port, are relevant because they show ICTSI's poor management and suggest it was ICTSI's poor management (rather than the reefer dispute) that led to its damages.

*Second*, ICTSI was entitled to a certain amount of money each month under its "rent rebate" agreement with the Port based on Terminal 6's rates of production. Under this agreement, ICTSI was incentivized to demonstrate lower rates of production to the Port. *See* Ex. B (Ganda Dep., 89:21-90:12); Dep. Ex. 309 (requesting analysis to justify a higher rent-rebate). Given ICTSI's claim to lost profits based on Terminal 6's purportedly low rates of production, the jury is entitled to hear any evidence related to ICTSI's motive, credibility, and bias in creating its production statistics. For this reason, any dispute over the rent rebate agreement is relevant.

*Third*, under the lease agreement, the Port provided ICTSI with certain services, such as maintenance and equipment repair, for which ICTSI later reimbursed the Port—i.e., "reimbursables." ICTSI's failure to properly maintain the equipment at the Port was another cause of the poor production rates at Terminal 6. *See* Ex. H (Wyatt Dep. 149:10-150:20) (testimony regarding Hanjin's complaint that ICTSI failed to maintain gantry cranes). Disputes over maintenance "work that wasn't done or work that was not requested" is relevant to showing the other causes for low production rates.

Therefore, the Court should deny Motion 20.

**Opposition to MIL 21**

ICTSI seeks to exclude relevant evidence regarding its PMA membership application. On May 12, 2010, ICTSI's CEO signed a lease with the Port that included a provision allowing the Port to assign the reefer work to a different, non-ILWU union. A few days later, on May 19, 2010, Mr. Ganda signed a membership application for ICTSI to join PMA (the organization responsible for negotiating and administering labor agreements with the ILWU) in which he attested that ICTSI is not "bound by any labor

THE ILWU'S OPPOSITIONS TO ICTSI'S MOTIONS IN LIMINE
Case No. 3:12-CV-01058-SI

agreement." Dep. Ex. 367; Ex. B (Ganda Dep., 60:1-19). ICTSI's knowledge (and apparent disregard) of the requirements of PMA membership is relevant to demonstrate ICTSI's inexperience operating and managing labor relations at a West Coast terminal and suggests ICTSI's poor management motivated any labor action and caused ICTSI's damages. The ILWU is further entitled to ask Mr. Ganda about his seeming misrepresentation on ICTSI's application to join the PMA as it bears on his credibility as a witness. Fed. R. Evid. 608. The Court therefore should deny Motion 21.

### Opposition to MIL 22

In deposition, the ILWU has pointed out that ILWU-represented workers were on the opposite side of ICTSI in a lawsuit. That flows from the fact that ICTSI chose to sue the union and the locals to which its ILWU-represented employees belong.

In this case, where the causes of a slowdown in production are a key factual issue, every factor that drove that lack of production is relevant. Being a member of the ILWU is like being a member of a family, a view shared by the officers and the rank and file members of the ILWU and its locals. Many of the ILWU-represented employees at Terminal 6 are multi-generational longshore members whose proud identity is wrapped up in being a member of the ILWU. ICTSI will try to prove that efforts to obtain the reefer work caused a slowdown in production, while the ILWU and its locals will demonstrate the difficulties of achieving high production numbers when working for an employer who took numerous hostile actions against its employees, including its choice to sue their union and their local. Yockey and others at ICTSI treated the ILWU-represented employees as adversaries, leading to low morale. ICTSI's hostility to its employees, and the low morality this generated, materially contributed to the deterioration of their relationship. Having made the decision to sue the ILWU and its locals, ICTSI should not be allowed to run away from that decision when the ramifications of that decision are exposed to the jury.

**Opposition to MIL 23**

The ILWU and its locals do not intend to suggest to the jury how individual members would pay a judgment, particularly given they don't know yet what the amount of any judgment would be.  Nor should ICTSI seek information on how a judgment will be paid, but that is exactly what it intends to do with Trial Exhibit 102, in violation of its own proposed motion in limine.

ICTSI sued the union and its locals and asked in a public pleading for over $101 million in damages.  Those actions cast a shadow over Terminal 6 that has had unsurprising impacts on the morale of its workforce.  The rank and file members of locals 40 and 8 fear losing the many protections and benefits that the union and union membership bestow on them, further eroding their morale.  The reasons for low morale and lack of motivation underlie the key factual determinations that the jury will make and thus are relevant.

**Opposition to MIL 24**

ICTSI seeks to exclude "evidence, argument, and comment about supposed legal rights and principles (*e.g*., the First Amendment) about which the jury is not instructed." The breadth and ambiguity of this proposition prevent any useful application at trial. There is no way of knowing in advance what "supposed legal rights and principles" this motion purports to proscribe.

The stated principle that the First Amendment "provides no legal justification for unlawful labor practices" better belongs as an anodyne jury instruction rather than as an ambiguous rule of evidence exclusion.  Moreover, a corresponding principle holds that First Amendment protections extend fully to "the dissemination of information concerning the facts of a labor dispute" which "must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Thornhill v. State of Alabama*, 310

U.S. 88, 101 (1940). Whether the latter or the former apply to particular evidence, argument or comments at trial can only be determined based on the particular circumstances in question.  Consequently, ICTSI's proposed generic rule of exclusion provides no utility to the parties or the Court.

ICTSI appears to sweep in evidence, argument, and comment that may be relevant to the jury's determination whether certain union conduct or objectives at certain times constitute lawful primary activity versus secondary activity under Section 8(b)(4)(B) of the NLRA (29 U.S.C. § 158(b)(4)(B)).  This core issue defies the kind of bright line rigidity that ICTSI proposes. *See, e.g.*, *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 673-74 (1961) ("Important as is the distinction between legitimate 'primary activity' and banned 'secondary activity,' it does not present a glaringly bright line" but rather involves "the drawing of lines more nice than obvious"). It is for this reason that "[t]he determination whether . . . Section 8(b)(4)(B) [was violated] cannot be made without an inquiry into . . . all the surrounding circumstances." *Chipman Freight Services v. NLRB*, 843 F.2d 1224, 1226 (9th 1988), quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644 (1967).

For these reasons, the Court should deny Motion 24.

**Opposition to MIL 25**

ICTSI concedes that it is seeking preclusive sanctions for purportedly inadequate interrogatory answers ***even though*** it already moved to compel more detailed responses and the Court ***denied*** that motion.  That should end the Court's inquiry.  Because the Court has already found that the ILWU's responses were "sufficient," Dkt. 343 (Dec. 3, 2018 Opinion and Order) at 23, 24, 26, ICTSI has no basis for any complaint, much less to seek preclusion.

The extent of ICTSI's overreach is made clearer on a cursory review of the cases it cites.  None come close to supporting the result ICTSI seeks here, and several of its

citations are deceptive.  In *Hoffman v. Constr. Protective Servs., Inc.,* 541 F.3d 1175, 1180 (9th Cir. 2008), the Ninth Circuit affirmed the preclusion of damages evidence where the plaintiff failed to disclose ***any*** damages calculations in its Rule 26 initial disclosures.  Here, the Court has already ruled that the ILWU provided sufficient answers to all the relevant requests.

Next, ICTSI truncates a quote from *Branch v. Umphenour,* 2014 WL 3891813, *8 (E.D. Cal. Aug. 7, 2014), attempting to give the Court the false impression that the case relates to ICTSI's complaint about ILWU's interrogatory answers.  The issue in *Branch* was whether the defendant had to produce documents to the plaintiff that he contended were in his employer's possession, custody, and control, not his.  *See id.*  The court ruled that, if he refused to acquire the documents from his employer and produce them in discovery, he would not be allowed to obtain and use them later at trial.  The ILWU has not done anything like that here, and ICTSI does not contend that it has.

Finally, ICTSI relies on *Stoba v. Saveology.com, LLC,* 2015 WL 10857528, *5 (S.D. Cal. July 7, 2015).  There, the plaintiffs faced a motion to compel because they had refused to produce any documents.  The court cautioned plaintiffs that, if they refused to produce documents, they would not be allowed to surprise the defendant by using them at trial.  *See id.*  This garden-variety warning to litigants who had entirely shirked their discovery obligations contrasts to the ILWU's "sufficient" responses here.

None of the above-cited cases are applicable here, where the parties litigated the adequacy of the ILWU's responses to ICTSI's extremely broad interrogatories, and the Court rejected ICTSI's complaints.  The Court should reject Motion 25.

### Opposition to MIL 26

This motion is based on ICTSI's deceptive and frivolous motion for sanctions, which the ILWU separately opposed.  The ILWU incorporates its opposition to ICTSI's motion for sanctions as its opposition to Motion 26.  Further, ICTSI's Motion 26 sweeps

1317890

too broadly for another reason.  Its motion for sanctions objected only to the preparation

of the 30(b)(6) designee for Local 8, Stuart Strader.  It has no such complaint about the

preparation of the designees for the International or Local 40.  Because there is no basis

for any sanction or exclusion order against any of the ILWU entities, the Court should

deny Motion 26.

<div style="margin-left: 40%">

Respectfully submitted,

</div>

Dated:  February 12, 2019

<div style="margin-left: 40%">

KEKER, VAN NEST & PETERS LLP

By:    */s/ Susan Harriman*
       Susan J. Harriman (CA No. 111703)
       Daniel Purcell (CA No. 191424)
       Brook Dooley (CA No. 230423)
       Philip J. Tassin (CA No. 287787)
       Maya Karwande (CA No. 295554)

</div>

1317890

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

This brief complies with the Court's Order (Dkt. No. 378) authorizing the use of up to 11,000 words in the parties' respective motion in limine briefing. This brief contains 10,714 words, including headings, footnotes, and quotations but excluding the caption, table of contents, table of authorities, signature block, and exhibits.

> _/s/ Susan J. Harriman_
> Susan J. Harriman (CA No. 111703)

1317890

# CERTIFICATE OF SERVICE

I hereby certify that on **February 12, 2019**, **The ILWU'S Oppositions to ICTSI's Motions in Limine** were served on the following parties

☑    by **ELECTRONICALLY POSTING** to the ECF website of the District of Oregon, Portland Division.  The Court performed service electronically on all ECF-registered entities in this matter.

Jeffrey S. Eden (*jeden@schwabe.com*)  
Richard K. Hansen (*rhansen@schwable.com*)  
Michael T. Garone (*mgarone@schwabe.com*)  
Amanda T. Gamblin (*agamblin@schwabe.com*)  
Andrew J. Lee (*ajlee@schwabe.com*)  
SCHWABE WILLIAMSON & WYATT, PC  
1600-1900 Pacwest Center  
1211 SW Fifth Avenue  
Portland, OR 97204

Attorneys for Defendant/Counter Claimant  
ICTSI OREGON, INC.

Peter Hurtgen (*phurtgen@chjllp.com*)  
CURLEY, HURTGEN & JOHNSRUD, LLP  
4400 Bohannon Drive, Suite 230  
Menlo Park, Ca 94025

Attorneys for Defendant/Counter Claimant  
ICTSI OREGON, INC.

*/s/ Susan J. Harriman*  
Susan J. Harriman (CA No. 111703)