IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ICTSI OREGON, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**; **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 8**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION Local 40**, <br><br> Defendants. | Case No. 3:12-cv-1058-SI <br><br> **OPINION AND ORDER ON MOTIONS CHALLENTING EXPERT TESTIMONY** |

**Michael H. Simon, District Judge.**

ICTSI Oregon, Inc. ("ICTSI") brings the sole remaining claim in this case against International Longshore and Warehouse Union ("ILWU") and International Longshore and Warehouse Union Local 8 ("Local 8") (collectively, "ILWU Entities").[1] ICTSI alleges that the ILWU Entities engaged in illegal secondary boycott activities, violating § 303 of the Labor-Management Relations Act, 29 U.S.C. § 187. Specifically, ICTSI alleges that the ILWU Entities engaged in work stoppages, slowdowns, safety gimmicks, and other coercive actions with an

---

[1] ICTSI has informed the Court that it will dismiss its claims against Local 40 with prejudice.

PAGE 1 – OPINION AND ORDER

object of forcing and compelling ICTSI to pressure the Port of Portland (the "Port") to reassign or relinquish control to ICTSI over jobs at Terminal 6 of the Port that involve the plugging, unplugging, and monitoring of refrigerated containers. This Opinion and Order addresses the parties' pretrial motions challenging the admissibility of expert testimony. For the reasons discussed below, ICTSI's motion to exclude the testimony of William Finlay is denied as moot, the ILWU Entities' motion to exclude the opinion of Nolan Gimpel is granted in part, the ILWU Entities' motion to exclude the opinion of Samuel Estreicher is denied as moot, and the Court will hold a Rule 104 hearing to discuss the ILWU Entities' motion to exclude the opinion of Jay Sickler.

1.  **Standards**

The United States Court of Appeals for the Ninth Circuit has discussed the standard under which a district court should consider the admissibility of expert testimony. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702.
>
> Under *Daubert* and its progeny, including *Daubert II* [*Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311 (9th Cir. 1995)], a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
>
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion

> testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.
>
> The test of reliability is flexible. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id.; see also Primiano*, 598 F.3d at 564. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin*, 740 F.3d at 463. The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 564-65. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1043-44 (case citation alterations added, remaining alterations in original).

"It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10 (*citing Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). The party presenting the expert must demonstrate that the expert's findings are based on sound principles and that they are capable of independent validation. *Daubert II*, 43 F.3d at 1316.

PAGE 3 – OPINION AND ORDER

2. **ICTSI's Motion to Exclude Expert William Finlay**

ICTSI moves to exclude the expert opinion and testimony of Dr. William Finlay ("Finlay") or, in the alternative, for a Rule 104 hearing. Dr. Finlay is a sociologist, who has spent time studying the ILWU and has generally researched rude, dismissive, and aggressive ("RDA") behavior in the workplace. ICTSI argues that Dr. Finlay's testimony regarding RDA at ICTSI, safety issues at Terminal 6, and productivity at Terminal 6 should be excluded for three reasons: (1) Dr. Finlay's testimony is not helpful to the jury because it is irrelevant, offers nothing more than a closing argument characterizing the testimony of others, and improperly vouches for the testimony of others; (2) Dr. Finlay is not qualified to opine about port productivity; and (3) Dr. Finlay's opinions are unreliable because they are based on incomplete and skewed information and are not based on any discernable methodology or reasonably connected to his experience and expertise.

At oral argument, the ILWU Entities amended the proposed opinions to be given by Dr. Finlay. As amended, the ILWU Entities offer the following opinion testimony by Dr. Finlay: (1) based on the testimony of ICTSI employees, ICTSI engaged in RDA; (2) RDA demoralizes a workforce; and (3) a demoralized workforce is less productive. The ILWU Entities represented that Dr. Finlay will not testify that the workers at Terminal 6 were demoralized or were less productive. The only testimony specific to ICTSI is that ICTSI engaged in RDA. Based on this amended testimony, ICTSI stated that it no longer has objections to Dr. Finlay's proffered testimony. The Court agrees that this limited testimony by Dr. Finlay is admissible. Accordingly, ICTSI's motion regarding Dr. Finlay is denied as moot.

3. **The ILWU Entities' Motion Challenging Nolan Gimpel**

The ILWU Entities argue that two opinions of ICTSI's expert witness Nolan Gimpel should be excluded as speculative and inherently unreliable: (1) Terminal 6's likely market

PAGE 4 – OPINION AND ORDER

capture rate but for the labor dispute; and (2) Terminal 6's likely carrier service but for the labor dispute. ICTSI does not dispute the first point and agrees to amend its expert witness statement to delete that testimony. ICTSI, however, disputes the ILWU Entities' second challenge to Mr. Gimpel's offered testimony.

The ILWU Entities argue that Mr. Gimpel's opinion that it is "almost certain" that another shipping carrier would have replaced Hanjin after it filed for bankruptcy but for the labor dispute is too speculative and unreliable. The ILWU Entities argue that Mr. Gimpel based this opinion on the fact that SM Lines took over Hanjin's assets and absorbed some of Hanjin's management, and as a result SM Lines likely would have called on Terminal 6, which was a profitable run for Hanjin. The ILWU Entities argue that because ICSTI never met with SM Lines, either before or after Hanjin's bankruptcy, Mr. Gimpel cannot assume without some evidence that SM Lines would have been interested in calling on Terminal 6. The ILWU Entities further argue that Mr. Gimpel ignores the testimony of ICTSI's Chief Operating Officer, who stated that carriers generally do not start calling on new ports "at the drop of a hat" and that it is a "long, tenuous process that could take years." The ILWU Entities additionally argue that Mr. Gimpel ignores the many other reasons that carriers might not call at Terminal 6, particularly at the same volume as Hanjin, including the Port's location 100 miles up the Columbia River, the generally "awful" state of the container industry, and that ICTSI's management had alienated potential carriers by charging higher rates and providing poor service.

ICTSI responds that this challenge is to factual underpinnings of Mr. Gimpel's opinion and as a "general rule" such challenges raise issues as "to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th

Cir. 2004). ICTSI also notes that § 187 "damages [do] not need to be proven with certainty." *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 2019 WL 267714, at *8 (D. Or. Jan. 17, 2019) (citing *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839, AFL-CIO*, 523 F.2d 1371, 1377 (9th Cir. 1975)). This is because:

> while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (discussing damages in the antitrust context); *see also Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 623 F.2d 1354, 1364 (9th Cir. 1980) (applying the same damages standard in a case involving § 303 of the LMRA and § 8(b)(4) of the NLRA).

ICTSI also argues that in addition to the ILWU Entities' attacks going to credibility and not admissibility, they are flawed for two further reasons. The first reason is that Mr. Gimpel's opinion that another carrier likely would have picked up substantially all of Hanjin's volume at Terminal 6 is not wholly based on the assumption that SM Lines would have been that carrier. When asked why he concluded that another carrier would have replaced Hanjin post-bankruptcy, Mr. Gimpel began with a discussion of SM Lines, but then added that he had no opinion as to which specific carrier would have picked up Hanjin's volume. Additionally, Mr. Gimpel's report provides several reasons why the volume would have been picked up, including because Portland is a unique market with limited direct calls and a carrier desirous of a disproportionate market share and operating smaller vessels would likely have had incentive to call on Terminal 6.

Mr. Gimpel also noted that the demise of one carrier in a trade lane generally results in the volume going to an existing carrier or a new carrier in that lane.

The second reason ICTSI argues the ILWU Entities' challenge is flawed is because it is based on the fact that ICTSI did not negotiate with SM Lines in the real world. ICTSI notes that in the real world the labor dispute chased Hanjin out of Portland 17 months before Hanjin's bankruptcy and made Terminal 6 a toxic port. Damages, however, are assessed in the "but for" world. In this world, asserts ICTSI, the labor dispute did not happen, Hanjin never stopped calling on Portland, and Terminal 6 remained a unique port that was a profitable stop for Hanjin. Thus when Hanjin filed for bankruptcy, in the but for world ICTSI would have had a lot of options of carriers to negotiate with that in the real world ICTSI did not have in August 2016. The ILWU Entities respond that unbid contracts are disallowed even in "but for" damages scenarios, citing to *George E. Hoffman & Sons, Inc. v. Int'l Bhd. of Teamsters, Chauffers, Warehousemand & Helpers of Am., Local No. 627*, 617 F.2d 1234, 1246 (7th Cir. 1980) and *Preferred Commc'ns, Inc. v. City of Los Angeles*, 13 F.3d 1327, 1334 (9th Cir. 1994).

*George E. Hoffman* does not support the position argued by the ILWU Entities, but rather holds the opposite. In that case, the Seventh Circuit noted that although damages need not be proven to a certainty, the fact of damages still had to be proven and that it would not second-guess the factfinding of the district court based only on general assertions of error. 617 F.2d at 1246-47. The court then noted that the district court *allowed* $41,860 of lost profits for $200,000 in unbid contracts "based on a finding that if the strike had not occurred Hoffman would have been able to do at least $200,000 of additional work *that it did not bid*." *Id.* at 1247 (emphasis added). The district court disallowed damages from additional unbid work, finding that "even in a prime work period of a prime season with much work available, it cannot fairly

be assumed that a volume of work which was not bid would have been both bid and received in such order as to keep the workload and facilities in reasonable balance for the whole season." *Id.* at 1246 (quoting the district court's opinion). The Seventh Circuit stated that the employer "has not persuaded us" that this finding was erroneous. *Id.* Notably, the union challenged the award of damages for the portion of unbid work that was allowed, arguing it was inconsistent with disallowing the remaining portion of unbid work. *Id.* at 1247. The Seventh Circuit found that there was no inconsistency in the district court's finding that the evidence supported that some, but not all, of the unbid work would have been completed if the strike had not happened. *Id.* It also held that that district court's finding that the employer would have completed those unbid contracts absent the strike was not clearly erroneous. *Id.*

*Preferred Communications* also does not directly support the ILWU Entities' argument and is distinguishable. As an initial matter, the case does not involve unfair labor practices. Indeed, the Ninth Circuit expressly stated in discussing the plaintiff's claim for "general and presumed damages":

> If we could know with certainty that "but for" the city's monopoly policy Preferred would have received the franchise, presumed damages might "approximate the harm that [Preferred] suffered and thereby compensate for harms that may be impossible to measure." [*Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 311 (1986)]. But we cannot know with certainty whether Preferred would even have received the franchise; its claim for "presumed damages" is just as speculative as its other damage claims.

13 F.3d at 1334. Damages in unfair labor practices cases, however, need not be shown with "certainty."

Additionally, in discussing lost profit damages, the Ninth Circuit noted that it was "hotly" contested whether the plaintiff had the technological or financial capacity to build and operate a cable system if it was given the opportunity to compete for a franchise. *Id.* Thus, the court

PAGE 8 – OPINION AND ORDER

concluded that lost profit damages "all depend on the very speculative assumption that Preferred would have built and operated a profitable cable franchise in South Central if it had only been given the chance." *Id.*

Moreover, the Court agrees that in a "but for" context in which there were no illegal secondary boycott activities, the reality of Terminal 6 as of August 2016 would likely have been quite different. Expecting ICTSI to behave in "real life" August 2016 the same as in "but for" August 2016, or limiting ICTSI's damages claims only to carriers it negotiated or contracted with under the "real life" conditions renders the "but for" aspect illusory. That said, ICTSI must still provide evidence of its damages, and the ILWU Entities can challenge the persuasiveness of that evidence.

ICTSI is not precluded from arguing or providing evidence that it would have been able to replace Hanjin's volume if the illegal secondary boycott activities had not occurred. The ILWU Entities' challenge to Mr. Gimpel's opinions on this topic go to their weight, not their admissibility. The ILWU Entities' motion in this regard is denied. The unopposed portion relating to market capture rate, however, is granted.

**4.      The ILWU Entities' Motion Challenging Jay Sickler**

The ILWU Entities argue that Mr. Sickler's testimony should be excluded under Rule 702 and *Daubert* because his testimony is speculative and relies on assumptions that bear no relationship to the undisputed history of Terminal 6. The ILWU Entities assert five reasons that Mr. Sickler's testimony requires exclusion: (1) he offers three different damages amounts,[2] asking the jury to pick one, demonstrating that his testimony is inherently speculative; (2) he

---

[2] After the motion was filed, ICTSI conceded the ILWU Entities' argument relating the 75 percent capture rate, which eliminates one of Mr. Sickler's damages amounts, leaving only two.

assumes all of ICTSI's losses are because of the unlawful labor conduct without considering any other reason, and the evidence shows that there were lawful reasons after August 13, 2013 for ILWU members' conduct and that there were other reasons for ICTSI's damages; (3) he assumes that ICTSI would have made up the loss of Hanjin, relying on Mr. Gimpel's improper opinion; (4) his first damages number, $188,985,000, should be excluded because it assumes a market capture rate of 75 percent each year starting in 2014; and (5) his second damages number, $135,722,000, should be excluded because it relies on self-serving and unverified 2011 projections of ICTSI employee Elvis Ganda about volumes he expected ICTSI to reach. Because ICTSI does not dispute the market capture rate argument, it concedes the ILWU Entities' fourth point, but disputes the rest of this motion.

      a.      **Multiple damages calculations**

Regarding the ILWU Entities' first point, the fact that Mr. Sickler will be offering (now) two different damages figures based on two different models or sets of assumptions does not render his opinion unreasonably speculative or unhelpful to the jury. *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 559 (8th Cir. 1990) ("It was not error to permit the expert to discuss eight models of damage calculations with a range of estimates from $20 million to $31 million. The expert provided sufficient guidance by explaining the different assumptions upon which each model was premised."). The ILWU Entities can challenge Mr. Sickler's multiple damages models on cross examination or argue to the jury the consequences of the fact that he is not stating a single damages figure. This goes to the weight, not admissibility, of his opinion.

      b.      **ILWU Entities' proffered other reasons for conduct and damages**

The ILWU Entities state they intend to argue that they have motives other than the reefer dispute for their post-August 2013 conduct and that, for all time periods, any unfair labor

PAGE 10 – OPINION AND ORDER

practices were not a substantial factor or did not materially contribute to ICTSI's damages. This, however, does not mean that ICTSI's expert must concede these arguments in his assumptions. The ILWU Entities argue that if the jury agrees with their arguments, then Mr. Sickler's damages opinion will not be helpful. If, however, the jury agrees with the ILWU Entities, the jury won't be awarding damages. And if the jury only partly agrees with the ILWU Entities, perhaps agreeing that there was no illegal labor practices after August 13, 2013, but finding that the illegal labor practices from before that date materially contributed to ICTSI's damages, or finding that there were illegal labor practices throughout the relevant time frame, but they only materially contributed to ICTSI's damages until August 2016 when Hanjin filed for bankruptcy, then the jury may still find some of the information from Mr. Sickler helpful in extrapolating and calculating damages. Of course, the jury may disagree entirely with the ILWU Entities, and follow Mr. Sickler's opinion in its entirety. The underlying factual issues are up to the jury.

The heart of the ILWU Entities' argument is that because they may prevail on their argument that they are not liable for some of ICTSI damages, or for ICTSI's damages for some of the relevant time period, ICTSI's expert must disaggregate damages or his entire testimony is not helpful to the jury. The most important factor in disaggregation involves lawful, primary labor activity combined with unlawful, secondary activity. "[W]here a union has engaged in both lawful and unlawful conduct, and the consequences of those activities are separable, the Union is liable under section 303 only for injuries proximately caused by the illegal activity." *Mead*, 523 F.2d at 1378. Disaggregation in this context stems from "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *Id.* at 1378 (quoting *NLRB v. Denver Building Trades Council*, 341

U.S. 675, 692 (1951)). Thus, § 303 damages must be apportioned, or disaggregated, when there is lawful and unlawful conduct and the consequences are separable. When "the consequences are not separable, and the damages cannot be apportioned," however, then the union is responsible for all damages so long as the unlawful secondary conduct materially contributed to or was a substantial factor in causing the damages. *Id.* at 1379.

Concerns regarding lawful, primary conduct alongside unlawful, secondary conduct do not arise in this case for the period before August 13, 2013. The Court has already determined that issue preclusion prevents the ILWU Entities from arguing that they engaged in the slowdowns and stoppages during this time for any reason other than the reefer dispute. For the period after August 13, 2013, the ILWU Entities can argue, and the jury might agree, that the ILWU Entities engaged in lawful primary conduct. If the jury finds that only lawful primary conduct occurred, then disaggregation would be unnecessary. If the jury finds that both lawful and unlawful conduct occurred and the consequences were not separable, then disaggregation would be unnecessary. If the jury disagrees and does not find any lawful primary conduct, then disaggregation would be unnecessary. Only if the jury concludes that both lawful and unlawful conduct occurred after August 13, 2013, and the consequences were separable, would disaggregation be required. The fact that if the jury finds a narrow set of circumstances as argued by the ILWU Entities disaggregation would be required, however, does not mean that Mr. Sickler is required to provide a damages estimate that includes that precise scenario.

Similarly, the ILWU Entities argue that outside forces other than labor activity caused ICTSI's damages. These arguments for disaggregation are even less compelling than the § 303 requirement to apportion damages between lawful and unlawful labor activity. Defendants in civil cases regularly argue that conduct other than their own caused damages. That does not

require the plaintiff's expert to offer damages calculations that agree with the defendant's theory of the case. What the ILWU Entities characterize as "disaggregation" is really an assertion that ICTSI's expert must accept the facts of the case as argued by the ILWU Entities and offer a damages number under those facts for his testimony to be helpful. That is not required.

The cases cited by the ILWU Entities do not hold otherwise. Moreover, they are distinguishable or inapposite. In *Sebastian International, Inc. v. Russolillo*, it was not in dispute that the claims involved only diversion of genuine goods and not counterfeit goods and yet the expert admitted that his report did not distinguish between the two. 2005 WL 1323127, at *8 (C.D. Cal Feb. 2005). In *Infusion Resource, Inc. v. Minimed, Inc.*, the district court dismissed the antitrust claims and allowed the plaintiff to submit an amended expert report to segregate non-antitrust damages from antitrust damages. 351 F.3d 688, 695 (5th Cir. 2003). The plaintiff "simply repackaged its original report, which claimed its damages flowed from MiniMed's antitrust conduct, to assert that essentially the same damages now flowed from the remaining non-antitrust claims." *Id.* Thus, the amended report was stricken. *Id.*

These cases are distinguishable because the need to disaggregate was not in dispute and the issues were segregable. Here, ICTSI disputes that the ILWU Entities' conduct after August 13, 2013 was lawful or that reasons other than the illegal labor actions caused ICTSI's damages. Only if the jury accepts some of the ILWU Entities' theory of the case *might* there be a need to disaggregate, and then likely only for a limited period of time. The fact that under some factual scenario disaggregation might become necessary does not mean that ICTSI's expert is required to present damages calculations assuming each possible scenario, including one in which the jury accepts enough of the ILWU Entities' arguments to necessitate disaggregation.

In *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, two companies competed in offering various trucking and railroad shipping services and one engaged in a conspiracy that allowed for a form of predatory pricing for a particular combined trucking and rail service ("Plan V"). 786 F.2d 1342, 1344, 1347-48 (9th Cir. 1985). This scheme was found to cause an antitrust injury. *Id.* at 1348. In reviewing post-trial motions, the Ninth Circuit found that the expert opinion on damages was insufficient because both methods offered by the expert were flawed. *Id.* at 1351-52. The first method was flawed because it assumed all the Plan V shipping of the defendant was infected by the unlawful scheme, and yet "[n]o evidence was produced showing the number of trailers that were diverted from the plaintiffs because of the illegal price-cutting activities, as opposed to legitimate competition." *Id.* at 1351. The second method was flawed because it was based on a study by an economist who assumed that the plaintiff's lost profits were caused by the illegal scheme, without showing any nexus between the illegal activity and the lost profits. *Id.* The Ninth Circuit emphasized that the plaintiff failed to produce evidence of direct causation. *Id.* at 1352. The critical missing piece was evidence that the shippers used Plan V shipping because of the unlawful scheme, versus without regard to the unlawful scheme, because the plaintiff's evidence focused on the conduct of the schemers instead of the customers. *Id.* The Ninth Circuit concluded:

> In sum, although Farley produced evidence it had suffered some injury due to Santa Fe's antitrust violation, Farley provided no evidence on the amount of damages attributable only to the unlawful conduct. Farley's utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages.

*Id.* The Ninth Circuit focused on the evidence that was presented at trial, and what was lacking to support the underlying damages assumptions.

PAGE 14 – OPINION AND ORDER

Mr. Sickler calculated how much, if any, profits Terminal 6 would have generated if the ILWU Entities had not engaged in their illegal labor activities. The ILWU Entities have already been adjudicated as engaging in illegal labor activities from May 21, 2012 through August 13, 2013. The parties disagree whether this conduct materially contributed to ICTSI's damages during this time. The parties also dispute whether the ILWU Entities engaged in illegal labor activities after August 13, 2013, and if so, whether such conduct materially contributed to ICTSI's damages during this later period or whether its damages were caused by other factors. At this point, the Court cannot conclude that there will be no evidence at trial to support that the ILWU Entities engaged in unlawful secondary conduct after August 13, 2013, the unlawful secondary conduct throughout the relevant period materially contributed to ICTSI's damages, and it was such conduct and not outside forces that caused ICTSI's damages. Those are the underlying assumptions made by Mr. Sickler that the ILWU Entities argue render Mr. Sickler's opinion inadmissible. ICTSI's expert is not required to accept the ILWU Entities' assumptions and theories. Accordingly, the fact that Mr. Sickler did not provide a damages estimate that presumes the facts argued by the ILWU Entities does not require excluding his testimony.

    **c.    Hanjin's replacement**

The ILWU Entities argue that Mr. Sickler improperly assumed that Hanjin's volume would be replaced, relying on the opinion of Mr. Gimpel. Because the ILWU Entities move to exclude the opinion of Mr. Gimpel, they also argue Mr. Sickler cannot rely on Mr. Gimpel's opinion. The Court denies the motion to exclude Mr. Gimpel's opinion that Hanjin's volume would be replaced and thus denies the motion that Mr. Sickler cannot rely on the opinion by Mr. Gimpel.

### d. Assumptions of Elvis Ganda

The ILWU Entities' last challenge to Mr. Sickler's testimony relates to his remaining highest damages number. The ILWU Entities argue that this number relies on the "self-serving" and "unverified" 2011 projections of Mr. Ganda and ignores the realities of business at Terminal 6. ICTSI responds that Mr. Ganda's assumptions will be proven at trial and that the ILWU Entities did not properly raise a Rule 703[3] challenge to Mr. Sickler's opinion on these grounds. The Court disagrees that the ILWU Entities failed to raise a challenge under Rule 703 of the Federal Rules of Evidence. The ILWU Entities argue that Mr. Sickler's "Scenario 2" growth projection improperly relied on Mr. Ganda's internal projections, and the ILWU Entities cited cases discussing how such reliance is improper under Rule 703 or renders an expert's opinion unreliable under Rule 702.

In *TK-7 Corporation v. Estate of Barbouti*, the Tenth Circuit discussed two ways in which expert testimony that relies on an underlying assumption relating to lost profits may be admissible. 993 F.2d 722 (10th Cir. 1993). The first way in which such expert testimony may be admissible is when the underlying assumption is proven at trial. *Id.* at 731-32. In *TK-7*, which involved post-trial motions, the Tenth Circuit noted that the plaintiff had failed to introduce at trial evidence tending to establish the underlying assumption. *Id.* at 732. The second way is when the underlying assumption, even if itself inadmissible, complies with Rule 703 because it is of the type of assumption reasonably relied upon by experts in the particular field in forming

---

[3] Rule 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

opinions or inferences upon the subject. *Id.* The Tenth Circuit excluded the expert testimony in *TK-7*, holding that it did not comply with Rule 703 because the expert "failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable" and that the expert's "lack of familiarity with the methods and the reasons underlying [the] projections virtually precluded any assessment of the validity of the projections through cross-examination of [the expert]." *Id.*

ICTSI appears to be arguing the first scenario—that the validity of Mr. Ganda's 2011 projections will be proven at trial. It is not clear, however, whether ICTSI also is arguing that such assumptions, even if not admissible, are the type reasonably relied upon by experts in evaluating lost profits in this type of situation. Either way, the Court needs further information to determine whether there is an evidentiary basis to conclude that Mr. Ganda's 2011 projections will be proven at trial and were more than Mr. Ganda's hopes, or if not admissible they are nevertheless the type of assumptions that experts reasonably rely on in calculating lost profits. Accordingly, the Court will hold a Rule 104 hearing relating to this aspect of Mr. Sickler's report. AT that hearing, the Court will need to hear from both Mr. Ganda and Mr. Sickler. The Court also notes that although ICTSI's management of Terminal 6 was new, the Port, either directly or through hired management companies, had been managing Terminal 6 for decades. Thus, the operation of Terminal 6 was not a new "business." Questions arise whether profit and loss figures from the Port's management are relevant to calculating ICTSI's lost profits, in addition to profit and loss figures from the first year of ICTSI's management before the reefer dispute. The Court anticipates hearing from Mr. Sickler regarding generally accepted methods for calculating lost profits, including for a new or unestablished business, and how those methods were (or were not) applied in his report. If such methods were not applied in his report, the Court

expects an explanation as to why the methods that were applied in Mr. Sickler's "Scenario 2" growth assumption are reasonable and reliable under Rule 702.[4]

**5.    The ILWU Entities' Motion Challenging Samuel Estreicher**

The ILWU Entities move to exclude the opinions of Samuel Estreicher, ICSTI's legal expert, because he was not listed on ICSTI's expert witness list and because his report consists of improper legal opinions. ICTSI responds that it will not be calling Mr. Estreicher as a witness, which is why he was not listed on the witness list. Accordingly, this motion is denied as moot.

## CONCLUSION

The parties' motions challenging expert testimony are resolved as stated in this Opinion and Order. The parties are directed jointly to contact the Courtroom Deputy within two weeks of this Opinion and Order to schedule the Rule 104 hearing including both Mr. Sickler and Mr. Ganda.

**IT IS SO ORDERED**.

DATED this 9th day of April, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[4] The ILWU Entities do not specifically challenge Mr. Sickler's "Scenario 3" growth assumption, and ICTSI has withdrawn Mr. Sickler's "Scenario 1" growth assumption in conceding the 75 percent capture rate.