# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

ICTSI OREGON, INC.,

Plaintiff,

v.

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION;
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION Local 8; and
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION Local 40,

Defendants.

Case No. 3:12-cv-1058-SI

OPINION AND ORDER ON
MOTIONS *IN LIMINE*

**Michael H. Simon, District Judge.**

ICTSI Oregon, Inc. ("ICTSI") brings the sole remaining claim in this case against

International Longshore and Warehouse Union ("ILWU") and International Longshore and

Warehouse Union Local 8 ("Local 8") (collectively, "ILWU Entities").[1] ICTSI alleges that the

ILWU Entities engaged in illegal secondary boycott activities, violating § 303 of the Labor-

Management Relations Act, 29 U.S.C. § 187. Specifically, ICTSI alleges that the ILWU Entities

engaged in work stoppages, slowdowns, safety gimmicks, and other coercive actions with an

---

[1] ICTSI has informed the Court that it will dismiss its claims against Local 40 with
prejudice.

object of compelling ICTSI to pressure the Port of Portland (the "Port") to relinquish control to

ICTSI over jobs at Terminal 6 of the Port that involve the plugging, unplugging, and monitoring

of refrigerated containers. This Opinion and Order addresses the parties' remaining motions *in

limine*.[2]

1.      **ICTSI's Motions *in Limine* (ECF 385)**

        a.      **Motion No. 1: Evidence and argument disputing that the ILWU Entities
                violated § 187 or had motives other than the reefer dispute, when previously
                adjudicated. GRANTED IN PART.**

        ICTSI moves to exclude evidence and argument that the ILWU Entities did not violate

§ 187 or that the work stoppages and slowdowns from May 21, 2012, through August 13, 2013,

were motivated by anything other than the illegal secondary purpose of obtaining the reefer

work. For this time period, the Court has already determined in its Opinion and Order resolving

ICTSI's motion for partial summary judgment that issue preclusion applies with respect to the

ILWU Entities' violation of § 187(a) and motivation for the work stoppages and slowdowns.

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.* ("*ILWU II*"), 2019 WL 267714,

at *7-11 (D. Or. Jan. 17, 2019).

        The ILWU Entities respond that they should be permitted to argue that their motives after

August 13, 2013 were something other than to obtain the reefer jobs, but this argument is

irrelevant to ICTSI's motion *in limine*, which involves only the time period from between

May 21, 2012 through August 13, 2013. The ILWU Entities also argue that they should be

allowed to present evidence and argument that factors other than the work stoppages and

slowdowns caused ICTSI's damages, but again that is irrelevant to ICTSI's motion *in limine*,

_____

[2] The Court previously issued an Opinion and Order addressing the ILWU Entities'
Motions *in Limine* Nos. 1, 2, and 7, involving challenges to expert witness testimony. *See*
ECF 464.

which is narrow in scope and only involves evidence and argument disputing that the ILWU Entities violated § 187 during the adjudicated periods or disputing the motivation of the work stoppages and slowdowns from May 21, 2012 through August 13, 2013. The ILWU Entities also argue that although the reefer dispute "substantially" motivated their conduct during the adjudicated period, this fact does not mean that the ILWU Entities cannot argue that other motives were also present during that timeframe.

The Court previously ruled that issue preclusion applies with respect to the previously-adjudicated period of May 21, 2012 through August 13, 2013. The Court held that based on issue preclusion, ILWU and Local 8 violated 29 U.S.C. § 187(a) from May 21 through August 13, 2013. *ILWU II*, 2019 WL 267714, at *11. The Court also held that that during this time period, the work stoppages and slowdowns were motivated by the reefer dispute. *Id.* The Court further held that issue preclusion prevents the ILWU Entities from arguing that during this period the ILWU Entities had motivations other than the reefer dispute. *Id.* at *9-10 ("What the ILWU Entities would not be able to argue if issue preclusion is applied is that the work stoppages or slowdowns were motivated by something other than the reefer dispute, such as ICTSI's poor management, equipment failure, or safety issues. This would be because the issue of what motivated the work stoppages and slowdowns was directly at issue in the previous adjudications, the ILWU Entities made arguments regarding what motivated them or had the opportunity to make those arguments, and those arguments were rejected. . . . The issue of what motivated the ILWU members to engage in work stoppages and slowdowns is identical, was actually litigated, and was necessarily decided . . . . Thus, it is given preclusive effect."). The Court thus disagrees with the ILWU Entities that they can argue other motives existed during the adjudicated period. The ILWU Entities are precluded from presenting evidence and argument that the work

stoppages and slowdowns from May 21, 2012 through August 13, 2013 were motivated by reasons other than the reefer dispute.[3]

The ILWU Entities' final argument is that they should be able to present evidence that the negative conditions that motivated the slowdowns and stoppages after August 13, 2013, existed before that date and progressively got worse, so that it does not appear to the jury that the ILWU Entities are arguing that suddenly on or after August 14, 2013, conditions became so bad as to warrant work stoppages and slowdowns for reasons other than the reefer dispute. To the extent the ILWU Entities wish to present evidence that, for example, there were generally unsafe working conditions or bad management decisions by ICTSI that existed throughout the relationship of the parties and increased over time, and these factors resulted in work stoppages and slowdowns in later, unadjudicated time periods, the Court will permit such evidence, including from May 21, 2012 through August 13, 2013. This evidence, however, may not be connected to specific instances of work stoppages or slowdowns during the previously-adjudicated timeframe. In other words, witnesses may not testify that they engaged in certain work stoppages or slowdowns between May 21, 2012 and August 13, 2013, because of unsafe equipment, poor management decisions by ICTSI, or reasons other than the reefer dispute. Witnesses may discuss factual instances relating to, for example, unsafe equipment and management decisions and the escalation of those instances over time, but only may connect those instances as motivation for work stoppages and slowdowns occurring after August 13, 2013.

---

[3] The ILWU Entities had also argued that Local 40 can present evidence of additional motives after June 10, 2012, because issue preclusion relating to Local 40 only involves the period of May 21, 2012 through June 10, 2012. That was before ICTSI represented that it is going to dismiss with prejudice its claims against Local 40.

The Court notes that in their Trial Brief, the ILWU Entities cite as examples of the type of conduct that caused the later work stoppages and slowdowns the requirement to operate cranes in bypass mode and changing stop signs to yield signs. These purported problems, however, were argued to ALJ Wedekind and were rejected as credible reasons for work stoppages and slowdowns. Thus, they may not be argued as reasons for the later work stoppages and slowdowns unless there was an escalation of this specific conduct, or it was in combination with new, additional safety concerns. The ILWU Entities cannot merely cite to the same conduct that was previously rejected by ALJ Wedekind or this Court in its Contempt Order and argue that the conduct is sufficient for later time periods. The Court is allowing the ILWU Entities to discuss alleged management and safety issues during the previously-adjudicated periods for the limited purpose of providing a coherent timeline and arguing an *escalation* of problems that purportedly led to later lawful work stoppages and slowdowns. The Court, however, will not permit the ILWU Entities to present previously-rejected arguments and attempt to apply them to later time periods.

    **b.**    **Motion No. 2: Evidence and argument disputing that the Port controlled the reefer work or it was unlawful for the ILWU Entities to pursue that work through labor activities. GRANTED IN PART.**

ICTSI moves to exclude evidence and argument disputing that the Port controlled the reefer jobs because this issue previously has been adjudicated and the Court found issue preclusion applies. ICTSI also moves to exclude evidence and argument that it was lawful for the ILWU Entities to pursue the reefer work through labor activities, that the reefer work belonged to ILWU members under the Pacific Coast Longshore and Clerks Agreement ("PCL&CA"), that the reefer work could or should have been controlled by ICTSI as a member of the Pacific Maritime Association ("PMA"), or that ICTSI engaged in a "plot" with the Port to keep the reefer work from ILWU members.

The ILWU Entities respond that they will follow the Court's Order that issue preclusion prevents them from arguing that any entity other than the Port controls the reefer work. They also accept that their 2012 litigation position was found to be legally invalid and that the PCL&CA does not "trump" ICTSI's lease with the Port. The ILWU Entities further assert that they do not intend to argue that ICTSI engaged in a "plot" with the Port. Thus, all these aspects of ICTSI's motion are granted.

The ILWU Entities argue, however, that they should be permitted to present to the jury the fact that ICTSI willingly joined the PMA and thus accepted the benefits and burdens of the PCL&CA. Additionally, ICTSI represented to the PMA that ICTSI had no third-party contractual obligations that conflicted with the PCL&CA. The ILWU Entities assert that the tension between ICSTI's lease with the Port (which required that the reefer work be assigned by the Port, which traditionally went to IBEW members) and ICTSI's membership in the PMA and thereby becoming a party to the PCL&CA (which required that the reefer work be assigned to ILWU members) created a situation that was inevitably going to result in problems. The ILWU Entities argue that this is important "context" for jurors to know, both with respect to the general management style and business practices of ICTSI (signing a lease in direct contradiction with the PCL&CA, foregoing its obligations under the PCL&CA, and undermining its relationship with its workforce right from the start) and that it is prejudicial simply to inform jurors that the ILWU Entities lost the legal battle that ILWU members should get the reefer jobs without this context. To hold otherwise, argue the ILWU Entities, would create an appearance that the ILWU Entities pursued the reefer jobs after 40 years for no apparent reason.

The issues of who controlled the reefer work, whether ICTSI had a job preservation claim, and whether the ILWU Entities engaged in illegal secondary conduct during this time

period with the motive of obtaining the reefer jobs already have been decided through issue preclusion and may not be relitigated. ICTSI asserts in its Trial Memorandum, however, that "the jury will be entitled to consider whether ILWU, Local 8, or Local 40 intended to harm ICTSI. That intent is important because, in effect, that intent makes the ILWU Entities responsible for a broad range of harms." ICTSI also asserts that "given ILWU Entities' clear intention to drive away Hanjin and other carriers, the jury will be entitled to find that—having done so—ILWU Entities' conduct at a minimum increased the risk that ICTSI would be unable to replace the volume associated with lost carriers before March 2017, when it bought out its lease." ICTSI thus appears to be putting the ILWU Entities' intent to harm ICTSI and the carriers at the forefront of this trial and claiming a "broad range" of harms as a result, beyond the narrow § 187 findings that are established through issue preclusion.

The findings established through issue preclusion are relatively narrow. They are that the ILWU Entities engaged in threats to harm ICTSI and the carriers and engaged in certain conduct that did harm ICTSI and the carriers, with the intent to obtain the reefer work. The intent findings were specifically related to obtaining the reefer work, not generally to harm ICTSI or the carriers. ICTSI's argument at trial, however, appears to be that the ILWU Entities engaged in the conduct with the intent, or a plan or scheme, to harm ICTSI. As such, ICTSI has opened the door for the ILWU Entities to respond with evidence of its intent (to obtain the reefer jobs and not to harm ICTSI) and rebut ICTSI's allegations. This may include evidence of why the ILWU Entities believed they were entitled to the reefer jobs (*e.g.*, because ICTSI was a PMA member and the ILWU Entities erroneously thought the PCL&CA and Joint Coast Labor Relations Committee ("CLRC") decision would supersede the lease). This evidence, however, may only be presented in a manner that respects the conclusions that are governed by issue preclusion.

     **c.**     **Motion No. 3: Evidence and argument that the ILWU Entities have a "work preservation" defense. (Unopposed). GRANTED.**

     **d.**     **Motion No. 4: Evidence and argument that slowdowns and stoppages were for "safety" issues during the adjudicated periods and beyond. GRANTED IN PART.**

ICTSI moves to preclude the ILWU Entities from relitigating that the work stoppages and slowdown from May 21, 2013 through August 13, 2013, were for "safety" reasons. This argument is subsumed in Motion *in Limine* No. 1 and the Court incorporates its ruling on that motion.

ICTSI also moves to exclude evidence and argument that, absent changed circumstances, work stoppages and slowdowns from later time periods can be attributed to safety reasons. There is no issue preclusion relating to later time periods. ICTSI is free to argue to the jury that without an intervening change in circumstances it is not credible that the work stoppages and slowdowns were for safety reasons when the stoppages and slowdowns previously were found to be an improper secondary boycott and the purported safety concerns were found to be pretextual. The Court, however, will not exclude the ILWU Entities from presenting evidence and argument that later work stoppages and slowdowns were motivated by safety issues. The Court notes, however, as discussed in the Court's ruling on Motion *in Limine* No. 2, that safety reasons that were argued to and rejected by ALJ Wedekind or this Court, such as operating cranes in bypass mode or changing stop signs to yield signs, cannot be relitigated as applying to a later date absent evidence of escalation or in conjunction with other additional problems. The ILWU Entities may not simply repeat previously rejected arguments as sufficient for later time periods. Nonetheless, because there may have been new or escalating safety issues, this portion of ICTSI's motion is denied.

### e. Motion No. 5: Evidence and argument disputing that the ILWU Entities agreed to increase productivity. DENIED.

ICTSI moves to exclude the ILWU Entities from disputing that Leal Sundet promised to increase productivity at Terminal 6 if the reefer jobs would be assigned to ILWU members. This promise purportedly took place during a 2013 meeting with then-Governor John Kitzhaber, the IBEW, the District Council of Trades Union ("DCTU"), the Port, the ILWU, and ICTSI. ICTSI argues that issue preclusion prevents the ILWU Entities from disputing this fact, because the Court found in its Opinion and Order resolving the National Labor Relations Board's ("NLRB") motion for contempt ("Contempt Order") that the declaration submitted by Bill Wyatt was more credible than the declaration submitted by Mr. Sundet and thus concluded that Mr. Sundet had made the representation at the meeting. *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, 72 F. Supp. 3d 1168, 1179-80 (D. Or. 2014). ICTSI also argues that the ILWU Entities may not dispute this fact because in responding to ICTSI's motion to compel, the ILWU Entities asserted that they were not going to rely on statements from settlement discussions and the Court stated it would hold the ILWU Entities to that representation.

The ILWU Entities respond that they do not intend to rely on statements from settlement discussions and that it is ICTSI that is trying to allow settlement statements to be admitted. The ILWU Entities argue that under Rule 408 of the Federal Rules of Evidence, evidence of anyone "furnishing, promising, or offering . . . valuable consideration" during settlement discussions is inadmissible yet that is precisely what ICTSI is seeking to have admitted, and be undisputed. The ILWU Entities also respond that to the extent evidence of statements during the 2013 discussions with then-Governor Kitzhaber is admitted, then the Court's findings in the Contempt Order should not be given preclusive effect because the Court acknowledged in the Contempt Order it was evaluating written declarations and could not assess the credibility of live witnesses, and

because additional information obtained in later discovery calls Mr. Wyatt's statements into question. Thus, argue the ILWU Entities, the credibility of Mr. Sundet and Mr. Wyatt and whether Mr. Sundet made the alleged promise of increased productivity should be assessed by the jury.

The Court does not consider the December 2013 meeting between Governor Kitzhaber, the DCTU, the Port, the IBEW, the ILWU, and ICTSI to be "settlement discussions" covered by Rule 408.[4] The State was not a party, and the Governor was not acting in the role of a confidential mediator trying to resolve pending litigation. Instead, he was a public official working solve a public problem by increasing productivity at a shipping port that had significant public interest implications. Additionally, the temporary work assignment agreement that was reached in December 2013 was between the Port, the IBEW, and the DCTU. It was not a "settlement" between the Port and the ILWU. Nor was it a "settlement" between ICTSI and the ILWU. Nor did it resolve or purport to resolve the pending litigation. Accordingly, the Court does not find that Rule 408 applies to the purported statement of Mr. Sundet.

The Court also does not consider its factual findings in the Contempt Order relating to the discussions that took place in the meeting with Governor Kitzhaber to qualify for issue preclusion. The Court was not evaluating live testimony and expressly made its findings on a limited written record. There was no cross examination of either Mr. Sundet or Mr. Wyatt. This

---

[4] The Court discussed that the Port and ILWU engaged in "settlement" discussions, including through the office of the Governor of Oregon, in resolving ICTSI's motion to compel. *See* ECF 343 at 4-5. In briefing the discovery motion, the parties had framed their dispute as involving settlement discussions relating to the settlement between the Port and the ILWU. In resolving that motion, the Court accepted the ILWU's representation that it did not intend to rely on any settlement discussions as a defense in this case. Accordingly, the Court did not analyze the applicability of Rule 408 to the purported "settlement" discussions facilitated through the Office of the Governor.

particular issue of witness credibility, although sufficiently resolved for purposes of the Contempt Order, was not fully litigated or necessarily decided for purposes of issue preclusion. ICTSI argues that the ILWU Entities chose not to have Mr. Sundet testify at the contempt hearing and thus waived their opportunity to request his live testimony be assessed for credibility, but Mr. Wyatt also did not testify live. Both witnesses may now testify before a jury and the jury may assess credibility. ICTSI's motion is denied.

      **f.**      **Motion No. 6: Evidence and argument disputing previously adjudicated facts. GRANTED IN PART.**

ICTSI requests that "all factual findings and legal conclusions" in the two NLRB decisions and the Court's earlier Contempt Order be given preclusive effect. ICTSI previously moved for summary judgment requesting that an enumerated list of 205 statements from the NLRB decisions and the Court's Contempt Order be given preclusive effect. The Court denied ICTSI's motion for partial summary judgment on this point because ICTSI essentially copied nearly all of the statements from the respective earlier judicial decisions and requested that they be given preclusive effect. ICTSI did not explain how each requested "fact" met the standards for preclusion and "essentially asked for pre-approval of ICTSI's ability to present at trial some large amount of unidentified evidence (*e.g.*, unknown witness testimony, unidentified documentary evidence, etc.)." *ILWU II*, 2019 WL 267714, at *11. The Court noted that ICTSI could get the relief it requests by submitting exhibits it believes should be permitted based on preclusion, submitting witness statements including testimony it believes is permissible based on preclusion, or moving *in limine* to exclude "certain specific evidence." *Id.* Instead of following the Court's directive, ICTSI's filed an even broader motion, requesting that all statements of law and fact contained in the earlier decisions be given preclusive effect. This motion is denied.

ICTSI also requests an order giving preclusive effect to 39 specific statements copied or paraphrased from the decisions of ALJs Wedekind and Schmidt and this Court's Contempt Order. These statements include findings of fact and conclusions of law.[5] ICTSI does not provide specific argument as to how each of the 39 statements meets the elements of preclusion (*e.g.*, was necessarily decided), why the statements are not cumulative, how the statements are relevant to damages or a claim or defense *at issue* (particularly when the Court has decided § 187(a) liability for the previously-adjudicated timeframe through issue preclusion), or how the statements should be presented to the jury. Moreover, the Court is admitting the previously-adjudicated determinations that the ILWU's proffered alternative motivations other than the reefer dispute were not credited. Some of the offered statements thus are cumulative because they are merely statements of an ALJ or the Court discussing and disregarding the proffered explanations. The relevance of such statements is further diminished by the Court's conclusion in Motion *in Limine* No. 1 that the ILWU Entities may not dispute their motive during the adjudicated time period.

Accordingly, at this time the Court gives preclusive effect only to statements that give a fuller explanation of the § 187 violation findings by one or both of the two ALJs or this Court or are relevant to ICTSI's claim that the ILWU Entities engaged in work stoppages and slowdowns during later time periods to obtain the reefer jobs (*e.g.*, statements that may indicate a longer-

---

[5] The ILWU Entities argue that issue preclusion does not apply to conclusions of law, citing a Fifth Circuit case, but that is not the law in the Ninth Circuit. *See Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010) ("'[T]he doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action.'" (quoting *U.S. v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984))).

term plan or goal).[6] ICTSI may renew its requests on additional statements if it can demonstrate how they meet the requirements for issue preclusion, are relevant to a claim or defense at issue or damages, are not cumulative, and are not unduly prejudicial.

The Court gives preclusive effect to the following statements listed by ICTSI in Exhibit A to the Declaration of Jeffrey S. Eden: 1; 2 as modified by ILWU; 3; 4; 7; 10; 12; 13, modified as follows: adding "that operating in bypass mode was an OSHA violation and" after "Bitz stated . . ." so that the sentence reads "Bitz stated that operating in bypass mode was an OSHA violation and that the Union was 'not going to work in a manner to help [ICTSI] as they have in the past' because of the complaints ICTSI had filed against Local 8 members."; 14, modified as follows: changing first sentence to read "In the summer of 2012, Local 8 crane operators and truckdrivers refused to move two 20-foot containers ('twin 20s') at a time on older 'bomb carts.'" and adding "claimed" before "safety reasons" in the second sentence and deleting the last two sentences and replacing them with "The claimed safety reasons were not credited and were found to be pretextual."; 22 (first and third sentences only); 23 (first, second, and fourth sentences only); 32; and 35.

g. **Motion No. 7: Evidence and argument that the ILWU Entities had a good faith belief that the reefer work belonged to their members. DENIED.**

ICTSI argues that because § 187 violations involve strict liability, the ILWU Entities' good faith belief is irrelevant, confusing, and unduly prejudicial. The ILWU Entities respond that

---

[6] The Court has not yet finalized how it will instruct the jury on the findings through preclusion that ILWU and Local 8 violated 29 U.S.C. § 187(a) from May 21 through August 13, 2013, and during this time the work stoppages, slowdowns, and safety gimmicks were motivated by the reefer dispute. The additional statements the Court is allowing through preclusion are supplemental to the Court's earlier determination that these findings are entitled to be given preclusive effect. The Court further notes that references to Local 40 shall be removed, based on ICTSI's stated intent to dismiss all claims with prejudice against Local 40.

it would be prejudicial to them if the jury is not allowed to know and understand the origins of the reefer dispute and the ILWU Entities' motivations, because ICTSI has put those motivations at issue. The ILWU Entities assert that these motivations include that the Port promised it would abide by the outcome of the contractual grievance procedure (the CLRC decision), that the PMA advised ICTSI that its contractual argument had no chance of winning, and that the CLRC and local area arbitrator ordered ICTSI to assign the reefer jobs to ILWU members.

The only authority cited by ICTSI that § 187 involves strict liability requiring evidence of good faith be excluded for all purposes is *W. R. Grace & Co. v. Local Union No. 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 652 F.2d 1248 (5th Cir. 1981). In *W.R. Grace*, the Fifth Circuit discussed the retroactive effect of appellate decisions, including providing examples of when parties act in good faith and yet are found to be liable for that conduct years later. *Id.* at 1255-56. The court discussed parties who publish something believing it to be lawful yet later it is found to be obscene or libelous, parties who rescind a contract believing the other party materially breached the contract only for it to be determined later that the other party did not breach the contract, and unions who engage in conduct they believe to be lawful under the secondary boycott provisions of the National Labor Relations Act ("NLRA") but later are held liable for illegal conduct. *Id.* The court stated:

> One of the clearest examples in the law of the situation where persons may in good faith believe they are acting properly but nevertheless be found to be responsible in damages for improper conduct is in the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 158(b)(4) (unfair labor practice), and 29 U.S.C. § 187 (creating civil liability for exactly the same conduct). It is well established that a NLRB determination not to prosecute a union for violation of § 8(b)(4) is not res judicata and does not bar a suit for damages under § 187 for the same episode. In other words, the union may not only be in good faith before charges are filed that it is not violating the secondary boycott provisions, it may be further convinced by the Board considering

its actions but deciding not to prosecute a complaint under
§ 8(b)(4), but still be found liable for damages under § 187. These
examples of the usual retroactive effect of an appellate court
decision reversing a lower court decision or the decision of an
administrative agency can be multiplied a thousand fold.

*Id.* at 1256 (citations omitted).

*W.R. Grace* does not hold that evidence of good faith is never admissible or relevant in a

§ 187 case. The fact that the ILWU Entities may have acted in good faith but nonetheless may

still be found liable for damages under § 187 does not mean that their good faith is irrelevant for

all purposes. As discussed above in ICTSI's Motion *in Limine* No. 2, ICTSI appears to be

placing the ILWU Entities' intent at issue for a "broad range" of harms. Because ICTSI has

opened the door by arguing about the ILWU Entities' general intent to harm ICTSI, then the

ILWU Entities' may introduce evidence rebutting that asserted intent, including that they

believed the PCL&CA and CLRC decision would govern. Accordingly, this motion is denied.

h.      **Motion No. 8: Evidence and argument that ICTSI failed to mitigate damages
or acted improperly by failing to insist on control of the reefer jobs.
GRANTED.**

The ILWU Entities assert that the although the Court will instruct the jury that the Port

had control of the reefer work and the ILWU Entities engaged in illegal secondary activity, the

ILWU Entities have the right to present the background facts to the jury that ICTSI could simply

have requested an amendment to the lease and avoided the entire problem. ICTSI would then

have controlled the disputed work and could have assigned it to ILWU members. The ILWU

Entities contend that there is evidence that the Port did not "have a good plan B" other than

ICTSI and thus ICTSI had leverage to demand the lease be amended.

ICTSI argues that as the victim of illegal labor activity, it "was under no duty . . . bow to

[ILWU's] demands in order to minimize its damages." *Int'l Longshoremen's & Warehousemen's*

*Union v. Juneau Spruce Corp.*, 189 F.2d 177, 191 (9th Cir. 1951); *see also Eazor Express, Inc. v.*

*Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 520 F.2d 951, 969-70 (3d Cir. 1975) (noting that the duty to mitigate does not include "taking steps which amount to a capitulation to the demands of the strikers"). ICTSI further argues that allowing the ILWU Entities to present evidence that ICTSI should have obtained control over the reefer jobs is irrelevant, unduly prejudicial, and poses too great a danger of confusing the issues and misleading the jury.

The ILWU Entities provide no legal authority for their contention that they should be permitted to present as "background facts" that ICTSI could have demanded an amendment to the lease. Allowing the evidence as argued by the ILWU Entities is not relevant because it does not have a tendency to make a consequential fact more or less probable. ICTSI did not have control of the reefer jobs. Whether they could have negotiated an amendment is irrelevant to ICTSI's claimed § 187 violation. To the extent a possible lease amendment may be argued to be relevant as mitigation of damages, it is speculation and ICTSI was under no obligation to capitulate to the ILWU members' demands and illegal secondary activity either by forcing the Port to assign the reefer work to ILWU members or forcing the Port to amend the lease to allow ICTSI to assign the reefer work to ILWU members. Accordingly, any potential probative value is minimal and is substantially outweighed by the danger of confusing the issues, misleading the jury, and unfair prejudice to ICTSI. This motion is granted.

### i. Motion No. 9: Evidence and argument that ICTSI's failure to concede to Hanjin's demand to assign the reefer work to ILWU members was improper or a failure to mitigate. GRANTED.

ALJ Schmidt made several findings regarding threats made by the ILWU Entities to Hanjin, and Hanjin's response. These included: (1) beginning March 9, 2012, Local 40 filed numerous grievances against Hanjin; (2) on August 15, 2012, ILWU sent a letter to Hanjin asserting that as a carrier it had primary responsibility to ensure the PCL&CA was followed, the fact that ICTSI was not following the PCL&CA by not having the reefer work assigned to ILWU

members did not alter Hanjin's obligation under the PCL&CA, the NLRB's decision against the ILWU did not provide a defense to Hanjin, and effective immediately Locals 8 and 40 would prosecute lost work grievances against Hanjin for every single container for which an ILWU member was not given the reefer work; (3) on August 16, 2012, Hanjin sent an email to ICTSI and the Port, attaching ILWU's letter, and demanding that ICTSI use ILWU members for reefer work; and (4) that "[b]y filing, processing, maintaining and prosecuting grievances or lawsuits or threatening to engage in such conduct against ICTSI," Hanjin, and others, the ILWU Entities violated § 8(b)(4)(ii)(B) of the NLRA.[7] Accordingly, the ILWU Entities' conduct toward Hanjin was part of the illegal secondary activity. Hanjin's forwarding of the ILWU's demand with a request that ICTSI and the Port concede to the ILWU's demand is the equivalent of requesting that they give in to the labor demands. Evidence that ICTSI should have conceded to Hanjin's demand, triggered by ILWU's threat, is similar to the evidence that is the subject of Motion *in Limine* No. 8. It is not relevant and is excluded.

The ILWU Entities argue that Hanjin sent requests that the reefer jobs be assigned to ILWU members in June 2012, before ILWU's August 15th letter, and thus those requests were not because of the illegal secondary activities. The ILWU Entities argue ICTSI's refusal to follow the request of its largest customer is an example of ICTSI's "cavalier attitude" toward its customers. This argument is rejected. Local 40 had been filing grievances against Hanjin, found to violate the NLRA, since March 2012. The ILWU Entities engaged in serious work stoppages and slowdowns in late May 2012 through early June 2012. The June 2012 correspondence between Hanjin, ICTSI, and the Port was focused on the labor issues at Terminal 6 and the cost

---

[7] ALJ Schmidt also found violations of § 8(b)(4)(i) and other violations of § 8(b)(4)(ii)(B) of the Act.

and problems those labor issues were creating for Hanjin. Moreover, the June 22, 2012 email from Hanjin to the Port and ICTSI specifically states that they have put Hanjin "in harm's way," that Hanjin will hold them responsible for any additional costs as a result of the "jurisdictional dispute," and that Hanjin believed the Port and ICTSI chose to "throw [Hanjin] under the bus." It is clear that Hanjin's correspondence and request that the reefer jobs be given to ILWU members were triggered by the ILWU Entities' illegal secondary activity.

To the extent the ILWU Entities have other evidence of ICTSI's purported "cavalier attitude" toward its customers, including Hanjin, that evidence may be admissible. But evidence of any carriers acquiescing to any of the ILWU Entities' demands or threats relating to the reefer jobs and, in turn, making demands or threats to ICTSI will be excluded under Rules 402 and 403 of the Federal Rules of Evidence.

**j.      Motion No. 10: Evidence and argument relating to Evraz Steel's complaints or the expiration of its sublease. GRANTED IN PART.**

ICTSI asserts that no parties' experts have included any damages relating to ICTSI's relationship with Evraz Steel (f/k/a Oregon Steel) and thus any evidence regarding Evraz Steel's complaints about ICTSI or the expirations of its sublease should be precluded as irrelevant. ICTSI also argues that including such evidence would be prejudicial, confusing, and is improper "character" evidence that creates "innuendos of collateral misconduct." *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1335 (9th Cir. 1985). ICTSI further argues that it would be a waste ICTSI's allotted trial time to necessitate a response regarding ICTSI's relationship with Evraz Steel.

The ILWU Entities respond that ICTSI's expert Nolan Gimpel opined that the only way for Terminal 6 to be profitable is a mixed-use terminal, which means having non-container customers like Evraz Steel. The ILWU Entities contend that by allowing Evraz Steel to leave,

ICTSI lost one million dollars per year in revenue, another factor that contributed to the demise of Terminal 6, which is relevant to damages.

At trial, ICTSI has the burden of proving: (1) for the non-adjudicated time periods, a violation of § 187 (proving the requisite underlying conduct with an object of obtaining the reefer jobs); (2) any proven violation of § 187 (whether through issue preclusion or at trial) was a substantial factor or materially contributed to ICTSI's damages; and (3) the amount of ICTSI's damages. The fact that ICSTI is not seeking damages for the loss of revenue from Evraz Steel does not mean that losing Evraz steel is not relevant to the amount damages that ICTSI is claiming. The ILWU Entities argue that losing the one million per year in revenue from Evraz Steel contributed to the overall weakening of Terminal 6 and thus was a factor in causing ICTSI's claimed damages. The fact of the loss of Evraz Steel is thus relevant. The details of the relationship between Evraz Steel and ICTSI, however, is not relevant, other than an assertion that ICTSI exhibited poor management with Evraz Steel or had disputes Evraz Steel and thus it did the same with ILWU members. This type of evidence is discussed below in Motion *in Limine* No. 19. Accordingly, evidence regarding the financial information relating to the sublease between Evraz Steel and ICTSI may be admitted as relevant to damages.

    **k.**    **Motion No. 11: Evidence and argument that Hanjin's bankruptcy offsets ICTSI's damages. DENIED.**

ICTSI argues that evidence of Hanjin's August 2016 bankruptcy should be precluded under general tort principles, relying on Sections 920 and 435A of the Restatement (Second) of Torts. Section 920 states that when a defendant's tortious conduct has caused harm to a plaintiff and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that it is equitable. Under this section of the Restatement, the benefit must result from the tortious

conduct. Section 435A states: "A person who commits a tort against another for the purpose of causing a particular harm to the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act."

ICTSI argues that the "benefit" of Hanjin's bankruptcy, meaning avoidance of some amount of future uncollectible receivables, was not caused by the ILWU Entities' conduct and they cannot argue for any offset in damages. The relevance of Hanjin's bankruptcy, however, is not to offset some speculative amount of specific avoided future receivables that may have been lost or discounted in Hanjin's bankruptcy proceeding.[8] Hanjin's bankruptcy is relevant because ICTSI is claiming damages relating to the lost business of Terminal 6 from 2012 through March 2017, which includes a period of seven months after Hanjin filed for bankruptcy. Hanjin's bankruptcy in August 2016, which arguably might have resulted in Terminal 6's lost business even if the ILWU Entities had never engaged in illegal secondary activity, is probative of whether the ILWU Entities' secondary boycott activities were a substantial factor or materially contributed to at least some of ICTSI's claimed damages. Hanjin's bankruptcy is not a "special benefit" conferred by the conduct of the ILWU Entities. ICTSI's Section 920 argument therefore is inapposite.

ICTSI also argues that Hanjin's bankruptcy is irrelevant because it occurred more than one and one-half years after the ILWU Entities forced Hanjin to stop calling at Terminal 6. ICTSI argues that in the "real world" Hanjin was not a customer of Terminal 6 when it filed for bankruptcy and it is only in a "but for" world in which Hanjin's bankruptcy might be relevant.

---

[8] The ILWU Entities represent that they do not intend to argue that ICTSI avoided unpaid receivables or introduce this type of evidence.

ICTSI's claimed damages, however, are based on a "but for" world where the ILWU Entities never engaged in the illegal secondary conduct. ICTSI's damages expert assumes that without the illegal secondary conduct of the ILWU Entities, ICTSI would have increased business at Terminal 6 while also increasing prices. The fact that Terminal 6's largest customer, who represented 80 percent of the Port's container business, filed for bankruptcy in August 2016 and ceased doing business entirely, is relevant to this "but for" world and damages model.

ICTSI's Section 435A argument is that the ILWU Entities intended to "send Hanjin packing," engaged in illegal behavior to achieve that goal, achieved it, and thus are liable for that harm. This argument only gets ICTSI so far. The damages model in this case presumes that there was no illegal labor activity, the ILWU Entities did not send Hanjin packing, and Hanjin would have continued to call on Terminal 6. The parties agree that the ILWU Entities played no part in Hanjin's bankruptcy, and thus it was an outside force. The fact that in August 2016 Hanjin filed for bankruptcy and ceased doing business is a relevant fact to the causation of ICTSI's damages in the "but for" scenario after that point in time, particularly because ICTSI is seeking special damages relating to the lease termination. ICTSI's argument that in the "real world" the ILWU Entities' conduct made it impossible to replace Hanjin's volume when other ports could replace Hanjin's volume is an argument to make to the jury. It does not, however, support excluding the fact of Hanjin's bankruptcy from the jury. This motion by ICTSI is denied.

l. **Motion No. 12: Evidence and argument that the ILWU Entities' wrongful conduct allowed ICTSI to avoid 21 years of lease payments. GRANTED IN PART.**

ICTSI moves to exclude any evidence or argument that the it obtained a benefit from the ILWU Entities' illegal conduct by saving 21 years of lease payments. ICTSI notes that it is not seeking any damages for lost profits after it terminated its lease with the Port in March 2017 and thus the "saved" lease payments after that date are irrelevant unless the lease termination was

unreasonable. ICTSI argues that because the ILWU Entities' damages expert does not opine that ICTSI should have continued its lease for 21 more years and incurred $94.5 million in lease payments instead of terminating the lease, the lease termination was reasonable and the lease payments beyond termination are not material to calculating damages. ICTSI also argues that the "saved" lease payments were not a "special benefit" conferred by the ILWU Entities and thus they cannot use them as an offset to damages. ICTSI further argues that it need not "choose" between lost profits and out-of-pocket recovery, but that argument is not relevant to this motion *in limine*.

The ILWU Entities respond that their defense relating to damages on this point is not that ICTSI "saved" 21 years of lease payments or that those "saved" lease payments offset any damages claimed by ICTSI. The ILWU Entities assert that their position on ICTSI's damages, including ICTSI's claimed special damages for the lease termination payment and the value of the equipment, is that those damages do not have the requisite causal nexus to the ILWU's illegal secondary boycott activity. The ILWU Entities contend that their conduct did not "materially contribute" or was not a "substantial factor" in causing ICTSI's damages, and that ICTSI would have been harmed regardless of the ILWU Entities conduct, and thus causation is not met. The ILWU Entities assert that their expert will opine that because of Hanjin's bankruptcy (caused by factors unrelated to the ILWU Entities' conduct), Terminal 6 would have failed regardless of the ILWU Entities' illegal secondary boycott activities, ICTSI would have had to terminate its lease at or around the same time in 2017, ICTSI would have incurred the same costs (lease termination fee and equipment costs), and thus ICTSI's damages do not have the required causal nexus. *See Feather v. United Mine Workers of Am.*, 711 F.2d 530, 537 (3d Cir. 1983) ("If the plaintiff

would have been harmed regardless of the section 8(b)(4) violation, then of course there can be no recovery.").

ICTSI's motion is granted to the extent that the ILWU Entities cannot argue (and they represent they do not intend to argue) that the lease payments after March 2017 were "saved" as a result of the conduct by the ILWU Entities, are an offset to any claimed damages by ICTSI, or ICTSI's savings in not having to remit those payments is a "benefit" from the conduct of the ILWU Entities. The ILWU Entities may, however, argue that the lease termination fee, equipment costs, and other claimed damages were caused by other circumstances, including Hanjin's bankruptcy, and that ICTSI would have had to terminate its lease and incur those costs regardless of the ILWU Entities' conduct. As discussed in Motion *in Limine* No. 11, ICTSI's claimed damages are based on a scenario in which the ILWU Entities' never engaged in the illegal secondary boycott and ICTSI's expert opines as to the profitability of Terminal 6 under that hypothetical situation. Accordingly, whether ICTSI would have had to terminate its lease and would have incurred at least some of its claimed damages regardless of the ILWU Entities' illegal conduct is relevant.

> **m.** **Motion No. 13: Evidence and argument relating to Terminal 6's potential profitability after the period for which ICTSI seeks damages. GRANTED IN PART.**

ICTSI argues that the potential profitability of Terminal 6 after ICTSI terminated its lease is irrelevant. The ILWU Entities respond that they do not intend to argue any offset of damages or "special benefit" as posited by ICTSI, but instead intend to argue the potential profitability of Terminal 6 with respect to causation of damages. The ILWU Entities argue that if, because of Hanjin's August 2016 bankruptcy or other issues, Terminal 6 was destined to fail regardless of the ILWU Entities' secondary boycott activity, then such evidence is relevant. Hanjin's bankruptcy, however, occurred before ICTSI terminated its lease.

ICTSI terminated its lease in March 2017 and is claiming damages up to that date. The ILWU Entities state that they intend to argue that other factors caused ICTSI's damages and that the ILWU Entities' illegal conduct was not a substantial factor or did not materially contribute to ICTSI's damages. The ILWU Entities assert that ICTSI would have incurred the same damages regardless of the illegal secondary boycott activities. Accordingly, the ILWU Entities can argue and present evidence on whatever other factors they contend caused ICTSI to terminate its lease. Those factors necessarily occurred before March 2017. Factors that occurred after ICTSI terminated its lease, however, are not relevant as to the causation of why Terminal 6 failed or why ICTSI had to terminate its lease. The ILWU Entities may not introduce evidence of market factors or other factors after March 2017 that they contend affected the profitability or caused the failure of Terminal 6.

Calculations of long term profitability, however, may be used to explain why ICTSI would have terminated its lease in approximately March 2017, even if the ILWU Entities had not engaged in illegal secondary boycott activities. In other words, the ILWU Entities' experts may, for example, opine about a hypothetical situation assuming Hanjin had not stopped calling on Terminal 6 as a result of the ILWU Entities' conduct, but then in August 2016 stopped calling on Terminal 6 as a result of its bankruptcy. Such a hypothetical situation might include what a long term profitability analysis would have looked like in August 2016 or later (but before March 2017) that might have motivated ICTSI to terminate its lease, even if the illegal secondary boycott activity had never occurred.

n.    **Motion No. 14: Evidence and argument relating to ICTSI's discretionary spending. DENIED WITH PARTIAL LEAVE TO RENEW AT TRIAL.**

ICTSI moves to exclude evidence of its discretionary spending such as employee bonuses and shareholder distributions as irrelevant and prejudicial. Regarding distributions to its parent

company in the Philippines, ICTSI, Inc., ICTSI argues that the ILWU Entities' damages expert Mr. Kidder has opined that because ICTSI had less earnings, it "repatriated" less money to ICTSI, Inc. as a distribution. ICTSI asserts its reduced earnings was because of the ILWU Entities' illegal conduct and they should not receive a windfall for this conduct, as opined by Mr. Kidder. The ILWU Entities respond that evidence that ICTSI "repatriated cash to its corporate parent in the Philippines in the form of dividends and payments on inter-company debt" is relevant so that the jury can assess the testimony of ICTSI's damages expert Mr. Sickler. The ILWU Entities argue that the millions of dollars paid to ICTSI's parent company were not considered by Mr. Sickler in his analysis. ICTSI's attack on Mr. Kidder's analysis and the ILWU Entities' attack on Mr. Sickler's analysis are issues for the jury. This portion of ICTSI's motion is denied.

The ILWU Entities further respond that bonuses paid to witnesses is relevant to bias, which ICTSI concedes. ICTSI argues, however, that arguments about what discretionary expenditures might have been made but for the ILWU Entities' wrongful conduct should not be permitted. It is not clear what type of evidence ICTSI is challenging with this latter assertion. The Court will not exclude evidence based on a vague and hypothetical argument. ICTSI may object to specific questions or testimony at trial.

  o.  **Motion No. 15: Evidence and argument regarding the Port's payment of some of ICTSI's damages. GRANTED.**

ICTSI moves to exclude evidence and argument relating to the Port's payment of some of ICTSI's damages, including the related agreements and statements. The Court previously granted ICTSI's motion for partial summary judgment based on the collateral benefits rule. The Court excluded any offset paid to ICTSI by the Port under the rent rebate or cost sharing agreements. The ILWU Entities argue that although no damages offset can be obtained, the jury may still

receive evidence relating to these agreements and their payments because they are relevant as follows: (1) ICTSI's damages expert Mr. Sickler assumes the rate increase in 2013 was sustainable through 2017 without considering that it was subsidized by the rent rebate program and thus one of his key assumptions is undermined; (2) under the program ICTSI was incentivized to demonstrate lower rates of production to the Port to increase the rebate and thus it demonstrates a bias in creating Terminal 6 production statistics; (3) the payment amounts show that ICTSI has overstated it damages in this case because it was paid significantly less than what it is now claiming in damages; and (4) the fact that ICTSI never told the carriers about this program is evidence of its poor customer service that contributed to the downfall of Terminal 6.

ICTSI responds that the ILWU Entities' attempts to create probative value fail because: (1) not including the rent rebate program in the expert report follows the Court's order not to consider the collateral benefits in expert reports, and a defendant may not cross examine a damages expert for omitting a collateral benefit, citing to *Zak v. Riffel*, 115 P.3d 165, 175-76 (Kan. App. 2005); (2) under the program ICTSI merely had to provide careful documentation, which it did; (3) ICTSI's payments through the programs were under the real-life scenario in which the ILWU Entities' illegal conduct affected Terminal 6 and are obviously different than the claimed damages under the "but for" scenario in which the ILWU Entities did not engage in illegal conduct; and (4) the "propensity" evidence argued by the ILWU Entities, based on information never learned by the carriers and thus conduct that could not have contributed to the downfall of Terminal 6, is irrelevant and inadmissible. Most importantly, argues, ICTSI, the Court's summary judgment ruling forecloses admission of this evidence because the Court determined that the collateral benefits rule applies. ICTSI cites to *Eichel v. New York Cent. R. Co.*, 375 U.S. 253, 255 (1963) (noting that evidence of collateral benefits is "subject to misuse

by a jury" and is likely to cause "prejudicial impact"); *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 930 (5th Cir. 1992) (noting that when the collateral source rule applies "evidence of collateral benefits simply has no relevance in the lawsuit"); *Brooks v. Cook*, 938 F.2d 1048, 1052-53 (9th Cir. 1991) (noting that "the fear is that a jury, informed of plaintiff's right to additional funds, will view the money as a windfall and take steps to offset it" and concluding "we hold that as with information about the right to treble damages or the receipt of funds from a collateral source, the right of a prevailing plaintiff to attorneys' fees under § 1988 should play no part in the jury's deliberation"); and *Sheehy v. S. Pac. Transp. Co.*, 631 F.2d 649, 653 (9th Cir. 1980) (finding that the district court abused its discretion in admitting the amount of benefit even though the source was excluded).

The ILWU Entities argue that there is no *per se* rule of inadmissibility and assert that *Eichel* and *Sheehy*, which limit a court's discretion to admit evidence related to collateral benefits, are distinguishable because they arise out of claims under the Federal Employers Liability Act. The Court does not find this to be a persuasive distinction when the underlying claim is based on a federal statute. *Eichel* noted that admitting evidence of collateral benefits would "violate the spirit of the federal statutes." 375 U.S. at 255. Indeed, in *Sheehy*, the Ninth Circuit cited with approval *Riddle v. Exxon Transportation Co.*, 563 F.2d 1103, 1107 (4th Cir. 1977), a case that followed *Eichel* and involved the Longshoremen's and Harbor Workers' Compensation Act. *Sheehy*, 631 F.2d at 652. Moreover, the Ninth Circuit in *Sheehy* also noted that "[i]n *Tipton v. Socony Mobil Oil Co.*, 375 U.S. 34 (1963), the Court found evidence of collateral benefits to be inadmissible but recognized that in a proper case an appropriate instruction would cure the error." *Id. Tipton* involved a case brought under the Jones Act. Other courts have also followed *Eichel* when the underlying claim involved federal statutes other than

the Federal Employers Liability Act. *See, e.g.*, *Reed v. Philadelphia, Bethlehem & New England R. Co.*, 939 F.2d 128, 134 (3d Cir. 1991) (Safety Appliance Act).

Additionally, the ILWU Entities cite to *DeMedeiros v. Koehring Co.*, as rejecting a rule of *per se* inadmissibility. 709 F.2d 734, 739-40 (1st Cir. 1983). *DeMedeiros*, however, did not involve a federal statutory claim and specifically noted: "In diversity negligence cases, this circuit has refused to extend the holding in *Eichel* beyond its federal statutory context." *Id.* at 741.

Finally, the ILWU Entities argue that *Phillips* supports that sometimes evidence of collateral benefits is admissible, citing to a discussion in which the court in *Phillips* noted that the benefits at issue might be admissible. 953 F.2d at 934. The ILWU Entities misconstrue that discussion. In *Phillips*, the Fifth Circuit remanded the case so that the district court could determine whether the payments at issue were subject to the collateral benefits rule. *Id.* If the rule *did not apply*, the payments might be admissible as a setoff, with a limiting instruction that the evidence could be used only to calculate a setoff and not as proof of lack of negligence. *Id.* This discussion did not detract from the court's earlier discussion of the general standards relating to when the collateral benefits rule *applies*, disallows a setoff, and excludes evidence. *Id.* at 929-31.

The Court notes that the Fifth Circuit *has* created a limited exception to the exclusion of evidence based on the collateral benefits rule. "In *Savoie v. Otto Candies, Inc.*, 692 F.2d 363 (5th Cir. 1982), however, [the Fifth Circuit] noted an exception to the general rule that the jury may not learn of collateral benefits. Compensation benefits may be admitted for a limited purpose (in *Savoie*, it was to prove seaman status) if there is little risk of prejudice and the court gives a limiting instruction to the jury." *Gates v. Shell Oil*, 812 F.2d 1509, 1513 (5th Cir. 1987). This exception is narrow. "Not only must there be little likelihood of prejudice and no strong potential

for improper use, the trial judge must give a careful qualifying jury instruction and there must be a specific purpose (e.g. proof of some other matter) for the evidence." *Phillips*, 953 F.2d at 930 n.6.

The Ninth Circuit has not adopted a similar exception. The precedent from the Supreme Court and the Ninth Circuit is more restrictive in the admission of collateral benefits evidence. Further, even if the Ninth Circuit were to adopt the Fifth Circuit's narrow exception, the Court finds that the most probative "other purpose" of the evidence, as argued by the ILWU Entities, is the fact that Mr. Sickler includes in his expert opinion the rent increase when that increase was subsidized by the rent rebate program. The ILWU Entities, however, may challenge whether the carriers would have accepted Mr. Sickler's opined high rent increase through other evidence, including witness testimony by carrier witnesses. The collateral benefits evidence, which the Supreme Court and the Ninth Circuit has held to be unfairly prejudicial, is therefore not necessary to challenge the assumption underlying Mr. Sickler's opinion. This motion by ICTSI is granted.

**p.      Motion No. 16: Improper lay opinion testimony. GRANTED.**

ICTSI moves to exclude improper lay opinion regarding what members of Local 40 and Local 8 would have done under hypothetical management situations. The ILWU Entities assert that they do not intend to elicit such lay opinion testimony. The ILWU Entities contend that they will elicit factual testimony regarding what witnesses experienced under ICTSI's management and the Port's management, and the effect of ICTSI's management on morale, productivity, and efficiency, but such testimony is irrelevant to this motion. This motion is granted as unopposed.

q.   **Motion No. 17: Evidence and argument that reference or denigrate the nationality or location of ICTSI or its parent company. GRANTED IN PART, RESERVED IN PART.**

The ILWU Entities do not oppose the portion of this motion relating to denigrating the nationality or location of ICTSI or its parent company but oppose the portion that seeks to exclude any mention of the nationality or location of ICTSI or its parent company. The ILWU Entities argue that the nationality of ICTSI, Inc. (a Philippines-based company) is relevant because before establishing its Oregon-based subsidiary ICTSI to operate Terminal 6, ICTSI, Inc. had never operated a United States port before and was unfamiliar with the ILWU, the PMA, U.S. labor laws, or West coast labor practices and customs. The ILWU Entities assert that the Port had concerns with ICTSI, Inc.'s lack of experience before committing to the lease. The ILWU Entities also contend that the CEO of Hapag-Lloyd, Terminal 6's second largest customer, had concerns with ICTSI, Inc. taking over based on his experience with them in Brazil and Mexico. The ILWU Entities argue that this information is relevant to the issue of whether it was *ICTSI's* (not ICTSI, Inc.'s) lack of experience, knowledge, and long term commitment to West coast ports, along with ICTSI's management style, that caused ICTSI's damages rather than the reefer dispute. ICTSI responds that the nationality of its parent is immaterial because *ICTSI* managed Terminal 6, not ICTSI, Inc., and ICTSI hired American management.

The Court agrees with the ILWU Entities that the fact that ICTSI, Inc., the parent company of ICTSI, is a global company and operates terminals around the world, but had not operated in the United States before establishing ICTSI and operating Terminal 6, is relevant. It tends to show how Terminal 6 came to be operated by ICTSI. Although ICTSI is the entity that managed Terminal 6, parent companies often have an influence on subsidiaries. ICTSI, of course, may argue to the jury that it made its management decisions, with its experienced management, independent of its parent company.

The ILWU Entities also argue that the fact that ICTSI "repatriated" money to its Philippines-based parent is relevant because these were significant expenses to ICTSI. The ILWU Entities further argue that ICTSI, Inc. was directing ICTSI's budgeting decisions and that the jury must be able to understand ICTSI's accounting and the relationship between its parent company and ICTSI. Although the Court agrees that ICTSI's distributions to ICTSI, Inc., the financial relationship between the parent and the subsidiary, and the accounting methods are all relevant, ILWU doesn't explain why the fact that the parent company is in the Philippines, as opposed to another foreign country, is relevant, other than to argue that it is a fact.

ICTSI moves in the alternative to excluding the fact of ICTSI, Inc.'s nationality, that the Court allow the jury to be informed of ICTSI, Inc.'s nationality but not repeated use of this fact. The Court agrees that the nationality of ICTSI, Inc. may be disclosed. The Court, however, will not allow excessive reference to ICTSI, Inc.'s nationality. The ILWU Entities may discuss *ICTSI's* lack of experience with West coast ports and its management style without repeated mention of ICTSI, Inc.'s nationality. The ILWU Entities may also discuss the financial relationship between ICTSI and ICTSI, Inc. without repeated mention of either company's nationality. Further, the culture, government, or practices of the Philippines is not relevant and evidence relating to those topics is excluded.

The Court notes that although the ILWU Entities state that they do not intend to denigrate or stereotype ICTSI or ICTSI, Inc.'s nationality, the ILWU Entities have used terms like "dictatorial" and "third-world" in discussing ICTSI's management style. Depending on how it is used, this type of characterization may be inappropriate stereotyping that should be precluded. For example, if a witness wanted to testify that ICTSI managed (or ICTSI, Inc. influenced ICTSI to manage) in a "typical Philippines" style, which is "dictatorial," that would be precluded. *See*

*Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1008 (9th Cir. 2001) (noting, in a case involving expert testimony that culturally stereotyped how Korean businesses behaved generally, "the risk of racial or ethnic stereotyping is substantial, appealing to bias, guilt by association and even xenophobia" and that the expert testimony "invited the jury to distrust [the plaintiff] by invoking an ethnic, national stereotype"); *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001) ("Racial stereotyping cannot be condoned in civil cases."). On the other hand, if a witness wanted to testify that a specific supervisor was demanding and told everyone exactly what to do and how to do it, in a dictatorial manner, that likely would not be precluded. ICTSI may challenge at trial any use by the ILWU Entities of terms that ICTSI believes are being used in a racially or ethnically stereotyping inappropriate manner.

    **r.**    **Motion No. 18: Evidence and argument regarding the financial resources of ICTSI or its affiliates. GRANTED IN PART, RESERVED IN PART.**

ICTSI moves to exclude evidence of its or ICTSI, Inc.'s financial data, other than the information used by each party's experts in calculating damages. ICTSI argues that such information is irrelevant and unduly prejudicial. *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1178-80 (11th Cir. 2002) ("The general rule is that, during trial, no reference should be made to the wealth or poverty of a party, nor should the financial status of one party be contrasted with the other's." (quotation marks omitted)); *Finjan, Inc. v. Sophos, Inc.*, 2016 WL 4560071, at *14-15 (N.D. Cal. Aug. 22, 2016) (excluding "evidence about the wealth of Sophos's founders or employees," including their compensation despite the fact that they were testifying witnesses, as "far more likely to be prejudicial than to be probative"); *Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, 2013 WL 2182864, at *7 (E.D. Cal. May 20, 2013) (excluding evidence of parent company's financial status as irrelevant and "even to the extent the document was marginally relevant for some purpose—which it is not—under the Rule 403 balancing test,

any probative value attributable to the financial statement is significantly outweighed by the danger of unfair prejudice in that it could entice a jury to award punitive damages based on the wealth of Fireman's Fund's group of companies and not that of Defendant").

The ILWU Entities respond that because the damages experts relied on some information, it "makes no sense" that further information is irrelevant or unduly prejudicial. The ILWU Entities, however, do not provide any explanation of how ICTSI's financial information that was not relied on for damages purposes is relevant to any issue of liability, causation, or other issues in the case. Nor do the ILWU Entities explain how they intend to use the additional financial information for damages. The ILWU Entities next argue that their expert Mr. Kidder explains how the "repatriation" amounts sent from ICTSI to ICTSI, Inc. are important expenses to ICTSI and relevant. This information was considered by Mr. Kidder, however, and thus would not be subject to this motion, which only seeks to exclude financial information *not* included in the expert reports. Finally, the ILWU Entities argue that compensation paid to testifying witnesses is relevant to bias, and ICTSI concedes that this information is relevant and withdraws its motion with respect to this information.

The parties' experts relied on ICTSI's relevant financial data in calculating damages and reaching their expert conclusions. It is unclear at this point what, if any, of ICTSI's financial information not relied on by any expert the ILWU Entities may wish to introduce, and what relevance that information may or may not have. The ILWU Entities have not provided any specific examples, other than information that was relied on by an expert and not subject to this motion. Accordingly, the Court reserves ruling on the portion of this motion relating to ICTSI's financial data until any specific evidence is proposed at trial that was not relied on by an expert and ICTSI believes should be excluded as irrelevant or unduly prejudicial.

Regarding the financial data of ICTSI, Inc., the ILWU Entities argue that ICTSI, Inc.'s receipt of transfers from ICTSI is relevant. This information, however, can be demonstrated through ICTSI's financial data. At oral argument, the ILWU Entities argued that after ICTSI terminated its lease at Terminal 6, it remained a functioning entity only for purposes of this lawsuit. The ILWU Entities asserted that the remaining ICTSI employees are actually being paid by ICTSI, Inc. because ICTSI has no income and ICTSI, Inc. is financially carrying ICTSI as an entity solely to keep it viable to the completion of this lawsuit.

The Court agrees that if ICTSI, Inc. is paying salaries or otherwise directly or indirectly keeping ICTSI employees compensated that has some relevance to bias. The ILWU Entities have leeway to explore this avenue in witness questioning. This does not, however, render the general worth or financial statements of ICTSI, Inc. relevant or admissible. Absent some other showing of relevance, the Court will exclude the financial information of ICTSI, Inc. that is not related to bias.

### s. Motion No. 19: Evidence and argument that ICTSI is "litigious." RESERVED.

ICTSI moves to exclude evidence and argument that ICTSI is litigious, is a frequent litigant, was involved in other litigation with related parties. ICTSI argues that such evidence and argument is unduly prejudicial and improper "character" evidence. The ILWU Entities respond that they will not use any of the "catch phrases" identified in ICTSI's motion, will not refer to ICTSI as "litigious," and will not denigrate the justice system. Accordingly, this portion of ICTSI's motion is granted as unopposed.

The IWLU Entities assert, however, that they are entitled to discuss the many disputes relating to Terminal 6 in which ICTSI has been involved. The ILWU Entities argue that ICTSI's many disputes, including with the Port, PMA, Hanjin, other carriers, barge companies, Evraz

Steel, and even the choice to file this lawsuit instead of complying with the CLRC decision, are all relevant to show that it was ICTSI's poor management of the terminal instead of the reefer dispute that motivated any labor action.[9] This response encompasses more than what ICTSI addressed in its motion. The Court resolves it on the merits in the interests of judicial efficiency.

As discussed in Motion *in Limine* No. 8, ICTSI was not required to capitulate to the demands of the ILWU Entities. Additionally, it has already been adjudicated that ICTSI's legal position was correct and the ILWU Entities' legal position, including asserting that the CLRC decision was correct and predominated over the lease, was incorrect. Thus, the fact that ICTSI filed this lawsuit instead of complying with the CLRC decision is not a "dispute" that can be argued against ICTSI. Additionally, as discussed in Motion *in Limine* No. 9, the fact that Hanjin or any other carrier asked ICTSI to assign the reefer jobs to ILWU members and ICTSI did not comply with that request is excluded from evidence.

There are essentially three issues for trial: (1) for the non-adjudicated time periods, did the ILWU Entities engage in conduct that violated § 187 (meaning conduct that constitutes an unfair labor practice under § 8(b)(4) of the NLRA, which includes determining whether the ILWU engaged in such conduct with an object of obtaining the reefer jobs); (2) whether any proven violation of § 187 (whether the already-adjudicated period through issue preclusion by itself or along with any newly-adjudicated period shown at trial) was a substantial factor or materially contributed to ICTSI's damages; and (3) the amount, if any, of ICTSI's damages. The ILWU Entities contend that ICTSI's bad relationships and disputes with others related to

---

[9] As discussed in Motion *in Limine* No. 1, the ILWU Entities may not discuss the motive of "any" slowdown or labor action because for the time period from May 21, 2012, through August 13, 2013, the ILWU Entities' motivation has been established. At trial, they only may discuss motivation for slowdowns or labor actions after August 13, 2013.

Terminal 6 show how poorly ICTSI managed Terminal 6. The ILWU Entities argue that it was that poor management that motivated the conduct of the ILWU members. The ILWU Entities don't explain how ICTSI's relationships with others is relevant to the motivation of ILWU members. To the extent the ILWU Entities are arguing that ICTSI's disputes with others directly motivated the ILWU members' conduct, the Court finds this argument without merit. It appears that the ILWU Entities are arguing that ICTSI's disputes and poor management style with others tends to show that it had similar disputes and poor management style with ILWU members. ICTSI moves to exclude this as improper "character" evidence under Rule 404(b) of the Federal Rules of Evidence.

Rule 404(a) of the Federal Rules of Evidence prohibits evidence of a "*person's* character or character trait . . . to prove that on a particular occasion the *person* acted in accordance with the character or trait." Fed. R. Evid. 404(a) (emphasis added). Similarly, Rule 404(b)(1) prohibits evidence of a crime, wrong, or other act, "to prove a *person's* character in order to show that on a particular occasion the *person* acted in accordance with the character." Fed. R. Evid. 404(b)(1) (emphasis added). Although in other contexts the word "person" includes a corporation or other non-natural entity, it is an open question whether "person" as used in Rule 404 includes non-natural entities. The Court is persuaded by the reasoning in the Federal Practice and Procedure treatise that it does not. Wright, *et al.*, 22B Fed. Prac. & Proc. Evid. 5234 (2d. Ed. 2018); *see also* Susanna M. Kim, CHARACTER EVIDENCE OF SOULLESS PERSONS: THE APPLICABILITY OF THE CHARACTER EVIDENCE RULE TO CORPORATIONS, 2000 U. Ill. L. Rev. 763, 810-11 (2000) (arguing that "character" evidence relating to corporate entities should only be evaluated for relevance and under Rule 403). Accordingly, the Court evaluates the admissibility of this evidence under Federal Rules of Evidence 402 and 403.

ICTSI's purported disputes and poor relationships with others at Terminal 6, including Evraz Steel, the Port, the carriers, the barge companies are relevant to causation. The ILWU Entities argue that it is ICTSI's poor management that caused Terminal 6 to fail. ICTSI's purported inability to work with its customers, lessees, landlord, and others at Terminal 6 is relevant to its allegedly poor management of Terminal 6. The ILWU Entities argue that this poor management caused ICTSI's damages, not the wrongful conduct of the ILWU Entities. The ILWU Entities also argue that this poor management created low morale among the ILWU members, and this contributed to the low productivity at Terminal 6. Accordingly, ICTSI's purported disputes and poor relationships with others are relevant.

The next question is whether the probative value of this information is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, wasting time, or undue delay. Fed. R. Evid. 403. At this time, the Court reserves ruling on this question until it can more closely evaluate the proffered evidence, either at the final pretrial conference or at trial.

   **t.    Motion No. 20: Evidence and argument regarding disputes between the Port and ICTSI.**

ICTSI moves to exclude evidence relating to disputes between the Port and ICTSI over their lessor/lessee relationship, including whether the Port appropriately billed ICSTI for reimbursable services. ICTSI argues that such evidence is irrelevant, improper "character" evidence, and unduly prejudicial, confusing, and a waste of time. ICTSI adds that the disputes are "collateral" and if admitted would create "mini-trials" over irrelevant issues or else the jury might believe that a non-party (the Port) had some culpability for ICTSI ceasing operations at the Terminal 6 and make adjustments to its damages award.

The ILWU Entities respond that disputes between the Port and ICTSI, including regarding reimbursables, are relevant for at least three reasons. The first reason is because the disputes may somehow be probative of ICTSI's poor management style, which suggests that it was ICTSI's management and not the reefer dispute that caused ICTSI's damages. This generally was discussed in Motion *in Limine* No. 19. In this context, however, it appears too remote and indirect to hold much probative value.

The second basis of relevance asserted by the ILWU Entities concerns the rent rebate program. The ILWU Entities argue that under this program ICTSI was incentivized to demonstrate lower rates of production to the Port. The ILWU Entities assert that because ICTSI claims lost profits, the jury is entitled to hear evidence relating to ICTSI's motive, credibility, and bias in creating its production statistics. Thus, argue the ILWU Entities, disputes over the rent rebate are relevant. The ILWU's broad categorization of "disputes over the rent rebate" as being relevant does not overcome the presumption of exclusion of collateral benefits evidence as discussed in Motion *in Limine* No. 15. The ILWU Entities do not contend that there is evidence that the Port accused ICTSI of improperly documenting its production rates or falsifying documents. Merely asserting that because ICTSI received rent rebates based on production rates it had a motive or bias to "demonstrate" lower rates of production to the Port is an insufficient basis to introduce the rent rebate program or any ancillary disputes relating to the program to the jury. If the ILWU Entities have evidence that the Port and ICTSI had a dispute because the Port believed that ICTSI falsified production rates, the Court will reconsider this portion of the motion.

The third reason given by the ILWU Entities for relevance relates to the dispute over reimbursable matters. The Port provided ICTSI with certain services, such as maintenance and

repair, for which ICTSI reimbursed the Port. The ILWU Entities argue that ICTSI's failure to maintain equipment at the Port was another cause of the poor production at Terminal 6. Thus, argue the ILWU Entities, disputes over work that was not done or work that was not requested is relevant to showing the other causes for low production rates. The relevance here appears to apply only quite narrowly. If ICTSI requested equipment be repaired or maintained and the Port did not perform the requested maintenance or repair, that would be relevant to the ILWU Entities' argument that equipment was not properly maintained (although it would not appear to support the argument that it was ICTSI's fault that the equipment was not properly maintained). As discussed below, however, that evidence is more directly obtained through evidence about equipment repair instead of evidence about disputes with the Port over equipment repair.

If the Port performed maintenance or repair on equipment that ICTSI later argued it had not requested, that does not show that the equipment was *not* properly maintained. It may arguably have some probative value to the ILWU Entities' argument that ICTSI was not keeping equipment properly maintained. In order to be probative of that argument, however, the ILWU Entities would have to show that those specific pieces of equipment needed the maintenance or repair that the Port provided and ICTSI did not want it performed. This might require one or more mini-trials about each piece of equipment. Moreover, the ILWU Entities can better make their arguments relating to the maintenance and repair of equipment through other evidence, including ILWU member witnesses, Port employee witnesses, ICTSI employee witnesses, carrier employee witnesses, and documentary evidence relating to equipment. The ILWU Entities may present evidence regarding what maintenance was performed (or was not performed when it should have been) on which pieces of equipment and when, at whose request, and the like. Evidence about whether the Port and ICTSI *disputed* about equipment maintenance is less

probative than evidence of the actual equipment maintenance itself. Accordingly, the evidence of disputes between the Port and ICTSI regarding equipment maintenance is cumulative and its probative value is substantially outweighed by its potential to confuse the jury, waste trial time, and create undue prejudice. It is, therefore, excluded.

   **u.      Motion No. 21: Evidence and argument that ICTSI may have defrauded the PMA. GRANTED.**

   ICTSI moves to exclude evidence and argument that it mispresented facts on its application to the PMA. Specifically, ICTSI moves to exclude argument relating to the assertion on the application that ICTSI was not "bound by any [other] labor agreement." ICTSI argues that this was a truthful answer, because the lease in which the Port was allowed to assign the reefer jobs was not a labor agreement. ICTSI further argues that such evidence and argument is irrelevant to any issue in this case (§ 187 violation after August 13, 2013, causation, or damages), confusing, unduly prejudicial, and improper "character" evidence. The ILWU Entities respond that the lease with the Port allowing the Port to assign reefer jobs to non-ILWU members conflicts with Mr. Ganda's sworn statement in ICTSI's PMA application that ICTSI was not bound by any other labor agreement. The ILWU Entities argue that this is relevant to show ICTSI's lack of experience and knowledge and to Mr. Ganda's credibility.

   The statement on the application is not relevant to ICTSI's experience or knowledge, but may, in theory, be relevant to Mr. Ganda's credibility. It is a sworn statement by Mr. Ganda and if it is knowingly untrue then that would be relevant information for the jury. ICTSI argues, however, that it is a truthful statement and allowing the ILWU Entities to argue to the jury that the lease between the Port and ICTSI was a "labor agreement" violates Rule 403. The ILWU Entities make a vague argument, but appear to argue that the lease provision giving the Port the ability to assign the reefer jobs to a non-ILWU union is the equivalent of a "labor agreement."

Control over assignment of the reefer jobs, however, has repeatedly been adjudicated to belong to the Port, and not ICTSI. Additionally, Judge Schmidt specifically found that the Port included the requirement that it be allowed to keep control over the reefer jobs in its early solicitations for lessees and its early draft lease, before ICTSI was even involved. The Court does not find it persuasive to assert that the lease provision was a "labor agreement." Even if there was some minimal probative value to this argument and thus to an argument that Mr. Ganda made an untrue statement on the PMA application, it is substantially outweighed by the danger of unfair prejudice, wasting trial time, misleading the jury, and confusing the issues. This motion is granted.

### v. Motion No. 22: Evidence and argument that ICTSI is suing union members individually or creating individual liability. GRANTED.

ICTSI moves to exclude evidence or argument that it is suing individual union members or attempting to create individual liability. ICTSI notes that § 303 of the LMRA does not allow for individual liability. In response, the ILWU Entities note that ILWU members consider the union to be a "family" and are often multi-generational. The ILWU Entities argue that ICTSI cannot sue the Local and the union and expect to "run away from that decision when the ramifications of that decision are exposed to the jury." To this extent, ICTSI's motion is granted.

It appears, however, that the ILWU Entities also want ILWU members to be able to testify about how the fact that Local 8, Local 40, or the ILWU was sued affected the individual members. The ILWU Entities assert that because the cause of low productivity and work slowdowns and stoppages is at issue, why employees had "low morale" is relevant. The ILWU Entities argue that the fact that ICTSI sued the union and its Locals and took other adversarial positions against employees contributed to a poor relationship between ICTSI and ILWU

members, which in turn caused low productivity. This is beyond what ICTSI raised in its motion, but the Court addresses it on the merits.

ICTSI responds that this is "victim blaming" and essentially permits union members to argue that it is acceptable to retaliate when an employer asserts its legal rights under § 303. ICTSI argues that this makes a "farce" out § 8(b)(4) of the NLRA and § 303 of the LMRA and renders their protections illusory.

The Court is mindful that the issues raised in the ILWU's argument do not involve the usual situation in which multiple factors simultaneously may motivate a union's conduct, some lawful and some unlawful, such as occurred in *Mead v. Retail Clerks Int'l Ass'n, Local Union No. 839*, 523 F.2d 1371 (9th Cir. 1975). The ILWU Entities seek to admit, in a case where it was already adjudicated that unlawful secondary boycott activity occurred, evidence that ICTSI's lawful use of the legal process motivated ILWU members to engage in *additional* work stoppages and slowdowns. As discussed above, ICTSI is not required to capitulate to the ILWU Entities' demands. *Eazor Express*, 520 F.2d at 969-70; *Juneau Spruce*, 189 F.2d at 191. ICTSI also has the right to exercise its rights under § 303. *Int'l Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 244 (1952) (recognizing that "[t]he right to sue in the courts is clear, provided the pressure on the employer falls in the prescribed category" to redress unfair labor practices). Additionally, as discussed by ALJ Wedekind, when ICTSI enacted strict measures in response to the reefer dispute that upset the workforce and reduced productivity, the union members' conduct was done indirectly because of the reefer dispute and thus was connected to the illegal secondary conduct. *Int'l Longshore & Warehouse Union*, 2015 NLRB LEXIS 870, at *36-38 (N.L.R.B. November 30, 2015). "To disregard such a connection or relationship in evaluating the object of union action would ignore industrial realities and

potentially discourage employers from engaging in self-help efforts to prevent or document continued unlawful conduct." *Id.* at *38-39. The Court also is reluctant to disregard that same connection when union members retaliate against employers who exercise their legal rights under §§ 303 and 187. Accordingly, under the circumstances of this case, the Court finds that the probative value of the evidence that union members were upset by ICTSI filing lawsuits against the ILWU or its Locals is substantially outweighed by its potential unfair prejudice to ICTSI and confusion of the issues.

### w. Motion No. 23: Evidence and argument regarding how the ILWU Entities would pay any judgment. GRANTED

The ILWU Entities assert that they do not intend to suggest to the jury that "individual members" would ultimately have to pay a judgment awarded to ICTSI. They also may not discuss how the ILWU Entities themselves might pay any judgment. Similarly, ICTSI may not discuss or present evidence regarding how the ILWU Entities or individual members would pay a judgment.[10]

The ILWU Entities continue, however, discussing that the pleading filed by ICTSI requesting more than $101 million in damages caused fear among union members that they would lose the protection of the union and this created low morale in union members. This is beyond the scope of ICTSI's motion, but the Court addresses it on the merits. ILWU members will not be able to discuss the fact that the amount of damages requested in this lawsuit was so high that it caused union members to fear that the union would not be able to pay a damage award and would ultimately cause them to lose the protections provided by the union. To the extent the ILWU Entities want to introduce testimony regarding the amount of the lawsuit and its

---

[10] The parties also discuss ICTSI's trial exhibit 102, but objections to exhibits will be resolved at a later date.

effect on morale, which in turn caused low productivity, it is excluded for the reasons discussed in Motion *in Limine* No. 22.

x.   **Motion No. 24: Evidence and argument regarding legal rights and principles about which the jury not instructed. DENIED WITH LEAVE TO RENEW AT TRIAL.**

ICTSI moves to exclude witnesses and counsel from presenting or arguing legal rights or principles to the jury beyond the legal instructions given by the Court. ICTSI argues that "[i]t is well settled . . . that the judge instructs the jury in the law," *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1983), and thus others who present or argue legal principles are invading the exclusive province of the judge. Although the Court agrees that it alone is responsible for instructing the jury on the law, the Court will not rule on such a broad exclusionary motion in a vacuum. ICTSI may object at trial if it believes a question calls for an improper legal opinion, or if testimony or attorney argument is invading the "exclusive province" of the judge to instruct the jury on the law.

y.   **Motion No. 25: Examples or incidents beyond the scope of Interrogatory Nos. 6, 8, 9, and 13. DENIED.**

The Court denied ICTSI's motion to compel a more complete response to these interrogatories. The Court found that ILWU's responses were sufficient for ICTSI to understand the activities and communications on which ILWU was relying, and held that the ILWU did not need to go "through five years of interactions and identify[] every specific action of purported primary conduct by date and time." *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 2018 WL 6305665, at *12 (D. Or. Dec. 3, 2018). ICTSI's motion *in limine* seeks to exclude evidence from trial anything that was not specifically disclosed in ILWU's interrogatory responses, as a Rule 37 sanction for ILWU's purported failure to respond to these interrogatories

in a complete manner. This is contrary to the Court's denial of ICTSI's motion to compel.

ICTSI's motion is denied.

     **z.**       **Motion No. 26: Evidence and argument that was within the topics listed on ICTSI's 30(b)(6) notice to Local 8. DENIED WITH LEAVE TO RENEW.**

Because the Court has allowed the reopening of the Rule 30(b)(6) depositions on certain

topics, the Court denies this motion. ICTSI has leave to renew this motion after the re-opened

depositions if ICTSI believes that the designated witness failed to comply with the Court's

Orders resolving the Parties' discovery disputes or the Court's Opinion and Order on ICTSI's

motion for sanctions.

     **aa.**     **Motion No. 27: Lay witnesses from the courtroom. (Unopposed). GRANTED.**

     **bb.**     **Motion No. 28: Evidence and argument relating to the parties' law firms or their respective size, or their association with any other party. GRANTED.**

     **cc.**     **Motion No. 29: Any "Golden Rule" argument or that the jury should put themselves in the positions of any party. GRANTED.**

No party submitted argument relating to this motion. Nonetheless, the Court does not

permit "golden rule" arguments, in which counsel or witnesses encourage the jury to put

themselves in the position of a party and render the verdict the jurors would want if they were in

that party's position.

**dd.**      **Motion No. 30: Argument during jury selection or opening statement. (Unopposed). GRANTED.**

**ee.**      **Motion No. 31: Addressing jurors individually except during *voir dire*. (Unopposed). GRANTED.**

**ff.**      **Motion No. 32: Evidence and argument that any party is covered by insurance. (Unopposed). GRANTED.**

**gg.**      **Motion No. 33: Argument from counsel suggesting personal knowledge of the facts or giving opinion of the testimony, facts, credibility of the witnesses, or justice of the case. GRANTED.**

**hh.**      **Motion No. 34: Speaking objections. GRANTED.**

**ii.**      **Motion No. 35: Evidence that was not disclosed in discovery being used for impeachment unless it is first discussed outside the presence of the jury. RULING RESERVED FOR TRIAL.**

**jj.**      **Motion No. 36: Requiring counsel to instruct witnesses not to discuss items precluded based on the Court's rulings on the motions *in limine*, unless specifically allowed by the Court. (Unopposed). GRANTED.**

**2.**      **ILWU Entities' Motions *in Limine* (ECF 407):**

**a.**      **Motion No. 3: Witness opinions regarding previous adjudications and briefing, as well as the previous adjudications and briefings themselves. GRANTED IN PART, RESERVED IN PART.**

The ILWU Entities move to exclude witness opinions regarding briefs filed relating to the related adjudications to this matter and the court or administrative opinions issued in those matters. The ILWU Entities argue that witness testimony about briefing and the previous rulings is improper lay opinion, irrelevant, and improper under Rule 403. The ILWU Entities also move to exclude the briefs and opinions themselves. They argue that these documents are inadmissible hearsay under Rules 801 and 802 and inadmissible under Rule 403. The ILWU Entities cite to *United States v. Sine*, which held that a federal court's preliminary injunction and contempt orders were inadmissible hearsay and unduly prejudicial. 493 F.3d 1021, 1034, 1036-37 (9th Cir. 2007).

Regarding hearsay, the Ninth Circuit stated:

The concern about evidence that is neither based on personal knowledge nor subject to cross-examination, which explains an ultimate judgment's treatment as hearsay, is even more pronounced when dealing with statements that recapitulate in detail others' testimony and declarations. We therefore agree with the Fourth, Tenth, and Eleventh Circuits that judicial findings of facts are hearsay, inadmissible to prove the truth of the findings unless a specific hearsay exception exists.

*Id.* at 1036 (citation omitted).

Regarding undue prejudice, the court stated:

Although we have not previously addressed the question, other federal circuit courts have held that the use as evidence of facts as found in a judicial opinion can unfairly prejudice a party. Of particular relevance is the Fourth Circuit's review of a civil trial in which "[p]ortions of the findings of fact" from a previous civil lawsuit between the same parties "were read to the jury by plaintiffs' counsel during the direct examination of [a plaintiff]. The portions of [the judge's] order that plaintiffs' counsel read to the jury repeatedly referred to factual findings of misrepresentations made by [the defendant], [his] failure to disclose material information, and [his] participation in a civil conspiracy, as well as findings that [his wife] had knowingly filed false affidavits in the case." The Fourth Circuit held the admission of these findings over the defendant's objection erroneous and reversed the jury's verdict based on the prejudice produced by the evidence.

As one of its grounds for reversal, the Fourth Circuit held that "[i]n circumstances similar to those in this case such evidence should be excluded under [Rule] 403. This is because judicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.'" The Eleventh Circuit has ruled similarly.

Our determination that reference to facts found in a judicial opinion can unfairly prejudice a party does not mean that admission of such facts will *always* fail the balancing test of Rule 403. Such a holding would be inconsistent with courts' "increasing reluctance to reject *in toto* the validity of the law's factfinding processes outside the confines of res judicata and collateral estoppel," which was noted, with approval, by the drafters of the Federal Rules of Evidence. In this case, however, the nature of the facts found and comments made by Judge Carr—

> directly opining on Sine's motivations and truthfulness, thereby implicating Sine's overall credibility as a witness—heavily weighs on the unfair prejudice side of the balance.

*Id.* at 1034 (alterations and emphasis in original) (citations omitted).

The ILWU Entities argue that in addition to being inadmissible hearsay, similar to *Sine*, the opinions from the previous adjudications submitted as exhibits in this case contain numerous findings relating to witness credibility, which increases the potential prejudice to the ILWU Entities. The ILWU Entities also argue that the opinions are dense and complicated and will confuse the jury. The ILWU Entities further argue that the opinions are cumulative because the Court will instruct the jury on the factual issues and conclusions it finds qualify for issue preclusion.

ICTSI argues that the previous legal opinions by the Court and the NLRB are not hearsay because they are "legally operative verbal conduct." ICTSI cites to *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) (finding that checks are not hearsay because they are "out-of-court statements that are offered as evidence of legally operative verbal conduct"), and *United Sates v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004) ("A prior judgment is not hearsay . . . to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties."). ICTSI asserts that the prior Court and NRLB decisions established legal obligations of the ILWU Entities'—that they could not engage in unlawful labor practices, that they must provide notice of the injunction, and that they had been held in contempt.

ICTSI also argues that these documents are not hearsay because they are not offered for the truth of the matter asserted but instead for the effect on the parties. ICTSI asserts that the jury may draw inferences from the fact that production remain depressed even after each decision was issued that held that the ILWU Entities instigated, supported, ratified, encouraged, authorized, participated in, directed, or condoned ongoing illegal job actions with an object of obtaining the

reefer jobs. ICTSI argues that these decisions are also relevant to the ILWU Entities' arguments that ICTSI was unreasonable in enforcing its contractual rights when confronted with work stoppages, safety gimmicks, and slowdowns and ICTSI's reasonableness in pursuing its legal remedies and self-help in an attempt to mitigate the harm caused by the ILWU Entities' illegal conduct. ICTSI further argues that the legal opinions qualify as a "public records" hearsay exception under Rule 803(8). ICTSI cites to *Beech Aircraft Corp. v. Rainey* to argue that opinions and conclusions are admissible under this exception so "long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." 488 U.S. 153, 170 (1988).

ICTSI also argues that the Court should reject the ILWU Entities' Rule 403 argument. ICTSI asserts that the opinions are highly probative because they are integral to the history of the dispute and tend to prove on an ongoing basis the involvement of the ILWU Entities in the conduct. ICTSI also argues that the opinions demonstrate that the ILWU Entities "acted with impunity even when under injunction" and thus tend to rebut the ILWU Entities' argument that ICTSI could have increased production by asking nicely. ICTSI further argues that the ILWU Entities' complaint of prejudice because their witnesses were repeatedly found not to be credible is not "prejudice" but is permissible because a jury can consider this type of factor bearing on credibility. ICSTI further asserts that the "dense procedural and legal analysis" of the opinions will not confuse the jury because it will be consistent with what the jury will be instructed and given the volume of evidence the jury will have, it is unlikely the jury will "delve into" this portion of the opinions unless specifically invited.

Finally, ICTSI argues that these opinions are not cumulative to the specific facts and conclusions for which ICTSI requests the Court instruct the jury based on issue preclusion.

ICTSI argues that the opinions are being offered for more than just their specific findings, including that they create an inference that based on the ILWU Entities' actions and inactions in response to each opinion, the ILWU Entities continued to call for, instigate, support, encourage, authorize, participate in, direct, condone, or ratify work stoppages, slowdowns, and safety gimmicks in pursuit of the reefer jobs.

The Court is admitting through issue preclusion the facts and conclusions from the previous legal opinions that the Court finds to be subject to preclusion, not cumulative, and not unduly prejudicial. The Court finds that the opinions themselves are cumulative and unduly prejudicial.[11] The probative value of the ILWU Entities' actions and inactions in response to the various legal opinions can be presented through alternate means, such as Court instructions conveying the court or administrative body that issued the opinion, the date, and the facts and conclusions the Court is admitting through issue preclusion. For similar reasons the Court also excludes the briefing related to these opinions.[12]

The Court reserves ruling, however, on witness testimony relating to the previous adjudications. Witnesses simply opining about whether the legal opinions were legally correct or incorrect is irrelevant and inadmissible lay opinion. Witnesses discussing whether they were aware of the opinions and how they reacted to the opinions may, however be relevant.

**b.** **Motion No. 4: Statements made during settlement discussions. GRANTED IN PART.**

The Court excludes statements made during settlement discussions between the Port and the ILWU Entities that resulted in the settlement agreement between the Port and the ILWU. The

---

[11] The Court thus does not reach the ILWU Entities' hearsay objection.

[12] The ILWU Entities move to exclude the briefs, and that motion is granted. The Court notes, however, that no briefs were submitted as trial exhibits.

Court similarly excludes any settlement discussions between ICTSI and the ILWU Entities. The Court, as discussed above in ICTSI's Motion *in Limine* No. 5, does not find the meeting with Governor Kitzhaber and the resulting agreement involving the Port, the DCTU, and the IBEW, to be a settlement discussion covered under Rule 408. Accordingly, discussions before, at, and after that meeting are not included in this Order. Similarly, it appears that the parties met with Oregon Governor Kate Brown, and the Court finds that meeting not to be a settlement meeting covered by Rule 408.

Additionally, ICTSI notes that it intends to offer evidence of a meeting between Robert McEllrath, then-President of the ILWU, and Elvis Ganda of ICTSI, to discuss "how to put an end" to the disputes at Terminal 6. In the meeting, Mr. McEllrath purportedly told Mr. Ganda that if ICTSI dropped the lawsuits, Terminal 6 would have the "best productivity on the west coast." Mr. Ganda did not believe Mr. McEllrath and told him that ICTSI would need something in writing. Mr. McEllrath responded that he would discuss it with the union membership and get back to Mr. Ganda, although Mr. McEllrath never followed up. The ILWU Entities argue that this discussion is covered by Rule 408 as a settlement negotiation. The Court agrees.

The offer of providing the "best productivity on the west coast" in exchange for ICTSI dropping its lawsuit was an offer of something of value (increased productivity beyond normal expectations) in exchange for dropping the lawsuit. The Court disagrees with ICTSI's characterization that this offer by Mr. McEllrath was a threat. Mr. McEllrath did not threaten retaliation for failing to drop the lawsuits or make any implied threats of reduced productivity. Mr. McEllrath may have made an aspirational promise (the best productivity on the west coast), that would have been difficult to memorialize and enforce, but that doesn't make it an implied

threat of continued illegal labor actions. Accordingly, the discussion between Mr. McEllrath and Mr. Ganda is excluded.

### c. Motion No. 5: Evidence regarding other disputes and the ILWU's departure from the AFL-CIO. DENIED IN PART, RESERVED IN PART.

The ILWU Entities move to exclude any reference to lawsuits and legal proceedings other than those arising out of the reefer dispute at the Port of Portland. The ILWU Entities argue that such evidence is improper "character" evidence under Rule 404 and unduly prejudicial under Rule 403. The ILWU Entities assert in this motion similar arguments that ICTSI asserted in its Motion *in Limine* Nos. 19 and 20 as to why the Court should exclude evidence of other disputes involving ICTSI. As with those motions, the Court does not consider this to be character evidence but analyzes these issues under Rules 402 and 403.

ICTSI argues that other jurisdictional disputes are relevant because they were part of a coastwide campaign. Mr. McEllrath testified that the reefer dispute would "bleed up and down the whole entire West Coast." Thus, asserts ICTSI, the reefer dispute was interrelated with other jurisdictional disputes by intent and a common plan. ICTSI also contends that the other jurisdictional disputes occurred during approximately the same timeframe, are similar in nature, and that ICTSI can present evidence that the ILWU Entities engaged in other similar jurisdictional disputes as part of their coastwide strategy.

ICTSI cites to *Silverman v. Local 3 Int'l Bhd. of Elec. Workers*, 1981 WL 2234 (S.D.N.Y., Dec. 23, 1981). The court in *Silverman* admitted evidence under Rule 404(b) as tending to establish that the union had a "total job" policy when it was competing with another union for jurisdiction of jobs. *Id.* at *4. The court stated:

> The evidence is relevant to show a uniform practice and policy in furtherance of respondent's total job philosophy; as the Board contends and as the history of various litigations reflects, at different sites in the Metropolitan area where [the other union's]

members were engaged in telephone installation work, respondent and its members pursued a persistent and recurrent pattern of conduct in the enforcement of its total job policy which resulted in strikes or stoppages and other conduct proscribed by the Act. There is no indication that respondent would alter this pattern of conduct if the occasion were to again arise. Indeed, our own Court of Appeals has deemed evidence of respondent's activities at other job sites relevant on the issue of the scope of relief to be granted. The evidence with respect to respondent's activities at [the other job site] indicates its agents, representatives and members were engaged in the same acts and conduct that occurred at [the pending litigation job site] in seeking to enforce their total job policy.

*Id.* (footnotes omitted).

The ILWU Entities respond that ICTSI fails to identify with sufficient specificity the other acts it intends to offer. The ILWU Entities argue that identifying a broad category of "jurisdictional disputes" is too vague. The ILWU Entities also argue that the other disputes are not relevant because they involve other parties, other unions, different ports, different legal theories, different time periods, and different disputes, and thus do not help to show the ILWU Entities' motive in this case. The ILWU Entities contend that the only evidence of the purported "common plan" is one comment by Mr. McEllrath that if the PCL&CA was not enforced at Terminal 6 it would undermine the contract as a whole and affect the entire coast.

Additionally, the ILWU Entities argue that *Silverman* is inapposite because it involved consideration of similar labor actions, not legal proceedings, by the same local union against the same employer in the same metropolitan area, related to the same provision in the union's bylaws when ruling on an NLRB petition for injunctive relief. The ILWU Entities also note that in *Silverman* the evidence was considered for the purpose of determining the scope of the injunction, not liability.

Finally, the ILWU Entities argue that even if evidence of unknown legal proceedings is relevant, it should be excluded under Rule 403. The ILWU Entities argue that it would require

time-consuming mini-trials on issues unrelated (or tangentially related) to questions the jury will decide, which is wasteful, unduly prejudicial, and confusing to the jury.

The Court has resolved discovery disputes between the parties involving the ILWU's jurisdictional disputes in other ports. The Court found they were relevant. In the most recent discovery dispute, the ILWU identified 25-50 jurisdictional disputes that resulted in formal complaints, which is all that the Court ordered be produced. Accordingly, the universe of these other jurisdictional disputes does not appear to be very large. At this time, the Court accepts ICTSI's representations that it has evidence to link the jurisdictional disputes it intends to offer as part of the ILWU Entities' motivation or coastwide "campaign" or plan. This is relevant to the ILWU Entities' motivation to continue its alleged illegal secondary conduct at Terminal 6 after August 13, 2013. The Court thus denies the ILWU Entities' motion based on Rule 402, with leave to renew if ICTSI does not present the evidence as represented. Regarding Rule 403, the Court reserves ruling until the pretrial conference or trial to assess the probative values of the specific evidence offered.

The ILWU Entities also move to exclude evidence regarding the ILWU's departure from the AFL-CIO. The ILWU Entities provided no argument or discussion in their motion on this issue, and simply attached as an exhibit the ILWU's letter to the AFL-CIO. The ILWU Entities, however, offered argument in their reply brief. The Court provided ICSTI with the chance to respond at oral argument.

Regarding the ILWU's departure from the AFL-CIO, the ILWU Entities argue that it is irrelevant because the ILWU left the AFL-CIO for reasons unrelated to the dispute at Terminal 6. ICTSI responds that the ILWU left the AFL-CIO the day before a scheduled mediation to be conducted by the AFL-CIO between the ILWU and the IBEW to settle the reefer dispute. This is

circumstantial evidence that the reefer dispute was related to the departure. Although the ILWU Entities deny this reason, it is for the jury to decide what reason is credible. This portion of the motion is denied.

      **d.**    **Motion No. 6: Evidence and testimony disputing previously adjudicated facts found in favor of the ILWU Entities. GRANTED IN PART.**

The ILWU Entities move to exclude any evidence or argument disputing two facts previously adjudicated in favor of the ILWU Entities. The first proposed fact is that Local 40 did not engaged in any job actions or slowdowns from June 11, 2012 to August 13, 2013, with an object of obtaining the reefer work. This is no longer relevant now that Local 40 will be dismissed with prejudice from the case. This part of the motion is denied as moot.

The second proposed fact is that Local 8 crane operators did not engage in slowdowns by arriving late to their assigned cranes. ALJ Wedekind found that from September 2012 to June 2013, the late arrival of crane operators was not proven by a preponderance of the evidence to be part of the slowdowns. 2015 NLRB LEXIS 870 at *29-30. ALJ Wedekind noted that late arrivals by crane operators had been documented before June 2012 and improved significantly after ICTSI requested Local 8's help in resolving the problem in November 2012. *Id.* at *30. Accordingly, this portion of the motion is granted, with dates added, that Local 8 crane operators did not engage in slowdowns from September 2012 to June 2013 by arriving late to their assigned cranes. ICTSI may not offer evidence contrary to these facts.

e.    **Motion No. 8: Evidence and argument regarding statements made by the ILWU in or related to administrative or court proceedings. DENIED.**

The ILWU Entities argue that the *Noerr-Pennington*[13] doctrine requires the Court to exclude evidence, testimony, and argument regarding statements made by the ILWU, its Locals, or their agents in or related to court or administrative agency proceedings. The ILWU Entities argue that although ICTSI is not arguing that the ILWU Entities' use of litigation or threatened litigation or statements about litigation (First Amendment petition activities) was itself wrongful, ICTSI is using such evidence to support its claim of liability and thus *Noerr-Pennington* is implicated.

The First Amendment to the United States Constitution guarantees the right "to petition the Government for a redress of grievances." U.S. Const. Amend. I, cl. 6. To make the Petition Clause meaningful, the Supreme Court, through the *Noerr-Pennington* doctrine, ensures parties are immune from antitrust, statutory, or tort liability "for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (describing immunity from antitrust liability); *see also BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002) (applying *Noerr-Pennington* to the NLRA). Importantly, the immunity extends to protect "conduct intimately related to . . . petitioning activities" in order "to preserve the breathing space required for the effective exercise of the rights it protects." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933-34 (9th Cir. 2006). The question, then, is whether allowing evidence of the ILWU Entities' conduct in

_____

[13] The *Noerr-Pennington* doctrine comes from *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

participating in or discussing the administrative and court proceedings would "impair the right of access to the courts protected by the First Amendment." *Id.* at 936.

Contrary to the ILWU Entities' assertion, the mere fact that a party or witness discusses a legal proceeding or testifies at a legal proceeding does not mean that if those discussions or that testimony is later used against the party or the witness *Noerr-Pennington* is automatically implicated. To so hold would eviscerate the doctrine of impeachment through previously-sworn statements. If ICSTI were alleging that the ILWU Entities were liable for their conduct in the various adjudications, *Noerr-Pennington* would be directly implicated. The ILWU Entities argue, however, that the doctrine is indirectly implicated because ICTSI relies on the ILWU Entities' statements relating to litigation conduct in support of ICTSI's liability allegations, even though liability is not based on litigation-relation conduct.

The normal context for whether conduct is intimately related to petitioning activities is whether the alleged conduct for which the plaintiff seeks to hold the defendant liable is conduct that is sufficiently related to petitioning to support application of *Noerr-Pennington*. For example, in *Sosa*, the plaintiff was asserting liability based on pre-litigation settlement demand letters. 437 F.3d at 935. The Ninth Circuit considered whether pre-suit demand letters were sufficiently connected to petitioning activities to warrant protection under *Noerr-Pennington* and concluded that they were. *Id.* at 935-37. Here, the conduct for which ICTSI seeks to hold the ILWU Entities liable is work stoppages and slow downs with an improper purpose (secondary boycott activities). Such conduct is not sufficiently related to petitioning activities. The ILWU Entities argue, however, that the evidence on which ICTSI intends to rely to prove this underlying conduct or to impeach witnesses' credibility implicates the *Noerr-Pennington* doctrine. The ILWU Entities do not cite any authority for the proposition that conduct that does

not form (even in part) the basis of the underlying claim for relief but is merely relevant evidence to help prove the underlying conduct, is subject to *Noerr-Pennington*. The Court declines to so extend the doctrine. The doctrine is designed to prevent liability for *engaging in* petitioning conduct (or conduct sufficiently related to petitioning), not to exclude such conduct from use in litigation for all purposes.

The ILWU Entities propose a jury instruction related to their filing of complaints or grievances and the "sham" exception to *Noerr-Pennington*. *See* Proposed Instr. No. 18, ECF 388 at 22. This proposed jury instruction does not appear to be a limiting instruction relating to how the jury may consider evidence of statements made in the adjudications or about the adjudications, but only relates to the ILWU Entities' filing of grievances. If the ILWU Entities propose a limiting instruction for the jury on the proper use of evidence relating to petitioning activities, consistent with the Court's opinion in this Motion *in Limine*, the Court will consider it.

## CONCLUSION

The parties' remaining motions *in limine* (ECF 385 and 407) are resolved as stated in this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 17th day of April, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge