**Jeffrey S. Eden**, OSB #851903
Email: jeden@schwabe.com
**Amanda T. Gamblin,** OSB #021361
Email: agamblin@schwabe.com
**Michael T. Garone**, OSB #802341
Email: mgarone@schwabe.com
**Richard K. Hansen**, OSB #832231
Email: rhansen@schwabe.com
**Andrew J. Lee**, OSB #023646
Email: ajlee@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Facsimile:  503-796-2900

*Of Attorneys for ICTSI Oregon, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ICTSI OREGON, INC.,** an Oregon corporation**,** <br><br> Plaintiff, <br><br> vs. <br><br> **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION** and **ILWU LOCAL 8,** <br><br> Defendants. | No. 3:12-cv-01058-SI <br><br> **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR** <br><br> Judge: Hon. Michael H. Simon <br> Hearing Date: February 14, 2020 |

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

**TABLE OF CONTENTS**

I.    Introduction ................................................................................. 1

II.   Standards .................................................................................... 2

    A.    Renewed motion for judgment as a matter of law ......................... 3

    B.    Motion for new trial ...................................................... 4

    C.    Remittitur.................................................................. 5

III.  This Court should reject defendants' foundational contention that it "should disregard evidence that [was] admitted at trial[.]" .................................... 6

    A.    Defendants' evidentiary arguments must clear two hurdles—preservation and the law of the case doctrine. ................................ 7

    B.    Defendants failed to raise timely most of their evidentiary objections and lost the rest........................................................ 8

IV.  This Court should not displace the jury's verdict on the issue of liability............. 10

    A.    The jury did not clearly err in finding that defendants engaged in unlawful secondary conduct, as proven by substantial evidence. ............... 12

    B.    Because the evidence showed defendants' claimed motive was pretextual or only part of a "mixed motive," the jury did not clearly err in rejecting defendants' claim of lawful, primary conduct.................... 16

        1.    Retaliation ......................................................... 18

        2.    Open-contract period....................................................... 22

        3.    Defendants' credibility issues ....................................... 25

V.   This Court should not displace the jury's verdict on the issue of causation. ......... 28

VI.  This Court should not displace the jury's verdict on damages. ........................... 32

    A.    This Court can reject defendants' Rule 50(b) argument on damages out of hand because, even setting Mr. Sickler's opinions aside, the jury had significant evidence before it regarding damages........................ 33

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

B.     This Court should reject defendants' arguments about the admissibility and weight of Mr. Sickler's models, which were based on assumptions that were consistent with substantial evidence. ................ 36

     1.     Separability by cause ......................................................... 38

     2.     "Causal nexus" to Dr. Ward's testimony ......................... 39

     3.     Volume changes .............................................................. 41

     4.     Price changes ................................................................... 47

     5.     Capital expenditures for environmental remediation ...................... 52

     6.     Hanjin's bankruptcy ........................................................ 53

     7.     Out-of-pocket expenses ................................................... 57

C.     Taking all inferences in ICTSI's favor, the jury had ample evidence to award *more than* $93.6 million in damages, even if this Court were to accept discrete arguments by defendants. ...................................... 59

VII.     Conclusion ............................................................................... 62

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

## TABLE OF AUTHORITIES

### Cases

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
No. SACV 12-00572 JVS (Ex), 2013 U.S. Dist. LEXIS 190005 (C.D.
Cal. Nov. 21, 2013 ........................................................................................ 31

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 62

*Armisted v. State Farm Mut. Auto. Ins. Co.*,
675 F.3d 989 (6th Cir. 2012) ......................................................................... 5

*Ayissi-Etoh v. Fannie Mae*,
712 F.3d 572 (D.C. Cir. 2013) ..................................................................... 11

*Baetge-Hall v. Am. Overseas Marine Corp.*,
624 F. Supp. 2d 148 (D. Mass. 2009) .......................................................... 25

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ......................................................................... 8

*Chavez v. City of Albuquerque*,
640 F. Supp. 2d 1340 (D.N.M. 2008) ............................................................ 5

*Children's Broad. Corp. v. Walt Disney Co.*,
357 F.3d 860 (8th Cir. 2004) ....................................................... 37, 42, 47, 52

*Christianson v. Colt. Indus. Operating Corp.*,
486 U.S. 800 (1988) ....................................................................................... 8

*Coach, Inc. v. Celco Customs Servs. Co.*,
No. CV 11-10787 MMM, 2014 U.S. Dist. LEXIS 201038 (C.D. Cal.
June 5, 2014) .................................................................................................. 7

*D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
692 F.2d 1245 (9th Cir. 1982) ................................................................... 6, 61

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996) ......................................................................... 5

*Easley v. Cromartie*,
532 U.S. 234 (2001) ....................................................................................... 5

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*Emery v. Premo*,
No. 6:14-cv-00285-SI, 2015 U.S. Dist. LEXIS 118897 (D. Or. Sept. 8, 2015) ................................................................................................. 7

*Farley Transportation Co. v. Santa Fe Trail Transportation Co.*,
786 F.2d 1342 (9th Cir. 1985) ............................................................. 37, 38

*Fenner v. Dependable Trucking Co.*,
716 F.2d 598 (9th Cir. 1983) ............................................................... 6, 61

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) ..................................................................... 5

*Frito-Lay, Inc. v. Local Union No. 137*,
623 F.2d 1354 (9th Cir. 1980) ................................................................. 58

*Geske & Sons v. NLRB*,
103 F.3d 1366 (7th Cir. 1997) ................................................................. 11

*Greisen v. Hanken*,
252 F. Supp. 3d 1042 (D. Or. 2017), *aff'd*, 925 F.3d 1097 (9th Cir. 2019) ..................................................................................................... 6

*Hall v. City of Los Angeles*,
697 F.3d 1059 (9th Cir. 2012) ................................................................... 7

*Handgards, Inc. v. Ethicon, Inc.*,
743 F.2d 1282 (9th Cir. 1984) ............................................................. 51, 52

*Hooks v. ILWU*,
72 F. Supp. 3d 1168 (D. Or. 2014) .................................................... 12, 19

*IBEW v. NLRB*,
341 U.S. 694 (1951) ................................................................................. 19

*ILWU Local 8*,
2015 NLRB LEXIS 870, 363 NLRB No. 47 (NLRB Nov. 30, 2015) ........................ 19

*Int'l Longshore & Warehouse Union v. NLRB*,
705 F. App'x 3 (D.C. Cir. 2017) .............................................................. 19

*Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB*,
781 F.2d 919 (D.C. Cir. 1986) ................................................................. 20

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**     SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*Intel Corp. v. Terabyte Int'l, Inc.,*
  6 F.3d 614 (9th Cir. 1993) ................................................................. 42

*International Longshore and Warehouse Union,*
  2015 NLRB LEXIS 729, 363 NLRB No. 12 (NLRB Sept. 25, 2015) ........................ 20

*Jerden v. Amstutz,*
  430 F.3d 1231 (9th Cir. 2005) ............................................................. 10, 47

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
  791 F.2d 1356 (9th Cir. 1986) ............................................................. 59

*Laffey v. Nw. Airlines, Inc.,*
  740 F.2d 1071 (D.C. Cir. 1984) ............................................................ 7

*Lakeside-Scott v. Multnomah Cty.,*
  556 F.3d 797 (9th Cir. 2009) .............................................................. 3

*Landes Const. Co. v. Royal Bank of Canada,*
  833 F.2d 1365 (9th Cir. 1987) ............................................................. 4, 5, 32

*Laro Maint. Corp. v. NLRB,*
  56 F.3d 224 (D.C. Cir. 1995) .............................................................. 11, 20

*Layne Christensen Co. v. Bro-Tech Corp.,*
  871 F. Supp. 2d 1104 (D. Kan. 2012) ...................................................... 10

*Marbled Murrelet v. Babbitt,*
  83 F.3d 1060 (9th Cir. 1996) .............................................................. 7

*McKenzie-Willamette Hosp. v. PeaceHealth,*
  No. 02-6032-HA, 2004 U.S. Dist. LEXIS 21050 (D. Or. Sep. 30, 2004) .................... 6

*Mead v. Retail Clerks Int'l Ass'n,*
  523 F.2d 1371 (9th Cir. 1975) ............................................................. 32, 35

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
  379 F. Supp. 2d 348 (S.D.N.Y. 2005) ...................................................... 56

*Mobile Mech. Contractors Ass'n v. Carlough,*
  664 F.2d 481 (5th Cir. 1981) .............................................................. 19

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    No. 14-cv-00722-SI, 2016 U.S. Dist. LEXIS 53734 (N.D. Cal. Apr. 21,
    2016) .................................................................................................. 38

*National Woodwork Mfrs. Ass'n v. NLRB*,
    386 U.S. 612 (1967) ......................................................................... 20

*NLRB v. Pipefitters*,
    429 U.S. 507 (1977) ......................................................................... 20

*Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*,
    866 F.2d 228 (7th Cir. 1988) ............................................................. 4

*Paulo v. Holder*,
    669 F.3d 911 (9th Cir. 2011) ........................................................... 18

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
    2011 U.S. Dist. LEXIS 133502, 2011 WL 5417090 (N.D. Cal. Oct. 27,
    2011) .................................................................................................. 53

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000).............................................................................. 3

*Shattuck Denn Mining Corp. (Iron King Branch) v. NLRB*,
    362 F.2d 466 (9th Cir. 1966) ........................................................... 27

*Silver Sage Partners, LTD v. City of Desert Hot Springs*,
    251 F.3d 814 (9th Cir. 2001) ....................................................... 33, 49, 61

*Skydive Ariz., Inc. v. Quattrochi (Skydive I)*,
    704 F. Supp. 2d 841 (D. Ariz. 2010), *rev'd in nonpertinent* part, 673
    F.3d 1105 (9th Cir. 2012)................................................................... 39

*Skydive Ariz., Inc. v. Quattrochi (Skydive II)*,
    673 F.3d 1105 (9th Cir. 2012) ............................................. 39, 41, 47, 52

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)......................................................................... 35

*Tennant v. Peoria & P. U. Ry. Co.*,
    321 U.S. 29 (1944).......................................................................... 2, 62

*Texas Distribs., Inc. v. Local Union No. 100*,
    598 F.2d 393 (5th Cir. ...................................................................... 21

ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*Union Oil Co. v. Terrible Herbst, Inc.*,
  331 F.3d 735 (9th Cir. 2003) ........................................................... 6

*United States v. Various Gold, Silver & Coins*,
  No. 3:11-cv-01179-SI, 2014 U.S. Dist. LEXIS 65139 (D. Or. May 12,
  2014), *aff'd*, 670 F. App'x 624 (9th Cir. 2016) ........................................ 4

*Wallace v. City of San Diego*,
  479 F.3d 616 (9th Cir. 2007) ........................................................... 3

*Warshawsky & Co. v. NLRB*,
  182 F.3d 948 (1999) .................................................................. 11

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000) ................................................................... 7

*Williams v. Gaye*,
  895 F.3d 1106 (9th Cir. 2018) ........................................................ 53

## Statutes

29 U.S.C. § 158 ........................................................................ 19

29 U.S.C. § 187 ........................................................................ 19

## Other Authorities

John E. Higgins, Jr., *The Developing Labor Law* (7th Ed. 2017) ....................... 20

Fed. R. Civ. P. 30(b)(6) ............................................................... 23

Fed. R. Civ. P. 50 ............................................................... 1, 3, 11

Fed. R. Civ. P. 50(b) .............................................................. 33, 35

Fed. R. Civ. P. 59 ........................................................... 4, 10, 16, 18

Fed. R. Civ. P. 103 ................................................................... 10

Fed. R. Civ. P. 401 ................................................................... 31

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

I.    **Introduction**

Even at the highest level, defendants' posttrial motions strain credulity.  Their

failure to move for summary judgment or even write up their Rule 50 motions at trial

betrays that their arguments were for the jury to resolve.  That jury, this Court saw, was

sophisticated, attentive, and insightful.  Ultimately, it did not agree completely with

*either party*, awarding tens of millions of dollars less than ICTSI Oregon, Inc. sought.

The jury rejected defendants' arguments on liability and causation.  This Court

should too.  After threatening to destroy ICTSI's business, defendants did just that.  The

totality of evidence was so clear that, with the jury excused, this Court remarked that "it

looks to me like a damages case, not a liability case."  (R. Tr. 10/30/19 at 279:18.)

Defendants' election posttrial to reargue the facts of liability and causation all but shouts

their knowledge that even their remittitur argument is meritless.

The jury weighed substantial evidence about damages—so much that its

$93.6 million verdict defies defendants' attempt to reverse engineer it.  Did the jury

construct its own damages analysis?  It had sufficient evidence, including (a) volume

growth (as a function of market share and population growth within the catchment basin

plus unrealized new calls from carrier APL to export 1,000 containers per week); (b) per

container pricing; (c) marginal per unit costs before and after the unlawful conduct; and

(d) out-of-pocket costs (including equipment purchases made in response to hardtiming

from the reefer dispute and the lease buyout).  The jury also had Jay Sickler's models.

But which one did it use?  Or was it a hybrid?  And from there, on what basis did the jury

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

adjust his figures?  Were there only deductions?  Or were there offsetting increases based on evidence the jury received that differed from Mr. Sickler's conservative models?

Only able to speculate about *how* the jury calculated damages, defendants mostly resort to overreaching attacks on Mr. Sickler's opinions of the sort that this Court rejected pretrial.  (Op. & Order on Mots. Challenging Exp. Testimony [Dkt. 464]); Minutes of Rule 104 Hearing [Dkt. 475].)  But defendants waived most of the evidentiary issues they now raise, and where they obtained rulings, those rulings are now the law of the case. Ultimately, defendants' remittitur motion is futile because, taking all inferences in ICTSI's favor and calculating the maximum amount sustainable by the proof—as this Court must for purposes of remittitur—leaves amounts *greater than* the jury's verdict.

Below, ICTSI sets forth the standards for posttrial motions, none of which aids defendants.  ICTSI next establishes that, under controlling Ninth Circuit authority, defendants' evidentiary objections fail, even when framed as "substantial evidence" arguments.  ICTSI then establishes why, for each element—liability, causation, and damages—defendants cannot evade the jury's verdict by posttrial motion.

As shown below, this Court should uphold the jury's verdict, which would fairly compensate ICTSI for the loss of its growing and profitable business.

## II.    Standards

"The very essence of [a jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable."  *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944).  Civil procedure respects that function.

Page 2        **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

### A.    Renewed motion for judgment as a matter of law

A Rule 50 motion must be denied if "plaintiff has presented sufficient evidence to support the jury's conclusion." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). The Court views all evidence in the light most favorable to and draws all reasonable inferences in favor of the nonmoving party. *Id.* An inference is reasonable "when it may be drawn from the evidence without resort to speculation" and, unlike a "threadbare conclusory statement," it arises from "significant probative evidence." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009) (citation and quotation marks omitted).

Defendants mistakenly suggest that *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000), allows the Court to credit defendants' evidence over plaintiff's evidence. (ILWU Posttrial Mots. at 6, 14, 28.) That case requires a court deciding a Rule 50 motion to "review all of the evidence in the record," "draw all reasonable inferences in favor of the nonmoving party," and forego "credibility determinations or weigh[ing] the evidence." *Id.* at 150. "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is *uncontradicted and unimpeached*, at least to the extent that that evidence comes from *disinterested* witnesses." *Id.* at 151 (emphasis added; quotation marks and citation omitted). Accordingly, this Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

**B.     Motion for new trial**

Under Rule 59, as this Court has previously explained:

> A trial court may grant a new trial only if the verdict is contrary to
> the clear weight of the evidence, is based upon false or perjurious
> evidence, or to prevent a miscarriage of justice.

> … [T]he district court has the duty to weigh the evidence as the
> court saw it, and to set aside the verdict of the jury, even though
> supported by substantial evidence, where, in the court's
> conscientious opinion, the verdict is contrary to the clear weight of
> the evidence.  Although a trial court may weigh the evidence and
> credibility of the witnesses, the court is not justified in granting a
> new trial merely because it might have come to a different result
> from that reached by the jury.

*United States v. Various Gold, Silver & Coins*, No. 3:11-cv-01179-SI, 2014 U.S. Dist.

LEXIS 65139, at *2-3 (D. Or. May 12, 2014), *aff'd*, 670 F. App'x 624 (9th Cir. 2016)

(citations and quotation marks omitted; alterations accepted).

No "verbal formula" alone informs a trial court's "difficult task" on a motion for

new trial because, while a "trial judge does not sit to approve miscarriages of justice[,]"

courts must respect "the collective wisdom of the jury."  *Landes Const. Co. v. Royal*

*Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (citation and quotation marks

omitted).  That is, even though a court assesses the "clear weight of the evidence," great

deference is owed to the jury.  Colorfully stated, a decision is clearly wrong only if it

"strike[s] [the court] as wrong with the force of a five-week-old, unrefrigerated dead

fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**          SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

1988) (Posner, J.).[1]  As such, "granting a new trial [based on the weight of the evidence]

is a rare occurrence[.]"  *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 991

(6th Cir. 2012).  *See also Chavez v. City of Albuquerque*, 640 F. Supp. 2d 1340, 1343

(D.N.M. 2008) (such motions are "generally disfavored").

## C.    Remittitur

The standard for remittitur is higher and more certain than defendants convey

when labeling the jury's damages award "excessive" and equivocating about whether this

Court views the evidence in the light most favorable to ICTSI.  (ILWU Posttrial Mots.

[Dkt. 639] at 58 & n.12.)  A jury's finding on damages is entitled to "substantial

deference" and cannot be set aside unless "the amount is grossly excessive or monstrous,

clearly not supported by the evidence, or based only on speculation or guesswork."  *Del

Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

The "*grossly* excessive or monstrous" exception relates to awards that appear to be

evidence of prejudice in the jury, an argument defendants do not advance.  *Freund v.

Nycomed Amersham*, 347 F.3d 752, 770-71 (9th Cir. 2003).  Further, defendants

mistakenly invite the Court to weigh the evidence on damages.  (ILWU Posttrial Mots.

[Dkt. 639] at 58 n.12.)  In fact, when considering the jury's award of damages, courts in

---

[1] Judge Posner was explaining the "clear error" standard, which is equivalent to that for ordering a new trial on the weight of the evidence.  *Compare Landes*, 833 F.2d at 1372 (to order a new trial, the trial court must have "a firm conviction that the jury has made a mistake") *with Easley v. Cromartie*, 532 U.S. 234, 242 (2001) ("clear error" means a court has a "definite and firm conviction that a mistake has been committed").

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

the Ninth Circuit view the evidence concerning damages "in a light most favorable to the prevailing party[.]" *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).  Relatedly, if remittitur is undertaken, it is "to the maximum amount sustainable by the proof."  *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).  *See also Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1046 (D. Or. 2017) (Simon, J.), *aff'd*, 925 F.3d 1097 (9th Cir. 2019) (same).

In sum, even motions for new trial—which allow the Court to consider the *clear* weight of the evidence—"should be granted judiciously, because ordering a new trial 'effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he [or she] does not usurp, the prime function of the jury as the trier of the facts.'"  *McKenzie-Willamette Hosp. v. PeaceHealth*, No. 02-6032-HA, 2004 U.S. Dist. LEXIS 21050, at *2-3 (D. Or. Sep. 30, 2004) (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960) (en banc)).  *See also Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) (reversing order granting new trial because "[i]t is not the courts' place to substitute our evaluations for those of the jurors").

## III.    This Court should reject defendants' foundational contention that it "should disregard evidence that [was] admitted at trial[.]"

Defendants' motions build from a common thread—specifically, that this Court "can and should disregard evidence that [was] admitted at trial" if the Court now deems it inadmissible.  (ILWU's Posttrial Mots. at 6-7.  *See also id.* at 3-5, 19, 25-30, 44-45 (similar).)  But defendants are mistaken.  They mostly waived their objections and, even

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

when they did propound timely objections, this Court's rulings, which correctly denied them, are the law of the case.

### A. Defendants' evidentiary arguments must clear two hurdles—preservation and the law of the case doctrine.

A party that fails to object timely to evidence waives such arguments for purposes of posttrial motions, even when the argument is "couche[d] … in terms of insufficiency of the evidence." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996). That is true even under *Weisgram v. Marley Co.*, 528 U.S. 440, 454 (2000), on which defendants lean. The notion that "*Weisgram* requires that the court excise inadmissible evidence" does not apply if the losing party "failed to timely object … on the grounds they now assert." *Coach, Inc. v. Celco Customs Servs. Co.*, No. CV 11-10787 MMM (FMOx), 2014 U.S. Dist. LEXIS 201038, at *32-33 (C.D. Cal. June 5, 2014).

When an objection is made, the ruling becomes the law of the case. That doctrine "generally preludes a court from reconsidering an issue," *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012), and has a pincer effect: a motion for reconsideration generally is not a vehicle for new arguments, *id.*, or repeating "arguments previously advanced," *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1082-83 (D.C. Cir. 1984). Instead, a party generally must show (1) newly discovered evidence; (2) clear error or manifest injustice; or (3) a change in controlling law. *Emery v. Premo*, No. 6:14-cv-00285-SI, 2015 U.S. Dist. LEXIS 118897, *1-2 (D. Or. Sept. 8, 2015) (Simon, J.).

Ultimately, reconsideration is "an extraordinary remedy, to be used sparingly in

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**      SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342

F.3d 934, 945 (9th Cir. 2003).  Generally, "courts should be loathe to [reconsider a

decision]." *Christianson v. Colt. Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)

(citation and quotation marks omitted; nonstandard spelling of "loath" in original).

> **B.    Defendants failed to raise timely most of their evidentiary objections
> and lost the rest.**

Defendants argue that certain evidence was inadmissible.  Because James

Mullen's testimony showed that they "engaged in [postpreclusive period] coercive job

actions in pursuit of the reefer work," defendants contend it was "conclusory."  (ILWU's

Mot. [Dkt. 639] at 19.)  Dr. Bryce Ward's findings that the reefer dispute depressed

productivity were, per defendants, "unreliable and/or speculative" and not based on

"specialized knowledge"; plus, part of his testimony was "closing argument."  (*Id.* at 25-

30.)  Nolan Gimpel, they say, engaged in "pure speculation" when concluding that, but

for the reefer dispute, Hanjin's volume was replaceable postbankruptcy.  (*Id.* at 44.)  As

to Jay Sickler, defendants argue that his modeling failed to separate damages by "specific

acts"; lacked a "causal nexus" to Dr. Ward's testimony; assumed a replacement for

Hanjin, prices that were too high, and growth from an elevated base (production during

the first five months of 2012) in accord with Elvis Ganda's projections or the Pacific

Northwest Index; failed to deduct capital and other expense; and included out-of-pocket

expenses inconsistent with his economic losses modeling.  (*Id.* at 33-51.)

Defendants raised these objections haphazardly.  A few first appeared in their

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Motions *in Limine* [Dkt. 407], and others in their Objections to ICTSI's Revised Expert

Witness List [Dkt. 491]—which the Court found to be untimely (Order on Pretrial

Matters [Dkt. 551] at 18-19). One was made during a witness's testimony, but others

were first raised in defendants' Motion to Strike [Dkt. 608] or never raised at trial.

| *Posttrial Obj.* | When ILWU *First* Raised the Objection | | | | Basis for Denial |
|---|---|---|---|---|---|
| | MILs [Dkt. 407] | Wit. List Obj. [Dkt. 491] | Obj. During Testimony | Mot. to Strike [Dkt. 608] | |
| *Mullen* | | | | | |
| "Conclusory" | | | | | [Never raised] |
| *Gimpel* | | | | | |
| Hanjin bankr. | X | | | | Merits |
| *Ward* | | | | | |
| [any objection] | | X | | | Waived |
| Relevance/"closing" | | | X | | Merits |
| *Sickler* | | | | | |
| Severability | X | | | | Merits |
| Ganda projection | X | | | | Merits |
| Hanjin bankr. | X | | | | Merits |
| "Causal nexus" to Ward | | X | | | Waived |
| PNW Index | | | | X | Unspecified |
| High prices | | | | X | Unspecified |
| Out-of-pocket costs | | | | X[2] | Unspecified |
| Capital/other expenses | | | | | [Never raised] |
| High production base | | | | | [Never raised] |

---

[2] Defendants first objected that Mr. Sickler's opinion on out-of-pocket expenses was inconsistent with his other opinions in their Motion to Strike [Dkt. 608]. Defendants had previously objected (still belatedly) to Mr. Sickler's testimony on a separate ground—namely, that there was no "causal nexus between the [out-of-pocket] damages and the ILWU's conduct" (ILWU's Obj. to ICTSI's Rev. Exp. Witness List [Dkt. 491] at 2).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Even in relation to issues arguably sharpened by trial, defendants' Motion to Strike was untimely. An objection should be made "as soon as the opponent knows, or should know, that the objection is applicable." *Jerden v. Amstutz*, 430 F.3d 1231, 1236-37 (9th Cir. 2005) (internal authority and quotation marks omitted). It is "unfair[]" to "deprive parties of the opportunity to lay a foundation in support of their evidence[,]" which includes delaying until after "it becomes too late to resolve [objections] effectively." *Id.* at 1236. "Counsel should not 'sandbag' *Daubert* concerns until the close of an opponent's case, thereby placing opposing counsel and the trial court at a severe disadvantage." *Id.* at 1237 (citations and quotation marks omitted). *See also Layne Christensen Co. v. Bro-Tech Corp.*, 871 F. Supp. 2d 1104, 1110 (D. Kan. 2012) (new objections in motion to strike filed after plaintiff rested were waived).

Here, after dismissing its last witness, ICTSI informed the Court at a jury recess that it would rest upon the jury's return. (Tr. Vol. 6 at 1026:2-8.) Only then did defendants preview that they would move to strike Mr. Sickler's testimony on the bases that "[w]e previously moved to exclude …." (*Id.* at 1030:20-23.) The day after ICTSI rested, defendants filed their far more expansive motion to strike expert testimony [Dkt. 608]. Defendants' motions to strike were not "timely" for purposes of Rule 103.

When defendants timely objected, the Court denied their objections. The Court should be "loath" to reconsider those rulings, which are the law of the case.

## IV.    This Court should not displace the jury's verdict on the issue of liability.

Defendants contend that the clear weight of the evidence (Rule 59) and, indeed, *all*

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

*evidence* (Rule 50) were contrary to the jury's verdict that defendants engaged in unlawful labor actions after August 13, 2013. Because defendants do not dispute having engaged in various labor actions,[3] the issue they raise is one of motive.

"Motive is a question of fact that may be inferred from direct or circumstantial evidence." *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995). "[D]irect evidence" of intent will "generally entitle a plaintiff to a jury trial." *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (so holding in context of discrimination claim; quotation marks and authority omitted). But generally, an injured party can only direct the factfinder to circumstantial evidence of motive. *See Geske & Sons v. NLRB*, 103 F.3d 1366, 1375 (7th Cir. 1997) ("Motive or intent almost always must be inferred from circumstantial evidence."). And ultimately, a factfinder's finding on the issue of motive or intent is entitled to great deference. *See Warshawsky & Co. v. NLRB*, 182 F.3d 948, 962 n.5 (1999) ("The deference owed to the Board's findings is even greater where, as here, the critical question involves the intent and motive of the Union.").

---

[3] As supported by evidence at trial, labor actions similar to those in the preclusive period continued thereafter and were observed to include, for example, crane operators driving slowly and below their capabilities; safety gimmicks; union members tripping the E-stop function, fouling operations, and abandoning posts; lashers hiding out so that the foremen would have to find them; truck drivers driving at a third of normal speed; truck drivers "get[ting] like sheep and all get[ting] into a line, and they would go as slow as their lead guy would"; refusing to provide labor for a ship operation without cause; failing to provide qualified mechanics; and faking equipment problems. (Tr. Vol. 2 at 165:12-166:12, 168:8-168:12, (Mullen); Tr. Vol. 3 at 457:10-24, 458:10-19, 458:20-459:1, 463:6-465:25, 480:22-496:18, 500:18-25, 504:1-507:22 (Yockey); Tr. Vol. 4 at 607:1-608:20, 609:1-4, 609:8-610:8, 614:24-615:14, 618:2-6, 618:25-6:19:6, 620:7-19, 648:3-14 (Roby).)

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

A.    **The jury did not clearly err in finding that defendants engaged in unlawful secondary conduct, as proven by substantial evidence.**

ICTSI presented substantial evidence that defendants' coercive actions during the postpreclusive period were substantially motivated by an unlawful object.  The jury agreed, finding in essence that defendants executed on their May 2012 threat to send carriers "packing" and to "put ICTSI out of business."  (Final Jury Instrs. [Dkt. 615] at Proven Facts Nos. 1-3, pp. 22-23.)  That threat evidenced defendants' unlawful object before August 13, 2013, and, by its verdict, the jury found that—when defendants persisted in the same conduct after that date—their unlawful object also persisted.  Even before examining further evidence, that inference has "some appeal."  *Hooks v. ILWU*, 72 F. Supp. 3d 1168, 1187 (D. Or. 2014).

That natural inference was also supported by significant evidence.  Mr. Mullen's testimony directly inculpates defendants during the postpreclusive period.  He testified that "union officers and a number of people within … all three unions" told him that "these coercive job actions, after August of 2013, were related to the reefer work."  (Tr. Vol. 2 at 164:5-10.).  He identified those individuals from Local 8:

> … So again, I left September 30th of 2014.  But Mike Stanton, Craig Bitz, Stuart Strader, president of two of the local relations committee members; other officers and past officers, like Bruce Holte, Jack Mulcahy, Stuart Wilson, Levi Manning, Kevin Johnson. I mean, quite a few people would either—a couple of times early in 2014, PMA, LRC—at PMA/LRC/ILWU meetings, it came up.  In the gear locker over the summer is when like Stuart Strader and Mike Stanton and Craig Bitz were together and told me once.
>
> And then at various times.  Bruce Holte was a crane operator on the

Page 12    **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

> dock during the summer.  I'm trying to think—it was a barge
> operation.  And he said, "This is all because you guys didn't want to
> give us the reefer work."  I'm like, "We can't."  He said, "Well, this
> is just going to continue.  Everybody wants you guys out of town."
> And it is like, "We are in a hard spot, guys.  We can't give you the
> work.  You know we can't."  He is like, "Well, it is not going to end
> well for you."

(Tr. Vol. 2 at 164:13-165:11.)[4]

Mr. Mullen's testimony evidencing defendants' unlawful motive was reinforced

by substantial evidence that defendants' object of obtaining the reefer work persisted

after August 13, 2013—in part because of the broad importance that defendants placed on

defeating the Port of Portland's method of retaining control of dockside jobs.  For

example:

- Then-ILWU president Robert (Bob) McEllrath testified (in deposition played
  at trial) that the reefer jobs at Terminal 6 were "symbolic" of "jobs up and
  down the coast" and to "let those job go … would bleed up and down the
  whole entire West Coast and … would undermine the contract."[5]

---

[4] Although defendants now argue that Mr. Mullen's testimony was unduly
"conclusory" (ILWU Posttrial Mots. [Dkt. 639] at 19), they did not object before or at
trial that it was opinion, speculation, or in some other fashion too "conclusory."
Moreover, defendants' argument conflates *the jury's conclusion*—namely, that
defendants engaged in unlawful conduct—with the testimony about facts.

[5] McEllrath Dep. [Dkt. 637:189] at 77:18-78:11, 78:21-23.  The importance of the
reefer work to the ILWU was reinforced repeatedly by ILWU witnesses. *See, e.g.*, *id*. at
192:14-16 (the ILWU's position throughout was that ICTSI's failure to assign the reefer
work to ILWU members was "an attack on the PCLCD"); Sundet Dep. [Dkt. 637:43] at
111:22-112:5 (ILWU believed that ICTSI "was destroying the fabric of West Coast
bargaining," which if allowed, would lead other PMA member companies to "start
picking and choosing what parts they're going to comply with").

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- Local 8 officer Bruce Holte admitted that expanding jurisdiction over maintenance and repair work is important to both defendants.[6]

- In notices to members in 2012, defendants disputed the legality of this Court's injunction and characterized ICTSI's actions as an "attack on the ILWU[.]"[7]

- Defendants did not tell their members to increase productivity after August 13, 2013.[8]

- The Port's executive director, Bill Wyatt, testified that there was "[n]o doubt" that the ILWU, through Leal Sundet, agreed in November 2013 to "improve Terminal 6 productivity in exchange for obtaining the reefer work."[9]

- Mr. Sundet e-mailed Mr. McEllrath on January 23, 2014, informing him that the Port's reassignment of the reefer work to defendants' members was to be temporary, to which Mr. McEllrath responded, "Temporary my ass."[10]

- In March 2014, Local 8's Executive Board passed a resolution calling for the resignation of Mr. Wyatt, in part because of his involvement in depriving the ILWU of the reefer work.[11]

- On May 31, 2014, Mr. Sundet e-mailed defendants, asserting that ALJ Wedekind's decision finding defendants had engaged in unlawful conduct and

---

[6] Tr. Vol. 7 at 1245:11-13 (Holte).

[7] Trial Exs. 14, 18.

[8] *See, e.g.*, Tr. Vol. 4 at 593:6-594:15 (Rapacz testifying that he was not told to increase productivity and that the Local 8 business agents are counting moves made by crane drivers and making sure they are keeping it at mediocre or average production and, if they are going too fast, telling the drivers to dial it back a little bit to average); Vol. 6 at 1187:6-16 (Scheffel); Tr. Vol. 7 at 1219:3-9 (Wescott).

[9] Wyatt Dep. [Dkt. 637:19] at 68:7-69:24. *See also* Trial Ex. 28 (Radak 11/25/13 e-mail conveying report: "ILWU had indicated that if the jurisdiction issue is resolved AND if ICTSI drops its lawsuit against the ILWU, productivity will be back to normal or maybe improved in a heartbeat"); Trial Ex. 30 (work assignment agreement).

[10] Tr. Ex. 32A.

[11] Tr. Vol. 7 at 1246:11-23 (Holte); Trial Ex. 44B (resolution).

ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

ordering them to cease and desist from future similar conduct does not "have to be complied with," "is not binding," and "has no teeth."[12]

- Defendants coordinated a July 9, 2014 statement to the Port Commission that, unless defendants permanently obtained the reefer work, they would "extend the labor dispute [at Terminal 6] and all of the turmoil that goes with it."[13]

- Dane Jones, Local 40's business agent, testified that, between July 2014 and March 2015, his discussions with Mr. Sundet and Mr. McEllrath led him to conclude that the reefer dispute was an important issue.[14]

- On August 23, 2014, Craig Bitz, a Local 8 official, e-mailed Mr. Holte that returning the reefer work to the IBEW would "just upset the workers more" and would not "return anything to normal."[15]

- On September 22, 2014, Mr. Sundet e-mailed Local 8's president, Mike Stanton, that allegations that defendants violated the injunction were "[o]ne big yawn for now."[16]

- In 2015, Jeff Smith, former president and then-LRC member for Local 8, said that "Leal Sundet is going to f--- ICTSI."[17]

- Mr. Roby testified that on the last Westwood ship's call at Terminal 6 (2015), Mr. Sundet—who had told ICTSI in May 2012 that he was the "guy that can f--- you badly" and threatened to "shut down ICTSI"—inexplicably showed up to operate a crane, operated poorly, and while refusing to exit the crane, stated ICTSI could "go f--- themselves."[18]

---

[12] Trial Ex. 51; Final Jury Instr. [Dkt. 615] at Facts re: Previous Adjudications No. 13 at p. 21.

[13] *See infra* Section IV.B.2 & Note 27.

[14] R. Tr. 10/30/19 at 130:12-131:1 (Jones).

[15] Tr. Vol. 7 at 1424:22-1426:3 (Bitz); Ex. 73 (e-mail).

[16] Tr. Ex. 77A.

[17] Tr. Vol. 3 at 469:6-21 (Yockey); Trial Ex. 114, pp. 52, 61.

[18] Tr. Vol. 4 at 651:6-653:1 (Roby); Final Jury Instrs. [Dkt. 615] at Proven Facts Nos. 1-3, pp. 22-23 (preclusive facts regarding May 2012 threats).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

- Dan Smith, defendants' expert, admitted that "much of the previous labor issues [at Terminal 6] involve[d] ILWU versus IBEW jurisdiction over refrigerated container servicing[.]"[19]

- In September 2017, ILWU, Local 8, Local 40, the Port, and the PMA agreed that Local 8 workers would perform the reefer work if container traffic returned to Terminal 6.[20]

In sum—and contrary to defendants' motions—substantial evidence supported the jury's finding that defendants' unlawful secondary object persisted after August 13, 2013. From the evidence, the jury was entitled to find that defendants viewed their failure to obtain the reefer jobs as an existential threat, their desire to obtain the reefer jobs never dissipated, and that they never stopped putting ICTSI to the Hobson's choice (plainly conveyed in their May 2012 threats) between being a viable business and pressuring the Port to permanently assign the reefer work to defendants' members.

### B.    Because the evidence showed defendants' claimed motive was pretextual or only part of a "mixed motive," the jury did not clearly err in rejecting defendants' claim of lawful, primary conduct

As they did before the jury, defendants argue about the open-contract period and their coercion of ICTSI to drop its defensive measures, including contractual remedies and ICTSI's lawsuit.  Even under the more lenient Rule 59 standard, defendants' arguments fail.  They cannot establish that the jury clearly erred in finding that the defendants' explanations were wholly pretextual or their ostensibly "primary" motives were substantially infected with unlawful secondary objects.

---

[19] Tr. Vol. 7 at 1312:1-11 (Smith).

[20] Tr. Ex. 111 at ¶ 6 (agreement); Tr. Vol. 3 at 302:16 (Ganda testimony).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

The jury found that defendants did not "engage in <u>lawful</u>, primary labor practices at any time in the period from August 14, 2013 to March 31, 2017" (Verdict [Dkt. 620] at Q. 4 (emphasis in original).)  It had been instructed that a labor union's primary motive is a necessary but not sufficient factor for finding lawful, primary activity because a secondary motive that substantially motivates the same conduct renders the conduct unlawful—specifically:

> [c]onduct engaged in by a union that has both a legal primary objective and an illegal secondary objective ("mixed motive" conduct) violates federal labor law if the illegal secondary objective is a substantial factor in motivating the conduct.

(Final Jury Intrs. [Dkt. 615] at Instr. No. 26, p. 31.)[21]  Except as to "concurrent causation," a factor is substantial if:

> a reasonable person would consider that it made a difference in the outcome.  In other words, it must materially contribute to causing the outcome.  *It does not have to be the only factor that contributed to causing the outcome.  There can be more than one substantial factor that causes an outcome.*  If the outcome would have happened without the alleged conduct, however, then the conduct is not a substantial factor.

(Final Jury Intrs. [Dkt. 615] at Instr. No. 27, p. 32 (emphasis added).)

That is, the jury was required to treat any "mixed motive" job actions that were substantially motivated by both primary and secondary objectives as "unlawful labor practices" for purposes of Question 1.  (Verdict [Dkt. 620] Q. 1.)  Relatedly, Question 4

---

[21] In their posttrial motions, defendants do not seek relief based on any supposed error in the jury instructions.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

is *not* whether defendants *ever* possessed some primary motive.  Rather, any "unlawful" conduct found for purposes of Question 1 could not, per the instructions, constitute "<u>lawful</u>, primary labor practices."  (*Id*. at Q. 4 (emphasis in original).)

Turning to defendants' stories, the jury did not clearly err in finding that defendants did not "engage in <u>lawful</u>, primary labor practices at any time in the period from August 14, 2013 to March 31, 2017."  (*Id*. (emphasis in original).)

### 1.    *Retaliation*

Per defendants, an employer's defensive measures render all subsequent retaliation primary as a matter of law because—defendants say—the employer has, by its defense, "entangled [it]self in the vortex of the primary dispute" and created a new primary dispute because, in relation to retaliations against its defensive measures, it has "the power to settle the dispute with the union."  (ILWU's Posttrial Mots. [Dkt. 639] at 10-11, 13-19 (citations and quotation marks omitted).)  Those arguments are meritless.

First, defendants are estopped by issue preclusion from arguing that, as a matter of law, their retaliation against ICTSI for taking defensive measures was necessarily separable from their unlawful labor actions.[22]  In finding defendants in contempt for

---

[22] Issue preclusion is available when "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessarily decided, also described as necessary or essential to the judgment."  (Op. & Order on MSJ [Dkt. 362] at 3.)  "[T]he fact that a particular argument or theory was not adjudicated does not prevent issue preclusion—it is only the underlying *issue* that must actually have been litigated, not the argument relevant to the issue."  (*Id*. at 21 (emphasis in original; construing *Paulo v. Holder*, 669 F.3d 911, 917-18 (9th Cir. 2011)).)

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

violating its injunction, this Court rejected defendants' "argument that many of the work stoppages and slowdowns were done in response to an action by ICTSI, such as firing an ILWU member or docking pay for late arrival[,]" because it found "such actions by ICTSI to be the byproduct of the labor dispute over the reefer jobs and not the source of the decline in productivity." *Hooks*, 72 F. Supp. 3d at 1185. Because the issue of whether defendants' retaliation against ICTSI's defensive measures constituted a separate dispute was already litigated,[23] defendants are estopped from arguing that, when they retaliated, such conduct was as a matter of law a form of primary conduct.

Second, defendants' arguments presuppose that unions hold a trump card when an employer facing unlawful actions defends itself by, for example, enforcing contractual terms or seeking remedies under 29 U.S.C. §§ 158 and 187. Courts have repeatedly declined to construe labor law to permit a union to obtain indirectly that which is directly prohibited,[24] and defendants are simply wrong about the law. Defendants lift their

---

[23] ALJ Wedekind, in a decision adopted by the NLRB, similarly found that "[t]o disregard such a connection or relationship [between ILWU members retaliating for ICTSI addressing work stoppages and slowdowns] in evaluating the object of union action would ignore industrial realities and potentially discourage employers from engaging in self-help efforts to prevent or document continued unlawful conduct." *ILWU Local 8*, 2015 NLRB LEXIS 870, *38-39, 363 NLRB No. 47 (NLRB Nov. 30, 2015). The decision was upheld by the D.C. Circuit. *Int'l Longshore & Warehouse Union v. NLRB*, 705 F. App'x 3, 4 (D.C. Cir. 2017).

[24] *See, e.g.*, *IBEW v. NLRB*, 341 U.S. 694, 703-04 (1951) (declining to construe Section 8 in a manner that was "destructive of the purpose of § 8 (b)(4)(A)" because it would be "incongruous" to conclude that Congress "intend[ed] to permit, through indirection, the accomplishment of an objective which it forbade to be accomplished directly" (internal quotation marks and authority omitted); *Mobile Mech. Contractors Ass'n v. Carlough*, 664 F.2d 481, 485 (5th Cir. 1981) (declining to construe Section 8 to

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

"vortex" phrase from *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 627

(1967), where it refers to the "ally doctrine"—a nonissue here.[25]  And as the ILWU

knows, the D.C. Circuit has rejected the notion that an employer is "primary" simply

because it "may have the power to fulfill the union's request."  *Int'l Longshoremen's &*

*Warehousemen's Union, Local 62-B v. NLRB*, 781 F.2d 919, 927 (D.C. Cir. 1986).[26]

Rather, the proper inquiry is whether, "under all the surrounding circumstances," the

union's objective was "addressed to the labor relations of the contracting employer *vis-à-*

*vis* his employees" or was "tactically calculated to satisfy union objectives elsewhere."

*NLRB v. Pipefitters,* 429 U.S. 507, 520 (1977) (quoting *National Woodwork*, 386 U.S. at

---

permit unions "to accomplish indirectly the forbidden objectives").

[25] The "ally doctrine" applies when (1) a primary employer "farms out" struck work to a second company, or (2) when, because of common ownership and control, the second company is so integrated with the primary employer that they are treated as a single employer or "straight-line operation."  *See* John E. Higgins, Jr., *The Developing Labor Law*, Ch. 22-57 (7th Ed. 2017).  Not only have defendants never before alleged that the "ally doctrine" applies in relation to Terminal 6, but defendants lost (and later disclaimed) the similar argument that ICTSI forfeited its status as a neutral secondary party by a supposed conspiracy with the Port.  *See International Longshore and Warehouse Union*, 2015 NLRB LEXIS 729, 363 NLRB No. 12 (NLRB Sept. 25, 2015) ("there is no evidentiary basis for a conclusion that the DCTU provisions in the T6 lease agreement were deliberately hatched by ICTSI in order to avoid the assigning the dockside reefer work to ILWU represented employees"); Op. & Order re: MILs [Dkt. 470] at 6 (defendants disclaimed argument).

[26] *See also* Higgins, *The Developing Labor Law*, Ch. 22-26 (setting forth principle and citing cases in support); NLRB's Basic Guide to the National Labor Relations Act, p. 11, available at https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-3024/basicguide.pdf ("A strike may be unlawful because an object, or purpose, of the strike is unlawful. *A strike in support of a union unfair labor practice*, or one that would cause an employer to commit an unfair labor practice, *may be a strike for an unlawful object*." (emphasis added)).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

644-45). This Court should reject defendants' *post hac* arguments, which purport to deny

employers any remedies against a union's unlawful labor practices and, if accepted,

would render labor law a farce.

Third, the issue of defendants' motive presented a jury question.  The jury was

entitled to "decide[] which testimony to believe and which testimony not to believe[,]" as

it bore on defendants' motivations or the circumstances of their labor actions after August

13, 2013.  (Final Jury Instrs. [Dkt. 615] at Instr. No. 7, pp. 7-8 ("Credibility of

Witnesses").  The testimony defendants refer to is no different.  So, for example, while

defendants rely heavily on Michael Nastari's testimony, he had a "somewhat tumultuous

relationship with Jim Mullen," left ICTSI just as the preclusive period ended, and

admitted that he had "no personal knowledge of whether the ILWU's illegal behavior

continued after [August 15, 2013]."  (Tr. Vol. 6 at 1147:9-1149:12.)  Harvey Witham, in

turn, was impeached many times with prior inconsistent statements.  (*See* Tr. Vol. 6 at

1111:17-1118:24, 1122:2-1123:1 (repeated impeachments of Witham's credibility by

prior inconsistent statements).)

Whatever the immediate circumstances of a labor action, the jury was entitled to

consider "the totality of the evidence in determining the motive or object [of the labor

action]." *Texas Distribs., Inc. v. Local Union No. 100*, 598 F.2d 393, 399 (5th Cir. 1979).

And, no doubt, a jury could conclude that coercing ICTSI into abandoning its defensive

measures would have furthered defendants' overarching pursuit of the reefer jobs by

making ICTSI more vulnerable to further unlawful secondary actions.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**                SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

## 2. *Open-contract period*

Defendants also argue about the period from July 2014 through February 2015, when the collective-bargaining agreement between the ILWU and the PMA was "open." (ILWU Posttrial Mots. [Dkt. 639] at 12.)  Not only was there substantial evidence that defendants' object during this period remained secondary, but the evidence was that the contract negotiations in San Francisco between the ILWU and the PMA were not a substantial motivation for defendants' labor actions at Terminal 6.  For example:

- Defendants coordinated a July 9, 2014 statement to the Port Commission that, unless defendants permanently obtained the reefer work, they would "extend the labor dispute [at Terminal 6] and all of the turmoil that goes with it."[27]

- Mr. Yockey testified to increased hardtiming after July 9, 2014, which was reflected in ICTSI's business records.[28]

- In August of 2014, Mr. Stanton became aware that the Port had canceled the temporary reassignment of the reefer work and "the entire union membership,"

---

[27] Trial Ex. 56 (Sundet 7/9/14 e-mail to Stanton); Trial Ex. 57 (Sundet's script for Stanton to use); Trial Ex. 58 (meeting transcript); Tr. Vol. 3 at 508:8-509:24 (Yockey testifying to hearing Stanton's speech to Port Commission); Sundet Dep. [Dkt. 637:43] at 130:4-131:14, 192:15-193:10 (coordination); Stanton Dep. [Dkt. 637:120] at 117:10-25 ("[t]he dispute between the ILWU and ICTSI over the plugging and unplugging of the reefers was not getting solved by the Port continuing to stick their nose in it"; the reefer dispute was still a "point of contention" between ILWU and ICTSI; ILWU continued to believe that the "reefer plug and unplug work should be permanently assigned to the ILWU").

The jury was instructed that "[e]vidence relating to the conduct or statements of ILWU or Local 8's agents or officers relating to the proceedings of any of these entities, … may be relevant to whether ILWU or Local 8 participated in, called for, instigated, directed, authorized, encouraged, condoned, adopted, or ratified any unlawful secondary activity after August 13, 2013, or to the objectives or motivations of any Defendant." Final Jury Instrs. [Dkt. 615] at Instr. No. 29, p. 34.

[28] Tr. Vol. 3 at 512:16-19.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

including all ILWU officers, expressed dissatisfaction with the Port's decision. 120:10-18.[29]

- Mr. Jones, a Local 40 official who was engaged in the 2014 coastwide bargaining, testified that the problems between ICTSI and ILWU during the open-contract period were disconnected from the 2014 negotiations over the labor contract.[30]

- Mr. McKenna, the head of PMA, testified that Terminal 6 was never brought up during the 2014 contract negotiations and the ILWU did not "specifically" target Terminal 6 in relation to the open period.[31]

- Mr. McEllrath, the lead negotiator for ILWU, testified that, while the ILWU's negotiating committee ordered slowdowns at other West Coast ports, no such instructions were given to its members at Terminal 6, to his knowledge.[32]

- Mr. Roby testified that, in relation to APL's trial call at Terminal 6, Mr. Stanton told him that defendants would not stop depressing productivity until ICTSI abandoned its lawsuit related to the reefer work.[33]

- Mr. Ganda testified that in February 2015, even after the ILWU and PMA reached an agreement on the contract returning other West Coast ports to normal productivity, production at Terminal 6 remained well below historical productivity levels.[34]

---

[29] Stanton Dep. [Dkt. 637:120] at 120:5-18.

[30] R. Tr. 10/30/19 at 131:12-132:19.

[31] McKenna Dep. [Dkt. 637:94] at 92:20-93:7, 93:10-12, 93:24-94:8, 96:9-17, 99:9-19, 100:3-6, 100:17-101:17, 107:19-25, 109:11-22.

[32] McEllrath Dep. [Dkt. 637:189] at 108:7-109:2; 109:12-19; 137:17-23. *See also* Sundet FRCP 30(b)(6) Dep. [Dkt. 637:267] at 85:16-25 (similar testimony that no directive for slowdowns given to workers at Terminal 6 to obtain bargaining leverage between July 1, 2014 and February 20, 2015).

[33] Tr. Vol. 4 at 649:8-650:7. *See also* Tr. Vol. 3 at 513:19-25, 515:1-23 (Yockey testifying that ILWU officers regularly communicated this precondition on improved productivity); Tr. Vol. 4 at 653:22-655:12, 677:10-678:22 (Roby's similar testimony).

[34] Tr. Vol. 2 at 274:9-22.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- On March 9, 2015, Mr. Ganda e-mailed Mr. McKenna, stating that productivity was back to normal at all other West Coast ports but that ICTSI was still getting hardtimed in Portland.[35]

- Productivity changes at Terminal 6 were materially different from those at other west coast terminals during the open period and, in Portland, productivity varied in conjunction with events relating to the reefer dispute.[36]

From this evidence and more, the jury was entitled to conclude that the open period was either entirely unrelated to events at Terminal 6 or pretext for defendants to continue their pressure on ICTSI with the object of obtaining the reefer work.

The clear weight of the evidence was not otherwise. Defendants selectively quote witnesses and impermissibly draw inferences in their favor. (ILWU's Posttrial Mots. [Dkt. 639] at 12.) For example, defendants selectively quote from Mr. McEllrath's testimony, telling the Court that "[s]lowdowns at Terminal 6 during that period were part of the 'effort to further negotiations of the contracts.'" (*Id*.) But that portion of his actual testimony describes the West Coast *generally* without specifying what motivated job actions at Terminal 6:

Q   Did the ILWU slow down production at U.S. West Coast ports in an effort to further negotiations of the contracts?

A   Yes.

---

[35] Trial Ex. 100.

[36] Tr. Vol. 5 at 754:1-759:5, 734:2-735:1, 754:1-759:5 (Ward testifying to disparate productivity between Terminal 6 and the Washington ports during and after the open contract period); McKenna Dep. [Dkt. 637:94] at 92:20-93:7, 93:10-12, 93:24-94:8, 96:9-17, 99:9-19, 100:3-6, 100:17-101:17, 107:19-25, 109:11-22 (the head of PMA observed similar disparate treatment at the time).

Page 24     **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

(McEllrath Dep. [Dkt. 637:189] at 108:24-109:2.)  The other testimony that defendants

reference is similarly nonspecific,[37] and only serves to highlight the fact that defendants

did not have any of their officers or members attest that their job actions at Terminal 6

were related, even in part, to the open period.  Even if such a person had so testified, the

disparate treatment of ports during the open-contract period is further evidence that

defendants were pursuing their illicit object at Terminal 6.  *See, e.g.*, *Baetge-Hall v. Am.

Overseas Marine Corp.*, 624 F. Supp. 2d 148, 160 (D. Mass. 2009) ("This record of

disparate treatment between similarly situated colleagues presents circumstantial

evidence that Baetge-Hall's termination may have been motivated by retaliatory

animus.").

### 3.    *Defendants' credibility issues*

Whatever defendants' story about "primary" motives, the jury was not required to

---

[37] Kelly Roby did not, as defendants contend, testify that "'there were a lot of job actions and slowdowns at Terminal 6,' … *as part of a general effort* to persuade the PMA and its members to agree to terms favorable to the ILWU."  (ILWU's Posttrial Mots. [Dkt. 639] at 12 (emphasis added).)  Instead, he observed events without assigning a motive.  (*See* Tr. Vol. 4 at 661:6-662:4 ("Q. And during that time …, there were a lot of job actions and slowdowns at Terminal 6, correct?  A. Correct.  Q. … [T]here were labor issues in Seattle, L.A., and Portland, right? A. During that period, yes.").)  Likewise, even though James McKenna did not mention *any events at Terminal 6* in the testimony defendants reference (McKenna Dep. [ECF 637:94] at 153:24-155:15), defendants selectively quote him while stating that "[i]t is undisputed that, as 'part of the normal negotiating strategy,' the ILWU put 'pressure' on ICTSI during this period."  (ILWU's Posttrial Mots. [Dkt. 639] at 12.)  As to Michael Radak, defendants summarize his testimony and Ex. 472 as "ICTSI increased rates *due to these* collective-bargaining actions."  (*Id.* (emphasis added).)  In truth, he testified to *the timing* of ICTSI's rate increases, not defendants' object.  (Radak Dep. [Dkt. 637:158] at 170:11–171:5, 171:23–172:1; Trial Ex. 472.)

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

accept it.  Adverse inferences arose from, for example:

- Defendants' policy that "anything surrounding ICTSI … cannot be reduced to writing";[38]

- ILWU's spoliation of its president's records;[39]

- Defendants' decision not to present live testimony from Mr. McEllrath to "explain" what his deposition testimony meant;[40]

- Defendants' proven history of pretextual actions in pursuit of their secondary object, including safety gimmicks, faking mechanical problems, and other efforts to impede work;[41]

- Defendants' history of false excuses for low productivity, including load characteristics, weather, use of casuals/labor experience, and equipment downtime;[42]

- Defendants' productivity spiking upwards when completing work at a faster pace was to their immediate benefit;[43] and

- ILWU's refusal to agree in writing to raise production when the reefer work was temporarily reassigned, as Mr. Wyatt testified, "because [Mr. Sundet] was very concerned that entering into some form of formal agreement like this and seeing an immediate return to productivity would be prima facie evidence that

---

[38] McEllrath Dep. [Dkt. 637:189] at 198:19-24 (McEllrath); Ex. 36 (Sundet's similar e-mail).

[39] Final Jury Instrs. [Dkt. 615] at Instr. No. 24, p. 29.

[40] R. Tr. 11/04/19 at 109:16-20 (ICTSI arguing same in closing).

[41] *See* Final Jury Instrs. [Dkt. 615] at Proven Fact Nos. 6, 9, 10, 11, pp. 24-26.

[42] Tr. Vol. 5 at 746:8-19, 747:3-748:9, 751:9-15, 752:7-17 (Ward testifying that regression analysis disproved defendants' contention that these factors impaired productivity); Tr. Vol. 4 623:7-626:1 (Roby testifying about high productivity on 2014 Super Bowl Sunday during a period when defendants were otherwise claiming a lack of working equipment was impairing productivity); Trial Ex. 35 (end of shift report for Super Bowl Sunday, February 2, 2014).

[43] Tr. Vol. 5 at 752:13-753:25 (Ward testifying to "shorty shifts" and Super Bowl effect).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

they'd been slowing down, and he didn't want to do anything publicly that would support that, but that over time, there would be an improvement to productivity[.]"[44]

When finding facts, the jury was entitled to rely on this evidence and more to assess the credibility of defendants' witnesses and, relatedly, defendants' story at trial. (*See* Final Jury Instrs. [Dkt. 615] at Instr. No. 7, pp. 7-8 ("Credibility of Witnesses").)

In sum, the jury did not clearly err. It was entitled to reject whatever evidence defendants presented and might now point to about their ostensible primary objects—whether contextual, contemporaneous statements, or testimony about past motives. *See Shattuck Denn Mining Corp. (Iron King Branch) v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966) ("Actual motive, a state of mind, being the question, it is seldom that direct evidence will be available that is not also self-serving" and a factfinder, if it finds the stated motive "false," can infer "an unlawful motive" when "the surrounding facts tend to reinforce that inference"). And even if the jury did believe that some primary motive may have existed, that finding is not incompatible with the jury's verdict because "mixed motive" conduct "violates federal labor law if the illegal secondary objective is a substantial factor in motivating the conduct." (Final Jury Intrs. [Dkt. 615] at Instr. No. 26, p. 31.) The jury was entitled to find that, as a condition for defendants to cease their labor actions, ICTSI had to capitulate to defendants' coercive measures by pressuring the

---

[44] Wyatt Dep. [Dkt. 637:19] at 68:13 to 69:3.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Port to permanently reassign the reefer work to defendants' members.  This Court should not disturb the jury's verdict on liability.

**V.     This Court should not displace the jury's verdict on the issue of causation.**

Defendants asked the jury to suspend disbelief.  By disputing causation, they asked the jury to accept that, even though defendants' power derives from their ability to inflict economic harm, they were unable at Terminal 6 to inflict *any damages*.  Given that the harms that materialized were *exactly* what defendants threatened—carriers sent "packing" (Final Jury Instrs. [Dkt. 615] at Proven Facts Nos. 1-3, pp. 22-23)—the jury understandably declined to be defendants' gull.

This Court should reject defendants' posttrial causation arguments, which remain disingenuous.  While defendants attack Dr. Ward (ILWU's Posttrial Mots. [Dkt. 639] at 21-30), they ignore substantial other evidence of causation.  For example, the jury knew labor actions can affect carrier decisions—in June and July 2012, Hapag-Lloyd skipped three vessel calls and Hanjin skipped six calls as a direct result of the ILWU's labor actions at that time.  (Tr. Vol. 2 at 265:6-17 (Ganda).)  Even after the preclusive period, the evidence included:

- Productivity declines caused lost container volume due to times when productivity was so poor ICTSI could not load or unload all the containers before the ship had to depart.[45]

---

[45] Tr. Vol. 2 at 265:18-266:9 (Ganda).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- After a trial call, APL told ICTSI that it did not make Terminal 6 a regular call because of the poor productivity at the terminal.[46]

- Existing ocean carriers complained about poor productivity and threatened to leave Terminal 6 permanently in 2013.[47]

- Hanjin gave notice that they were terminating their service at Terminal 6 permanently in February 2015 when, for 21 days, the Hanjin Copenhagen was in port for a call that should have taken a few days, during which time that ship occupied a berth preventing another Hanjin ship from coming into Terminal 6.[48]

- Hanjin stopped calling because of defendants' productivity issues.[49]

- Hapag-Lloyd stopped calling because of defendants' productivity issues.[50]

---

[46] Tr. Vol. 3 at 382:4-383:7 (Ganda).  *See also* Tr. Vol. 2 at 267:7-13 (labor actions impaired efforts to market Terminal 6); Tr. Vol. 5 at 824:25-825:21 (Gimpel addressing APL call); *id.* at 907:20-908:7 (Gimpel addressing effects of very damaged reputation in later 2017).

[47] Tr. Vol. 2 at 266:21-267:3 (Ganda).

[48] Tr. Vol. 3 at 419:7-420:21 (Ganda).

[49] *See* Radak Dep. [Dkt. 637:158] at 93:20-25, 182:25-183:24 (Hanjin "couldn't make money" because of "poor productivity at Terminal 6," and the departure was driven by the operations side, who were "the ones responsible within Hanjin for dealing with the labor issues at Terminal 6"); Wyatt Dep. [Dkt. 637:19] at 81:17-82:14, 82:25-84:4, 84:5-14 (addressing Dep. Ex. 32, Hanjin's letter to Ganda re: reasons for leaving and importance of schedule reliability).

[50] Gallaway Dep. [Dkt. 637:223] at 75:19- 77:15 ("[S]chedule reliability" caused by poor labor productivity "played a major factor" in Hapag Lloyd's decision to leave Terminal 6; from "a schedule reliability standpoint, we couldn't keep a schedule.  We just never knew if the ship would get out in one day or three days, and, you know, you can't run a liner service like that" and Hapag Lloyd ultimately left because it "just could not depend on the product."); *id.* at 59:6-16, 62:9-14, 73:14-74:12, 75:1-11, 14-18 (addressing importance of consistent productivity and persistent issues with it at Terminal 6).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- Westwood stopped calling because of defendants' productivity issues.[51]

- During the last call by Westwood, defendants provided poor production, resulting in the vessel's departure with empty containers still on the dock.[52]

- Ganda made the decision in late 2016 to terminate the lease when it became apparent that it was going to be extremely difficult to get an ocean carrier to call on Portland because of the labor dispute.[53]

That is, even without Dr. Ward's opinions, there was substantial evidence before the jury (including further evidence addressed below in relation to damages) from which the jury could reasonably find for ICTSI on causation.

As to Dr. Ward, he provided quantitative evidence substantiating that defendants' members were depressing productivity to a statistically significant and economically meaningful degree as well as econometric analysis that those changes were attributable to the reefer dispute.  (Tr. Vol. 5 at 728:25-729:13, 734:2-737:18, 743:4-25, 746:8-19, 747:3-748:9, 751:9-15, 752:7-753:25, 760:5-762:6, 762:7-765:5.)

Defendants' arguments about the admissibility of Dr. Ward's testimony are not a springboard to posttrial relief.  Only one of defendants' arguments relates to an unwaived objection.  At trial, in anticipation of defendants' arguments that Dr. Ward should have

---

[51] Westwood shrunk its volume after defendants' hardtiming in 2015 and 2016 and questioned whether to "stay in Portland because of the labor situation."  (Tr. Vol. 3 at 394:19-395:12 (Ganda).)  It left when it could not bear the "pretty steep increase" in rates associated with being ICTSI sole customer, after defendants had driven away the bulk of ICTSI's volume.  (*Id*. at 412:5-19 (Ganda).)

[52] Tr. Vol. 4 at 650:11-653:1 (Roby).

[53] Tr. Vol. 2 at 279:25-280:20 (Ganda).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

performed a regression analysis in relation to variables that were themselves dependent on the reefer dispute (*e.g.*, firing gangs), Dr. Ward addressed the futility of such analysis for a dependent variable—he analogized to a fight, with blocking the punch as a dependent variable.  (Tr. Vol. 5 at 764:7-765:5.)  Defendants, after characterizing the testimony as "sound[ing] like closing argument, or something" and then retracting that characterization, ultimately settled on objecting that the testimony was "irrelevant."  (*Id.* at 764:17-19.)  The testimony was relevant because it made a fact of consequence— namely, what regression analysis can and cannot establish—more or less probable. Defendants undertake no showing that, when the Court overruled their relevance objection, it clearly erred.  (ILWU's Posttrial Mots. [Dkt. 639] at 29.)  It did not.  *Cf. Active Sports Lifestyle USA LLC v. Old Navy, LLC*, No. SACV 12-00572 JVS (Ex), 2013 U.S. Dist. LEXIS 190005, at *24 (C.D. Cal. Nov. 21, 2013) (analogy "clear[s] the bar for relevance" under Rule 401).

Defendants also argue sundry *Daubert* issues about Dr. Ward.  (ILWU's Posttrial Mots. [Dkt. 639] at 25-30 (arguing opinions were, *e.g.*, "unreliable and/or speculative" because did not consider "*any* alternative causal factors," in part because of how he construed the "reefer dispute").)  Because defendants failed to include these objections in their timely *Daubert* motions (*see generally* ILWU's MILs [Dkt. 407]) or even advance them during trial, they were waived (Order on Pretrial Matters [Dkt. 551] at 18-19).[54]

---

[54] The objections are, regardless, without merit.  When denying a similar (but timely) objection to Mr. Sickler's testimony, this Court concluded that "[t]he fact that

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Ultimately, defendants can have no complaint that Dr. Ward's opinions were before the jury, which defendants tacitly acknowledge supported the jury's finding of causation. Armed with Dr. Ward's opinions and other substantial evidence, the jury found that defendants *caused* harm, as threatened. That finding was not clearly erroneous. *Cf. Mead v. Retail Clerks Int'l Ass'n*, 523 F.2d 1371, 1378 (9th Cir. 1975) (upholding finding of causation in part because "the injury alleged was precisely the type of loss that the claimed violations would be likely to cause" (quotation marks and citation omitted; *Mead*'s alterations accepted)).

## VI. This Court should not displace the jury's verdict on damages.

Defendants have no viable arguments on the issue of damages. That much is apparent from their heavy reliance on evidentiary objections, some of which they waived and others of which they lost on the merits. Having also framed their arguments as factual disputes for the jury at trial, defendants now try to prove that their factual arguments have overwhelming merit (even when taking all inferences in favor of ICTSI) *but* were still rejected at trial by the jury. That fraught position is further imperiled by the fact that defendants never requested a verdict form that would allow the parties and this

---

under some factual scenario disaggregation might become necessary does not mean that ICTSI's expert is required to present damages calculations assuming each possible scenario, including one in which the jury accepts enough of the ILWU Entities' arguments to necessitate disaggregation." (Op. & Order on Mots. Challenging Exp. Test. [Dkt. 464] at 13.) Further, the jury has now conclusively rejected defendants' contention that there are *any* alternative causal factors in relation to ICTSI's damages. (*See* Special Verdict [Dkt. 620] at Qs. 4, 6 (defendants did not engage in primary labor practices after the preclusive period and no "non-labor factors cause[d] any loses to ICTSI").)

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Court to parse *which* factual arguments the jury accepted and rejected.  *See Landes*, 833 F.2d at 1373 (placing onus on defendant).  Such parsing is impossible now because the jury ultimately awarded damages that were tens of millions of dollars more than the figures that defendants presented to the jury, but still tens of millions of dollars less than ICTSI sought.

Below, ICTSI tackles the lowest hanging fruit first—defendants' Rule 50(b) motion on damages—before analyzing defendants' arguments about the admissibility and weight of Mr. Sickler's modeling.  Finally, ICTSI establishes that, even if this Court were to agree with defendants regarding certain discrete issues—*e.g.*, the effect of Hanjin's bankruptcy—the jury had ample evidence to adjust its finding of damages and may well have done so.  That is, defendants are not entitled to any posttrial relief on the issue of damages because, taking all inference in ICTSI's favor, the maximum amount sustainable by the proof is *greater* than the jury awarded.  *See Silver Sage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 825 (9th Cir. 2001) (holding that remittitur is not available where, "even excluding [the disputed amount], the amount of damages that he evidence would support … is more than the amount the jury awarded").

**A.  This Court can reject defendants' Rule 50(b) argument on damages out of hand because, even setting Mr. Sickler's opinions aside, the jury had significant evidence before it regarding damages.**

Defendants' Rule 50(b) motion on damages is spurious.  Even without Mr. Sickler's more comprehensive modeling of damages (*e.g.*, including volume changes and increased per unit prices), there was significant evidence before the jury from which

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

it could award damages for harms substantially caused by defendants.  For example, the

jury learned that:

- Before the unlawful labor actions began, ICTSI anticipated 2012's annual volume to be more than 216,000 TEUs (approximately 120,000 moves);[55]

- Hapag-Lloyd missed 3 calls (1,200 moves) during June and July 2012;[56]

- Hanjin's alliance missed 6 calls (10,732 moves) during June and July 2012, which *defendants valued* at $764,995 in lost profits;[57]

- Starting after December 2014, ICTSI lost about 1,000 moves per week that, but for hardtiming, APL would have exported out of Terminal 6;[58]

- Even with hardtiming, ICTSI earned $4.6 million in profits in 2013, which shrunk to $1.6 million in 2014 (as productivity declined further);[59]

- By late March 2015, Hanjin and Hapag-Lloyd stopped calling, resulting in the loss of all their volume;[60]

---

[55] Ex. 334 at ICTSI0204131 (Ganda report to parent company in TEUs); Tr. Vol. 5 at 838:20-22 (conversion factor of 1.8).

[56] Tr. Vol. 2 at 168:13-23 (Hapag-Lloyd's 3 missed calls would have been approximately 1,200 moves); Tr. Vol. 2 at 265:6-17 (Ganda testifying to 9 missed calls and that Hapag-Lloyd represented 18 percent of ICTSI's business);

[57] Tr. Vol. 2 at 265:6-17 (Ganda testifying to 9 missed calls and that Hapag-Lloyd represented 18 percent of ICTSI's business); R. Tr. 10/29/19 at 160:13-163:1 (Kidder opining that lost opportunity to make 10,732 moves from 6 of those ships resulted in lost profits of $764,995).

[58] Tr. Vol. 2 at 227:20-228:17 (Ganda testifying to average volume and anticipated added revenue of approximately $200,000/week); Tr. Vol. 3 at 381:18-383:9 (Ganda testifying about basis of expectation of continued calls).

[59] Tr. Vol. 2 at 251:18-252:8 (Ganda testimony).

[60] Tr. Vol. 2 at 270:8-13 (Ganda testimony).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- Starting in May 2016, ICTSI lost Westwood, which—before ICTSI lost its other customers—had been about 2 percent of total volume;[61]

- After the reefer dispute, defendants' members' productivity went down and "stayed down";[62]

- Starting in the second half of 2012, hardtiming increased ICTSI's marginal labor costs (from $98/lift to $124/lift) and gearlocker costs (from $64/lift to $92/lift);[63]

- As a defensive measure against defendants' equipment-related hardtiming, ICTSI bought millions of dollars of equipment that it otherwise would not have required;[64] and

- The lease buyout in March 2017 cost ICTSI more than $20 million.[65]

As this Court has repeatedly recognized, "damages [do] not need to be proven with certainty."  (Op. & Order [Dkt. 362] at 17 (discussing *Mead*, 523 F.2d at 1377); Final Jury Instrs. [Dkt. 615] at Instr. No. 30, p. 35 (similar).)  That rule exists, in part, because "[t]he wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is

---

[61] Tr. Vol. 2 at 270:8-13 (Ganda testifying to Westwood leaving); Tr. Vol. 6 at 1002:17-21 (Sickler testifying that Westwood was less than 2 percent of volume).

[62] Tr. Vol. 5 at 765:25-766:4 (Ward).

[63] Tr. Vol. 2 at 258:7-22, 293:14-18 (Ganda).

[64] Tr. Vol. 2 at 235:18-236:8 (spent $7 million on equipment to address hardtiming when $1.25 million had been budgeted); *id.* at 256:21-257:25 (detailing purchases, including beyond actual needs to thwart ILWU and Local 8's hardtiming).

[65] Tr. Vol. 2 at 279:3-281:17 (Ganda testifying to efforts to obtain new customers after existing customers driven away, eventual decision to buy out 19 remaining years on lease, and lease buy-out costs of $11,450,000 in case and approximately $8.7 million worth of equipment, inventory, and supplies).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Given those precepts, there was substantial evidence before the jury such that, even without Mr. Sickler's damages models, it could award tens of millions of dollars in damages. Indeed, defendants' election to pursue a Rule 50(b) motion that is so facially deficient is a tacit admission that their other posttrial damages motions are similarly feeble.

**B.    This Court should reject defendants' arguments about the admissibility and weight of Mr. Sickler's models, which were based on assumptions that were consistent with substantial evidence.**

As Mr. Sickler testified, it is generally accepted to model lost earnings, as he did, by "measur[ing] the difference between the profits that a plaintiff actually earned and the profits that the plaintiff expected to earn or should have earned 'but for' the acts of the defendant.'" (Tr. Vol. 5 at 920:6-921:14. See also Tr. Vol. 5 at 922:24-923:18 (describing EBITDA—Earnings Before Interest, Tax, Depreciation, and Amortization). In his modeling of ICTSI's damages, revenue and expenses varied by volume between the actual and "but for" worlds; overhead expenses such as administrative and equipment costs were consistent between the worlds. (*Id*. at 922:10-18, 932:23-933:21.) Unit pricing was also consistent between the two worlds, starting with rates actually charged by ICTSI through 2013, with conservative increases over time for inflation. (*Id*. at 922:10-923:18, 930:13-932:7.) Mr. Sickler presented two damages scenarios, one where volume grew in the "but for" world at the rates Mr. Ganda had projected for business

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

purposes before defendants' unlawful activities began, and the other with volume dipping and nearly recovering in line with the Pacific Northwest Index. (Tr. Vol. 5 at 932:14-22, 936:2-937:6; Tr. Vol. 6 at 1005:25-1007:5, 1012:16-1013:21.) Including lease buy-out costs, Mr. Sickler's models yielded damages of about $135.6 million (budget) or $97.6 million (index). (Tr. Vol. 6 at 1020:7-23.)

By providing two scenarios, Mr. Sickler implicitly and explicitly respected the role of the jury as the ultimate finder of facts. As he explained, while "both [scenarios] are accurate in terms of how they are constructed," it was ultimately for the jury to assess the underlying assumptions and adjust its damages award based on its findings:

> the jury gets to hear lots of fact and expert testimony, and there may be parts or a group—a portion of that testimony that you believe is more compelling than another part, which might lead you down one or the other of these two scenarios. I'm not in control of that, because I'm only one witness in this trial.

(Tr. Vol. 6 at 1015:7-1016:8.)

As shown below, defendants raise no cognizable challenge to Mr. Sickler's methods. And, as a "general rule," challenges to "the factual basis of an expert opinion" raise issues as "to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (internal quotation marks and citation omitted). Moreover, the jury did not clearly err if it found facts consistent with the assumptions in Mr. Sickler's models.

Page 37    **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

### 1.    *Separability by cause*

Invoking *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342 (9th Cir. 1985), defendants contend that Mr. Sickler's damages models are unduly speculative because they do not separate damages by causes and instead assume that damages were caused by the unlawful secondary actions.  (ILWU's Posttrial Mots. at 35.)  Defendants' objection is without merit for at least two reasons.

First, while defendants timely objected (ILWU's MILs [Dkt. 407] at 5), this Court denied the objection.  It recognized that in *Farley*, 786 F.2d 1342, the plaintiff and the damages expert failed "to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme …."  (Op. & Order on Mots. Challenging Exp. Test. [Dkt. 464] at 14 (quoting *Farley*, 786 F.2d at 1352).)  Mr. Sickler's testimony, in contrast, was admissible on the assumption that there would be evidence at trial "that the ILWU Entities engaged in unlawful secondary conduct after August 13, 2013, the unlawful secondary conduct throughout the relevant period materially contributed to ICTSI's damages, and it was such conduct and not outside forces that caused ICTSI's damages."  (*Id.* at 15.)  Mr. Sickler was entitled to construct his models based on those "underlying assumptions" to the exclusion of defendants' "assumptions and theories."  (*Id.*)  That ruling remains the law of the case.

Second, defendants' position is now *even less tenable*.  The separability issues—including the presence of other causes and whether damages could be disaggregated by cause—were defendants' to prove.  (Final Jury Instrs. [Dkt. 615] at Instr. No. 31, pp. 36-

ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

37.)  The jury, however, found that defendants *did not* engage in "lawful, primary labor practices" after August 13, 2013, and that *no* "non-labor factors cause[d] any losses to ICTSI[.]"  (Special Verdict [Dkt. 620] at Qs. 4, 6 (emphasis in original).)  Consistent with those jury findings, Mr. Sickler's models are sound.  *See, e.g.*, *In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14-cv-00722-SI, 2016 U.S. Dist. LEXIS 53734, at *35-36 (N.D. Cal. Apr. 21, 2016) (expert's methodology was not flawed "simply because he did not disaggregate the price impact of one alleged wrongdoing that directly resulted from another").

As the District of Arizona commented when confronting similar factual arguments from a defendant, if a defendant is "upset with the jury's determination of [damages], this ultimately reflects its failure to adequately meet its burden of proving which [damages] were not attributable to its [unlawful conduct]."  *Skydive Ariz., Inc. v. Quattrochi (Skydive I)*, 704 F. Supp. 2d 841, 848-49 (D. Ariz. 2010), *rev'd in nonpertinent part*, (*Skydive II*), 673 F.3d 1105 (9th Cir. 2012).

### 2.    *"Causal nexus" to Dr. Ward's testimony*

Defendants object that Mr. Sickler's models lack any "causal nexus to unlawful activity" because Mr. Sickler did not himself assess or rely on Dr. Ward's productivity figures.  (ILWU's Posttrial Mots. [Dkt. 639] at 34.)  The objection is meritless.

First, this Court already found that defendants waived this objection.  One of the *Daubert* objections that defendants belatedly raised was that Mr. Sickler's damages models lacked a "nexus" to defendants' unlawful conduct because "Mr. Sickler did not

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

consider or rely on the opinion of Dr. Ward and therefore his opinion on damages is untethered to ICTSI's basis of liability—that lowered production caused ICTSI economic harm." (ILWU's Obj. to ICTSI's Revised Exp. Wit. List [Dkt. 491] at 2.) This Court found that objection to have been waived. (Order on Pretrial Matters [Dkt. 551] at 19.)

Second, defendants' objection is unfounded. From the outset, defendants threatened to send the carriers "packing" and "put ICTSI out of business." (Final Jury Instrs. [Dkt. 615] at Proven Facts Nos. 1-3, pp. 22-23.) The weapon that defendants wielded was hardtiming, which Dr. Ward substantiated. Generally, good productivity helps grow volume, as it did at Terminal 6 before defendants' unlawful labor actions, and bad productivity negatively impacts carriers and therefore volume. (Tr. Vol. 2 at 220:3-221:15, 232:17-233:21 (Ganda); Tr. Vol. 5 at 816:6-819:1 (Gimpel).) Not only did the unlawful labor actions make Terminal 6 "very difficult to market" to new customers (Tr. Vol. 2 at 267:7-13 (Ganda)), but Terminal 6 "lost container volume" from existing customers—for example, hardtiming prevented ICTSI from moving some containers off or onto ships (id. at 265:21-266:20 (Ganda)). Carriers threatened to leave over the depressed productivity, and ultimately, they all did so. (Id. at 267:21-268:3 (Ganda testifying to threats to leave); Radak Dep. [Dkt. 637:158] at 93:20-25 (Hanjin ceased calling on Terminal 6 in 2015 because it "couldn't make money" because of "poor productivity at Terminal 6"); Gallaway Dep. [Dkt. 637:223] at 75:19-76:23, 77:1-15 ("[S]chedule reliability" caused by poor labor productivity "played a major factor" in Hapag Lloyd's decision to leave Terminal 6); Tr. Vol. 3 at 394:19-395:12, 412:5-19

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

(Ganda testifying about Westwood's departure).[66])  Mr. Sickler's testimony quantified damages in relation to lost volume.

The jury was entitled to rely on the totality of the evidence to assess what harms were substantially caused by defendants' unlawful conduct and quantify damages.

### 3.    *Volume changes*

To model lost container volume substantially caused by defendants' unlawful conduct, Mr. Sickler built from the 2012 predispute volumes, including annualizing the January through May container volumes.  (Tr. Vol. 5 at 925:19- 926:12; Tr. Vol. 6 at 1004:11-1005:24.)  From that annualized 2012 figure, Mr. Sickler created separate damages models reflecting the percentage volume changes in Mr. Ganda's predispute growth projections and the Pacific Northwest Index, respectively.  (Tr. Vol. 5 at 932:14-22, 936:2-937:6; Tr. Vol. 6 at 1005:25-1007:5, 1012:16-1013:21.)  This Court should reject defendants' objection to each consideration.

---

[66] Defendants suggest that ICTSI obtained undeserved damages for Westwood because its "production *improved* in the relevant period."  (ILWU's Posttrial Mots. [Dkt. 639] at 34 (emphasis in original).)  The record is otherwise.  Westwood's comparatively good productivity for a period reflected an apples-to-oranges comparison; it had "easier ships to work," elevating productivity relative to the other 98 percent of ICTSI's business.  (Tr. Vol. 3 at 392:7-9 (Ganda); Tr. Vol. 6 at 1002:17-21 (Sickler).)  Also, it had no reefers and less than a shift's worth of containers, creating an immediate self-interest for defendants' members to work efficiently.  (Ruda Dep. [Dkt. 637:126] at 129:9-130:17 (describing calls); Tr. Vol. 5 at 752:13-753:25 (Ward testifying to dynamic of "shorty shifts").)  Still, while Westwood called, its small volume did reduce damages in Mr. Sickler's model.  (Tr. Vol. 5 at 922:10-923:18 ("real world" EBITDA was subtracted from the EBITDA in the "but for" world).)  The jury found defendants' unlawful conduct substantially caused any losses associated with Westwood.  (*See* Special Verdict [Dkt. 620] at Qs. 4, 6. (no alternative causes).)

Page 41     **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Defendants object that Mr. Sickler's analysis is unreliable because he annualizes volume for 2012 by including "unusually high" volume in January 2012.  (ILWU Posttrial Mots. [Dkt. 639] at 38.)  This Court should reject that argument.  First, defendants undoubtedly waived this *Daubert* argument by failing to advance it at any time before the jury returned its verdict.  *See Skydive II*, 673 F.3d at 1114 (upholding finding of waiver on similar facts).  Second, as a challenge to "the factual basis of an expert opinion," defendants present an issue of weight not admissibility.  *See Children's Broad.*, 357 F.3d at 865.  Third, the reasonableness and reliability of Mr. Sickler's annualized volume is reinforced by the fact that it is less than 1 percent different than Mr. Ganda's last predispute projection.  (*Compare* Tr. Vol. 5 at 925:19-926:21 (Sickler's estimated figure of 218,000 TEUs) *with* Ex. 334 at ICTSI0204131 (Ganda report to parent company anticipating annual volume of 216,191 TEUs).)  And fourth, damages awards are not subject to rejection simply because they are the product of "extrapolation from limited data," even if the resulting method is "somewhat crude."  *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (upholding trial court's finding extrapolating damages from six-month period).

Equally unsound is defendants' objection that Mr. Sickler's Pacific Northwest damages model was speculative because, according to defendants, Terminal 6 would have underperformed the index, which showed net negative growth between 2012 and 2017.  (ILWU Posttrial Mot. [Dkt. 639] at 46-48; Tr. Vol. 5 at 1012:7-1013:21 (Sickler testifying to index's negative growth).)  First, defendants waived their objection by not

ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

raising it in their timely Motions *in Limine* [Dkt. 407].  (*See* Order on Pretrial Matters [Dkt. 551] at 19 (so finding in relation to other belated objections to Sickler).)  Second, because defendants challenge "the factual basis of an expert opinion" rather than his methodology, defendants presented an issue of weight not admissibility.  *See Children's Broad.*, 357 F.3d at 865.  Third, there was substantial evidence from which the jury could reasonably conclude that the Pacific Northwest Index *understated* ICTSI's likely growth.

Mr. Ganda testified:

Q   You don't know, do you, Mr. Ganda, if Terminal 6's volumes rose and fell with the rest of the Pacific Northwest?

A   In the sense of the index?

Q   Just in terms of along [*sic*] do you think they matched the Pacific Northwest?

A   It is not really tied to the Pacific Northwest Index *because we have the catchment basin cargo that we can track cargo from.  There are other factors for growing our volume.*

(Tr. Vol. 2 at 323:24–324:4 (emphasis added).)[67]

That likelihood of volume growth at Terminal 6 independent of the Pacific Northwest Index was reinforced by Mr. Gimpel, an industry expert.  He testified that Terminal 6 would have outperformed Seattle and Tacoma "on a percentage basis" (because, whereas Terminal 6 was not competing in the intermodal market, the

---

[67] Defendants snip the phrase "not really tied to the Pacific Northwest Index" from Mr. Ganda's testimony to suggest he supported their argument that that index *overstates* ICTSI's likely growth.  (ILWU's Posttrial Mots. [Dkt. 639] at 46.)  Plainly, the context belies defendants' argument.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Washington ports were losing volume to Canadian intermodal terminals) and owing to

"organic growth" from its 35-percent market share in the catchment basin, which had

increased volume from a growing population (about 10 percent between 2012 and 2017)

and improving economy.  (Tr. Vol. 5 at 820:18-823:1, 905:20-906:10.)  Not only were

Terminal 6's supposed disadvantages in servicing the catchment basin overblown,[68] but

ICTSI held many advantages over the Washington ports, including lower rates, lower

costs for moving a container overland to and from the Portland area, balanced import and

export volumes, higher weight capacities, little competition among carriers, and loyal

customers.[69]

---

[68] Tr. Vol. 2 at 181:24-182:3 (Mullen testifying that Terminal 6, Seattle, Olympia, or Tacoma all have similarly "long transits coming off the ocean"); Tr. Vol. 5 at 809:6-810:6, 909:1-910:6 (Gimpel testifying that transit time across the Pacific, transit time off the ocean, and pilotage costs are similar for Terminal 6 versus the Washington ports); *id*. at 827:23-828:14 (industry trend toward larger ships had not affected carriers calling in the Pacific Northwest before between 2017 and 2019).

[69] Tr. Vol. 2 at 250:20-251:4 (Ganda testifying that ICTSI's rates from January 2013 to March 2015 were lower than they had been in Seattle and Tacoma); *id*. at 429:8-430:24 (Ganda testifying to Terminal 6's advantage on overland transportation costs); Tr. Vol. 3 at 430:25-431:19 (Ganda testifying to ability to move heavy cargo and loyal customers); Tr. Vol. 5 at 808:6-809:5, 820:8-17 (Gimpel testifying to same); *id*. at 810:7-22 (Gimpel testifying to advantage to carriers of balanced import/export business, which made Portland "unique"); Gallaway Dep. [Dkt. 637:223] at 53:10-54:18 (despite moving lower volume than larger ports, Hapag-Lloyd made "a good profit on the boxes that [it] did move"; Portland was a niche market that did not "garner the attention of most of the huge shipping lines"); Wyatt Dep. [Dkt. 637:19] at 25:22-26:24, 27:4-12 ("fairly balanced portfolio" allowed carriers to "generate revenue in both directions"; barging heavy cargo and value of same; loyal customers; attractive to a carrier like Hanjin because it had a "leverage on pricing" to its customers because it was "the only game in town").

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW Fifth Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

What's more, ICTSI's likely outperformance of the Pacific Northwest Index in the "but for" world was only reinforced by Mr. Ganda's growth projections in late 2011 and related evidence.  In relation to Mr. Ganda's growth projection, defendants incorporate the arguments they set forth in their motion to strike.  (ILWU Posttrial Mots. [Dkt. 639] at 30-31 n.6.)  There, they noted that those projections were derived in part from industry figures, which defendants contend deviated from what actually occurred.  (ILWU's MTS [Dkt. 608] at 3-4.)  This Court should reject defendants' argument.  First, defendants' objections to Mr. Sickler's damages model based on Mr. Ganda's growth projections were already overruled.  (Minutes of Rule 104 Hr'g [Dkt. 475].)

Second, the Court's ruling was correct.  Mr. Ganda prepared the underlying budget in the ordinary course of business, had experience preparing such budgets, and, as ICTSI's CEO, could attest that the volume growth in the budget was realistic.  (Tr. Vol. 2 at 236:9-243:10, 244:10-245:6, 291:5-292:5.  *See also id.* at 284:3-286:1 (explaining ruling on Ganda's opinion testimony).)  Mr. Sickler in turn testified that he commonly relies on such documents when, as was the case here, the budget was prepared in the ordinary course of business by a person with adequate experience or expertise to put together a credible budget.  (Tr. Vol. 5 at 924:7-925:18.)

Third, the jury would not have clearly erred if it found that Mr. Ganda's growth projections were within the range of likely growth—indeed, if anything, they were likely *too conservative*.  When he was budgeting, Mr. Ganda was incentivized to be realistic and conservative in forecasting volume.  (Tr. Vol. 2 at 237:7-20.)  He believed that

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Terminal 6 had growth potential *beyond* how the market was likely to perform because it was, at the time, only capturing about 35 percent of business available in the catchment basin.  (*Id*. at 237:21-238:19.)  And his projections were shown to be overly conservative.

Consider defendants' complaint that, whereas Mr. Ganda forecast 4.5 percent growth from 2011 to 2012, "the actual rate [*for the entire West Coast shipping market*] was less than a third of that: 1.4%; instead of 3% growth for 2012 to 2013 (the number Mr. Ganda used), the actual rate was 2.6%[.]"  (ILWU's MTS [Dkt. 608] at 3-4.)  What defendants fail to mention is that ICTSI *dramatically outperformed **both*** the West Coast shipping market *and* Mr. Ganda's projections until the defendants' unlawful labor conduct commenced.  He testified that, in 2011, before the labor dispute, ICTSI exceeded its growth projection by 9.6 percent and, in 2012, before the unlawful labor actions by defendants, ICTSI was obtaining about 10 percent annualized growth.  (Tr. Vol. 2 at 221:13-223:11.)  Further, because both Mr. Sickler's models assiduously tracked the volume changes in either the Pacific Northwest Index or Mr. Ganda's projection, neither model adds a significant and likely source of new volume in the "but for" world— specifically, carrier APL's 1,000 containers per week, on which it could save roughly $200,000 per week by moving them through Terminal 6.  (Tr. Vol. 2 at 227:20-228:17 (Ganda); Tr. Vol. 3 at 381:18-383:9 (Ganda).)

In sum, this Court should reject defendants' arguments challenging Mr. Sickler's modeling of volume.  At this juncture, defendants' objections are waived or subject to rulings that are the law of the case.  Further, the jury did not clearly err if it found

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Mr. Sickler's assumptions were borne out by the facts, as it found them to be.

### 4.    *Price changes*

Defendants also contend that Mr. Sickler's opinions were "unrealistic, unfounded, and unreasonable" because he relied on prices that were, according to defendants, "indisputably unreasonable." (ILWU Posttrial Mots. [Dkt. 639] at 39-43.)  But like defendants' other challenges to Mr. Sickler's testimony, this too fails.

First, defendants waived their *Daubert* challenge to Mr. Sickler's modeling on the issue of price.  They first objected on this basis *after* defendants rested.  (ILWU's MTS [Dkt. 608] at 4-5, 7-8.)  These objections were waived.  *See* Order on Pretrial Matters [Dkt. 551] at 2-3; *Jerden*, 430 F.3d at 1236-37 (motion to strike after party rests is untimely); *Skydive II*, 673 F.3d at 1114 (defendant "waived its ability to challenge the substance of [the damage expert's] testimony" by failing to object before or at trial).

Second, like other issues, defendants challenge the factual basis for Mr. Sickler's damages models—namely, prices they deem too high.  Such challenges provide no basis for excluding testimony.  *Children's Broad.*, 357 F.3d at 865.

Third, the jury did not clearly err if it found that the base price used in Mr. Sickler's models—specifically, the $270/TEU that carriers were *actually* paying ICTSI despite defendants ensuring terrible service at Terminal 6 (Tr. Vol. 5 at 930:13-20 (Sickler)—was within the range of reasonable pricing in the "but for" world.  There was substantial evidence that:

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- Even after being raised, Terminal 6's rates were "below market."[70]

- Terminal 6 had a favorable "cost differential" for containers destined for the Portland area versus "spend[ing] a lot more money in trucking" to come through Seattle-Tacoma.[71]

- ICTSI "track[ed]" the added costs of transporting containers from Seattle and Tacoma to the Portland area, which were $750 at the "low end" and "on the high side about $1,100" for each move.[72]

- Carriers stayed at Terminal 6 even after prices rose.[73]

- The carriers ultimately stopped calling on Terminal 6 because persistent productivity issues impaired their businesses.[74]

Even if not all stakeholders would have selected $270/TEU as their preferred price in the real world where defendants' unlawful actions impaired the value of calling at Terminal 6,[75] the record supported a finding that, in the absence of the defendants' unlawful conduct, $270/TEU was within the range of reasonable pricing.

---

[70] Tr. Vol. 5 at 820:8-14.  *See also* Tr. Vol. 2 at 250:20-251:4 (Ganda's similar testimony that rates were below those of the Washington ports); Tr. Vol. 6 at 985:12-14 (Sickler recounting that he had been told by Ganda that ICTSI could have continued to change "the $270 rate … over time" or continued "[e]ven at higher rates").

[71] Tr. Vol. 2 at 234:21-235:6 (Ganda).

[72] Tr. Vol. 3 at 429:8-430:24 (Ganda).  *See also* Tr. Vol. 5 at 808:6-809:5, 820:8-17 (Gimpel's similar testimony).

[73] Tr. Vol. 5 at 820:8-14 (Gimpel).  *See also* Tr. Vol. 2 at 227:20-228:17 (Ganda testifying that APL had an average of 1,000 empty containers to export each week and could save approximately $200,000 per week by taking them out of Portland).

[74] *See supra* Notes 49-51.

[75] Defendants invoke statements made on behalf of Hapag-Lloyd, which in relation to price increases, was in an adversarial relationship with ICTSI.  (ILWU Posttrial Mots. [Dkt. 639] at 39.  *But see* Tr. Vol. 5 at 892:14-16 (Gimpel testifying that carriers "always" "threatened to leave … if the threatened rate increases were enacted").

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Defendants also seem to argue that, when Mr. Ganda initially budgeted increased prices before defendants' "hardtiming" had begun, he forever locked ICTSI into that budgeted figure in the "but for" world because it was less than the $270/TEU that ICTSI obtained in the real world.  (*See* ILWU's Posttrial Mots. [Dkt. 639] at 39.)  To be sure, Mr. Ganda could form intentions back in 2011 and may, even now, hold *an opinion* about what he "theoretically" would have done, but for defendants' unlawful labor conduct. (Tr. Vol. 2 at 248:1-250:7, 334:6-335:8.)  Defendants' argument, however, presupposes that, at this juncture, Mr. Ganda's projections and opinion represent *established facts* about pricing in the "but for" world that Mr. Sickler needed to accept in his model.  They do not.  *See, e.g.*, *Silver Sage* 251 F.3d at 822 (overturning remittitur where trial court had deducted from the damages testified to by an expert and found by the jury amounts the plaintiff had "promised" to pay).

The same sort of factual dispute plays out in relation to defendants' argument that the prices ICTSI *actually obtained* would have depressed volume in the "but for" world where ICTSI could deliver good productivity to customers.  Mr. Kidder referenced elasticity—"the simple proposition that if you increase prices, then volume will go down,

---

Defendants also editorialize that the Advisian report had "reasonable prices" (ILWU's Posttrial Mots. [Dkt. 639] at 39) and, by noting Mr. Gimpel's involvement, suggest that he endorsed those low rates.  That is inaccurate.  Mr. Gimpel testified that the Advisian report assumed unreasonably low rates—"not reflective of what market rates were"—at the request of the report's sponsor. (Tr. Vol. 5 at 906:18-907:17.)  Indeed, Mr. Gimpel testified, his team "[a]bsolutely" did not "recommend[] [that rate] to the Port" and would not because those rates were noncompensatory.  (R. Tr. 11/30/19 at 182:8-183:12.)

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

or the reverse, if you lower volume, price goes up"—which he argued was incompatible with Mr. Sickler's damages models.  (Tr. Vol. 7 at 1337:23-1338:3.)  But there was also substantial evidence that Mr. Kidder's "simple proposition" was unduly simplistic.

For each of the reasons noted above, ICTSI had market advantages over the Washington ports in relation to the catchment basin that would have made it attractive to carriers even at $270/TEU if it were able to provide good and consistent productivity. Mr. Kidder's simplistic view of ICTSI's damages is also contrary to testimony that:

- Volume in the catchment basin as a whole was growing "organic[ally]" between 2012 and 2017 as a result of increased population and growing economy, and, but for the illegal labor actions, should have resulted in increased volume at Terminal 6.[76]

- Carriers are drawn to strong and consistent productivity.[77]

- If Terminal 6 could improve on its historic productivity, prices and volume could have grown simultaneously.[78]

- APL tried calling on Terminal 6 in December 2014, and would have saved about $200,000 by using Terminal 6 to export 1,000 TEU/week, but was driven away by defendants' hardtiming.[79]

- In the absence of the "illegal labor actions at Terminal 6," the increase to $270/TEU would not have "driven volume away from Terminal 6."[80]

---

[76] Tr. 822:4-823:17 (Gimpel).

[77] Tr. Vol. 2 at 220:3-10, 232:17-21 (Ganda).

[78] *Id*. at 220:3-10, 221:13-18 (Ganda); Tr. Vol. 5 at 868:3-6 (Gimpel).

[79] Tr. Vol. 2 at 227:20-228:17 (Ganda testifying to average volume and anticipated added revenue of approximately $200,000/week); Tr. Vol. 3 at 381:18-383:9 (Ganda testifying about basis of expectation of continued calls).

[80] Tr. Vol. 5 at 820:8-14, 868:3-6 (Gimpel).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- In the absence of the "illegal labor actions," Terminal 6 would have grown at the expense of the Washington ports.[81]

As Mr. Sickler testified, it is not an immutable rule that "if the price goes up, then the volume will go down[.]" (R. Tr. 10/30/19 at 155:6-156:20.) For example, iPhone sales increased while Apple increased its prices. (*Id.*) From that example, the jury could grasp various pricing variables that defendants ignored in their factual argument about elasticity, including increased demand, a lack of comparable services at a given price, quality, and brand preferences/loyalty. The jury would not have clearly erred in finding that volume was substantially depressed in the real world by defendants' unlawful labor actions, rather than, as assumed by Mr. Kidder and defendants, price elasticity.

Moreover, when Mr. Kidder testified, he did not recalculate Mr. Sickler's damages models while isolating the supposed impact of his elasticity critique or with the lower price that Mr. Ganda had initially projected. Indeed, he never mentioned Mr. Ganda's intended price increase at all. The jury was entitled to conclude that defendants themselves saw little merit in their own arguments or had concluded the effect was nominal in relation to the overall damages dispute. *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (defendant's failure to provide the jury "an alternative and tangible" recalculation of damages incorporating its argument about plaintiff's damages calculation "undoubtedly weakened its position" with the jury).

---

[81] *Id*. at 820:21-821:19.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Ultimately, defendants fail to establish any basis for excluding Mr. Sickler's

models or that the jury clearly erred in relying on the pricing in his models, if it did so.

### 5. Capital expenditures for environmental remediation

Defendants challenge Mr. Sickler's opinion because, they contend, there were

"many millions of dollars in capital expenditures, environmental costs, and other such

expenses that he should have *subtracted*" in the "but for" world.  (ILWU's Posttrial Mots.

[Dkt. 639] at 50 (emphasis in original).)  This Court should reject defendants' objection,

which only directs this Court to evidence relating to environmental costs.  (*Id*.)  First, as

with so many issues, defendants waived this objection—indeed, they first raised this one

in their posttrial motions.  *See Skydive II*, 673 F.3d at 1114 (upholding finding of waiver).

Second, this is yet another improper challenge to "the factual basis of an expert

opinion."  *Children's Broad.*, 357 F.3d at 865.

Third, defendants' argument simply begs the question of how capital expenditures

should be treated when modeling damages by comparing real world and "but for"

EBITDA—Earnings Before Interest, Tax, Depreciation, and Amortization.  (Tr. Vol. 5 at

923:24-18.)  Mr. Sickler testified that the $5 million unincurred environmental cost was

"not relevant in an economic damages calculation."  (Tr. Vol. 6 at 998:15-999:4 (Sickler

testifying expense).)  Without mentioning environmental costs, Mr. Kidder generally

criticized Mr. Sickler for omitting "incremental" capital expenditures.  (R. Tr. 10/29/19 at

136:20-138:7.)  But his testimony was not compelling.  EBITDA *excludes* amortizable

costs and his testimony about adjusting capital expenditures in the real versus "but for"

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

world was internally inconsistent. Specifically, when opining about the issue, Mr. Kidder *did not* tell the jury to offset *his* capital expenditures figure to account for defendants substantially causing ICTSI to purchase otherwise unneeded equipment in the real world. (Tr. Vol. 2 at 235:18-236:8, 256:21-257:25 ($7 million spent on equipment to address hardtiming when $1.25 million had been budgeted).) The jury was not required to accept defendants' damages theory about environmental costs.

Defendants waived their objection to Mr. Sickler's treatment of environmental costs, which regardless, was not contrary to the clear weight of the evidence.

### 6.    *Hanjin's bankruptcy*

In their posttrial motions, defendants again argue that Hanjin's bankruptcy in August 2016 so confounded Mr. Sickler's damages models as to render his opinions inadmissible. (ILWU's Posttrial Mots. [Dkt. 639] at 43-46.) This Court should reject defendants' arguments. First, this Court already denied defendants' *Daubert* objections to Mr. Gimpel's and Mr. Sickler's opinions relating to this issue. (*See* Op. & Order on Mots. Challenging Exp. Test. [464] at 3-9, 15.) Those rulings are the law of the case and defendants undertake no showing this Court's rulings were clearly erroneous.[82]

---

[82] Plainly, the Court's rulings were correct. *See, e.g.*, *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (upholding opinion regarding value of song, if licensed in "but for" world, where opinion relied in part on industry standards and was "tethered to her deep industry expertise"); *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011 U.S. Dist. LEXIS 133502, 2011 WL 5417090, at *8 (N.D. Cal. Oct. 27, 2011) (Ware, J.) (expert testimony grounded on the expert's personal knowledge and experience was admissible in light of his extensive background in the area).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

Second, the jury was entitled to conclude that Terminal 6 would have been able to replace the container volume carried by Hanjin, but for defendants' unlawful labor actions having already expelled Hanjin and made Terminal 6 too toxic to attract new business. For example, Mr. Gimpel testified that:

> Q    Assuming there had never been a labor dispute and assuming that Hanjin was still calling on Terminal 6 in August of 2016, do you have an opinion about whether, after that bankruptcy, another ocean carrier would have come in to Terminal 6 to take over that service that Hanjin had abandoned?
>
> A    It is my strong opinion that that would have happened. It would have happened either with a successor company, a company called SM Lines that ultimately took over the Hanjin assets and a lot of the Hanjin management, and had Hanjin still been at Terminal 6, I suspect they would have continued that call because it was a profitable call. Why would they give it up?
>
> Had APL not been chased away, I'm sure they would have picked up Hanjin's cargo. I have no doubt whatsoever. In addition to that, Hanjin's alliance partners could have picked it up. They both had ships—K Line and Yang Ming Line had ships of the size that could serve it.
>
> If nothing else, one of the other carriers in the Trans-Pacific would have staked claim to 40 percent of the catchment basin. Why give it up? If you send it over to Seattle or Tacoma, you are going to share it with eight other carriers. If you pick it up in Portland, you get the whole 40 percent.

(Tr. Vol. 5 at 826:5-827:1.) Even when pressed on cross-examination, Mr. Gimpel reinforced the analytical bases for concluding there would not have been an irrevocable loss of volume—namely, "[t]hat volume is still moving," "[s]omebody is going to carry it," and taking it through other ports comes at further "costs." (*Id.* at 843:11-18. *See also id.* at 862:25-863:4 ("Q Well, you're the shipping expert. Wasn't Hanjin's bankruptcy a

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**    SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

big deal in the industry?  A It was a big deal for Hanjin.  It wasn't a big deal in the

industry.  All the cargo continued to move.  All the terminals that it operated in kept

working."); Tr. Vol. 5 at 943:5-9: (Sickler testifying that he did not stop his analysis on

the date of Hanjin's bankruptcy because Gimpel told him to "assume that there would be

a carrier or carriers that would have stepped into Hanjin's shoes to continue to move

cargo in and out of Portland"); Tr. Vol. 3 at 384:8-14, 415:7-417:5 (Hanjin's alliance

partner, Yang Ming Line, would have benefitted from calling on Terminal 6 after

Hanjin's bankruptcy in "but for" world).)

     In response to this substantial evidence, defendants failed to present any evidence

that the jury was required to accept that Hanjin's volume was materially diminished

*anywhere*—let alone necessarily would have been at Terminal 6—before SM Lines

succeeded to Hanjin's assets.  Among those assets the jury learned SM Lines succeeded

to in December 2016 were Hanjin's ships that had previously called on Portland.  (Tr.

Vol. 5 at 898:24-899:7 (Gimpel).)  Likewise, defendants offered no evidence that the jury

was required to accept that, if Hanjin's bankruptcy would have disrupted service to

Portland in late 2016, its alliance partners or APL would have been unable to seize on the

market opportunity created by Hanjin's absence.  In sum, if the jury found that Hanjin's

volume could have been replaced postbankruptcy, it did not clearly err in doing so.

     Third, under the substantial factor instruction, the jury was entitled to find that

defendants' unlawful labor actions, which led Hanjin to stop calling on Terminal 6 in

March 2015, were a substantial cause of lost container volume thereafter *even if* Hanjin's

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

bankruptcy would be a concurrent cause of the same lost container volume after

August 2016.  As the Court instructed the jury, substantial factor causation includes the

principle of concurrent causation:

> [Concurrent causation] applies when more than one factor
> independently can cause the same outcome.  This means that the
> alleged conduct, operating alone, would have been enough, or
> sufficient, to cause the outcome, even if there are other factors that,
> operating alone, also would have been sufficient to cause the
> outcome.  Under the concurrent causation exception, a factor is a
> substantial factor even though the outcome could have been caused
> without that factor. …
>
> The "concurrent causation" principle may apply even if one of the
> causes is "innocent," such as when lightning strikes and naturally
> starts a fire and a person also starts a fire and the two fires merge and
> burn a house.  The person is a substantial factor causing the house to
> burn if the fire he started would have caused the house to burn, even
> though the house may have burned without the person's conduct if
> the fire caused by the lightning, standing alone, would have caused
> the house to burn.

(Final Jury Insts. [Dkt. 615], Instr. No. 27, pp. 32-33.)  That is, a party whose wrongful

conduct was sufficient to cause harm that actually occurred cannot always avoid liability

based on the notion that another occurrence was *also* sufficient to cause the harm.

Here, the concurrent causation principle defeats defendants' argument.  They

argue that—like the unlawful conduct that actually was sufficient to cause the loss of

container traffic from Hanjin's regular calls on Terminal 6—Hanjin's bankruptcy *also*

would have been sufficient to cause Hanjin to stop calling on Terminal 6 and, relatedly,

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

depress container volume in the same amount.[83]  Even if one were to accept defendants'

factual predicate, *there is still a jury issue*.  Specifically, the jury was entitled to find that

Hanjin's bankruptcy was a concurrent cause of it not calling on Terminal 6 thereafter and

a concurrent cause of *the same injury*—lost container volume after August 2016—that

was *also caused* by defendants' earlier unlawful actions.

     For each of these reasons—law of the case, evidence that Hanjin's volume was

replaceable, and concurrent causation—defendants' arguments about Hanjin's

bankruptcy fail.  If the jury relied on Mr. Sickler's models to assess damages

uninterrupted by Hanjin's bankruptcy, it did not clearly err in doing so.

### 7. *Out-of-pocket expenses*

     Defendants pursue three lines of attack on ICTSI's special damages, all of which

fail.  (ILWU's Posttrial Mots. [Dkt. 639] at 48-50.)  They say ICTSI is not entitled to

recover lost profits *and* its out-of-pocket expenses associated with the lease buyout.

Further, they argue that Mr. Sickler cannot opine about out-of-pocket expenses because,

in the "but for" world of his models, ICTSI would have been profitable and not incurred

those costs.  Finally, defendants dispute that their unlawful labor actions were a

substantial cause of the out-of-pocket expenses.

     First, defendants' arguments are waived or subject to rulings that are law of the

case.  Defendants waived their objection to ICTSI recovering both lost profits *and* its out-

---

[83] That the events did not occur simultaneously is immaterial.  *In re Methyl
Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 371-72 (S.D.N.Y. 2005).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

of-pocket expenses by failing to raise it until *after* ICTSI rested its case.  (ILWU's MTS [Dkt. 608] (raising issue).)  On causation, this Court already overruled defendants' objections to this item of special damages [Dkt. 400], finding that "[t]he question of whether ILWU's conduct had the requisite causal connection … is a question for the jury" (Order on Pretrial Matters [Dkt. 551] at 35-36).  Defendants also waived their argument that Mr. Sickler's opinion about out-of-pocket expenses is unreliable because it is inconsistent with profitability in the "but for" world, which defendants first asserted after ICTSI had rested.  (*See* ILWU's MTS [Dkt. 608] at 7.)

Second, defendants' various arguments all fail on the merits.  Under *Frito-Lay, Inc. v. Local Union No. 137*, 623 F.2d 1354, 1365 n.11 (9th Cir. 1980) (Kennedy, J.), "[i]n addition to lost profits, an injured employer is entitled to recover the extraordinary expenses, not normal to its business operation, incurred as a result of the Union's illegal strike."[84]  As to some supposed inconsistency in Mr. Sickler's model, Mr. Sickler simply opined on the separate categories of damages allowed under *Frito-Lay*.  And on causation, the jury was entitled to find defendants liable for the various lease buy-out

---

[84] Defendants must know Ninth Circuit law on this issue; ICTSI has directed them to *Frito-Lay* several times.  (*See* ICTSI's Proposed Jury Instrs. [Dkt. 375] at Instr. No. 31, p. 58 (quoting same to define out-of-pocket expenses); ICTSI's Proposed Jury Instrs. [Dkt. 481] at Instr. No. 34, p. 60 (same); ICTSI's Resp. to ILWU's MTS [Dkt. 612] at 15-16 (quoting same because "Defendants' contention that ICTSI cannot recover both lost earnings and out-of-pocket costs conflicts with Ninth Circuit law.").)  Yet they fail to cite this controlling case when arguing such damages are unavailable.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

expenses for the same reasons it could reject defendants' argument that Hanjin's

bankruptcy somehow cut off ICTSI's incursion of damages.

That is, defendants' arguments about out-of-pocket expenses suffer from the same

deficiencies as all of their arguments about Mr. Sickler's testimony: their evidentiary

arguments fail on waiver and law of the case grounds.  And even when reframed as

factual disputes, defendants cannot establish that, if the jury accepted ICTSI's evidence

on the subject, the jury committed clear error in doing so.

### C.    Taking all inferences in ICTSI's favor, the jury had ample evidence to award *more than* $93.6 million in damages, even if this Court were to accept discrete arguments by defendants.

ICTSI was not required to "prove the exact amount of [its] damages"; the jury was

entitled to find from a preponderance of the evidence ICTSI's "damages as a matter of

just and reasonable inference, although only approximate[.]"  (Final Jury Instrs.

[Dkt. 615] at Instr. No. 30, p. 35.)  The jury faced complex damages issues and, while

defendants contend that there were "questionable elements" of ICTSI's claim or even a

"total inadequacy of proof on isolated elements of damages claims submitted to a jury[,]"

the Ninth Circuit has found even such a showing insufficient to impeach a damage award.

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir.

1986) (antitrust action).  Instead, the jury's verdict must be upheld if the "aggregate

verdict … is nevertheless reasonable in light of the totality of the evidence."  *Id.*

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

Here, the parties presented substantial evidence regarding damages.  Indeed, the jury was well equipped to award damages even if the jury found facts different than those assumed in Mr. Sickler's models:

- <u>Volume change</u>.  The jury had ample evidence from which to adjust its damages award if it found higher or lower volumes more likely.[85]

- <u>Price changes</u>.  There was ample evidence from which the jury could adjust damages if it found that the $270/TEU that ICTSI obtained in the real world should have been higher or lower.[86]

- <u>Capital expenditures</u>.  The jury received evidence from which it could, if it believed Mr. Kidder and defendants, make line item increases or decreases to its award relative to capital expenditures.[87]

---

[85] Mr. Sickler testified extensively about his models and that, as well as his demonstratives, conveyed the component parts of his models.  Moreover, the jury would also have been entitled to use Mr. Kidder's testimony, which valued lost profits in 2012 for 10,732 moves (or about 19,300 TEUs) at $764,995, to increase or decrease its award of damages based on its findings about likely TEU volumes.  (R. Tr. 10/29/19 at 160:13-163:1 (Kidder); Tr. Vol. 5 at 838:20-22 (Gimpel testifying to conversion factor between moves and TEUs of 1.8).)

[86] *See* Tr. Vol. 5 at 922:10-23 (Sickler testifying revenue is TEUs multiplied by unit price); Tr. Vol. 2 at 248:1-250:7, 334:6-335:8 (Ganda testifying to roughly $20/TEU difference between initial budget figure and ICTSI actual 2013 rate); Tr. Vol. 6 at 1023:10-23 (disagreeing with defense counsel's claim that Mr. Ganda's budgeted price meant that Mr. Sickler's "damage numbers would die," because, if the jurors felt that the $270/TEU price was too high, "[the damages] can just be recalculated").

[87] *See* Tr. Vol. 2 at 235:18-236:8, 256:21-257:25 ($7 million spent on equipment to address hardtiming when $1.25 million had been budgeted); Tr. Vol. 5 at 942:7-17 (Sickler's out-of-pocket calculation related only to *depreciated* equipment costs at time of lease buy-out); Tr. Vol. 6 at 998:15-999:4 (Sickler testifying to budgeted but unspent environmental remediation expense of about $5 million).

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

- <u>Hanjin's bankruptcy</u>.  ICTSI presented evidence from which the jury could adjust its damages award if it concluded Hanjin's bankruptcy would have interrupted or terminated volume at Terminal 6.[88]

- <u>Out-of-pocket expenses</u>.  ICTSI presented evidence of its incursion of extraordinary expenses, not normal to its business operation, incurred as a result of defendants' unlawful activities, which allowed the jury to increase or decrease the out-of-pocket damages testified to by Mr. Sickler.[89]

It must follow that defendants cannot obtain posttrial relief on the damages award.

They cannot show the jury erred because they cannot establish what predicate facts—

volume, price, and expenses—the jury found when awarding damages nor that those facts

were against the clear weight of the evidence.  Indeed, because the jury awarded between

$4 and $42 million less than Mr. Sickler's models, it appears the jury actually did

partially agree with defendants.  But which arguments did it accept or reject?  And were

those reductions offset by findings that Mr. Sickler's assumptions were too conservative?

For example, neither of Mr. Sickler's scenarios reflected continued volume growth at the

rates that ICTSI was *actually achieving*.  (Tr. Vol. 2 at 221:13-223:11 (Ganda testifying

to significantly exceeding projections in 2011 (9 percent) and being on track to do so

---

[88] *See* Tr. Vol. 2 at 942:24-944:9, 947:7-18 (Sickler testifying to how to adjust figures in relation to Hanjin's bankruptcy, if the jury wanted to); Tr. Vol. 3 at 1020:24-1021:13 (same).

[89] *See* Tr. Vol. 2 at 235:18-236:8, 256:21-257:25 ($7 million spent on equipment to address hardtiming when $1.25 million had been budgeted); Tr. Vol. 2 at 279:3-281:17 (Ganda testifying to lease buy-out costs of $11,450,000 and surrender of approximately $8.7 million worth of equipment, inventory, and supplies); Tr. Vol. 5 at 941:1-942:17 (Sickler testifying to components of special damages, including as relating to *depreciated* equipment costs at time of lease buy-out).

Page 61     **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

again in 2012 (10 percent)); Tr. Vol. 5 at 924:19-925:18, 926:13-927:18 (Sickler

adhering to more conservative budget figures for growth beyond 2012).)  Likewise,

neither scenario adds volume to the "but for" scenario after defendants prevented APL

from returning after its trial call in December 2015.  (Tr. Vol. 2 at 227:20-228:17 (Ganda

testifying to average volume and anticipated added revenue of approximately

$200,000/week); Tr. Vol. 3 at 381:18-383:9 (Ganda testifying about basis of expectation

of continued calls).)

        Ultimately, taking the evidence in the light most favorable to ICTSI and

calculating the maximum amount sustainable by the proof—as required in the Ninth

Circuit, *Fenner*, 716 F.2d at 603; *D & S Redi-Mix*, 692 F.2d at 1249—results in amounts

far greater than awarded by the jury.  As such, defendants are not entitled to any posttrial

relief on damages.  *See Silver Sage*, 251 F.3d at 825 (remittitur not available where "even

excluding [the disputed amount], the amount of damages that he evidence would support

… is more than the amount the jury awarded").

## VII.   Conclusion

        Plaintiff presented substantial evidence that defendants destroyed a profitable and

growing business.  Defendants, of course, had a different story and presented what

evidence they could.  It was "[t]he very essence of [jurors'] function"—and their function

alone—to weigh all the evidence.  *Tennant*, 321 U.S. at 35.  *See also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW, MOTION FOR NEW TRIAL, AND MOTION FOR
REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

those of a judge."). And, having weighed the evidence, the jurors unanimously found that defendants engaged in unlawful conduct that was a substantial factor in causing significant damages.

Lacking any good basis to contest *any* aspect of the jury's verdict, defendants attack *every* aspect of it. They do so by ignoring the substantial evidence that supported the jury's verdict, taking inferences in their favor, and, in some cases, cutting phrases from their context to wholly alter their meaning. Defendants' utter inability to confront the record as it *actually* exists and the standards on posttrial motions as *actually* applied is telling. The record and the law supply no basis for relief. Indeed, their motions are a retread of their failed jury arguments. To grant any of defendants' posttrial motions would be to displace the jury from its essential function.

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone: 503.222.9981
Fax: 503.796.2900

The jury has spoken.  Its verdict is supported by substantial evidence and is not clearly erroneous.  Moreover, the jury's damages award is less than the maximum amount supported by the evidence.  This Court should deny each of defendants' motions.

Dated this 21st day of January, 2020.

SCHWABE, WILLIAMSON & WYATT, P.C.

By: s/ Jeffery S. Eden
        Jeffrey S. Eden, OSB #851903
        Email: jeden@schwabe.com
        Amanda T. Gamblin, OSB #021361
        Email: agamblin@schwabe.com
        Michael T. Garone, OSB #802341
        Email: mgarone@schwabe.com
        Richard K. Hansen, OSB #832231
        Email: rhansen@schwabe.com
        Andrew J. Lee, OSB #023646
        Email: ajlee@schwabe.com
        Facsimile: 503-796-2900

        *Of Attorneys for ICTSI Oregon, Inc.*

**ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR**

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Fax: 503.796.2900

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of January, 2020, I served the foregoing **ICTSI OREGON, INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND MOTION FOR REMITTITUR** on:

| | |
|---|---|
| Robert A. Shlachter<br>Timothy S. DeJong<br>Lydia Anderson-Dana<br>STOLL STOLL BERNE LOKTING & SHLACHTER, PC<br>209 SW Oak Street, Suite 500<br>Portland, OR 97204<br>Telephone:  (503) 227-1600<br>Facsimile:   (503) 227-6840<br>Email:    rshlachter@stollberne.com<br>            tdejong@stollberne.com<br>            landersondana@stollberne.com<br><br>*Of Attorneys for ILWU and ILWU Local 8* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email<br>☒ Electronically via USDC CM/ECF system |
| Susan J. Harriman (admitted *pro hac vice*)<br>Daniel Purcell (admitted *pro hac vice*)<br>Brook Dooley (admitted *pro hac vice*)<br>Philip J. Tassin (admitted *pro hac vice*)<br>Dan Jackson (admitted *pro hac vice*)<br>KEKER, VAN NEST & PETERS, LLP<br>633 Battery Street<br>San Francisco, CA  94111-1809<br>Telephone:  (415) 391-5400<br>Facsimile:   (415) 397-7188<br>Email:    sharriman@keker.com<br>            dpurcell@keker.com<br>            bdooley@keker.com<br>            mkarwande@keker.com<br>            ptassin@keker.com<br>            djackson@keker.com<br><br>*Of Attorneys for ILWU and ILWU Local 8* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email<br>☒ Electronically via USDC CM/ECF system |

SCHWABE, WILLIAMSON & WYATT, P.C.<br>Attorneys at Law<br>Pacwest Center<br>1211 SW 5th Ave., Suite 1900<br>Portland, OR  97204<br>Telephone: 503.222.9981<br>Fax: 503.796.2900

| | |
|---|---|
| Peter Hurtgen (admitted *pro hac vice*)<br>CURLEY, HURTGEN & JOHNSRUD, LLP<br>4400 Bohannon Drive, Suite 230<br>Menlo Park, CA  94025<br>Telephone:  (949) 302-9193<br>Facsimile:   (650) 323-1002<br>Email:    phurtgen@chjllp.com<br><br>    *Of Attorneys for ICTSI Oregon, Inc.* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email<br>☒ Electronically via USDC<br>   CM/ECF system |

s/ Jeffrey S. Eden
Jeffrey S. Eden, OSB #851903

Page 2       **CERTIFICATE OF SERVICE**