# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

ICTSI OREGON, INC.,

       Plaintiff,

  v.

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION; and
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION Local 8,

       Defendants.

Case No. 3:12-cv-1058-SI

**OPINION AND ORDER**

Jeffrey S. Eden, Amanda T. Gamblin, Michael T. Garone, Richard K. Hansen, and Andrew J. Lee, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; Peter Hurtgen, CURLEY, HURTGEN & JOHNSRUD LLP, 4400 Bohannon Drive, Suite 230, Menlo Park, CA 94025. Of Attorneys for Plaintiff ICTSI Oregon, Inc.

Susan J. Harriman, Dan Jackson, Brook Dooley, and Philip J. Tassin, KEKER, VAN NEST & PETERS LLP, 633 Battery Street, San Francisco, CA 94111; Robert A. Shlachter, Timothy S. DeJong, and Lydia Anderson-Dana, STOLL BERNE PC, 209 SW Oak Street, Suite 500, Portland, OR 97204. Of Attorneys for Defendants International Longshore and Warehouse Union and International Longshore and Warehouse Union Local 8.

**Michael H. Simon, District Judge.**

After a ten-day trial, the jury returned a verdict in the amount of $93,635,000 in favor of

Plaintiff ICTSI Oregon, Inc. ("ICTSI") and against Defendants International Longshore and

Warehouse Union ("ILWU National") and International Longshore and Warehouse Union

Local 8 ("Local 8") (collectively, "ILWU"). The jury also determined that ILWU National was solely responsible for 55 percent of ICTSI's damages and Local 8 was solely responsible for 45 percent. The jury found that both Defendants had engaged in illegal secondary boycott activities, in violation of § 303 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 187. The Court received the jury's verdict and discharged the jury but deferred entering judgment.

International ocean-going shipping of commercial containers forms the background of this lawsuit. Along the West Coast, members of local unions affiliated with ILWU National typically perform the work of loading and unloading commercial containers on and off ocean-going vessels. They do this under a coastwide contract between ILWU National and Pacific Maritime Association ("PMA"). PMA's members include shipping companies and terminal operators.

Some ocean-going containers are refrigerated. These containers are known as "reefers." During the time a reefer is onshore at a port terminal, either before the reefer is loaded onto a vessel or after it has been unloaded, it must be connected to a source of electrical power to maintain refrigeration, and it must be monitored. The job of plugging, unplugging, and monitoring refrigerated containers is called a "reefer job," and the work is known as "reefer work." Under the West Coast contract between ILWU National and PMA, when control over assigning reefer work rests with a PMA-member terminal operator, that work must be assigned to local members of ILWU National.

ICTSI is a PMA-member terminal operator. In 2010, ICTSI arrived in Portland, Oregon and leased Terminal 6 (the container terminal) from the Port of Portland (the "Port"). For a long time before, the Port controlled the reefer work at Terminal 6 and assigned the reefer jobs to electricians who were local members of the International Brotherhood of Electrical Workers

("IBEW"), not to local members of ILWU National. In February 2011, the Port transferred management of Terminal 6 operations to ICTSI, but the Port retained control over the assignment of reefer work under the Port's lease agreement with ICTSI. The Port continued to assign the reefer work to local members of the IBEW, but ILWU wanted the reefer work assigned to its local members. Thus began the reefer dispute at the Port of Portland.

As shown by the evidence presented at trial, ILWU engaged in work stoppages, slowdowns, "safety gimmicks," and other coercive actions with at least one substantial motivating factor being to compel ICTSI to put pressure on the Port to have the reefer work done by ILWU members. This could include pressuring the Port to assign the work to ILWU members or to transfer control over the assignment of the reefer work at Terminal 6 to ICTSI. As long as the assignment of reefer work at Terminal 6 remained under the control of the Port, the Port could continue to assign the reefer jobs to members of the IBEW, rather than to members of ILWU. If, however, the Port transferred control over the reefer work at Terminal 6 to ICTSI, then under the coastwide contract between ILWU National and PMA, ICTSI would have to assign the reefer work to members of ILWU. The controversy between ICTSI and ILWU leading to this lawsuit began in May 2012 and continued until March 2017, when ICTSI ended its operations at Terminal 6.

ILWU has moved for judgment as a matter of law, remittitur, or new trial. For the reasons explained below, the Court will not disturb the jury's thoughtful and well supported findings on liability and causation. When, however, the Court considers the portion of IWLU's motion that seeks a new trial on damages and the Court exercises its obligation to consider all the evidence as the Court views that evidence, the Court is left with the definite and firm conviction that the evidence does not support a damage award of $93.6 million. The Court also finds that an award

of $19,061,248 is the maximum amount sustainable by the proof. As a result, if ICTSI agrees to accept that lower figure, the Court will enter judgment in that amount. Otherwise, the Court will grant a new trial limited to damages. ICTSI will have two weeks from the date of this Opinion and Order to inform Defendants and the Court of ICTSI's decision.

## STANDARDS

### A. Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure, judgment as a matter of law is proper if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quotation marks omitted); *see also Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (explaining that a motion for judgment as a matter of law must be granted if "the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party"). Because a motion under Rule 50(b) is a renewed motion, "a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law that it did not first raise in its Rule 50(a) pre-verdict motion.'" *Go Daddy*, 581 F.3d at 961 (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

A court reviews properly raised arguments challenging the factual sufficiency of a jury's verdict for substantial evidence. That means that "the jury's verdict must be upheld if there is 'evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'" *Id.* at 963 (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)); *see also Weaving*, 763 F.3d at 1111 (noting that substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion[,] even if it is possible to draw two inconsistent conclusions from the evidence" (quotation marks omitted)). In ruling on a motion under Rule 50(b) based on a ground not asserted in a motion under Rule 50(a), a court is

"limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Go Daddy*, 581 F.3d at 961 (quotation marks and citation omitted). "This exception, however, permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) (emphasis in original) (quoting *Patel v. Penman*, 103 F.3d 868, 878 (9th Cir. 1996)).

In evaluating a motion for judgment as a matter of law, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Experience Hendrix, L.L.C., v. Hendrixlicensing.com, Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). Further, the Court may not make credibility determinations, weigh the evidence, or "substitute its view of the evidence for that of the jury." *Krechman v. City of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (quotation marks and citation omitted).

## B. New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a district court may "on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). "Rather, the court is 'bound by those grounds that have been historically recognized.'" *Id.* (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)); *see also Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007).

Unlike a motion (or renewed motion) for judgment as a matter of law under Rule 50, when considering motion for new trial under Rule 59 the Court is not limited to viewing the evidence in the light most favorable to the non-moving party. *Experience Hendrix*, 762 F.3d at 842. Rather, the Court "can weigh the evidence and assess the credibility of the witnesses." *Id.* "The district court also is not limited to the grounds a party asserts to justify a new trial, but may *sua sponte* raise its own concerns about the damages verdict." *Id.*

Although a district court may view the evidence differently than the jury, a district court may not substitute its "evaluations for those of the jurors." *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) ("[A] district court may not grant a new trial simply because it would have arrived at a different verdict."); *France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892, at *1 (N.D. Cal. Mar. 2, 2015) (noting that a judge should not grant a new trial unless "left with the definite and firm conviction that a mistake has been committed" (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987)).

A "trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). In determining the clear weight of the evidence, "the district court has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Id.* (alterations in original) (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

**C. Remittitur**

When a district court holds that a new trial is warranted because the verdict is against the clear weight of the evidence or the jury has awarded excessive damages, the district court may either grant a new trial or deny the motion for new trial conditioned upon the prevailing party accepting a remittitur. *See Silver Sage*, 251 F.3d at 818-19; *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1452 (9th Cir. 1988). "The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified." *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). "A remittitur must reflect 'the maximum amount sustainable by the proof.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (quoting *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982)).

The Ninth Circuit has explained the standard that *it* (as an appellate court) applies when reviewing a district court's decision upholding a jury's damage award. According to the Ninth Circuit: "*We* afford substantial deference to a jury's finding of the appropriate amount of damages. *We* must uphold the jury's award unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *United States v. CB & I Constructors, Inc.*, 685 F.3d 827, 839 (9th Cir. 2012) (emphasis added) (quotation marks, citation, and alteration omitted). As the early cases establishing this standard in the Ninth Circuit also explained, the authority of a *district court* reviewing a jury's damage award is *broader* than the authority of the Ninth Circuit on appeal, and the district court may review a jury's decision on damages under the traditional standards of Rule 59:

> When the trial court is presented with a motion for a new trial grounded on a claim of an excessive verdict its power to deal with the motion is not limited to questions of law. The same power and duty which the trial judge has to set aside any verdict and grant a new trial when he is of the opinion the verdict is against the weight

of evidence, is that which the trial court frequently exercises in ordering a new trial, or in conditioning denial of a new trial on a remittitur because, in the opinion of the court, the amount of the verdict is against the weight of the evidence. *But this power and duty belongs exclusively to the trial judge.* It is not for us to give directions in such a case, even although he may have declined to take action, such as we consider we would have done had we been in his place.

*S. Pac. Co. v. Guthrie*, 186 F.2d 926, 932-33 (9th Cir. 1951) (emphasis added) (citation omitted).

As the Ninth Circuit reiterated in another case:

The trial court considered Sibrand Bros.' contention on motion for new trial and denied the motion. The action of the trial judge on such a motion for new trial "is not limited to questions of law," but he may "grant a new trial when he is of opinion the verdict is against the weight of evidence . . . ." *Southern Pac. Co. v. Guthrie*, 186 F.2 926, 932 (9th Cir. 1951); *Bradley Mining Co. v. Boice*, 194 F.2d 80, 83 (9th Cir. 1951).

*But the power of the Court of Appeals is not as broad as that of the trial court.* Absent a total want of evidence on all or certain portions of the case, or the erroneous exclusion from consideration by the trial court of appropriate matters or a showing of bias or prejudice on the part of the jury, *this court* may not reverse the trial court unless the verdict can be said to be grossly excessive or monstrous.

*Siebrand v. Gossnell*, 234 F.2d 81, 94 (9th Cir. 1956) (emphasis added).

The Ninth Circuit uses the term "we" in its more modern cases, which discuss overturning the jury's award rather than overturning the trial court's decision. In those cases, the Ninth Circuit has stated that "we" review the jury's damages award for substantial evidence, "we" give substantial deference to the jury's determination, and "we" will uphold the jury award unless it is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *See, e.g.*, *CB & I Contractors*, 685 F.3d at 839; *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008); *In re Exxon Valdez*, 270 F.3d 1215, 1247-48 (9th

Cir. 2001); *Yeti by Molly*, 259 F.3d at 1107; *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). These cases, however, do not direct that the *district court* must apply that appellate standard. As explained by the earlier Ninth Circuit cases, the respective powers of the district and appellate courts, and the respective standards applied by these courts, are different.

The Ninth Circuit also has held that a *district court* should evaluate claims for excessive damages under the standards applicable to Rule 59. *See, e.g.*, *Molski*, 481 F.3d at 729. The Ninth Circuit instructed that when considering a motion under Rule 59, a district court need not view the evidence in the light most favorable to the prevailing party, *Experience Hendrix*, 762 F.3d at 842, or review for substantial evidence; instead, a district court may weigh the evidence and overturn the jury's verdict if the district judge believes that "the verdict is contrary to the *clear weight of the evidence*, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (emphasis added). This is the standard that the Court applies here when considering ILWU's motion for new trial or remittitur under Rule 59 based on a claim of excessive damages.[1]

---

[1] ICTSI cited one case, and the Court found another, that state that motions for a new trial based on an argument of excessive damages require the district court to view the evidence in the light most favorable to the prevailing party. *See, e.g.*, *Oltz*, 861 F.2d at 1452; *Fenner*, 716 F.2d at 603. More recent cases from the Ninth Circuit, however, hold that Rule 59 does not require that a district court, when considering such a motion, view the evidence in the light most favorable to the prevailing party. *See Experience Hendrix*, 762 F.3d at 842 (directing that when considering a motion under Rule 59, a district court need not view the evidence in the light most favorable to the non-moving party); *Molski*, 481 F.3d at 729 (explaining that a district court reviews a motion seeking new trial based on an argument of excessive damages under the standards traditionally applicable to Rule 59). The Court follows the most recent Ninth Circuit precedent on this issue.

**DISCUSSION**

ICTSI responds to many arguments made by ILWU seeking either judgment as a matter of law or a new trial by asserting that ILWU has waived the specific argument or that the doctrine of "law of the case" precludes that argument. The Court addresses ICTSI's arguments of waiver and law of the case preclusion before turning to the merits of ILWU's motions.

**A. Waiver and Preclusion**

**1. Waiver**

ICTSI argues that ILWU waived many of its evidentiary challenges because ILWU did not timely raise them. ILWU presented these arguments at trial in ILWU's oral motions under Rule 50(a). At the close of ICTSI's case, the Court asked whether ILWU intended to make a Rule 50(a) motion, adding that the Court would allow ILWU to "wait until later" in the trial or ILWU could simply state its motion and then have "another opportunity" at the close of all evidence. ECF 647 at 54 (Tr. 1026:9-17). ILWU chose to make an oral motion, raising in broad strokes the arguments that ILWU now presents in the renewed motion. ILWU also incorporated by reference ILWU's earlier *Daubert* motion against ICTSI's damage expert Mr. Jay Sickler and ILWU's related motion to strike Mr. Sickler's testimony. ECF 647 at 54-59 (Tr. 1026-1031). In addition, at the close of all evidence, ILWU made another Rule 50(a) motion. In this motion, ILWU incorporated its earlier Rule 50(a) motion, its earlier motion to strike, its *Daubert* motions, and all of the briefing and arguments ILWU submitted relating to causation and damages (mainly about jury instructions). *See* ECF 649 at 263 (Tr. 1703:5-23). The Court accepted that oral motion as "fine for now" and also accepted ILWU's incorporation of its earlier motions. *Id.* (Tr. 1703:9-17). The Court denied the Rule 50(a) motions made by both sides. ECF 650 at 93 (Tr. 1825:8-10). The Court now concludes that ILWU's oral Rule 50(a) motions sufficiently preserved the issues for the pending motion under Rule 50(b). Even if every detail of

every issue were not specifically articulated, the Court finds ILWU's oral motions to be adequate. *See Go Daddy*, 581 F.3d at 961 ("However, Rule 50(b) may be satisfied by an ambiguous or inartfully made motion under Rule 50(a). Absent such a liberal interpretation, the rule is a harsh one." (citation and quotation marks omitted)).

ICTSI also argues that ILWU did not file a *Daubert* motion before trial challenging the testimony of ICTSI's causation expert Dr. Bryce Ward. ICTSI further argues that ILWU did not challenge Mr. Sickler's testimony in ILWU's *Daubert* motion on many of the specific grounds that ILWU now raises against his testimony. ICTSI argues that for those grounds, ILWU's motion to strike and Rule 50(a) motions failed to preserve the specific arguments and thus ILWU waived those grounds. ICTSI cites *Jerden v. Amstutz*, 430 F.3d 1231, 1237 (9th Cir. 2005), *opinion amended on denial of reh'g*, 2006 WL 60668 (9th Cir. Jan. 12, 2006); *Macsenti v. Becker*, 237 F.3d 1223, 1233-34 (10th Cir. 2001); and *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066-67 (9th Cir. 1996), *as amended on denial of reh'g* (June 26, 1996), in support of ICTSI's argument that ILWU has waived any *Daubert* challenges first raised after expert testimony at trial.

*Jerden* clarifies the timing required for an objection to expert testimony and a motion to strike. *See Jerden*, 430 F.3d at 1235-38. The Ninth Circuit discussed in *Jerden* that a timely objection is one that "is made as soon as the opponent knows, or should know, that the objection is applicable." *Id.* at 1237 (quoting 1 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 103.11 (Joseph M. McLaughlin ed., 2d ed. 1997)). The court noted that there is a "general rule that neither the district court nor the opposing party may unfairly deprive parties of the opportunity to lay a foundation in support of their evidence," and thus "[t]he opposing party may not delay objections until after trial such that it becomes too late to resolve

them effectively." *Id.* The Ninth Circuit held "that the exclusion of testimony for lack of foundation is improper following an untimely objection if such objection unfairly deprives the proponents of the testimony of an opportunity to cure the objection." *Id.* at 1238.

In *Macsenti*, the Tenth Circuit reiterated "the general requirement of a timely objection to the evidence and that a 'party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner.'" *Macsenti*, 237 F.3d at 1233 (quoting *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289-90 (10th Cir. 2000)). The motions to exclude expert testimony in *Macsenti* were first raised after the close of all evidence. *Id.* The Tenth Circuit held:

> By waiting until after the close of all the evidence to raise the *Daubert/Kumho* objection, basic errors occurred. The proponent of the evidence was deprived of the opportunity to offer other supporting proof from Dr. Sullivan and from literature. Moreover the trial judge was disadvantaged in that she was not alerted to the need of stating *Daubert/Kumho* findings and analysis. And, obviously, appellate review by us is impaired as well, due to the inadequacy of the record. Accordingly on this record and persuasive precedent we hold that the *Daubert/Kumho* objection was waived, and our review is only for plain error.

*Id.* at 1233-34.

In *Marbled Murrelet*, a case the Tenth Circuit in *Macsenti* found persuasive, the Ninth Circuit addressed *Daubert*-based objections in the context of an appeal of a permanent injunction by a district court, with the appellant arguing that the evidence could not prove the required harm because it failed to meet the standard for reliable scientific evidence under *Daubert*. *Marbled Murrelet*, 83 F.3d at 1066. The Ninth Circuit recognized that unreliable evidence is necessarily insufficient, but noted that "the appropriate time to raise *Daubert* challenges is the trial. By failing to object to evidence at trial and requesting a ruling on such an objection, a party waives the right to raise admissibility issues on appeal." *Id.* The court further noted that "[t]he rationale

behind this rule applies to Pacific Lumber's *Daubert* argument in this appeal, even though it couches its argument in terms of insufficiency of the evidence, because its insufficiency argument is identical to the admissibility objection which it waived." *Id.* The Ninth Circuit concluded that Pacific Lumber waived its *Daubert* objection in part by failing to raise it earlier. *Id.* at 1067. The court explained that Pacific Lumber "evaded [the district] court's decision of the issue and denied EPIC the opportunity to lay a better foundation for the evidence." *Id.*

ILWU responds that after an expert is cross-examined, if "examination reveals that the opinions advanced by an expert rest on a wholly inadequate foundation, the judge, on timely motion, may strike the testimony." *United States v. Sepulveda*, 15 F.3d 1161, 1183 (1st Cir. 1993). *Sepulveda*, however, involved a circumstance in which the cross-examination revealed "startling insights" not previously known to the examining party and "cast serious doubts" about the foundation of the expert's testimony.

After considering the cases cited by the parties, the Court determines that when a non-propounding party is aware of purported deficiencies in an expert's report or proposed testimony, that party must raise its objections before, or at the latest during, the expert's testimony. Otherwise, the non-propounding party risks a finding of waiver of the objection to that expert's testimony or waiver of the argument that the testimony is necessarily insufficient to support a verdict. If, however, the expert's testimony, or other trial testimony, reveals some previously unknown information that casts doubt on the admissibility of the expert's testimony, then the opposing party may move to strike or object at the earliest reasonable time after the basis for the objection becomes apparent. But these issues of waiver relate to admissibility—not weight. For that reason, ICTSI's arguments do not preclude the Court from considering under Rule 59 (but

not under Rule 50) post-trial arguments raised about the weight that the court should give to challenged testimony, including expert testimony.

Applying these principles to Mr. Sickler's damage opinions, ILWU did *not* raise in its *Daubert* motion any of these arguments that ILWU now makes: (1) that Mr. Sickler started with unreasonably high prices that are unsupported in the "but for" world that his damage analysis assumes; (2) that Mr. Sickler assumed both increasing prices and increasing volumes, despite the basic economic law of a downward sloping demand curve; (3) that Mr. Sickler improperly relied on an artificially selected data set (using a specific five-month period in 2012); (4) that Mr. Sickler relied on an improper benchmark when using the Pacific Northwest Index; and (5) that the extraordinary expenses in Mr. Sickler's damage calculations are not appropriate.[2]

ICTSI argues that although ILWU raised these arguments in their Rule 50(a) motions and motion to strike after Mr. Sickler testified and Plaintiff rested, this was too late to preserve them. The Court recognizes that these issues present serious problems for Mr. Sickler's testimony. Indeed, had ILWU raised these arguments in a timely *Daubert* motion, the Court likely would have excluded Mr. Sickler's damage testimony. Other than the challenge relating to the Pacific Northwest Index, ILWU could have presented these arguments in a timely *Daubert* motion.

---

[2] In ILWU's reply brief in support its *Daubert* motion, ILWU stated: "Alternatively, ICTSI contends that Sickler's damages models do account for injuries caused by factors other than ILWU's reefer-motivated actions because the models are based in part on past performance. But Sickler's models cherry-pick data helpful to ICTSI, largely ignoring Terminal 6's track record of dismal past performance. He relies on a minimal dataset from five months of actual operations in 2012 and multiplies it by extravagant growth rate projections that bear no relationship to Terminal 6's many years of uninterrupted losses." ECF 455 at 16. These statements, made in support of an argument relating to ILWU's causation challenge and made in a reply brief, did not preserve these new challenges to Mr. Sickler's testimony. *See, e.g.*, *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (noting that "arguments raised for the first time in a reply brief are waived"); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Thus, ILWU waived these arguments for purposes of striking Mr. Sickler's testimony or rendering his evidence legally insufficient under Rule 50.

As to ILWU's objection about the Pacific Northwest Index, however, the Court finds that ILWU could not reasonably have anticipated before trial that the Pacific Northwest Index was an improper benchmark. That portion of ILWU's motion is based on the trial testimony of Elvis Ganda, an ICTSI witness. Mr. Ganda testified on that issue during the second day of trial, October 22, 2019. At that time, ILWU knew that Mr. Sickler had based one of his damage models on the Pacific Northwest Index and knew that Mr. Ganda's testimony raised concerns about that index as a reliable benchmark. ILWU did not file a motion or otherwise challenge ICTSI's damage models during the three days before Mr. Sickler testified on October 25, 2019. ILWU also did not object to Mr. Sickler's direct testimony based on Mr. Ganda's testimony. ILWU did not raise this objection until their oral Rule 50(a) motion made on October 28, 2019, and in their motion to strike made on October 29, 2019. ILWU made these motions after ICTSI rested, but before ICTSI's rebuttal case. The Court finds that ILWU did not timely raise this objection and thus did not preserve it for purposes of striking Mr. Sickler's testimony post-trial or rendering this evidence legally insufficient under Rule 50.

As to Dr. Ward, his expert report revealed that he performed a regression analysis much like the analysis performed in his earlier report relating to the preclusionary period. His report also stated that he found that the reefer dispute caused the productivity decline, the same as he concluded it had in the earlier period. His testimony at trial, however, began with a statement that he merely assumed that the reefer dispute continued and that the question he asked was whether anything happened to change that fact. Dr. Ward's trial testimony was not something that ILWU should have reasonably anticipated based on Dr. Ward's expert report and is the basis

of ILWU's current challenge. As a result, ILWU could not have been expected to bring this motion before trial. Dr. Ward, however, testified at the beginning of the fifth day of trial, October 25, 2019, and ILWU did not object during his testimony. ILWU did not even raise this objection until their oral Rule 50(a) motion made on October 28, 2019, and in their motion to strike filed on October 29, 2019. Thus, ILWU did not raise the objection at the earliest reasonable time the objection became apparent. *Jerden*, 430 F.3d at 1237. ILWU, therefore, waived this objection both for excluding Dr. Ward's testimony and for ILWU's motion under Rule 50.

### 2. Preclusion and Law of the Case

ICTSI also argues that when ILWU previously raised issues, such as at summary judgment, in *Daubert* motions, and in ILWU's motion to strike filed during trial, the Court ruled against ILWU and those rulings then became the "law of the case." ICTSI asserts that ILWU may not now raise similar arguments as a basis for ILWU's post-verdict motions. This argument encompasses the earlier raised challenges to the testimony of Mr. Sickler, Mr. Gimpel, and Dr. Ward, some of which ILWU raised in *Daubert* motions and some in ILWU's motion to strike presented during trial.

In denying ILWU's pretrial *Daubert* challenge to Mr. Sickler's testimony based on the argument that his damage models failed to consider other possible nonlabor causation factors or lawful primary labor causation factors, the Court noted that "at this point" it could not conclude that those assumptions were unreasonable. *See* ECF 464 at 15. Further, in response to ILWU's trial motion to strike all or a portion of the testimony of Mr. Sickler, Dr. Ward, and Mr. Gimpel (and in denying ICTSI's motion to strike a portion of the testimony of one of ILWU's expert witnesses), the Court stated:

> I think that both sides have made a few fair points in support of your respective motions to strike, but on balance I think it would be inadvisable for me to grant any of those motions to strike and to instruct the jury to disregard all or portions of those four witnesses' testimony.
>
> So all four motions to strike are denied, although I do understand some of the merits in part of some of the arguments, and maybe there will be other times to revisit that, but for right now I'm not going to instruct the jury to disregard any of the portions of those people's testimony.

ECF 649 at 247 (Tr. 1687:9-18).

In making these rulings, the Court did not foreclose the ability of either party to raise the same arguments in the future, in a different context such as in motions under Rule 50 or Rule 59. Nor do such evidentiary rulings generally preclude arguments in post-verdict motions, because a district court is not bound by its earlier rulings and can evaluate post-trial motions by looking at the evidence received at trial. *See, e.g.*, *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000) (holding that "the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict" because "[i]nadmissable evidence contributes nothing to a 'legally sufficient evidentiary basis'" (quoting Fed. R. Civ. P. 50(a))); *United States of Am. for the Use of Salinas Constr., Inc. v. W. Sur. Co.*, 2016 WL 3632487, at *6 (W.D. Wash. July 7, 2016) ("District courts consider *Weisgram* to stand for the proposition that 'in determining whether there is a legally sufficient evidentiary basis for the verdict, erroneously admitted evidence will play no role in the court's application of the appropriate legal standard.'" (quoting *Risk v. Burgettstown Borough, Pa.*, 2008 WL 4925641, at *2 (W.D. Pa. Nov. 14, 2008))).

As the Ninth Circuit, sitting en banc, explained:

> To the extent that *Scarsella Bros.* purported to hold that the law of
> the case doctrine bars district courts from reconsidering pretrial
> rulings, we overrule it. Pretrial rulings, often based on incomplete
> information, don't bind district judges for the remainder of the
> case. Given the nature of such motions, it could not be otherwise.
> At the summary judgment stage, for example, trial courts ask only
> whether there could be a material issue of fact. They must draw all
> inferences in the non-movant's favor, and rest their rulings on the
> evidence that they think *could* be introduced at trial. But when
> considering whether to grant judgment as a matter of law, they
> look only at the evidence actually introduced at trial.
>
> It makes no sense to say that a ruling that the plaintiff could
> hypothetically prove some set of facts that would support his claim
> prevents a district court from later finding that the plaintiff had not,
> in fact, proven those facts. Nor to say that if a district court realizes
> an earlier ruling was mistaken, it can't correct it, but must instead
> wait to be reversed on appeal. All that would do is waste both the
> courts' and litigants' time and resources.

*Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) (citation omitted). The Court

therefore rejects ICTSI's argument that any previous denials of objections raised by ILWU are

the "law of the case" that bars ILWU's arguments made in support of ILWU's motions under

Rule 50 and Rule 59.

**B.  Motion for Judgment as a Matter of Law**

ILWU argues for judgment as a matter of law on three general bases. ILWU asserts that

three findings by the jury are unsupported by legally sufficient evidence: (1) that ILWU engaged

in unlawful secondary activity after August 13, 2013; (2) that ILWU's illegal secondary

activities were the sole cause of ICTSI's damages; and (3) the amount of damages. The Court

addresses each in turn.

**1.  Activity after August 13, 2013**

ILWU argues that the jury's verdict that ILWU engaged in unlawful secondary activity

after August 13, 2013 is unsupported by substantial evidence. ILWU also argues that the

evidence shows that ILWU engaged in lawful primary activity during that period, and thus the

jury incorrectly answered Question 4 on the verdict form, which then renders the remaining questions void and nullifies the verdict. Finally, ILWU argues that ICTSI lost its status as a neutral secondary employer and thus ILWU could not have engaged in any secondary activity against ICTSI.

### a. Unlawful secondary activity

ILWU argues that there was inadequate evidence introduced at trial to support the jury's finding that ILWU engaged in unlawful secondary activity after August 13, 2013. ILWU asserts that the only reasonable conclusion supported by the evidence is that the labor activities in which ILWU members engaged during that period were lawful primary activities.

The Court instructed the jury that ICTSI was a neutral employer for assigning the reefer jobs, that the Port of Portland was the primary employer for those jobs, and that "coercive activity that was substantially motivated by a desire to obtain the reefer jobs for ILWU members is unlawful secondary activity." ECF 615 at 31 (Final Jury Instr. No. 26). The Court also instructed the jury that "[c]onduct engaged in by a union that has both a legal primary objective and an illegal secondary objective ('mixed motive' conduct) violates federal labor law if the illegal secondary objective is a substantial factor in motivating the conduct." *Id.* Thus, the issue for the jury in determining whether there was illegal secondary activity after August 13, 2013, was whether ILWU's job actions were substantially motivated by the reefer dispute, even if these job actions were also motivated by other legal primary objectives.

ILWU emphasizes that the jury heard evidence that ILWU members engaged in labor activity after August 13, 2013, because they were upset with ICTSI's managerial decisions and policy changes and because of the West Coast contract negotiations with PMA. Jurors also heard evidence that ILWU members wanted ICTSI to drop this lawsuit.

Under the doctrine of collateral estoppel, however, the Court instructed the jury to accept as proven facts that "[f]rom May 21, 2012 through August 13, 2013, ILWU [National] and Local 8 engaged in unlawful secondary activity. During this time period, the work stoppages, slowdowns, safety gimmicks, and other unlawful conduct were substantially motivated by the reefer dispute." ECF 615 at 28 (Final Jury Instr. No. 22, ¶ 15). The jury had to determine whether the reefer dispute continued to be a substantial motivation for the job actions after August 13, 2013. The evidence of improper motivation and illegal conduct before August 13, 2013, however, was circumstantial evidence the jury could consider in evaluating ILWU's motivation after August 13, 2013 and determining whether the illegal conduct continued after that date.

The jury also heard the following evidence: (1) the Court instructed the jury, based on collateral estoppel, to accept as a proven fact that because of the reefer dispute, ILWU threatened to "put ICTSI out of business" and that ILWU threatened to run ICTSI's customers "out of town"; (2) ILWU National's then-President Robert McEllreth testified that the Terminal 6 reefer jobs were "symbolic" of jobs "up and down the coast" and that to "let those jobs go . . . would bleed up and down the whole entire West Coast and . . . would undermine the contract"; (3) in deposition testimony introduced at trial, Leal Sundet (testifying under Rule 30(b)(6) as a designated representative of ILWU National) stated about the reefer dispute that "any time you have a contractual matter that any one given PMA employer refused to comply with, that's an assault on the fabric of the [coastwide] agreement . . . Because why would the next PMA employer need to comply with the agreement, and the one after that?"; (4) Mr. Sundet also testified about the reefer dispute that "if you let the PMA member companies start picking and choosing what parts they're going to comply with, then you don't have a contract any longer";

(5) in 2014, the topic of the reefer jobs came up several times at PMA meetings; (6) Stuart

Strader, Craig Bitz, and Mike Stanton, all from Local 8, mentioned the reefer jobs in the summer

of 2014; (7) Bruce Holte from Local 8 said in 2014 that the labor activity was "all because you

guys didn't give us the reefer jobs" and because ICTSI could not give the reefer jobs "it is not

going to end well for you"; (8) Bill Wyatt, Executive Director of the Port of Portland during the

relevant period, stated that there was "no doubt" that ILWU agreed in November 2013 to

increase productivity in exchange for obtaining the two reefer jobs; (9) Mr. Sundet emailed

Mr. McEllrath saying that the Port had suggested that the reassignment of the reefer jobs in

late 2013 was temporary, and Mr. McEllrath responded, "temporary my ass."; (10) in

March 2014, Local 8's Executive Board passed a resolution calling for Bill Wyatt's resignation

from the Port; (11) ILWU's leadership was involved in drafting the statement that Mr. Stanton

gave to the Port Commission on July 8, 2014; (12) Mr. Stanton's statement to the Port

Commission focused on the reefer work and included comments such as that "the Port's

involvement in the reefer work is really a proposal to extend the labor dispute and all the

terminal costs that are going with it," "a vote to extend the service contract with TMC [a terminal

management subcontractor hired by the Port temporarily to assign the reefer jobs to ILWU] is a

vote to extend the labor dispute and all the turmoil that goes with it," and that the Port should not

let the reefer work go back to the electricians but should "stay out of it altogether," which would

"go a long way to help heal the wounds of this labor dispute between ILWU and ICTSI . . .

rather than trying to help ICTSI win a never-ending war. The Governor has gotten DCTU to give

up the reefer work for the sake of building peace. Don't let misguided intervention by the Port

cause you to turn this olive branch into a sword. Let it remain an olive branch for peace.";

(13) Dr. Ward testified that after Mr. Stanton made his statement at the Port Commission

meeting, productivity declined at Terminal 6; (14) Mr. Stanton testified that the reefer dispute between ILWU and ICTSI "was not getting solved by the Port continuing to stick their nose in it," that the reefer dispute was "still one point of contention" causing turmoil at Terminal 6 in July 2014, and that as of July 2014 ILWU "still [took] the position that the reefer plug and unplug work should be permanently reassigned to ILWU."; (15) an ILWU Local 40 business agent testified that from his experience on the contract negotiating committee, from discussions with Mr. Sundet and Mr. McEllrath, he believed that the reefer jobs were an important issue to ILWU in 2014 and 2015; and (16) in September 2017, after ICTSI terminated its lease, ILWU, the Port, the PMA, and ILWU Local 40 agreed that Local 8 members would perform the reefer work if container traffic returned to Terminal 6.

From this evidence, a jury reasonably could find that the reefer work remained an important issue for ILWU after August 13, 2013. ILWU National and Local 8 leaders continued to discuss it, it was emphasized in the Port Commission meeting as an important, ongoing issue, the "labor dispute" as characterized in the Port Commission statement was over the reefer work, the reefer work was characterized as symbolic work that had implications for the union beyond the two jobs in Portland, and the issue was important enough that shortly after ICTSI terminated its lease, ILWU negotiated an agreement to get the reefer work if container business were to resume at Terminal 6.

As to the coastwide contract negotiations, which ILWU argued to the jury was a lawful primary objective that motivated their conduct, the jury heard evidence that during the open contract period ILWU National did not specifically target Terminal 6, the problems at Terminal 6 were not discussed during contract negotiations, and the problems between ICTSI and ILWU were "disconnected" from the contract negotiations. Mr. McEllrath also testified that

to his knowledge, while ILWU National's negotiating committee ordered slowdowns at other West Coast ports, no such instructions were given to ILWU members at Terminal 6. ICTSI personnel testified that in February 2015, after ILWU and PMA finished contract negotiations and other West Coast ports returned to normal productivity, production at Terminal 6 remained well below historical productivity levels. The jury also had as an exhibit a March 9, 2015 email from ICTSI's Mr. Ganda to PMA stating that productivity was back to normal at all other West Coast ports but that ICTSI was still getting "hard timed" in Portland, productivity was at around 50 percent, customers were leaving, and there was a serious chance of a "complete shut down." Dr. Ward testified that his analysis showed that the productivity pattern at the ports in Seattle and Tacoma as a result of contract negotiations differed from the pattern at Terminal 6 and that productivity changes at Terminal 6 appeared to have been affected by reefer-related events such as the Port Commission meeting and the reefer jobs being returned to IBEW members. Most of the testimony supporting the proposition that the labor actions at Terminal 6 related to the coastwide contract negotiations, in contrast, was general and vague. The jury had sufficient evidence to reject ILWU's contention that ILWU's members engaged in work stoppages and slowdowns *at the Port of Portland* solely, or even mainly, to further lawful contract negotiations.

The Court also instructed the jury, based on collateral estoppel, to accept as proven that before August 13, 2013, ILWU members and management threatened to shut down ICTSI over the reefer dispute, that Local 8 members had falsely asserted safety reasons for engaging in conduct found to be a "pretext," and that the unions took no steps to stop the illegal conduct even after the Court entered its preliminary injunction. The jury could have considered these proven

facts in evaluating the credibility of ILWU's assertions that there were only legitimate, primary reasons for work stoppages and slowdowns after August 13, 2013.

Most significantly, whether ILWU engaged in secondary labor activity after August 13, 2013 depended on motive. "Motive is a question of fact that may be inferred from direct or circumstantial evidence." *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995). "Motive or intent almost always must be inferred from circumstantial evidence." *Geske & Sons v. NLRB*, 103 F.3d 1366, 1375 (7th Cir. 1997). The jury had to consider conflicting testimony, weigh credibility, and decide whether the reefer dispute was a substantial motivating factor for the work slowdowns and stoppages after August 13, 2013. The jury found that there was illegal secondary activity after August 13, 2013. The evidence as discussed above shows that there was substantial evidence in the record to support the jury's verdict. The evidence, particularly when viewed in the light most favorable to ICTSI, cannot be said to support "only one reasonable conclusion," with that conclusion being "contrary to the jury's verdict." *Go Daddy*, 581 F.3d at 961.

### b. Lawful primary activity

ILWU also argues that the jury erroneously concluded that ILWU did not engage in *any* lawful primary activity after August 13, 2013. The court instructed the jury that primary activity was lawful and defined "primary activity" for the jury. The Court also instructed the jury that secondary activity was unlawful and defined "secondary activity" for the jury as well. The Court also gave the jury an instruction about "mixed motives," as set forth above. The Court explained that if conduct has both a legal primary objective and an illegal secondary objective, that conduct is unlawful if the illegal secondary objective is a substantial factor in motivating the conduct. The Court defined "substantial factor" for the jury, including explaining that a substantial factor need not be the only factor. ECF 615 at 32 (Final Jury Instr. No. 27). The Jury Instruction

defining unlawful labor practices explained that ICTSI must prove: (1) a defendant engaged in or

is otherwise liable for a coercive job activity; (2) obtaining the reefer work was a substantial

factor motivating that coercive job activity, making it unlawful secondary activity; and

(3) unlawful secondary activity was a substantial factor in causing ICTSI's damages. *Id.* at 29-30

(Final Jury Instr. No. 25). Thus, "substantial factor" was relevant both in determining motivation

(making the activity unlawful) and causation.

Question 4 on the verdict form asked the jury to answer "yes" or "no" to whether either

ILWU National or Local 8, or both, engaged in "lawful primary labor practices at any time in the

period from August 14, 2013 to March 31, 2017?" ECF 620 at 2. The jury answered "no" for

both entities. Question 5 on the verdict form asked whether the lawful primary activity caused

any losses to ICTSI, but the form instructed the jury to leave this question blank if they answered

"no" to Question 4. The jury left it blank.

ILWU argues the answer to Question 4 must be wrong, at least for ILWU National,

because ILWU National engaged in lawful primary activities during contract negotiations

elsewhere along the West Coast. ILWU's argument is baseless. Although no question on the

verdict form was limited to Terminal 6 at the Port of Portland, all the questions implicitly—and

undeniably—related to Terminal 6. For example, the verdict form asks about ILWU National

and Local 8's unlawful labor practices and the jury was not expected to answer whether ILWU

National engaged in unlawful labor practices at other ports. The entire trial focused on ILWU's

conduct at Terminal 6, on causation issues at Terminal 6, and on ICTSI's claimed damages

allegedly suffered at Terminal 6. The Court rejects ILWU's argument that Question 4 included

lawful primary conduct beyond Terminal 6.

ILWU also argues that there was evidence that it engaged in at least some lawful primary activities at Terminal 6. This includes during contract negotiations and in response to issues and concerns involving ICTSI. As discussed above, however, the jury's verdict that ILWU engaged in unlawful secondary activity after August 13, 2013, was supported by sufficient evidence. The Court instructed the jury that if it found labor activity to have a mixed motive, this activity was unlawful if the illegal secondary objective was a substantial factor in motivating the activity. Thus, if the jury found that the reefer dispute was a substantial motivating factor for the labor activity after August 13, 2013, it was reasonable for the jury to answer "no" to Question 4, even if the jury found some lawful primary objective, because all of the conduct properly could be found to be unlawful secondary activity. *See R.L. Coolsaet Const. Co. v. Local 150, Int'l Union of Operating Engineers*, 177 F.3d 648, 655 (7th Cir. 1999) (noting in a § 303 case that when a union acts with "mixed motives," the conduct is unlawful if "one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary"); *Feather v. United Mine Workers of Am.*, 903 F.2d 961, 967 (10th Cir. 1990) (explaining that when a strike's objective was to resolve 40 lawful issues and one unlawful issue, so long as the unlawful issue was a substantial factor causing the strike, the entire strike was unlawful); *Mautz & Oren, Inc. v. Teamsters, Chauffeurs & Helpers Union, Local No. 279*, 882 F.2d 1117, 1121 (7th Cir. 1989) (stating in a § 303 case that "[i]f the union acts with 'mixed motives,' partially primary and partially secondary, its conduct is unlawful"); *Collier v. Hoisting and Portable Eng'rs Local Union No. 101*, 761 F.2d 600, 602 (10th Cir. 1985) ("If the picketing was in part for any of the proscribed purposes it is wholly illegal. The secondary purpose issue is a fact question for the jury if there is sufficient evidence." (citation omitted)); *accord Mead v. Retail Clerks Int'l Ass'n Local Union No. 839*, 523 F.2d 1371, 1379 (9th Cir. 1975) (explaining that when lawful primary

and unlawful secondary purposes motivate conduct, if the unlawful secondary purpose is a substantial factor or materially contributed to bringing about the loss, then the loss is fully recoverable).

ILWU further argues that if the jury found a mixed motive, that would be relevant to answering Question 5 relating to causation and not Question 4. But in defining unlawful labor practices, the Court explained that the jury would need to find three elements—the second element involved motive and third element involved causation. The second element required determining whether the reefer dispute was a substantial motivating factor, and it related to whether the conduct was unlawful. The Court also clarified these elements in its instructions on coercive, primary, and secondary conduct and substantial factor. The Court instructed that if the reefer dispute was a substantial motivating factor for ILWU's conduct, that conduct was unlawful, including any mixed motive conduct. The jury's finding on the second element was a threshold finding for lawful primary or unlawful secondary conduct.

Based on the jury instructions, if the jury found that ILWU's actions had solely a secondary objective, solely a mixed motive substantially motivated by the reefer dispute, or some combination of the two, all of ILWU's conduct was unlawful and the jury should answer "no" to Question 4 and then skip Question 5. If the jury, however, found that some or all of ILWU's post-August 13, 2013 actions had solely a lawful primary objective, solely a mixed motive where the reefer dispute was *not* a substantial motivating factor, or some combination of the two, then the jury would answer "yes" to Question 4, because those actions would be lawful primary actions. Only then in answering Questions 5 and 7 would the jury have to determine whether those lawful primary actions were a substantial factor in harming ICTSI and whether that harm was separable from any harm caused by ICTSI's illegal labor actions.

As discussed above, there was sufficient evidence to support the jury's determination that after August 13, 2013, ILWU's conduct had as a substantial motivating factor obtaining the reefer work at Terminal 6 and thus was illegal secondary conduct. As a result, the jury's conclusion that the conduct was illegal and that ILWU engaged in no lawful primary conduct after August 13, 2013 is supported by substantial evidence.

### c.   ICTSI's status as a neutral secondary employer

ILWU further argues that even if ICTSI were a secondary employer for the reefer dispute, it "entangled [it]self in the vortex of the primary dispute" and thus lost its status as a neutral secondary employer. *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 627 (1967). This rationale is generally applied when the purported neutral employer and the primary employer are so entangled or intertwined to render the purported neutral employer not genuinely neutral in the dispute. *See id.*; *T.H. Eifert, Inc. v. United Ass'n of Journeymen*, 422 . Supp. 2d 818, 834-36 (W.D. Mich. 2006) (discussing cases). Such circumstances are not present here.

ICTSI did not entangle itself in the dispute between ILWU and the Port, or entangle itself with the Port. ILWU engaged in illegal labor actions toward ICTSI that affected ICTSI's business, and ICTSI responded to those actions. Some of those actions are what Administrative Law Judge Wedekind described in adjudicating the unfair labor practices charge as ICTSI "engaging in self-help efforts to prevent or document continued unlawful conduct." *Int'l Longshore & Warehouse Union*, 363 NLRB No. 47, 2015 NLRB LEXIS 870, at *39 (N.L.R.B. November 30, 2015), *aff'd*, 705 F. App'x 3 (D.C. Cir. 2017). This conduct is part of the "industrial realities" in this type of situation. *Id.*

To the extent there are job site changes and managerial decisions by ICTSI that were not a "byproduct" of the reefer dispute and ILWU's disputes with ICTSI over those particular issues were primary disputes, ICTSI still remained a neutral in the Port's assignment of the reefer jobs.

As discussed above, the evidence supports the jury's finding that the reefer dispute remained a substantial motivating factor for ILWU's conduct after August 13, 2013. Also as explained above, this finding makes all of ILWU's conduct illegal secondary activity.

## 2. Causation

ILWU also argues that ICTSI failed to prove that any illegal secondary activity by ILWU caused ICTSI's damages after August 13, 2013. ILWU argues that Dr. Ward's testimony cannot show causation of damages because he improperly began his analysis by assuming that the illegal secondary activity continued to cause the productivity decline after August 13, 2013 and then engaged in an analysis to see whether evidence showed that other factors interrupted this causal link. ILWU asserts that Dr. Ward needed to begin with no assumptions and then determine the cause of the lower productivity, particularly in the context of secondary boycott activity, which is interpreted narrowly under the labor laws. As discussed above, ILWU waived these arguments for purposes of Rule 50.

Moreover, ILWU's arguments fail on the merits. ILWU argues that ICTSI had to prove that illegal secondary activity caused its damages instead of lawful, primary activity and that Dr. Ward's testimony fails properly to distinguish between the two types of conduct and "draw the line." As discussed above, however, the jury's verdict that ILWU engaged in illegal secondary conduct after August 13, 2013, and the illegal conduct was a substantial motivating factor for the labor actions at Terminal 6 is supported by sufficient evidence. Thus, all the conduct at Terminal 6 may be considered illegal and all the damages caused by that conduct are recoverable by ICTSI. *See Collier*, 761 F.2d at 602; *Mead*, 523 F.2d at 1379.

## 3. Damages

ILWU waived most of the arguments for ILWU's motion under Rule 50 on damages because ILWU did not raise them before (or even during) Mr. Sickler's trial testimony. The

preserved arguments are that Mr. Sickler did not consider causation and Mr. Sickler improperly did not account for Hanjin's bankruptcy causing any interruption in ICTSI's revenue.

### a. Causation

As to the causation argument, ILWU argued before trial in the *Daubert* motion that Mr. Sickler's testimony would not help the jury because he assumed that all of the labor activity at Terminal 6 was unlawful and did not consider that there were lawful primary activities and nonlabor factors that contributed to ICTSI's damages. Mr. Sickler's damage models assumed that ILWU's illegal conduct caused all of ICTSI's damages. The Court denied ILWU's motion to exclude Mr. Sickler's testimony on this ground, noting that if the jury accepted ICTSI's theory of the case, then Mr. Sickler's assumptions would be the facts found by the jury, and ILWU's arguments that Mr. Sickler improperly viewed causation and thus offered opinions unhelpful to the jury would be moot. The Court further noted that only if the jury accepted some or all of ILWU's theory of the case, that there was lawful primary activity or nonlabor factors that contributed to ICTSI's damages, would Mr. Sickler's assumptions potentially be problematic.

ILWU makes the same arguments now, despite the jury's findings. ILWU cites *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985). In *Farley*, there was a truck-rail "scheme" that Farley argued violated the antitrust laws. *Id.* at 1349. The Ninth Circuit noted that "there was nothing illegal about the Santa Fe arrangement on its face" and thus if Farley lost business as a result of that arrangement, Farley did not suffer any antitrust injury. *Id.* Farley only suffered an antitrust injury if Santa Fe illegally undercut the tariff as part of the legal arrangement, making it illegal. *Id.* The evidence proved that Santa Fe engaged in the illegal conduct only some of the time, and thus only some of Farley's lost business was attributable to Santa Fe's illegal conduct. *Id.* at 1349-50. Because Farley only established that some of its lost profits were attributable to illegal conduct, it needed to provide the jury with a sufficient

evidentiary basis to calculate damages for lost profits caused by the illegal conduct and not caused by legal conduct. *Id.* at 1350. The Ninth Circuit reversed the verdict, finding that Farley "failed to present *any* evidence permitting the jury to parse out which damages are attributable to the unlawful competition." *Id.* at 1351 (emphasis in original).

*Farley* is distinguishable. The requirement to parse damages between lawful and unlawful conduct arose after the facts were found to support that both lawful and unlawful conduct caused the damages. Here, the jury found that ILWU did not engage in any lawful primary activity (or that there was mixed motive activity and that the illegal activity was a substantial motivating factor, making all the activity illegal), and that there were no nonlabor factors that contributed to ICTSI's damages. Thus, there was no unlawful and lawful activity to parse. ILWU's argument that Mr. Sickler's damage models are flawed because the models assumed that ILWU's illegal conduct caused all of ICTSI's damages and that Mr. Sickler did not consider or parse out other causation factors that may have caused damages goes against the jury's findings.

### b. Hanjin bankruptcy

ILWU also argues that ICTSI would have incurred certain damages regardless of the reefer dispute because of Hanjin's bankruptcy. This includes some or all of ICTSI's damages after Hanjin's bankruptcy in 2016 and the damages associated with ILWU's lease termination in 2017. ILWU argues that because ICTSI did not seek to keep Hanjin serving Terminal 6 or persuade Hanjin to return to Terminal 6, it is not entitled to damages after Hanjin filed for bankruptcy in 2016. ILWU further argues that if damages are not cut off in 2016 for that reason, then Hanjin's bankruptcy would have caused significant economic harm to ICTSI, causing it to have to close. This would have forced ICTSI to terminate its lease to avoid more expenses. From this, ILWU argues that ICTSI may not recover any lease termination costs. The jury, however,

found that no nonlabor factor harmed ICTSI, despite ILWU arguing that Hanjin's bankruptcy was a nonlabor factor that would have caused Terminal 6 to close or to at least cause economic harm to ICTSI while it sought to replace Hanjin's business.

The evidence, viewed in the light most favorable to ICTSI, does *not* permit only one reasonable conclusion about Hanjin's bankruptcy that conflicts with the jury's verdict. The jury heard ICTSI's expert Mr. Gimpel testify that it was his "strong opinion" that another carrier would have taken over for Hanjin at Terminal 6 after Hanjin filed for bankruptcy but for the reefer dispute. Mr. Gimpel opined that any number of carriers could have taken over, including Hanjin's successor SM Lines, APL, Hanjin's alliance partners K Line and Yang Ming Line, or one or more of the other carriers operating in the trans-Pacific ocean-shipping container business. Mr. Gimpel explained that Terminal 6 was a profitable port for Hanjin, it represented 40 percent of the catchment basin, and if the cargo has to go through Seattle or Tacoma the shipper has to compete with eight other carriers even though there is little competition in Portland for the Hanjin-level carrier. He also explained why the Port of Portland is a unique and profitable port for a carrier. Mr. Gimpel further opined that after Hanjin's bankruptcy, "[a]ll the cargo continued to move. All the terminals that it operated in kept working." Mr. Ganda also testified that Yang Ming Line could have picked up the Terminal 6 business after Hanjin filed for bankruptcy, because it would have been additional volume to the volume Yang Ming Line was committed to bring to Tacoma.

ILWU argues that Mr. Gimpel's testimony is speculative and conclusory. ILWU made the same arguments in their *Daubert* challenge to Mr. Gimpel, which the Court rejected as going to the weight of his testimony and not its admissibility. The Court sees no reason to change that ruling now. Mr. Gimpel is a highly qualified and experienced expert in the shipping industry and

in the ports of the Pacific Northwest. His experience and expertise qualified him to opine about whether another shipping company likely would have replaced Hanjin's business at Terminal 6 in the "but for" world, which necessarily requires some level of speculation. He described his reasoning, and ILWU challenged both on cross-examination and in closing argument. ILWU argued to the jury that Hanjin's volume of business could not have been replaced, or at least not immediately, and the jury did not find that argument persuasive.

ILWU did not present any evidence showing how Hanjin's bankruptcy affected revenues at the other ports in which Hanjin was still doing business at the time of its bankruptcy. This may have provided some evidence for the jury of how long it took those ports to replace Hanjin's business or how long it took SM Lines to get back up to Hanjin's pre-bankruptcy volume and revenues for those ports. ILWU cites the testimony of David Trzyzewski, ICTSI's Chief Commercial Officer, who testified that "[o]cean carriers do not *change* ports at the drop of a hat" and that it is a "very long, tenuous process that could take years." ECF 637 at 75 (emphasis added). Taking volume over after Hanjin's bankruptcy, however, would not be "changing" ports, but would be simply adding volume and adding a new port. Mr. Ganda explained this in contrasting Yang Ming Line's *inability* to *change* to Portland before its lease with Tacoma expired in 2022, and its *ability* to *add* Portland in 2016 after Hanjin filed for bankruptcy.

Mr. McKenna testified that Hanjin's bankruptcy caused "disruption" along the West Coast ports, but that does not establish that the Hanjin bankruptcy caused financial damage of any measurable amount at any port. A new carrier taking over can be a "disruption." Mr. Wyatt testified that he believed that the loss of Hanjin and later operational losses would have occurred regardless of the labor dispute. Mr. Wyatt, however, did not discuss whether another company likely would have replaced Hanjin's routes but for the reefer dispute, or how or whether Hanjin's

volume was replaced over at any other ports. The jury was free to disregard this opinion in favor of Mr. Gimpel's expert opinion, which provided a more detailed analysis.

ILWU also argues that ICTSI's request for damages after Hanjin left in 2015, or at least after Hanjin filed bankruptcy in 2016, is akin to the rejected damages requested by the plaintiffs in *Collier* and *Matson Plastering Co. v. Plasterers and Shophands Local No. 66, Operative Plasterers And Cement Masons Int'l Ass'n of the U.S. and Canada*, 852 F.2d 1200 (9th Cir. 1988). ILWU makes this comparison by arguing that ICTSI did not make any attempts to keep Hanjin or get Hanjin to return to Terminal 6 after Hanjin left.

In *Collier*, the plaintiff lost a customer because of an illegal strike. 761 F.2d at 603. The customer told the plaintiff that there would be no more jobs until the plaintiff straightened out his problems with the union, showing that the customer expected contact from the plaintiff when the problems with the union were over. *Id.* The problems with the union ended, but the plaintiff never contacted the customer. *Id.* There was a lapse of 52 months between the incident and the suit and the plaintiff requested damages for lost profits in each month. *Id.* The Tenth Circuit held that "the proof of damages was speculative at best in the absence of any effort on the part of plaintiff to obtain any jobs." *Id.*

In *Matson*, the Ninth Circuit found that damages for the lost opportunity to bid on future construction projects were too speculative. 852 F.2d at 1203. The court in *Matson* distinguished the circumstances presented from those in *Frito-Lay, Inc. v. Local Union No. 137, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, in which the Ninth Circuit awarded lost sales volume by comparing pre-strike sales volume to other divisions in the state, calculating the projected growth rate for the affected division, and then calculating

sales lost because of the strike. 623 F.2d 1354, 1364 (9th Cir. 1980). The critical difference was whether damages could reasonably be determined.

The facts here differ from both *Collier* and *Matson* and are rather unusual. This case involves illegal labor activity that continued from May 21, 2012, until ICTSI terminated its lease with the Port in March 2017. There was no time when the illegal conduct ended and productivity returned to normal. Thus, ICTSI could not approach Hanjin or any other carrier to try to persuade them to begin or resume container service at Terminal 6. This is unlike *Collier*, in which after the labor dispute ended, the plaintiff failed to contact his former customer for 52 months. ICTSI faced marketing a port that was in the middle of illegal labor activity and suffering from productivity problems during the time that ILWU argues that ICTSI should have been able more effectively to approach and convince carriers to come to Terminal 6. ILWU engaged in illegal labor activities for several years, which continued even after the Court entered its preliminary injunction. This created an environment at Terminal 6 that was undesirable to carriers. ILWU argues that because ICTSI could not attract carriers into that environment ICTSI may not recover damages. That is not the law of damages in these cases. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." (discussing damages in the antitrust context)); *see also Frito-Lay*, 623 F.2d at 1364 (applying the same damages standard in a case involving § 303 of the LMRA and § 8(b)(4) of the NLRA).

As to Hanjin, ILWU's argument is particularly unpersuasive. ICTSI, the Port, and others convinced Hanjin to stay for three years with terrible productivity. There were multiple productivity issues experienced with Hanjin's ships. Expecting ICTSI somehow to be able to

convince Hanjin to return to the same problematic situation at Terminal 6 that it left is not persuasive. In any event, the jury was free to reject that argument. Further, in the "but for" world of no unlawful labor activity at Terminal 6, there is no reason to expect that Hanjin would have stopped serving the Port before Hanjin's bankruptcy.

The jury also heard evidence of ICTSI's efforts to retain carriers and obtain new carriers. The jury heard about how several Oregon governors got involved to try to keep the carriers, how ICTSI tried to get APL and had a "test run," and how ICTSI approached other carriers. ICTSI's conduct is not like the plaintiff in *Collier*, who did nothing to obtain the business for 52 months after the labor problems ended.

Damages were also reasonably ascertainable. The experts here had volume and productivity data from before ICTSI began operations at Terminal 6 and during the first 15 months when ICTSI ran the terminal without the reefer dispute. Portions of that data could then be extrapolated to determine what likely would have happened to volumes and productivity in the "but for" world if there had been no reefer dispute. The formulas used were analogous to the formula approved in *Frito-Lay*. The jury's decision not to stop damages as a result of Hanjin's departure or bankruptcy is supported by substantial evidence.

## A. Motion for New Trial

ILWU also moves, in the alternative, for a new trial under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure. ILWU argues that the entire verdict is contrary to the weight of the evidence and that the damage award is excessive and contrary to the weight of the evidence. As to the jury's damage award, ILWU also argues that the Court could, alternatively, require ICTSI to choose between remittitur and a new trial. The Court addresses each argument in turn.

## 1. New Trial Based on Liability or Causation Determinations

ILWU argues that the jury's verdict is against the clear weight of the evidence because the jury concluded that ILWU engaged in unlawful secondary activity after August 13, 2013 and did not engage in any lawful primary activity after that date. The Court has weighed the evidence and does not find that it is against the clear weight of the evidence to find that ILWU engaged in mixed motive activity after August 13, 2013, with the reefer dispute continuing as a substantial motivating factor for ILWU's conduct. Thus, finding all of ILWU's conduct unlawful is not against the clear weight of the evidence.

ILWU also argues that the jury's verdict that no nonlabor factors caused losses to ICTSI is against the clear weight of the evidence. ILWU argues that many problems relating to Terminal 6's location, ICTSI's unreasonable rates, the fact that ICTSI did not seek to get Hanjin to stay or come back, and Hanjin's bankruptcy all contributed to ICTSI's losses.

The clear weight of the evidence does not show that the carriers left Terminal 6 because of its location or ICTSI's rates. Mr. Ganda testified that in late 2013 the carriers complained about their concerns over poor productivity and they threatened permanently to leave Terminal 6. This led to a meeting hosted by Governor Kitzhaber in November 2013. Mr. Ganda also testified that in February 2015 a Hanjin ship was in port for 21 days when it should have only taken a few days, that caused another Hanjin ship to miss port, and during that time Hanjin gave notice it was leaving Terminal 6 permanently. Michael Radak, Senior Vice President of Marketing at Hanjin testified that Hanjin "did what the union wanted and we left" Terminal 6 because of the poor productivity; that Hanjin left because it could not make money due to the poor productivity; that Hanjin did not have concerns about ICTSI before the reefer dispute began; that during contract negotiations Hanjin would engage in "posturing" to try to get a better deal; and that the "commercial" side of the business wanted to stay at Terminal 6, realizing its value to the

customers using that shipping line, but that the "operations" side, who dealt with the labor dispute, wanted to leave. Mr. Wyatt testified, reading a letter from Mr. Radak to Mr. Ganda, in which Mr. Radak expressed his "serious concern" about the low productivity at Terminal 6 causing "huge financial damage" to Hanjin. Mr. Wyatt then further explained why low productivity harms carriers. Other evidence included: (1) APL's willingness to give a trial run at Terminal 6 and the abysmal productivity it encountered that ended any chance of APL becoming a new customer at the terminal; (2) Hapag-Lloyd's Vice President of Marine Operations, Steven Gallaway, testifying that the schedule problems from low productivity played a major factor in Hapag-Lloyd's decision to leave; and (3) Mr. Wyatt testifying that Hapag-Lloyd left because of low productivity.

ILWU notes that both Hanjin and Hapag-Lloyd complained about ICTSI's rates. Complaining about rates, however, does not mean high rates were the reason the carriers left Terminal 6 as opposed to the productivity problems. High rates may not have helped the situation, but the clear weight of the evidence does not support that the carriers left because of rate concerns.

As to ICTSI's purported failure to convince Hanjin to stay or to return to Terminal 6 after leaving in 2015, as noted above, the weight of the evidence shows that Hanjin left because of the productivity problems from the labor dispute. The problems caused by the reefer dispute at Terminal 6 had been ongoing for several years by the time Hanjin left, and the productivity problems at Terminal 6 continued. It is unclear what ILWU is arguing ICTSI should have been able to do to convince Hanjin to stay or come back. Terminal 6 remained the same unproductive environment from which Hanjin left, at a time when one of its ships had been unnecessarily kept at the Port for *21 days*.

Finally, the clear weight of the evidence does not show that Hanjin's bankruptcy harmed ICTSI. There was substantial evidence in the record that Hanjin's service would have been replaced and that other ports were able to replace Hanjin's business. There was no evidence in the record about any losses suffered at any other port in which Hanjin had been docking at the time of its bankruptcy from which the jury could determine whether there would have been some short term loss. Considering all the evidence, the jury's verdict that nonlabor factors did not harm ICTSI is not against the clear weight of the evidence.

## 2. New Trial Based on Damages Award

The jury awarded $93,635,000 in damages. Because Mr. Kidder testified that ICTSI's maximum damages were less than $8 million, the only evidence that could support the jury's award was the testimony of Mr. Sickler, ICTSI's damage expert. Mr. Sickler provided two alternative damage models. He calculated damages in the amount $97,635,000 based on the Pacific Northwest Index. Mr. Sickler also testified to damages in the amount of $135,638,000 based on 2012 budget projections prepared by Mr. Ganda. Both damage calculations included about $20 million in claimed extraordinary expenses, with the remainder of the damages comprising lost profits. ILWU raises many challenges to Mr. Sickler's testimony, some applying to both damage models and some unique to one or the other. ILWU challenges both lost profits and the extraordinary expenses.

### a. Lost profits

Mr. Sickler's damage models were based on estimated twenty-foot equivalent units ("TEUs"), a measure of container volumes, that would have shipped through Terminal 6 but for the labor dispute. He calculated the TEU volumes that would have shipped each year, beginning June 1, 2012 and continuing through March 31, 2017. He also calculated the revenue that ICTSI would have made each year per TEU. Both of Mr. Sickler's damage models began with

historically high prices ($270 per TEU). Mr. Sickler then assumed increasing prices, or rates, each year. The rate of $270 per TEU was the average rate that ICTSI charged carriers in 2013. The clear weight of the evidence, however, does not support that ICTSI would have charged that high of a rate in the "but for" world of no reefer dispute (or that the carriers would have paid that high of a rate without the reefer dispute, either in 2013 or in the long term). This significantly undermines one of Mr. Sickler's most important damage analysis assumptions.

The evidence shows that the carriers paid that rate and the 2014 increase under protest, and that they understood that these higher rates were tied to the labor dispute. Thus, the evidence supports that the carriers understood the higher rates to be only for the short term. Even more significantly, ICTSI's Mr. Ganda testified that he only raised the rates to those levels because of the reefer dispute and related labor actions. He testified that in 2013 he had planned on raising the rates only 15 percent to $197 per "lift" but "had to" raise them 26 percent to $250 per lift (which correlated to $270 per TEU) to compensate for the additional costs imposed on ICTSI as a result of the reefer dispute and labor actions. Thus, even under ICTSI's own evidence, the 2013 rate of $270 per TEU would not have been charged by ICTSI in the "but for" world (*i.e.,* one without the labor dispute) that formed the foundation of Mr. Sickler's damage models. Mr. Ganda also testified that because of the labor dispute, he had to impose a surcharge on shipping companies in 2014, which also would not have been assessed without the labor dispute (*i.e*, in the "but for" world). Further, an independent study performed by the Advisian Group, in which ICTSI's expert Mr. Gimpel was involved, found that in 2018 (after ICTSI ceased operating at Terminal 6) the reasonable rate charged would have been only $213 per TEU. This was well less than Mr. Sickler's assumed rates for earlier years.

In addition, Mr. Sickler's selection of a specific five-month base period to use for the foundational calculation of sales volume (or quantities) was artificial and without adequate evidentiary support. He based his "but for" TEU volume calculations on only the first five months of 2012. January 2012, however, was an "outlier" month, a month with unusually high TEU volume. "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). "An 'outlier' is an extreme data point that lies far from a regression line [that fits] the remaining data points." *Estate of Bud Hill v. ConAgra Poultry Co.*, 1997 WL 538887, at *8 (N.D. Ga. Aug. 25, 1997). "Outliers can significantly impact the slope of the regression line and, ultimately, distort the results of an otherwise accurate regression analysis." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1299 (N.D. Fla. 2017). ICTSI had operated Terminal 6 for 15 months. Mr. Sickler's decision to choose only a specific five-month period, especially one that contained an outlier month, renders the reliability of this aspect of Mr. Sickler's methodology suspect. *See id.* at 1299-1300; *see also Oiness*, 88 F.3d at 1031-32 (rejecting economic analysis extrapolating demand for future sales from an initial "burst" of sales from a few months); *Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004) (rejecting expert methodology, in part because it appeared to select dates "chosen in order artificially to support" the expert's hypothesis, particularly one date that created such a vast price spike that without its inclusion the difference would not be statistically significant).

ILWU also raised reliability questions about Mr. Sickler's Pacific Northwest Index damage model because that index is not an appropriate benchmark, according to ICTSI's own evidence. ICTSI's Mr. Ganda testified that volumes at Terminal 6 are "not really tied to the

Pacific Northwest Index." A "poor benchmark cannot supply sufficient evidence" in a "but for" damage analysis. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001). Economists are expected to "derive a demand curve" and make price approximations "without relying on inapposite benchmarks." *Id.*; *see also Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772 (5th Cir. 1999) (finding that damages were "wholly speculative" because the witness "estimated future profits extrapolated from the growth curve of a company that, as we have already shown, was not proven to be closely comparable to DGI"); *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1027 (S.D.N.Y. 1997) (finding that the use of a securities index that was not sufficiently correlated to the security at issue "seriously undermines the reliability of the proposed [expert] testimony").

Mr. Sickler also admitted that he "did no analysis to determine whether it was reasonable to assume that container volume [for Terminal 6] would have grown or declined at the same annual rate as the total combined volume of Tacoma, Seattle and Portland." He simply "assumed" that Terminal 6 volumes "would move with that index." Mr. Sickler, however, has no expertise in the maritime industry on which to base such an assumption, and Mr. Ganda's testimony shows that Mr. Sickler's assumption was erroneous. ICTSI argues that Terminal 6 had market advantages that make the Pacific Northwest Index a lower benchmark. The evidence, however, shows that Terminal 6 had both market advantages and disadvantages, and ICTSI points to no specific evidence about whether Terminal 6 traditionally grew at a faster or slower pace than the Pacific Northwest Index. In any case, whether Terminal 6 volumes were higher or lower than the Pacific Northwest Index, that Index did not correlate to Terminal 6 volumes and Mr. Sickler did not consider that fact, perform any analysis into that issue, or make any

necessary adjustments compensate for the fact that Terminal 6 volumes did not move with the Pacific Northwest Index.

ILWU also raises reliability questions about Mr. Sickler's 2012 budget model because it is based on a 2012 budget prepared by Mr. Ganda that he built from industry projections proven to be incorrect over time. ILWU raised this issue before trial and the Court, relying on *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 731-32 (10th Cir. 1993), ordered a Rule 104 hearing to determine whether Mr. Ganda's budget projections could be proven at trial as more than Mr. Ganda's mere "hope." After the Rule 104 hearing, the Court held that there was enough evidence to resolve ILWU's objections as presenting an issue of weight not admissibility. The Court specifically noted the Ninth Circuit's instructions not to exclude shaky but admissible expert evidence, that a district court must screen the jury from unreliable nonsense opinions, that a district court should not exclude expert opinions that are merely impeachable, and that it is not the district court's task to decide whether an expert's opinion is correct. *See generally City of Pomona v. SQM N. Am. Corp*., 750 F.3d 1036, 1043-44 (9th Cir. 2014).

The Ninth Circuit also has held that objections to assumptions for a lost profit analysis are generally issues for the jury in weighing evidence. *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) ("As to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence. It is for the trier of fact to accept or reject this evidence, and this evidence not being inherently improbable provides a substantial basis for the trial court's award of lost profits." (citation omitted)); *see also Glenwood Sys., LLC v. Thirugnanam*, 2012 WL 1865453, at *2 (C.D. Cal. May 21, 2012) (rejecting an admissibility challenge to expert testimony that relied on the president of a company's calculation of lost

profits and other underlying financial assumptions); *Nomo Agroindustrial SA DE CV v. Enza Zaden N. Am., Inc.*, 2009 WL 211085, at *14-15 (D. Ariz. Jan. 29, 2009) (finding that objections that a damages expert incorporated the testimony of the president of a company to calculate damages goes to the weight and not admissibility of the expert opinion).

Evaluating the weight to give this opinion by Mr. Sickler, the Court considers the bases of Mr. Sickler's underlying assumptions. Mr. Ganda attended an industry conference in 2010 where he learned about anticipated projected growth in the industry over the next several years. In 2011, Mr. Ganda prepared a 2012 budget that incorporated anticipated future growth based on the industry growth percentages he had heard at the 2010 conference. That projected growth in the industry, however, did not occur. Mr. Sickler, though, began with Mr. Ganda's budgeted number for 2012, even though at the time of trial it was undisputed that those projections deviated from the actual data. Mr. Sickler then *increased* Mr. Ganda's projected numbers, because of the higher-than-projected actual performance achieved by ICTSI during the first five months of 2012. Mr. Sickler then used Mr. Ganda's additional budgeted percentage increases for each later year.

Mr. Sickler accepted that Mr. Ganda prepared the budget and that Mr. Ganda had experience in the industry. Mr. Sickler, however, did not inquire into how Mr. Ganda developed his future growth estimates, or investigate whether the basis of those estimates, the industry growth estimates, in fact occurred. Had Mr. Sickler done that, he would have learned that the actual industry data was much lower than his assumed figures.

Thus, Mr. Sickler did not make any adjustments for what occurred in the industry in those future years. For example, Mr. Ganda assumed growth from 2013 to 2014 of five percent based on industry growth projections and the actual industry growth was only 2.5 percent.

Mr. Sickler testified that his calculations are sound because Mr. Ganda's budget had five months of actual performance in 2012, which showed performance higher than Mr. Ganda had budgeted. That calculation, however, includes the outlier month of January 2012. It also compounds the problem of taking a selective choice of a few months' performance and extrapolating over several years. It also assumes the productivity of that limited data set would last, and indeed would increase, over years, without considering what happened in the industry over those same years. It also has the reliability concern of being based only on the optimistic projections of ICTSI itself. *See, e.g.*, *Zenith Elecs. Corp v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (noting that a party's "internal projections . . . rest on its say-so rather than a statistical analysis" and "represent hopes rather than the results of scientific analysis"); *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (finding that "the entrepreneur's 'cheerful prognostications'" create reliability concerns (quoting Dobbs Law of Remedies § 3.4)).

ILWU also raised serious reliability questions about Mr. Sickler's 2012 budget model because it included increases of both pricing and volume. This model ignored the basic economic principle of a downward sloping demand curve in most real-world settings. Stated another way, as the price of a good or service increases, the demand for that good or service generally decreases. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a restriction in output."); *Crystal Semiconductor*, 246 F.3d at 1359 ("All markets must respect the law of demand. According to the law of demand, consumers will almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products. . . . Therefore, according to basic tenets of economics, because Crystal is in a competitive market, if Crystal raised prices, Crystal's sales would have fallen." (citation omitted)); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031-32 (Fed. Cir. 1996)

("The economic axiom that demand curves slope downward calls into question the doubling of demand for a product year after year."). The "very rare" exception to this is an "inelastic" market—where substitution is impossible, and the product is a necessity. *Crystal Semiconductor*, 246 F.3d at 1359. That is not the case here.

Markets exist somewhere on the spectrum between perfect inelasticity and perfect elasticity. *Id.* In his rebuttal testimony, Mr. Sickler testified that volume does not always decrease as prices increase, citing the Apple iPhone as an example. The iPhone is an extraordinary example, where demand remains high and the product is near the inelastic side of the spectrum even though there are other competing products on the market. Few products can reach that level of desirability.

ICTSI argues that the evidence shows that Terminal 6 has that level of desirability because it had market advantages over Seattle and Tacoma and the carriers paid the higher rate. The evidence, however, does not prove that Terminal 6 is the "iPhone" of port terminals in the Pacific Northwest. Keith Leavitt and Mr. Wyatt of the Port of Portland testified about the many carriers who left the Port for Seattle or Tacoma, showing that these ports compete in a market with a relatively elastic demand curve, not inelastic. They also testified to the market disadvantages of Terminal 6. Additionally, the Port was unable to attract new carriers when carriers left, further detracting from the notion that Terminal 6 was extraordinarily desirable.

That carriers begrudgingly paid ICTSI higher rates for a short time does not support that they would have consistently paid higher rates on an ongoing basis. They paid these rates understanding they were tied to the labor dispute, which for a time they were willing, as Mr. Gallaway from Hapag-Lloyd testified, to "wait it out." Nor does the mere fact that the carriers paid higher rates for a while support that they would have paid those rates at higher and

higher volumes. Further, the higher rates being paid were not at Mr. Sickler's assumed higher volumes. For example, in 2014 the actual volume was 166,378 TEUs and the volumes assumed by Mr. Sickler was 235,932. In 2015, the actual volume was 22,781 TEUs, and the volume assumed by Mr. Sickler was 250,088. The point of ILWU's argument is that as prices increase, one would generally not expect to see volumes (or quantities) also increase. This is the law of a downward sloping demand curve, and an economically sound analysis should account for that or explain the deviation with persuasive evidence. Mr. Sickler, however, simply assumed ever-increasing volumes, higher than what the carriers experienced, and at ever-increasing prices. Based on the evidence presented at trial, this is not reliable or credible.

Considering all the problems discussed above with Mr. Sickler's damage models, the Court finds that cumulatively these issues cast significant doubt on the reliability of his testimony supporting lost profits. The Court, therefore, gives Mr. Sickler's testimony little weight on this issue. Without Mr. Sickler's testimony on lost profits, the jury's verdict is against the clear weight of the evidence, the jury awarded excessive lost profit damages, and a new trial on damages is warranted.

### b. Extraordinary Expenses

ILWU contends that ICTSI also is not entitled to the approximately $20 million in extraordinary expenses that Mr. Sickler opined were reasonable damages together with lost profits. These expenses include: (1) the $11,450,000 cash payment that ICTSI paid to the Port of Portland upon terminating the lease; (2) $4,364,000, representing the appraised value of the equipment bought by ICTSI while operating the Port but left at Terminal 6 when it terminated its lease; and (3) $4,240,000, representing a portion of the $8 million concession fee that ICTSI paid the Port for the right to operate Terminal 6 and use some equipment that already was at Terminal 6 when ICTSI signed the lease.

ILWU argues: (1) that ICTSI cannot recover both lost profits and these expenses in the "but for" world because ICTSI would not have terminated its lease in the "but for" world; (2) that ICTSI would have incurred these expenses regardless, as a result of Hanjin's bankruptcy; (3) that ICTSI may not recover both lost profits and extraordinary expenses because they are mutually exclusive alternative theories of recovery; and (4) that these expenses are not the type of expenses allowed in this type of case. The Court addresses each argument in turn.

The Court rejects ILWU's first argument because the Ninth Circuit allows both the recovery of lost profits, calculated in the "but for" world, and the recovery of extraordinary actual out-of-pocket expenses incurred as a result of the illegal labor practices. *See Frito-Lay*, 623 F.2d at 1365 n.11 ("In addition to lost profits, an injured employer is entitled to recover the extraordinary expenses, not normal to its business operation, incurred as a result of the Union's illegal strike."). The Court rejects ILWU's second argument because, as discussed above, the jury's finding that Hanjin's bankruptcy would not have caused the closure of Terminal 6 and ICTSI's termination of its lease is supported by sufficient evidence and accepted under Rule 59. The Court rejects ILWU's third argument because ICTSI could have continued its lease with the Port, operated at a loss, and at trial claimed lost profits through the date of trial. Instead, ICTSI terminated its lease and is not claiming lost profits for any period beyond the lease termination. It essentially "stopped the bleeding" and reduced its damages, but at the same time possibly incurred some extraordinary expenses that it would not have otherwise occurred. Thus, these are not alternative theories of recovery, and ICTSI is not "double dipping." The question remains, however, whether the claimed expenses are the type of expenses that are recoverable in this type of case.

The Ninth Circuit has described the type of extraordinary expenses generally awarded in labor cases to include the cost for extra guards, overtime pay, travel expenses, long distance telephone calls, extra freight expenses, and bonuses and salaries paid to certain personnel to keep them during the strike when the business was closed. *Frito-Lay*, 623 F.2d at 1364, 1365 n.11. These are all expenses incurred as a result of the illegal labor and paid out-of-pocket at that time. This case, as noted above, has unique factual circumstances involving illegal labor practices that continued for nearly five years, resulting in ICTSI terminating its lease. This may have caused out-of-pocket expenses not seen in other labor cases. The Court will accept these out-of-pocket expenses because they align with the type of expenses allowed in a § 303 case. Without specific Ninth Circuit guidance, however, the Court declines to expand the types of "extraordinary expenses" allowed in § 303 cases to expenses not paid out-of-pocket as a result of the illegal labor practices.

Applying these principles, the Court finds that the $11,450,000 payment ICTSI made to the Port is a recoverable extraordinary expense incurred as a result of ILWU's illegal labor activity. As discussed above, weighing all the evidence and considering the Rule 59 standard, the Court declines to disturb the jury's findings that there were no other factors that contributed to the loss in productivity. Thus, ICTSI would not have had to terminate its lease and pay that lease termination fee absent ILWU's illegal legal practices.

There are two problems, however, with the recoverability of the $4,364,000 appraised value for the equipment as an extraordinary expense. First, ICTSI did not pay this amount out of pocket at the lease termination, which is what ICTSI argues is the "outside its normal business practice" element that makes this expense recoverable. ICTSI bought that equipment throughout

the time it operated Terminal 6. Thus, this expense does not fall within the type of out-of-pocket extraordinary expense accepted under Ninth Circuit precedent.

Second, and as an independent and alternative reason, ICTSI chose to leave the equipment at the Port. If the equipment had a value of about $4.3 million, as claimed, ICTSI could have elected to sell it or ship it to another port run by ICTSI's parent company. ICTSI made the voluntary decision to abandon the equipment. That is a not an expense directly caused by the illegal labor action.[3] *See, e.g.*, *Lewis v. Benedict Coal Corp.*, 259 F.2d 346, 352-53 (6th Cir. 1958), *modified*, 361 U.S. 459 (1960) (finding that replacement cost of cable that the plaintiff left on the job site after a strike that later was destroyed was "the direct result of [the plaintiff's] own decision" and was only "indirectly related to the strikes").

There are similar problems with the prorated value of the concession fee paid by ICTSI to the Port in 2011 being recoverable as an extraordinary expense. ICTSI did not pay the $4,240,000 amount at the time of lease termination, let alone as a result of the illegal labor activity. ICTSI made this payment, indeed it paid a much larger sum, when ICTSI signed the lease. It is only through an accounting convention that ICTSI calculates this value from a fee paid up front to the Port. Thus, it is not the type of expense that the Ninth Circuit has accepted as extraordinary and recoverable in a § 303 case.

In addition, as an independent and alternative reason, this extraordinary expense amount is against the clear weight of the evidence because it is based on speculation and on conclusory testimony. First, Mr. Sickler speculates that the Port tied the $8 million to the 25-year term of the lease. There is no evidence that Mr. Sickler confirmed this fact with the Port. In other words, the

---

[3] This analysis differs from the argument that ICTSI failed to mitigate its damages, which the Court excluded from trial as a self-executing sanction under Rule 37(c)(1) of the Federal Rules of Civil Procedure.

Port might have charged the same $8 million fee for a lease of a different duration. The $3,761,041 "purchase price" for the existing equipment logically would seem to be the same regardless of the term of the lease. Nor is there any evidence that the Port would not require the same $4,238,959 as a concession for the right to lease the terminal, even if the lease term were shorter. Mr. Sickler amortized the $4,238,959 concession fee evenly over the 25-year lease term.

Furthermore, even if the $8 million fee were charged specifically because it was a 25-year lease (and a 10- or 15-year lease would have had a lower fee), no evidence shows that the concession fee was intended to be amortized evenly over the 25 years as opposed to following some other amortization schedule. Various economic arrangements use front-loaded amortization schedules.

Moreover, Mr. Sicker depreciated all the existing equipment on a 10-year schedule. He provided no analysis whether all that equipment qualified for 10-year depreciation. He did not describe the age of the existing equipment, the particular piece of equipment's depreciation schedule, and the remaining years of a piece of equipment's depreciation schedule. For example, trucks and large capacity cranes might have different depreciation schedules, and different pieces of equipment most likely would have had a different number of years left of depreciation.

For all these reasons, the lease termination payment of $11,450,000 is an extraordinary expense that is recoverable under § 303. The $4,364,000 appraised value of the equipment that ICTSI bought during the time it operated Terminal 6 and that ICTSI chose to leave at Terminal 6 when ICTSI ceased operations is not an extraordinary expense, as § 303 cases use that term. It is, therefore, not recoverable. Similarly, the $4,240,000 estimated value of the "remaining" portion of the concession and equipment fee paid by ICTSI to the Port of Portland upon the signing of the lease is not a qualifying § 303 extraordinary expense and also is against the clear weight of

the evidence, even if it could qualify as an extraordinary expense. In summary, the verdict includes extraordinary expenses that are not recoverable in § 303 cases and are otherwise unsupported by the evidence. Thus, the jury awarded excessive damages on ICTSI's claim of extraordinary expense. A new trial relating to damages is appropriate.

### 3. Remittitur

The Court determines that a new trial is appropriate solely on damages. In considering whether to deny ILWU's motion for new trial conditioned on ICTSI accepting a remittitur, the Court evaluates whether there is evidence from which the Court can reasonably determine a maximum sustainable amount of damage. The Court finds that there is evidence supporting the extraordinary expense of $11,450,000. The Court also reviews the record for evidence of ICTSI's lost profits. The jury found that ILWU engaged in unlawful conduct throughout the relevant period and there were no other substantial causes of ICTSI's damage. Thus, ICTSI is entitled to lost profits from June 2012 through March 31, 2017. Because of the substantial reliability problems with Mr. Sickler's lost profits analyses, as discussed above, the Court considers other evidence in the trial record on this issue. ILWU's damage expert, Mr. Douglas Kidder, testified that the value of ICTSI's lost productivity from June 2012 through March 2017, plus the value of the volume from the ships that had to bypass Terminal 6 due to the labor dispute, was $7,611,248. The Court finds this evidence credible. Thus, the maximum damages supported by the evidence is $19,061,248.

### CONCLUSION

Defendants' Motion for Judgment as a Matter of Law, Remittitur, or New Trial (ECF 654) is granted in part and denied in part. ILWU's request for judgment as a matter of law is denied. ILWU's alternative request for new trial is denied except for damages, for which it is denied conditioned upon ICTSI accepting reduced damages in the amount of $19,061,248. If

ICTSI does not accept this remittitur, then ILWU's motion for new trial is granted in part, limited to damages. The Court directs ICTSI to inform ILWU and the Court of ICTSI's decision about remittitur within two weeks from the date of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 5th day of March, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge