# Expert Report of Nolan Gimpel

February 8, 2023

*Page 2*
*Gimpel Report*
*February 8, 2023*

**Contents**

I.      Background and Assignment ................................................................................. 4

II.     Qualifications and Experience ............................................................................ 5

III.    The Container Shipping Industry ...................................................................... 45

        A.      Overview ................................................................................................ 7

                1.      Carriers, Shippers, Ports and Terminal Operators ..................... 7

                2.      Elements of the TO/Carrier Contract ......................................... 9

                3.      Carrier Alliances ..................................................................... 111

                4.      Carrier Interests in Terminal Operators .................................... 13

                5.      Port Operating Models ............................................................... 13

                6.      Intermodal and Local Cargo ..................................................... 14

        B.      Carrier Considerations in Choosing a Port .......................................... 15

                1.      Reliability is Paramount ............................................................ 16

                        (a)     Hard Costs of Missing a Berth Window ....................... 16

                        (b)     Damages to Customer Relationships ............................ 18

                2.      Terminal Operator Pricing is a Minor Consideration ............... 19

                        (a)     TO Cost is Insignificant Compared to Total Cost ........ 19

                        (b)     TO Cost is Insignificant Compared to Cost of Delay ... 20

                        (c)     TO Cost is a Fraction of Ground Transport Costs ........ 20

                        (d)     Portland TO Cost to Shipper is Less Than 5% of Total
                                Shipping Cost ............................................................... 21

                3.      Other Important Considerations ................................................. 21

                        (a)     Margin Analysis ........................................................... 21

                        (b)     Customer Relationships ................................................ 22

                        (c)     Carrier's Financial Interest in the Terminal ................. 23

*Page 3*
*Gimpel Report*
*February 8, 2023*

IV.    The Port of Portland and Terminal 6 .................................................................. 24

    A.    History.......................................................................................................... 24

    B.    Carriers and Cargo ...................................................................................... 24

    C.    The T6 Catchment Area............................................................................... 25

    D.    The Advantages of T6 over Seattle or Tacoma .......................................... 26

    E.    History of Volumes, Pricing and Productivity at T6 .................................. 28

        1.    Historic Below-Market Prices.................................................... 28

        2.    Historic Volumes ...................................................................... 29

        3.    Historic Productivity.................................................................. 31

    F.    ICTSI Would Not Have Lost Market Share in a But-For World.......................... 33

        1.    Absent ILWU's Illegal Conduct T6 Carriers Would Not Have Left T6 ................................................................................................. 33

        2.    Using a One-Year Period to Calculate Market Share is Reasonable ........ 33

        3.    Reasonable T-6 Capture Rate in a But-For World Would Not Have Decreased................................................................................. 33

        4.    It is Probable That APL Would Have Instituted a Regular Vessel Call................................................................................................ 34

        5.    Carriers Could Increase Capacity without Moving to Ships that are Too Large to Travel Up the Columbia River........................................... 35

    G.    Certain Price Increases Would Not Have Reduced T6's Market Share or Caused Carriers to Leave T6 in a But-For World................................................. 37

    H.    Another Carrier Would Have Replaced Hanjin within a Reasonable Time After Its Bankruptcy in a But-For World............................................................. 38

V.    Documents Considered ....................................................................................... 45

*Page 4*
*Gimpel Report*
*February 8, 2023*

## I.     Background and Assignment

I am an independent consultant in the marine shipping and ports industry.  I have over 50 years of experience in all aspects of the marine shipping industry and related terminal services operations. I have been retained by Schwabe Williamson and Wyatt on behalf of ICTSI Oregon, Inc. to provide my specialized knowledge of the unique and complex marine shipping and terminal services industry.  Specifically, I have been asked to do the following:

A.     Describe the shipping industry generally;

B.     Describe the important factors carriers consider when they are choosing a port of call;

C.     Describe the history of Terminal 6 ("T6") at the Port of the Portland and the "catchment area" that T6 serves;

D.     Discuss the advantages and/or disadvantages of T6 over container terminals in Seattle and Tacoma;

E.     Offer an opinion on whether T6 would have more likely gained or lost market share in a world where the ILWU did not engage in illegal conduct between 2012 and 2017, including whether:

     1.     using a one-year period before the ILWU engaged in illegal conduct is a reasonable period from which to predict market share in a but-for world;

     2.     a reasonable but-for market capture rate would have decreased;

     3.     carriers would have been able to absorb increased volume without moving to ships that were too big to call T6;

     4.     certain ICTSI price increases would have caused the carriers to leave or decrease container volumes through T6;

     5.     it is more likely than not that APL would have instituted a regular call at T6;

     6.     any carrier would have left T6 before August 2016, when Hanjin filed bankruptcy; and

     7.     Portland would have been a profitable enough call such that another carrier would have replaced Hanjin after it filed bankruptcy in August 2016; and if so, when and at what volumes?

I am compensated at a rate of $500 per hour.  My compensation is not predicated on the outcome of the lawsuit between ICTSI Oregon, Inc. and the International Longshore and Warehouse Union and International Longshore and Warehouse Union Local 8.

## II.     Qualifications and Experience

After graduating with honors from the State University of New York Maritime College (Fort Schuyler, 1968), I fulfilled my obligations to the United States Government and sailed on US flag Merchant Marine vessels for three years. In the process of fulfilling that commitment, I advanced my license from that of Unlimited Third Mate, Oceans to Unlimited Second Mate, Oceans and obtained a waiver that allowed me to sail as Chief Mate. During this time, I also sailed as Master on vessels of under 500 gross tons in inland waters.

With my seagoing duties completed, I secured shoreside employment in the industry. In 1971, I was recruited by Seatrain Lines in Weehawken, New Jersey as a terminal manager/vessel planner. Seatrain Lines was an early pioneer in cargo containerization. Over the next 10 years, my career with Seatrain took me to North Carolina, Pennsylvania, California and back to New York. During these 10 years, I served as Vice President of Operations for both the Far East and European services.

In 1981, I joined American President Lines (APL), a major shipping line, as the Managing Director for the East Coast and then transferred to California in 1982. After that transfer to California, I held the following positions at APL: Vice President, Logistics; Senior Vice President and President of Asia (with responsibilities for sales, operations, logistics, administration, and marketing for 23 countries in Asia generating approximately $ 3 Billion in revenue); President and CEO of an APL affiliate, American President Intermodal, which ran double stack trains (containers stacked two high on rail cars) supporting APL's domestic and international transportation networks; and lastly I was appointed Senior Vice President of Sales, Marketing and Pricing, a role I held until my departure from APL in 1989. In this role, I was responsible for marketing APL's container shipping services to Beneficial Cargo Owners (BCOs), who were the customers of the line as well as for setting the prices that APL charged for those services.

In 1989, I was appointed to the position of CEO of the Port of Oakland and for the next two years, I managed all aspects of the operations of the Port. My responsibilities as CEO included the negotiation of the new leases for the terminals in the Port of Oakland with the terminal operators. This included the pricing of the container terminals of the Port of Oakland to the various terminal operators who leased them. This experience provided an overview of the impacts of the lease costs on the terminal operators (TOs) and the efforts made by the TOs to recover costs from its customers (the lines it served).

In 1991, I returned to the private sector by joining Stevedoring Services of America (SSA) as the Vice President of International Business development. During the next 10 years, my team reviewed hundreds of investment opportunities for the company and successfully developed an intermodal terminal in Thailand, major ports in Panama and Mexico and began exploring operations in Colombia and Chile where the company ultimately developed operations.

In 2001, I founded Axiom Consulting, a transportation consulting business, which I sold to TranSystems Corporation in 2005. I remained with TranSystems until 2008 as the Market Sector Leader for Ports and Terminals. At Axiom, I consulted mainly for NYK Lines on international

business development in the Port Sector.  While at TranSystems, I grew the port consulting practice by 300% in three years by aggressively marketing the firm's engineering and design capabilities to terminal operators and port authorities.  After leaving TranSystems, I returned to Seattle and along with several other industry experts, founded Mercator International, a successful consulting firm, which advises terminal operators, ports, shipping lines and industry investors (e.g., private equity, pension funds, banks etc.).

I left Mercator in 2016 and became an independent industry consultant.  A copy of my curriculum vitae, including a list of cases in which, during the last four years, I have testified as an expert at trial or by deposition, and a list of all publications I have authored or co-authored in the previous 10 years, is included as Appendix A to this report.

My prior experience is notable for its breadth because I have performed high-level management and consulting work in virtually all aspects of the marine shipping industry.  Aside from having myself operated merchant marine vessels, I have worked as a (1) vessel planner, terminal manager and Vice-President managing container loading and unloading operations as well as having had responsibility for designing the deployment of the entire APL fleet of vessels; (2) Vice-President of a major ocean carrier with responsibilities over sales, operations, logistics, administration, and marketing in twenty-three Asian countries, (3) Senior Vice-President of Sales, Marketing and Pricing for that same carrier; (4) President and CEO of an affiliate of that carrier engaged in intermodal rail transport of containers; (4) CEO of a major West Coast public port authority; (5) Vice President of International Business development for a major terminal operating company; and (6) founder of two separate transportation consulting firms advising terminal operators, ports, shipping lines and industry investors on important strategic management decisions.

In this last role, I have consulted with the Port of Portland on multiple occasions regarding Terminal 6 over many years and have deep familiarity with that terminal, its business operations, and its economic viability.  I first consulted with the Port of Portland around 2009 when the Port was first putting Terminal 6 out for bid.  I reviewed the Port of Portland's first draft of the proposed offering for Terminal 6 and advised the Port on the need to engage a specialist to help with the offering document.  The Port hired Morgan Stanley to better define the bid parameters and provide financial information necessary for bidders.

After the termination of ICTSI's lease in 2017, the Port hired me to lead the process of analyzing T6 and the potential options for its use ("The Advisian Report").  The Advisian Report was a forward-looking document intended to analyze potential uses for Terminal 6 in the context of no carriers calling on T6 because of the unresolved illegal labor actions.[1]  One of the tasks was to calculate break even volumes using Port imposed rate assumptions, inflation adjusted from 2004-2008.  These assumptions resulted in using a below-market rate for calculating break even volumes.  At the time I disagreed with this formula for achieving the rate applied because it did

---

[1] Advisian Report, p. 1. (ICTSI0076164-0076299)

*Page 7*
*Gimpel Report*
*February 8, 2023*

not accurately reflect current market conditions. I expressed my concern but was directed against my objections to use the Port's assumptions.

In addition, I have first-hand experience evaluating container terminals for economic viability and developing new ports and container terminals throughout the world. For example, I have developed new terminals in Manzanillo, Mexico and Manzanillo, Panama. I developed new container services for APL from Singapore to India, Singapore to Sri Lanka and Singapore to the Middle East. The first step of implementing a new service is to analyze the market and business factors such as market demand, competition, and potential profitability as well as analyze the logistical factors, such as vessel deployment, the terminals called, number and size of ships needed, and many other factors.

I have also reconfigured existing strings. For example, at APL we took cargo that went to a large port, put it on a small vessel to make a direct call on a smaller port and filled that smaller vessel by building a relationship with another carrier that also saw profit in serving that small port. I have also reconfigured existing strings upon exigent circumstances. The time it takes to reconfigure an existing string can vary widely depending on the circumstances, priorities, potential profit, whether you must work with other carriers or whether the carrier is working independently or within its own alliance, etc.

## III.     The Container Shipping Industry

### A.     Overview

#### 1.     Carriers, Shippers, Ports and Terminal Operators

There are many components to the container shipping industry. There are ocean carriers or shipping lines that run regularly scheduled services between ports in North America and the rest of the world. The carriers run a string of ships in a fixed rotation to provide a service (usually weekly) from/to each port in the voyage rotation. These carriers rely on revenues received from importers and exporters of cargo (collectively referred to as "shippers") that is loaded aboard these vessels. Carriers charge shippers, with the method of setting rates varying. Typically, carriers set rates based on the carrier's cost per lift as well as overall operating costs including vessel, fuel, port costs, etc., and may include the cost of truck or rail transportation from the port of call to the shipper's final destination, although sometimes shippers pay that cost directly. For larger cargo interests, shippers and carriers usually agree to negotiate rates for periods of 1-3 years; in contrast, smaller shippers often pay carriers' published tariff rates. Negotiated rates between carriers and shippers are filed with the Federal Maritime Commission (FMC) and are

kept highly confidential by both the cargo interests and the carriers. Tariffs are also filed with the FMC.[2]

In ports where multiple carriers may serve the same general markets, the carriers compete based on the prices they charge shippers, the overall transit time between port pairs, equipment availability and quality, schedule integrity, space availability, and the relationships the carrier maintains with its customer base. Larger shippers tend to use more than one carrier to ensure that the supply chain is consistent and remains uninterrupted regardless of any issue with any given line. Shippers like Walmart, Costco, Amazon, Safeway, Kroger, etc. all have used multiple carriers and/or Non-Vessel Operating Common Carriers (NVOCCs) to move their cargo. NVOCCs negotiate space and rates with multiple carriers by offering guarantees and then resell that space to the owners of the goods being shipped, known as the Beneficial Cargo Owners or BCOs.

Cargo interests may choose to use freight forwarders or third-party logistics providers (3 PLs) to handle routings as well as to arrange inland transportation by truck or rail from the origin or to the final destination or may employ a freight forwarder or 3PL to arrange ocean transportation, inland transportation, or both. The shipper will either negotiate directly with the local carrier or will do so through the freight forwarder or 3PL. 3PLs provide the same services as a freight forwarder but provide a menu of additional services such as track and trace, negotiating inland freight rates, providing insurance, etc.

The BCOs compete with other suppliers of the goods based on many factors including the landed cost of goods sold, the ability to source the cargo on a reliable basis, the ability to ship on a reliable basis, the transit time they offer to their customers, the terms of sale, the relationships they maintain with their customers as well as their overall reputation.

The carriers' vessels may call at a terminal within a larger port complex. Larger ports may have several container terminals. For example, Seattle has four active container terminals as does Tacoma while the Port of Portland has only one container terminal. Terminal operators at ports with multiple terminals attempt to keep their terminal charges to the ocean carriers roughly in line with each other to prevent disparity in the cost basis between the lines. Portland, with only one terminal, does not experience such internal competition.

---

[2] Ports will set tariffs for each terminal that detail the rates, charges, rules and regulations that apply to that terminal. Privately run container terminals are typically free to negotiate their own rates. But a publicly operated port will charge the published tariffs.

*Page 9*
*Gimpel Report*
*February 8, 2023*



Terminals are operated, in most cases, by a terminal operator (TO) that is responsible for receiving and delivering the cargo, storing the cargo, organizing (staging) the freight to ensure it gets to its final destination, be that overseas (vessel), to a nearby inland point in the US (truck), or to the appropriate rail terminal in the case of rail intermodal cargo (for example, there are six intermodal rail terminals in the Port of Los Angeles). US West Coast terminal operators are typically responsible for purchasing and maintaining container handling equipment such as reach stackers, top lifts, bomb carts, yard hustlers, etc., and they hire and manage the ILWU labor that loads, unloads, and maintains the container handling equipment. Typically, ILWU labor gets paid by the hour no matter how productive they are, whereas the TO receives a set fee for handling and storing containers. For this reason, TOs closely measure and track labor productivity. The overriding competitive factor between terminal operators is the reliability and efficiency of its service, which is largely dependent on the consistency and productivity of labor.

### 2.    Elements of the TO/Carrier Contract

Each terminal within the port complex is typically operated by a different TO. The TOs negotiate contracts with the ocean carriers for receiving and delivering freight, storing the freight, as well as loading and unloading the freight from the vessel and moving the freight between the ship and the terminal. In addition, the TO receives empty containers into the terminal for loading aboard the vessels to send to areas of short supply and dispatches empties for export loads.

The TO rates to carriers typically include, among other items:[3]

A.     Wharfage, which is a fee the port charges to the TO as a handling fee for the use of the pier or wharf to move cargo over.

B.     Dockage, which is based on the length of time the vessel is tied up at the berth as well as the size of the vessel.  This is sometimes combined with the wharfage fee.

C.     Lift or throughput rate, which is the charge for the intake of a container at the terminal and the loading and unloading of the container on or off a vessel, including labor and may or may not include gate charges which are sometimes billed separately.

D.     Reefer fee, which is the cost of plugging and unplugging reefer containers and monitoring and maintaining the temperature in refrigerated containers.

E.     MFSA, which is the required fire and safety assessment charged to all maritime companies to support a system of emergency response.

F.     PMA assessments, which are fees the TOs pay to the Pacific Maritime Association.

G.     Security fee, which is the cost of security because ports are subject to national security protocols through the Department of Homeland Security.

H.     Rehandling fees if containers on the ship need to be repositioned in order to reach containers that, for example, need to be discharged at a particular port.

In a typical contract between a TO and an ocean carrier, rates are adjusted each July to allow the TOs to recover negotiated coastwide labor rate increases pursuant to the coastwide labor agreement between the Pacific Maritime Association (PMA) and the International Longshore and Warehouse Union (ILWU).  These labor-rate increases are negotiated every few years when the ILWU/PMA contract expires.  The negotiations with the ILWU are conducted on behalf of the TOs and the carriers by the PMA and include the annual wage and benefits adjustment for ILWU members.  In many instances, there may also be an annual contractual adjustment between the carriers and the TOs to reflect at least partial recovery of the Consumer Price Index (CPI) increases as terminal operating costs other than labor costs also tend to increase (fuel, utilities, etc.).  Above the recovery of the ILWU wage increases and/or other increased costs based on CPI or some other index, there are no other standard increases set forth in a typical contract between a TO and an ocean carrier.  However, once the contract expires, TOs will often attempt to negotiate increased throughput and other rates in a successor contract.   ICTSI raising rates to the carriers at the expiration of the below market rates negotiated by the Port of Portland

---

[3] These are but a few of the myriad charges a terminal operator may charge a carrier.  There are dozens of potential charges depending on the services the carrier needs.

is an example of this practice within the industry.  In my experience, when the TO's negotiate new contracts, they successfully negotiate a rate increase, with the exception of the Port of Portland.  I have never experienced a negotiation that resulted in a rate decrease.

There were several reasons the Port of Portland was ineffective in keeping pace with market rates.[4]  First, the Port's mission as a governmental entity is to provide a gateway to the catchment basin to promote regional economic growth (as opposed to profit) for the community[5]. In addition, the Port historically viewed its financial performance as a whole, including the airport which was very profitable.  When the Port began looking at its operations independently, Terminal 6's unprofitability became obvious, motivating the Port to look for an independent operator which could more effectively negotiate rate increases with the carriers.[6]

### 3.  Carrier Alliances

Many carriers have formed alliances where vessels and space on vessels are pooled and coordinated among the partners in the alliance.  For example, a string may be made up of one or more vessels from each carrier within the alliance and each vessel will have cargo from all the alliance partners. In some cases, one carrier may contribute the majority of the vessels in the deployment. The formation of alliances is a type of asset rationalization where carriers can share costs and maximize utilization.[7]  Multiple carriers will put freight on each ship in the alliance, which allows them to fill those vessels. Full vessels result in lower costs per container, which allows the alliance members to be more competitive.  Alliances exist to maximize profit and control costs.[8]  The CKYH Alliance originally had five vessels on the string that called T6 during the relevant time period, but then added a sixth.  It moved cargo from Asia to the Pacific Northwest on the following route:

---

[4] See Advisian Report page 88 figure 9 showing flat revenues between 2001-2010. (ICTSI0076164-0076299) In addition, "market rate" refers to the rate the catchment area market will bear.  It is not only a function of the rates charged in Seattle and Tacoma.

[5] Port of Portland Mission Statement, Strategic Plan-Values

[6] Wyatt Deposition, pp. 17-21

[7] Advisian Report, p. 3 (ICTSI0076164-0076299)

[8] Advisian Report 2018, p. 4 (ICTSI0076164-0076299)



The CKYH Alliance was approximately 80% of T6's container operations during the period of ICTSI's operation.[9]  The CKYH Alliance served a limited number of Asian ports in addition to West Coast ports (Vancouver/Seattle/Portland/Prince Rupert).  This meant that T6 did not have direct access to a number of significant parts of Asia.  For example, American President Lines ("APL") served parts of Asia that CKYH Alliance did not such as Japan (several ports), Taiwan, Philippines (a dozen or more), Hong Kong, South China, Singapore, Indonesia, Thailand, India, Sri Lanka, Pakistan, Saudi Arabia and United Arab Emirates, to name a few.  One reason T6 did not capture more of the local shipping market in the catchment area is because no carrier stopped at ports like this and there was only limited transshipment on the CKYH service.

Beginning with the introduction of the first 6000+ TEU vessels on the Asia – Europe trade in the mid 1990's, the existence of vessel sharing agreements (VSAs) became more prevalent.[10] VSA's allow carriers to charter and exchange space on one another's vessels and to coordinate and cooperate with respect to the parties' transportation services and operations in order to improve efficiency, save costs, and provide premium service to the shipping public in the trade.[11]  The

---

[9] Ward report dated February 8, 2023, Section 6

[10] Dr. Theo Nooteboom Ports and Container Shipping, Chapter 4 Horizontal Integration, Operational Agreements and M&A

[11] Med USEC vessel sharing agreement; purpose

specific terms of these agreements varied widely depending on the trade and the carriers participating in the VSA.

### 4. Carrier Interests in Terminal Operators

In some cases, a carrier may have a financial interest in a container terminal or may have its own terminal operating subsidiary. For example, Mitsui OSK Line has TraPac as its operating subsidiary, Hanjin previously held an interest in Total Terminals, Inc. and NYK owns Yusen Terminals. Carriers who own an interest in a terminal may favor calling on that terminal over other terminals, but only to a degree. Terminal operators may give a discount to those carriers who have a financial interest in their operations but can charge a higher rate to other carriers. Therefore, it is not always in the terminal operator's interest to flow only cargo of its carrier affiliates through the terminal because it can charge higher prices to non-affiliated carriers. Carriers sometimes have a minimum annual guarantee of cargo that will flow through a terminal. Once that is met, both the carrier and TO can pursue cargo that maximizes their profits.

As a result, where a carrier serves a niche market which is profitable and it would be less profitable to move the cargo through the carrier's affiliated terminal, the carrier will continue to serve the niche market through the most profitable port. In this case, Hanjin's financial interests in the terminal in Seattle and any minimum guarantee in that terminal were largely irrelevant to driving volume through T6. Hanjin identified T6 as its most profitable US West Coast port on a per box basis and identified as a KPI driving more cargo through T6 even to the exclusion of some of the other ports.[12] In addition, as discussed below, carriers weigh several factors when deciding how to route their cargo.

During my time at APL, we developed terminals in Seattle, Oakland, Los Angeles, Yokohama and Kaohsiung. In all cases we handled APL's business and third-party business as well due to the profitability enhancement provided by third parties. APL did the same in its intermodal business by developing a rail network for the company and then marketing it to other shipping lines at higher prices. Similarly, TraPac, the terminal operating subsidiary of Mitsui, continued to contract with a small carrier from Polynesia that was expensive to serve because of TraPac's ability to charge it higher prices.

### 5. Port Operating Models

There are four basic types of operating models a Port Authority can use to run its terminals and various permutations can exist for each model.

**Port Operating Model** – A public port authority directly owns and operates the terminal and is fully responsible for all management aspects and customer satisfaction. Most notably under this

---

[12] Burns Declaration, ¶¶ 11-12.

model, the port authority directly hires longshore labor.  The port has 100% of the operational and financial risk under this model.  This is the model the Port of Portland used from 1974-1994.

**Port Semi-Operating Model** – The port authority contracts part of the operation to a terminal operator.  The range of what is contracted can be as simple as performing payroll services only to contracting the entire management of all aspects of the day-to-day operations. The port still owns the terminal but has less operational control and retains most of the risk (financial and customer satisfaction).  The terminal operator is compensated within a range from a fixed fee to a cost-plus contract.  A variation of this model is one in which one entity (the port or the operator) purchases the equipment.  In addition, the parties will agree which party performs the maintenance and to what standards. This is the model used by the Port of Portland from 1994 to 2011.

**Landlord Model** – The port leases the terminal to a terminal operator on a long-term basis and the terminal operator performs all or most of the operations within the leased area.  Under this model, the parties would agree on party would be responsible for equipment ownership, equipment maintenance, and terminal maintenance.  Depending on the terms that are negotiated, the port may have little control over the operation but reduced risk when compared to the port operating or semi-operating models. The independent operator would bears most or all of the risks and costs under this model including workers compensation costs, which can be very expensive.  Leases typically run between 20-30 years and may contain the option to extend the term of the lease.  The Port of Portland used this model when it leased T6 to ICTSI starting in 2011.  There was no extension provision in the ICTSI lease agreement, and the lease was set to expire 25 years from the commencement date.[13]

**Concession Model** – The port offers a long-term concession to a tenant, usually 25-50 years or even longer depending on the initial development investment required.  This model requires the tenant to offer a concession fee up front as well as to provide the equipment and all capital improvements to the terminal area.  Usually, the concessionaire retains responsibility for all maintenance and the port has no exposure to maintain any assets.  The port effectively has no control over operations and little financial or operational exposure.

6.      Intermodal and Local Cargo

Local cargo typically is destined to places that are a short distance from the port and usually moves by truck.  Intermodal cargo is generally long-haul cargo and moves to or from a container terminal by rail to inland destinations such as Memphis, St. Louis, or Chicago, to name a few.  Typically, a shipper will want its local cargo, both imports and exports, to move through the terminal nearest the location of the cargo origin or destination to reduce the cost of rail or trucking.

---

[13] Port of Portland/ICTSI Lease Agreement, dated 5/12/2010, Section 2.7 (b) p. 34 (ICTSI023875-0236176)

B.        **Carrier Considerations in Choosing a Port**

To implement or continue a call, carriers in an alliance may consider the preference of other carriers within their alliance, subject to impacts on profitability.  The carriers in the alliance that are contributing vessels to a string have more sway as to which ports and terminals are called.  Carriers within the alliance that have an ownership interest in a terminal at the port have some say in what terminals are called on a given string.

Once the alliance implements its deployment, the alliance will choose to continue calling a port, modify volumes, or terminate a call based primarily on productivity and contribution margin.  Although carriers and TOs negotiate prices for terminal services, price is only one consideration of carriers in selecting a preferred port—and not even the most significant consideration.[14]  In interviews done in connection with the Advisian Report, we found that productivity and reliability were paramount.  The lack of productivity and reliability due to illegal labor actions helps to explain why the labor disruptions experienced in Portland from 2012 – 2016 had such an impact on the lines,[15][16] as well as the customers served by the lines. The Advisian team did not find that a TO's rate was an important factor in a carrier choosing a port.[17]

In addition, terminal pricing ranked below productivity and reliability as a priority[18] for shippers.  But because a TO's rate (at both departure and destination terminal combined) is generally less than 5% of the total shipping cost paid by the shipper, shippers do not recognize significant increase in their total shipping cost should a TO raise its rates.[19]  This is fully consistent with my experience working in senior level executive positions with ocean carriers, such as APL.  The ocean carrier chooses among terminals suitable for its service based on many considerations.  Maintaining schedule reliability was paramount.

---

[14] Advisian Report, Section 4.3.2, p. 58 (ICTSI0076164-0076299)

[15] Gallaway Deposition, 110:6-10

[16] Radak Deposition, 95:19

[17] For the purpose of the breakeven analysis in the Advisian Report, the Port required that we use inflation adjusted rates from 2004-2008 adjusted to 2014.  I pushed back because using under market rates from 2004, even with increases for inflation would continue the unprofitability of T6.  Unprofitable rates adjusted for inflation remain unprofitable.  Despite my objection, the Port insisted that we use the below market rates instead of rates that a terminal operator could have reasonably charged.

[18] Advisian Report, pp. 59-60 Section 4.3.5, ¶¶ 1,2 (ICTSI0076164-0076299)

[19] *Id.*

*Page 16*
*Gimpel Report*
*February 8, 2023*

### 1.     Reliability is Paramount

Carriers look for ports with adequate and well-maintained infrastructure and that provide consistent, reliable labor with acceptable levels of productivity (23+ gross moves per hour per crane). In this way the ocean carriers can plan the length of stay required in each port for the number of containers it needs to load and unload and to make the berth window (the day and hours the berth is reserved for that specific carrier) in the next port in the rotation.

### (a)     Hard Costs of Missing a Berth Window

When a carrier does not receive reliable service at a port, it may not leave that port at the scheduled time, missing berth windows at other ports on the rotation. The carriers incur substantial costs from missing berth windows and the resultant delays.[20]  For example, in July 2012, Hapag Lloyd's Director of Corporate Operations, Steve Gallaway, reported additional costs for two Portland calls of over $200,000.[21]  Burning fuel is perhaps the greatest cost.  If a vessel is delayed at a berth window and must then run at higher speeds to arrive at the next terminal on its rotation, it will burn significantly more fuel and incur substantially higher costs. A 4500 TEU vessel, for example, will burn approximately 80 tons of a fuel a day at 20 knots and twice that much at 24 knots.[22]  For each 24 hours at 24 knots, as opposed to 20 knots, the vessel can make up 96 nautical miles.  In 2012, for example, bunker fuel prices were around $600 per ton and stayed that way through 2014.  In 2015 prices went down to about $250 to $300 per ton, and in 2016 the cost went down to $144 per ton.[23]  Therefore, in 2012 if a vessel was late for its next berth and as a result had to speed up from 20 – 24 knots, this might have increased its fuel costs an additional $48,000.00 for each day it ran at 24 knots.

In addition, a carrier may have to "cut and run" to ensure that it makes the next berth window, which means it leaves export containers on the dock or fails to unload import containers from the vessel to the discharge port.  When that occurs, the containers left behind must later be picked up by the carrier or its alliance partner (if it has room) or stored by the TO until the next carrier vessel arrives, resulting in additional demurrage charges to the carrier.  For example, in 2013 ICTSI' terms of service to the carriers allowed it to charge anywhere from $27 - $140 per day in demurrage charges depending on the size of the container and time at the terminal.

---

[20] Gallaway deposition, 89:11-14

[21] Gallaway Deposition, Ex. 153

[22] T. Nootteboom and P. Carriou (2009), Fuel surcharge practices of container shipping lines

[23] Ship and Bunker, *Ten Years of Bunker Prices* 6/16/2022.  FEATURE: 10 Years of Bunker Prices - Ship & Bunker (shipandbunker.com)

When a carrier must cut and run the containers may need to be loaded and trucked to the next terminal or they get unloaded at the next terminal and then trucked to their final destination. For T6, that often meant trucking those containers to Seattle. Trucking costs from Terminal 6 to Seattle were approximately $450 - $600 per container from 2012 – 2016.[24] For example, in December of 2014 when illegal labor actions delayed sailing of the APL vessel, APL was forced to leave roughly 283 containers at the terminal.[25] Trucking those to Seattle could have cost APL around $141,500 - $169,800.

Additional costs of delay include dockage. The Port of Portland's tariff allowed it to charge dockage at a rate of about $9,871 per day in 2013.[26]

There are hidden costs of delays as well. For example, Hamburg Sud, or any vessel on the Mediterranean route, needed to book its Panama Canal passage in advance with a substantial nonrefundable deposit.[27] A late sailing from Portland could cost not only the deposit but additional time waiting for a time slot to transit the canal.

Similarly, a late departure from Portland for Hanjin meant a late arrival in Vancouver. Since the vessel was already behind schedule, the line may be forced to use an overtime shift in Vancouver.

The carrier may also incur additional operating costs should it miss the next berth window due to illegal labor delays at the previous one. If it misses its berth window, it may have to wait days until the TO at the next terminal can fit the vessel in to the schedule to be unloaded and loaded. While the vessel sits, the carrier is paying its crew, fuel, and other operating costs during the increased length of the voyage which could cost an estimated $35,000 per day for a 4000 TEU vessel based in operating costs of $6 per day per slot[28] and a charter hire of thousands of dollars per day in 2014. It is for all these reasons that carriers closely track labor's productivity at each port of call.

---

[24] Dr. Ward Report dated February 8, 2023, Section V, Table 3.

[25] Roby Trial Testimony, pp. 637-644 (Dkt. 645)

[26] Port of Portland Terminal Tariff Number 8, 7/1/2013 for a 950 ft. vessel, which is the equivalent of a 4500TEU vessel. Microsoft Word - Terminal Tariff No 8 - Rules 07.01.13 DRAFT.docx (azureedge.net).

[27] *See* https://www.waypointports.com/panama-canal/panama-canal-estimated-transit-expenses-container-vessel in which the deposit is listed at $35,000.

[28] World Maritime University 8/24/2014 (a study of the upsizing trend of containerships in the international shipping industry Table 5 p. 27).

In all, when a vessel is delayed at a port the increased costs of that delay are substantial.  In addition, it can be difficult or impossible for the vessel to make up for the delay.  For example, if a vessel leaves without loading all its cargo, it goes to the next terminal with empty slots, which are valueless.  Further, the containers must sit on the terminal incurring demurrage charges until the next vessel in the rotation docks, which could be a week or more.  And when the vessel returns, it may not have extra space to retrieve all the containers because vessel slots are booked in advance.  The carrier might make a decision to bump another customer's container to make room for a container left behind, particularly if the customer whose containers were left behind does a lot of business with the carrier.  The disfavored customer might pick up its container and go to another port in the Puget Sound, with resulting drayage costs.  This could be a major problem if there are numerous containers and it causes the carrier to lose this customer    It is apparent to anyone in the industry that the cascading harm caused by delay is substantial.

I have not experienced any delays in my career as long and devastating as when the ILWU's unlawful labor actions caused APL's delay in December 2014 and Hanjin Copenhagen's approximate 21-day delay in February 2015.[29]

The continuous hard timing by the ILWU included behavior such as extremely slow operations of cranes and rolling stock, failure to dispatch qualified personnel to the gear locker and mechanics taking equipment out of service unnecessarily, refusing to operate cranes in bypass mode based on spurious safety concerns, and blocking traffic lanes in the terminal to name a few.[30]  These incidents were not isolated and were well known within the container shipping industry.  I was approached frequently by people in the industry who were knowledgeable about the ILWU's illegal and outrageous conduct at Terminal 6.  Accounts of the ILWU's illegal conduct were frequently reported in major industry publications such as The Journal of Commerce, Lloyds Register, and American Shipper which are read by maritime executives around the world.  The ILWU's conduct adversely affected the reputation of Terminal 6 within the international shipping community and created a huge barrier to marketing the terminal and attracting additional carrier calls or cargo volume.

(b)      <u>Damage to Customer Relationships</u>

In addition, shippers rely on the carrier they hire to load and unload their cargo in a timely manner.  A fruit or grain exporter could experience abnormal spoilage if their shipment is delayed.  APL once left a shipment of mangos on the dock in Bombay causing significant consternation from the customer.  APL wound up paying in the neighborhood of $80,000 for the entire shipment as mangoes spoil so quickly.  An importer of goods, such as furniture, clothing, or computers, may experience economic and market losses if a shipment is delayed causing the importer to have empty shelves on Black Friday, for example.  Starting before the beginning of

---

[29] Roby trial testimony, pp. 645-646 (Dkt. 645); Ops Reports Trial Exhibits 97 and 98

[30] NLRB decisions of Judges Schmidt and Wedekind; Judge Simon's contempt order; trial testimony of Brian Yockey and Kelly Roby (Dkt. 644, 645 & 649)

this century, many businesses in the United States moved to a "just-in-time" inventory strategy increasing the importance of carrier reliability. When a carrier experiences repeated schedule unreliability, it damages its customer relationship and shippers will look to other carriers who can provide more reliable service.

I have not in my career witnessed sustained illegal labor activity causing the degree of unreliability that was experienced from 2012 – 2016 at T6. Despite the unprecedented extent of the ILWU's illegal actions, Hanjin nevertheless continued to call T6 until March 2015 because of the high CMPB and Hapag Lloyd also continued to call until March 2015 when they left in order to "improve the schedule integrity of our Mediterranean-Pacific Service."[31]

### 2.    Terminal Operator Pricing is a Minor Consideration

The price charged by the TO is only one element of the value proposition offered to the carrier, and a minor one at that. The small fraction of the TO cost as compared to the overall supply chain cost, the cost of delays, the cost of extra lifts and gate charges as well as overland transportation costs render TO price relatively insignificant.

### (a)    TO Cost is Insignificant Compared to Total Cost

Terminal costs represent a small percentage of the overall supply chain costs.[32] As discussed above, the TO typically charges a per lift or throughput fee along with ancillary charges such as wharfage, reefer support, rehandling fees, etc. A carrier's total cost includes not only the TO charge at both the ports of loading as well as discharge, but fuel, crew, capital expenditures, insurance, administrative and overhead costs, maintenance, the costs of tugs, pilots, and line handling to name a few.

In addition, the carriers will sometimes try to pass increased TO costs on to the shipper, although there may be some delay depending on the timing of the TO increase and the timing of the shipper's contract renewal. However, while carrier contracts with TO's are typically three-year contracts, the contracts between carrier and shipper are often only one year. Therefore, carriers need not wait long to attempt to pass any TO rate increase to the shipper, if the market will bear such transfer. In some cases, the carrier is already making a significant profit from a shipper and will choose instead to make a slightly lesser profit from a TO rate increase rather than transfer it to the shipper.

When gathering data and information for the Advisian Report, we interviewed multiple carriers and distilled their primary concerns.[33] Those concerns included vessel productivity, vessel call

---

[31] Hapag Lloyd notice of schedule change dated April 7, 2015 (ILWU 00023627; ICTSI0671118)

[32] Advisian Report, pp. 59-60, Section 4.3.5, ¶¶ 1,2 (ICTSI0076164-0076299)

[33] Advisian Report, p. 58, Section 4.3.2 (ICTSI0076164-0076299)

productivity, crane productivity, terminal storage productivity, terminal dwell time, and truck turn-time.  The TO's rate is not even mentioned.

(b) <u>TO Cost is Insignificant Compared to Cost of Delay</u>

In addition, terminal costs are a fraction of the costs incurred by carriers and shippers because of repeated delays.  In other words, when a vessel experiences a delay and misses its next berth window, the cost can be in the magnitude of hundreds of thousands of dollars.  Thus, even a terminal operator throughput rate increase of about $40 per lift, is only a fraction of the hard and soft costs of unreliable terminal service and resulting delays.  Therefore, if the carrier is getting good productivity and reliable service from a TO, a rate increase is often a reasonable expectation, especially when the rates being charged are below what the market will bear.[34] [35] [36] Extrapolated over a year, the hard operational costs of consistent delays are likely to be substantial.  When one adds in the costs of customer dissatisfaction and possible loss of business caused thereby, it becomes even more clear that the effects of unreliable service outweigh increases in the TO's rates.  A TO's rate increase only becomes hard to swallow when the terminal is not providing good labor productivity and service.

(c) <u>TO Cost is a Fraction of Ground Transport Costs</u>

Where there is a strong local cargo market served by a port, carriers will want to move containers through that port.  For example, with cargo either originating from or destined for the Portland catchment area, it is more efficient to use Terminal 6 rather than more distant ports such as Seattle, Tacoma, or Oakland.  Using a distant port entails significant trucking and rail costs.  In many cases, the difference in TO rates at different ports is a small fraction of these total transportation costs. For example, a $40 differential in throughput costs is small compared to an inland trucking or rail cost differential of approximately $450-600 per container.[37]

---

[34] Wyatt Deposition, p. 28: 3-7

[35] Advisian Report, p. 58, Section 4.3.2 (ICTSI0076164-0076299); Wyatt Deposition 27:13-28:17

[36] Ruda Deposition, 25:12-22

[37]  Dr. Ward Report dated February 8, 2023, Section V. In addition, at the time the Advisian Report was authored, Terminal 6 was no longer in operation and due to high demand trucking costs between the Puget Sound and Portland were in the range of $1100 - $1200.

    (d) <u>Portland TO Cost to Shipper is Less Than 5% of Total Shipping Cost</u>

Typically, the rates charged by the TO, both at the originating terminal and the destination terminal combined are less than 5% of the total cost of transportation paid by the shipper.[38] [39]  If a TO raised its throughput rates roughly $40 per lift, and assuming the carrier passes the cost to the shipper, the shipper's overall increase would be less than 1% of total transportation, which include, picking up an empty, loading the container, returning the load to the terminal, wharfage, terminal handling charges on both ends, miscellaneous terminal charges, ocean freight, bill of lading fees, booking fees, custom data submission fees, custom clearance fees, forwarder or NVOCC charges, insurance, carrier profit, drayage at destination to the consignee, the unloading of the container and other inland charges as required.  Moreover, if the TO rate increase is not passed on by the carrier, the shipper has no increased costs.

    3. <u>Other Important Considerations</u>

    (a) <u>Margin Analysis</u>

Most, if not all, carriers assess the profitability of a port of call based on a metric known as contribution margin per box (CMPB), although it may be referred to by another name or acronym depending on the carrier.  Typically, this calculation computes the profit margin that a carrier is making on each container.  However, this calculation also attempts to capture benefits of a port of call that may not be easily discerned from only dollar figures.  When a carrier must reposition an empty, for example, it must pay to have the container moved, by ship, truck, or rail, with no offsetting revenue.  If calling one port requires the redistribution of equipment through other ports, then that port's cost should include the cost to reposition the containers.  Ports where imports are roughly equivalent to exports produce fewer empties and higher CMPB.  Therefore, the CMPB calculation shifts some of the carrier's costs of handling empties to the port that causes equipment repositioning. While each carrier may have its own specific contribution calculation, they are similar in that, at a high level, they take into consideration revenue, cost, and opportunity cost.  An outline of the formula we used at APL was: revenue from container minus all vessel ownership and vessel operating costs (including repositioning costs), and other terminal operating costs for each port pair.  This is similar to the metric used by Hanjin, which resulted in the conclusion that Portland was Hanjin's most profitable West Coast call.[40]  Carriers will make decisions on where to call and how to prioritize cargo selection using these margin

---

[38] Advisian, p. 58, Section 4.3.5; Consultation with J. Michael Zachary, formerly of Advisian and co-author of the Advisian Report. (ICTSI0076164-0076299)

[39] Advisian Report, pp. 59-60, Section 4.3.5, ¶¶ 1,2 (ICTSI0076164-0076299)

[40] USPDX Promotion p. 30 prepared by Hanjin Shipping (ICTSI696799), and Declaration of Larry Burns.

analyses, which incorporate not just financial profitability, but the margin per container, including opportunity costs.

It is not surprising that Portland was Hanjin's most profitable call on the West Coast. Niche ports like Portland often have a higher CMPB because the carrier can charge a premium for its service. A catchment area shipper generally prefers to ship through a local port because of efficiencies and to avoid the cost of trucking its goods to a faraway port. The carrier, therefore, can charge the shipper a substantial rate provided its rate does not exceed the cost to transport the container to another port. For example, if a carrier is transporting a container through Seattle for a Portland customer, the carrier will incur its usual operating costs plus approximately $450-$600 to transport the container down to Portland by truck or rail. Those costs may require a carrier to charge the Portland shipper $1000 per container. The cost to the carrier to transport the container through Portland, however, would only cost the carrier its ordinary operating costs plus a short trucking journey to a local Portland customer. Given the lower cost for the carrier, it can charge the Portland shipper less. If the carrier charged the Portland shipper $900, for example, the carrier may enjoy a hypothetical profit of $300-$400 on each container by shipping it through Portland rather than Seattle. And the shipper is happy because it may be paying approximately $100 less to ship its container through Portland than it would through Seattle. Because niche markets like Portland bear premium rates, they are often quite profitable for the right carrier.

### (b)    Customer Relationships

Carriers typically have long term relationships with the customers they serve. Many carriers call on the large ports such as Los Angeles, Long Beach, and Seattle. But to move the cargo to where the shipper is located may require that the cargo move by truck or rail long distances from major cities. These larger ports can be congested, and traffic snarled. If a carrier can provide a more direct route to a shipper, it saves the shipper additional truck or rail costs, and gets its goods to the shipper faster. A carrier that is willing to establish a deployment closer to where its shippers need cargo delivered earns long term loyalty from that customer that can result in the shipper moving more cargo through that shipper up and down the West Coast or even on East or Gulf Coast ports. Where carriers can provide these advantages to their customers by calling ports that allow their customers to take advantage of a direct call, the business relationship is strengthened.

Not only is a more direct service cheaper for the shipper, but it is often more profitable for the carrier because, as discussed above, it can charge a premium rate. For example, at Terminal 6 Hanjin had a long relationship with Kroger (known in the Portland area as Fred Meyer). By establishing a call at Terminal 6, Kroger was able to save transportation costs because it could avoid transporting containers from the Puget Sound to Portland. Hanjin, in turn, could charge

analyses, which incorporate not just financial profitability, but the margin per container, including opportunity costs.

It is not surprising that Portland was Hanjin's most profitable call on the West Coast. Niche ports like Portland often have a higher CMPB because the carrier can charge a premium for its service. A catchment area shipper generally prefers to ship through a local port because of efficiencies and to avoid the cost of trucking its goods to a faraway port. The carrier, therefore, can charge the shipper a substantial rate provided its rate does not exceed the cost to transport the container to another port. For example, if a carrier is transporting a container through Seattle for a Portland customer, the carrier will incur its usual operating costs plus approximately $450-$600 to transport the container down to Portland by truck or rail. Those costs may require a carrier to charge the Portland shipper $1000 per container. The cost to the carrier to transport the container through Portland, however, would only cost the carrier its ordinary operating costs plus a short trucking journey to a local Portland customer. Given the lower cost for the carrier, it can charge the Portland shipper less. If the carrier charged the Portland shipper $900, for example, the carrier may enjoy a hypothetical profit of $300-$400 on each container by shipping it through Portland rather than Seattle. And the shipper is happy because it may be paying approximately $100 less to ship its container through Portland than it would through Seattle. Because niche markets like Portland bear premium rates, they are often quite profitable for the right carrier.

(b)    Customer Relationships

Carriers typically have long term relationships with the customers they serve. Many carriers call on the large ports such as Los Angeles, Long Beach, and Seattle. But to move the cargo to where the shipper is located may require that the cargo move by truck or rail long distances from major cities. These larger ports can be congested, and traffic snarled. If a carrier can provide a more direct route to a shipper, it saves the shipper additional truck or rail costs, and gets its goods to the shipper faster. A carrier that is willing to establish a deployment closer to where its shippers need cargo delivered earns long term loyalty from that customer that can result in the shipper moving more cargo through that shipper up and down the West Coast or even on East or Gulf Coast ports. Where carriers can provide these advantages to their customers by calling ports that allow their customers to take advantage of a direct call, the business relationship is strengthened.

Not only is a more direct service cheaper for the shipper, but it is often more profitable for the carrier because, as discussed above, it can charge a premium rate. For example, at Terminal 6 Hanjin had a long relationship with Kroger (known in the Portland area as Fred Meyer). By establishing a call at Terminal 6, Kroger was able to save transportation costs because it could avoid transporting containers from the Puget Sound to Portland. Hanjin, in turn, could charge

*Page 23*
*Gimpel Report*
*February 8, 2023*

Kroger a premium rate.  Hanjin's willingness to create this win/win strategy for its customer helped cement Kroger's loyalty to Hanjin.[41]

(c)    <u>Carrier's Financial Interest in the Terminal</u>[42]

Even where a carrier has a financial interest in another terminal and may be able to move cargo through that terminal at a lower TO rate, that is not a significant determinative factor in whether a carrier chooses to cease a call in another a port.  A port call in another port may be more profitable, may attract other cargo and may be more desirable to shippers.  In addition, if the carrier moves its customer's cargo through a larger port, it is subject to more competition from other carriers able to offer the same or similar service options.

For example, although Hanjin had an interest in a terminal in Seattle through which it likely could move cargo at a discount, it nonetheless moved cargo through Terminal 6 and in exchange received loyalty from Kroger, the biggest importer in the region.  It also avoided competition for this cargo from other carriers calling on Puget Sound ports.  As the Hanjin margin document shows, Terminal 6 was Hanjin's most profitable call per box because it was able to charge a premium.  In addition, it could protect its relationship with its long-term customer Kroger.  This is borne out by the fact that Hanjin lost a good deal of Kroger cargo when it ceased direct calls at T6 in March 2015.[43]   This was likely, in part, because multiple carriers offering similar service options in Puget Sound ports were then able to compete with Hanjin not only on service but on price.[44]

---

[41] This information is based on conversations between Nolan Gimpel and Patricia Villalonga and Bob Wilkerson of the Kroger Group via the Industry Leaders Committee during the preparation of the Advisian Report and later substantiated through discussion with Larry Burns on July 6, 2022.

[42] Of the 11 major marine terminal operators in the world, several have affiliations with ocean carriers, for example, AP Moeller Terminals (a Maersk Lines subsidiary), COSCO Ports Ltd (a China Ocean Shipping Company subsidiary), TIL (an MSC subsidiary), and Terminal Link (a subsidiary of CMA-CGM).  Despite these affiliations, all of these carriers call on ports other than the ones in which they have a financial interest.  Marine Insight, 11 Major Terminal Operators in the World.

[43] Discussions with Bob Wilkerson and Patricia Villalonga in 2017 Industry Leaders Committee meetings during creation of the Advisian Report

[44] Expert Report of Dr. Ward, Summary, pp. 11-12.

### IV.    The Port of Portland and Terminal 6

#### A.    **History**

The Port of Portland operated Terminal 6 under the Port Operating Model from 1974 until 1994. In 1994, the Port hired Marine Terminals Corporation (MTC) to manage payroll. MTC was later sold to Ports America Group (PAG).  MTC/PAG operated T6 on a cost-plus contract.  The MTC/PAG responsibilities increased over time to the point where the MTC/PAG ran the entire terminal.  This model remained in effect until ICTSI took over the operation in 2011 under a landlord model.

#### B.    **Carriers and Cargo**

The carriers serviced by ICTSI since 2011 were Hanjin (Far East), Hapag Lloyd (South America and the Mediterranean) and Westwood (Far East).  In addition to handling its own cargo, Hanjin vessels carried cargo from their alliance partners, Cosco, Yang Ming, and to a much lesser degree, K Line.  Hamburg Sud vessels also called on T6 occasionally, although it mostly loaded its cargo on Hapag Lloyd vessels.

Westwood carried a mixture of forest products, containers and breakbulk/project cargo unlike the services of Hanjin and Hapag Lloyd that only carried containers. Prior to the illegal labor disruption that commenced in May 2012, these carriers found the Portland call to be profitable and some even charged a higher rate for the direct call at Portland.[45] [46] [47] [48] [49] [50]

The primary shippers included Kroger (Fred Meyer), Les Schwab, and Columbia Sportswear, among others.  Typically empties in Portland comprise about 20% of the lift handled by the TO[51]

---

[45] USPDX Promotion p. 30 prepared by Hanjin Shipping (ICTSI0696799)

[46] Radak Deposition, 34:19-25; 110:2-5; 176:5-10

[47] Gallaway Deposition, 54:15-18; 56:19-25; 57:1-7; 100:18-24; 101:7-25; 102:1-13

[48] Wyatt Deposition, 26:25; 27:1-17

[49] July 6, 2022 interview of Larry Burns

[50] Conversation with Guy Stephenson in 2017, member of the Advisian Industry Leader Committee.

[51] Advisian Report, p. 16, Section 2.3.2 including Footnote 5 (ICTSI0076164-0076299)

[52] as the import and export load counts are fairly balanced.  This balance was an important positive attribute of Terminal 6.

In reviewing this matter, I have given much thought regarding whether there are any other U.S. ports that could be used as a comparison or yardstick for T6 but was unable to identify one.  This is because Portland is unique in many ways.  It is a port with a single container terminal with no other ports effectively competing for catchment basin cargo which is well served over Portland.  There is no other ILWU or West Coast Port that compares to Portland.  Terminals in Seattle, Tacoma, Oakland, Long Beach and Los Angeles all compete with other terminals within the port complex.  Cargo moving through those ports has multiple carriers competing to carry it and multiple terminals soliciting the carrier business.  In addition, these other USWC terminals all compete with one another to some degree or another for intermodal cargo.  Intermodal cargo bound for the Midwest and similar U.S. locations can more easily move over any of these USWC gateways and therefore is much more sensitive to price than is T6 catchment area cargo.  This competitive environment impacts rates, volumes and productivity.

        C.      **The T6 Catchment Area**

The T6 Catchment Area is the area in which cargo can move more efficiently over the Portland gateway than any other.   When conducting market analyses, the most common data relied upon in the industry is PIERS data (Port Import/Export Reporting Service).  The PIERS data are compiled from bills of lading submitted by carriers to the U.S. Customs Service and are routinely relied upon to analyze the origin and destination of commodities.  For example, when I was at APL, I used PIERS data to analyze APL's transpacific market share compared with other carriers and used it as a management tool.[53]  The Port of Portland, Advisian, Mercator International (another industry consulting group), Dr. Bryce Ward, and others, have identified the T6 catchment area to include Southern Washington, Oregon, and parts of Idaho.  For example, in the Advisian report, Mercator defined the catchment area as follows:

---

[52] PMA Annual Report 2014 shows empties in Portland constituted 22.6% of the total lift count (ICTSI0694032-0694107)

[53] While PIERS data is very useful, its information regarding the origin and destination of cargo can be ambiguous.  Because of this, when doing market analyses it is common to have the data analyzed by industry experts familiar with those specific cargo movements to interpret most likely origins and destinations for that cargo.  When I was at Mercator, we used PIERS data to inform potential investors in terminals about the universe of cargo potentially available to that terminal.

*Page 26*
*Gimpel Report*
*February 8, 2023*



### D.    The Advantages of T6 over Seattle or Tacoma

Terminal 6 is ideally suited to serve its catchment area.  The cargo that can be served over Portland originating or terminating in the catchment basin has a significant cost advantage versus moving to Seattle or Tacoma by truck or rail.  In 2017, after ICTSI terminated its lease, the Port of Portland hired a team of consultants, including Advisian (the consulting subsidiary of Worley Parsons) to do a study about potential future uses of T-6.  I was the Project Manager and Principal Consultant for that study and led a large team consisting of other consultants, representatives from the Port of Portland, and various industry leaders, including representatives of labor interests (including Mike Stanton, President of ILWU Local 8, as well as a representative of the IBEW) as well as shippers.  We made a presentation to the Port Commission in February of 2018 to summarize the results of that report. The data source used to identify the cargo volumes in the catchment basin was the PIERS data.  This information was based on bill of lading data captured and maintained by the Journal of Commerce and as stated above, is the industry standard for this type of analysis.  This data set is regularly used by terminal operators, port authorities and investors in the terminal space.

When the Advisian Report was prepared for the Port of Portland in 2017, we found trucking costs between Portland and Seattle/Tacoma to be in the $1000-1100 range based on interviews with cargo interests. Rail costs were in the range of $700 at that time.[54] [55]

In 2011, Portland cargo offered the highest contribution margin per box on the West Coast for Hanjin Shipping in both the eastbound and westbound directions. At that time, Hanjin's stated goal was to increase eastbound Portland volume in order to support an increase in outbound cargo volumes.[56] This high contribution to profits on a per box basis speaks to the ability of this carrier to absorb an increase in the fee charged by the terminal operator without having to consider a change of rotation as a result, as well as to the fact that Hanjin was actively looking to increase the inbound and outbound allocation for Portland.[57] In addition, T6's balance between import and export results in lower repositioning costs, contributing to higher contribution margin per box.

Seattle and Tacoma by comparison, offer intermodal service to points in the West, Midwest and South Atlantic as well as handle cargo that is destined for local consumption in Washington, Northern Idaho, and Montana. The intermodal cargo is fungible as it pertains to gateways. In other words, intermodal cargo can move over whichever gateway it determines is most advantageous either for price or transit time considerations.

The Canadian Ports of Vancouver and Prince Rupert were able to attract some of the Seattle/Tacoma intermodal cargo through price incentives provided[58] by those Ports and thereby eroded Seattle and Tacoma's market share of the intermodal cargo starting in around 2010. In addition, Southern California also was able to offer incentives to Seattle and Tacoma intermodal customers[59] and was able to further erode the Puget Sound intermodal market share.

---

[54] Advisian Report, p. 73, Table 28 (ICTSI0076164-0076299)

[55] In addition, the more recent Port of Portland Marine Cargo Forecast 2021, p. 3, estimates that shippers will experience transportation cost savings from a Portland service of $31.5 million in 2030.

[56] USPDX Promotion p. 30 prepared by Hanjin Shipping (ICTSI0696799)

[57] Hanjin Analysis of Contribution Margin Per Box and stated goals of increasing both imports and exports to/from Portland (ICTSI0076164-0076299)

[58] Journal of Commerce Article: Seattle, Tacoma Seek Intermodal Edge, by Bill Mongelluzzo, dated 4/22/2014

[59] Journal of Commerce Article: Tacoma Seattle Focus on Intermodal to Protect, Expand Market Share Mark Szakonyi, Executive Editor, dated 12/1/2014

The third area of cargo erosion came from all water services to the East Coast.[60]

In contrast to Seattle and Tacoma, Portland almost exclusively handled cargo within the catchment basin and very little intermodal cargo. Portland therefore did not experience the erosion of cargo that Seattle and Tacoma experienced during the time frame from 2012 to 2017. Meanwhile the cargo in the Portland catchment basin was growing during the relevant time period based on the analysis of data from PIERS performed by Dr. Bryce Ward. Such growth is common sense given the growth of the local economy and is borne out by the growth in real GDP of Oregon from $173.8 billion in 2011 to $205.74 billion in 2017.[61][62]

Seattle also experienced a significant amount of congestion during the relevant time period. The Seattle container terminals are in downtown Seattle. Trucks transporting cargo to their final destination must therefore contend with normal Seattle traffic plus a myriad of construction projects that took place in the 2014 – 2015 time frame.[63] Seattle was ranked as the fifth most congested city in a national ranking released by the Tom Tom navigation company.[64]

E.    **History of Volumes, Pricing and Productivity at T6**

1.    Historic Below-Market Prices

As verified in the depositions of Sam Ruda and Bill Wyatt, the Port of Portland historically charged below what the catchment area market would bear, were not good negotiators and were unreasonably fearful that the lines might leave if they implemented rate increases.[65] The Port was also concerned with the public perception should the carriers leave. The Port's public mission statement was to provide a regional gateway for the purpose of enhancing economic activity for the business community.[66] Moreover, the losses incurred by T6 were overshadowed by the profits made at Portland International Airport.

---

[60] Journal of Commerce Article: Rosy East Coast port forecasts hinge on more than Panama Canal by Bill Mongelluzzo, Senior Editor, dated 9/19/2016

[61] Deptmentofnumbers.com/gdp/oregon.

[62] Statista Real GDP Growth of Oregon from 2000 -2021

[63] Seattle Times, March 31 2015: Seattle traffic congestion: We're No.5

[64] Seattle Times, March 31, 2015: Seattle traffic congestion: We're No. 5

[65] Wyatt deposition, 27:17; Ruda Deposition 25:15-22

[66] Port of Portland Mission Statement

The Port, believing that a private entity with deep industry experience and that was motivated by business interests would be able to better expand economic activity in the region, sought to privatize the terminal operating model at T6.[67] ICTSI was motivated to move as much volume as possible through the terminal at a profitable margin and Elvis Ganda had extensive experience negotiating rates with and on behalf of carriers and knew the puffery that is common in the industry.[68] ICTSI could be confident engaging in strong negotiations because it knew the carriers were unlikely to leave given their profit margins at T6 and if one did leave, ICTSI was confident that it could replace the carrier.[69]

The rates that ICTSI inherited were negotiated by the Port through the end of 2012 without the consent of ICTSI and were designed to provide the carriers some degree of comfort before ICTSI inevitably would need to raise those rates to something closer to market.[70] [71] From 2001 to 2010 the operating revenue per vessel move was essentially flat.[72] The Port negotiated rates through 2012 were below what the market would bear and the increase in 2013 was expected by the carriers and by the Port.[73]

2.      Historic Volumes

(a)      2000          293,000 TEU

(b)      2001          281,000

(c)      2002          254,000

(d)      2003          309,000

(e)      2004          328,000

---

[67] Wyatt deposition, pp. 22:3-10; 23:19-25; 25:1-25; 28:1-25; 29:20-25.[68] Resume of Elvis Ganda[69] Interview with Elvis Ganda

[68] Resume of Elvis Ganda[69] Interview with Elvis Ganda

[69] Interview with Elvis Ganda

[70] N Gimpel discussions with Sam Ruda, circa 2011

[71] Ganda trial testimony, pp. 245-252 (Dkt. 643)

[72]  Advisian Report, p. 88, Figure 9 (ICTSI0076164-0076299)

[73] Wyatt deposition p. 28:3-7, and ICTSI summary rate sheet

*Page 30*
*Gimpel Report*
*February 8, 2023*

(f)     2005              200,000 (after losing Hyundai and K-line)

(g)     2006              180,000

(h)     2007              261,000

(i)     2008              268,000

(j)     2009              278,000

(k)     2010              176,000 (coming out of economic downturn)

(l)     2011              176,751 (10 months only)

(m)     2012              184,565

(n)     2013              181,767

(o)     2014              166,378[74]

It is interesting to note that in 1995, when the population, GDP and catchment size were much smaller, the Port of Portland was able to generate 333,000 TEUs.  Between 2000 and 2010, Oregon's economy grew by 62% while the US economy as a whole grew at 22%.[75]  That would indicate that, with no labor issues, ICTSI would have been able to generate an even larger number and increased coverage in Asia during the period of time it operated Terminal 6. Attracting a carrier like APL would have gone a long way to replicating the service offerings the Port had in 1995 and 2004.

K-Line stopped calling T6 in December 2004. It moved a combination of local and intermodal cargo and worked with UP to move its intermodal cargo. However, UP did not have reliable access to T6 due to Burlington Northern's domination of the local rails, which at least in part caused K-Line additional costs to call on Portland.[76]  Hyundai stopped calling T6 in September

---

[74] 2011-2014 ICTSI Management Reports and 2000-2010 Advisian Report pp. 86-87, Table 37 (converted to TEUs)

[75] Oregon Center for Public Policy Fact Sheet, April 20, 2014 OCPP.org

[76] N. Gimpel discussions with K Line Terminal Manager in Tacoma during work for Port of Tacoma on the General Central Peninsula circa 2013

2004 for undetermined reasons but quite possibly because of Hanjin's announced intent to begin a Portland service to Japan in November 2004.[77]

K-Line and Hyundai's departures in 2004, however, are not indicative of a future without those historic volumes. The very reason the Port of Portland implemented a search for a private terminal operator is because it recognized its inability to grow the business. I saw the Port at many conventions and other functions and, while they were good at taking people out to dinner, they were not good at building serious relationships. They were unable to get potential customers to visit T6 and analyze the opportunities the port offered. In addition, the Port employees were not the major players in the Port industry – Oakland or L.A. for example. A private terminal operator that was well known in the industry and had a high level of credibility, such as ICTSI, may have caused a carrier to more closely consider the opportunities at T6. In addition, the ICTSI marketing team was adept and successful at developing a plan and pro forma to demonstrate to carriers why T6 would be a profitable call for the carrier.[78] A large group of consultants and industry experts concluded in the Advisian Report that, despite the ILWU's illegal conduct, T6 had a future.

### 3.     Historic Productivity

Productivity in Portland historically mirrored that of other West Coast Ports. In 2007, a report done for Transport Canada reported that West Coast productivity was as follows:[79]

|             |          |
|-------------|----------|
| Los Angeles | 23 GMPH  |
| Long Beach  | 25 GMPH  |
| Seattle     | 22 GMPH  |
| Oakland     | 23 GMPH  |
| Tacoma      | 25 GMPH  |

Productivity in Portland between January 2010 and June 2012 was 23.1 gross moves per hour average and then fell to 16.9 gross moves per hour after the labor dispute began. In July, after the second NLRB hearing, productivity went up slightly to 20.0 gross moves per hour and remained at that level through August 2013.[80] Because Portland achieved similar productivity as other ports prior to the illegal labor actions, it is reasonable to assume that, but for the labor

---

[77] Portland Business Journal 10/21/2004

[78] APL Presentation (ICTSI0306591-0306592)

[79] Hanam Canada Corporation 2007, Container Capacity Expansion Plans at Pacific Coast Ports

[80] Expert Report of Dr. Bryce Ward, 9-19-2013 (Dkt. 372)

dispute, Portland would have been competitive with other ports with respect to productivity. It is also reasonable to conclude that ICTSI would have been able to increase productivity in a but-for world, as evidenced by its achievement of a terminal production record shortly before the onset of the labor dispute.

Furthermore, in Jury Instruction No. 21, paragraph 14, the Court in this case found as a matter of law that factors other than the ILWU's illegal conduct were not the reason for the productivity declines at T6 between June 1, 2012 and August 13, 2013:

> "A deliberate labor slowdown was the most probable explanation for the productivity decline at Terminal 6 between June 1, 2012 and August 13, 2013. Factors raised by the ILWU and Local 8 to explain the drop in productivity that occurred June 1, 2012 through August 13, 2013, such as ship schedule changes, yard congestion, management turnover and inexperience, changes in the yard (*e.g.*, changing stop signs to yield signs), problems with the quantity or condition of equipment, and changes to ICTSI policies and practices, did not explain the significant drop in productivity during this period."

The prior jury further found that no non-labor factor caused any losses to ICTSI through March 31, 2017.[81] Jury Instruction No. 31 instructed the jury that

> " . . . the threshold question that you may have to decide is whether there are other factors, besides the unlawful labor practices, that caused losses to ICTSI. These other factors may include lawful primary conduct by ILWU or Local 8 after August 13, 2013, or non-labor factors, for example, market conditions, the location of Terminal 6 on the Columbia River, the bankruptcy of Hanjin, the management practices of ICTSI, or something else."

The jury in this case answered this threshold question in the negative when it found in response to Question 6 of the verdict form that none of these factors caused any losses to ICTSI through March 31, 2017.

As already proven in this case, therefore, no factor other than illegal labor activity negatively impacted productivity between 2012 and 2017. And in the absence of the ILWU's misconduct during that period there would similarly be no factors - like yard congestion, management turnover, problems with equipment, market conditions, location on the Columbia River, etc. - that would have occurred that would have caused ILWU to reduce productivity. Therefore, absent the labor dispute one would expect that T6 would have enjoyed productivity similar to that of other West Coast ports.

---

[81] Verdict Form, Question 6 (Dkt. 620)

F.     **ICTSI Would Not Have Lost Market Share in a But-For World.**

1.     <u>Absent ILWU's Illegal Conduct T6 Carriers Would Not Have Left T6</u>

As long as import volume and productivity remained approximately the same in the but-for world as they had historically been in the real world prior to the labor dispute, there is no scenario in which the carriers would have left T6 before August 2016, when Hanjin filed bankruptcy.   I am aware of no material changes in the market during 2012 - 2016 that would have undermined the economic viability of the carriers' calls on Terminal 6.

In fact, because Portland is a port that largely serves its catchment basin and does not rely on the intermodal market, it was more stable than the other ports on the West Coast.  As long as the local economy was growing and purchasing the goods that the carriers were importing, volume should have increased.  And because carriers calling T6 could charge a rate that was higher than what they could charge in Seattle or Tacoma, it was a more profitable call.  Hanjin, for example, was strategically attempting to push more cargo through Portland due to its high contribution margin per box.  I am not aware, nor do I believe, that transportation costs to Seattle or Tacoma fell substantially during the 2012 – 2017 time period.  In fact, there were relative increases from the T6 catchment area to Seattle and Tacoma.[82]  Therefore, the carriers would have continued to make a profit by calling on Portland.

2.     <u>Using a One-Year Period to Calculate Market Share is Reasonable</u>

Cargo flowing through T6 (and all Ports) has a seasonal flow.  For example, container traffic is high in the months leading up to the December holidays and in January prior to Chinese New Year.  Volumes are lower immediately before and after Christmas and after Chinese New Year with other less extreme peaks and valleys throughout the year.   The cycle of volumes, however, is annual.  Year over year, we experience similar ups and down in the container volumes coming in and out of T6 as well as the other West Coast Ports.  Because the cycle is annual, it is reasonable to rely on a one-year period of volumes to determine a reasonable market share for T6.

3.     <u>Reasonable T-6 Capture Rate in a But-For World Would Not Have Decreased</u>

The Advisian Report found in the real world that T6 captured 48% of catchment area volume in 2014.[83]  And in the 12 months prior to the illegal conduct, T6's market share in the real world has been estimated at 44%.[84]  In a scenario where the ILWU had not been engaged in illegal conduct since June 2012, it is reasonable to conclude that T6's market share in the but-for world

---

[82] Dr. Ward report dated February 8, 2023, Section V, Table 3

[83] Advisian Report, p. 16, Table 2 (ICTSI0076164-0076299)

[84] Dr. Ward report dated February 8, 2023, Appendix E, Figure E-3.

would have been at least the same, but probably higher. Regardless of what reasonable market share figure is used in a but-for scenario, there were no market conditions or impacts in the but-for world until Hanjin's bankruptcy that would have caused T6's volumes or market share to decrease.

In addition, in the absence of the unlawful labor actions, ICTSI would have been more likely to increase coverage in Asia by attracting a carrier such as APL which serviced Asian ports other than the ones serviced by Hanjin.[85]  Under these circumstances T6's share of catchment area volumes would have substantially increased in the but-for world.

### 4.    It is Probable That APL Would Have Instituted a Regular Vessel Call

Given the magnitude of savings available to APL based on the repositioning of empties,[86] it is likely that this carrier would have instituted a regular call and would have started moving loaded containers in addition to repositioning the empties.  APL had a vast network of its own vessels as well as a feeder network in Asia that would have enabled the carrier to offer broad coverage to markets that were not being served at that time.  For example, APL had excellent service to Indonesia, a market that had about 3800 TEU of imports and 1200 TEU of exports moving over Seattle and Tacoma that was within the T6 catchment area.  APL also had direct service to Japan which had some 52,000 TEUs of T6 catchment area moving over Seattle and Tacoma.[87]  APL

---

[85] Report by Randy Fischer May 2015/Market Opportunity Assessment for the Port of Portland/ICTSI

[86] Ganda trial testimony, pp. 226-228 (Dkt. 643)

[87] Research and Strategic Analysis, prepared by Randy Fischer for the Port of Portland, May 2015 (ICTSI0690365-0690388)

could also have facilitated T6 service to markets like India, Taiwan, Malaysia, Vietnam and Singapore because they were already serving those markets.



ICTSI and the Port of Portland estimated that APL could earn additional revenues of $13,014,000 with a direct Portland call covering Japan, Korea, China, Hong Kong and Taiwan.[88] The math involved in the savings of moving empty containers is straightforward. In my opinion, the cargo generation and rate assumptions in the APL presentation were reasonable and would have been most enticing to APL absent the experience they had during their trial call in Portland when the ILWU engaged in illegal conduct causing APL to have to cut and run.

> 5.    Carriers Could Increase Capacity without Moving to Ships that are Too Large to Travel Up the Columbia River

I have always maintained that there were ample ships in the transpacific trades that were of a size that could call Portland. During our research on the Advisian Report we predicted a steady number of vessels in the 3000 - 5099 TEU range through 2019. While the industry was building bigger ships, which moved the average ship capacity higher, the number of vessels available to call Portland would have remained stable through 2017. At the time of the Hanjin bankruptcy, there were 12 transpacific strings calling the PNW, eight of which had ships capable of calling

---

[88] ICTSI presentation to APL regarding the benefits of a direct Portland call on the NP2 service (ICTSI0306591-0306592)

Portland.[89] There were also numerous independent shipping companies which, but for the well-publicized labor issues, might have been candidates to call Portland (i.e. Zim, Wan Hai and PIL)[90]. This is further borne out by the commencement of the Samra Midras (SM Lines) service to Portland in January 2020 after the Port had awarded the reefer work to the ILWU and after the ILWU had been found guilty of illegal labor actions.

The Port of Portland Container Service Forecast and Economic Assessment completed in October of 2021 by BST Associates, confirmed my analysis when it concluded that vessels of 2500 - 4500 TEU will likely continue to be operating in the Pacific Northwest Container Trade in 2035, despite the rapid shift to larger vessels by most carriers.[91] This would indicate that the trend to larger vessels would not have impacted T6's ability to serve the trade in the But-For world. We know that in 2023 there are vessels still appropriately sized ships serving T6.

Furthermore, as discussed above T6 is a profitable call due to the savings in transporting cargo to Seattle or Tacoma as well as any premium the carriers could get for the direct Portland call (estimated by the Port and ICTSI to be $300 westbound and $450 eastbound in the ICTSI presentation to APL).[92] Carriers and alliances would be motivated to absorb any increased demand in the catchment basin. There are several ways carriers could do that. If the current carriers were reasonably full and the Portland call remained profitable, the alliance could have changed its allocations to take more Portland cargo and less Seattle/Tacoma cargo. At this time Hanjin was operating its PNH service which had a rotation of Tokyo, Busan, Kwangyang Ningbo, Shanghai, Busan, Prince Rupert, Seattle, Vancouver, Tokyo[93] which could have facilitated an increased allocation for Portland by taking freight from Seattle that was going on the Portland service thereby leaving more room on the ship for Portland origin cargo. If the carriers were then turning away cargo in Seattle, they would look at moving to a bigger vessel to call Seattle/Tacoma or move the cargo to a different string. Carriers would also look at modifying existing deployments to add Portland to take advantage of the higher margin. And last, a carrier could add a new string if cargo volumes justified it or it could add another vessel to

---

[89] Alphaliner service database 7/14/2017 lists Maersk TP-1, Maersk TP-9, Evergreen PNW-3, OOCL PNW-4, Kline (ONE)PN-1, Zim ZMP, HMM PN-2 and Westwood all with ships under 6000 TEU

[90] Alphaliner service database 7/14/2017

[91] Port of Portland Container Service Forecast and Economic Contribution Assessment, Final Report, BST Associates, 10/27/21, p. 5

[92] APL Presentation (ICTSI0306591-0306592)

[93] Alphaliner service database July 2017

*Page 37*
*Gimpel Report*
*February 8, 2023*

its existing rotation. In fact, Hanjin added a vessel to the string that called Portland during the relevant time period.[94]

G.    **Certain Price Increases Would Not Have Reduced T6's Market Share or Caused Carriers to Leave T6 in a But-For World**

Drayage from Portland to Seattle or Tacoma was estimated to average approximately $450-$600 between 2012 and 2016.[95] In order for ICTSI's rate increase to influence cargo routing ICTSI would have had to increase its TO rates to equal or exceed the TO charge in Seattle or Tacoma, plus transportation costs between Portland and Sea/Tac, plus the premium carriers were charging for direct service to T6.[96]

One of Dr. Blackburn's damage models assumes that ICTSI would have raised but-for pricing to the same level as ICTSI charged Hamburg Sud in 2012, which I believe to be reasonable, albeit conservative. At that time, ICTSI and Hamburg Sud agreed on a throughput rate of $235 per container. In addition to Hamburg Sud agreeing to these rates prior to the labor problems, Westwood also signed a contract at even higher rates in 2013. Moreover, starting in early 2013, Hanjin and Hapag Lloyd paid even higher rates for over two years despite poor labor performance, making the quality-adjusted price higher still.[97] In addition, the average revenue per TEU that ICTSI charged to Hamburg Sud in 2012 alone didn't equal the cost to ship the container to Seattle/Tacoma, plus the Seattle/Tacoma TO rate. In 2012, ICTSI charged Hamburg Sud an all-in rate (with ancillary charges) of approximately $414 per lift or approximately $230 per TEU.[98] Trucking costs between Portland and Seattle/Tacoma were thus greater than what Hamburg Sud was paying ICTSI per container. While we don't know exactly what Hamburg Sud was charged in Seattle or Tacoma for TO fees, they would need to be so much lower than the T6 rate as to offset the approximate transportation cost of $450-$600, which of course, is highly improbable. ICTSI's increased rates would thus not have caused the carriers to leave T-6 in a but-for world.

---

[94] *Id.*

[95] Dr. Ward report dated February 8, 2023, Section V, Table 3

[96] Advisian Report, p. 73, Table 28 (ICTSI0076164-0076299)

[97] In my opinion, had Hanjin and Hapag Lloyd been highly dissatisfied with these increased rates, they could have quickly adjusted their services and skipped T6 within weeks or months. The fact that they continued service at T6 for over two years demonstrates that their complaints about the rates were highly exaggerated and that their calls on T6 remained profitable.

[98] Dr. Blackburn report dated February 8, 2023.

H.    **Another Carrier Would Have Replaced Hanjin within a Reasonable Time After Its Bankruptcy in a But-For World**

Based on Hanjin's calculations of its highly profitable margin per box, Hanjin would likely have moved at least as much, if not more, volume through T6 as it did before the labor dispute.[99] Hanjin was trying to increase its inbound cargo to create more empties for export because both had higher contribution margin per box than other West Coast ports. In fact, ICTSI's primary marketing push was to increase T6 volumes by increasing Hanjin's discretionary cargo moving through T6 which was thwarted by the ILWU's illegal labor actions.[100]

In August of 2016 Hanjin Shipping filed for bankruptcy. But for ILWU driving away ICTSI's customers, it is more likely than not that the volume that Hanjin would have been carrying through Terminal 6 in August 2016 would have been carried by one or more carriers going forward. To begin, Hanjin's bankruptcy largely created a timing issue for the container shipping industry—that is, it delayed some shipments, but it did not reduce overall volumes shipped in the industry generally or the catchment basin specifically. The PMA annual reports show an increase in West Coast lifts of containers of all sizes from 11,659,977 in 2015 to 12,426,672 in 2017.[101]

In a world where the ILWU was not engaged in illegal action, ICTSI, the Port, the local and state governments including the Oregon Governor, the shippers, and possibly the ILWU would all have engaged in efforts to attract a new carrier as soon as possible. A carrier would be motivated to get in quickly to seize Hanjin's customers before they formed relationships with another carrier. Hanjin had a near monopoly in the catchment area because it was the only significant trans-Pacific carrier calling on T-6, which gave it great strategic advantages and cemented relationships with large shippers, such as Kroger. Kroger, as a shipper, had a stake in ensuring that a carrier called on Portland to avoid substantial costs to truck cargo and to reconfigure their distribution system. Kroger was faced with assuming great capital expenditures to change its distribution system to one that included increased trucking costs just as demand for trucking spiked, as well as longer travel time to store shelves in the catchment basin.[102] Any carrier who could have come in to T6 and alleviated Kroger's financial burden would have not only solved

---

[99] USPDX Promotion p.30 prepared by Hanjin Shipping (ICTSI0696799)

[100] Lawrence Burns Declaration, and USPDX Promotion p. 30 prepared by Hanjin Shipping (ICTSI0696799)

[101] PMA Annual Reports 2015, 2016, 2017 Container Box Counts (ICTSI0694108-0694359)

[102] This information is based on conversations between Nolan Gimpel and Patricia Villalonga and Bob Wilkerson of the Kroger Group via the Industry Leaders Committee during the preparation of the Advisian Report

an immediate problem for Kroger, but would have given the carrier the opportunity to take over more Kroger shipping, not just that moving through T6. The same is likely true of Dr. Martins, Hampton Lumber, Allports Forwarding, Columbia Sportswear and the other shippers that moved cargo through T6 as we learned during our Industry Leaders Committee meetings.[103]

Anyone who has been responsible for managing a fleet of ships quickly realizes that there are myriad of factors that can impede the carrier's ability to maintain a vessel schedule. Some of these are within the carrier's control while most are not. Weather (hurricanes, typhoons), natural disasters (such as an earthquake), strikes, civil unrest, political events, war, berth conflicts (i.e., a competitor is off schedule), mechanical breakdowns, equipment breakdowns, equipment shortages, terminal congestion, are the types of events that force the carrier to make changes to its scheduled deployment in order to continue to try to maintain schedule and provide the best possible service to its customers. Carriers might have to speed up, slow down, skip a port, serve a port with a substitute service (feeder ship, truck, rail, etc.) in order to service as many customers as possible on a voyage. The ability to act decisively and with agility is part of what differentiates the carriers in the eyes of the customer. The goal is to provide continuity of service to the shippers through these service disruptions to dissuade the shippers from finding alternate routing to ship through.

To bring the above paragraph to life, let me cite some examples of major disruptions that have occurred. On January 17, 1995, the Port of Kobe experienced the Great Hanhsin Earthquake. This earthquake caused 4,571 fatalities in Kobe alone and caused some $200 billion in damages including the total devastation of the Port. Most terminals were rebuilt by March 1997.[104] In the interim, carriers found ways to service that market through truck and rail substitute service and by using self-sustaining feeder vessels. Despite the availability of alternate ports in Japan, the carriers' efforts to continue to service their customers ensured that the vast majority of the shippers who shipped their cargo through Kobe returned to the Port of Kobe once it was rebuilt.

Another example is the carnage done to Busan by Typhoon Maemi which destroyed 11 container gantry cranes in the Port of Busan. ShinGamman terminal lost six of its seven cranes in the storm. Vessels scheduled to call at ShinGamman had to call at nearby terminals and small feeder vessels were immediately routed to nearby ports.[105] Busan was inoperable for 91 days and all the cranes were rebuilt within 15 months.[106]

---

[103] 2017 Discussions at Industry Leaders group during Advisian research.

[104] Reuters World News 3/25/2011 FACTBOX: Japan's recovery from the 1995 Earthquake

[105] American Shipper September 30,2003 South Korean Port digs out after massive storm

[106] Transportation Research Part D: Transportation and Environment, volume 85 August 2020

Recovering from the pandemic, there was a tremendous surge of cargo and ships around the world were off schedule and had to wait days and sometimes weeks to dock and unload. This raised havoc with vessel schedules and supply chains in general. Even ships arriving on time could not berth vessels due to earlier arriving ships being delayed.[107] These and countless other impediments to schedule integrity have been overcome due to the ingenuity and agility of the executives in the industry working in concert with union labor. Had ILWU at T6 not engaged in illegal conduct, it could have worked in concert with ICTSI to replace Hanjin's service as soon as possible.[108]

There are many examples in the industry of a carrier making very quick adjustments to take advantage of a vacuum caused by an unexpected event and preserving cargo routing patterns after an external shock. While running the vessel deployments at APL, I encountered several situations where the company was forced to make immediate deployment changes. In one incident, APL was replacing older vessels (C9s) with new ones (C10s). The new vessels, however, had defective propellers requiring replacement. We had to continue to rotate the C10s in and out of the string as the new propellers were manufactured and repairs were undertaken. For five months we had to continually make deployment changes to serve the market and avoid service disruption to the customers.

APL made decisions which allowed it to react quickly and continue to serve the marketplace. And none of these changes were inexpensive. But when a carrier has a market opportunity, it will make capital and other operating expenditures to take advantage of that opportunity.

Even at T6 carriers have made quick adjustments.[109] When Hanjin started serving Japan from T6 market in 2004, it did so within four months. Hyundai announced that it was leaving T6 on July 14, 2004 and Hanjin announced the new Japan service on October 21, 2004 to commence on November 18, 2004.[110] While Hanjin did not replace 100% of the cargo lost when Hyundai left

---

[107] Marine Insight 1/26/2022 Causes and Consequences of Vessel Delays in Container Shipping

[108] It is possible that ILWU would not have participated in attracting cargo after Hanjin's bankruptcy because the ILWU gets paid regardless of whether they work. See Pacific Coast Longshore Contract Document July 1, 2019-July 1, 2022 pp. 112-129 pay guarantee program.

[109] While carriers can add calls relatively quickly, they can also drop calls quickly. For example. Hanjin and Hapag Lloyd dropped Portland service within a few weeks after the start of the labor dispute in June 2012 and then resumed that service a couple of months later in August 2012. This demonstrates that a carrier that is dissatisfied with the service provided by a terminal operator can make service changes quickly, sometimes even within weeks.

[110] Journal of Commerce, *Hyundai Quitting Portland Service,* July 14, 2004; Portland Business Journal, *Hanjin to offer container service to Asia,* October 21, 2004

*Page 41*
*Gimpel Report*
*February 8, 2023*

T6, this is explained by the fact that Hyundai remained a going concern competing with Hanjin to keep as many of its T6 catchment area customers as it could.  When Hanjin went bankrupt in 2016, however, no such competition existed.  Rather, Hanjin's bankruptcy created a vacuum where any carrier could come in and take over those customer relationship, undoubtedly with the full support of ICTSI Oregon, Kroger and other catchment area shippers, the Port of Portland, the Governor of Oregon and other political leaders, and hopefully ILWU labor.[111]  Therefore, one would expect that after the Hanjin bankruptcy substantial volume would have remained with T6.

An opportunity like the Hanjin bankruptcy would, without other mitigating circumstances, induce carriers to take immediate advantage of Hanjin's demise. It is more probable than not that the effects of Hanjin's bankruptcy at Terminal 6 would have been similar.  As far as assessing how Hanjin's volume would have been replaced, ILWU's unlawful conduct has prevented us from having concrete knowledge about which particular carrier or combination of carriers would have replaced that volume. Still, I have scenarios within a reasonable degree of professional probability that one or more of the following would have occurred.

In scenario one, if Hanjin had still been calling Portland at the time of its bankruptcy filing in August 2016 under a backdrop of good reliable service by the ILWU, other CKYH partners would have had a strong financial incentive to pick up Hanjin's Portland volumes (Hanjin's volume alone was 64% of ICTSI's overall volume for the CKYH Alliance in 2012 rising to approximately 70% in 2013-2014)[112] and would likely have begun service soon after Hanjin's bankruptcy.  For example, at the time of Hanjin's bankruptcy, COSCO was operating the PNW South Loop with 6 X 5500 TEU vessels[113] and could easily have immediately (within weeks) begun a Portland call.  This service had added an extra ship early in 2015 due to congestion in USWC ports.  It could have eliminated the double call at Prince Rupert, speeded up the deployment or added another vessel to facilitate the Portland call and a Korea call and would have given Portland access to the Hong Kong, Yantian and Ningbo markets in addition to Shanghai.

Scenario two involves Yang Ming, another member of the CKYH Alliance which also operated ships of a size that could have called at Portland and would likely have been interested in

---

[111] The support of these groups is apparent from the real world in which, when the ILWU engaged in illegal conduct, those entities gave support to T6.  For example, the Port gave subsidies to the carriers so they would continue calling despite illegal labor actions, three Governors intervened to resolve the ILWU's dispute with the Port and IBEW, and Senators and other political leaders attempted to help ICTSI and the carriers remain viable despite ILWU's illegal conduct.

[112] Conversation with Elvis Ganda

[113] Alphaliner service database July 2017

capturing Hanjin's cargo by instituting a Portland call but for the illegal labor issues. At this time, Yang Ming did operate its own Asia – PSW service with ships that would have been too large to facilitate a Portland call, but it also had a PNW service operated entirely with Yang Ming vessels ranging from 4200-5500 TEU. It is likely these ships could have gone to Portland after being discharged in Tacoma and then on to Vancouver to top off with export cargo. These were vessels capable of doing 24 knots and an extra vessel would not have been required to facilitate a Portland call although, fuel costs would have increased slightly as the ships would have been able to operate at about 22 knots.

As a third scenario, the successor company to Hanjin, SM Lines (Samra Midas) was formed in December 2016 and the new carrier launched its service from California on March 8, 2017.[114] In May of 2018, SM Lines' Pacific Northwest Service began.[115] Since the new line was being managed by former Hanjin employees who understood the value of the Portland call under normal conditions, it is possible that SM Line would have called Portland soon after the launch of the new service, but for ILWU's illegal labor actions.

In the fourth scenario, COSCO and Yang Ming could have created a joint service. Both carriers had ships of the right size and by going with a partner each carrier could have reduced risks and increased marketing capability. I anticipate that such a joint service would call the same ports and maybe more because the string was a proven success and because Yang Ming might have wanted to call Taiwan because that is where its headquarters are located and where it had its strongest market presence in Asia. Because creating a new string would require two carriers to work through the terms of their alliance and then negotiate with terminals it might take longer than other scenarios, but I believe they could do it within three or four months.

When Hanjin went bankrupt, if the alliance decided to keep the service going, it would be COSCO and Yang Ming who would have been interested in participating. K-Line utilized the string very little, if at all. With only two alliance partners, especially two who are already parties to the former alliance and are familiar with the string, it is relatively easy to create a joint service. The two could have negotiated a new agreement in a month and a half. Furthermore, COSCO and Yang Ming would also have already been signatories to ICTSI's contracts in the but-for world and presumably on the contracts with the other terminal operators on the string. Therefore, COSCO and Yang Ming would not have to renegotiate those contracts – they could simply take Hanjin's name off. Finally, Hanjin's primary customer, Kroger and most of the others, would have been very pleased to hear that COSCO and Yang Ming were going to reinstitute the call.

---

[114] SM Line (smlines.com)

[115] NWSeaportalliance.com; SM Line to begin calls at Northwest Seaport Alliance North Harbor | Northwest Seaport - Port of Tacoma (nwseaportalliance.com)

Therefore, COSCO and Yang Ming would have had built in customers and a dominant market position at T6.

The only thing that would possibly take time was deploying the vessels.  At this time the charter market was cheap.[116]  COSCO and Yang Ming would probably have been eager to invest some into chartering vessels to get this call up and running and could then replace those charters down the road as they worked on other redeployments.

It is also important to note that, in the but-for world, ILWU labor would have been performing at an acceptable level of productivity consistent with or perhaps even better than before the labor dispute.  Just a month or so before the labor dispute, ILWU achieved record-setting productivity at the terminal.[117]  Compare this with the substandard productivity and reliability experienced at Terminal 6 after the labor dispute started, which resulted in severe disruptions to carriers and shippers.  With good productivity and reliability, another trans-Pacific carrier would have had great incentive to pick up the significant local cargo of loyal Hanjin customers, for which they could charge a premium based on the fact that there was no competition from any other trans-Pacific carrier.  Based on my extensive experience working with large ocean carriers, filling Hanjin's void in Portland would have been given priority by an ocean carrier such as COSCO or Yang Ming and expedited measures would have been taken to pick up as much of this dedicated business as possible before someone else did.  The fact that drayage rates to the Puget Sound increased to $1100-$1400 immediately after the cessation of service[118] would have been further incentive for one or more of these carriers to have jumped in.

Another option to have served Portland would have been Zim Line as it had expressed interest in taking over the entire T6 operation prior to the agreement with ICTSI[119] and was well aware of Portland, Kroger, the captive market concept, etc.  A Zim employee studying for his Masters' degree at Cal Maritime, in April 2017 flagged Fred Meyer as a good opportunity for the company.[120]

In addition to the Hanjin replacement scenarios listed above, perhaps the most obvious is APL.  In January 2016, ICTSI did a comprehensive presentation to APL about the revenue opportunities for APL with a direct Portland call on the NP 2 service.  This showed (using

---

[116] JOC.com 2/19/2014 Charter rates dropped from $8800 per day for 4000 TEU ships to $7000

[117] ICTSI Management Report, 5/2012 (ICTSI0687423-0687434)

[118] Based on interviews with exporters and importers during the preparation of the Advisian report in 2017

[119] Meeting at Port of Portland between Gimpel, Ruda and Captain Shocham of Zim 2009

[120] Shipping Crisis: Combating Overcapacity by Brandon Teepen April 2017; See https://scholarworks.calstate.edu/downloads/p2676w57z?locale=it.

*Page 44*
*Gimpel Report*
*February 8, 2023*

conservative assumptions) that APL could handle an incremental 16,260 import containers as well as 18,990 export containers with a direct Portland call not counting transshipment opportunities to places like India, Indonesia and Vietnam. Using the premiums charged for a direct Portland call ($300 WB and $450 EB), APL could generate an incremental $13,014,000 annually (about $250,000 per week). In addition, APL could have saved about $600-$750 per container on empty repositioning out of Portland directly to Asia. As demonstrated by the APL call in Portland, APL had ships of the right size and would have been highly motivated to implement this type of service in the immediate aftermath of Hanjin's bankruptcy. Based on the above, but for the labor issues, APL likely would have been calling on T6 at the time of Hanjin's bankruptcy.

If a carrier did come into Portland within three months, very few, if any, shippers would have permanently rerouted their cargo because such efforts take time, especially in light of the carriers, government leaders, ports, and terminal operators' efforts to encourage shippers to keep their deployments through the local port. In my experience with Seatrain when we stopped calling a port and restarted service within a few months we retained about 75% to 85% of the cargo because alternative routes were more expensive. At Seatrain Lines in the 1970's, I saw this happen two times, once at the Port of Philadelphia and once in Boston. While some portion of the catchment area cargo may have permanently rerouted, it is safe to assume the majority of it would not have permanently rerouted within only a few months.

In my opinion, APL, Cosco or Yang Ming could have started service within 6 weeks of the Hanjin bankruptcy at approximately 75-85% of Hanjin's volume. That volume would have grown to approximately 95% over the next 6 months. I have no opinion about the timelines for SM Lines or Zim.

Carriers have consistently taken advantage of market opportunities in smaller ports. SeaLead, a Singaporean Line, started calling Norfolk with 6500 TEU ships on 2022.[121] Seaboard Marine began calling Savannah in 2021.[122] RoRo carrier ARRC commenced calls to the Port of Philadelphia in 2018 due to the capabilities, facilities, equipment and support it received from the Port.[123] MSC increased its calls in Boston to 2 times a week by adding a new string of small 1200 TEU vessels in June of 2003.[124] SM Lines commenced service to Portland on January 14,

---

[121] PortofVirginia.com 5/29/22

[122] www.seaboardmarine.com>featurednews>seaboardmarineconnectssavannahtoitslatinamericaandcaribbeannetwork

[123] PortGlobalTradeMag.com 8/29/2018

[124] MarineLink  June 9, 2023

2020.[125]  Therefore, carriers redeploy to smaller ports when the opportunity for profit arises. This list is not meant to be all-inclusive but exemplifies what ICTSI rightfully anticipated when signing the lease for T6 and is illustrative of what should have happened in but-for world.

## V.     Documents Considered

1.     Statista Real GDP Growth of Oregon 2000-2021; GDP growth Oregon 2021 | Statista

2.     American Shipper: Korean port digs out after massive storm, dated 9/30/2003; South Korean port digs out after massive storm - FreightWaves

3.     Journal of Commerce Article: Hyundai Quitting Portland Service, dated 7/16/2004

4.     Portland Business Journal Article: Hanjin to offer container service to Asia, dated 10/21/2004

5.     Hanam Canada Corporation 2007 Container Capacity Expansion Plans at Pacific Coast Ports

6.     Amendment No. 4 changing Hapag Lloyd Container Line to Hapag Lloyd America Inc., dated 8/1/2008 (ICTSI0028806-0028808)

7.     2008-2014 Pacific Coast Longshore Contract Document (PCLCD) (ICTSI019262-0179513)

8.     T. Nooteboom and P. Carriou 2009, Fuel surcharge practices of container shipping lines

9.     Amendment No. 5 Hapag Lloyd America Agreement, dated 2/1/2009, adjusting reefer monitoring rates (ICTSI0028832-0028833)

10.     Amendment No. 2 to the Stevedoring, Terminal Services and Terminal Use Agreement between Hanjin Shipping Co. Ltd. and the Port of Portland, dated 7/1/09 (ICTSI0028774-0028775)

11.     Amendment No. 6 Hapag Lloyd America Agreement, dated 7/1/2009, adjusting Stevedoring throughput rates and extra move per container rates (ICTSI0028837-0028838)

12.     Amendment No. 7 Hapag Lloyd America Agreement, dated 1/1/2010, extending

---

[125] www.portofportland.com SM Line makes first container service call at Port of Portland's Terminal 6

agreement and waiving reefer monitoring rates and lowering barge lift on/off rates (ICTSI0028834-0028836)

13. Amendment No. 3 between Hanjin Shipping Co. Ltd., Cosco Container Lines Co. Ltd., Kawasaki Kisen Kaisha Ltd., and Yang Ming Transport Corporation and the Port of Portland, dated 2/19/2010 (ICTSI0028776-0028779)

14. Lease Document between ICTSI Oregon, Inc. and the Port of Portland, dated 5/12/2010 (ICTSI023875-0236176)

15. Stevedoring, Terminal Services and Terminal Use Agreement between Westwood Shipping Line and the Port of Portland, dated 6/3/2010 (ICTSI0028813-0028825)

16. Exhibit B – Contract Labor Adjustment Formula between the Port and Westwood (ICTSI0028826)

17. Amendment No. 4 to the Stevedoring, Terminal Services and Terminal Use Agreement between Hanjin Shipping Co. Ltd. and the Port of Portland, dated 7/1/2010 (ICTSI0028780-0028789)

18. Port of Portland Exhibit A-2 Stevedoring and Terminal Handling Services Rates July 1, 2010- December 31, 2012 (ICTSI0028790-0028793)

19. Port of Portland Exhibit B-2 Container Throughput Services- Basic (ICTSI0028794-0028795)

20. Port of Portland Exhibit C-2 Contract Labor Adjustment Formula (ICTSI0028796)

21. Amendment No. 8 Hapag Lloyd America Agreement, dated 11/30/2010, establishing new reefer monitoring rates between April 2011- December 2011 and January 2012- December 2012 (ICTSI0028809-0028812)

22. Reuters World News 3/25/11 Factbox: Japan's recovery from 1995 earthquake

23. Letter from ICTSI to Hapag Lloyd raising Wharfage rates, dated 11/29/2011 (ICTSI0690363)

24. All ICTSI management reports 2011-2017 (ICTSI0077409-0077416; ICTSI0077812-0077819; ICTSI0077876-0077883; ICTSI0077894-0077901; ICTSI0077994-0078001; ICTSI0078065-0078072; ICTSI0078128-0078135; ICTSI0078155-0078162; ICTSI0078206-0078213; ICTSI0078266-0078321; ICTSI0078524-0078265; ICTSI0078711-0078718; ICTSI0078765-0078722; ICTSI0080853-0080860; ICTSI0080910-0080917; ICTSI0080987-0080994; ICTSI0081061-0081068; ICTSI0085190-0085213; ICTSI0085222-0085229; ICTSI0085788-0085792; ICTSI0085801-0085808; ICTSI0085825-0085832; ICTSI0085849-0085888; ICTSI0086588-0086595; ICTSI0087136-0087143;

ICTSI0087308-0087323; ICTSI0088586-0088609; ICTSI0091524-0091528; ICTSI0091530-0091537; ICTSI0091541-0091548; ICTSI0091555-0091562; ICTSI0091604-0091611; ICTSI0091615-0091622; ICTSI0091679-0091686; ICTSI0091698-0091705; ICTSI0091714-0091721; ICTSI0091731-0091738; ICTSI0091742-0091749; ICTSI0091850-0091857; ICTSI0091859-0091867; ICTSI0091882-0091889; ICTSI0091895-0091902; ICTSI0091905-0091912; ICTSI0091935-0091942; ICTSI0091935-0091942; ICTSI0091970-0091985; ICTSI0092001-0092008; ICTSI0687242-0687434)

25. TTI/CKYH Terminal Service Agreements and Rates, Seattle 2012, 2013, 2014, 2015, 2016;  Long Beach 2011, Oakland 2011 (TTI_000001-000136)

26. Hamburg Sud/ICTSI rate agreement, dated 2/1/2012 (ICTSI0696790-0696797)

27. Port of Portland Terminal Tariff No. 8, dated 7/1/2013

28. Final Expert Report of Dr. Bryce Ward entitled Productivity at ICTSI's Terminal Six, January 1, 2010 –August 11, 2013, dated 9/19/2013 (Dkt. 372)

29. WUT Terminal Service Agreement and Rates 2013, 2014 (WUT_005303; WUT_5363-005364; WUT_005653-005654)

30. ICTSI Post Hearing Brief to Judge Wedekind, dated 3/13/2014

31. ILWU Post Hearing Brief to Judge Wedekind, dated 3/13/2014

32. ICSTI Post Hearing Brief to NLRB, dated 3/14/2014

33. Journal of Commerce Article: Seattle, Tacoma seek intermodal edge, by Bill Mongelluzzo, dated 4/22/2014

34. Cardno-Tec Container Crane and Rolling Stock Audit, dated 6/20/2014 (ICTSI0076654-0076917)

35. ILWU Brief to NLRB Appealing Wedekind decision, dated 7/28/2014

36. World Maritime University, A Study in the Upsizing of Containerships in the International Shipping Industry, dated 8/24/2014

37. ICTSI Answering Brief to NLRB in Response to ILWU Appeal, dated 9/19/2014

38. Contract between APL and ICTSI, dated 11/18/2014 (ICTSI0308219-0308227)

39. Journal of Commerce Article: Tacoma, Seattle focus on intermodal to protect, expand market share by Mark Szarkoni, Executive Editor, dated 12/1/2014

40. ICTSI Operations Report for APL Thailand dated 12/6-12/10, 2014

(ICTSI0036130)

41. ICTSI Operations Report for Hanjin Copenhagen dated February 2015 (Trial Exhibits 97 and 98)

42. Findings of Fact and Conclusions of Law Judge Michael H. Simon, Case No. 3:12-cv-01088-SI, dated 12/16/2014 (Dkt. 114)

43. Ports America Group Terminal Services Agreement and Contracts with Westwood, 2014, 2015, 2016 (WSL_000055-000106)

44. PMA Annual Reports 2014, 2015, 2016 and 2017 (ICTSI0694032-0694359)

45. Seattle Times Article: Seattle Traffic Congestion, We're No. 5, dated 4/1/2015' https://www.seattletimes.com/seattle-news/transportation/seattle-congestion-were-no-5/

46. Hapag-Lloyd Notice of Schedule Change, dated 4/7/2015 (ILWU 00023627) (ICTSI0671118)

47. Existing Transpacific Strings – Opportunity Assessment for Portland, by Randy Fischer, dated 5/2015 (ICTSI0690365-0690388)

48. PBA Crane Inspection Report, dated 9/15/2015 (ICTSI0690309-0690362)

49. NLRB Decision and Order, dated 9/24/15, affirming the Decision of ALJ William L. Schmidt from 8/28/13

50. NLRB Decision and Order, dated 11/30/2015, affirming the Decision of ALJ Jeffrey D. Wedekind from 5/30/14

51. ICTSI Presentation to APL regarding the benefits of a direct Portland call by the NP2 Service (ICTSI0306591-0306592)

52. The Lodestar Alliance Partners Abandon Ship as Hanjin Applies for Court Receivership, dated 8/31/2016

53. Journal of Commerce Article: Rosy East Coast Port Forecasts hinge on more than the Panama Canal by Bill Mongelluzzo, dated 9/19/2016

54. Shipping Crisis: Combating Overcapacity by Brandon Teepon, dated 4/2017

55. Alphaliner service database, 4-2017

56. ICTSI's Third Amended Answer and Counterclaims, dated 10/27/2017 (Dkt. 235)

57. Advisian report to Port of Portland re Terminal 6 Container Business Strategy,

dated 2/14/2018 (ICTSI0076164-0076299)

58. Deposition of Bill Wyatt, dated 5-16-2018

59. Resume of Elvis Ganda

60. Deposition of Sam Ruda, dated 8/9/2018

61. Deposition of Mike Radak, dated 8/21/2018

62. Portglobaltrademag.com (Port of Philadelphia) 8/29/2018

63. Deposition of Steve Galloway, dated 9/13/2018

64. Deposition of Max Furer, dated 9/17/2018

65. Deposition of Elvis Ganda dated 10/5/2018

66. Trial testimony of Kelly Roby, 10/24/2019 & 10/30/2019 (Dkt 645 & 649)

67. Trial testimony of Elvis Ganda, 10/22/2019 & 10/23/2019 (Dkt. 643 & 644)

68. Trial testimony of Brian Yockey, 10/23/2019 & 10/30/2019 (Dkt. 644 & 649)

69. Trial testimony of Nolan Gimpel, 10/25/2019 & 10/30/2019) (Dkt. 646 & 649)

70. Jury Instructions, 10/31/2019 (Dkt. 615)

71. Special Verdict Form, dated 11/4/2019 (Dkt. 620)

72. Pacific Coast Longshore Contract Document July 1, 2019-July 1, 2022

73. Opinion and Order, Judge Michael Simon, dated 3/5/2020 (Dkt. 662)

74. Med USEC Vessel Sharing Agreement, dated 4/23/2020

75. Transportation Research Part D: Transportation and the Environment Volume 85, dated 4/2020

76. HellenicShippingNews.com, dated 9/3/2021

77. Port of Portland Container Service Forecast and Economic Contribution Assessment, prepared by BST Associates, dated 10/27/21

78. Marine Insight: Causes and Consequences of Vessel Delays in Container Shipping, dated 1/26/2022

79. PortofVirginia.com 5/29/22

Page 50
*Gimpel Report*
*February 8, 2023*

80.    Ship and Bunker, Ten Years of Bunker Prices, dated 6/16/2022

81.    Declaration of Nathaniel Ruda, dated 7/15/2022

82.    Declaration of Jeff McEwen, dated 11/7/2022

83.    Declaration of Lawrence I. Burns, dated 1/3/2023

84.    Resume of Lawrence I. Burns

85.    Marine Link (MSC service to Boston) 6/9/2023

86.    Emails between ICTSI and the carriers negotiating rate increases as discussed in the depositions of Radak and Gallaway.

87.    Hanjin internal document showing Portland's Contribution Margin Per Box (CMPB) as compared to all West Coast ports referenced as "USPDX Promotion p. 30 prepared by Hanjin Shipping" (ICTSI0696799)

88.    Alphaliner vessel data and deployment information from **Mercator Advisory Group**

89.    Deptofnumbers.com/gdp/Oregon

90.    Dr. Theo Nooteboom, Ports and Container Shipping, chapter 4 horizontal integration, operational agreements and M&A

91.    Waypointports.com/panama-canal-estimated-transit-expenses-container-vessel/

92.    Marine Insight 11 Major Terminal Operators in the World

93.    Oregon Center for Public Policy (https://www.ocpp.org)

94.    ICTSI rate history sheet

95.    NWSeaportalliance.com

96.    SeaboardMarine.com (Service to Savannah)

97.    PortofPortland.com SM Line Makes First Container Service Call at T6

98.    Port of Portland Mission Statement, Strategic Plan-Values

99.    Dr. David Blackburn Report dated February 8, 2023

Dated: February 8, 2023

Nolan Gimpel

**Appendix A - Curriculum Vitae**

### I.     Education and Experience

a) State University of New York Maritime College (with Honors)
b) Harvard; Strategic Marketing Management
c) Third Mate US Merchant Marine, Unlimited tonnage, Oceans
d) Second Mate US Merchant Marine, Unlimited tonnage, Oceans
e) Inland Master on Vessels of less than 500 Gross Tons, US Merchant Marine

### II.     Professional Accomplishments

a) VP Operations Seatrain Lines (European Division)
b) VP Operations Seatrain Lines (Pacific Division)
c) Managing Director US East Coast American President Lines
d) VP Logistics American President Lines
e) VP Sales American President Lines
f) Senior VP Asia American President Lines
g) President and CEO American President Intermodal
h) Senior VP Marketing, Sales and Pricing American President Lines
i) CEO Port of Oakland
j) Senior VP International Business Development Stevedoring Services of America
k) Founder Axiom Consulting
l) SVP and Market Sector Leader TranSystems Corporation
m) Founder and Principal Mercator International
n) Independent Consultant

### III.     Summary of Relevant Experience

a) Ran marine terminals in North America (East and West Coasts)
b) Ran marine terminals in Asia (23 countries)
c) Managed US Longshore Labor (East and West Coasts)
d) Managed Equipment…containers and lift equipment
e) P&L responsibility
f) Ran a major Port
g) Ran a railroad
h) Ran a shipping line
i) Participated in drafting the original offering for Terminal 6
j) Participated in advising the Port of Portland regarding the privatization of T6
k) Vetted ICTSI on behalf of the Port of Portland
l) Refurbished existing terminals and built new terminals for SSA and APL
m) Advised shipping lines, terminal operators and Port Authorities as a consultant
n) Advised investors in maritime infrastructure as a consultant

## IV.     Relevant Testimony and Publications

a) Advisian Report, 2018
b) Testimony in this case in December 2019 trial