# Expert Report of Mr. Steven C. Rothberg

# Assessment of Container Shipping Service Options for Port of Portland's Terminal 6



February 8th, 2023

This page intentionally left blank.



# Contents

Summary ........................................................................................................................................... 3

    A.   Qualifications and Relevant Experience ........................................................................ 3

    B.   Assignment..................................................................................................................... 4

Background ...................................................................................................................................... 5

    C.   Basics of Container Shipping......................................................................................... 5

    D.   General Factors in Port Call Selections by Ocean Carriers............................................ 8

    E.   Recent History of Containership Service Calls in Portland........................................... 10

    F.   Alternative Vessel Service Scenarios for Portland Without Illegal ILWU Conduct ......................... 12

Appendices...................................................................................................................................... 17

    A.  Data Considered……………………………………………………………………………………………………..17

    B.  Resume of Steven C. Rothberg……………………………………………………………………………….18

# Summary

## A. Qualifications and Relevant Experience

I am a Founding Partner of Mercator International LLC (Mercator), which is an advisory firm serving private and public-sector clients in the global transportation and logistics domains, with a particular concentration on port infrastructure development, cargo markets, and marine terminal planning/ operations. Dating back to the beginning of 1978, I have 45 years of freight industry experience, inclusive of 17 years working directly in marketing, operations, and strategic planning positions for two different container shipping lines.

For one of those lines – Sea Land Service – I served as the Vice President of Finance and Planning for the company's Pacific Division, next as the Vice President of Strategic Planning and Business Development (for the entire company), and then as the Vice President and General Manager for Southeast Asia & Australia.  During my nearly thirteen years with Sea-Land Service, I was continuously involved in the design/planning, implementation, and operation of liner shipping services across multiple trade lanes.

For example, in 1987-1988, I re-designed and helped implement the liner shipping services that Sea-Land operated between East Asia and the US West Coast, to adapt to a re-assignment of three ships from the company's Trans-Atlantic operations to the Trans-Pacific theater and concurrently, to incorporate a set of ships that Sea-Land had acquired from the bankruptcy of United States Steamship Lines.  This entailed designing an entirely new Trans-Pacific liner service that also would serve the mainland USA-to-Hawaii/Guam markets (which were markets that Sea-Land had not previously served).  The new service that I designed was operated with essentially the same configuration of ports of call and the same ships for the next fifteen years.

As another example, in 1992, I designed two inter-twined liner shipping services to serve the trade lanes linking East Asia, the Arabian Gulf, the Mediterranean, and North Europe, to be operated in a tri-lateral vessel sharing agreement between Sea-Land Service, Norasia Lines (a Switzerland-headquartered ocean carrier), and Hyundai Merchant Marine.   As Sea-Land's representative, I participated in the negotiations between Sea-Land Service and the other two carriers concerning which ships from which of the three lines would be assigned to which of the two separate services, which ports of call would be covered for each of the two services, how much capacity would be assigned to each of the three carriers on each of the two services, and other related matters essential for the implementation of this vessel sharing agreement.

As yet another example, in 1995, as the VP of Strategic Planning, I worked with a counterpart at Maersk Line, to design an entire network of liner shipping services, covering all of the east-west "arterial" trade lanes (East Asia to/from the West Coast of North America, East Asia to/from the East Coast of North America, East Coast of North America to/from North Europe, etc.) that Sea-Land and Maersk would jointly operate in a "global" vessel sharing alliance (one of the first of its kind in the industry).  In addition to designing the itineraries of several dozen separate liner services, determining which ships should be assigned to which of those services, which terminal in each port of call to use for each service, and numerous other commercial/operational items, I also participated in the negotiations for the global alliance agreement with the senior managements of both companies. This agreement eventually led to



the acquisition of Sea-Land's international liner shipping operations by the parent corporation of Maersk Line in late 1999.

Also during 1995, I designed the business plan for a green-field container terminal in southwestern Oman near the small port of Mina Raysut.  This plan, which incorporated modifications to several Sea-Land and Maersk liner shipping services operating between Asia and Europe, was utilized by both of those companies to secure a long-term concession from the Sultanate of Oman to develop and operate the Salalah Container Terminal, using it as their hub facility for the Indian Ocean and Arabian Gulf.  It now handles over 4.5 million TEUs per year

While serving as Sea-Land's senior executive for the company's operations in Southeast Asia and Australia from 1996 to 1999, I was regularly providing inputs to divisional and corporate executives on the designs of the inter-continental shipping services that the company utilized between those regions and other continents.  In addition, I was periodically refining the network of "feeder" shipping services that Sea-Land utilized to link smaller ports in Thailand, Vietnam, Malaysia, Indonesia, and the Philippines with those aforementioned inter-continental "line-haul" services.  In 1998, I also designed and helped implement a new liner service between East Australia and Northeast Asia, in conjunction with Maersk Line executives.

Following the acquisition of Sea-Land's international shipping operations by A.P. Moller-Maersk, I was invited to serve as the Vice President of Liner Network Planning for the new Maersk Sea-Land ocean carrier, but had to decline the position for family-related reasons and instead launched Mercator Transport Group, a predecessor consulting firm to Mercator International LLC.  During the following five years, as well as during three subsequent years with the Macquarie Capital Global Ports Group, and the past fourteen years with Mercator International, I have continuously studied the evolving liner service networks and individual vessel deployments of all of the major ocean carriers in the industry, in support of marketing studies, operations analyses, strategy, and investment support assignments for container ports and terminals around the world.

I have a B.S. in industrial engineering and operations research from Cornell University and M.S. in transportation systems engineering from the Massachusetts Institute of Technology.  I also completed a post-graduate course in management studies from the University of Virginia's Darden School of Business. Attached as *Appendix A* is my curriculum vitae.

My work specific to this report and any subsequent testimony is compensated at $350 per hour for analysis and testimony. I have not served as an expert witness either in trial or in deposition over the past four years. I have not authored any maritime industry-related publications in the public domain in the past ten years.  My compensation in this matter between ICTSI and the ILWU is not dependent on the outcome of this matter.

## *B. Assignment*

I was engaged to provide analysis and commentary, utilizing my knowledge of and experience in the container shipping industry (as well as my knowledge of and experience with container terminal concessions in North America and overseas) to assess whether – in a scenario in which illegal actions of the International Longshore and Warehousing Union (ILWU) against ICTSI had not occurred – another containership line would have operated an Asia – Pacific Northwest liner service to replace the



Transpacific liner service operating by Hanjin Shipping that was terminated abruptly, following the latter company's filing for receivership in August 2016, and also to assess how much time the replacement service would have taken for implementation. In support of this assessment, I will also address the following topics:

➢ A general description of the container shipping industry, covering the structure of and competition framework within the industry, how ocean carriers organize their respective liner services across different cargo trades, how carriers utilize vessel sharing agreements/alliances with other shipping lines, and what are the respective roles of ocean carriers relative to importers/exporters, terminal operators, and port authorities.
➢ A general description of the factors that ocean carriers consider when they are selecting the ports of call for a particular liner shipping service
➢ A high-level review of the liner services that have called at T6 since 2000

# Background

## C. Basics of Container Shipping

### Evolution of Core Service Operating Philosophy

The introduction of containers in the 1950s and 1960s revolutionized what was then a highly fragmented liner shipping industry, in which a few hundred companies operated ships with onboard cranes on defined service routes around the world.  Prior to containerization, the loading and unloading of cargoes to and from ships was relatively inefficient, time-consuming, and unreliable (in terms of how long the ship would need to stay in port for cargo operations).  As a result, the arrival and departure times of ships in a particular port would typically vary considerably by day of the week, and consequently, the intervals between ship calls of a particular liner service of a specific ship line would also be erratic.

Since then, ocean shipping carriers have been able to leverage the inherent efficiencies of containerization and the technologies of ship design and container handling equipment to launch and sustain liner services that operate with far greater levels of arrival/departure reliability at all of the ports that would be included in the rotations of the vessels in those services.   By the 1990s, the vast majority of liner services covering the world's major trade lanes were operated with dedicated containerships (also known as "fully-cellular" ships, to be distinguished from "combination" ships that carried break-bulk cargoes or roll-on/roll-off cargoes, in addition to containers) and with "fixed-day-weekly" frequency.

A liner service with fixed-day-weekly frequency has a schedule in which any port that is planned to be visited by the ships assigned to the service will receive every one of those ships on the same day of the week, every week of the year.   For example, if an ocean carrier – such as Maersk – were to operate a liner service linking a few ports in Central/North Asia (such as Shanghai, Qingdao, and Busan) with a few ports in the Pacific Northwest (for example, Seattle and Portland), and if the schedule was designed for a ship to call in Seattle on a Monday and then call in Portland on a Wednesday, then the ocean carrier's operating plan would  have a ship visiting Seattle and then Portland every seven days apart, on successive Mondays and Wednesdays.

The number of ships assigned to a particular liner service is derived from the number of days required for an individual ship in that service to complete a round-trip voyage.   Thus, using the prior example, if a ship takes 35 days to depart Shanghai, then sail to and stop at Qingdao, Busan, Seattle, and Portland, and then return to Shanghai (taking into account how much time has to be allotted in each port of call for the targeted volumes of inbound containers to be discharged from the ship and outbound containers to be loaded to the ship, and also taking into account the targeted average speed at which the ocean carrier wants the ship to operate on each "leg" of the voyage), then the carrier needs to assign 5 ships to the service ( based on the voyage length of 35 days divided by the planned service frequency of 7 days between sailings).

As indicated previously, this liner service design philosophy – of operating each individual liner service with fixed-day-weekly frequency – is now ubiquitous for all of the main ocean carriers serving all of the main trade lanes that link North America, Europe, the Middle East/India, and East Asia, as well as many of the secondary trade lanes that link Northern Hemisphere regions with Southern Hemisphere regions (such as East Asia with Australia/New Zealand, and North Europe with the East Coast of South America).[1]

A key attribute of operating each liner service with a fixed-day-weekly sailing frequency is that it facilitates and leads to much higher levels of schedule and service reliability than can possibly be achieved without it.  Providing high levels of service reliability is of great commercial importance to most ocean carriers, because the majority of shippers and consignees are seeking to minimize the amount of cargoes moving through their respective networks at any time and thereby reduce their inventory carrying costs.  When a liner service has low levels of schedule reliability, shippers and consignees using that service have to stock higher levels of inventory at origin and/or at destination to insure their supply chains and product flows are not interrupted.

From an operational perspective, the higher levels of service reliability associated with fixed-day-weekly sailing frequency of a liner service result in more predictable workloads for the marine terminal, and as corollaries, higher productivity levels and lower unit costs.  However, the higher productivity levels and lower unit costs are only achievable if terminal labor works in a predictable and consistent manner.  If longshore labor arbitrarily reduces productivity – as occurred at T6 during the period of illegal labor actions – then the entire operation of the liner service, encompassing all of the ships assigned to that service, gets off schedule and begins generating unnecessary, large excess costs.

### *Service Designs, Trade-Lane Coverage, and Industry Concentration*

Ocean carriers organize and design their respective liner shipping services around the inter-continental trade lanes that they decide to serve to support their respective corporate and commercial strategies.  In the 1960s and 1970s, most ocean carriers focused their liner services on only a few trade lanes.   The leading US-headquartered ocean carriers, for example, typically operated liner services between the United States and Europe, and/or between the United States and East Asia, while smaller ocean carriers focused on serving trade lanes linking the United States with South America.  Similarly, during that same era, the leading Asian-based ocean carriers operated their respective primary liner services between East

---

[1] Source:  Alphaliner Data Base as of January 9, 2023



Asia and Europe, as well as between East Asia and North America, while smaller, specialized carriers ran services between East Asia and Africa, or between East Asia and Australia/New Zealand.[2]

However, from the late 1970s through the 1990s, a series of mergers and acquisitions occurred that led not only to a greater degree of concentration in the industry, but also led to the emergence of what industry stakeholders referred to as "global" carriers (because their service networks had evolved to cover most or all of the main trade lanes linking the Northern Hemisphere regions with each other, as well as two or more North – South trade lanes).  Transactions just in the 1990s that contributed to the emergence of these global carriers included:  Neptune Orient Lines acquiring APL in 1997, P&O Container Lines merging with Nedlloyd in 1998, Hamburg Sud acquiring Alianca also in 1998, and Maersk buying the international shipping operations of Sea-Land Service in 1999.  By 2000, fewer than 25 ocean carriers controlled and operated about 65% of the global fleet of containerships.[3]

Further concentration in the ocean carrier industry has occurred since 2000, with the most recent surge in the 2014-2018 period, during which time Hapag Lloyd merged first with CSAV and then with United Arab Shipping, CMA CGM acquired APL in 2015, the two PRC state-owned carriers (COSCO and China Shipping) merged in early 2016, the three main Japanese shipping companies (NYK, Mitsui OSK, and K Line) also merged their respective container lines  to form the Ocean Network Express (ONE) in 2017, Maersk acquired Hamburg Sud (in early 2017), COSCO acquired OOCL (in the first half of 2018), and Hanjin terminated operations after entering into receivership in August 2016.

### Vessel Sharing Alliances

Vessel sharing agreements have been in place since the onset of containerization in the international trade lanes during the 1960s, in order to enable the participants in such agreements a mechanism that could provide higher sailing frequencies in a given trade lane, call on a wider array of ports, and share vessel operating expenses (thereby reducing financial risks for the participants).  In such agreements, two or more ocean carriers would agree to operate one or more liner services for a given trade lane.  These participating carriers would agree upon the design of each service (i.e. the ports that the service would cover, and the sequence in which each of the ships in the service would call those ports) to be covered by the agreement.  They would also agree upon:

- the level of average weekly capacity that the ships assigned to the service would provide to the trade lane
- which specific ships from each of the participating carriers would be assigned to the service
- what portion of the capacity of each ship assigned to the service would be reserved for each of the carriers in the agreement (which would form the basis for allocating the costs of operating the service to each of the participating lines)
- what would be the price for exchanging capacity (on a week-to-week basis) between the participating carriers – so that if one of the carriers did not have a sufficient number of containers to ship in a given week, that carrier could sell shipboard container slots that would otherwise be empty to one of the other carriers participating in the agreement (that might need more than its regular, weekly allocation of capacity)

[2] Source:  Comments from US Lines and Sea-Land executives to author
[3] Source:  Containerisation International Yearbook, 2001

These vessel sharing agreements (VSAs) were utilized extensively by multiple ocean carriers during the 1970s and 1980s, but in the mid-1990s, a handful of carriers began implementing VSAs that covered multiple main trade lanes.  Initially, three carriers that had been operating a vessel sharing agreement for the East Asia – Europe trade – specifically, P&O Container Lines (POCL), NYK, and Hapag-Lloyd – extended their cooperation to encompass the Europe – Middle East trade and the East Asia – US West Coast trade. In addition, they invited Neptune Orient Line into their new arrangement and formed a new "global" collaboration, which they called the "Grand Alliance".  This catalyzed selected rivals of these carriers to form a competing alliance to serve the Asia – Europe and Asia – US West Coast trade lanes, with APL, Mitsui OSK, OOCL, and Nedlloyd as founding members of what they called the "Global Alliance".  Maersk and Sea-Land then decided to form a bi-lateral, multi-trade vessel sharing alliance at the beginning of 1996 that covered the East Asia – Europe, East Asia – North America, East Asia – Middle East, and a few other smaller trade lanes.

These multi-trade or "global" vessel sharing alliances evolved considerably since the late 1990s, especially after merger/acquisition transactions among carriers.  In particular, between 2015 and 2018, the industry experienced a restructuring of the multi-trade alliances that had been operating since 2012, with three "global" VSAs reconstituting into four alliances and then back again to three, concurrent with a spate of merger/acquisition transactions among several major carriers.[4]

## D.  General Factors in Port Call Selections by Ocean Carriers

### Competition Dynamics Among Ocean Carriers and Port Selection Considerations

Notwithstanding the significant concentration that has emerged in the container carrier industry since 2015, and the capacity management efforts within the alliances, there is still substantial commercial competition among the top ten carriers and also among the alliances for securing container volumes from importers, exporters, and the intermediary logistics service providers that manage ocean transportation for those importers and exporters (these three groups are collectively referred to within the industry as beneficial cargo owners, or BCOs).  There are several reasons why such competition exists in this industry, starting with the respective roles of the key participants in transporting containerized cargoes into or out of the United States (or any other country).

While ocean carriers ultimately decide which trade lanes their respective liner service networks will serve, how many separate liner services they will respectively operate in each trade lane, which of their ships will be assigned to each of their liner services, and what ports will be regularly called by each of their services, these decisions are ultimately driven primarily by the following factors:

➢ the size (in terms of container loads or TEUs per week) of each trade lane in total (as well as the sizes of each of the individual port sub-markets),
➢ what future growth is expected in the trade lane's volumes,
➢ What is the carrier's current market share in the trade lane and how competitive are the carrier's current liner services for the market, relative to the other carriers serving this trade lane

---

[4] Port Economics, Management and Policy, Theo Notteboom, Athanasios Pollis, and Jean-Paul Rodrigue, New York Routledge Press (2022)

➢ How many major BCOs are there generating the majority of the container volumes in the trade lane and in each of the port sub-markets?
➢ How many of those major BCOs are regularly tendering volumes for shipment with the carrier
➢ How many containers per week, on average, can the carrier expect to handle from each of the major BCOs in each port sub-market, and for the trade lane overall, and…..
➢ How many containers per week, on average, can the carrier expect to handle from ALL BCOs in each port sub-market.

The last two factors are generally the most important drivers of the port selection and sequencing decisions that an ocean carrier's network planners and trade lane managers utilize in designing one liner service or an array of liner services. However, operational parameters – in particular, reliability of berth availability and reliability of stevedoring productivity -- are also taken into account by ship lines when selecting the ports of call for a vessel deployment.

The network structure plans and individual service designs decided upon by each ocean carrier are critical drivers of how BCOs' respective supply chains are designed and operated, as the services and prices they offer attract or deter BCOs. Additionally, ocean carriers determine the ports called on a vessel string and which CTO is used at each stop. These interactions are shown in the graph below:

Figure 1: Overview of Main Parties Relation in an International Supply Chain – Source Mercator Analysis

While ocean carriers' decisions are critical to how BCOs make shipping arrangements, a carrier has only a relatively limited amount of bargaining power with BCOs, as the liner services it offers in any trade lane are generally viewed to be relatively similar, having become commoditized as a result of the growth and pervasiveness of vessel sharing alliances in every major trade lane. The perceptions among BCOs that there

are relatively small differences between ocean carriers' product offerings has been reinforced by the reality that – because of those alliances -- multiple carriers are offering capacity to those BCOs on the same vessel services.

Nonetheless, Hanjin's commitment over many years to having its Asia – Pacific Northwest liner service call at the Port of Portland (while the majority of other carriers served that trade only through the ports of Tacoma, Seattle, and Vancouver) provided the Korean carrier with superior access – relative to all other carriers in the trade other than its vessel sharing partners of COSCO, K-Line, and Yang Ming -- to a catchment area that exceeded 150,000 TEUs/year of imports and over 200,000 TEUs/year of exports after 2011.[5]   Hanjin could achieve a higher share of the Portland market than other Asia – PNW carriers, with lower land transport costs to serve the Portland catchment area, and obtain higher rate levels relative to those other ship lines serving the same catchment area but through the Ports of Seattle and Tacoma. Hanjin also benefited, relative to those other ship lines, by having uncongested berth availability at T6 and by being able to balance its import containers with export loads, thus increasing Hanjin's profit per container – as demonstrated by the Hanjin margin contribution per box report discussed in the Burns declaration.[6]


## E.  Recent History of Containership Service Calls in Portland

In 2011, US imports from Asia had largely returned to levels exhibited prior to the Global Financial Crisis of 2008-2009.  At that time there were eleven weekly-frequency liner services operated by major shipping lines for the Asia – Pacific Northwest trade (plus one service operated by the niche carrier Westwood Shipping Line), and six of these utilized ships with nominal capacities ranging between 5500 and 8500 TEUs.[7]  None of those larger-ship services called at Portland, and only one of the other five liner services of the major carriers' Asia – PNW strings (operated with smaller ships) called at the Oregon port.[8]

In fact, the Port of Portland had already been reduced to handling only one Asia – PNW string of the major carriers starting in 2009, with only a monthly frequency call by the Westwood service in addition.  This one Asia – PNW main carrier string was operated by Hanjin Shipping, which referred to it as the "PNN" string, and which had included a Portland call in its Asia – PNW deployment going back to at least the year 2000. [9]

From 2006 to 2008, in addition to Hanjin's PNN string, Yang Ming had also included Portland as a port of call on its own long-established Asia – PNW vessel service, but discontinued the call during the Global Financial Crisis.  K Line had also modified its established Asia – PNW deployment  in early 2008 to include Portland in the itinerary, but discontinued the call barely one year later, in early 2009.[10]

---

[5] Expert Report of Todd A. Gray
[6] Declaration of Lawrence Burns, January 03, 2023, Exhibit 2
[7] Source: Alphaliner Data Base
[8] Source: ibid.
[9] Source: Containerisation International Yearbook, 2001
[10] Sources:  Containerisation International Yearbooks and Alphaliner Data Base

Thus, from the middle of 2009 through early 2011 (when ICTSI acquired responsibility from the Port of Portland for operational and commercial management of Terminal Six) and until the first quarter of 2015, this Hanjin PNN deployment was the only weekly-frequency liner service linking Portland directly with Asia.

Although the Westwood service continued calling at Portland until early 2016, this deployment had only a monthly frequency. Moreover, this service has historically utilized specialized "con-bulker" ships that can carry break-bulk cargoes and containers, and the container-carrying capacities of each of these ships have historically been relatively small, in the range of 1800-2000 TEUs.

The second container trade lane that was historically served directly by the Port of Portland was the Mediterranean market. Going back to at least the year 2000, Italia Lines operated a service between the West Coast of North America (WCNA) and the West Mediterranean via the Panama Canal, with intermediate stops in Panama and Colombia. Referred to by Italia Lines as its "Med-Pacific Express", the service featured Pacific Northwest calls in Vancouver and Portland, as well as in California's main ports, and utilized ships with nominal capacities in the 1800-2400 TEU range.

Italia Lines was subsequently acquired by CP Ships in 2002, and the latter continued to operate the Med-Pacific Express, with calls continuing at Portland. CP Ships was itself acquired by Hapag-Lloyd in late 2005, and by 2006, the service had been renamed as the "MPS" by the German carrier. It still featured calls in Portland, operated with sailing frequencies of every 10-12 days, and utilized ships with nominal capacities in the 2200-2600 TEU range. A Seattle port call was also added to the MPS' itinerary, after Hapag-Lloyd had taken control of the operation.

In order to compete more effectively in this trade lane against Mediterranean Shipping Company (MSC) – which had launched its own West Med – WCNA service (with less than weekly sailing frequency) in 2010 – Hapag Lloyd decided to team with fellow German carrier Hamburg Sud in 2012 (with the latter contributing two ships) and operate the MPS with a weekly frequency. This vessel deployment remained in place – inclusive of the Portland call – until April of 2015, when the illegal actions of the ILWU made it operationally and commercially infeasible for Hapag Lloyd and Hamburg Sud to continue calling Portland.

The MPS continued to be operated by Hapag-Lloyd and Hamburg Sud, with calls in Vancouver and Seattle well after April of 2017.

Nonetheless, considering that Hanjin continued operating the PNN without a Portland call for about 17 months, until the company filed for bankruptcy, and that Hapag Lloyd and Hamburg Sud continued operating the MPS without a Portland call for another six years, and based on my experience in planning and managing liner shipping services for two shipping lines and three vessel sharing agreements, it is apparent to me that in a but-for world without illegal labor actions, these two carriers would have undoubtedly continued calling their respective liner services at the Port of Portland in order to have preferential access to -- and continue capturing high shares of -- the comparatively high-margin container loads destined to and originating from that market. As a corollary, it is obvious to me that the ILWU's illegal actions caused the Port to lose the only two services that had called Portland for at least fifteen consecutive years prior to their respective withdrawals, and which accounted for approximately 95% of Portland's container throughput.

## F. Alternative Vessel Service Scenarios for Portland Without Illegal ILWU Conduct

As discussed in Section E, Hanjin operated the PNN service until it filed for bankruptcy and was forced to cease all liner operations.  The Korean carrier called Portland continuously with the PNN for at least fifteen years prior to being compelled by the ILWU's actions to terminate the Terminal Six call.  Given the customer base and volume level  that Hanjin had constructed in the Portland metropolitan area and proximate areas over the 2000-2011 period, and considering that this Portland market provided Hanjin in 2011 with relatively high margin revenue per container levels (compared to the other West Coast markets)  (i.e. prior to the labor disruptions), it is obvious to me that Hanjin would have maintained – if not increased – the volumes that the PNN had been contributing to T6 (especially after Asian import volumes had returned by 2011 to their levels in the 2006-2008 period (i.e., prior to the Global Financial Crisis)) for the last ten months of 2015 and the first six[11] months of 2016 (after which time, Hanjin's financial problems were becoming more evident).

Furthermore, since 2001, the PNN liner service had been operated by Hanjin within the framework of a multi-trade vessel sharing alliance (known as the "CYKH Alliance") with three other ocean carriers – specifically, COSCO, Yang Ming, and K-Line.  Each of those three other Asian carriers was operating its own Asia – Pacific Northwest vessel deployment.  In the second quarter of 2015, in particular, the three strings being operated had the following parameters:

- ➢ Yang Ming service ("PNY")
    - o Itinerary of Ningbo – Shanghai – Busan  - Tacoma – Vancouver – Busan – Ningbo
    - o Operated with 7 ships with nominal capacities ranging between 4500 and 5500 TEUs, all capable of calling at Portland with particular PNW port sequencing
- ➢ K Line service ("NOWCO-A")
    - o Itinerary of Kaohsiung – Xiamen – Hong Kong – Yantian – Nagoya – Tokyo – Tacoma – Vancouver – Tokyo – Nagoya – Kobe – Kaohsiung
    - o Operated with 8 ships with nominal capacities of about 5500 TEUs, all capable of calling at Portland with particular PNW port sequencing
- ➢ COSCO service ("PNC")
    - o Itinerary of Hong Kong – Yantian – Shanghai – Prince Rupert – Vancouver – Seattle – Prince Rupert – Ningbo – Hong Kong
    - o Operated with 6 ships with nominal capacities of about 5500 – 6000 TEUs

After the Hanjin bankruptcy in August 2016, both Yang Ming and COSCO continued calling Seattle and Tacoma with their own Asia-PNW strings.

For reference, the parallel parameters for the Hanjin service at the beginning of 2015 were as follows:

---

[11] Mercator report on US container market for South Carolina Ports Authority, 2018



> ➤ PNN/PNH
>   - o Itinerary of Busan – Kwangyang – Ningbo – Shanghai – Busan – Prince Rupert – Seattle – Portland – Vancouver – Busan
>   - o Operated with 6 ships with nominal capacities ranging between 4600 and 5700 TEUs

Based upon my experience in liner shipping management and specifically in managing vessel sharing alliances, the executives of COSCO, K Line, and Yang Ming would likely have become aware – through articles in trade publications such as Alphaliner Weekly, Lloyds List and Marine Link, as well as from published financial statements of the company -- that Hanjin was in financial distress by or before July 2016, given the Korean carrier's reported losses in 2014-2015 and its high debt levels (which were known by other ship lines) and given Hanjin's long-term commitments to multiple chartered ships with high daily rates (which were known by most major shipbrokers).[12]  As a result, one could have expected that by or before late August 2016, the executives of these three carriers would have been urgently discussing how to modify their vessel sharing alliance and corollary service network to adapt to the pending termination of each of the Korean line's various services -- including the PNN (also referred to by those other carriers as the "PNH").   They would concurrently have been planning how to not only protect their respective market shares but also to capture as much of Hanjin's market shares as possible.  This would be particularly true for the Portland market's  containers as they enjoyed reduced competition  from other carriers serving the Asia – PNW trade, a rate premium from shippers, and other unique market advantages outlined above that had historically contributed to the highest contribution margin per box on the US West Coast for Hanjin.[13]

In the case of the PNN/PNH, as a stop-gap measure, this would have logically entailed a joint decision to immediately modify the itinerary of at least one of the above-three liner services to include a regular, weekly call at Portland and thereby attempt to not only protect their own volumes to/from that market but also to capture as much of Hanjin's volumes as possible.  For example, the three other carriers could have jointly decided (or Yang Ming could have unilaterally decided) to modify the PNY itinerary to maintain the first-inbound call at Yang Ming's terminal in Tacoma, then have a Portland call, and then return into the Strait of Juan de Fuca to have a last-outbound call at Vancouver.  That sequence would enable the full capacity of each ship in the PNY string to be fully utilized eastbound and westbound across the Pacific Ocean, while reducing the draft of the ships into and out of Portland (as the intermediate port call).

Implementation of such a modification would have likely entailed operating the ships in the PNY about 2 knots faster from Vancouver to Busan and from Busan to Ningbo than the speed in the existing schedule at that time (in 2016).   But with seven ships assigned to the PNY, there would have been sufficient buffer time in the PNY schedule to incorporate the added port call in Portland.  Implementation would have also entailed insuring that Yang Ming's terminal operator in Vancouver could handle the PNY on a different day of the week and concluding an agreement with the operator for that adjustment, but it should have been feasible to make such a schedule modification within approximately 4-5 weeks from the decision to do so,

---

[12] As an example, Alphaliner Weekly Newsletter, 2015 – Issue 41, pp 1-2
[13] Burn's Declaration

resulting in the Hanjin T6 cargo returning to at least 70% within six weeks of the Hanjin filing for receivership and to 90% within three months.

The two tables below each present a "vessel pro forma schedule" for the PNY deployment operated by Yang Ming in 2016. A vessel pro forma schedule indicates the following key information for a given deployment:

➢ The ports that each vessel in the deployment will call upon and in what sequence
➢ The scheduled arrival and departure time for the vessel for each port of call in the deployment
➢ The estimated number of hours that the terminal's gantry cranes (for each port of call) should have available (in the schedule) for unloading and loading containers and the estimated maximum number of container moves that can be moved during that port window, given the assumed level of stevedoring productivity.
➢ The nautical miles for each port-to-port link in the voyage
➢ The scheduled speed of the ship when sailing from one scheduled port call to the next.

I have utilized the scheduling methodology entailed in producing such vessel pro forma schedules since 1984, first for United States Steamship Lines, and then for Sea-Land Service, as well as for the Maersk/Sea-Land Global Vessel Sharing Alliance and the Sea-Land/Hyundai Merchant Marine/Norasia vessel sharing agreement in the Asia – Europe trade.

The first table below presents the PNY deployment with two scheduled port calls in the Pacific Northwest – specifically, Tacoma and Vancouver (BC). The second table presents the same vessel service, but with the addition of a call in Portland after the Tacoma call but before the Vancouver call.

Figure 2: Vessel Pro Forma Schedules for Yang Ming's PNY Service in 2016 – Source: Mercator Analysis

| | | Service: | | Yang Ming - PNY | | | | | | # of Vessels: | 6 | |
| | | | | | | | | | Nominal Capacity: | 5500 | TEU | requency: | 7 |
| | | | | | | | | | Index: | 12 | | | |

| Arrive at Pilot Station | | Pilot Steam In | Arrive at Dock | | Port | Port Time | Undocking Time | | | Pilot Steam Out | Sea Steaming | Sea Distance | Speed | Zone Desc | Estimated Port Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day | Time | Hours | Time | Days | | TotHrs | Day | Time | Days | Hours | Hours | Naut Miles | Knots | | |
| SAT | 3:00 | 2.0 | 05:00 | 0.0 | Ningbo, PRC | 24 | SUN | 5:00 | 1.0 | 1.0 | 14 | 186 | 13.2 | - | 29,300 |
| SUN | 20:00 | 2.0 | 22:00 | 1.7 | Shanghai, PRC | 24 | MON | 22:00 | 2.7 | 1.0 | 34 | 443 | 13.2 | 1.0 | 29,300 |
| WED | 10:00 | 2.0 | 12:00 | 4.3 | Busan, Korea | 24 | THU | 12:00 | 5.3 | 1.0 | 352 | 4,649 | 13.2 | (17.0) | 29,000 |
| THU | 12:00 | 2.0 | 14:00 | 19.4 | Tacoma, WA | 48 | SAT | 14:00 | 21.4 | 1.0 | 11 | 149 | 13.2 | - | 26,300 |
| SUN | 02:00 | 2.0 | 04:00 | 22.0 | Vancouver, BC | 48 | TUE | 4:00 | 24.0 | 1.0 | 352 | 4,641 | 13.2 | 17.0 | 22,800 |
| WED | 14:00 | 2.0 | 16:00 | 39.5 | Busan, Korea | 18 | THU | 10:00 | 40.2 | 1.0 | 38 | 501 | 13.2 | (1.0) | 29,000 |
| SAT | 00:00 | 2.0 | 02:00 | 41.9 | Ningbo, PRC | | | | | | | | | | |
| TOTALS | | 14.0 | | | | 186 | | | | 6.0 | 801.0 | 10,570 | 13.2 | - | 165,700 |

| | | | | | | at Sea | | | | | | | | |
| | TOTAL VOYAGE SUMMARY | | | | Voyage Cost | Days1 | | $/day | $/voy | $/TEU | | | | |
| | Hours | Days | % | | Vessel Hire | 42.0 | | 28,070 | 1,178,940 | 264 | | Min Lifts Per R-T | | |
| Pilot In | 14.0 | 0.6 | 1.4% | Fuel - ME | 29.1 | | | 226,460 | 51 | | 4460.82 | TEU | |
| Port | 186.0 | 7.8 | 18.5% | Fuel - ME (SECA) | 4.2 | | | 62,066 | 14 | | 1.871 | TEU/Box | |
| Pilot Out | 6.0 | 0.3 | 0.6% | Fuel - Aux | 29.1 | | | 102,965 | 23 | | 2,384 | Boxes Per Direction | |
| Steaming | 801.0 | 33.4 | 79.5% | Fuel - Aux (SECA) | 4.2 | | | 55,319 | 12 | | 9,537 | Linehaul Lifts | |
| Buffer | 1.0 | 0.0 | 0.1% | Port Call Costs | | | | 165,700 | 37 | | - | 0% Interport Moves | |
| Total | 1008.0 | 42.0 | 100.0% | Canal Transit Dues | | | | - | - | | 9,537 | Total Lifts Per Voyage | |
| | | | | Total Voyage | | | | 1,791,451 | 402 | | | | |

| Vessel Characteristics | | | ME Fuel Cons | | Aux Fuel Cons. | | DG Fuel: | $/mt | DG Fuel % | |
|---|---|---|---|---|---|---|---|---|---|---|
| Nom TEU | Eff TEU | Ref Speed | At Sea | Man'v. | At Sea | In Port | HFO | 300 | 100% | |
| 5719 | 4461 | 23.0 | 136.7 | 34.2 | 11.8 | 8.3 | MDO | 460 | 0% | |

Figure 3: Vessel Pro Forma Schedules for Yang Ming's PNY Service in 2016 with Portland call – Source: Mercator Analysis

| | | Service: | Yang Ming - PNY + Portland | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Nominal Capacity: | 5500 | TEU | | Frequency: | 7 | |
| | | | | | | | | Index: | 12 | | | | | |

| Arrive at Pilot Station | | Pilot Steam In | Arrive at Dock | | Port | Port Time | | Undocking Time | | Pilot Steam Out | Sea Steaming | Sea Distance | Speed | Zone Desc | Estimated Port Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day | Time | Hours | Time | Days | Port | TotHrs | Day | Time | Days | Hours | Hours | Naut Miles | Knots | | |
| SAT | 3:00 | 2.0 | 05:00 | 0.0 | Ningbo, PRC | 24 | SUN | 5:00 | 1.0 | 1.0 | 13 | 186 | 14.2 | - | 29,300 |
| SUN | 19:00 | 2.0 | 21:00 | 1.7 | Shanghai, PRC | 24 | MON | 21:00 | 2.7 | 1.0 | 31 | 443 | 14.2 | 1.0 | 29,300 |
| WED | 06:00 | 2.0 | 08:00 | 4.1 | Busan, Korea | 24 | THU | 8:00 | 5.1 | 1.0 | 327 | 4,649 | 14.2 | (17.0) | 29,000 |
| WED | 07:00 | 2.0 | 09:00 | 18.2 | Tacoma, WA | 42 | FRI | 3:00 | 19.9 | 1.0 | 27 | 379 | 14.2 | - | 26,300 |
| SAT | 07:00 | 2.0 | 09:00 | 21.2 | Portland, OR | 18 | SUN | 3:00 | 21.9 | 1.0 | 26 | 371 | 14.2 | - | 69,000 |
| MON | 06:00 | 2.0 | 08:00 | 23.1 | Vancouver, BC | 48 | WED | 8:00 | 25.1 | 1.0 | 327 | 4,641 | 14.2 | 17.0 | 22,800 |
| WED | 17:00 | 2.0 | 19:00 | 39.6 | Busan, Korea | 18 | THU | 13:00 | 40.3 | 1.0 | 35 | 501 | 14.2 | (1.0) | 29,000 |
| SAT | 00:00 | 2.0 | 02:00 | 41.9 | Ningbo, PRC | | | | | | | | | | |
| TOTALS | | 16.0 | | | | 198 | | | | 7.0 | 786.0 | 11,171 | 14.2 | - | 234,700 |

| TOTAL VOYAGE SUMMARY | | | | Voyage Cost | at Sea Days1 | | $/day | $/voy | $/TEU | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | Days | % | Vessel Hire | 42.0 | | 28,070 | 1,178,940 | 264 | | Min Lifts Per R-T | | |
| Pilot In | 16.0 | 0.7 | 1.6% | Fuel - ME | 27.1 | | | 262,582 | 59 | | 4460.82 | TEU | |
| Port | 198.0 | 8.3 | 19.6% | Fuel - ME (SECA) | 5.7 | | | 98,241 | 22 | | 1.871 | TEU/Box | |
| Pilot Out | 7.0 | 0.3 | 0.7% | Fuel - Aux | 27.0 | | | 95,588 | 21 | | 2,384 | Boxes Per Direction | |
| Steaming | 786.0 | 32.8 | 78.0% | Fuel - Aux (SECA) | 5.7 | | | 65,635 | 15 | | 9,537 | Linehaul Lifts | |
| Buffer | 1.0 | 0.0 | 0.1% | Port Call Costs | | | | 234,700 | 53 | | - | 0% | Interport Moves |
| Total | 1008.0 | 42.0 | 100.0% | Canal Transit Dues | | | | - | - | | 9,537 | Total Lifts Per Voyage | |
| | | | | Total Voyage | | | | 1,935,686 | 434 | | | | |

| Vessel Characteristics | | | ME Fuel Cons | | Aux Fuel Cons. | | DG Fuel: | $/mt | DG Fuel % | |
|---|---|---|---|---|---|---|---|---|---|---|
| Nom TEU | Eff TEU | Ref Speed | At Sea | Man'v. | At Sea | In Port | HFO | 300 | 100% | |
| 5719 | 4461 | 23.0 | 136.7 | 34.2 | 11.8 | 8.3 | MDO | 460 | 0% | |

As the pro forma schedules above indicate, the differential (increase) in voyage cost for the PNY to include a call in Portland is estimated to have been about $144,000 (considering market fuel costs in the fourth quarter of 2016). Presumably this relatively modest additional marginal expense is consistent with Hanjin's actual marginal voyage cost for the Portland call. It is reasonable to assume Hanjin considered this call profitable, even at the higher rates ICTSI imposed in 2013. If not, faced with poor labor productivity and inconsistent schedule reliability, Hanjin likely would have dropped the Portland T6 call long before March 2015. The T6 call could have been even more profitable in a but-for world with better productivity and schedule reliability.

In order for COSCO, Yang Ming, and K Line to try to retain other traffic flows that they and Hanjin had been moving on the PNN/PNH up until the summer of 2016 – such as Busan to Seattle containers and Vancouver to Busan/Kwangyang containers -- they would have had three fundamental choices:

➢ Launch a fourth Asia – PNW string with an itinerary identical to the PNN/PNH, but using smaller ships (on the reasonable assumption that some of Hanjin's volumes would be captured by other ocean carriers, so the new "PNN" would not need as much capacity as its predecessor string), with each of the three CKY carriers contributing two ships.
➢ Replace most or all of the ships in one or possibly two of their three Asia – PNW strings with much larger ships
➢ Invite a new carrier into the CKY Alliance, with a requirement placed on that new carrier to operate a new PNN

In a "but-for" scenario in which Terminal Six was operating normally (i.e., no differently than other West Coast ports, in terms of labor productivity/reliability in the 2012-2016 period), all three of these scenarios



would have been considered by the executives of COSCO, K Line, and Yang Ming.  However, the first option would have had the shortest time required for implementation, relative to the others.

In 2016, COSCO owned or long-term chartered 38 containerships with nominal capacities of about 4200 TEUs, in addition to 4 ships of about 4000 TEUs capacity and 8 ships of about 3500 TEUs capacity.  At the same time, Yang Ming owned or long-term chartered 4 containerships with nominal capacities of about 4200-4600 TEUs, and K Line had 7 ships with comparable capacities.   The majority of the combined set of these 61 ships were assigned at the time to secondary trade lanes (compared to the strategic importance of the Asia – North America trade lane, for these Asian carriers).  Thus, it would have been relatively easy for the CKY carriers to collectively switch 6 of the 61 ships out of their respective assignments in the fall of 2016 and launch a new deployment to replace Hanjin's PNN service.   The 6 ships would then have been replaced in their respective assignments at that time with smaller ships from the fleets of these three carriers or with newly chartered ships.  Even if the three carriers decided not to redeploy six or seven of their ships from secondary trade lanes to the replacement Asia – PNW service, they could have readily secured suitable ships of approximately 4000 TEUs capacity from the charter market.

Implementation of this strategy, of using ships already in their fleets, could have been accomplished over a 3-4 month period after the three carriers decided on this approach.  Thus, with the combination of a "stop-gap" measure of immediately modifying one of their existing Asia – PNW vessel services to include a Portland call and concurrently arranging to add a fourth Asia – PNW string (using smaller ships), the remaining CKY alliance should have been able to "recover", within 2-3 months, the majority of  Asia – Portland volumes that could have been diverted to route through other West Coast ports during the few months immediately following Hanjin's cessation of its Transpacific liner services.

In addition to the CKY carriers replacing the Hanjin PNN service – with lower-capacity ships – it is certainly conceivable that another carrier or carrier-alliance would have modified its Asia – PNW service portfolio in order to add a Portland call and thereby compete with the CKY carriers for Hanjin's Portland volumes, while simultaneously shifting containers originating or terminating in the natural Portland hinterland that it had been inducing to move through Seattle or Tacoma.  At least one of these other carriers would have – in the but-for scenario – concluded that it had as much potential – if not more – as COSCO, K Line, or Yang Ming to capture a significant portion of the natural Portland hinterland market.  For example, it is my understanding that APL had exploratory discussions about calling at T6 with ICTSI in 2014, and even had one of its vessels make a call at the Port at that time.  Moreover, APL had historically used the Union Pacific Railroad as its preferred intermodal train service provider between the West Coast and the Midwest, and given that UP's PNW – Midwest route terminated at T6 (and thereby enabled that railroad to provide excellent train service between the Port and Chicago), this ocean carrier would likely have pursued the opportunity to not only compete with Hanjin for the Portland hinterland market but also to increase its intermodal volumes with UP in the PNW – Midwest corridor.  In addition, as a member of the G6 Alliance in 2014-2015, APL would have likely been supported by other carriers in that Alliance in modifying its Asia – PNW service to include a Portland call, in order for that Alliance to compete more effectively against the CKYH Alliance that Hanjin belonged to.

*Steven C. Rothberg, February 8, 2023*

_____

Steven C. Rothberg, February 8, 2023

# Appendix A – Data Considered

I considered and utilized the following data in the preparation of this report:

1. Outputs from the on-line "Alphaliner" data base, produced and maintained by AXS Marine.  This data base is maintained by the staff of AXS Marine, which monitors and reports on the disposition all of the containerships that are either being built, or are operating in liner shipping services, or are in idle (lay-up) status.  Alphaliner also monitors each liner shipping service being operated by each container shipping carrier in the world, providing data on which ships are assigned (by the carrier) to a particular liner service, what ports receive regular calls by those ships, and which other ocean carriers might be allocated capacity on the service (and/or contributing ships to it).  Alphaliner is utilized regularly by executives and staffs of major ocean carriers, as well as by professionals in the maritime transportation industry.  My firm has had a subscription to this data base for the past ten years, and we utilize/access this data base on a daily basis.
   a. The Alphaliner data base can be accessed with a subscription at www.alphaliner.axsmarine.com

2. Contents of the printed Annual Yearbooks of Containerisation International for the years 2001, 2002, 2004, 2005, 2007, 2008, and 2010.  Containerisation International was a monthly magazine published by National Magazine Company, Limited, of the United Kingdom, that first appeared in 1967 and thereafter became the leading periodical of the container shipping industry.  In the late 1970s, National Magazine Company began publishing an annual yearbook that provided a guide to each ocean carrier's operations and fleets; a route analysis of deep-sea operators and short-sea operators, a detailed vessel-by-vessel register of ships in service and new buildings.  Mercator purchased hard copies of these yearbooks during the first decade of this century, prior to the publisher transitioning the product to an on-line format.

3. A chart on the evolution of global vessel sharing alliances, developed by Theo Notteboom, Professor of Transport and Regional Economics at the University of Antwerp (Belgium), in the book he co-authored with Anthanassios Pollis and Jean-Paul Rodrigue, entitled "Port economics, management, and policy", published by Routledge/Taylor & Francis in 2012 and updated in 2022.  This chart is also referenced on the following website:  www.porteconomicspolicy.org, and can be located within that website with the following link: https://porteconomicsmanagement.org/pemp/contents/part1/ports-and-container-shipping/alliances-container-shipping/

4. Expert Report of Todd A. Gray
5. Declaration of Lawrence Burns, January 03, 2023
6. Market Assessment and Forecast for South Carolina Port Facilities, May 16, 2018 – a report prepared and produced by Mercator International LLC
7. Alphaliner Weekly Newsletter, 2015, Issue 41, pages 1-2

# Appendix B - Resume

## Steven C. Rothberg

Founding Partner, Mercator International LLC

### EDUCATION

BS, Industrial Engineering, Cornell University, 1976

MS, Transportation Systems Engineering, MIT, 1978

### EXPERIENCE SUMMARY

Mr. Rothberg has 45 years of experience in transportation network design, ocean shipping economics, cargo market analyses, port infrastructure development, asset valuations and strategic planning. Mr. Rothberg has led or participated in numerous port planning projects on six continents for port authorities, terminal operators, and financial institutions. He has designed and managed transportation networks and services as well as asset sharing agreements for multiple international shipping lines and railroads. He has also developed strategic market studies and business plans for an array of transport service providers and infrastructure operators. He has led numerous efforts conducting market studies and demand forecasts of numerous commodities.

### INDUSTRY EMPLOYMENT HISTORY

*Mercator International LLC, Founding Partner, 2009-Present, Seattle, WA*

Provide strategic planning and advisory services to clients involved in operating, financing, or purchasing international freight transportation services, as well as to companies developing, financing, and/or operating transport/logistics infrastructure.

*Macquarie Capital Funds Inc., Senior Vice President and Managing Director, 2006-2008, Seattle*

Directed a team of maritime professionals responsible for identifying, evaluating, executing, and managing investment transactions in the global port sector for twenty separate infrastructure investment funds. Participated in the valuation of, and business plan construction for, thirty prospective acquisitions of major marine terminal companies, and in the completion and management of seven transactions involving twelve marine terminals in North America, Asia, and Europe, including two greenfield projects.

*Mercator Transport Group, LLC., Managing Director, 2000-2005, Seattle, WA*

Responsible for Mercator's sales, marketing, joint ventures, and business development activities worldwide. Secured consulting assignments from multiple US and international port authorities, terminal operators, ocean carriers, and financial institutions, as well as selected railway companies and multi-national exporters/importers. Established a network of representative agents in Japan, China, Thailand, Australia, India, Chile, Mexico, and Belgium.

*Sea-Land Service, Inc., Vice President & General Manager for Southeast Asia/Australia, 1996-1999, Singapore*



Responsible for all of Sea-Land's business activities in the ten-country ASEAN region, with profit and loss accountability therein. Supervised a staff of over 700 associates in 31 branch offices.  Led Sea-Land's entry into the Asia – Australia liner markets.  Established two terminal joint ventures in Australia.  Implemented inter-continental supply chain management programs for Fortune-500 multi-national companies in Thailand, Malaysia, and Singapore.

*Sea-Land Service, Inc., Vice President of Strategic Planning & Business Development, 1991-1996, Liberty Corner, NJ*
Responsible for evaluating all capital expenditure proposals and vessel deployment plans, as well for formulating the company's strategic plans. Led the planning/negotiations of numerous capital expenditure projects, vessel-sharing agreements, port and terminal development projects, and merger/acquisition proposals with shiplines and other transport companies in Europe, Latin America, the CIS and Mideast.

*Sea-Land Service, Inc., Vice President of Pacific Finance, 1987 – 1991, Seattle, WA*
Responsible for the financial control and accounting activities of the company's largest business unit, overseeing $1.1 billion of operating expenses and providing analytical support of all expansion projects in Asia and the West Coast of North America.

*United Airlines, Director of Corporate Planning, 1987, Chicago, IL*
Responsible for the development and implementation of a formal, structured strategic planning process to guide the business expansion, airplane fleet acquisition plan, and market entry plans of the airline.

*United States Lines, Director of Pacific Marketing, 1984-1986, Cranford, NJ*
Responsible for developing and implementing commercial strategies to increase the ship line's volumes and shares of the Asia – North America liner markets.  Guided sales and pricing efforts for the company's services in the Transpacific trades.

*United States Lines, Manager of Corporate Planning, 1982-1984, Cranford, NJ*
Responsible for producing operational plans and schedules in support of a twelve-ship newbuilding project, which doubled the company's asset base upon implementation

*Southern Pacific Railroad, Manager of Operations Planning, 1978-1982, San Francisco, CA*
Designed and help implement train and terminal operating schedules to handle multiple classes of rail traffic, inclusive of unit bulk trains.


RECENT REPRESENTATIVE PROJECTS


*Due Diligence on Port of Brisbane Corporation (Morgan Stanley Infrastructure).*  Evaluated the markets, infrastructure, volumes/revenues, and operations of each cargo-handling terminal located in the Port of Brisbane to assist investors in preparing their bid to acquire the asset from the State of Queensland. Examined the commodity composition of each liner trade lane to/from Australia, including petroleum, coal, cement, and other mineral bulk commodities.


*Commercial and Financial Due Diligence for a Portfolio of 16 Marine Terminals in South America (top pension fund).*  Project lead for the analysis of key commodity markets for a complex mix of port assets in South



America, several of them primarily related to the movement of Chilean mineral bulk flows. Developed base-case, optimistic, and pessimistic long-term volume forecasts for containers, dry bulk (including Chilean Copper), liquid bulk, break-bulk and RoRo.

*Comparative Transportation Costs of Inbound Raw Materials for the Port of Algoma (top infrastructure fund).* Identified the location of iron ore and cooking coal production sites, mapped the inbound supply chain for iron ores and coal destined to a steel mill at the Great Lakes St Lawrence Seaway System, developed the rail service plans and analyzed the economics to transport the estimated tonnage from the iron ore and coal production sites to the mill.

*Commercial Due Diligence for a Portfolio of Marine Terminals in the United Kingdom (top pension fund).* Lead the due diligence study to assess the long-term commercial and financial viability of an operator of marine terminals in England and Scotland that handle a diverse mix of cargo including containers, mineral bulk, liquid bulk and vehicles. Performed a competitive analysis of the marine terminal operator's peers by geography and key commodity.

*Columbia Snake River Business Assessment (Foss Maritime Company).* Lead the commodity market study for the total regional market including shipments to/from the Pacific Northwest moved outside the river system. Utilized publicly available statistics to estimate the annual volume of cargoes currently being shipped from Grays Harbor for each of the following major commodities: mineral bulk, break-bulk, liquid bulk, and RoRo vehicles.

*Master Port Development Plan (Dubai Port Authority).* Analyzed container and non-container import/export markets and port competitive dynamics for the Arabian Gulf, with emphasis on shipments to and from the United Arab Emirates in order to assist Dubai Port Authority in determining the future demand for terminal capacity and new facilities for the ports of Jebel Ali and Port Rashid. As part of this effort, evaluated how the service networks of specific shipping lines in the Asia – Europe corridor would evolve over time, and how those network changes would impact the demand for transshipment activity at the major relay ports of the Indian Ocean and Arabian Gulf.

*Strategic Market/Facility Planning (Port of Long Beach).* Conducted a detailed study of liner shipping service patterns and economics for the Asia – North America trade in order to project the future frequencies and average vessel sizes of deployments calling at the Ports of Los Angeles and Long beach, on behalf of the port authority of the latter. Applied the outputs of this work to assist the client in re-assessing its strategic plans for marine terminal development, to reflect the operational impacts of very large container ships in Transpacific services.



Mercator International, LLC

4040 Lake Washington, Suite 310. Kirkland, WA 98033
Tel:  425.803.9876   Fax: 425.803.9476

www.mercatorintl.com