# Expert Report of Dr. Bryce Ward

## ICTSI, Oregon, Inc. v. ILWU
CASE NO. 3:12-cv-1058-SI



**AβMJ**

CONSULTING

February 8, 2023

1581 Cornerstone Dr.
Missoula, MT 59802

**www.abmjconsulting.com**

This page intentionally left blank

# I.    SUMMARY

## A. Qualifications

I am a founder of ABMJ Consulting (ABMJ), which provides economic and statistical analysis for complex litigation. I have also served as a Senior Research Professor, Visiting Assistant Professor or a Visiting Adjunct Professor at the University of Montana, Lewis and Clark College, the University of Oregon, and Portland State University, where I taught courses in microeconomic theory, statistics and econometrics, public economics, labor economics, and environmental economics. I have testified on economic matters in administrative, legislative, and court proceedings, and I have presented papers at professional proceedings on economics. I received a Ph.D. in economics from Harvard University. Attached as Appendix G is my *curriculum vitae*.

My work specific to this report and any subsequent testimony is compensated at $450 per hour. My compensation is not dependent on the outcome of this matter.

## B. Background and Assignment

ICTSI Oregon, Inc. (ICTSI) leased and operated the container terminal at the Port of Portland's Terminal 6 (hereafter, "T6"). Members of the International Longshore and Warehouse Union (ILWU) performed a large share of the work at T6. Starting on or around June 1, 2012, a labor dispute between ICTSI and the ILWU over work that ICTSI did not control but which was controlled by the Port of Portland caused the ILWU to engage in a work slowdown and other coercive labor actions. That dispute caused two of the carriers that regularly called on Terminal 6, Hanjin and Hapag-Lloyd, to stop calling on T6 for a period during the summer of 2012. Even after those carriers re-initiated regular calls, the total volume of containers moving through Terminal 6 from their calls trended downward and those two carriers ceased calling on Terminal 6 in March 2015. The only other carrier that regularly called on Terminal 6, Westwood, stopped calling in 2016.  On March 31, 2017, ICTSI bought out the remaining 19 years of its lease.

Two NLRB administrative judges and one federal judge (in a contempt proceeding) have found that ILWU's slowdown and other coercive job actions were unlawful ("the unlawful job actions") and that ILWU continued the unlawful job actions at least through August 13, 2013. A jury later found that ILWU continued to engage in this unlawful pattern of conduct (to the exclusion of lawful labor actions) between August 13, 2013, and March 31, 2017. The jury further found that ILWU's unlawful job actions caused damages to ICTSI and that no other factor (for example, market conditions, the location of Terminal 6 on the Columbia River, the bankruptcy of Hanjin on August 31, 2016, the management practices of ICTSI, or anything else) caused damages to ICTSI. A further trial has been ordered to decide the amount of ICTSI's damages caused by ILWU's unlawful conduct.

I have repeatedly applied my education and training to analyze statistical, econometric, and economic issues relating to ILWU's labor actions. In late 2012, attorneys representing ICTSI asked me to conduct an independent, statistical analysis of productivity at T6. Specifically, I was asked if productivity at T6 fell by a statistically significant and economically meaningful amount following the start of the labor dispute. I was also asked to investigate the causes of any observed decline in productivity. In August 2013, I produced a report documenting that productivity at T6 remained substantially below the pre-June 1, 2012 average through the time of that report. I further concluded:

A decline in labor productivity stemming from the labor dispute provides the most probable explanation for the decline in productivity. This explanation is consistent with the patterns in the data (i.e., it starts around June 1 and could affect all gangs, cranes, and crane operators) and the other main potential explanations (changes to vessels, lines, weather, gross delays, terminal layout, equipment, equipment productivity, net delays, management, the amount of casual labor employed, or crane operator experience/skill) do not explain the decline.

In forming their opinions that the ILWU engaged in an unlawful slowdown through at least August 13, 2013, both Administrative Law Judge Jeffrey D. Wedekind and Federal Judge Michael H. Simon relied on the findings in my analysis.

In advance of the first jury trial, attorneys representing ICTSI asked me to update my August 2013 report.  Specifically, I was asked to address the following questions:

1. Did productivity at T6 remain below the pre-June 1, 2012 average between August 2013 and the last vessel call at T6 in May 2016 by a statistically significant and economically meaningful amount?

2. If so, to what extent did low labor productivity contribute to low output?

3. If low labor productivity contributed to low output, did the reefer dispute contribute to low labor productivity?

I reached five primary conclusions, which I summarize as follows:

(1) Since the period covered in my 2013 report, productivity at T6 remained below the pre-June 1, 2012 (the pre-reefer dispute) average. Gross, adjusted gross, and net productivity all remained at least 10 percent below the pre-dispute level through the end of ICTSI's lease.

(2) To conclude that low productivity at T6 after August 13, 2013 is unrelated to the unlawful job actions – given the continued low productivity and given the NLRB and court rulings that find the ILWU engaged in those actions at least through August 13, 2013 – one must believe that: (a) the ILWU stopped those actions; and (b) some other factors must have changed (independent of the unlawful job actions) in a manner that

prevented productivity from returning to the pre-dispute level. Neither of these conditions is satisfied.

(3) There is evidence that labor continued to slow production at T6. ICTSI observed labor engaging in the same (or similar) job actions after August 13, 2013 as they observed before August 13, 2013. Port of Portland managers believe that the ILWU continued to interfere with production at T6. An agreement to assign the disputed reefer work to the ILWU was premised on the belief that the ILWU continued to interfere with production. An independent audit of equipment and equipment maintenance at T6 identified several behaviors or outcomes (e.g., removing equipment from service with no apparent problems) that are consistent with the ILWU's efforts to interfere with production. Productivity occasionally spiked at T6, and when it spiked it was frequently during shifts where workers had extra incentives to speed production (e.g., on Super Bowl Sunday or short shifts where there were insufficient volumes for a full workday). This is consistent with labor continuing to interfere with production, and inconsistent with alternative explanations. In various forums, the ILWU has acknowledged that low output at T6, at least in part, reflects low labor production.

(4) There is no evidence that some other determinant of productivity at T6 changed in a manner that can explain the low production. Regression analyses similar to those used in my 2013 report yield the same pattern of results. Productivity at T6 remained below the pre-dispute average by a large and statistically significant amount, even after accounting for changes to external factors (e.g., vessels serviced, load characteristics, weather) and internal factors (e.g., equipment-related delays, the number of casuals or inexperienced workers, the number of gangs working simultaneously).

(5) The pattern of evidence in my second report is consistent with my 2013 report. As such, it supports the same conclusion. The decline in productivity at T6 that began on June 1, 2012 and persisted thereafter is tied to the reefer dispute. Had the reefer dispute never occurred, it is unlikely that output would have declined and persisted at the levels observed at T6.

At the last trial, ICTSI elicited my opinions on these issues and the jury's verdict was consistent with my opinions.

Attorneys representing ICTSI have again asked for my independent analysis of statistical, econometric, and economic issues. Specifically, I have been asked to address the following question:

What volume of containers (in TEUs) do you estimate that ICTSI likely would have moved between June 1, 2012, and March 31, 2017, in the absence of ILWU's unlawful conduct, taking into consideration market factors you deem relevant, including for example the local, national, and international economies, the shipping market, T6's competitive position in relation to Washington ports including the effects, if any, of likely price-changes in the but-for world (not to exceed contemporaneous prices paid by carriers

utilizing T6's services in the real world), and the likely effects, if any, of Hanjin's bankruptcy on August 31, 2016?

In addition to estimating container volumes that likely would have flowed through Terminal 6 in the absence of ILWU's unlawful conduct, I have also been asked to supply certain data regarding operations at Terminal 6 to other experts, which I have done.  Any such data is included in my expert file.

## C. Information Considered

I base my opinions described in this report on my past experience and education, on my interviews with the ICTSI management, and on the materials specific to this matter which I have reviewed and considered. These materials are detailed in the report text, but include:

- My previous export reports in this matter and all materials listed therein, *see, e.g.*, Dkt. 372[1]
- Expert Reports of Nolan R. Gimpel dated October, 22, 2018 (Dkt 372) and February 8, 2023
- Expert Report of Todd Gray dated February 2, 2023
- Expert Report of Steve Rothberg dated February 8, 2023
- Expert Report of Dr. Christopher Knittel dated February 8, 2023
- Expert Report of Dr. David Blackburn dated February 8, 2023
- Declaration of Lawrence Burns dated Jan. 3, 2023
- Declaration of Dan Gatchet dated Feb. 2, 2023
- Declaration of Jeff McEwen dated Nov. 7, 2022
- Declaration of Nathaniel Sam Ruda dated July 15, 2022
- Trial testimony of Elvis Ganda (10 22 2019 - ICTSI v ILWU - VOL 2 - Final Transcript.PDF) (Dkt. 643)
- Case No. 3:12-cv-1058-SI Special Verdict (Dkt. 620)
- Case No. 3:12-cv-1058-SI Opinion and Order, March 5, 2020 (Dkt. 662
- Deposition of Steven Gallaway dated Sept. 13, 2018
- Deposition of Michael Radak dated August 21, 2018
- Deposition of William Wyatt dated May 16, 2018
- Deposition of Nathaniel Sam Ruda dated August 9, 2018
- Port of Portland Hanjin Vessel Time in Port (https://dochub.clackamas.us/documents/drupal/3550f2a8-5dcb-4461-a9e6-bd1945229ea7)
- Confidential Stevedoring and Terminal Services Rate Schedule for APL Limited
- Interviews with Elvis Ganda
- Interviews with Brian Yockey
- Interviews with Dan Gatchet
- Interviews with Todd Gray

---

[1] I incorporate my findings and conclusions from these reports into this report by reference.

- Interview of Guy Stevenson
- Interviews with Nolan Gimpel
- Interviews with Steve Rothberg
- Data from Terminal 6 vessel operations reports from Jan. 1, 2005-March 31, 2017
- ICTSI total TEU volumes provided by Jay Sickler prior to the 2019 trial
- ICTSI data pre-stow plan and ops reports calculating containers added or left behind during 2011-2013 (Vessel container prestow vs ops report all ICTSI vessels worked 10 Aug 20.xlsx)
- T6 Vessel Calls (Pre-ICTSI) 2005 – 2011 By Date
- Annual North American port volumes from the American Association of Port Authorities (AAPA) http://aapa.files.cms-plus.com/CONTAINER%20TRAFFIC%20NORTH%20AMERICA%201980%20-%202018.xlsx
- AAPA monthly data for major West Coast ports (provided by Todd Gray of Mercator International)
- Data from Pacific Maritime Association (PMA) Annual Reports from 2005-2017 (ILWU 052094-052136; ILWU 052344-052437; ILWU 052438-052679; ILWU 053117-053200; ILWU 053285-053368; 053201-053284; ILWU 053369-053452; ICTSI06940320694359)
- Data on inflation-adjusted quarterly GDP, personal income, and personal consumption expenditures for Pacific Northwest states and counties, and the Far West region obtained from the Bureau of Economic Analysis
- Data on unemployment and labor force participation for PNW states and the Far West region obtained from the Bureau of Labor Statistics Local Area Unemployment Statistics
- Export/Import price indices obtained from the Bureau of Labor Statistics
- Port Liner Shipping Connectivity Index (PLSCI) produced by MDSTransmodal and obtained from UNCTAD (https://unctadstat.unctad.org/wds/TableViewer/summary.aspx)
- GDP in real $US for East Asia & Pacific, Latin American & Caribbean; Europe and Central Asia obtained from the World Bank
- Port Import/Export Reporting Service (PIERS) data for volume handled in Portland, Seattle, and Tacoma from Jan. 2011-Mar. 2017 provided by Todd Gray of Mercator International
- Data on trucking rates from PNW destinations to port terminals in Portland, Seattle, and Tacoma provided by Dan Gatchet
- Data on trade volume (Kg) and value by port and state of origin/destination obtained from U.S. Census Bureau.
- Port of Portland, Portland Container Trade—Direct and Indirect Cargo, Transpacific Trade, Imports and Exports (various months)
- Hanjin US PDX Promotion (ICTSI0696799)
- ICTSI rates by carrier (Rates - Straight time throughput & wharfage 2011-2017.XLSX)
- Mercator (2022) North American Container Port Volume Forecast

- WSP (2020) Long-term Container Traffic Forecast, 2020-2060: Vancouver Fraser Port Authority
- Advisian (2018). Port of Portland Terminal 6 Container Business Strategy (ICTSI0076164-0076299)
- International Trade and Logistics Initiative (2016). Steering Committee Report (ICTSI0246499-0246515)
- BST Associates (2021). Port of Portland Container Service Forecast and Economic Contribution Assessment.
- Mercator (2020) Analysis of Port of Portland's Container Traffic Market;
- ECONorthwest (2016) Feasibility of an Intermodal Transfer Facility in the Willamette Valley, Oregon
- Tioga Group (2016) Trade and Logistics Report: Concepts and Business Case Analysis. (ICTSI0246499-0246515)
- Freidman and Struxness (2015) Oregon Trade and Logistics Initiative Stakeholder Engagement Report
- Fisher, R. (2015) Existing Transpacific Strings – A Market Opportunity Assessment for Portland
- Cambridge Systematics, Inc. (2011). Port Activity and Competitiveness Tracker (PACT).
- UNCTAD (2022) Review of Maritime Transport, Chapter 3 https://unctad.org/system/files/official-document/rmt2021ch3_en.pdf
- Hyundai Portland Opportunity Texas Visit January 2010,
- ICTSI (2016) "APL NP2 Service with a Portland Direct Call Concept" (ICTSI0306591-0306592)
- Martínez Moya, J., & Feo Valero, M. (2017). Port choice in container market: a literature review. *Transport Reviews*, *37*(3), 300-321;
- Steven, A. B., & Corsi, T. M. (2012). Choosing a port: An analysis of containerized imports into the US. *Transportation Research Part E: Logistics and Transportation Review*, *48*(4), 881-895;
- Parola, F., Risitano, M., Ferretti, M., & Panetti, E. (2017). The drivers of port competitiveness: a critical review. *Transport Reviews*, *37*(1), 116-138.
- Talley, W. K., & Ng, M. (2013). Maritime transport chain choice by carriers, ports and shippers. *International Journal of Production Economics*, *142*(2), 311-316.
- Tongzon, Jose L. "Determinants of port performance and efficiency." *Transportation Research Part A: Policy and Practice* 29.3 (1995): 245-252;
- Tongzon, J. L. (2009). Port choice and freight forwarders. *Transportation Research Part E: Logistics and Transportation Review*, *45*(1), 186-195;
- Beškovnik, B. (2008). Measuring and increasing the productivity model on maritime container terminals. Pomorstvo—Journal of Maritime Studies, 22(2), 171-183;
- Hummels, D. L., & Schaur, G. (2013). Time as a trade barrier. *American Economic Review*, *103*(7), 2935-2959.

- Blonigen, B. A., & Wilson, W. W. (2008). Port efficiency and trade flows. *Review of international Economics*, *16*(1), 21-36
- Blonigen, B. A., & Wilson, W. W. (2018). Trade costs, trade, and port efficiency. In *Handbook of International Trade and Transportation*. Edward Elgar Publishing
- Davies, P. (2017) Does Environmental Compliance Impact Port Competitiveness? https://www.dtci.ca/wp-content/uploads/2011/10/DTCI-Environmental-Compliance-Paper-Web-Oct-23.pdf
- Steven, A. B., & Corsi, T. M. (2012). Choosing a port: An analysis of containerized imports into the US. *Transportation Research Part E: Logistics and Transportation Review*, *48*(4), 881-895
- Ignatenko, A. (2020). Price Discrimination in International Transportation: Evidence and Implications. *Retrieved from: https://www. annaignatenko. com/JMP_AnnaIgnatenko. pdf*.
- Mani, A., & Prozzi, J. (2004). State-of-the-practice in freight data: a review of available freight data in the US.
- Stock, J. H., & Watson, M. W. (2020). Introduction to econometrics 4th ed
- Cameron, A.C. and P.K. Trievedi. Microeconometrics using Stata (Second Edition)
- Diebold, F.X. (2019), Econometric Data Science: A Predictive Modeling Approach, Department of Economics, University of Pennsylvania, http://www.ssc.upenn.edu/~fdiebold/Textbooks.html.
- Currie, J., Kleven, H., & Zwiers, E. (2020, May). Technology and big data are changing economics: Mining text to track methods. In *AEA Papers and Proceedings* (Vol. 110, pp. 42-48).
- Li, X., Özer, Ö., & Subramanian, U. (2022). Are we strategically naïve or guided by trust and trustworthiness in cheap-talk communication?. *Management Science*, *68*(1), 376-398.
- Gaughan, P. A. (2009). *Measuring business interruption losses and other commercial damages*. John Wiley & Sons.
- Bonney, J. (2016) "Chiquita to return to Gulfport from New Orleans." Journal of Commerce (Jul. 6, 2016). https://www.joc.com/article/chiquita-return-gulfport-new-orleans_20160706.html.
- Mongelluzzo, B. (2012) "PNW Ports Building on reliability." Journal of Commerce (May 18, 2012).
- Harbarger, M. (2015). "Ripple felt as shipper leaves Port of Portland." East Oregonian (April 7, 2015) https://www.eastoregonian.com/news/agriculture/ripple-felt-as-shipper-leaves-port-of-portland/article_5c546c07-d253-505b-9b38-466033ab3c46.html
- Hammill, L. (2016) "Harney County farmer 'just trying to break even' after loss of Portland container shipping" Oregonian (July 2, 2016) https://www.oregonlive.com/business/2016/07/harney_county_farmer_just_tryi.html

## D. Summary of Opinions

Based on my analysis and review of materials related to this case, I proffer the following opinions at this time. Should new information become available, I may revise my analysis, my opinions, or both.

Conceptually, estimating T6's volumes in the world without the ILWU's illegal acts is simple—T6 volume equals the size of the market T6 would have served times the share of the market it would have captured. As such, projecting but-for volumes entails obtaining an estimate of market size in the absence of the ILWU's unlawful conduct and assessing whether some force(s) would have changed T6's market share in the absence of the ILWU's unlawful conduct.

### 1. Market size

The market served by T6 likely grew during the relevant period. At worst, volume growth in T6's market was effectively flat. The economy served by T6 grew quickly during the damages period, as did container volumes across the West Coast, U.S., and North America. Given that T6's market volumes generally moved with these larger economic trends before the ILWU's unlawful conduct, these broader trends suggest a growing market for T6.

Figure S1 shows my estimated range for T6's market growth in the but-for world. The lower end of the range is based on a calculation that assumes T6 would have captured the same share of West Coast import and export volumes in the damages period as it had in the 12 months prior to the ILWU's unlawful conduct (and assuming that, consistent with historical averages, empty containers comprise 20 percent of total volume and rehandles comprise one percent). Other reasonable assumptions yield nearly identical estimates to this outcome. E.g., this outcome is effectively equivalent to assuming:

- T6's market would have remained at the same size as it was during the 12 months prior to the labor dispute;
- That T6 would have grown at a rate comparable to the third or fourth slowest mainland North American ports during 2012-2017 (e.g., at the roughly same rate as Seattle/Tacoma or Lazaro Cardenas).

The upper end of the range comes from a predictive regression that uses the pre-dispute relationships (between variables like the unemployment rate in the Pacific Northwest and West Coast import or export container volumes and T6 volumes) to predict damages period volumes, given real-world unemployment rates, West Coast container volumes, etc. during the damages period. Similar regressions that use the same approach to predict volumes in Seattle/Tacoma/Portland or Oakland yield predicted volumes very close to what occurred. Again, other reasonable assumptions yield nearly identical results for this outcome. E.g., this outcome is effectively equivalent to assuming:

- T6's market would have returned to the levels that existed prior to the Great Recession;
- T6's market would have grown at rates slightly below the rates it had during the few years prior to the labor dispute;
- T6 would have grown at rates slightly below the median mainland, North American port, and roughly in line with U.S. or North American growth.

**Figure S1: Range of T6 market growth in the but-for world**



Notes: T6 projected volumes based on changing market conditions assuming constant T6 competitiveness.

Given the range of plausible assumptions that yield the same range of conclusions, it is likely that T6 volumes would have fallen within this range (in the absence of changes to T6's competitiveness). As such, to argue that T6 volumes would have fallen outside this range in the world without the ILWU's illegal conduct, one likely needs to argue (and provide evidence to support) that T6's competitive position would have changed in the but-for world.

### *2. Market Share*

Without the ILWU's unlawful conduct, T6 was unlikely to become significantly less competitive during this period. Consistent with the jury verdict in the 2019 trial, the observed decline in T6's competitiveness during this period was due to the ILWU's unlawful conduct. Productivity is an essential source of port terminal competitiveness. It is essential to both carrier and shipper choices. The decline in productivity due to the ILWU's unlawful conduct led to declines in T6's competitive position and the observed decline in volumes.

While, in theory, changes to factors unrelated to the ILWU's illegal conduct could have changed T6's competitive position, the evidence does not suggest that the net effect of these changes would have led to a decline in volume at T6.

Some evidence suggests that, in the absence of ILWU's unlawful conduct, T6's competitive position would have improved. Specifically:

- ICTSI was working to improve productivity, increase volumes on existing carriers, and attract new carriers. The literature on container terminals suggests that private terminal operators generally succeed in improving terminal efficiency and competitiveness.
- Consistent with these expectations, Hanjin had redirected resources to boost volume at T6 in early 2012 because T6 was its most profitable West Coast terminal. These efforts appear to have succeeded. During the first five months of 2012, Hanjin's loaded T6 volumes increased by 19 percent relative to the first five months of 2011. Hapag Lloyd also was growing its T6 volume, adding an additional call at T6 in early 2012.
- Furthermore, even with diminished productivity caused by the ILWU's illegal conduct, ICTSI management had sufficient skill and market knowledge to recruit a new potential carrier. In 2014, ICTSI determined that APL was moving approximately 1,000 empty containers a week through Seattle-Tacoma that could be handled more economically by APL in Portland. APL agreed to a trial call in December 2014, which should have saved APL hundreds of thousands of dollars. During that call, however, productivity was very low. APL abandoned the call after five days and did not return.
- Additionally, the key source of T6's competitive position—the fact that T6 catchment area shippers must incur hundreds of dollars of additional trucking costs (plus potential delays and the associated time costs) to ship to terminals in Seattle/Tacoma—remained intact and shifted slightly in T6's favor. The cost of trucking containers to Seattle/Tacoma increased relative to Portland for nearly all parts of the catchment area during this period.

Other factors could have reduced T6's competitive position—e.g., Hanjin's bankruptcy or ICTSI's intended price increase; however, the evidence and other expert option in the case do not suggest that these other factors would have substantially depressed T6 volumes.

T6's largest carrier, Hanjin, filed for bankruptcy protection on August 31, 2016. This event could have reduced T6 volumes. However, Hanjin's bankruptcy was unlikely to substantially affect T6 volume because:

- At historical productivity, the carriers calling on T6 indicated that calling at T6 was profitable. In fact, as noted earlier, Hanjin documents indicate that Portland was its most profitable West Coast terminal in 2011.

- Additionally, Portland's key competitive advantage (the cost of moving volume to Seattle-Tacoma) remained intact, and volume in its catchment area was likely growing (see section III).
- Industry experts Nolan Gimpel and Steve Rothberg believe that T6 would have offered an attractive opportunity to carriers. The remaining carriers had the capacity to meet demand and an incentive to enter this market. This suggests that a carrier would likely have seized on the vacancy created by the Hanjin bankruptcy and began calling at T6 in very short order (if they had not already established service at T6 prior to this).
- Ultimately, consistent with industry experts' assessment that the Portland market was sufficiently attractive to entice a carrier, carriers did return to T6 after the resolution of the original trial in this matter, even though many prior catchment area shippers (like Kroger) adjusted their shipping chains after the carriers left.
- However, consistent with Mr. Gimpel and Mr. Rothberg's reports, I compute two scenarios. One where T6 replaces most of Hanjin's volume over three months and another where it does not replace Hanjin's volume after its bankruptcy.

Even without the ILWU's unlawful conduct, ICTSI planned to increase its rates in 2013. In theory, this price increase could have reduced T6 volume; however, ICTSI's rate increase was unlikely to substantially affect T6 volume.

The potential impacts of ICTSI's rate increase depend on how it affected carriers and/or shippers. While carriers would prefer to pass the full rate increase onto shippers, economic conditions may preclude them from doing so. However, if one assumes that carriers bore the rate increase, several factors suggest the rates charged by ICTSI were not sufficient to deter the carriers from serving T6, including:

- Prior to the ILWU's illegal conduct, in 2012, Hamburg Sud agreed to rates almost equal to those charged by ICTSI in 2013. Similarly, during the ILWU's illegal conduct, APL agreed to rates higher than those ICTSI charged other carriers.
- Prior to the ILWU's illegal conduct, in 2011, T6 was Hanjin's most profitable terminal. Even if one assumes that Hanjin would have had to pay for the entire but-for rate increase as lower profits, under the conditions present in 2011, T6 would have remained Hanjin's most profitable West Coast terminal.
- According to Westwood CEO Guy Stephenson, the terminal charge at T6 after the rate increase was not out of line with the rates in Seattle and Tacoma. As such, holding productivity and other determinants of terminal costs constant, shifting to Seattle or Tacoma was unlikely to lead to significantly lower terminal costs (and therefore potentially higher profits for the carriers)—particularly given that leaving Portland would significantly reduce their market share. For instance, prior to the ILWU's unlawful conduct, Hanjin captured 10.6 percent of PNW loaded volume. This share fell to 8.97 percent after the summer of 2012, but it fell even further after Hanjin left T6. Had Hanjin continued to capture 8.97 percent of PNW loaded volume, it would have handled an additional 65,883 TEUs during March 2015-Aug. 2016. This amounts to an average decline of 3,721 TEUs per

month (an amount equal to 60 percent of Hanjin's 2014 T6 average monthly volume).

- Terminal charges are not a particularly important determinant of carrier choices. For instance, Tongzon (2009) notes, "Port users are more concerned with indirect costs associated with delays, loss of markets/market share, loss of customer confidence and opportunities foregone due to inefficient service, than with port charges (Tongzon, 1995). Murphy et al. (1991, 1992) have shown that some users are actually willing to accept higher port costs in return for superior and more efficient service."

- Mr. Gimpel notes in his report that as long as import volume and productivity remained at historic levels, there was effectively no reasonable scenario that would have led the carriers to leave.

Ultimately, the best evidence that ICTSI's price increase was insufficient to cause the carriers to leave is that they did not leave. They continued to pay ICTSI's higher rates for more than two years after the 2013 rate increase, even though declining productivity meant that the quality-adjusted price increased much faster. This suggests that ICTSI's price increase was likely insufficient to cause the carriers to leave T6 in the world without the ILWU's illegal acts.

Alternatively, even if one assumes that carriers pass the entire rate increase onto shippers, several factors suggest that the impact of ICTSI's rate increase on shippers' decision to route volume through T6 also would have been minimal, including:

- Terminal charges are not a significant determinant of shipper choices. For instance, the Advisian report argued that shippers consistently indicate that "reliability was paramount in their carrier and port selection process; the second unanimous criteria for carrier selection was the service offerings provided (weekly, twice a week, etc.). Cost came in third in the hierarchy of decision criteria." Consistent with this finding, when discussing the factors that affect terminal competitiveness, a different report argues it is "important to note that the terminal handling costs portion is a comparatively low portion of overall logistics costs, so not a key driver of overall competitiveness."

- Port charges are typically small relative to the total cost of shipping a container. If, as argued by one study, terminal charges comprise five percent of the total cost of the shipping chain, a $43-83 but-for-price increase amounts to a one-two percent increase in total costs, assuming that the carriers pass the entire terminal charge increase onto shippers.

- ICTSI's price increase was small relative to the cost of transporting a container to Seattle-Tacoma. Transportation to Seattle typically costs catchment area shipments an additional $400-$600 (not accounting for potential additional charges). This is more than 600 percent larger than ICTSI's price increase. A significant amount of volume is unlikely to lie at the margin where any increase passed on from carriers would make Portland more expensive than the alternative.

- Furthermore, the trucking cost to Seattle/Tacoma increased during this period. As such, holding other parts of the supply chain cost constant, the change in relative

trucking cost would have offset some or all of T6's price increase. As a result, these changes would reduce (or potentially eliminate) the effect of ICTSI's rate increase on the relative price of shipping via Portland. Ultimately, if changing relative trucking costs (or other changes in relative price) offset ICTSI's price change so that ICTSI's price increase did not make it relatively cheaper to ship via Seattle/Tacoma, then the impact of ICTSI's price increase of shippers' route choice is limited.

- ICTSI's price increase was also small relative to time costs. A recent study estimates that shippers value each day of transit time at between 0.6 and 2.1 percent of the value of the shipment. Given the values of T6 shipments, each day of transit time is worth $132-$462 per TEU for the shipper. If shipping through T6 at normal productivity would have allowed shippers to, on average, spend fewer days in transit, then time savings further reduce the likelihood that ICTSI's but-for rate increase would induce shippers to ship via Seattle/Tacoma.

- While data limitations preclude obtaining reliable estimates of price elasticity at T6, some studies suggest that the price elasticity for volume destined for local markets (like that served by T6) is low (e.g., less than 0.3). The expert report of Dr. Christopher Knittel also argues that price elasticity for T6 was also low. A trivial increase in the total cost of shipping (e.g., one percent) times a low elasticity (0.3) suggests a very small effect of ICTSI's price increase on volumes (0.6 percent).

- Given the totality of this evidence, any impact of ICTSI's price increase is likely very small and dwarfed by the margin of error inherent in any reasonable method for estimating ICTSI's but-for volumes.

### 3. Projected but-for volume

Ultimately, I assume that the T6's volumes would have grown at the market rates assumed in Figure S1. However, I consider four scenarios built around this assumption. Specifically, at the lowest end of the range, I assume no carrier replaces Hanjin during Sept. 2016-Mar. 2017. Hanjin represented approximately 80 percent of T6 TEUs. As such, I assume that T6 would have lost 80 percent of its projected volume during this period. I also present an alternative calculation that assumes that a carrier/set of carriers would replace 70 percent of Hanjin's volume after six weeks and 90 percent after three months.[2]

The upper end of the range assumes that ICTSI successfully recruited APL in late 2014. Specifically, I assume that T6 would have handled the projected 1,000 empty TEUs per week starting in January 2015. This assumption is likely conservative. In addition, an APL call likely would have provided catchment area shippers access to markets not

---

[2] Specifically, I assume that during the first six weeks (1.5 months) after Hanjin's bankruptcy, T6 loses all its Hanjin volume (80 percent). Then, for the next 1.5 months, carriers replace 70 percent of Hanjin's volume (so adding other carriers' volume, T6 captures 76 percent of projected volume). Finally, for the last four months of the damages period, the replacement captures 90 percent of Hanjin's volume (so T6 captures 92 percent of projected volume).

served by Hanjin. As such, APL likely could have captured additional catchment area volume had it called at T6.

These modifications are summarized in Table S1.

**Table S1: Projection scenarios**
**No Hanjin replacement**

|  | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
|---|---|---|---|---|---|
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 200,555 | 177,774 | 226,155 | 203,374 |
| 2016 | 1,791 | 151,430 | 149,639 | 169,292 | 167,501 |
| 2017 | - | 10,342 | 10,342 | 12,539 | 12,539 |
|  |  |  | 439,665 |  | 522,691 |

**Hanjin replacement 6 weeks 70%, 3 months 90%**

|  | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
|---|---|---|---|---|---|
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 200,555 | 177,774 | 226,155 | 203,374 |
| 2016 | 1,791 | 180,019 | 178,228 | 200,245 | 198,454 |
| 2017 | - | 47,573 | 47,573 | 57,681 | 57,681 |
|  |  |  | 505,485 |  | 598,787 |

**No Hanjin replacement with APL empties**

|      | Actual  | Fixed WC share projection | Difference | Regression projection | Difference |
|------|---------|---------|---------|---------|---------|
| 2012 | 184,566 | 213,658 | 29,092  | 213,823 | 29,257  |
| 2013 | 181,767 | 210,915 | 29,148  | 225,197 | 43,430  |
| 2014 | 166,378 | 210,048 | 43,670  | 232,968 | 66,590  |
| 2015 | 22,781  | 252,555 | 229,774 | 278,155 | 255,374 |
| 2016 | 1,791   | 203,430 | 201,639 | 221,292 | 219,501 |
| 2017 | -       | 23,342  | 23,342  | 25,539  | 25,539  |
|      |         |         | 556,665 |         | 639,691 |

**Hanjin replacement 6 weeks 70%, 3 months 90% with APL empties**

|      | Actual  | Fixed WC share projection | Difference | Regression projection | Difference |
|------|---------|---------|---------|---------|---------|
| 2012 | 184,566 | 213,658 | 29,092  | 213,823 | 29,257  |
| 2013 | 181,767 | 210,915 | 29,148  | 225,197 | 43,430  |
| 2014 | 166,378 | 210,048 | 43,670  | 232,968 | 66,590  |
| 2015 | 22,781  | 252,555 | 229,774 | 278,155 | 255,374 |
| 2016 | 1,791   | 232,019 | 230,228 | 252,245 | 250,454 |
| 2017 | -       | 60,573  | 60,573  | 70,681  | 70,681  |
|      |         |         | 622,485 |         | 715,786 |

## II. CORE QUESTIONS AT ISSUE

A reasonable estimate of T6's lost container volume due to the ILWU's illegal conduct is a key input in calculating ICTSI's lost profits. While it is conceptually simple to produce such an estimate—T6 volumes are a function of the size of the market it would have served and the share of that market it would have captured—it is practically hard.  We do not observe the size of the market that would have existed or the share of the market T6 would have captured in the world where the ILWU's unlawful conduct did not occur.

Fortunately, we do observe T6's volume before the ILWU's unlawful actions. As such, to estimate T6's but-for volumes, one needs to determine the extent to which market size and market share would have changed in the world without the ILWU's unlawful conduct. E.g., would the market served by T6 have grown? Would the share of the market T6 captured have shrunk? For T6 volumes to fall from their pre-dispute levels, the market must have shrunk (e.g., due to a recession), or T6 must have lost market share (e.g., due to becoming less competitive). Alternatively, for T6 volumes to grow from their pre-dispute levels, the market must have grown, or T6 must have gained market share.

## III. MARKET POTENTIAL BUT FOR THE ILLEGAL ACTS

The first core question for this analysis is, "But for the ILWU's illegal acts, how much would the market served by T6 have changed?" Ideally, one would directly measure market growth. That is, one would calculate T6's market potential by identifying the market served by T6, counting up all the containers that flowed into or out of this area, and adjusting this total for any impact of the ILWU's illegal acts on catchment area volume. Unfortunately, there are several impediments to this ideal. While we have ample data on the volume that flows through each port, we do not have complete data on the precise origin or destination of each shipment. As such, attempts to measure market growth directly suffer from significant limitations.[3]

Given these limitations, I consider a variety of data and use several analytical approaches to develop a reasonable range for T6's market growth.[4] These various approaches suggest that the market served by T6 likely would have grown (or, at a minimum, remained constant). Two types of evidence support this conclusion. First, the regional economy grew during this period, and container volumes generally move with economic activity. Second, consistent with a growing economy, container volumes grew across the West

---

[3] Appendix E presents one attempt at such a calculation and describes its limitations.

[4] The use of multiple approaches is sometimes referred to as the "collage approach." The collage approach is increasingly common in applied economics. Instead of relying on a single method or dataset, authors "attempt to make a case based on a more multi-pronged approach." Currie, J., Kleven, H., & Zwiers, E. (2020, May). Technology and big data are changing economics: Mining text to track methods. In *AEA Papers and Proceedings* (Vol. 110, pp. 42-48).

Coast and the country, and T6's market also moved with container market trends in the years before the ILWU's unlawful conduct.

## A. Economic trends

Shipping throughput is a byproduct of economic activity. It often moves with the economy, rising with growth and falling in recessions. Nationally, the relationship between the economy and container volumes is strong enough that Mercator International builds its published throughput forecast primarily around real GDP. They note that there exists "a strong and enduring relationship between North American real GDP and demand for container imports," and import volumes drive total container throughput.[5]

Regionally, T6 volumes are also highly correlated with economic trends. A simple regression analysis shows that during the six years before the labor dispute, T6 volumes moved with regional economic indicators like real GDP, real personal income, or the unemployment rate. For instance, during this period, a 10 percent change in regional GDP or income was associated with a 40 percent change in T6 volumes, and a one percentage point change in the unemployment rate was associated with a 9 percent change in T6 volumes.[6] These relationships are sufficiently strong that these simple regressions can explain 60-86 percent of the variation in T6 volumes over this period.[7] Assuming this strong relationship between regional economic trends and T6 volumes persisted during 2012-2017, a strong regional economy should have contributed to T6 market growth.

During 2011-2017, the economy within the catchment area and the broader Pacific Northwest (OR/WA/ID) grew significantly faster than the U.S. economy. For instance, during 2011-2017, real GDP grew by 22 percent in Oregon, Washington, and Idaho but only by 14 percent in the US.[8] Figure 1 presents several different measures of regional growth over this period. The solid lines show growth in the T6 catchment area (i.e., the area over which it is cheaper to transport containers to T6 than to alternative container

---

[5] Mercator (2022) North American Container Port Volume Forecast. WSP (2020) Long-term Container Traffic Forecast, 2020-2060: Vancouver Fraser Port Authority includes a similar discussion.

[6] Specifically, I regress the natural log of T6 container volumes on the natural log of inflation-adjusted personal income, inflation-adjusted GDP, or the unemployment rate in Oregon, Washington, and Idaho with controls for quarter and carrier connectivity using data from 2006Q3-2012Q1.

[7] These values come from the R-squared of these regressions. The R-squared measures how much variation in the outcome (volumes) is explained by the variables included in the regression. One textbook notes that R-squared describes the "in-sample success of the regression equation in predicting y; hence it is widely used as a quick check of goodness of fit, or predictability, of [the outcome] based on the variables included in the regression." Diebold, F.X. (2019), Econometric Data Science: A Predictive Modeling Approach, Department of Economics, University of Pennsylvania, http://www.ssc.upenn.edu/~fdiebold/Textbooks.html.

[8] Analysis of state-level and county-level real GDP data obtained from the Bureau of Economic Analysis. The gap in personal income growth was even larger. Real personal income in the PNW grew by 29 percent between 2011-2017, but it only grew by 17 percent in the US.

terminals).[9] The dashed lines show the PNW totals. While the precise growth rates vary, the big picture is clear. Economic activity was rising in this period in this area. GDP and income grew quickly, as did an alternative measure of real GDP growth that focuses on growth in exporting industries.[10]

**Figure 1: Regional Economic Growth Indicators, 2011-2017**



Notes: Analysis of Bureau of Economic Analysis data. Catchment area includes counties included in T6 catchment area discussed in section III.C.1.

Real GDP was also growing in the regions most linked to catchment area trade, e.g., East Asia and Oceania, Latin America and the Caribbean, and Europe and Central Asia. Figure 2 shows real GDP in these regions as a percent of the 2011 level.

---

[9] Various studies have defined the T6 catchment area. It includes Oregon, most of Idaho, and Southern Washington. I discuss the catchment area in greater detail in section V and in Appendix E. Other discussions of the catchment area are included in: Advisian (2018). Port of Portland Terminal 6 Container Business Strategy; International Trade and Logistics Initiative (2016). Steering Committee Report; BST Associates (2021). Port of Portland Container Service Forecast and Economic Contribution Assessment. The catchment area lines in Figure 1 define the catchment area at the county level and use county-level measures of GDP and personal income obtained from the Bureau of Economic Analysis.

[10] Other measures of local economic activity followed similar trends. E.g., PNW and catchment area real GDP in agriculture and manufacturing, PNW real personal consumption expenditures and PNW real personal consumption expenditures on goods only all grew, and the unemployment rate fell.

**Figure 2: Real GDP as Percent of 2011 by Region, 2011-2017**



Notes: Analysis of regional GDP (US$ 2015) data obtained from World Bank.

Thus, broad regional and global economic conditions suggest a favorable environment for growing volume in T6's market.

## B. Container Volume Trends

Consistent with the growing economy, container volumes grew along the West Coast and across the country during this period. Figure 3 shows container growth for the U.S. West Coast, the West Coast including Canada, the U.S. total, and the North American total. Each index shows significant growth over this period.

**Figure 3: Growth in container volumes relative to 2011**



Notes: Analysis of American Association of Port Authorities (AAPA) data

---

Importantly, this growth was widespread. Nearly every significant port saw volume growth during this period. Excluding Portland, among the other 32 North American mainland ports that averaged at least 100,000 annual TEUs during 2011-2012, 31 saw their volumes increase from 2011 to 2017, and the median port grew by 33 percent.[11]

Volume growth was also consistent over time. Comparing cumulative volume at each port during 2012-2017 to an alternative total that assumes volume remained at the 2011-2012 average, 30 of 32 ports show growth.[12] The median port handled 14 percent more volume during 2012-2017 than had it remained at its 2011-2012 average.[13] Looking only at the U.S. West Coast, excluding Portland, every significant (average volume over 100,000 TEUs in 2011-2012) port also grew by these measures. Thus, it was rare for a port not to maintain its volume at least at its 2011-2012 average during this period.

While each port may serve different local markets, niche markets, or intermodal markets, it is reasonable to assume that T6's market would generally move with broader trends observed elsewhere. Historically, West Coast volume trends provided insight into trends in T6's market. A regression analysis that regresses quarterly T6 container volumes on quarterly West Coast container volumes (with controls for quarter and carrier connectivity) finds that T6 container volumes moved slightly more than one-for-one with West Coast volumes during 2006Q3-2012Q1. This simple regression explains 77 percent of the variation in T6 container volumes.[14] As such, TEU throughput at West Coast ports can help describe what likely would have happened in T6's market but for the ILWU's illegal conduct.[15]

---

[11] Analysis of AAPA data obtained from http://aapa.files.cms-plus.com/CONTAINER%20TRAFFIC%20NORTH%20AMERICA%201980%20-%202018.xlsx. I exclude U.S. island ports from this analysis. These ports are subject to their own market forces and are subject to the Jones Act, which distorts these shipping markets by requiring vessels serving those markets from American ports to be American owned and American crewed. I also exclude Anchorage because its data are not comparable over this period. The port that did not grow between 2011-2017 was Wilmington, NC. This port saw its volume nearly triple between 2004 and 2011. Then, it bounced around its new level. Exceeding the 2011 peak in some years, but falling below in others (e.g., 2016-2017). Appendix A includes a complete table of results for these ports.

[12] Specifically, I sum volume for the years 2012-2017. Then, I subtract six times the 2011-2012 average.

[13] The two ports that did not show cumulative growth over this period were Wilmington, NC and Gulfport, MS. Wilmington's cumulative deficit was only three percent (that is, relative to a baseline assumption that volume would have remained at the 2011-2012 average over 2012-2017, it handled 97 percent of the assumed volume). Gulfport's decline was more significant. It saw a 10 percent decline. Much of the volume handled in Gulfport is bananas from Central American. During 2015 and 2016, one of Gulfport's two major importers (Chiquita) switched its volume to New Orleans before switching back in 2017 (https://www.joc.com/article/chiquita-return-gulfport-new-orleans_20160706.html).

[14] Specifically, I regress the natural log of T6 container volumes on the natural log of West Coast container volumes with controls for quarter and carrier connectivity as measured by the PLSCI using data from 2006Q3-2012Q1.

[15] I examine West Coast ports instead of PNW ports because shifts in intermodal traffic can lead to large changes in sub-regional volumes unrelated to the larger shipping trends relevant to this analysis. While the West Coast aggregate may also be affected by shifts in volume destined for distant areas, any shifts between the included West Coast ports (e.g., shifts from Seattle/Tacoma to LA/Long Beach) will not affect the analysis.

Figure 4 presents data on West Coast throughput obtained from Pacific Maritime Association annual reports.  Total West Coast volumes grew over this period. Including empty containers, total West Coast volume grew by 15 percent between 2011-2017 (a 2.4 percent annual rate). West Coast import volumes grew consistently over this period (by 19 percent over the whole period); however, West Coast exports fell below 2011 levels during 2014-2017.[16]

**Figure 4: West Coast TEU volume as % of 2011, 2011-2017**



Notes: Analysis of data obtained from PMA Annual reports. Imports and Exports equal discharged and loaded shares times revenue TEUs. Total equals all cargo-baring plus all empty TEUs.

Exports comprise a larger share of TEU volume at T6 than the whole coast. As such, the import and export growth disparity could suggest that T6's market would have deviated from the West Coast trend. To illustrate these effects, I compute an alternative measure of West Coast growth that assumes that T6's import and export markets grow with West Coast import/export growth rates.[17] Figure 5 shows the growth in this measure relative to the 12 months before June 2012. This approach suggests a relatively constant market for T6.

---

[16] This decline may reflect the fact that the dollar appreciated significantly relative to other currencies starting in July 2014.

[17] This approach is equivalent to assuming that T6 captures a fixed share of West Coast import and export volumes. To complete this calculation, I assume that T6 would capture the same share of West Coast imports and exports as it had during the 12 months prior to the labor dispute (0.8 and 1.6 percent, respectively). I further assume that empty containers comprise 20 percent of total volume, consistent with the historic average at T6.

---

**Figure 5: West Coast TEU growth weighted by T6 import/export shares**

Note: Analysis of AAPA monthly volumes. 2012 reflects only the post-dispute period divided by 7/12 so that it equals a full year. The reference period (i.e., the period equal to 100%) is the 12-months pre-dispute.

This relatively flat growth is similar to what occurred at Seattle/Tacoma (and other ports near the bottom of the 32 previously noted).

It is important to note that T6's market may deviate from the West Coast (or Seattle/Tacoma). This is because T6 only serves a local market while the major West Coast container terminals serve both local markets and distant markets (i.e., they are gateways for a substantial volume destined for (or coming from) the rest of the country). As such, if growth rates for volume destined for other parts of the country differ from the growth rates in local markets, then T6's market growth may deviate from the West Coast (even assuming that local market growth was the same across the different West Coast markets).

Several facts suggest that West Coast non-local volumes may have slowed during this period. First, the U.S. West Coast ports lost market share to the Canadian West Coast ports, particularly Prince Rupert. In 2011, U.S. ports captured 87 percent of all U.S. and Canadian West Coast volume, but in 2017, the U.S. ports only captured 85 percent. Second, the U.S. West Coast ports lost market share to other U.S. ports. In 2011, the West Coast ports captured 47 percent of U.S. volume, but only 44 percent in 2017.[18] If these declines reflect slower growth in non-local volume (which do not apply in the Portland market), the re-weighted West Coast trend shown in Figure 5 may understate growth in T6's market.

---

[18] These declines may reflect various factors, including loss of confidence in West Coast ports following the coastwide slowdown in 2014/2015 or the expansion of the Panama Canal in 2016.

## C. Combining economic trends using regression analysis

The regional economic and container shipping trends discussed above suggest that T6's market was likely growing (or at least it was not shrinking); however, given differences in the various growth rates, they do not describe how much the market was likely growing. I use a regression analysis to help translate the observed trends into an estimate of market growth (assuming that competitive conditions remained consistent with the pre-slowdown average).

Specifically, I regress T6 volumes on various market indicators during the six years prior to the dispute. Then, I use the relationships (coefficients) from this regression plus the observed real-world values from 2012Q2-2017Q1 for the included market indicators to predict T6 volume during the damages period (under the assumption that these real-world indicators were not significantly affected by the ILWU's unlawful conduct).

This type of analysis is known as predictive regression. Predictive regressions differs from other types of regression analysis. The goal of a predictive regression is not to estimate/establish a causal relationship between an outcome (y) and an explanatory variable (x). The goal of a predictive regression is a prediction. One evaluates a predictive regression not by how well it estimates the relationship between x and y but by how well the regression predicts the outcome of interest.[19]

When constructing predictive models, researchers evaluate potential models in two ways. First, they look at how well their model fits the data. A regression analysis generates a predicted outcome for each included observation. One can compare this predicted outcome to the actual outcome. Generally, researchers want the values predicted by the regression to fall close to the actual values. A variety of measures help describe how well a predictive model fits the data available (e.g., R-squared, mean squared error (MSE), Akaike information criterion (AIC), Schwarz information criterion (SIC or BIC)). These measures are all calculated using the information used to fit the predictive model.

Second, researchers assess whether their model will likely yield valid predictions for the population and setting they want to predict. A model that fits the observed data may not generate a good prediction outside the observed data. I.e., a model that tightly fits the pre-dispute data may not yield a good prediction of outcomes during the damages period. For any predictive regression to reasonably predict outcomes outside the sample used to fit the model, the model must be externally valid. That is, the predictions generated by the model must apply to the population and setting of interest.[20]

Unfortunately, there is no way to definitively prove that the results from within the sample yield accurate predictions outside the sample.[21] We cannot directly evaluate the predicted outcome for T6 against the outcomes in the but-for world because we do not

---

[19] Stock, J. H., & Watson, M. W. (2020). Introduction to econometrics 4th ed., section 9.3.
[20] Stock and Watson (2020), Chapter 9.
[21] Stock and Watson (2020), Chapter 9.

observe the but-for world. Typically, one judges external validity by comparing the population and setting used in the regression to the population and setting one is predicting.[22]

Here, the population is the same. I predict T6's outcomes using data from T6 and the surrounding region. However, the setting may differ. I predict T6's outcomes during the damages period using relationships from before the damages period. If conditions would have changed in the but-for world such that the relationships between the predictors and the outcome changed, then the prediction may deviate from what would have occurred in the absence of the ILWU's unlawful conduct.[23]

Fortunately, it is possible to partially test whether pre-dispute conditions accurately predict outcomes during the damages period. Specifically, I can estimate comparable regressions (using the same variables and the same period) for other ports/port regions and compare the predictions from these models to the actual outcomes during the damages period. For example, suppose the models yield predictions close to the outcomes for these other regions. In that case, it is more likely the analogous model for Portland will reliably predict outcomes in Portland. Specifically, I evaluate how well each model fitted to pre-dispute data can predict outcomes for the combined Seattle-Tacoma-Portland region and the port of Oakland during the 2012-2017 period.

The models presented below do well using both criteria. They closely fit the pre-dispute data and come close to predicting PNW and Oakland volumes during 2012-2017. Appendix C discusses potential alternative specifications.

Specifically, I estimate separate regressions for imports and exports. For the import regressions, I regress the natural log of quarterly loaded import volume on:

- The natural log of quarterly West Coast loaded import volumes[24];
- The quarterly unemployment rate in the Pacific Northwest (Oregon, Washington, and Idaho)[25];
- The natural log of inflation-adjusted quarterly GDP in agriculture and manufacturing in the Pacific Northwest[26];

---

[22] Stock and Watson (2020), section 9.1.

[23] Here, I am assuming constant competitiveness, so any changing conditions need to be unrelated to changes in T6's competitiveness.

[24] The volume data used in these regressions come from AAPA and were provided to me by Todd Gray. However, the Port of Portland did not separate empties from loaded volumes when reporting to AAPA. As such, I replace the AAPA data for Portland with data collected from T6 operations reports. For these analyses, the West Coast totals equal the sum of volumes for LA, Long Beach, Oakland, Portland, and Seattle/Tacoma. These ports comprise 99 percent of West Coast volume.

[25] I compute the PNW unemployment rate by summing the total number of unemployed in each state and dividing by the total labor force using data obtained from the Bureau of Labor Statistics Local Area Unemployment Statistics (LAUS).

[26] Specifically, I sum Bureau of Economic analysis data on real GDP (chained-index $2012) for "agriculture, forestry, fishing, and hunting" and for "manufacturing" for each state and period.

- A measure of port connectivity[27];
- Quarterly indicator variables.

This regression has an R-squared of 0.91, an adjusted R-squared of 0.87, and a root mean squared error of 0.07. These values suggest that the model fits the data during the pre-dispute period well. Additionally, the mean absolute percent error for the comparable regressions for Seattle-Tacoma-Portland combined and for Oakland are 4.6 and 3.2 percent, respectively.[28] This means that, on average, the predicted quarterly volume during 2012Q2-2017Q1 is plus or minus 3-5 percent from the actual value. Importantly, these errors offset over time. The total predicted import volume for Seattle-Tacoma-Portland during 2012Q2 and 2017Q1 exceeds the total actual import volume by only 1.8 percent, and total predicted volume lags the actual the total volume in Oakland by 0.3 percent. As such, these predictions come very close to the actual values.

Figure 6 shows the predicted values from the Portland loaded import regression (blue line) compared to actual T6 import volumes (gray line). The predicted values show import volumes growing steadily back to their pre-Great Recession levels.

**Figure 6: Actual and regression predicted loaded import volumes at T6**



For the loaded export regressions, I regress the natural log of export volume on:

- The natural log of quarterly West Coast export volumes;

---

[27] Specifically, I use the Port Liner Shipping Connectivity Index (PLSCI) produced by MDSTransmodal and obtained from UNCTAD (https://unctadstat.unctad.org/wds/TableViewer/summary.aspx). The PLSCI is affected by the labor dispute. As such, in the post dispute period, I assume it remained fixed at its pre-dispute level in Portland. For the Seattle-Tacoma-Portland regressions, I use the average of Seattle and Tacoma for this variable.

[28] For the Oakland regressions, I replace PNW variables with variables for the "Far West."

- The quarterly unemployment rate in the Pacific Northwest (Oregon, Washington, and Idaho);
- The Bureau of Labor Statistics' BEA end use export price index for all commodities[29];
- A measure of port connectivity[30];
- Quarterly indicator variables.

This regression has an R-squared of 0.82, an adjusted R-squared of 0.74, and a root mean squared error of 0.11. Furthermore, the mean absolute percent error for the comparable regressions for Seattle-Tacoma-Portland combined is 4.1 percent and 4.0 percent for Oakland. Predicted export volumes for Seattle-Tacoma-Portland between 2012Q1 and 2017Q1 lag actual volume by 0.1 percent, and the total predicted export volume lags the actual total volume in Oakland by 3.0 percent. As such, these predictions also yield values very close to (although slightly below) the actual values.

Figure 7 shows the predicted values from the Portland export regression (blue line) compared to actual T6 volumes (gray line). The predicted values show export volumes rising slightly through mid-2014 before declining to slightly below the 2011 average before rising again in late 2016/early 2017.

**Figure 7: Actual and regression predicted loaded export volumes at T6**



Figure 8 shows the cumulative change in projected T6 volume growth based on these regressions assuming that empty containers comprise 20 percent of the total volume. Similar to the import-only figure, this projection shows T6 volumes returning to the 2006Q3-2008Q3 average (although it takes slightly longer than the import prediction). While there are other ways one could project T6 volumes using predictive regression (see Appendix C), the most reasonable models support a similar conclusion – projections

---

[29] Data obtained from https://www.bls.gov/mxp/.
[30] Specifically, I use the Port Liner Shipping Connectivity Index (PLSCI) produced by MDSTransmodal and obtained from UNCTAD (https://unctadstat.unctad.org/wds/TableViewer/summary.aspx).

based on economic indicators and West Coast container volumes show a growing market during the damages period.[31]

**Figure 8: Actual and regression predicted total volumes at T6**



To help put the projection in context, the projected growth rate is slightly below T6's actual growth rates over the 2-3 years prior to the labor dispute. That is, the growth rate predicted by the regression is reasonable, in part, because it does not exceed T6's recent growth rate.

Furthermore, the projected growth rates align with the growth rates at other ports during this period. For instance, had T6 grown in line with this projection, total volume would have increased by 30 percent between 2011 and 2017, slightly below the median mainland North American port discussed in section III.A.2. Similarly, total volumes during 2012-2017 would have exceeded the pre-dispute level (2011Q2-2012Q1) by 13 percent, an amount slightly below the median port's difference between actual volumes and 2011-2012 average volumes during this period. Furthermore, consistent with the projection showing T6 returning to its pre-Great Recession levels, among the 32 North American mainland ports discussed elsewhere, all but one had 2017 volumes that exceeded their 2007 levels.

## D. Summary of market trends

Collectively, the economic data, West Coast and other port TEU volumes, and the regression projection suggest improving market conditions during the damages period. While these trends do not perfectly align with each other, they support conclusions about the likely range of changes in T6's market during this period.

---

[31] As discussed in Appendix B, a predictive regression that directly predicts total T6 volume suggests even faster growth than shown in Figure 8. As such, the total prediction may be conservative.

At the low end, these analyses are consistent with a stable market. None of the data examined suggest T6's market was shrinking significantly during 2012-2017. Assuming that this level reasonably describes T6's market size is effectively equivalent to assuming any of the following:

- T6's market would have remained at the same size as it was during the 12 months prior to the labor dispute;
- That T6's import and export markets move exactly in proportion to West Coast export and import markets (and empty volumes remained at the same proportion of total volume as prior to the dispute);
- That T6 would have grown at a rate comparable to the third or fourth slowest mainland North American ports during 2012-2017 (e.g., at the roughly same rate as Seattle/Tacoma or Lazaro Cardenas).

At the high end, these analyses are consistent a growing market. Specifically, they suggest that T6's market potential would have grown back to pre-Great Recession levels. Assuming that T6's market would have grown at this higher level is equivalent to assuming any of the following:

- T6's market would have returned to the levels that existed prior to the Great Recession;
- Consistent with trends in the local economy and in the West Coast container market, T6's market for imports would have grown at rates that returned imports to pre-Great Recession levels, the market for exports would have stagnated/shrunk, and the market for empties would have grown due to increased imbalance between imports and exports;
- T6's market would have grown at rates slightly below the rates it had during the few years prior to the labor dispute;
- T6 would have grown at rates slightly below the median mainland, North American port.

Given the wide range of plausible assumptions that yield the same range of conclusions, it is likely that T6 volumes would have fallen within this range (in the absence of changes to T6's competitiveness). As such, to argue that T6 volumes would have fallen outside this range in the world without the ILWU's illegal conduct, one likely needs to argue (and provide evidence to support) that T6's competitive position would have changed in the but-for world.

## IV. BASELINE PROJECTION OF T6 BUT FOR MARKET VOLUME BASED ON ECONOMIC TRENDS

The second core question for this analysis is, "But for the ILWU's illegal acts, what share of the market would T6 have captured (i.e., how competitive would it have been)?" This is a difficult question because the ILWU's illegal acts directly affected T6's competitiveness. As such, observed changes in T6's competitiveness during the period after May 2012 include the effects of the ILWU's actions.

Economists regularly confront this type of situation when quantifying damages as part of litigation. They often employ a before-and-after (or before-during) approach in these situations.[32] This approach assumes that performance but for the illegal acts would have resembled performance before the illegal acts—perhaps with adjustments for shocks that would have occurred even in the absence of the illegal acts.

I start with this approach here. I present a range of estimates for T6's but-for volumes based on the market trends discussed in the previous section. These projections describe T6's potential volumes under a constant competitiveness assumption—T6 would have remained as competitive but for the labor dispute as it had been prior to the labor dispute. I discuss potential violations of this assumption—whether (and to what extent) any shocks unrelated to the ILWU's illegal acts would have caused significant changes to T6's market share—in section V.

Consistent with the discussion in section III, I present two different baseline estimates of T6's constant competitiveness market volumes here: one based on West Coast volume growth (suggesting little to no growth in T6 volume) and one based on the regression prediction (suggesting T6 volumes returning to pre-Great Recession levels, with growth rates similar to the regional economy and national container market).

## A. Stable market/Constant share of West Coast loaded import/export volume

My first baseline estimate builds on the trend shown in Figure 5 based on the assumption that T6 volumes would have moved with West Coast loaded export and import volumes. Specifically, I assume that T6 would have captured the same share of West Coast import and export volumes as it had in the 12 months prior to the labor dispute.  Figure 9 presents T6's share of West Coast import and export volumes over time. These shares fell during the Great Recession but were trending upward prior to the ILWU's unlawful conduct. Both shares spiked up during the last full quarter before the labor dispute (2012Q1), reaching shares close to the pre-Great Recession average. For this calculation, I assume that T6 would capture the same share it captured during the 12 months prior to the labor dispute, 1.6 percent of export volume and 0.8 percent of import volume. These levels fall below the share from the seven-year pre-dispute period (1.7 percent and 0.9 percent).

---

[32] Gaughan, P. A. (2009). *Measuring business interruption losses and other commercial damages*. John Wiley & Sons.

**Figure 9: T6 share of West Coast loaded imports and exports**



Notes: T6 loaded import and export volumes recovered from T6 operations reports. West Coast loaded import and export volumes obtained from AAPA data for Seattle/Tacoma, Oakland, Los Angeles, and Long Beach.

Given differential growth rates for West Coast imports and exports during the period of the labor dispute, this approach does not yield a constant total share for T6. T6's projected share drifts down slightly due to weaker export volumes during the damages period. As such, the average over the whole projected period is only slightly higher than the level T6 captured during the Great Recession in 2009-2010.[33]

Table 1 compares T6's projected volumes to its actual volumes under this approach.[34] For these calculations, I assume that empty containers comprise 20 percent of the total volume for these calculations, consistent with T6's historical levels.[35] I also increase the estimated values by one percent to account for rehandled volume. ICTSI is paid for rehandle lifts; however, rehandles measures of loaded and empty volume do not include rehandles.[36]

---

[33] During 2009Q2-2010Q4, T6's share of West Coast volume was fairly constant, and T6 averaged 0.97 percent of West Coast volume. During the projected period (2012Q2-2017Q1), T6 averages 1.01 percent of West Coast volume.

[34] Specifically, I calculate the projections for imports and exports separately, and I assume that empty containers comprise 20 percent of total T6 TEUs, consistent with its pre-dispute average.

[35] While empty volumes may fluctuate over time (at least in part with the imbalance between exports and imports), they averaged 20 percent the seven years prior to the labor dispute.

[36] I describe the empty and rehandle assumptions in greater detail in Appendix D.

**Table 1: Fixed-share of West Coast projection comparison with actual volumes**

|        | Actual  | Projected based on fixed WC share | Difference |
|--------|---------|-----------------------------------|------------|
| 2012   | 184,566 | 213,717                           | 29,151     |
| 2013   | 181,767 | 210,915                           | 29,148     |
| 2014   | 166,378 | 210,048                           | 43,670     |
| 2015   | 22,781  | 200,555                           | 177,774    |
| 2016   | 1,791   | 209,644                           | 207,853    |
| 2017q1 | -       | 51,710                            | 51,710     |
| Total  |         |                                   | 539,306    |

Notes: Actual volumes equal total ICTSI volumes obtained from Sickler report. Projections increase volume to account for assumed empty share (20%) and rehandle share (1%).

The projected level is very close to assuming that T6 volumes would have remained at the levels reached during the 12 months prior to the labor dispute, 208,222. The cumulative projected volume lags a projection assuming volume remained constant at the level of the 12 months prior to the labor dispute by 714 TEUs (or 0.1 percent).

As shown in Appendix C, this approach also yields total projected volume within three percent of assuming that T6 volume would have grown at the same rate as:

- Seattle-Tacoma imports and exports (assuming empty containers comprise 20 percent of the total)
- Seattle-Tacoma total volume

This approach assumes that the T6 market for imports and exports would have grown at the same rate as the West Coast. Given that T6 serves a local market while other West Coast ports serve both local and distant markets, this approach effectively assumes that the T6 local market, the West Coast local markets, and the West Coast distant markets all would have grown at roughly the same rate during this period.[37] As discussed in section III, the West Coast lost market share to other ports that also serve distant markets (despite its relatively strong local economies). This suggests that the growth rate for the combination of West Coast terminals serving distant markets may have lagged the growth rate for local markets and if so, this approach would underestimate T6 market growth.

## B.  Growing market/Predictive regression

My second baseline estimate for T6 volumes relies on the predictive regression discussed in section III.A. I describe the details of that analysis in that section. Figure 8 showed the volume projected in the but-for world under this approach. Table 2 compares actual volumes to the amounts from these projections.

---

[37] Alternatively, it entails assuming that any differences between WC local and WC distant growth rates would offset in such a way that they equal the growth rate in the Portland market.

**Table 2: Regression prediction comparison with actual volumes**

|        | Actual  | Predicted by regression | Difference |
|--------|---------|-------------------------|------------|
| 2012   | 184,566 | 215,705                 | 31,139     |
| 2013   | 181,767 | 225,197                 | 43,430     |
| 2014   | 166,378 | 232,968                 | 66,590     |
| 2015   | 22,781  | 226,155                 | 203,374    |
| 2016   | 1,791   | 232,853                 | 231,062    |
| 2017q1 | -       | 62,697                  | 62,697     |
| Total  |         |                         | 638,293    |

Notes: Actual volumes equal total ICTSI volumes obtained from Sickler report. Projections increase volume to account for assumed empty share (20%) and rehandle share (1%).

This projected level is very close to assuming that T6 volumes would have grown in line with national and regional markets. As shown in Appendix C, this approach yields total projected volume within one percent of assuming that T6 volume would have grown at the same rate as:

- The median mainland North American port with 2011-2012 average volume in excess of 100,000 TEUs;
- North American total volume;
- U.S. total volume.[38]

## C. Summary

Figure 10 shows both projections as a share of West Coast volume.[39] The different assumptions about the growth in T6's market that underlie these different projections yield slightly different results. However, these approaches suggest that T6 would have captured between roughly one percent of West Coast volume (slightly above the lowest values observed over the period examined) and 1.2 percent of West Coast volume (an amount lower than the levels observed prior to the Great Recession). Thus, the projections based only on potential market growth (and assuming constant T6 competitiveness) all fall well within the recent historical experience at T6.

---

[38] These estimates are also close to an estimate based on assuming T6 would have captured its pre-dispute share of a direct measure of catchment area volume described in Appendix E.

[39] To maintain consistency with the West Coast volume data, the T6 projected totals do not include the adjustment for rehandles.

**Figure 10: Baseline projections as share of West Coast volumes**



Notes:T6 volumes from projections (excluding rehandle adjustment) divided by West Coast total volumes obtained from AAPA data for Seattle/Tacoma, Oakland, Los Angeles, and Long Beach.

I note that a margin of error exists around each of these calculations. For instance, several data sources report volumes by port (e.g., PMA, AAPA). While these datasets are highly correlated, they are not perfectly correlated. Using a different data source in these various calculations would yield slightly different results. However, the differences between these port measures are small (cumulative differences are approximately one percent), so the differences in projected T6 volumes are also small. Similarly, the slightly different approaches discussed in Appendices B and C suggest minor differences from slightly different (although still reasonable) assumptions.

I also note that these calculations are likely conservative. The fixed share calculation shows T6 losing market share relative to the West Coast. It also suggests that T6 would have lost share relative to the U.S. at rates exceeded only by Gulfport and Wilmington, NC (and, depending on precisely how the change is calculated, Seattle/Tacoma). The regression calculation (based on separate import and export calculations) also lags the comparable projection that uses total volume as the outcome in part due to the use of a more conservative assumption about empty volume (given that a growing imbalance between imports and exports may have generated more empties). It also uses West Coast volumes as an input. If shifts in competitiveness for non-local volume at the other West Coast ports depressed West Coast volumes, this could also lead to a more conservative regression projection.

## V. T6 COMPETITIVENESS/MARKET SHARE BUT FOR THE ILLEGAL ACTS

Given the information about market growth described above, it is unlikely that larger forces within the economy or the market for container shipping would have caused T6 volume to decline during the damages period. The baseline projections in section IV assume that all differences between projected and actual volume are due to the ILWU's illegal acts. Productivity is a key determinant of port competitiveness, and the ILWU's unlawful conduct substantially reduced productivity. As such, the jury in the prior trial found the ILWU's unlawful labor practices were a "substantial factor in causing damages to ICTSI" (i.e., the ILWU's illegal acts reduced volume at T6).[40]

However, I understand that the ILWU contends that shocks unrelated to the ILWU's illegal conduct could have changed T6's competitiveness and market share in the but-for world. If other shocks would have changed ICTSI's competitiveness, the but-for volumes may not fall within the range described in section IV.

The literature on port competitiveness argues that many factors shape terminal competitiveness.[41] The terminal may shape some factors (e.g., marketing, efficiency), but many are outside the terminal's control.[42] Other parts of the larger transport chain (e.g., carriers, shippers, port authorities), competing transport chains, and other market forces all shape the competitive environment.[43]

Below, I examine various forces that someone might imagine could have adversely affected T6's competitive position even without the ILWU's illegal acts. Specifically, I consider the question, "without the ILWU's illegal actions, would any essential determinant of T6's competitiveness have changed in a way that could not/would not be counteracted by the actions of those with a vested interest in maintaining the T6 shipping chain's competitive position (e.g., the carriers, the terminal, the port, the shippers)?"

The second part of this question is important. Port competition is dynamic. Those interested in maintaining the competitive position of a shipping chain might act to offset a shock that one might expect to reduce market share if everything else remained constant. This process played out in response to the adverse shock created by the ILWU's illegal actions. Various agents (e.g., the Port of Portland, the governor) vested in preserving T6 tried to offset or resolve the problem.

---

[40] Case No. 3:12-cv-1058-SI Special Verdict.

[41] See for instance Martínez Moya, J., & Feo Valero, M. (2017). Port choice in container market: a literature review. *Transport Reviews*, *37*(3), 300-321; Steven, A. B., & Corsi, T. M. (2012). Choosing a port: An analysis of containerized imports into the US. *Transportation Research Part E: Logistics and Transportation Review*, *48*(4), 881-895; Parola, F., Risitano, M., Ferretti, M., & Panetti, E. (2017). The drivers of port competitiveness: a critical review. *Transport Reviews*, *37*(1), 116-138.

[42] Martínez Moya, J., & Feo Valero, M. (2017). Port choice in container market: a literature review. *Transport Reviews*, *37*(3), 300-321

[43] Talley, W. K., & Ng, M. (2013). Maritime transport chain choice by carriers, ports and shippers. *International Journal of Production Economics*, *142*(2), 311-316.

With a few exceptions (e.g., the recruitment of additional carriers and the Hanjin bankruptcy), the evidence I reviewed does not suggest that T6 likely would have lost significant market share (beyond what is already implicit in the baseline calculations).

## A. Basic framework for understanding T6's competitive position

T6's competitive position is complicated.[44] T6 directly provides services to carriers, who then provide services to shippers. As such, the forces that shape shipper and carrier choices shape T6's competitive position. To understand whether T6's competitive position would have changed in the but-for world, it is useful to consider the basic economic principles that govern shipper and carrier choices. For T6's competitive position to change, the forces that shape carrier and shipper choices need to change, and the net effect of these changes needs to lead T6 to capture less of the market.[45]

### 1. Shipper choices

Demand for T6 is derived from shipper choices. If a catchment area shipper can reach their desired destination by their desired date via T6 at a cost below the next best alternative, then shipper demand for T6 will exist.

The extent of this demand is a function of the shippers' next best option. Specifically, a catchment area shipper would ship via a non-T6 port if either of two conditions are met[46]:

(1) T6 does not provide service that meets their needs (e.g., the carriers that serve T6 do not provide service to/from the places the shipper wants to reach, or the carriers provide service to the desired location but the timing of their call at T6 does not align with shipper needs).
(2) The quality-adjusted total cost of reaching the destination is higher using a route that includes T6.[47]

Thus, to argue that shipper choices would have prompted a change to T6's competitive position in the but-for world relative to the pre-dispute period, one needs to argue that that the match between service offering and shipper needs would have changed or that relative quality or price of routes that include T6 would have changed. Furthermore, to argue that shipper choices would have led to a decline in T6's competitive position, one

---

[44] The expert reports of Nolan Gimpel and Dr. Christopher Knittel provide additional discussion of the forces shaping T6's competitiveness.

[45] Dr. Knittel's expert report provides a more formal discussion of these forces.

[46] A catchment area shipper is one who wants to reach a destination within the catchment area or a shipper who wants to ship out of the catchment area.

[47] The price and quality at issue include the prices/quality of all elements of the route: carriers, other terminals, truckers, etc. There is a third possibility that I do not include in this discussion—bundling. Some shippers may enter into large contracts with carriers that cover volume from multiple ports. As such, it is possible that a catchment area shipper would ship through Seattle/Tacoma because the agreement they reached with a Seattle/Tacoma carrier generated sufficient savings elsewhere to offset the cost of trucking to Seattle/Tacoma.

needs to argue that the net effect of all changes in the but-for world would lead a significant portion of catchment area shippers to prefer routes that do not include T6.[48]

Of course, the potential changes shippers face, in part, depend on the choices of the various elements of the different transportation chains (e.g., carriers, terminals, truckers). E.g., if shippers' desire to reach destinations not served via T6 grew, would carriers adapt supply to meet this demand? If the cost of terminal services at T6 rise, does the relative cost of shipping via T6 change, or does some other element of the chain absorb or offset the increase? Does a competing chain raise its prices and preserve the status quo? Thus, to understand potential changes to shippers' choices, one also needs to understand the choices of the various parties who collectively move each container from origin to destination.

## 2. Carrier choices

The carriers also shape T6's competitive position.[49] Are they willing to call at T6? How many slots are they willing to supply? At what price? At what quality? On what strings?

The carriers' supply decision depends on the expected profitability of calling at T6. Carriers face two main choices. First, they must decide whether to call at T6. Then, they must decide how many vessel slots (including containers) they are willing to allocate to T6 (e.g., how many containers the terminal will be able to load/unload within the time allotted, what's the opportunity cost of allocating slots/containers to T6 relative to other ports).[50] Expected profitability typically governs both of these choices. Does the marginal revenue of adding or extending a call in Portland exceed the marginal cost? If a carrier expects supplying slots at T6 to yield profits, they will likely provide service.[51]

Calling at T6 could boost a carrier's marginal revenue via two channels: higher volumes and higher prices. The increase in volume comes from two sources:

(1) Increased share of catchment area volume: If a carrier can call at T6 and charge a price below the cost of service via Seattle-Tacoma (including the trucking costs), then they should expect to capture a large share of catchment area volume seeking to travel to/from the places served by the call. As such, adding this call boosts the share of catchment area volume captured by the carrier calling at T6. While the T6 carrier may have captured a portion of this volume without the T6 call,

---

[48] That is, if multiple factors changed, it is possible that the changes would offset and leave T6's competitive position unchanged.

[49] For this discussion, I focus only on carrier choices. Technically, other parts of the routes (e.g., other terminals, truckers) may also affect T6's competitiveness; however, carrier choices are the key determinant of the supply of routes that include T6 and those that compete with these routes.

[50] The Declaration of Lawrence Burns illustrates this process.

[51] The relevant expected profitability may cover long time horizons. A carrier that loses money on a call at some point in time will evaluate whether they expect long-run profits from maintaining the call to generate a positive return.

capturing more catchment area volume likely increases the total volume handled by the carrier.

(2) New catchment area volumes: Given the cost of transporting a container to/from Seattle-Tacoma, some catchment area shippers may not ship via vessel without a T6 call.[52] By adding a call at T6, the carrier likely increases total catchment area volume and captures all of this increase (unless a competing carrier also enters the market and competes for this additional volume).

In addition to boosting volume, a T6 call likely allowed the carriers to charge a higher price than they can charge elsewhere. To understand why consider this illustrative scenario. Assume that the carrier charges $1,000 for service via Seattle and that, to use this service, shippers must also pay $700 to truck their container to Seattle. As such, the total cost of shipping via Seattle is $1,700.[53] Assuming that it costs a shipper only $200 to move their container to T6, a carrier calling at T6 could charge a much higher price for service T6 (e.g., $1,499), and shippers would still prefer the T6 route (all else equal).[54]

Thus, if a T6 call boosts catchment area volumes, increases the share of catchment volume captured by the carrier, or boosts the prices carriers can charge, it could generate significant marginal revenue. Whether this marginal revenue is sufficient to justify calling at T6 depends on the marginal cost of the call.

Since the carrier has two supply decisions – call at T6 and how many slots to allocate to the call, there are two marginal costs. The marginal costs of adding the call are the additional time and financial costs the carrier incurs by adding a stop on the vessel string, plus the terminal charges at T6. The marginal costs of allocating more slots to T6 include any increase in total costs from extending the time at T6 (e.g., higher terminal costs, additional fuel) plus the opportunity cost of increasing vessel slots at T6.

As long as marginal revenues exceed marginal costs, carriers should continue to call at T6 and increase the slots allocated to T6. As such, to argue that carrier supply choices would have changed T6's competitive position, one must argue that but-for marginal revenues fell or but-for marginal cost rose by an amount sufficient to change the carriers' willingness to supply slots at a price that shippers are willing to pay.

## B. The link between productivity and volumes

Before considering whether something other than the labor dispute depressed T6's volumes, it is useful to understand why it is likely that the decline in volumes at T6 stems

---

[52] I discuss some evidence for these effects in Appendix E.

[53] In this illustration, I am assuming away other components of the shipper's cost (e.g., time, quality, and costs on the other end of the journey). I also note that these values are purely illustrative.

[54] Given that the total cost of trucking to Seattle includes more than the financial cost (e.g., congestion costs, weather delay costs), it is possible that a T6 carrier could charge even more than the financial cost of trucking and still leave shippers better off shipping via T6.

from the decline in productivity, why the ILWU's unlawful conduct affected both carrier and shipper choices.

### 1. T6 productivity

The ILWU's illegal actions depressed productivity at T6 by roughly 20 percent (or 4-5 moves per hour) on Hanjin and Hapag Lloyd vessels.[55] Figure 11 shows gross productivity over time on Hanjin vessels.[56] Over the roughly seven-and-a-half years before the labor dispute, gross productivity was pretty constant at just over 26 moves per hour. The 12-month moving average moves up and down slightly; however, the minimum and maximum 12-month values are within three percent of the overall average. After the start of the labor dispute, productivity falls. When Hanjin resumed service in Aug. 2012, productivity was only 80 percent of the pre-dispute average. Productivity improved slightly over the next year, reaching 90 percent of the pre-dispute average, before collapsing in 2014.

**Figure 11: Monthly average gross moves per hour on Hanjin vessels.**



Notes: Analysis of productivity data from T6 operations reports

This decline in productivity reduced volume at T6.  Several types of evidence support this conclusion.

---

[55] I provide a much more detailed discussion of changes in my reports from the earlier trials.
[56] I provide an alternative visualization in Appendix F.

### a. The literature on container terminals indicates that productivity is a key determinant of volume.

The container terminal literature argues that volume depends on productivity.[57] Moves per hour is an important – perhaps the most important – variable that shipping lines use to evaluate port terminal performance.[58] Terminal operators who cannot achieve reliable productivity above a certain level will struggle to compete and should expect to lose business.

The link between productivity and volume is straightforward. Shipping lines run ships on set routes and schedules. Each vessel has a window during which it must off- and on-load the containers scheduled for that port. The number of containers carriers plan within each window depends on productivity.[59] If production is lower than expected, carriers must remain in port longer or leave containers behind ("cut and run").

Both of these outcomes are bad for carriers. For example, spending more time in a port means that vessels burn more fuel to make up for lost time or miss berth windows at other ports. Leaving containers behind means carriers have less capacity on future vessels or the quality of service they provide suffers. Thus, low productivity may lower carriers' service quality, increase carrier costs, and lower profitability.

In response to persistently lower productivity, carriers have three choices: reduce the amount of cargo scheduled at the low productivity port, extend the length of the call (and increase fuel costs, reduce call duration at other ports, or increase the total time in takes to complete the string), or stop calling at the unreliable/unproductive port. Importantly, each of these choices reduce the capacity or efficiency of the string.

Similarly, shippers also care about productivity. The cost of shipping a container from point A to point B includes more than the dollar price the shipper pays the carrier. It also includes a time price. The longer it takes for a shipper to get their container to its desired destination, the higher the time price. Time prices are substantial. One estimate finds that each day in transit is worth 0.6 to 2.1 percent of the value of the shipment.[60] Given a median value per TEU of roughly $22,000 in the pre-dispute period, this suggests daily

---

[57] E.g., Tongzon, Jose L. "Determinants of port performance and efficiency." *Transportation Research Part A: Policy and Practice* 29.3 (1995): 245-252; Tongzon, J. L. (2009). Port choice and freight forwarders. *Transportation Research Part E: Logistics and Transportation Review*, *45*(1), 186-195; Beškovnik, B. (2008). Measuring and increasing the productivity model on maritime container terminals. Pomorstvo—Journal of Maritime Studies, 22(2), 171-183;

[58] Beškovnik, B. (2008).

[59] Stated mathematically: carriers want to select volume such that: *Scheduled Volume <= (#Gangs * Expected production) * # hours at port*

[60] Hummels, D. L., & Schaur, G. (2013). Time as a trade barrier. *American Economic Review*, *103*(7), 2935-2959. These estimates focus on the value shippers place on quicker delivery. They may not fully incorporate direct costs of delay (e.g., terminal operator charges for leaving a container in the yard).

time costs of between \$132-\$462 per TEU.[61] Shippers want to minimize the total cost of the shipment, and, as such, they may be willing to pay higher dollar prices to avoid time costs.

Ultimately, a slowdown creates problems for both carriers and shippers. It increases direct costs to carriers and time costs to both carriers and shippers. Importantly, the time costs created by the ILWU's unlawful conduct at T6 affect shippers all along the routes. If a vessel cannot make up for the time lost at T6, misses its berthing window elsewhere, etc., shippers in Seattle, Tacoma, Vancouver, etc. may experience delays and incur substantial time costs. If they incur these time costs, they will likely be unhappy with the carrier and may seek a different provider. As such, productivity is essential to the operation of the whole system.

*b. Prior testimony shows that lower productivity at T6 led carriers and shippers to reduce volume and ultimately leave.*

Prior testimony confirms that the carriers at T6 viewed productivity consistent with the literature. For instance, Steven Gallaway of Hapag Lloyd noted that, "productivity is very important because we have to know -- schedules are very tight, we run a liner service, and so if you've got an eight-hour window, we would have to know we could get our ship in and out in that eight-hour window."[62]

When productivity fell at T6, it created the problems described above. For instance, Hanjin sent a letter to Mr. Ganda complaining about Hanjin's losses due to "extra bunker cost, vessel waiting charge[s]" and "actual and possible" losses incurred due to customer dissatisfaction caused by "low productivity."[63] In addition, Michael Radak of Hanjin agreed that "it was fair to say that … Hanjin was experiencing increased costs due to shift delays, low productivity, missed berthing windows at Vancouver, and speeding up the scheduled transit to stay on schedule."[64]

Both Mr. Radak and Mr. Gallaway confirmed that low productivity led to reduced volume at T6. For instance, Mr. Radak noted that "poor productivity" was the primary reason Hanjin suspended service at T6 at various points.[65] He also agreed that "hard timing" by the ILWU caused Hanjin to send discretionary container traffic to ports other than Terminal 6 during June 2012 through March 2015.[66] Mr. Gallaway agreed that "increasing costs, decreasing schedule reliability, and poor labor productivity" contributed to Hapag Lloyd's decision to leave Portland.[67]

---

[61] Calculation of median value per TEU for T6 volume using PIERS data. To minimize the influence of potential reporting errors (e.g., a value equal to 0), I exclude values equal to zero and the top one percent of values per TEU.

[62] Deposition of Steven Gallaway, p. 37.

[63] Letter from Hanjin to Elvis Ganda referenced in the deposition of William Wyatt (May 16, 2018), p. 81-82.

[64] Deposition of Michael Radak, pp. 80-81.

[65] Deposition of Michael Radak, pp. 75-77

[66] Ibid.

[67] Deposition of Michael Gallaway, pp.105-106.

Staff at the Port of Portland echoed Mr. Radak and Mr. Gallaway's claims. For example, former executive director William Wyatt reported that the carriers left T6 due to low productivity.[68] Sam Ruda, former Chief Commercial Officer at the Port of Portland, believed that the carriers would not have left T6 without the ILWU's unlawful conduct.[69]

Mr. Nolan Gimpel, in his expert opinion in the prior case, also concluded that volume at T6 would have been higher in the absence of the illegal acts. Specifically, he noted"

> "Low T6 volume was primarily caused by the ongoing labor and productivity problems in the Port. Many shippers decided to use other gateways in spite of the added cost of transportation.
>
> Had the labor issues not occurred or had they been resolved, it is likely that a large percentage of that cargo would have returned to Portland."[70]

Mr. Gimpel also concludes that, in the absence of the illegal acts, carriers would have continued to call at T6 and volume would have exceeded observed volumes. In his expert report for this trial, Mr. Gimpel reiterates and expands upon these points (including additional discussion of the significant costs low productivity imposes on carriers and shippers).[71] Specifically, he notes that "maintaining schedule reliability was paramount" to carriers' port selection decisions.[72]

Furthermore, in my interview with former Westwood CEO Guy Stephenson, he emphasized that productivity is paramount to carriers, that slow productivity creates significant problems for carriers, and that productivity makes carriers money.[73]

Ultimately, after reviewing this and other evidence, the jury in the prior trial found the ILWU's unlawful labor practices were a "substantial factor in causing damages to ICTSI" (i.e., the ILWU's illegal acts reduced volume at T6).[74]

### c. Data are consistent with the hypotheses implicit in the literature and carrier statements. Volume moves with productivity.

The testimony discussed in the prior section indicates that lower productivity at T6 led to lower volume at T6. These claims made are also corroborated by data.

First, several data points confirm that the problems created by low productivity occurred at T6. For instance, Figure 12 shows Hanjin vessels' average time in port increased from

---

[68] Deposition of William Wyatt, pp. 88-90.
[69] Deposition of Nathanial Sam Ruda, p. 83.
[70] Expert Report of Nolan R. Gimpel dated October, 22, 2018.
[71] Expert Report of Nolan R. Gimpel dated February 8, 2023.
[72] Gimpel 2023 report, section III.B.
[73] Interview of Guy Stephenson.
[74] Case No. 3:12-cv-1058-SI Special Verdict.

36 hours during 2010/2011 to 66 hours during Feb. 2014-Jan. 2015 (an increase of more than a full day). While Hanjin vessels spent more time at the port, the number of containers per vessel fell.[75]

**Figure 12: Port of Portland discussion of Hanjin time in port.**



Furthermore, Hanjin's odds of cutting and running increased even as time at port increased. Pre-dispute, 34 percent of Hanjin vessels left containers behind, and seven percent took on extra containers. From June 2012-Dec. 2013, 52 percent of Hanjin vessels left containers behind, and zero vessels took on extra containers.[76]

Second, there are two things I would expect to see in the data if carriers were reducing volume in response to lower productivity. First, I would expect volume to fall roughly in proportion to production. If carriers are trying to maintain a schedule and expect a terminal to complete fewer moves per hour, they should reduce the number of containers scheduled in the low productivity location. This will increase the vessel's chances of completing its planned moves during the berth window. Second, I would expect to see volume moving with recent production. If carriers notice lower (higher) production at recent calls, they may decrease (increase) the volume scheduled at future calls so that scheduled volume aligns with expected productivity. Each of these patterns shows up in the data.

---

[75] Hanjin's average moves per vessel call fell from 1758 in 2011 to 1521 in 2014.
[76] Analysis of data compiled from pre-stow plan and ops reports provided by ICTSI for vessel calling during 2011-2013.

T6 volume fell roughly in proportion to production. Figure 13 shows volume and productivity (gross moves per hour) as a percentage of the pre-dispute level over six-month intervals. The declines are close to each other.

**Figure 13: Average Volume and Gross Moves Per Hour as % of Average During 12 Months Pre-Dispute for Hanjin Vessels**



Source: Analysis of T6 operations reports.

While this figure shows these trends over long periods, a statistical analysis finds that volume—particularly Hanjin export volume—also moves with recent productivity during the damages period. When productivity on the last four Hanjin vessels serviced at T6 trended up, volume increased. When productivity on the last four Hanjin vessels fell, volume fell. A simple regression of the natural log of loaded export TEUs on the average net productivity on the last four vessels service, the natural log of West Coast export TEUs, and quarter indicators shows that when average recent productivity falls by 10 percent loaded export TEUs fall by 15 percent.[77] This relationship was not observed prior to the dispute. This pattern is consistent with Hanjin monitoring productivity, updating their expectations of T6 productivity, and adjusting the slots/containers allocated to T6 in response.

### C. Potential shocks to T6's competitive position in the but-for world

The discussion above establishes a link between the ILWU's unlawful conduct and reduced volumes at T6. In this section, I consider several factors that arguably could have

---

[77] These effects are statistically significant, p<0.05. I limit the period to Sept. 2012-Feb. 2015 to eliminate the influence of the initial slowdown. A similar regression for loaded imports also shows volume moving with lagged productivity, although the relationship is roughly half the size. I find similar results if I restrict the sample to June 2013-Feb 2015 to limit confounding impacts from price change with impacts from productivity impacts.

increased or decreased the share of the market T6 would have captured in the absence of the ILWU's illegal actions.

### 1. ICTSI marketing and terminal productivity

ICTSI and the Port expected to grow T6's market share through improved marketing and productivity.[78] Specifically, ICTSI expected to convince existing customers to move more cargo through T6, to convince existing customers to expand services in Portland, and to attract new carriers.[79] In part, it hoped to do this by increasing productivity at T6.[80]

Some evidence suggests that these expectations were realistic. Private terminal operators are often successful at boosting efficiency and competitiveness. Studies in the port terminal literature "point to the role of privatization as improving port efficiency and competitiveness."[81] In his prior roles, Mr. Ganda had succeeded in increasing port terminal efficiency, and just prior to the labor dispute, T6 productivity reached a new record, over 45 gross moves per hour.[82] ICTSI hoped to leverage higher productivity into greater market share by working with its existing carriers to increase throughput at T6 and by attracting new carriers.[83]

Also consistent with these expectations, prior to the ILWU's illegal acts, Hanjin was working to increase its Portland volumes because T6 was its most profitable West Coast terminal.[84] As shown in Figure 14, these efforts generated results. Hanjin saw a significant increase in volume at T6 in early 2012.  During the first five months of 2012, Hanjin's T6 loaded volumes were 19 percent higher than during the first five months of 2011. This growth was driven by a 54 percent increase in export volumes. Hanjin did not experience similar increases at Seattle-Tacoma during this period.[85]  After the start of the labor dispute, Hanjin's T6 volumes quickly fell to levels below 2011. As such, barring some shock to T6's relative profitability, but for the ILWU's unlawful conduct, Hanjin likely would have continued its marketing efforts, and T6 would have enjoyed greater volumes.

---

[78] Interview of Elvis Ganda, Ganda trial testimony; Mongelluzzo, B. (2012) "PNW Ports Building on reliability." Journal of Commerce (May 18, 2012).

[79] Ganda trial testimony, p. 233.

[80] Ganda trial testimony, p. 233.

[81] Blonigen, B. A., & Wilson, W. W. (2018). Trade costs, trade, and port efficiency. In *Handbook of International Trade and Transportation*. Edward Elgar Publishing.

[82] Interview with Elvis Ganda. Ganda trial testimony pp. 220-21.

[83] Ganda trial testimony, p.233.

[84] Hanjin USPDX Promotion.

[85] Analysis of PIERS data.

**Figure 14: Hanjin quarterly loaded T6 volume**



Notes: Analysis of PIERS data. I exclude June from the 2012q2 data. To make data comparable, I scale two months of data into three.

Even with the ILWU's illegal conduct, ICTSI management had sufficient skill and market knowledge to recruit a new potential carrier. In 2014, ICTSI determined that APL was moving approximately 1,000 empty containers a week through Seattle-Tacoma that could be handled more economically by APL in Portland. APL agreed to a trial call in December 2014, which should have saved APL hundreds of thousands of dollars. During that call, however, productivity was very low. APL abandoned the call after five days and did not return.[86]

Had ICTSI managed to secure this business, its volume could have increased by over 50,000 TEUs per year. This would have represented a more than 20 percent increase in projected volume and an additional 0.2 percent of West Coast volume. Furthermore, APL could have provided a different service to Asia (service to different ports on a different timeline).[87] As such, T6's market share could have grown even more had APL started moving some non-empty catchment area containers via T6.

Thus, without the ILWU's illegal acts, T6 could have increased its market share. If it succeeded, the fixed competitiveness assumptions in the baseline calculations would understate the impact of the ILWU's illegal acts on T6's volume. In light of this evidence, I also present a scenario in section VI below that assumes that T6 captured APL's empty volume.

---

[86] Ganda trial testimony, pp. 226-228.

[87] Based on an analysis of PIERS data, in addition to the countries served by Hanjin during this period, APL handled significant volume to/from Japan, Singapore, Taiwan, Thailand, and Vietnam to the PNW. Mr. Gimpel's 2023 report also discusses the wider range of locations served by APL.

## 2. Hanjin Bankruptcy

Hanjin filed for bankruptcy protection on August 31, 2016, which in the but-for world where Hanjin was still calling at T6, would have disrupted T6's volume and market share.

The key question for this analysis is how long would one or more carriers take to replace Hanjin's T6 volume? At historical productivity, the carriers calling on T6 indicated that calling at T6 was profitable.[88] As noted earlier, Hanjin documents show that Portland was its most profitable West Coast terminal in 2011.[89]

Additionally, Portland's key competitive advantage (the cost of moving volume to Seattle-Tacoma) remained intact, and volume in its catchment area was likely growing (see section III). As such, industry experts believe that T6 would have offered an attractive opportunity to carriers.[90] The remaining carriers had the capacity to meet demand and an incentive to enter this market.[91] This suggests that a carrier would likely have seized on the vacancy created by the Hanjin bankruptcy and began calling at T6 in very short order (if they had not already established service at T6 prior to this).[92]

Ultimately, consistent with industry experts' assessment that the Portland market was sufficiently attractive to entice a carrier, carriers did return to T6 after the resolution of the original trial in this matter, even though many prior catchment area shippers (like Kroger) adjusted their shipping chains after the carriers left.

Figure 15 shows this empirically. Specifically, this figure shows the Port Liner Shipping Connectivity Index over time.[93] This measure combines information on:

- The number of scheduled ship calls per week in the port.
- Deployed annual capacity in Twenty-Foot-equivalent Units (TEU): total deployed capacity offered at the port.
- The number or regular liner shipping services from and to the port.
- The number of liner shipping companies that provide services from and to the port.
- The average size in TEU (Twenty-Foot-equivalent Units) of the ships deployed by the scheduled service with the largest average vessel size.
- The number of other ports that are connected to the port through direct liner shipping services. A direct service is defined as a regular service between two

---

[88] Depositions of Gallaway and Radak.
[89] Hanjin US PDX Promotion
[90] Expert reports of Nolan R. Gimpel and Steve Rothberg dated February 8, 2023
[91] Expert Report of Nolan R. Gimpel dated October, 22, 2018; Expert reports of Nolan R. Gimpel and Steve Rothberg dated February 8, 2023
[92] Expert reports of Nolan R. Gimpel and Steve Rothberg dated February 8, 2023
[93] Port Liner Shipping Connectivity Index (PLSCI) produced by MDSTransmodal and obtained from UNCTAD (https://unctadstat.unctad.org/wds/TableViewer/summary.aspx).

ports; it may include other stops in between, but the transport of a container does not require transshipment.

After the resolution of the initial trial in this matter, connectivity relatively quickly recovered to levels that exceeded the pre-dispute level.

**Figure 15 – Portland's PLSCI, 2006-2022**



Note: PLSCI data obtained from UNCTADSTAT

However, given the interruption to Hanjin's service, based on industry-expert opinion, I present two scenarios in section VI that describe the impact of Hanjin's bankruptcy on T6 volume. In the most conservative scenario, I assume that T6 loses all of Hanjin's volume, and no other carrier replaces it during the damages period. In the second scenario, I assume that T6 loses Hanjin's volume for 1.5 months, replaces 70 percent of Hanjin's volumes over the next 1.5 months, and 90 percent of Hanjin's volume after that.[94]

### 3. Miscellaneous other shocks

Except for terminal charges (discussed in the next section), the data do not suggest that any other key determinant of T6's competitive position would have substantially changed in the but-for world.

### a. Catchment area

The core determinant of T6's competitive position is the cost of transporting containers to competitor ports. It is expensive to move containers longer distances. Figure 16 shows the average difference in trucking cost to Seattle/Tacoma relative to trucking to T6 in 2012 from one measure of trucking costs.[95] It is more expensive to truck to Seattle/Tacoma in green areas. It is more expensive to truck to Portland in the purple and gold areas. Yellow areas are at the margin, where it is only slightly more/less expensive to truck to Seattle/Tacoma instead of Portland.

---

[94] Expert reports of Nolan R. Gimpel and Steve Rothberg dated February 8, 2023
[95] ICTSI attorneys retained Dan Gatchet to assemble these data and provide them to me. They are described in the Declaration of Dan Gatchet dated February 2, 2023.

**Figure 16: Average difference in cost of trucking to Seattle/Tacoma relative to Portland**

Notes: Average trucking rate to Seattle/Tacoma minus average cost of trucking to Portland for all locations with data by zip code. Place level trucking cost data are averaged by zip code, weighting by population.

Table 3 illustrates these costs by three-digit zip code in 2012. For example, in 2012, it cost $211 to move a truck to T6 from within Portland (zip 972), but it cost an additional $477 to haul a container to Tacoma and an extra $558 to haul it to Seattle. From zip code 974 (southern Willamette Valley and South Coast), the average cost to T6 was $808, with an additional cost to Tacoma of $556 and Seattle of $691.

**Table 3: Trucking costs to T6 with cost differential to Seattle and Tacoma by three-digit zip code**

| 3-digit zip code | Trucking Cost to T6 | Additional Cost to Seattle | Additional Cost to Tacoma |
|---|---|---|---|
| 970 | $263 | $568 | $477 |
| 971 | $284 | $585 | $493 |
| 972 | $211 | $558 | $477 |
| 973 | $390 | $648 | $557 |
| 974 | $691 | $694 | $593 |
| 975 | $1,177 | $682 | $589 |
| 976 | $1,259 | $678 | $586 |
| 977 | $732 | $654 | $562 |
| 978 | $980 | $296 | $326 |
| 979 | $1,619 | $301 | $363 |
| 986 | $249 | $455 | $354 |
| 832 | $2,950 | $314 | $343 |
| 833 | $2,472 | $295 | $328 |
| 834 | $3,169 | $184 | $274 |
| 836 | $1,849 | $295 | $327 |
| 837 | $1,911 | $293 | $335 |

Notes: Analysis of trucking rates from 2012 provided by Dan Gatchet. Data are reported below the three-digit zip code. I weight sub-unit costs by population to generate the reported averages. It would be preferable to weight by the volume of containers moving to/from each destination, however, given the absence of such data I use population to reduce the chances that the calculation overweight high-cost, low volume areas.

These trucking rates describe the dollar cost for a "typical" container. As such, they may fail to capture other relevant parts of trucking charges (e.g., heavy containers or other accessorial charges), adding other aspects of trucking charges (a) likely only increases the size of the difference and (b) is unlikely to offset these consistent differences.[96] They also do not include relevant time costs. Longer distances mean more potential for delays, hassles, and missed shipping windows. As such, in addition to higher dollar prices, trucking to Seattle or Tacoma likely adds additional time and uncertainty costs.

These costs and shippers' willingness to pay to avoid them fundamentally shape T6's value proposition. Nearly all discussions of Terminal 6, its importance, and its competitiveness, start with these costs.[97]

Importantly, changes to trucking costs did not reduce the appeal of T6 during the damages period. On the contrary, according to these data, the relative trucking cost to

---

[96] Mr. Gimpel's 2023 report notes that the Advisian report found even higher costs of moving containers to Seattle/Tacoma.

[97] See, for instance, Advisian (2018), International Trade and Logistics Initiative (2016), Hyundai Portland Opportunity Texas Visit January 2010, ICTSI (2016) "APL NP2 Service with a Portland Direct Call Concept"; BST Associates (2021). Port of Portland Container Service Forecast and Economic Contribution Assessment.

Seattle/Tacoma increased. Table 4 shows the change in the relative price by three-digit zip code in 2013 and 2014. This table shows how much the price of trucking to Seattle or Tacoma increased relative to the change in the price of trucking to Portland. These findings suggest increases in the relative cost of trucking to Seattle or Tacoma for nearly all parts of the catchment area in 2013 and 2014. For instance, the average cost from three-digit zip code 970 (eastern Multnomah County, Clackamas County, Columbia County, Columbia Gorge) to Seattle or Tacoma increased by $31-$32 more than the change in the price to Portland in 2013. Relative to 2012, in 2014, the relative price from 970 to Seattle/Tacoma increased by $62-$67 in 2014. These larger changes in relative price in 2014 were in addition to a general surge in trucking prices. On average, prices from all locations to T6, Seattle, and Tacoma increased by roughly $350 per load in 2014 relative to 2013.

**Table 4: Change in average price to Seattle/Tacoma minus change in average price to Portland, 2012-2013 and 2012-2014**

|  | Change 2012-2013 | | Change 2012-2014 | |
|---|---|---|---|---|
|  | To Seattle | To Tacoma | To Seattle | To Tacoma |
| 970 | $20 | $16 | $45 | $38 |
| 971 | $9 | $6 | $52 | $56 |
| 972 | $3 | -$3 | -$37 | $141 |
| 973 | $38 | $31 | $45 | $36 |
| 974 | $70 | $62 | $61 | $59 |
| 975 | $50 | $42 | $64 | $55 |
| 976 | $57 | $52 | $75 | $70 |
| 977 | $30 | $23 | $48 | $34 |
| 978 | $37 | $37 | $60 | $62 |
| 979 | $37 | $11 | $59 | $33 |
| 986 | -$19 | -$21 | $13 | $3 |
| 832 | $41 | $42 | $58 | $60 |
| 833 | $55 | $45 | $138 | $129 |
| 834 | $20 | $18 | $26 | $23 |
| 836 | $24 | $25 | $28 | $30 |
| 837 | $12 | $18 | $8 | $12 |
| Pop. Weighted Average | $23 | $19 | $33 | $51 |

Notes: Analysis of trucking rates from 2012 provided by Dan Gatchet. Each cell represents the change in average cost to Seattle/Tacoma minus the change in the average cost to T6. Averages for each three-digit zip code weighted by population of its component places. Population weighted average are coefficients from a regression of the difference in costs between Seattle/Tacoma and Portland on year and five-digit zip code fixed effects weighted by zip code population. All changes are statistically significant at the $p<0.001$ level.

These changes (and those in 2015, 2016, and 2017) describe what happened in the real world. As such, it is possible that relative prices would have changed differently in the but-for world. However, these data suggest that relative changes in trucking prices may also have helped make T6 more attractive to shippers during this period.

*b. Market composition*

T6's market share may also be a function of market composition. The baseline calculations already account for the main potential shift in market composition—the differences in the growth rates between exports and imports. However, more narrowly, if, in the but-for world, growth in the catchment area was disproportionately among shippers that were more (less) likely to choose T6, then T6's market share would increase (decrease) relative to the levels assumed in the baseline calculations.

For instance, the carriers that served T6 served particular destinations. As such, catchment area cargo originating in or destined for those locations was much more likely to flow through T6.

Thus, T6's expected market share could differ from the level assumed in the baseline calculation if external forces changed the composition of catchment area volume (e.g., different shippers wanted to reach different destinations). However, evaluating this possibility is difficult. As discussed in Appendix E.C, the ILWU's illegal acts likely affect observed market composition. For instance, the ILWU's unlawful conduct may have led some shipments to not be placed on a container vessel, so the observed size of the market is less than what would have occurred in the but-for world. Alternatively, once a shipper has to truck to Seattle/Tacoma they may choose to ship to a different location via a different carrier. Also, the available data do not completely describe the origin or destination of catchment area volume. As such, changes in market composition but for the illegal acts cannot be observed.

This means we cannot calculate any effects of changes in market composition unrelated to the ILWU's illegal acts. However, it is useful to note two things. First, if the composition of the catchment area changed significantly, carriers could (and likely would) change their supply to meet shifting demand. Second, if one assumes that T6 would have captured the same share of PNW HS two-digit commodity-foreign region volume as it had in the 12 months before June 2012, projected loaded total volume at T6 during June 2012-2016 would have fallen by less than two percent relative to the level in the 12 months before the ILWU's unlawful conduct.[98] The period where this commodity-destination projection lags the pre-dispute level is 2014 and 2015 when the ILWU significantly slowed production, the carriers left T6, and shippers had to scramble to rebuild their shipping chain.[99] As such, it is likely that the small loss reflects the impact of the ILWU's unlawful conduct on total shipping volumes.[100]

---

[98] Analysis of PIERS data for the three PNW ports. I use regional aggregates and two-digit commodity codes to (a) reduce the impact destination shifts directly impacted by the ILWU's unlawful conduct and (b) to reduce the amount of volume with no observed commodity-region trade flow in the pre-dispute period.
[99] Appendix E, section C provides additional discussion of these effects.
[100] This calculation is also based on data from Seattle/Tacoma. As such, it is also potentially affected by shifts in Seattle/Tacoma's competitiveness in the intermodal markets and shifts in their local markets (that may not have applied to Portland in the but-for world).

### c. Relative efficiency

T6's market share is also a function of the efficiency of the terminal (and the other parts of the shipping chain of which it is a part—carriers, foreign terminals) relative to the alternative. As such, the efficiency of alternative routes relative to routes that include T6 also could matter.

It is difficult to understand the impact of competitor choices during this time because data are limited and deficient.[101] Furthermore, observed choices during this period indicate the response to T6 with the ILWU's illegal acts. They do not tell us how competitors would have responded to the conditions that would have existed without the ILWU's illegal acts.

However, the relative efficiency of shipping via T6 relative to Seattle or Tacoma was likely to have stayed the same in the but-for world. Although the sample size is small, indicators are that normal productivity in the Washington ports was not dissimilar to T6's pre-dispute productivity.[102] Mr. Gimpel also notes that productivity at T6 historically mirrored the other West Coast ports and concludes that T6 would have been competitive with respect to productivity in the absence of the ILWU's unlawful conduct.[103]

Furthermore, two studies generated estimates of port efficiency that can be compared across ports (covering 1991-2009).[104] In both of these studies, Portland's efficiency was close to Oakland and significantly better than Seattle and Tacoma. These studies estimate efficiency by looking at the total port-to-port cost of shipping via a port, accounting for the various determinants of these costs. These studies find that the cost of importing via Seattle or Tacoma was roughly 12-13 percent higher than via Portland, and the relative costs were roughly constant between 1991-1993, 2001-2003, and 2007-2009. While these studies include non-containerized volumes and containerized volumes, they suggest that relative efficiency between Portland, Seattle, and Tacoma was stable for a prolonged period prior to the labor dispute.

As such, I make no specific adjustments for the relative efficiency of service via Portland versus Seattle or Tacoma. While, as discussed above, there is evidence that ICTSI would have made productivity gains, etc., that could have improved relative efficiency at T6, I

---

[101] What limited data is available presents apples-to-oranges comparison issues. Different actors use different terminology to describe the same thing and charge complex rates where higher fees for one thing offset lower fees elsewhere. This makes it very difficult to cleanly describe differences in basic competitive actions like pricing. For instance, see the discussions of wharfage in Cambridge Systematics, Inc. (2011). Port Activity and Competitiveness Tracker (PACT).

[102] PMA's 2014 Annual Report included productivity figures for Seattle and Tacoma for parts of 2014-2015 when productivity was not being impaired by labor actions. While productivity calculations may vary between ports, these data show productivity in the mid-20s (before and after the coastwide labor slowdown).

[103] Expert report of Nolan Gimpel dated February 8, 2023

[104] Blonigen, B. A., & Wilson, W. W. (2008). Port efficiency and trade flows. *Review of international Economics*, *16*(1), 21-36; Blonigen, B. A., & Wilson, W. W. (2018). Trade costs, trade, and port efficiency. In *Handbook of International Trade and Transportation*. Edward Elgar Publishing.

effectively assume that productivity remains constant relative to competitor ports during the damages period.

### 4. ICTSI's price increase

ICTSI expected to raise its prices when it took over the terminal.[105] It ultimately did so in January 2013. In March 2013, ICTSI slightly modified its rates by reducing the wharfage rate for full containers by $3. Ultimately, rates per lift increased by $57.81 for Hapag Lloyd, $72.47 for Hanjin, and $84 for Westwood.[106] The rates for Hamburg SUD increased by less, $8.82. These data describe the actual rate increases; however, the rates may not have increased by as much in the but-for world. As such, whatever impact higher prices had on T6 volumes in the real world, if any, would be smaller in the but-for world.

One cannot simply assume that because ICTSI raised its prices that T6's container volumes and market share in the but-for world would fall. While economists typically expect price and quantity to move in opposite directions, this inverse relationship between price and quantity only occurs, *holding everything else constant*—and even then, this negative relationship does not always exist. As discussed above, everything else was not constant. For instance, for shippers deciding between T6 and Seattle/Tacoma, the change in relative trucking costs in 2013 and 2014, shown in Table 4, would have partially or fully offset a potential change in relative prices due to the change in terminal costs. As such, the impact of ICTSI's price increase depends on what else was happening to demand and supply in this market and the size of the price increase. One needs to know the rest of the context to estimate the impact of ICTSI's price increase in the world without the ILWU's illegal actions.

### a. Direct estimation of the effects of ICTSI's price increase

Unfortunately, because of the ILWU's unlawful conduct, one cannot measure the effect of the real-world price change, if any, from what happened at T6 after the price increase. It is generally extremely difficult to isolate the effect of a policy change (like a price change) when another shock occurs simultaneously (an unlawful labor slowdown), and here, as shown below, has not been possible.

Additionally, what happened at T6 after the price change describes the impact of the real-world price change; however, in the absence of unlawful conduct, ICTSI may have raised its prices by a lesser amount. As such, the impacts of the but-for price increase would differ from whatever impact might be alleged to have occurred in the real world.

### b. Indirect estimation of the effects of ICTSI's price increase

In the absence of direct evidence, one could look for indirect evidence, i.e., evidence from price changes at other ports. However, identifying the effects of terminal price changes on volumes at any port is extremely difficult, and identifying effects from ports

---

[105] Interview of Elvis Ganda.
[106] Rates - Straight time throughput & wharfage 2011- 2017.xlsx

sufficiently similar to T6 is even more difficult. For such indirect evidence to prove useful, one must clear two hurdles. First, one must obtain an accurate and reliable estimate (i.e., an internally valid estimate). Second, the estimate obtained must apply to Portland (i.e., it must have external validity). Both of these hurdles are hard to clear.

### i. Internal validity

Dr. Knittel's expert report describes the various approaches economists use to estimate price elasticity.[107] His report also describes how difficult it is to find a situation and data that yield credible estimates for price elasticity.[108]

The data requirements to estimate price elasticity are well-known and often insurmountable. The first data requirement to estimate price elasticity is information about prices; however, complete pricing information in the relevant markets is unavailable. We don't know how much each shipper pays for each shipment or what they would have paid had they shipped via a different route. Some shippers negotiate contract rates.[109] Others pay spot rates. Some shippers pay the carrier to truck the container to the port. Others negotiate directly with trucking companies. Furthermore, if carriers have some degree of market power, they may price discriminate—charging different customers different amounts based on their characteristics.[110]

Additionally, available pricing information is typically incomplete and not comparable (due to the massive amount of variation and complexity of pricing throughout the system). For instance, focusing only on terminal charges, one study notes:

> "Published tariffs contain wharfage rates for containerized cargo; however, comparing the published rates of the west coast ports would be misleading. Ports negotiate leases with their tenants, including provisions for revenue sharing when volume exceeds a certain threshold. As a result, it is very difficult to assess the relative competitiveness of west coast gateways using wharfage as a metric because the lease terms may vary significantly. Besides, to date ocean carriers typically charge large shippers a so-called "Group Four" ocean rate, which is the same for the Pacific Northwest and Pacific Southwest ports regardless of the differences in wharfage rates. Thus, the shipper may see little difference in rates from one U.S. west coast port to the next."[111]

---

[107] Expert report of Dr. Knittel dated February 8, 2023
[108] Expert report of Dr. Knittel dated February 8, 2023
[109] Mr. Gimpel discusses the complex relationships and contracts between carriers, shippers, and various intermediaries in his 2023 report.
[110] Ignatenko, A. (2020). Price Discrimination in International Transportation: Evidence and Implications. *Retrieved from: https://www. annaignatenko. com/JMP_AnnaIgnatenko. pdf*.
[111] In addition to wharfage, one must also consider dockage, demurrage, and any other port fees. Cambridge Systematics, Inc. (2011). Port Activity and Competitiveness Tracker (PACT). https://scag.ca.gov/sites/main/files/file-attachments/comprehensive_regional_goods_movement_plan_and_implementation_strategy_-_port_activity_competitiveness_tracker_pact_report.pdf?1605991875

These types of complexity plague each part of the shipping chain. It is difficult to understand how prices affect the outcome when one does not know the prices paid or how much they change over time or across shippers.

Furthermore, dollar prices are not the only relevant prices in this system. Time prices also matter. Hummel and Schaur (2013) provide some examples of why time costs can be significant, noting:

> "Lengthy shipping times impose inventory-holding and depreciation costs on shippers. Inventory-holding costs include both the capital cost of the goods while in transit, as well as the need to hold larger buffer-stock inventories at the final destination to accommodate variation in arrival time. Depreciation captures any reason that a newly produced good might be preferable to an older good. This could include literal spoilage (fresh produce or cut flowers), or rapid technological obsolescence for goods such as consumer electronics … Long lags between ordering and delivery require firms to commit to quantities supplied well before uncertain demand is resolved. Forecast errors then result in lost profitability as firms over- or under-supply the market … the absence of key components due to late arrival or quality defects can idle an entire assembly plant, making the ability to ship rapidly worth potentially many times the value of the components being transported."[112]

These authors estimate that shippers value a one-day reduction in transit time at between 0.6 and 2.1 percent of the value of the shipment. Given the magnitude of these effects, without good data on quality, reliability, and time cost (or a situation where one can reliably assume that these forces were fixed), one cannot reliably estimate the effects of price on quantity.

Thus, it is unlikely that one can obtain an accurate, reliable estimate of price elasticity (or, more likely, all of the relevant price elasticities) without, at a minimum, data that describe the relative costs shippers evaluate when making their decision.

### ii. External validity

Of course, obtaining an accurate and reliable estimate of price elasticity is insufficient to answer the relevant question. The estimate must be externally valid. Even if one could accurately/reliably estimate price elasticity in one or more ports, there would be the additional issue of whether such an estimate was applicable to T6 during this period.

T6 serves a local market and does not significantly compete in the intermodal market. The market for intermodal volume differs from the market for local volume. Elasticity in the intermodal market is typically assumed to be higher than in the local market.[113] As

---

[112] Hummels, D. L., & Schaur, G. (2013). Time as a trade barrier. *American Economic Review*, *103*(7), 2935-2959.

[113] Davies, P. (2017) Does Environmental Compliance Impact Port Competitiveness? https://www.dtci.ca/wp-content/uploads/2011/10/DTCI-Environmental-Compliance-Paper-Web-Oct-23.pdf

such, any estimate based on other ports must isolate the effect of price on local volume. However, volume data do not allow one to separately identify intermodal and local volume.

Price elasticity may also vary depending on specific port characteristics (e.g., the availability and cost of potential substitute terminals) or local market characteristics (e.g., what is being shipped where). As such, port and market conditions must be comparable for an estimate from a different port to apply in Portland.

Given these challenges, obtaining an internally and externally valid estimate that would help describe the impact of ICTSI's but-for-price increase is very unlikely. I am aware of no high-quality studies that yield such an estimate.

### iii. Estimates

A recent industry report summarizes some of the existing estimates.[114] Consistent with the discussion above, it notes that "lack of data" hinders these types of analysis. This report summarized three different studies of the elasticity for local traffic at LA/Long Beach, noting that, in two of the three studies, local traffic elasticities ranged between 0 and 0.3 (the other study found different elasticities for different commodities and locations). However, only one of these studies "based their estimates on the actual relationship between market shares and relative costs," and none "analyzed the impact of changes in transit times on demand."[115] The analysis in this study (which suffers from its own limitations) estimates a price elasticity of demand of 0.26 (for all volume), which meant that a $100 per container cost increase in LA/LB would reduce volume by 1.8 percent.

The Blonigen and Wilson studies discussed in section V.D.3 also estimate a relationship between port costs and trade volumes and find modest effects.[116] A ten percent increase in their "port efficiency" measure leads to a two percent increase in trade volume between a pair of countries.

While these studies have a variety of limitations, they suggest that the price elasticity (particularly for local volumes) may be low or zero in relation to some price increases. However, given their limitations, it is useful to look to economic theory and other evidence to assess the potential impact of ICTSI's price increase on its competitive position. Dr. Knittel provides a more thorough investigation of this issues, and, similar the estimates described above, concludes that elasticity is low in this market.[117] Here, I provide a high-level summary of price elasticity and describe several quantitative and qualitative measures that speak to the potential impact of price on volume in this market.

---

[114] Davies (2017)

[115] Furthermore, the one study that used the actual relationship between cost and market share used model-based (not actual) cost and used market shares derived from data that do not reliably describe market shares.

[116] Blonigen and Wilson (2008, 2018).

[117] Expert report of Dr. Christopher Knittel dated February 8, 2023.

### c. Basic price theory

ICTSI raised the prices that carriers pay; however, terminal services are an input to a larger service – container transportation. Ultimately, the market for any terminal exists because shippers want to move goods from point A to point B. Shippers hire carriers (sometimes in conjunction with other services like trucking) to move their goods from A to B. Carriers hire terminals (and others) to help facilitate this process.

As such, the impact of an increase in terminal charges on terminal volumes depends on the carrier's response, but the carriers' response depends on the relationships between carriers and shippers in the market.[118]

Stated more technically, ICTSI increased the cost of an input in the production of container transportation through Portland. Basic economic theory argues that when the price of an input rises: (1) some of the cost increase may be passed onto the consumer (the shipper), but some may be absorbed by the "producer" (the carrier), and (2) how much of the cost increase each party absorbs is a function of the relative elasticities of supply and demand. If carrier supply *or* shipper demand is relatively inelastic, a cost increase (like a terminal charge) is unlikely to substantially affect quantity (all else equal). As such, if the available evidence suggests that either carriers or shippers are unresponsive to a price increase of the magnitude at issue, then one can conclude that the impact of ICTSI's price increase on market share is nominal.

### d. Carriers' response

The carriers' response to an increase in terminal charges depends on the impact of the increase on its expected profitability. In the short run, given the large fixed costs of calling at T6, incumbent carriers have an incentive to maximize the quantity of slots they offer in Portland. Once a carrier incurs the costs of establishing a call, they want to maximize the benefits of the call, which generally means maximizing the volume. This suggests that carriers have low short-run elasticities.

Likewise, it is extremely unlikely that ICTSI would have raised its prices to the level where expected profits were too low for carriers to choose to call at T6 because:

- In 2011, Hanjin profitability per FEU was $1,665 for imports and $1,536 for exports. T6 was Hanjin's most profitable West Coast terminal.[119] Just prior to the labor dispute, Hanjin was directing its salespeople to work to increase T6 volumes, and there is evidence that Hanjin increased its T6 volumes during this period. At this level of profitability, assuming that the carriers paid all of ICTSI's rate increases (so they did not change the price they charged shippers due to the T6 rate increase), Hanjin would have continued to earn significant profits by

---

[118] Dr. Knittel provides a more in-depth discussion economic theories and competitive dynamics that shape outcomes in this market in his expert report.
[119] Hanjin US PDX Promotion.

serving T6. At the volumes and profitability listed in this document, Hanjin could have absorbed 100 percent of the most likely but-for price increase in Dr. Blackburn's report, and T6 would have remained its most profitable terminal (by $121 per FEU).[120] This is important. For T6 to move down these rankings, some other factor would have had to decrease marginal revenue or increase marginal cost at T6 relative to other ports (changes that affect all ports similarly would not change T6's ranking). And, given that Hanjin continued to call on ports ranked below T6 as to profitability, even movement down the rankings would not imply that Hanjin would terminate the call.

- In 2012, prior to the labor dispute, Hapag Lloyd required Hamburg Sud to negotiate its rates with ICTSI for the containers it shipped through T6 on Hapag Lloyd vessels. Hamburg Sud accepted a $235 per lift rate, 94 percent of the level ICTSI charged the other carriers in 2013. This suggests that a carrier did not balk at prices approximately equal to the rates ICTSI charged in 2013. Similarly, in 2014, when APL did its test run at T6, it agreed to rates much higher than the rates paid by the other carriers, $400 per lift.[121]

- According to Westwood CEO Guy Stephenson, the terminal charge at T6 after the rate increase was not out of line with the rates in Seattle and Tacoma.[122] As such, holding productivity and other determinants of terminal costs constant, shifting to Seattle or Tacoma was unlikely to lead to significantly lower terminal costs (and therefore potentially higher profits for the carriers)—particularly given that leaving Portland would significantly reduce their market share. For instance, prior to the ILWU's unlawful conduct, Hanjin captured 10.6 percent of PNW loaded volume. This share fell to 8.97 percent after the summer of 2012 but fell even further after Hanjin left T6. Had Hanjin continued to capture 8.97 percent of PNW loaded volume, it would have handled an additional 65,883 TEUs during March 2015-Aug. 2016. This amounts to an average decline of 3,721 TEUs per month (an amount equal to 60 percent of Hanjin's 2014 T6 average monthly volume).[123]

- Terminal charges are not a particularly important determinant of carrier choices. The container terminal literature argues that productivity is a more important determinant of carrier choices.[124] Moves per hour is an important – perhaps the

---

[120] For this calculation, I reduce CMPB per FEU by $126. This two times Dr. Blackburn's assumed but-for price increase (from $187/TEU to $250/TEU). I multiply by reported volume in table in Hanjin USPDX Promotion and divide by total volume to get the average CMPB for T6 at the new prices assuming everything else remained constant.

[121] Confidential Stevedoring and Terminal Services Rate Schedule for APL Limited

[122] Interview with Guy Stephenson.

[123] Analysis of PIERS data.

[124] E.g., Tongzon, Jose L. "Determinants of port performance and efficiency." *Transportation Research Part A: Policy and Practice* 29.3 (1995): 245-252; Tongzon, J. L. (2009). Port choice and freight forwarders. *Transportation Research Part E: Logistics and Transportation Review*, *45*(1), 186-195; Beškovnik, B. (2008). Measuring and increasing the productivity model on maritime container terminals. Pomorstvo—Journal of Maritime Studies, 22(2), 171-183;

most important – variable that shipping lines use to evaluate port terminal performance.[125] Terminal operators who cannot achieve reliable productivity above a certain level will struggle to compete and should expect to lose business. Relative to productivity, the effect of port charges on carrier choices is minimal. While studying the impact of port charges on port choice is difficult because the data shortcomings discussed elsewhere in this report exist almost everywhere, several studies argue that port charges are not an important determinant of port choice.[126] For instance, Tongzon (2009) notes, "Port users are more concerned with indirect costs associated with delays, loss of markets/market share, loss of customer confidence and opportunities foregone due to inefficient service, than with port charges (Tongzon, 1995). Murphy et al. (1991, 1992) have shown that some users are actually willing to accept higher port costs in return for superior and more efficient service."[127]

- Mr. Gimpel notes in his report that terminal charges pale in comparison to the costs associated with delays, and he states that "import volume remained approximately the same in the but-for world as it did in the real world, there is no scenario in which the carriers would have left T6 before August 2016."[128]

Ultimately, the best evidence that ICTSI's price increase was insufficient to cause the carriers to leave is that they did not leave. While the carriers complained about the price increase, they continued to pay ICTSI's higher rates for more than two years after the 2013 rate increase, even though declining productivity meant that the quality-adjusted price was increasing much faster.[129] This suggests that ICTSI's price increase was likely insufficient to cause the carriers to leave T6 in the world without the ILWU's illegal acts.[130]

---

[125] Beškovnik, B. (2008).

[126] Steven, A. B., & Corsi, T. M. (2012). Choosing a port: An analysis of containerized imports into the US. *Transportation Research Part E: Logistics and Transportation Review*, *48*(4), 881-895; Advisian (2018); Tongzon (1995), Tongzon (2009).

[127] Tongzon (2009).

[128] Expert report of Nolan Gimpel dated February 8, 2023.

[129] The carriers complaining while continuing to call at T6 is an example of the difference between stated and revealed preferences. Economists generally find revealed preferences more informative than stated preferences. Furthermore, the carriers' statements are also an example of "cheap talk"—an attempt by one party (the carriers) with superior information (in this case, about willingness to pay for terminal services) to influence the decisions of another party (the terminal operator). Cheap talk scenarios are common in situations like terminal price negotiations where "the information communicated is easy to distort and difficult to verify, and the communication does not create binding commitments." In these situations, "`talk is cheap' and communication need not be truthful." Li, X., Özer, Ö., & Subramanian, U. (2022). Are we strategically naïve or guided by trust and trustworthiness in cheap-talk communication?. *Management Science*, *68*(1), 376-398. Dr. Knitttel provides a more in-depth discussion of cheap talk in his report.

[130] This is also consistent with Mr. Gimpel's opinion in his 2023 report that, in the absence of the ILWU's illegal acts, carriers would have continued to serve T6 and maintained their market share, even with ICTSI's but-for price increase.

Finally, it is also important to note in the but-for world, had ICTSI raised its prices to a level where the carriers credibly threatened to leave because of the price, ICTSI would likely have lowered its prices (or some other change would have occurred).[131]

### e. Shippers' response

Shippers' response to an increase in terminal charges also depends on its impact on their expected profitability. While shippers' choices are complicated, in simple terms, they want to select the lowest cost route that gets their goods to the market that offers the highest revenue.

For catchment area shippers trying to reach destinations served by the carriers that called at T6, routing their goods through T6 offered significant advantages. Shippers could avoid spending hundreds of dollars to move the container to Seattle or Tacoma, as well as the delays and hassles related to congestion or adverse weather over a longer journey.[132] They could also enjoy the benefits of the same truck making multiple turns in one day (i.e., delivering more than one container to the terminal on the same day).

As a result of these advantages, the vast majority of shippers routing via foreign terminals serviced by vessels that call at T6 chose T6. Prior to the ILWU's illegal acts, among the subset of volume with Oregon listed as the U.S. origin/destination in the PIERS data, T6 handled 80 percent of volume to/from the main areas served by Hanjin and 97 percent of volume to/from the main areas served by Hapag Lloyd.[133]

Furthermore, the share of this volume not moved through T6 prior to the dispute could be the result of a number of non-price-related forces, e.g., no vessel available at T6 that meets the desired timetable or the result of getting a better deal on other volumes as part of a larger negotiated agreement between the shipper and carrier.

---

[131] I confirmed with Mr. Ganda that he was trying to find the highest price that the market would bear (i.e., ICTSI's profit-maximizing price) and that he would not have left his price at a level where the carriers credibly threatened to leave. Guy Stephenson also noted that he had never seen a terminal under normal conditions raise its prices to a level where carriers leave as a result.

[132] Appendix F contains some additional visualizations of these issues.

[133] Analysis of PIERS data. While as discussed in Appendix E, origin/destination information in the PIERS data is limited (and reporting changes over time). During the pre-dispute period, 53 percent of T6 TEUs have a U.S. Origin/Destination listed in Oregon, Washington, or Idaho (most of the other 47 percent have no U.S. Origin/Destination state listed). In this analysis, I look only at volumes with an Oregon O/D. I calculate the share of identified Oregon volume from/to the main foreign initial ports served by Hajnin and Hapag Lloyd (identified as the ports that comprise more than one percent of all Hanjin/Kline/COSCO/Yang Ming or Hapag Lloyd/Hamburg SUD T6 volume. For Hanjin, these ports include Busan, Shanghai, Gwangyang, Ningbo, Qingdao, and Tianjin. For Hapag, these ports include Manzanilla, Caucedo, Cartagena, Cagliari, Valencia, Leghorn, Genoa, Punta Manzani, Barcelona, or FOS. Collectively, these ports comprise 92 percent of all T6 TEUs during the pre-dispute period. Using a more expansive set of geographic identifiers (a shipment has an Oregon origin/destination if the listed origin/destination is Oregon, the US company state is Oregon, or the notify company state is Oregon), yields similar results (74 percent of Oregon volume to Hanjin destinations flows through T6 and 94 percent of Oregon volumes to Hapag destinations flows through T6).

Differences in terminal price are unlikely to drive much, if any, of the volume that could have effectively been handled at T6. Terminal charges are not a significant determinant of shipper choices. For instance, the Advisian report argued that shippers consistently indicate that "reliability was paramount in their carrier and port selection process; the second unanimous criteria for carrier selection was the service offerings provided (weekly, twice a week, etc.). Cost came in third in the hierarchy of decision criteria."[134] As such, Advisian argued that "while a terminal cannot be out of the normal range on costs; service and reliability are items shippers are willing to pay for with a marginally higher cost at the terminal."[135] Consistent with this finding, when discussing the factors that affect terminal competitiveness, a different report argues it is, "important to note that the terminal handling costs portion is a comparatively low portion of overall logistics costs, so not a key driver of overall competitiveness."[136]

These factors suggest that ICTSI's price increase was unlikely to trigger a significant response from shippers. The evidence does not suggest that many T6 shippers were very close to choosing Seattle/Tacoma over Portland (a requirement to expect a large response to a price increase). This conclusion is further supported by the facts that:

- The carriers would have absorbed some (and potentially all) of ICTSI price increase.

- Port charges are typically small relative to the total cost of shipping a container. The Advisian report notes that, based on ten recent studies with more than 1,500 respondents, "the port or terminal component of the total supply chain was identified to be less than 5% of the total cost."[137] Given that there are terminal costs on both ends, T6's share of the cost is likely well below five percent. Conservatively, assuming that T6's pre-price increase charges comprised all five percent of the total cost, a $43-83 but-for-price increase amounts to a one-two percent increase in total costs, assuming that the carriers pass the entire terminal charge increase onto shippers.[138]

- ICTSI's price increase was small relative to the cost of transporting a container to Seattle-Tacoma. As discussed above, transportation to Seattle typically costs catchment area shipments an additional $400-$600 (not accounting for potential additional charges). This is more than 600 percent larger than ICTSI's price increase. While we do not have data on the precise cost difference between Portland and the alternatives, nor do we have data on the precise location of shippers, it is unlikely that a significant amount of volume lies at the margin

---

[134] Advisian (2018), p. 74.
[135] Advisian (2018), p. 60.
[136] WSP (2020)
[137] Advisian (2018).
[138] Dr. Blackburn assumes a but-for price increase from $187/TEU (at the end of 2012) to $230-$270 starting in 2013. If $187/TEU was five percent of the total cost, then total cost equals $3,740. $63 is 1.7 percent of this amount. However, if $187 is only 2.5 percent of the total cost (assuming T6 is only half of the total terminal charge), then the total price is $7480, and $63 represents a 0.8 percent increase.

where any increase passed on from carriers would make Portland more expensive than the alternative. Particularly given that the changes in relative trucking prices discussed above suggest that changes in trucking costs that occurred at the same time could have partially or fully offset whatever change in relative price ICTSI's pricing increase may have caused (assuming the prices of other parts of the shipping chain remained constant). If ICTSI's price change would not have made it cheaper to ship via Seattle/Tacoma, its impact on volume is limited.

- ICTSI price increase was also small relative to normal fluctuations in carrier rates. For instance, the Shanghai-US West coast freight index regularly fluctuated by several hundred dollars during 2013.[139]

- ICTSI's price increase was also small relative to the time costs discussed above. If each day of transit time is worth $132-$462 for the shipper and if shipping through T6 at normal productivity would have allowed shippers to, on average, reach their destination in fewer days, then time savings create an additional barrier to shippers choosing to ship via Seattle/Tacoma.[140]

Cumulatively, I am aware of no evidence that supports a conclusion that ICTSI's price response was likely to generate a substantial response from either carriers or shippers. Given that the impact of a price increase on T6 volume would be minimal if either carriers or shippers had relatively inelastic demand, it is improbable that ICTSI's price increase would have had a significant impact on its market share in the world without the ILWU's illegal acts.[141] This conclusion is consistent with other expert opinions in this case.[142]

It is also consistent with the limited empirical evidence available. A price increase of two percent applied to an elasticity within the 0 to 0.3 range described in Davies (2017) suggests impacts of less than one percent. Even if ICTSI's rate increase caused the total cost of shipping to increase by more than two percent, or even if the elasticity is higher than 0.3, a small elasticity times a small percentage change yields a small impact. Given that the price increase and the elasticity may fall below these estimates suggests even smaller impacts.

Furthermore, the impact of price on volume must be strictly less than what occurred. Relative to the levels from the 12 months before June 2012, 2013 loaded volumes fell by only 10 percent. Given that ILWU's unlawful conduct certainly reduced volumes and the

---

[139]UNCTAD (2022) Review of Maritime Transport, Chapter 3 https://unctad.org/system/files/official-document/rmt2021ch3_en.pdf

[140] In addition to time costs, shippers may face effort costs that reduce price sensitivity. Guy Stephenson also mentioned that shippers often integrate their systems with their carriers' systems and, as such, they face switching costs that make them less likely to change carriers. Shippers may also simply want to avoid worrying, tracking, and resolving issues associated with longer hauls to Seattle/Tacoma.

[141] Dr. Knittel's expert report also discusses the variety of reason why demand for T6 is likely inelastic.

[142] Expert report of Nolan Gimpel dated February 8, 2023.

but-for price increase would have been less than the real-world amount, the impact of ICTSI's but-for price increase would have generated a decline relative to the pre-dispute level of less than 10 percent in the first year it was implemented.

Ultimately, given that I do not have a reliable estimate of the impact of price on volume, but the evidence suggests that it is (a) small and (b) likely smaller than the margin of error around the baseline projections, I do not explicitly adjust the baseline calculations for price impacts. Instead, I treat them as another source of uncertainty (like potential impacts of improved productivity or alternative market growth assumptions) that could have affected T6 volumes, but whose expected effects are sufficiently small so as to not affect the reasonable range captured in the baseline calculations.

## VI. CONCLUSION AND MODIFIED BASELINE

The discussion above suggests that the baseline calculation discussed in section IV provides a reasonable range of estimates for the volume that would have flowed through T6 without the ILWU's illegal acts. T6 and ICTSI had demonstrated an ability to capture the share of West Coast volumes used in those calculations. In the absence of definitive evidence that T6's competitive position would have changed in the world without the ILWU's illegal acts, it is most reasonable to assume that it would continue to capture something within this range.

The baseline estimate is conservative for several reasons. First, it relies on actual West Coast volumes. However, it is possible that total West Coast volume would have increased in the absence of the ILWU's illegal acts. It is also possible that declines in other West Coast ports' competitiveness for distant volumes leads projections based on West Coast levels to understand market potential in Portland. Second, it is possible that better marketing or improved productivity would have increased T6's market share above the levels assumed in the baseline calculation.

If carriers could expect to earn profits at T6 under the conditions that would have existed but for the illegal actions over the long run, then it is unlikely that either Hanjin's bankruptcy or T6's pricing would have significantly reduced T6's market share. The available evidence, including other expert witness testimony, suggests that carriers could expect to earn profits at T6 in the but-for world.

However, given these factors, I expand the baseline calculation to cover a range of possible outcomes. Specifically, at the lowest end of the range, I assume no carrier replaces Hanjin during Sept. 2016-Mar. 2017. Hanjin represented approximately 80 percent of T6 TEUs. As such, I assume that T6 would have lost 80 percent of the baseline projected volume during this period. I also present an alternative calculation that assumes

that a carrier/set of carriers would replace 70 percent of Hanjin's volume after six weeks and 90 percent after three months.[143]

The upper end of the range assumes that ICTSI successfully recruited APL in late 2014. Specifically, I assume that T6 would have handled the projected 1,000 empty TEUs per week starting in January 2015.  This assumption is likely conservative. In addition, an APL call likely would have provided catchment area shippers access to markets not served by Hanjin. As such, APL likely could have captured additional catchment area volume had it called at T6.

These modifications are summarized in Table 5.

**Table 5: Projection scenarios**
**No Hanjin replacement**

|      | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
| --- | --- | --- | --- | --- | --- |
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 200,555 | 177,774 | 226,155 | 203,374 |
| 2016 | 1,791 | 151,430 | 149,639 | 169,292 | 167,501 |
| 2017 | - | 10,342 | 10,342 | 12,539 | 12,539 |
|      |        |         | 439,665 |        | 522,691 |

**Hanjin replacement 6 weeks 70%, 3 months 90%**

|      | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
| --- | --- | --- | --- | --- | --- |
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 200,555 | 177,774 | 226,155 | 203,374 |
| 2016 | 1,791 | 180,019 | 178,228 | 200,245 | 198,454 |
| 2017 | - | 47,573 | 47,573 | 57,681 | 57,681 |
|      |        |         | 505,485 |        | 598,787 |

---

[143] Specifically, I assume that during the first 1.5 months after Hanjin's bankruptcy, T6 loses all of its Hanjin volume (80 percent). Then, for the next 1.5 months, carriers replace 70 percent of Hanjin's volume (so adding other carriers' volume, T6 captures 76 percent of projected volume). Finally, for the last four months of the damages period, the replacement captures 90 percent of Hanjin's volume (so T6 captures 92 percent of projected volume).

**No Hanjin replacement with APL empties**

|  | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
|---|---|---|---|---|---|
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 252,555 | 229,774 | 278,155 | 255,374 |
| 2016 | 1,791 | 203,430 | 201,639 | 221,292 | 219,501 |
| 2017 | - | 23,342 | 23,342 | 25,539 | 25,539 |
|  |  |  | 556,665 |  | 639,691 |

**Hanjin replacement 6 weeks 70%, 3 months 90% with APL empties**

|  | Actual | Fixed WC share projection | Difference | Regression projection | Difference |
|---|---|---|---|---|---|
| 2012 | 184,566 | 213,658 | 29,092 | 213,823 | 29,257 |
| 2013 | 181,767 | 210,915 | 29,148 | 225,197 | 43,430 |
| 2014 | 166,378 | 210,048 | 43,670 | 232,968 | 66,590 |
| 2015 | 22,781 | 252,555 | 229,774 | 278,155 | 255,374 |
| 2016 | 1,791 | 232,019 | 230,228 | 252,245 | 250,454 |
| 2017 | - | 60,573 | 60,573 | 70,681 | 70,681 |
|  |  |  | 622,485 |  | 715,786 |

Bryce A. Ward
February 8, 2023

25

## APPENDIX A: GROWTH TRENDS AT NORTH AMERICAN PORTS

Section III describes trends at larger (mean volume greater than 100,000 TEUs in 2011-2012) North American ports. Table A1 describes trends at the included ports during 2011-2017.

**Table A1: Growth trends at North American ports, 2011-2017**

|  | 2011 TEUS | 2017 TEUS | 2011-2012 Average | % change 2011-2017 | % change relative to 2011-12 avg. |
|---|---|---|---|---|---|
| Philadelphia | 291,091 | 545,408 | 282,141 | 87% | 49% |
| Prince Rupert | 410,476 | 926,540 | 487,667 | 126% | 42% |
| Mobile | 169,282 | 318,889 | 194,063 | 88% | 29% |
| Manzanillo | 1,762,508 | 2,830,370 | 1,877,342 | 61% | 28% |
| Charleston | 1,381,352 | 2,177,550 | 1,447,969 | 58% | 27% |
| Ensenada | 132,727 | 230,185 | 136,598 | 73% | 25% |
| Penn Terminals | 111,971 | 201,096 | 113,605 | 80% | 24% |
| Baltimore | 631,804 | 962,484 | 655,033 | 52% | 23% |
| Hampton Roads | 1,918,029 | 2,841,016 | 2,011,958 | 48% | 22% |
| Veracruz | 732,538 | 1,117,304 | 769,293 | 53% | 20% |
| Wilmington(DE) | 272,996 | 374,600 | 286,088 | 37% | 19% |
| Boston | 192,705 | 270,881 | 190,226 | 41% | 19% |
| Palm Beach (FY) | 212,008 | 282,290 | 220,223 | 33% | 19% |
| Savannah | 2,944,678 | 4,046,216 | 2,955,446 | 37% | 17% |
| San Diego | 99,336 | 132,566 | 100,746 | 33% | 17% |
| Altamira | 547,612 | 803,222 | 563,149 | 47% | 16% |
| Long Beach | 6,061,091 | 7,544,507 | 6,053,377 | 24% | 13% |
| Metro Port Vancouver | 2,507,032 | 3,054,467 | 2,610,096 | 22% | 12% |
| Port Everglades | 880,999 | 1,076,893 | 902,300 | 22% | 12% |
| Houston | 1,866,450 | 2,459,107 | 1,894,490 | 32% | 11% |
| Halifax | 410,649 | 559,242 | 413,611 | 36% | 9% |
| New York/New Jersey | 5,503,485 | 6,710,817 | 5,516,699 | 22% | 9% |
| New Orleans | 477,363 | 532,597 | 471,099 | 12% | 6% |
| Miami (FY) | 906,607 | 1,024,338 | 907,902 | 13% | 6% |
| Los Angeles | 7,940,511 | 9,343,192 | 8,009,113 | 18% | 5% |
| Montreal | 1,362,975 | 1,537,669 | 1,363,658 | 13% | 4% |
| Jacksonville | 900,433 | 1,033,070 | 912,023 | 15% | 4% |
| Oakland | 2,342,504 | 2,420,836 | 2,298,550 | 3% | 2% |
| Lazaro Cardenas | 953,497 | 1,149,079 | 1,098,137 | 21% | 0% |
| Seattle/Tacoma | 3,493,283 | 3,665,329 | 3,528,871 | 5% | 0% |
| Wilmington(NC) | 287,469 | 259,819 | 279,131 | -10% | -3% |
| Gulfport | 216,156 | 216,683 | 209,236 | 0% | -10% |
| Portland(OR) | 197,446 | - | 190,325 | -100% | -52% |
|  |  |  |  |  |  |
| Median (excluding Portland) |  |  |  | 33% | 14% |
| Median Portland-sized (2011-2012 avg.=190K-220K) (excluding Portland) |  |  |  | 37% | 19% |
| Median U.S. Ports (excluding Portland) |  |  |  | 28% | 12% |

Source: Analysis of AAPA data.

## APPENDIX B: ALTERNATIVE REGRESSION PROJECTIONS

In section III, I use a regression model to predict T6 market growth without the ILWU's illegal acts. In contrast to a forecast (which tries to predict what will happen next based on what's happened in the past), a predictive regression allows one to construct the but-for world based on what happened in the real world during the relevant period, assuming that the relationships between the predictors and the outcome did not change.

For such a regression to provide helpful information, three conditions must hold. First, the set of variables included must strongly predict the outcome. That is, the independent variables must do a good job predicting the outcome, or the predictors must "substantially contribute to explaining the variation in Y."[144]

Second, the set of variables included must also be unaffected by the ILWU's actions. If any of the included predictors are strongly affected by the ILWU's actions, then the predicted value will not accurately describe the but-for world. Instead, it will describe something closer to the real world.

Third, the relationships found during the period examined (the pre-dispute period) must hold in the period predicted (the post-June 2012 period). I.e., the results must be externally valid.

Selecting predictors for this regression entails three choices:

(1) Which measures of economic activity or volume to use?
(2) Which geography to measure economic activity over?
(3) Which period of time to use to predict outcomes during the damages period?

For the first choice, I focus on the descriptive measures used in section III—inflation-adjusted GDP, personal income, and West Coast loaded import and export volumes. I also consider the unemployment rate and a modified measure of GDP that includes only agriculture and manufacturing. Each of these measures is available quarterly at the state level from 2005Q1.  For the second choice, I consider state and regional aggregation (e.g., Oregon, PNW, or West Coast).

I also consider a few additional variables. First, given the fluctuations in service at T6 before the dispute, I also include a measure of port connectivity (the PLSCI) in some specifications. Since this measure is directly affected by the labor dispute, I fix it at its pre-dispute levels when generating the predicted values during the damages period. Second, I include quarterly dummy variables in some specifications to account for potential seasonal fluctuations. Finally, I also consider measures of export and import price changes compiled by the Bureau of Labor Statistics.

---

[144] Stock, J. H., & Watson, M. W. (2020). Introduction to econometrics 4th ed, p. 345.

The third choice is the trickiest. Since this analysis aims to predict outcomes during the damages period, one wants to use a period where the relationships between the predictors and the outcome are similar to what would have occurred during the damages period. The most natural choice is the period just before the damages period. Based on preliminary analysis, models estimated using 2006Q3-2012Q1 perform well when predicting out-of-sample, so I start with this period and consider alternatives later in the process.

Collectively, the number of options in each choice suggests an enormous number of potential models. To simplify the process of model selection, I use two different approaches. First, I create several parsimonious models incorporating the most basic theoretically relevant predictors. Second, I turn to methods that algorithmically select models given a set of potential predictors. I use two different algorithmic approaches to select possible models. I use a stepwise selection algorithm using both forward selection and backward elimination, applying four different information criteria (AIC, AICC, BIC, and adjusted R2), and I use LASSO using both cross-validation (with five folds) and adaptive selection.[145] These approaches yield several candidate models that fit the data well during the sample period.

These algorithms select models based on how well they predict outcomes within the sample. However, it is possible that a model that fits the data well in the pre-dispute period does not yield the best prediction for the damages period. Therefore, when selecting final models from among the candidate set, I rely on how well the model predicts the actual outcomes for the three PNW ports combined and Oakland during the damages period. Below, I only report outcomes for models where the mean absolute percent error for these out-of-sample predictions was five percent or less. I.e., on average, the predicted value was within plus/minus five percent of the actual value each quarter during 2012Q2-2017Q1.

While many models come close to meeting the five percent absolute error for both PNW and Oakland models, only a handful clear these criteria. Table C1 summarizes these models. Among the models considered, only one import and one total volume model satisfies the out-of-sample prediction threshold; however, two export models cross the threshold. The second model yields a smaller error for the out-of-sample prediction and a smaller predicted T6 volume. Therefore, I use this more conservative estimate in the report.

---

[145] I implement both procedures using STATA 16.1. The stepwise procedures were implemented using the vselect command using both the forward and backward options. For each option, I also use all four information criteria (AIC, AICC, BIC, adjusted R2). I used the cross-validation and adaptive approaches with five folds for the lasso models.

**Table B1: Regression specifications and diagnostics for specifications that met inclusion threshold**

|  |  | Abs. % error | Cumulative % error |
|---|---|---|---|
| Loaded Imports |  |  |  |
| Ln(West Coast imports), unemployment rate PNW, ln(PNW GDP agriculture and manufacturing), PLSCI, quarter. | MSE: 0.003 Adj. R2: 0.869 AIC: -49.66 BIC: -40.58 | PNW: 4.6% Oakland: 3.2% | PNW: 1.7% Oakland: -0.3% |
| Loaded Exports |  |  |  |
| Ln(West Coast imports), Ln(West Coast exports), unemployment rate PNW, PLSCI, export price index, quarter. | MSE: 0.004 Adj. R2: 0.838 AIC: -42.54 BIC: -32.32 | PNW: 5.2% Oakland: 4.7% | PNW: -2.9% Oakland: -3.8% |
| Ln(West Coast exports), unemployment rate PNW, PLSCI, export price index, quarter. | MSE: 0.007 Adj. R2: 0.739 AIC: -32.06 BIC: -22.97 | PNW: 4.1% Oakland: 4.0% | PNW: -0.1% Oakland: -2.9% |
| Total Volume |  |  |  |
| Ln(West Coast total), unemployment rate PNW, ln(real PNW GDP) PLSCI, quarter. | MSE: 0.003 Adj. R2: 0.852 AIC: -49.62 BIC: -40.53 | PNW: 4.0% Oakland: 4.5% | PNW: 2.0% Oakland: 3.7% |

Finally, I consider whether applying these models to a different pre-dispute period yields a smaller average absolute percentage error for the PNW and Oakland predictions. On average, across all models, the 2006Q3-2012Q2 period yields the lowest error; however, for each analysis, a slightly different period yields a slightly lower margin of error. For the different candidate periods, the import and export models yield very similar projections. The cumulative predicted volume is different by one and two percent, respectively. However, the 2006Q3-2012Q1 model exceeds the cumulative predicted volume from 2007Q2-2012Q1 by 7.7 percent. This suggests that the model that predicts total volumes, the other time period yields a more conservative estimate.

Figure C1 plots the total from combining the preferred import and export prediction with an assumed empty volume equal to 20 percent of the total against the preferred specification that directly estimates total volume (including imports, exports, and empties) using the more conservative 2007q2-2012q1 period. The regression prediction for the total volume shows significantly more growth than the projection that separately predicts import and export volume. It shows volumes returning to pre-Great Recession peaks by 2015 and climbing to new highs by late 2016. I use the lower, more conservative estimate in the report.

**Figure B1: Comparison of predicted volume separately predicting imports/exports vs. directly predicting total volume**



# APPENDIX C: PROJECTED VOLUME UNDER ALTERNATIVE ASSUMPTIONS

As discussed in sections III and IV, several reasonable assumptions yield similar volume projections for T6 without the ILWU's unlawful conduct. In this appendix, I present projected T6 volumes under these alternative assumptions.

Assumptions consistent with relatively constant T6 volume:

|  | Total predicted volume June 2012-March 2017 | Difference from fixed share of WC imports/exports | % difference |
|---|---|---|---|
| Baseline projection (fixed share im/ex) | 1,005,692 |  |  |
| No change in T6 volume relative to the 12 months before June 2012 | 1,006,406 | 714 | 0.1% |
| Imp/Exp grow at rates observed in Seattle/Tacoma (20% empties) | 1,039,756 | 34,064 | 3% |
| Total volume grows at rates observed in Seattle/Tacoma | 1,017,825 | 12,133 | 1% |

Notes: Baseline projection including rehandles from June 2012-Mar. 2017.

Assumptions consistent with growing T6 volume:

|  | Total predicted volume June 2012-March 2017 | Difference from regression projection | % difference |
|---|---|---|---|
| Baseline projection (regression) | 1,195,575 |  |  |
| Annual median North American port (>100,000 TEUs 2011-2012) | 1,202,192 | 6,617 | 1% |
| Annual North American growth rate 2011-2017 | 1,185,958 | -9,617 | -1% |
| Annual US growth rate 2011-2017 | 1,188,102 | -7,473 | -1% |

Notes: Baseline projection from Table 2. Other projections inflate last 12 months pre-dispute volume by 7/12 of 2012 annual growth rate. Then, I inflate the 2012 level by annual growth rates through 2017 (but only include 25 percent of 2017 in total).

## APPENDIX D: EMPTY CONTAINER VOLUMES AND REHANDLES

### A.    Empties

In the years prior to the labor dispute, empty containers averaged 20 percent of total volume. This is consistent with industry rules of thumb, which suggest that empties comprise about 20 percent of volume.[146] Consistent with this history, I assume that empties would comprise 20 percent of the total volume in the various projections.

However, empty shares do vary. In particular, they vary with the imbalance between import and export volumes. As import volumes deviate from export volumes, the share of empty containers rises. Figure D1 plots this relationship for T6 during the pre-dispute period. In particular, as import volumes grow relative to export volumes, empty containers comprise a larger share of volume.

.

**Figure D1: Relationship between import/export imbalance at T6 and empty share by year-quarter**



---

[146] Advisian (2018)

Figure D2 shows the projected imbalance under the two baseline scenarios. These trends suggest that the fixed 20 percent empty share may overstate empty volume early in the damages period. Still, it likely understates empty volume later in the damages period, particularly for the regression projection.

**Figure D2: Projected loaded import volume minus projected loaded export volume for the two baseline scenarios during the damages period.**



Given the margin of error around each projection and the margin of error in the relationship between imbalance on empty volume, I assume that empty volume will balance out at the historical share. However, this approach may lead to a slight overstatement of fixed share volume and a potentially more significant understatement of volume in the regression projection.

## B.    Rehandles

As discussed in sections IV and VI, I modify the baseline projections to account for the fact that the volume measures used do not include rehandles. In this section, I present the analyses used to calculate the rehandle adjustment.

Table D1 shows four different measures of total T6 volume (PMA, AAPA, ICTSI operations reports, and ICTSI total). The first thing to note is that there are slight differences between each measure in each year; however cumulatively they yield very similar estimates of T6 volume. E.g., between 2012 and 2016, the cumulative totals for the PMA, ops reports, and AAPA estimates are within 600 TEUs of each other (less than one-tenth of a percent). However, the difference between the ICTSI total and the other

measures is larger, between 6,000 and 7,000 TEUs (or slightly more than one percent). The final two columns show that this difference is almost exactly equal to the number of rehandle TEUs reported on ICTSI's operations reports (I estimate rehandle TEUs by multiplying the number of rehandle moves by 1.7). Subtracting estimated rehandle TEUs from the ICTSI total yields an estimate almost exactly equal (less than 0.1 percent difference) to the other three estimates.

**Table D1: Comparison of T6 volume from different sources**

|  | PMA | ICTSI Ops Reports | AAPA | ICTSI 2019 trial | Estimated rehandles |
|---|---|---|---|---|---|
| 2005 | 159,516 | 159,211 | 160,479 |  |  |
| 2006 | 218,102 | 215,952 | 214,484 |  |  |
| 2007 | 266,301 | 263,540 | 260,128 |  |  |
| 2008 | 247,504 | 246,969 | 245,459 |  |  |
| 2009 | 174,920 | 175,076 | 174,203 |  |  |
| 2010 | 188,581 | 185,313 | 181,100 |  |  |
| 2011 | 196,609 | 198,460 | 197,446 | 170,245* | 1,751 |
| 2012 | 183,454 | 182,424 | 183,203 | 184,566 | 2,695 |
| 2013 | 178,634 | 178,645 | 178,451 | 181,767 | 1,346 |
| 2014 | 163,858 | 165,822 | 164,931 | 166,378 | 207 |
| 2015 | 22,790 | 21,897 | 22,683 | 22,781 | 58 |
| Total 2012-2016 | 550,461 | 550,513 | 550,993 | 557,283 | 6,057 |
| Total excl. est. rehandle |  |  |  | 550,870 |  |

Notes: * ICTSI 2011 estimate only covers the portion of the year ICTSI operated the terminal (mid-Feb.-Dec.).

## APPENDIX E: DIRECT ESTIMATION OF T6 MARKET VOLUMES

### A. Direct measurement of catchment area volumes

Ideally, one could directly measure T6's market size by identifying all of the volume with origins and destinations within the market served by T6 (and making any required adjustment for the impact of the ILWU's unlawful conduct on total volume). This direct approach is commonly used within the industry to assess the current performance of a terminal within its market. It entails two steps: identifying the market served by T6 (its catchment area) and then attempting to quantify the total container volume with origins or destinations within this area.

#### 1. Terminal 6's catchment area

T6 serves a specific geographic region, its catchment area. The catchment area is the area over which it is cheaper to transport containers to T6 than to alternative container terminals.

Various studies have defined the T6 catchment area.[147] While there may be slight differences between different efforts, the T6 catchment area typically resembles the dark blue area in Figure E1. It includes Oregon, most of Idaho, and Southern Washington.

Given the relatively small amount of shipping volume and economic activity in the border areas that may or may not belong in the catchment area, slight differences in catchment area definition have little impact on measured catchment area volume.[148]

---

[147] Advisian (2018). Port of Portland Terminal 6 Container Business Strategy; International Trade and Logistics Initiative (2016). Steering Committee Report; BST Associates (2021). Port of Portland Container Service Forecast and Economic Contribution Assessment.

[148] For instance, approximately seven percent of catchment area population lives in three-digit zip codes at the margin of inclusion.

**Figure E1: Terminal 6 catchment area**



## 2. Catchment area volume

The standard industry approach for calculating catchment area volumes relies on Port Import/Export Reporting Service (PIERS) data. PIERS data are considered "one of the most comprehensive databases on U.S. foreign waterborne imports and exports."[149] They are regularly used by port authorities, terminal operators, etc. to understand port catchment areas and support investment decisions.[150]

The PIERS data are compiled from freight vessel manifests (bills of lading) submitted by carriers to the U.S. Customs Service. Bills of lading typically include information on the shipment's contents, number of twenty-foot equivalent units (TEUs), origin-destination, routing, carrier, vessel, etc. The PIERS data also are subject to various quality control procedures. PIERS staff regularly audit and cross-check the data and PIERS subscribers (importers, exporters, and carriers) verify their own information and report discrepancies.

Thus, the PIERS data contain information to compute catchment area volumes, and prior attempts to measure T6 catchment area volume relied on the PIERS data.[151]

---

[149] Mani, A., & Prozzi, J. (2004). State-of-the-practice in freight data: a review of available freight data in the US.

[150] Interview with Todd Gray.

[151] E.g., Advisian (2018) Port of Portland Terminal 6 Container Business Strategy; International Trade and Logistics Initiative (2016) Steering Committee Report; BST Associates (2021). Port of Portland Container Service Forecast and Economic Contribution Assessment.

ICTSI's attorneys retained Todd Gray of Mercator International to assemble PIERS data to identify catchment area volume flowing through the ports of Portland, Seattle, and Tacoma during Jan. 2011-Mar. 2017.

As a crosscheck on the accuracy of the data provided by Mercator, I compared the 2014 total to the estimate in the Advisian report.[152] Advisian uses a slightly different catchment area and included catchment area shipments via Oakland; however, Advisian and Mercator's estimates for the size of the catchment area in 2014 are very similar, less than two percent different.

Figure E2 shows volume growth in the catchment area over the relevant period (measured in twenty-foot equivalent units (TEUs) indexed to 2011) as captured in the PIERS data. Between 2011 and 2016 (that last full year of data provided by Mercator), loaded catchment area volume grew by 19 percent, from 352,590 TEUS to 420,061 TEUs. This growth rate falls within the range identified by the regressions discussed in section III.

**Figure E2: Growth in T6 catchment area volume, 2011-2016**



Source: Analysis of PIERS data.

## B. Baseline projection using PIERS catchment estimate

Figure E3 describes T6's share of catchment area volume (as measured in the Mercator/PIERS data). It fluctuates from month-to-month; however, it was relatively constant over the first 15 months ICTSI operated T6. For purposes of this analysis, I assume that T6 would have captured the same share of catchment area TEUs as it did in the twelve months prior to the start of the labor dispute (44 percent). Table E1 compares

---

[152] Advisian (2018)

actual volumes to the amounts predicted by this approach.[153] This projection falls between the West Coast share and regression estimates.

**Figure E3: T6 share of catchment area TEUs by month**



Source: Analysis of PIERS data and T6 volume.

**Table E1: Fixed-share of catchment area projection comparison with actual volumes**

|  | Actual | Projected based on fixed catchment area | Difference |
|---|---|---|---|
| 2012 | 184,566 | 213,120 | 28,554 |
| 2013 | 181,767 | 216,163 | 34,396 |
| 2014 | 166,378 | 229,262 | 62,884 |
| 2015 | 22,781 | 234,513 | 211,732 |
| 2016 | 1,791 | 243,047 | 241,256 |
| 2017q1 |  | 53,500 | 53,500 |
| Total |  |  | 632,321 |

---

[153] Specifically, I calculate this projection by calculating catchment area TEUs for each quarter. Then, I divide this value by 0.96 to account for the fact that the PIERS data undercounts actual volume. Finally, I adjust this value to account for empty volume, assuming that empty volumes comprise 20 percent of the total and add one percent for rehandles.

## C. Limitations with the direct measurement approach

It is important to note that the PIERS data have several limitations. As such, explicitly rely on them when generating the projected volumes presented in section VI.

First, the PIERS data do not include empty containers. As such, if the trend in empty containers deviates from the trend in loaded containers, the PIERS data will miss these effects. Second, PIERS does not capture all non-empty container volumes. The PIERS data typically understate total volume by a small amount.[154] For T6, TEU volume in the PIERS data is 96 percent of PMA non-empty volume. Third, like most administrative data, the records may contain errors. Sometimes mismeasurement simply reflects reporting or data entry errors, but sometimes it reflects systematic problems. In particular, PIERS origin/destination data may sometimes be inaccurate because addresses used as origins/destinations are sometimes corporate addresses or addresses for intermediaries who collect/consolidate items for various producers/sellers, and sometimes this information is missing altogether.[155]

This approach also suffers from the fact that the volume captured in the PIERS data describe what actually happened. These data do not describe what would have happened in the absence of the ILWU's illegal acts. If the alleged acts changed the shipping volumes (or shipping patterns), the direct approach may not accurately describe catchment area growth in the absence of the illegal acts.

I discuss each of these limitations in greater detail below.

### 1. PIERS data caveats

The PIERS data have three important caveats. First, PIERS data may miss volumes from some ports or carriers (particularly small ones) or some records may miss key information (like TEUs). Second, the reported U.S. origin/destination locations may be corporate locations or locations of distribution centers and not the actual shipment origins/destinations. Third, origin/destination data is not reported for all shipments.

Thus, the PIERS data could provide an inaccurate estimate for the real-world size of the catchment basin in two ways:

(1) It could fail to capture some volume of cargo because it was not reported or not reported in a way captured in the data.
(2) Inaccurate or incomplete origin/destination data could lead to under/over statement of catchment area cargo.

---

[154] Interview of Todd Gray.
[155] Mercator (2020) Analysis of Port of Portland's Container Traffic Market; ECONorthwest (2016) Feasibility of an Intermodal Transfer Facility in the Willamette Valley, Oregon.

a. Volume misattributed to the catchment area due to HQ or distribution center location could lead to an overstatement of the size of the catchment area;

b. Volume with actual origin/destination in the catchment area but not included in the catchment area could lead to an understatement of the size of the catchment area.

The first issue is unlikely to pose a significant problem for this analysis. Comparing PIERS loaded volume to T6 loaded volume shows a relatively small undercount. This is consistent with Mercator's expectations. I adjust for this undercount assuming that the PIERS undercount is consistent over time (and among T6 and non-T6 volume). However, the PIERS undercount *could* lead to an overstatement of T6's but for if the odds that PIERS missed containers shrank over time. In this case, some of the growth in the catchment area is a mirage attributable to less missed volume; however, given the small size of the undercount, this issue is unlikely to introduce significant bias.[156]

Imprecise origin/destination information poses a greater challenge. The PIERS data do not track every container from its actual origin to its final destination. The specific origins/destinations in the PIERS data may reflect corporate address or distribution centers and not actual origins or destinations.

In some cases, the PIERS data track containers for only a portion of their whole journey (e.g., from middleman to middleman).  As such, the PIERS data may not correctly identify some container volume that originates/terminates in the catchment area. For instance, if an eastern Oregon hay farmer ships containers to a broker in Ellensburg who then exports them through Seattle, PIERS may classify those containers as originating in Ellensburg. In this case, the calculation above would not include this volume in the catchment area.

In 2016, a study investigating the feasibility of an intermodal transfer facility in the Willamette Valley helps illustrate the potential magnitude of misidentified origins for agricultural exports.[157] This study took advantage of the fact that most countries require phytosanitary certificates for agricultural imports and that these certificates typically identify the location of the applicant (usually the grower), mode of transport (ocean vessel), and packaging (container). This study identified 38,170 loaded agricultural export containers from their study region based on this method. This is 25 percent more loaded export containers than a different study found in the same study area and time frame based on the PIERS data.[158] Thus, the PIERS data may misrepresent the locations of a non-trivial amount of container traffic.

---

[156] Undercount could also bias the calculation of market shares. If the odds a shipment is missed differ between T6 volume and non-T6 volume, the denominator used to calculate market share (which includes an adjustment for the PIERS undercount) could be too large.

[157] ECONorthwest (2016)

[158] Tioga Group (2016) Trade and Logistics Report: Concepts and Business Case Analysis.

This data limitation is a particular concern if shipper decisions are endogenous to the ILWU's illegal acts. For instance, imagine that the hypothetical eastern Oregon hay farmer would have shipped to a Portland broker in the absence of the ILWU's illegal acts and that PIERS would identify the origin of this shipment as Portland. However, after the carriers left, this farmer shifted to a broker in Ellensburg and PIERS identified the origin as Ellensburg. In this case, the actual size of the catchment area is unchanged, but the PIERS data would indicate that it shrunk. As such, if the ILWU's illegal acts led catchment area shippers to ship through third parties outside the catchment area and PIERS identifies some shipment origins based on third party location, then the catchment area volume used in the baseline calculation would understate the true catchment area volume (and cause the baseline estimate to understate the impact of the ILWU acts on T6 volume holding other assumptions constant).

Figure E4 illustrates one example market composition changes likely attributable to the ILWU's illegal acts. Figure E4 shows catchment area exports (blue) and Washington/Idaho non-catchment area exports (Gray) destined for the areas served by Hapag Lloyd. Catchment area exports to these areas fell precipitously after Hapag Lloyd pulled out of T6 at the end of 2015Q1, but non-catchment area volume increased. As such, the decline in catchment area exports to these regions likely reflects the ILWU's illegal acts and not exogenous shocks to markets.

Interestingly, the cumulative increase in non-catchment area exports almost exactly equals the decline in catchment area market shifts. This illustrates a different problem with attempting to account for exogenous changes to market composition. It is possible that the shift from catchment to non-catchment origins for these exports does not reflect an actual change in origin. It is possible that this shift merely reflects a change in how the PIERS data classified the origin.

**Figure E4: Catchment and non-catchment area export TEUS to the west coast of South America, the Caribbean, Central America, or the Mediterranean**



Source: Analysis of PIERS data.

While origin/destination limitations introduce measurement error into the projected volume calculations based on the PIERS data, these measurement errors only matter if they introduce bias into the calculation of T6's but for volumes. In particular, imprecise origin/destination data would be particularly concerning if it inflated T6's but for volume.

For origin/destination errors to significantly bias the baseline calculation, they must be asymmetric. That is, non-catchment area volume inaccurately assigned to the catchment area must exceed catchment area volume inaccurately assigned to a non-catchment area location. If the number of noncatchment TEUs incorrectly assigned to the catchment area equals the number of catchment TEUs incorrectly assigned to the non-catchment area, then the errors cancel out.

Even if the errors are not symmetric, they must change overtime to generate bias. If the PIERS data consistently over/understates the size of the catchment area by x percent, then O/D errors have no effect on the baseline calculation. This is because the errors affect both the baseline share and size of the catchment basin post-dispute, and these errors cancel out.

Thus, for the baseline approach to overstate T6's but for volume, errors must have deflated the size of the catchment area during the baseline period (i.e., more true catchment area cargo not assigned to catchment area leading to inflated baseline market share) or errors must have inflated the size of the catchment area in the post-dispute period (i.e., more non-catchment area cargo inaccurately assigned to catchment area during this time period). Thus, understanding the potential for O/D errors to inflate the baseline estimate entails assessing whether:

(1) Some conditions led to a disproportionate amount of actual catchment area cargo being excluded from the catchment area during the baseline period; and
(2) Some conditions led to a disproportionate amount of non-catchment area cargo being assigned to the catchment area during the post dispute period.

Given the mechanics of the calculation used in the main report, the second conditions is the larger concern for this analysis. The PIERS calculation increases pre-dispute volume by the growth in the catchment area volume and issue (2) could lead to artificially high growth rates.

Evaluating this concern is difficult. If one knew the precise origins and destinations, one could see whether non-catchment area volume was more likely to be misattributed to the catchment area in later years; however, without such information one cannot directly investigate the magnitude of this potential issue.

However, the information used to place volume in the catchment area changed over time. As such, measurement error may change over time.

The Mercator approach identifies potential catchment area shipments using a four-step process.[159] First, shipments handled at T6 are part of the catchment area. Second, shipments with listed origin within the catchment area are part of the catchment area. Third, shipments are placed based on exporter address (if address is a feasible address for shipping via a PNW port). Finally, if none of the geographic identifiers are available, shipments may be located based on the commodity.

While this approach is reasonable, it may be better suited to obtaining a measure of catchment area volume at a single point in time. Given the imprecision of the geographic data discussed elsewhere and that this imprecision changes over time, the Mercator approach may struggle to accurately describe trends.[160] The signal (changes catchment area TEU growth) may get overwhelmed by the noise (changes in the information available to determine origin/destination).

Three key issues are worth highlighting. First, volume not handled at T6 is placed within the catchment area based on the second-fourth factors. One simple way to evaluate these additional factors is to assess what share of T6 shipments would be placed in the catchment area without information about whether it shipped via T6. Less than half of T6 export volume has a listed origin within Oregon, Washington, or Idaho. One-third is placed based on exporter address, and twenty percent has no geographic information (and therefore would have needed to be located based on commodity). These shares also change over time. In 2013, forty percent of T6 export volume did not have a listed origin. Thus, the information available is unlikely to allow one to accurately predict whether a shipment went through T6.

Second, as the labor dispute depresses T6 volumes, the share of volume that must be located using only geographic and commodity information increases. Since these factors do not predict catchment area location as well as knowing that the shipment was handled at T6, the potential for error in identifying catchment area volume grows over time as T6 volume falls.

Third, potential errors also increase due to changes in the share of observations with geographic information. In 2011 and 2012, very little volume was located using non-geographic information (e.g., commodity). By 2015-2016, roughly one-third of catchment area volume was placed in the catchment area based on non-geographic information. Increasing placement based on non-geographic information could increase the amount of noise in an estimate of catchment area trends.

Combined, these issues suggest that the margin of error in the PIERS/Mercator estimate increases over time. While, the data do not allow one to definitive quantify the change in

---

[159] Technically, there are five steps, but the fourth step (using the state of the notify company if other information is not available) is almost never used. Expert Report of Todd Gray.

[160] The change in imprecision reflects two main forces. First, as less volume flows through T6, the share of catchment area identified using the first step (handled at T6) falls (eventually to zero). Second, the share of observations without a US origin/destination (step 2) changes over time (in particularly it increased substantially in 2013/2014).

error and the extent to which it increases or decreases the PIERS based projection of T6's but for volumes, it is important to note this potential limitation with these data.

It is also possible that the catchment area definition introduces bias into the catchment area calculation. The data used to calculate catchment area volume used three-digit zip codes to place containers into their origin/destination. As such, I use a catchment area defined using three-digit zip codes.[161] While the precise catchment area boundary is unlikely to follow three-digit zip code boundaries, the catchment area used in the baseline analysis is reasonably accurate. It is generally similar to other analysts' definitions.[162] More important, according to the PIERS data, container volumes in the area at the margin are small. Looking at trucking costs for five-digit zip codes, seven three-digit zip codes are mixed—they have some portion where the cost of trucking to Portland is lower than the cost of trucking to Seattle-Tacoma and another portion where the opposite is true. Four of these three-digit zip codes are included in Mercator's T6 catchment area, while three are not. However, the volume in these marginal areas is small. For instance, the four split three-digit zip codes in the T6 catchment area contribute less than one-half of one percent of the catchment area total in the PIERS data. As such, tweaks to the catchment area definition within the reasonable range of definitions likely yield trivial changes to projected T6 volumes.

### 2. PIERS data describe the real-world not the but-for world

The labor dispute affects these data and calculations based on them. The ILWU's illegal actions increased the costs of shipping in the catchment area. They increased both tangible costs (e.g., the additional cost of moving the container to/from Seattle/Tacoma, the surcharge ICTSI imposed due to low production) and intangible costs (e.g., uncertainty about whether the container will make it onto its scheduled vessel and arrive at its destination on time or about whether a shipper will be able to get their container to a vessel given the greater need for trucks and more congestion in Seattle/Tacoma).

All else being equal, the but-for world could differ from the real world if the higher costs and uncertainty generated by the ILWU's illegal labor action (or other differences between the real and but-for world) led shippers to change their choices. E.g., the real-world could differ from the but-for world if shippers chose to:

1. Ship overseas via breakbulk (if applicable)
2. Ship via train or truck to a different market
3. Produce (exports)/buy (imports) less and thus ship less (or not at all).

To the extent that the ILWU's illegal actions increased costs in ways that made shipping via other modes to other locations more attractive, total catchment basin container volume would shrink. Similarly, if the ILWU's illegal actions increased costs in ways

---

[161] The catchment area I used was created by Mercator as part of preparing the PIERS data for my analysis. Mercator (2020) Analysis of Port of Portland's Container Traffic Market

[162] Advisian (2018) Port of Portland Terminal 6 Container Business Strategy; International Trade and Logistics Initiative (2016) Steering Committee Report.

that made producing some goods for export or buying some goods for import unviable, the total catchment basin container volume would shrink.

While it is difficult to precisely quantify how many potential shippers responded to increased costs in ways that reduced the number of catchment basin containers, several sources note that some volume exists along this margin.[163]

First, following the departure of Hanjin and Hapag Lloyd in 2015, Oregon Governor Kate Brown launched the International Trade and Logistics Initiative. In its report, this group noted that Terminal 6 was "critical for managing costs and maintaining the competitiveness of Oregon businesses" and for maintaining "cost-competitive access to markets for agricultural producers along the Columbia River."[164] The loss of competitiveness could reduce container volumes in the catchment area. However, the report found that "Most Oregon exporters and importers [used] rail and truck to reach Seattle and Tacoma rather than changing their shipping patterns" in the first year after the carriers' departure.[165] However, the report also noted that "A few have reduced shipments or diverted export products into domestic markets."[166] A related report also noted that some shippers chose to ship breakbulk instead of via container.[167] The ITLI report further noted that impacts on shipping volumes could increase after shippers made "long-term decisions" when they renegotiated their contracts in 2016.[168] Thus, the impact of the loss of T6 on the size of the catchment area could have increased in 2016 and 2017.

Two news articles from 2015 and 2016 also suggest that the carriers leaving T6 led producers to shift to other markets or not produce at all. For instance,

> "Puzey said he has spoken to agricultural producers who can no longer afford to export their products now that the river system has been effectively taken out of the equation."[169]

> "Owens has a new problem. He can no longer ship hay to Portland, now that the last remaining trans-Pacific carrier at the Terminal 6 container port has left town. Instead, he has to send the hay to Ellensburg, Wash., or Winters, Calif., cutting profits 10 to 15 percent, or $10 to $15 a ton …

---

[163] Freidman and Struxness (2015) Oregon Trade and Logistics Initiative Stakeholder Engagement Report; Tioga Group (2016) Trade and Logistics Report: Research Analysis; International Trade and Logistics Initiative (2016) Steering Committee Report.

[164] International Trade and Logistics Initiative (2016) Steering Committee Report.

[165] International Trade and Logistics Initiative (2016) Steering Committee Report.

[166] International Trade and Logistics Initiative (2016) Steering Committee Report.

[167] Freidman and Struxness (2015) Oregon Trade and Logistics Initiative (2015), Stakeholder Engagement Report.

[168] International Trade and Logistics Initiative (2016) Steering Committee Report.

[169] Harbarger, M. (2015). "Ripple felt as shipper leaves Port of Portland." East Oregonian (April 7, 2015) https://www.eastoregonian.com/news/agriculture/ripple-felt-as-shipper-leaves-port-of-portland/article_5c546c07-d253-505b-9b38-466033ab3c46.html

---

Duane Olson, sales and warehouse manager at Northwest Onion Co., near the unincorporated community of Brooks northeast of Salem, said the loss of the Port has "definitely changed how we market our product." He's feeling the effects of competition more acutely now that he has to truck his onions to the Puget Sound area or to California rather than Portland."[170]

Thus, it is likely that the catchment area volume in the PIERS calculation is too small for the period after the start of the labor dispute (and, in particular, after the carriers left).[171] While it is difficult to precisely quantify the magnitude of these effects without comprehensive data on the precise movements of all goods, the available evidence indicates that, but for the ILWU's illegal actions, the total volume of containers shipped into/out of the catchment area would have been larger. As such, holding the other assumptions constant, the data on market growth may understate the impact of the ILWU's actions on volumes at T6.

---

[170] Hammill, L. (2016) "Harney County farmer 'just trying to break even' after loss of Portland container shipping" Oregonian (July 2, 2016)
https://www.oregonlive.com/business/2016/07/harney_county_farmer_just_tryi.html
[171] It is also possible that the ILWU's illegal acts also depressed total West Coast volume and regional economic activity; however, those impacts on these larger aggregate variables is likely small. As such, the ILWU's illegal acts are unlikely to significantly affect the regression predictions discussed above.

## APPENDIX F: ADDITIONAL FIGURES

Alternative view of T6 productivity



Congestion in Portland and Seattle





Traffic Hazards



## Appendix G: Ward CV and table of testimony

# Dr. Bryce Ward

Ph.D. Economics, Harvard University
B.A. Economics and History, University of Oregon

Dr. Ward is co-founder of ABMJ Consulting. Previously, he served as a Senior Research Professor/Associate Director at the Bureau of Business and Economic Research at the University of Montana, as a Research Associate and the University of Montana's Rural Institute and as Senior Economist at ECONorthwest, a Portland, OR based economics consulting firm.

Dr. Ward's areas of expertise include econometric analysis and applied microeconomics -- including urban and regional economics, labor economics, health economics, public finance, and environmental and natural resource economics. Dr. Ward has applied his expertise to a variety of projects involving litigation support and policy analysis. He has provided oral and written testimony in more than thirty court, legislative, or administrative proceedings. Dr. Ward has taught courses in microeconomic theory, econometrics, labor economics, public finance, environmental and natural resource economics, and social economics at Harvard University, Lewis and Clark College, the University of Oregon, Portland State University, and the University of Montana.

**Litigation Support Projects**

*Labor*

- Calculated economic damages from lost wages, earnings capacity, etc. and testified in wrongful termination trials. *Various clients – Various locations.*

- Organized data and conducted statistical analysis to evaluate claims of discrimination in employer discrimination lawsuits. *Various confidential clients – Various locations.*

- Provided written and oral testimony on the economics and costs/benefits of union release time. *Martin & Bonnet; Sherman Howard. – Phoenix, AZ*

- Provided written testimony describing the expected impact of a mass layoff on coal miners, their households, and their community (long-term earnings, health, etc.). – *Baker Hostetler – Cleveland, OH*

- Provided testimony and conducted statistical analysis to determine if an observed decline in productivity at the Port of Portland's container terminal reflected union slowdown in response to a labor dispute. *Schwabe Wyatt & Williamson – Portland, OR.*

- Evaluated plaintiff's expert report and helped prepare cross-examination questions in a case involving lost bonus payments and lost profits from the termination and alleged defamation of a financial advisor. *Shepherd Mullin Richter & Hamilton – New York*

- Prepared testimony regarding the comparability of jurisdictions and their compensation schemes in preparation for a public interest arbitration involving sheriff's deputies. *Winterbauer Diamond – Seattle*

- Provided testimony and conducted statistical evaluation of alleged discrimination against African-Americans union workers on a large construction project. *Winterbauer Diamond -- Seattle*

- Provided testimony evaluating plaintiffs' expert report, presenting evidence of failure to mitigate, and calculating damages in a case involving the alleged wrongful termination of 25 Somali immigrants. *K&L Gates -- Seattle*

- Prepared testimony in preparation for a public interest arbitration regarding a timber-dependent county's ability to pay higher compensation to sheriff's deputies in light of potential loss of federal timber payments. *Confidential Client*

- Developed an analytical framework, gathered data, and conducted analyses of current market conditions for workers in comparable jobs and comparable communities as precursor to public-interest arbitrations involving transit districts. *Bullard Smith Jernstadt Wilson – Portland, OR.*

- Described the potential impact of the financial crisis, recession, potential deflation, and other related uncertainty on labor markets and labor negotiations subject to public interest arbitration. *Bullard Smith Jernstadt Wilson – Portland, OR.*

- Testified about the reasons and methods for adjusting wages for changes in the cost of living based on the Consumer Price Index (CPI) and the long-term consequences of not adjusting wages during periods of deflation. *Bullard Smith Jernstadt Wilson – Portland, OR.*

- Summarized economic forecasts for the Portland area, identified potential threats that could cause the economy to deviate from the forecasts, and outlined the implications of the forecast for negotiations between the Portland Police Officers' Association and the City of Portland. *Aitchison & Vick – Portland, OR.*

- Analyzed historical wage and benefit growth for sheriff deputies relative to other public and private sector employees in preparation for labor bargaining. *Bullard Smith Jernstadt Wilson – Portland, OR.*

- Provided written testimony on the effects of proposed increases in piloting fees on local ports and the local economy. *Columbia River Bar Pilots and Haglund Kelly Horngren and Jones — Astoria, OR.*

- Reviewed and conducted analyses in order to determine if specialty forest product harvesters should be considered independent contractors or employees of the "brush picking sheds" that issued their harvester permits. *Talmadge/Fitzpatrick — Washington.*


*Business Damages*
- Calculated lost profits associated with alleged wrongful termination of direct repair program contract termination. *Confidential Client.*

- Evaluated plaintiff's alleged damages associated with alleged business interruption and reputation damage in a bail bonds business. *The Hustead Law Firm – Denver, CO*

- Provided testimony calculating damages associated with a delayed real estate sale. *Tarlow Stonecipher Weamer & Kelly – Bozeman, MT*

- Provided testimony evaluating plaintiff's alleged damages in a dispute about a flooded mine tunnel. *Laird Cowley – Missoula, MT*

- Provided testimony evaluating plaintiff's expert damages and provided alternative estimates in a case involving alleged delay in certification of purebred cattle. *Laird Cowley – Missoula, MT*

- Provided testimony calculating business damages stemming from a former employee shutting down the firms' internet access. *St. Peter's Law Offices – Missoula, MT*

- Provided testimony calculating damages associated with a lost real estate development. *Datsopoulos, MacDonald, Lind – Missoula, MT*

- Provided testimony evaluating plaintiff's damages calculation in a case involving lost profit and lost business value stemming from alleged fraud and breach of a contract. *Garlington Lohn Robinson – Missoula, MT*

- Provided testimony evaluating plaintiff's expert damages calculation in a case involving lost profit and lost tax advantages from a failed real estate transaction. *Peck, Hadfield, Baxter & Moore – Logan, UT*

- Provided testimony evaluating plaintiff's expert damages calculation in a case alleging harm from the improper implementation of Montana's Department of Transportation Disadvantaged Business Entity program. *Montana Department of Transportation, MT*

AβMJ CONSULTING

- Provided testimony about damages from the alleged misappropriation of confidential information, including pricing information. *Wilson Sonsini Goodrich & Rosati – New York, New York*

- Provided written testimony evaluating plaintiff's expert's lost profits analysis in a matter involving alleged substandard performance by a call center. *Arnold Gallagher Percell Roberts & Potter -- Oregon*

- Calculated damages suffered by an auto dealership and service department stemming from the violation of non-solicitation and non-compete clauses in an asset purchase agreement. *Foster Pepper – Oregon.*

- Reviewed plaintiff's expert report and provided questions for deposition and trial for a business damages case involving breeding dogs. *Schedler Bond -- Washington*

- Calculated lost profits to an oyster farm stemming from chemical contamination of their oyster beds. *Confidential client – Pacific Northwest.*

- Analyzed firm losses resulting from former employees' breaches of restrictive employment-contract covenants regarding future employment with a competitor. *Confidential client – Oregon.*

### Anti-Trust & Competition

- Testified regarding the economic aspects of alleged anticompetitive behavior in a market for outpatient diagnostic imaging services in several markets. *Various clients – Various locations.*

- Analyzed the economic issues of class certification and damage calculations related to alleged antitrust violations in the market for residential lots. *Hagens Berman Sobol Shapiro, LLP – Boise, ID.*

- Provided written testimony regarding the presence of competition in a market for private prisons and the likelihood of substantial competitive harm to private prison operators from a Freedom of Information Act (FOIA) request. *Stephen Raher – Portland, OR.*

- Estimated share of LCD TVs, LCD computer monitors, and notebook computer monitors were purchased by Oregon consumers and state and local governments as part of a price fixing lawsuit. *Oregon Department of Justice – Oregon.*

- Conducted economic analysis on economic damages attributed to alleged antitrust actions in the market for concert-promotion services in the Portland area. *McNamer and Company – Portland, OR*

### Environment & Natural Resources

- Identified and estimated the value of economic costs imposed by an oil spill from a Chevron pipeline. *SWCA Environmental Consultants – Utah.*

- Described the potential economic damages suffered by municipalities in Alabama as a result of the *Deepwater Horizon* / BP oil spill in the Gulf of Mexico. *Cunningham Bounds — Orange Beach, AL.*

- Conducted a rate analysis for a stormwater utility in a large metropolitan area. *Confidential client — Confidential location.*

- Conducted economic analyses on the economic aspects of a breach of contract claim over a reasonable price to provide water to, and process effluent from, a Georgia-Pacific paper mill. *Schwabe Williamson & Wyatt, PC — Hasley, OR.*

- Calculated natural resource damages associated with a Superfund site using a Habitat Equivalency Analysis (HEA). *Quapaw Tribe of Oklahoma — Oklahoma.*

- Described the impact of a change in recreational harvest allocation rules on the economic health and stability of the small businesses that make up the commercial Dungeness crab industry in Puget Sound. *Puget Sound Crabbers Association — Washington.*

- Evaluated the potential economic effects of the U.S. Department of Agriculture and California Department of Food and Agriculture's proposed eradication of the Light Brown Apple Moth. *Earthjustice — California.*

- Calculated profit disgorgement earned while violating California emissions laws. *California Attorney General — California.*

- Evaluated a contingent valuation study of the proposed development of a wind farm. *Perkins Coie — Nantucket, MA.*

- Evaluated the U.S. Environmental Protection Agency's draft report on groundwater and soil remediation scenarios for a creosote-contaminated Superfund site. *Confidential client — Washington.*

- Assisted in an analysis that compared and contrasted benefits and costs, stemming from the use in California of MTBE-oxygenated gasoline with those stemming from the use of ethanol-oxygenated gasoline to determine if refiners could have used ethanol to meet federal reformulated gasoline mandates instead of MTBE during the 1990s. *Various clients — Various locations.*

### *Right-Of-Way Studies*

- Provided written testimony to the Federal Communications Commission (FCC) that described the results of an original evaluation into the effect of municipal right of way fees on broadband deployment and adoption using both economic theory and statistical analysis. *Miller Van Eaton — Nationwide.*

- Provided oral and written testimony regarding economic issues related to municipal right-of-way fees in New Orleans. *Goins Aaron and City of New Orleans — New Orleans, LA.*

- Provided written testimony to the Federal Communications Commission (FCC) regarding the economic aspects of allowing local governments to charge telecommunications providers for access to government-owned or managed property. *Miller Van Eaton – Nationwide.*

- Addressed the economic issues of telecommunications firms' challenge, under the Telecommunications Act of 1996, to the City of Portland's franchise-fee agreements for use of the municipal right-of-way. *Miller Van Eaton and City of Portland – Portland, OR.*

### Real Estate

- Calculated economic damages associated with delayed real estate developments. – *Various clients – Various locations.*

- Developed automated valuation models to statistically assess the value several thousand properties in Arizona and Nevada, and provided oral and written testimony on the economic aspects and harm, if any, to plaintiffs, from an alleged scheme that inflated the appraised market value of real estate. *Hagens Berman – Arizona and Nevada.*

- Provided written testimony on the economic aspects and harm, if any, to plaintiffs, from an alleged scheme that inflated mortgage costs without proper disclosure. *Hagens Berman – Arizona.*

- Described the economic costs of a pipeline rupture and related oil spill on residential and public property values. *Salt Lake City – Salt Lake City, UT.*

- Analyzed the impacts of Measure 37 (property rights limitation) on the State of Oregon. *Department of Justice, Office of the Attorney General – Oregon.*

- Prepared testimony regarding the national and Salem, OR real estate markets for a condemnation case. *Garrett, Hemann, and Robertson P.C. – Oregon.*

### Personal Injury & Wrongful Death

- Calculated economic damages in wrongful death lawsuits. *Various clients – Various locations.*

- Calculated lost wages and presented expert testimony in personal injury cases. *Various clients – Various locations.*

- Calculated non-economic damages to a father denied access to his child for 17 years based on expenditures by parents on children. *Jamin Law Group – Alaska.*

### Other

- Provided an opinion on the valuation of two convenience stores/gas station/casinos. *Laird Cowley – Missoula, MT*

- Provided testimony calculating the value of a minority stake in the ammunition manufacturer. *Laird Cowley – Missoula, MT*

- Developed a model to estimate damages suffered by employees as a result of alleged violation of state meal and rest break rules. *Winterbauer Diamond – Seattle, WA*

- Calculated economic damages stemming from an alleged breach of cost and revenue sharing agreements among former law partners. *Laird Cowley – Missoula, MT*

- Provided an opinion regarding the value of a minority stake in manufactured home community. *Reep, Bell, Laird, & Jasper, Missoula, MT.*

- Provided written testimony regarding changes in the market for garbage hauling in Missoula, MT. *Rhoades, Siefert, Erickson – Missoula, MT*

- Prepared a report describing economic and potential non-economic damages for a person who was wrongfully convicted and spent 24 years in jail. *Reep, Bell, Laird, & Jasper, Missoula, MT.*

- Estimated the value of a private real estate brokerage. *Reep, Bell, Laird, & Jasper, Missoula, MT.*

- Prepared written and oral testimony on the value of a minority share of a closely held private corporation. *Reep, Bell, Laird, & Jasper, Missoula, MT.*

- Prepared a report that described the appropriate discount rate to use to compensate a group of developers owed a lump-sum amount for prior investments in the development of local water infrastructure. *Reep, Bell, Laird, & Jasper, Missoula, MT.*

- Evaluated California's methods for validating ballot initiative petitions. *Bell, McAndrews & Hiltachk, Sacramento, CA.*

- Testified in Oregon tax court regarding the extent to which Serenity Lane (a non-profit drug and alcohol treatment center) gives to charity through care scholarships, pricing its services below market rates, offering an intern education program, and performing community education. *Arnold Gallagher Percell Roberts & Potter -- Oregon*

- Testified before the Oregon legislature regarding proposed legislation before the Oregon House that amends ORCP 32 by repealing subsection K and, therefore allowing recovery of UTPA statutory damages (currently $200) in class actions. *Confidential client – Oregon.*

- Calculated reimbursements to families who adopted foster children as part of a class action settlement. *Johnson Johnson Larson and Schaller – Oregon.*

- Evaluated statistical evidence of cheating on a test and testified before administrative review board at a university. *Christie White – Oregon*

**Representative Projects on Other Topics**

*Natural Resources*

- Examined the impacts of implementing the King County Wastewater Treatment Division's Combined Sewer Overflow Control Plan on ratepayers and assessed their financial capacity to bear these impacts. *King County Wastewater Treatment Division – King County, WA.*

- Helped develop an analytical approach to describe the short-term and long-term benefits and costs of clean-up and remediation alternatives for the Portland Harbor Superfund Site. *City of Portland – Portland, OR.*

- Analyzed the effect of Seattle's Natural Drainage (low impact development) Projects on neighboring property values using a hedonic regression analysis and data from county assessors' records. *Water Environment Foundation – Seattle, WA.*

- Described the growth in the market for third-party certified forest products and discussed the reasons why firms choose to pursue certification.

*Education*

- Helped design a long-term evaluation strategy, including both quantitative and qualitative methods, for the "Dreamer School," a program designed to promote college attendance for an entire elementary school. *I Have a Dream Foundation – Oregon.*

- Designed and implemented a randomized evaluation that employed longitudinal student and school data to demonstrate the effects of Safe and Civil Schools' positive behavior support programs on elementary schools in the Fresno Unified School District. *Randy Sprick's Safe and Civil Schools – Fresno, CA.*

- Evaluated the effectiveness of the South Shore School, a public-private partnership school in Seattle, using a quasi-experimental regression analysis and longitudinal student data. *Seattle Public Schools – Seattle, WA.*

- Evaluated the effectiveness of ASPIRE, a program to increase college enrollment among Oregon high school students, using a regression analysis and longitudinal student data that matched student K-12 records with college enrollment data. *Oregon Community Foundation – Oregon.*

- Developed a district report card system for several Oregon school districts based on longitudinal student data. *Chalkboard Project – Oregon.*

- Evaluated the effectiveness of Pre-K and K programs in Bremerton, Washington using a regression analysis on longitudinal student data. *Bremerton School District – Bremerton, WA.*

- Testified before Oregon legislature regarding the benefits of using block grants for funding school transportation systems. *Chalkboard Project – Oregon.*

- Developed regression models to calculate funding levels for student transportation in Washington school districts and developed linear programming tools to evaluate the efficiency of district transportation spending. *Washington's Office of the Superintendent of Public Instruction – Washington.*

- Analyzed and presented results of a survey regarding methods for improving efficiency in Oregon schools. *Chalkboard Project – Oregon.*

- Reviewed literature on motivations for and effects of mergers between institutions of higher education. *Confidential client – Various locations.*

- Developed a method for using longitudinal student data to calculate and report student achievement growth (aka a school value-added-model (VAM)) as part of a school accountability program in Seattle, Washington. *Seattle Public Schools – Seattle, WA.*

- Used longitudinal data to describe the Hispanic-White and Black-White achievement gaps in Oregon schools. *Chalkboard Project – Oregon.*

- Described the potential economic effects of eliminating the achievement gaps in Oregon's schools on the state's economy. *Chalkboard Project – Oregon.*

- Reviewed and evaluated current research on the effectiveness of the Safe and Civil Schools program, and worked with clients to develop and implement additional program evaluation. *Randy Sprick's Safe and Civil Schools – Washington.*

### Labor Markets

- Prepared a report on the "State of the Workforce" in Missoula, MT – *Missoula Economic Partnership*

- Evaluated gender, racial, and age disparities in performance evaluations and promotion decisions at a Fortune 500 company. *Confidential client.*

- Designed survey and prepared article investigating women's low rates of participation in low-stakes "pre-entrepreneurial" activities. *Kauffman Foundation, Kansas City*

- Investigated methods and data for introducing greater flexibility into union contracts. *Association of General Contractors Oregon-Columbia Chapter – Oregon.*

- Described the methods used to calculate hourly billing rates, calculated plausible billing rates for local government employees, and compared these rates to the hourly rates charged by the Lane Council of Governments. *Lane Council of Governments – Eugene, OR.*

- Used IRS tax migration data and the American Community Survey to evaluate the impact of income tax differentials between Oregon and Washington on migration within the Portland-Beaverton-Vancouver, OR-WA MSA. *Association of Oregon Industries – Oregon and Washington.*

- Created a large longitudinal data set of Harvard College students that matched labor market and family outcomes obtained from surveys administered 15-30 years following graduation to undergraduate records. Dr. Ward supervised the creation of the undergraduate database, drafted the survey instrument, managed survey distribution and collection, and conducted preliminary data analysis. *Office of the President, Harvard College – Nationwide.*

- Calculated the potential economic costs associated with proposed change in Oregon's meal and rest break rule by empirically identifying potentially affected workers and employers, modeling potential employer responses, and identifying values for model parameters. *Michael Lilly Attorney – Oregon.*

### Regional Economics

- Provided analysis, presentation, and support for the development of a Community Economic Development Strategy (CEDS). Missoula Economic Partnership – *Missoula, MT*

- Described and evaluated Montana's bioscience sector – Missoula Economic Partnership – *Missoula, MT*

- Prepared a report describing the state of entrepreneurship in Montana – *Montana Chamber of Commerce – Helena, MT.*

- Analyzed the economic contribution of the Missoula County Fairgrounds to Missoula's economy – *Missoula County Fairgrounds, Missoula, MT*

- Described the contribution of health care to Billings, MT's economy. *Big Sky Economic Development Agency – Billings, MT*

- Described trends in key economic indicators (e.g., gross metropolitan product, employment, personal income per capita) in the Portland Area and evaluated them relative to other comparison areas. *Portland Business Alliance – Oregon*

- Defined and described Portland's traded sector and explained how it contributes to employment growth, income growth, new business formation, and overall regional economic health. *Portland Business Alliance – Oregon*

- Performed a quantitative and qualitative analysis of the economic contributions of Oregon State University's College of Engineering to the regional economy. *Oregon State University College of Engineering – Oregon.*

- Performed a quantitative and qualitative analysis of the economic contributions of The Evergreen State College on the regional and state economies. *The Evergreen State University – Washington.*

- Performed a quantitative and qualitative analysis of the economic contributions of Oregon's Cultural Trust to state economies and assessed the effectiveness of the Oregon Cultural Trust Tax Credit. *Oregon Cultural Advocacy Coalition—Oregon.*

- Conducted data analysis to describe the role of Washington County and Portland's Westside in the regional economy. *City of Hillsboro -- Oregon*

- Conducted data analysis and prepared a report that defined and described Portland's manufacturing and explained how it may contribute to the regional economy by paying higher wages, promoting innovation, and boosting the traded sector. *Portland Business Alliance – Oregon*

- Evaluated the effect of enterprise zone tax incentives on employment growth using a regression-discontinuity analysis of longitudinal establishment-level data. *Oregon Economic Development Association -- Oregon*

*Healthcare*
- Prepared a presentation on COVID's impact on Montana's economy, COVID's impact on health and healthcare in Montana, and long-term issues on health and healthcare in Montana – *Montana Healthcare Foundation*

- Prepared a report that examined the economic impact of Medicaid expansion in Montana – *Montana Healthcare Foundation; Headwaters Foundation*

- Prepared a report describing the fiscal impacts of Medicaid expansion on states' budgets. *Commonwealth Fund – New York, NY.*

- Designed evaluation of Montana's Medicaid Expansion Waiver (HELP Program) – *Montana Department of Public Health and Human Services – Helena, MT*

- Evaluated Montana's Patient Centered Medical Home (PCMH) program – *Montana Commissioner for Securities and Insurance – Helena, MT*

- Evaluated effects of pain, fatigue, and depressed mood on individual participation in daily activities. *University of Montana Rural Institute for Inclusive Communities – Missoula, MT*

- Prepared presentation on drivers and potential solutions to rising health care costs and discussed the impact of high health care costs on large employers. *Blue Cross Blue Shield of Montana – Helena, MT.*

- Prepared report describing characteristics of Montanans who would be eligible for Medicaid if Montana accepted the ACA Medicaid Expansion. *Bureau of Business and Economic Research. Missoula, MT.*

- Prepared report and presentation describing Native American health and health insurance coverage in Montana. *Confidential Client.*

- Reviewed and evaluated current research on the impact of increased hospital supply on local health care markets. *SEIU Local 49 – Portland, OR.*

- Reviewed the literature on the prevalence, preventability, and expense associated with medical injuries and medical errors and used estimates from this literature to describe the potential economic cost to Oregonians caused by medical errors. *Oregon Trial Lawyers Association – Oregon.*

- Produced a primer on health care cost that addressed nine common questions about health care and health care costs. *Regence Blue Cross-Blue Shield of Oregon – Oregon.*

- As part of on-going labor negotiations, provided an independent analysis of a hospital systems financial health based on common financial indicators and health care spending forecasts. *SEIU Local 49 – Oregon.*

### *Public Policy*

- Estimating the potential economic impact of funding cuts to Oregon's courts. *Oregon Trial Lawyers Association – Oregon.*

- Performed a quantitative and qualitative analysis of the economic contributions of Oregon State University on the regional and state economies. *Oregon State University – Oregon.*

- Led a benefit-cost analysis that compared the economic benefits and costs of developing 300 acres of West Hayden Island into a port facility and restoring the remaining 500 acres to leaving all 800 acres in their current state. *City of Portland – Portland, OR.*

- Reviewed the economic literature and described potential impact of proposed income tax increase on taxable income and economic growth. *Oregon Business Council – Oregon.*

- Reviewed the economic literature on the effects of STEM education, conducted data analysis, and produces a simple economic model designed to help educate policy markers about the potential returns to investments in STEM. *Oregon Business Council – Oregon.*

- Developed a model and analyzed data to estimate gross revenues for video, voice, and data services at the city level. *League of Oregon Cities – Oregon.*

- Provided data collection services to determine garbage and yard debris can weights and set-out rates for Eugene residents. *City of Eugene – Eugene, OR.*

### Real Estate & Land Use

- Conducted a market analysis for a proposed real estate development in Belgrade, MT – *Confidential Client*

- Estimated the potential economic effects of future residential rural development on real estate values. *San Luis Obispo County – San Luis Obispo County, CA.*

- Analyzed the effect of Portland's Intertwine (a network of open spaces) on property values in the Portland-Vancouver metropolitan area using a hedonic regression analysis and data from county assessors' records. *Metro – Portland, OR.*

- With a team of researchers at Harvard University, analyzed the effect of local land-use regulations on housing supply and housing prices for 187 communities in Eastern Massachusetts. *Pioneer Institute for Public Policy Research – Massachusetts.*

- Detailed the sources of housing-price cycles at the neighborhood level. *Pioneer Institute for Public Policy Research – Boston, Massachusetts.*

- Applied the principles of benefit-cost analysis to help Clackamas County understand the full range of economic benefits and costs associated with improving its score on FEMA's Community Rating System. *University of Oregon – Clackamas County, OR.*

- Worked with emergency managers at the University of Oregon to identify the tradeoffs associated with various hazard mitigation and response plan options, gathered data to evaluate these tradeoffs, and helped calculate the economic benefits and costs associated with different options. *University of Oregon – Eugene, OR.*

## Academic Publications

"Events Across the Life Course Contribute to Higher Mobility Impairment Rates in Rural US." *Rural Disability and Community Participation*, *16648714*, 22. Ipsen, C., Ward, B., & Myers, A. (2022).

"Effects of an Exercise Intervention on Participation Reported by People with Disabilities: A Mixed Methods Randomized Trial." *Disability and Health Journal*, 101272. Ravesloot, C., Myers, A., Santasier, A., & Ward, B. (2022).

"Effects of a consumer driven home modification intervention on community participation for people with mobility disabilities." *Disability and Health Journal Greiman, L., Ravesloot, C., Goddard, K. S., & Ward, B. (2022).*

"Is the presence of home entrance steps associated with community participation of people with mobility impairments?" *Disability and Health Journal*, 101183. Ravesloot, C., Myers, A., Greiman, L., Ward, B., Shinnick, K., & Hall, J. (2021).

"Effects of a consumer driven home modification intervention on community participation for people with mobility disabilities." *Disability and Health Journal*, 101210. Greiman, L., Ravesloot, C., Shinnick-Goddard, K., & Ward, B. (2021).

"Health status changes with transitory disability over time." *Social Science & Medicine*, 244, 112647 Myers, A., Ward, B., Wong, J., & Ravesloot, C. (2020).

"Transitory and Enduring Disability Among Urban and Rural People." *The Journal of Rural Health*. Sage, R., Ward, B., Myers, A., & Ravesloot, C. (2019).

"Life starts at home: bathing, exertion and participation for people with disabilities." *Archives of Physical Medicine and Rehabilitation* Greiman, L., P. Fleming, B.Ward and C. Ravesloot.

"Disability Items From the Current Population Survey (2008-2015) and Permanent Versus Temporary Disability Status" *American Journal of Public Health.* 2017, Ward, B., A. Meyers, J. Wong, and C. Ravesloot.

"Why Stay Home? Ecological Momentary Assessment of a Community-Based Mixed Impairment Sample" *Disability and Health 9(2)*, Ravesloot, C, B.Ward, T. Hargrove, J. Wong, N. Livingston, L. Torma, C. Ipsen.

"Scale-up of Safe & Civil Schools' Model for school-wide positive behavioral interventions and supports." *Psychology in the Schools 53(4):339-358.* Smolkowski, K., Strycker, L., & Ward, B

"A Randomized Evaluation of the Safe and Civil Schools Model for Positive Behavioral Interventions and Supports at Elementary Schools in a Large Urban School District." *School Psychology Review* 42(3):317-333, Ward B. and R. Gersten. 2013,

"The Causes and Consequences of Land Use Regulation: Evidence from Greater Boston" *Journal of Urban Economics* 65(3): 265-278 Glaeser, E., and B Ward.

"The Effect of Low Impact Development on Property Values." *Proceedings of the Water Environment Federation, Sustainability 2008*, pp. 318-323 Ward, B., E. MacMullan, and S. Reich.

"Myths and Realities of American Political Geography." *Journal of Economic Perspectives*. Glaeser, E., and B. Ward. Spring 2006.

Regulation and the Rise of Housing Prices in Greater Boston. Glaeser, E., J. Schuetz, and B. Ward. Cambridge, MA: Rappaport Institute for Greater Boston, Harvard University, and Pioneer Institute for Public Policy Research. 2006.

"Distance and Social Capital: Can Isolation Be Good?," in *Social Interactions and Economics*, Ph.D Dissertation, Harvard University, March 2006.

"Does Reunion Attendance Affect Alumni Contributions?: Evidence from the Harvard College Classes of 1990-1999," in *Social Interactions and Economics*, Ph.D Dissertation, Harvard University, March 2006.

## Other Publications

Economic Effects of Medicaid Expansion in Montana: 2023 Update, January 2023

"The Future of Montana: What the new wave of in-migration means for the state." *Montana Business Quarterly* (Winter 2022)

"Americans are spending more time alone. Here's why we should reverse that." *Washington Post* (November 23, 2022)

The Economic Effects of Medicaid Expansion in Montana, January 2021

The State of Missoula's Workforce. *Missoula Economic Partnership.*

The Impact of Medicaid Expansion on States' Budgets. *Commonwealth Fund.*

Research and Training Center on Disability in Rural Communities. (April 2020). How will the COVID-19 Recession Impact People with Disabilities in Rural America? Missoula, MT: The University of Montana, Rural Institute for Inclusive Communities.

Ward, B., C. Ipsen, L. Greiman, and L. Smith (2019). *ACA and Medicaid Expansion Associated with Increased Insurance Coverage for Rural Americans with Disabilities.*

*The Economic Impact of Medicaid Expansion in Montana: Updated findings*, January 2019.

"Rural people with disabilities are still struggling to recover from the recession." *The Conversation* Greiman, L. A. Myers, B. Ward, and C. Ipsen. January 2019.

*The State of Entrepreneurship in Montana,* August 2018.

*The Economic Impact of Medicaid Expansion in Montana*, April 2018.

"Tackling Montana's Workforce Shortage: If you want answers, talk with workers." *Montana Business Quarterly*, Spring 2018.

"Poverty With a View" *Montana Business Quarterly*, Winter 2018.

"Affordable Housing in Montana: Are We Pricing Out Our Residents?" *2018 Montana Economic Report.*

"Health Care: Recent Trends in Health Care Spending." *2018 Montana Economic Report.*

"Barriers to Women's Entrepreneurship" *Montana Business Quarterly*, Summer 2017.

"The High Wage Jobs Puzzle: Finding Montana's Place in the New Geography of Jobs." *2017 Montana Economic Report.*

"Health Care: More Change and Uncertainty" *2017 Montana Economic Report.*

"Building Missoula's Entrepreneurial Ecosystem" *Missoulian* January 29, 2017.

"Picking the Right College" *Montana Business Quarterly*, January 2017.

"The Curse of the College Town" *Montana Business Quarterly*, September 2016.

"Higher Education: Explaining the Outmigration of Montana's College-Educated Workers" *Montana Economic Report 2016.*

"Expanding Medicaid in Montana: What do the experiences of other states tell us?" *Montana Economic Report 2016.*

"Health Care: Spending hits a speed bump" *Montana Economic Report 2016.*

"Who might get Medicaid if Montana expands eligibility." BBER Issue Brief 2015.

"Health Care: A system in transition." BBER 2015 Outlook Briefing Book.

"Future Needs a Sound Foundation." *The Register-Guard.* Ward, B., E. Whitelaw, and P. Taylor. March 17, 2013.

"Bend's True Economic Picture May Surprise You." *The Bulletin.* Ward, B., E Whitelaw, and P. Taylor. February 21, 2013

"Oregon education reform: Clues to the success of overachieving schools lie in the data" *Oregonian.* Tapogna, J, A. Dyke, and B. Ward. August 11, 2012.

"Economic Bridges Falling Down." *Eugene Weekly.* Ward, B. and E. Whitelaw. October 8, 2008.

"The Economy: Now What? The Economists: Ward and Whitelaw" *Oregonian*, Ward B. and E. Whitelaw. September 20, 2008.

"Dream On." *Oregon Quarterly.* Ward, B. and E. Whitelaw. Winter 2007.

"Still the Land of Opportunity?" *Oregonian.* Tapogna, T., B. Ward, and E. Whitelaw. March 2006.

"The Price Is (Not) Right." *Commonwealth: Growth and Development Extra.* Glaeser, E., J. Schuetz, and B. Ward. January 2006.

## Presentations

"The Future of Montana." University of Montana Bureau of Business and Economic Research 2023 Economic Outlook Seminar. January-February 2023.

"Montana's Economy: What's going on and how do we do better?" Montana University System. December 2022.

"Missoula's economic challenges: Looking back and looking forward" Missoula Economic Partnership Annual Meeting. October 2022

"Getting to Happily Ever After in Small Business Valuation." Montana Tax Institute. October 2022.

"Montana's Economy: The post-COVID rollercoaster." State Bar of Montana Annual Bankruptcy Seminar. July 2022.

"Defining the issue: Workforce." Big Sky Business Innovation Summit. May 2022.

"Why is it so hard to hire? Where are all the workers?" Glacier Country Tourism Summit, November 2021.

"The simple story of the COVID economy." State Bar of Montana Annual Bankruptcy Seminar, August 2021.

"Racial and ethnic inequity: Understanding and addressing local government's contribution." University of Montana Public Service Academy, August 2021.

"The economy is going crazy!!! What's going on?" Missoula Gives, May 2021.

"Missoula's economy: What's going on and how can we do better?" Missoula Economic Partnership, December 2020.

"How to grow a bioscience cluster." Big Sky Business Innovation Summit, October 2020.

"The COVID economy: Where are we now, and where might we be headed?" State Bar of Montana Annual Bankruptcy Seminar, August 2020.

"Potential impacts of the coronavirus on the economy." Missoula Marketwatch, March 2020.

"Montana's Economy: What's going on and how can we do better?" State Bar of Montana Annual Bankruptcy Seminar, August 2019.

"The Economics of Addiction in Montana" Montana Opioid & Addictions Summit, October 2018.

"The economic impact of Medicaid expansion in Montana." State Chamber of Oklahoma Health Care Summit, October 2018.

"The State of Entrepreneurship in Montana." Montana Chamber of Commerce 2018 Economic Update Series, August 2018.

"Better off in Billings – Data for talent attraction" Billings' Workforce Council Annual Meeting, April 2018.

"Healthcare in Montana: Can consumer centrism move us closer to the ideal?" *Healthcare at a Crossroads*, Healthcare policy conference, Montana State University, April 2018.

"An economist's perspective on pulmonary health." *Big Sky Pulmonary Conference*, March 2018.

"Is single-payer the solution (or part of the solution) to our healthcare problems?" Missoula League of Women Voters Forum, March 2018.

"The Future of Higher Education" Bureau of Business and Economic Research 2017 Economic Outlook Seminar Tour (Jan-Mar 2018)

"Ugh! This is awful!: The economic consequences of wildfire smoke." State of Missoula, January 2018.

"The Contribution of Health Care to Montana's Economy" Montana Tax Payer Association Annual Conference, December 2017.

"Missoula's economy: What's going on and how can we do better?" Leadership Missoula, November 2017.

"Understanding and mitigating the economic costs of cancer." Montana Cancer Action Network Policy Conference, Keynote Address, November 2017.

"Montana's economy: What's going on and how can we do better?" Missoula Federal Credit Union Board Retreat, October 2017.

"How to build a regional economy: the role for talent attraction." Montana Economic Developers Association Fall Conference, October 2017.

"The significance of health care to Western States' economies" Western States Association of Tax Administrators Conference, October 2017.

"A health economist's view of the world and Mountain Pacific Quality Health's role in it." Mountain Pacific Quality Health Foundation Board Meeting, August 2017.

"Building Montana's Health Care Workforce: The role of talent attraction." Innovate Montana Symposium, July 2017.

"Meet Me in Montana: Developing Talent Attraction Tools for Montana" BillingsWorks, April 2017.

"The High Wage Jobs Puzzle: Finding Montana's Place in the New Geography of Jobs" Keynote Address: Bureau of Business and Economic Research 2017 Economic Outlook Seminar Tour; Montana Society of CPAs Industry Conference, Jan – Mar 2017.

"The Contribution of Health Care to Montana's Economy" Bureau of Business and Economic Research 2017 Economic Outlook Seminar Tour (Jan-Mar 2017)

"Life Starts at Home: Linking Home Environment and Quality of Life for People with Disabilities." Affordable and Accessible Housing for Vulnerable Older Adults and People with Disabilities Living in the Community: A Workshop, National Academies of Science, Engineering, and Medicine, 12/2016.

"Missoula's Economy: A Framework" Missoula Economic Partnership, 10/2016; Missoula City Council Committee of the Whole 12/2016.

"The Contribution of Health Care to Flathead County (MT)'s Economy." Kalispell Chamber of Commerce, 8/2016

"Time Use at Home and in the Community." National Association for Rehabilitation Research and Training Centers Annual Conference, 5/2016

"Housing Characteristics, Home Experiences, and Community Engagement of People Who Report Impairment." RTC: Rural State of the Science webinar, 6/2016.

"Finding Missoula's Place in the New Geography of Jobs." Missoula Rotary Club, 6/2016.

"Employment Outcomes for Montana University System Graduation: Evidence from Administrative Data." University of Montana School of Business Administration, 10/2015.

"Moving beyond time and money: The effect of effort scarcity on individual choices." University of Montana, Department of Economics Seminar, 11/2015.

"Understanding and Increasing Women's Participation in Pre-Entrepreneurial Activities" University of Montana School of Business Administration. 4/2016

"Health Care in Montana: The next 10 years" 2016 BBER Economic Outlook.

"Economic Impact of the Western Montana Family Residency" Western Montana Family Medical Residency Board Meeting, 10/2015

"Revisiting the Economic Impacts of Medicaid Expansion" Association of University Business and Economic Research (AUBER) Fall Conference, 10/2015

"The Future of Health Care Costs – Impacts on your business" – Blue Cross Blue Shield of Montana Employer Summit (Keynote) 8/2015.

"Eight Questions about Health Economics" Healthcare Financial Managers Association (Keynote) 4/2015.

"Healthcare Headlines: Changing Access, Managing Costs, Improving Quality." 2015 BBER Economic Outlook.

"Recent trends in the microeconomics of family medicine practices." Didactic presentation to Family Medicine Residency of Western Montana 1/2015.

"The economics of Medicaid Expansion in Montana." Montana Health Care Forum. 12/2014

"A Primer on Health Care Costs: Brief answers to nine important questions." Didactic presentation to Family Medicine Residency of Western Montana 11/2014

"The contribution of health care to Billings' Economy: Final Report." Big Sky Business Healthcare Summit 11/2014

"The Culture of Non-Work?: Quality of Life and the College Educated Workforce in Oregon." Association of University Business and Economic Research (AUBER) Fall Conference, 10/2014.

"Health and Health Care in Montana." Montana Healthcare Foundation Board of Trustees 8/2014

"The economic impact of health care on Billings' economy" Big Sky Business Healthcare Summit 7/2014

"The contribution of health care to Billings' economy." Big Sky Business Healthcare Summit 7/2014

"The contribution of health related industries to Billings' economy." Big Sky Business Healthcare Summit 7/2014

"The future of healthcare in Billings." Big Sky Business Healthcare Summit 7/2014

"Economic Contribution of Health Care to Rural Economies." Northern Rockies Health Care Innovation Summit, Fairmount, MT, June 10, 2014

"Assessing the Health of the Missoula Economy." National Association of Insurance and Financial Advisors, Missoula, 5/2014.

"'Your Voice, Your Vote: Debt-ceiling deadline." KATU News. October 2013.

"Jobs and Economy Forum." Oregon Summit. October 2013.

"Oregon's Economy: Mixed Symptoms" Testimony before Oregon House Committee on Transportation and Economic Development. February 2013.

"Polka Dots and Stripes: Mismatch Between Supply and Demand in a Changed Economy." Housing Land Advocates Conference. Portland, Oregon. September 14, 2012.

"Eugene-Springfield's economy" Eugene City Club. Eugene, OR. July 13, 2012.

"Economic Growth, Natural Capital, and Sustainability." CLE presentation. Portland, Oregon. April 11, 2012.

"Benefits and Costs of Seismic Mitigation." January 19, 2011. CREW Benefit-Cost Analysis Forum. Eugene, Oregon.

"Does Low-Impact Development Affect Property Values?: Evidence from Seattle's Natural Drainage System Projects." Water Environment Foundation Sustainability 2008 Conference. June 2008.

"Compensation for ROW Access Under the Telecommunications Act of 1996: Fiscal Issues Related to Communications Services." NATOA 27th Annual Conference. Sponsored by the National Association of Telecommunications Officers and Advisors. Portland, Oregon. October 2007.

"Outside the Light: The real factors driving Eugene/Springfield's Economy." Eugene-Springfield Leadership Program. Sponsored by the Eugene Area Chamber of Commerce. Eugene, Oregon. October 2006.

"Deregulating the Housing Market." Preserving the American Dream Conference. Sponsored by the American Dream Coalition. Atlanta, Georgia. September 2006.

## Teaching

Instructor, University of Montana; Course: Social Networks and Social Skills, Spring 2020.

Visiting Adjunct Instructor, Portland State University; Courses: Global Environmental Economics, Spring 2010.

Visiting Assistant Professor, Lewis and Clark College; Courses: Intermediate Microeconomic Theory, Econometrics, Public Economics, Environmental and Natural Resource Economics, Spring 2008 & Fall 2009.

Visiting Adjunct Instructor, University of Oregon; Courses: Labor Economics, Spring 2009.

Tutorial Leader, Harvard College; Courses: Everybody's Doin' It: Social Interactions and Economics, 2002-2006, Senior Thesis Tutorial: Labor, 2004-05.

Teaching Fellow, Harvard University; Courses: Intermediate Microeconomic Theory, Intermediate Macroeconomic Theory, Microeconomics: A Policy Tool for Educators, 2001-2003.

Teaching Assistant, University of Oregon; Courses: Principals of Microeconomics, Urban Economics, Economy of the Pacific Northwest, 1998-1999.

**Memberships**

- Maureen and Mike Mansfield Center, Advisory Board, 2021-Present.
- Mountain-Pacific Quality Health Foundation, Board of Directors, 2014-2020
- Oregon Seismic Safety Policy Advisory Commission (OSSPAC), 2012-2013.

# Bryce Ward Expert Testimony During the Last Four Years: Annotated Summary

Prepared Feb. 2023

| Case Summary | Client | Year | Court Case or Hearing | Testimony |
|---|---|---|---|---|
| Testified regarding economic damages in personal injury case | Bennett & Heyman, P.A. | 2020-2022 | Devin v. Southern Oregon Orthopedic Group, et al. | Trial 6/27/22 |
| Reviewed and commented plaintiff's experts' lost wage and benefits calculation in a wrongful termination case. | Winterbauer & Diamond | 2021-ongion | Spry v. Costco Wholesale Company, et al | Report 2/26/2021<br><br>Deposition: 3/10/2021 |
| Provided opinions on the economics and costs/benefits of union release time and to evaluated plaintiffs' expert report. | Sherman & Howard/Martin & Bonnett | 2020-21 | Gilmore and Harder v. Gallego, Zuercher, City of Phoenix, and AFSCME Local 2384 | Report 9/18/2020<br><br>Deposition 1/4/2021 |
| Conducted analysis and provided testimony at trial based on a statistical analysis of cargo handling at Port of Portland Terminal 6. | Schwabe Williamson & Wyatt, PC<br><br>Portland, OR | 2013-ongoing | ILWU v. ICTSI, Oregon. | Report 11/11/2013<br><br>Trial 11/20/2013<br><br>Report 10/26/2018<br><br>Trial 10/2019-11/2019 |